## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C.
c/o Washington Lawyers' Committee for Civil
Rights & Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005,

TONI SANDERS
c/o Washington Lawyers' Committee for Civil
Rights & Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005,

J.N.C., through his mother Demetria Bright,
c/o Washington Lawyers' Committee for Civil
Rights & Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005,

KISHON MCDONALD
c/o Washington Lawyers' Committee for Civil
Rights & Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005,

GARRETT BOND
c/o Washington Lawyers' Committee for Civil
Rights & Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005,

and

KEARA SCALLAN
c/o Washington Lawyers' Committee for Civil
Rights & Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005,

        Plaintiffs,

   v.

Case No.

**JURY TRIAL DEMANDED**

1

DONALD J. TRUMP
President of the United States of America
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500,

WILLIAM P/ BARR
Attorney General of the United States
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

MARK ESPER
Secretary of Defense of the United States
1000 Defense Pentagon
Washington, D.C. 20301-1000,

GREGORY T. MONAHAN
Acting Chief of the United States Park Police
1100 Ohio Drive, S.W.
Washington, D.C. 20242,

JAMES M. MURRAY
Director, U.S. Secret Service
950 H Street, NW, Suite 7800
Washington, D.C. 20223,

MAJOR GENERAL WILLIAM J. WALKE
Commanding General of the District of
Columbia National Guard
2001 E. Capitol Street, S.E.
Washington, D.C. 20003,

GENERAL JAMES C. MCCONVILLE
Chief of Staff of the United States Army
200 Army Pentagon
Washington, D.C. 20310-0200,

JOHN DOES 1 – 100,

and

JOHN POES 1-20,

                    Defendants.

**COMPLAINT**

**(for injunctive relief and damages; violation of First Amendment rights, Fourth Amendment rights, and conspiracy to violate civil rights)**

1.       This case is about the President and Attorney General of the United States ordering the use of violence against peaceful demonstrators who were speaking out against discriminatory police brutality targeted at Black people.

2.       Just after 8:00 pm on May 25, 2020, George Floyd, a forty-six-year-old father, son, brother, and African American man was accused of a non-violent offense and arrested by the Minneapolis police. In the process of his arrest, Mr. Floyd was handcuffed and fell to the pavement. Less than ten minutes after the police arrived, a police officer who participated in Mr. Floyd's arrest placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground. For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief. Other officers held his legs or stood by and watched while he died. Among Mr. Floyd's final words were "please, please, please, I can't breathe." These words are reminiscent of the words spoken by Eric Garner before he was killed by a New York City police officer in 2014, which have since become a tragic rallying cry for people seeking to address racial inequities and reform the American criminal justice system. These are some of the words that a group of peaceful demonstrators chanted on June 1, 2020, in Lafayette Square, across the street from the White House in Washington, D.C.

3.       On June 1, 2020, a group of demonstrators, including Plaintiffs, gathered peacefully in Lafayette Square to protest the gross, systemic injustices perpetrated by law enforcement against Black people in the United States, exemplified by the recent brutal murders of George Floyd and Breonna Taylor, a Black woman who was shot eight times and killed in March 2020 by three Louisville police officers who entered her home in the middle of the night

without knocking. This was a continuation of protests in Washington, D.C. and elsewhere since Mr. Floyd's killing. Without provocation, Defendants directed their agents in the U.S. Secret Service, U.S. Park Police, D.C. National Guard, and U.S. Military Police to fire tear gas, pepper spray capsules, rubber bullets and flash bombs into the crowd to shatter the peaceful gathering, forcing demonstrators to flee the area. Many peaceful demonstrators were injured, some severely, by this unprovoked attack.

4.      Defendants had no legitimate basis to destroy the peaceable gathering. Defendants professed purpose – to clear the area to permit the President to walk to a photo opportunity at a nearby church – was a wholly illegal reason for abridging the constitutional rights of Plaintiffs and the others assembled in Lafayette Square. Indeed, the President has consistently demonstrated hostility towards viewpoints different than his own, and in the days and moments leading up to the attack, expressed his intent to violently attack protesters and "dominate" them.

5.      The Department of Justice has officially acknowledged that Defendant Barr ordered Lafayette Square cleared minutes before the assault started. Defendant Barr issued this order following a series of statements from Defendant Trump in the days and hours leading up to this attack in which he clearly threatened to use and encouraged violence against protestors.

6.      The police violence that Plaintiffs and other lawful, peaceful demonstrators were met with on June 1, 2020 is a continuation of an unlawful history of oppression of civil rights activists. The peaceful assembly of people seeking systemic change in the criminal justice system, like the assembly of Plaintiffs and others on June 1, 2020, in Lafayette Square, is based on a decades-old history of civil rights activism in this nation. Following the long tradition of those who marched for voting rights on Sunday, March 7, 1965, in Selma, Alabama,[1] Plaintiffs

---

[1] Ronald J. Krotoszynski, Jr., "Celebrating Selma: The Importance of Context in Public Forum Analysis," 104 Yale L.J. 1411 (1995).

seek to address racial inequities. But like that "Bloody Sunday" fifty-five years ago, Plaintiffs'

peaceful, lawful assembly was met by police violence.

7.     For Defendants to describe their actions as "domination" is telling. To dominate is

to establish supremacy by subjugation of others. It is precisely such domination – in the form of

centuries of white supremacy and subjugation of Black lives – that was the core focus of the

peaceful demonstration in Lafayette Square. Just as in Tulsa,[2] Scottsboro,[3] Anniston,[4]

Birmingham,[5] Selma,[6] Philadelphia,[7] Los Angeles,[8] Ferguson,[9] New York City,[10] Baltimore,[11]

Minneapolis,[12] and countless other times in our nation's bloody history, the Lafayette Square

assault was violence against Black people and their supporters committed by state actors. What

---

[2] Alicia Lee and Sara Sidner, *99 years ago today, America was shaken by one of its deadliest acts of racial violence*, CNN, June 1, 2020, https://www.cnn.com/2020/06/01/us/tulsa-race-massacre-1921-99th-anniversary-trnd/index.html.

[3] N. Jeremi Duru, *The Central Park Five, the Scottsboro Boys, and the Myth of the Bestial Black Man*, 25 CARDOZO L. REV. 1315, 1334 (describing state violence against nine black boys accused of raping two white women in 1931; while the women eventually recanted and confessed to making up the story the "Scottsboro boys" spent years in prison).

[4] Terri Gross, *Get On the Bus: The Freedom Riders of 1961*, NPR, Jan. 12, 2006, https://www.npr.org/2006/01/12/5149667/get-on-the-bus-the-freedom-riders-of-1961 (describing a white mob's attack a bus of freedom riders in 1961, while the city government remained unresponsive).

[5] Steven H. Hobbs, Alabama's Mirror: The People's Crusade for Civil Rights, 6 Ala. C.R. & C.L. L. Rev. 1, 2 (describing the 1963 attack on African-American children who were marching peacefully for civil rights by Birmingham Commissioner of Public Safety Eugene "Bull" Connor).

[6] J. Gerald Hebert & Renata E. B. Strause, *The Future of the Voting Rights Act*, 64 RUTGERS L. REV. 953, 953–54 (2012) (describing how police attacked civil rights activists calling for equal voting rights in Selma, Alabama in 1965).

[7] Lindsey Norward, *The day Philadelphia bombed its own people*, Vox, Aug. 15, 2019, https://www.vox.com/the-highlight/2019/8/8/20747198/philadelphia-bombing-1985-move.

[8] Cydney Adams, *March 3, 1991: Rodney King beating caught on video*, CBS NEWS, Mar. 3, 2016, https://www.cbsnews.com/news/march-3rd-1991-rodney-king-lapd-beating-caught-on-video/.

[9] Dep't of Justice, *"Department of Justice Report Regarding the Criminal Investigation Into the Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson,"* Mar. 4, 2015. https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/doj_report_on_shooting_of_michael_brown_1.pdf.

[10] Joseph Goldstein & Marc Santora, *Staten Island Man Dies From Chokehold During Arrest, Autopsy Finds*, N.Y. TIMES, Aug. 1, 2014, https://www.nytimes.com/2014/08/02/nyregion/staten-island-man-died-from-officers-chokehold-autopsy-finds.html.

[11] Leah Donnella, Reflecting On The Death Of Freddie Gray, One Year Later, NPR, Apr. 20, 2016, https://www.npr.org/sections/codeswitch/2016/04/20/474668796/reflecting-on-the-death-of-freddie-gray-one-year-later.

[12] Chris McGreal, *Dispatch from Minneapolis: the night the city cracked down on George Floyd Protests*, THE GUARDIAN (May 31, 2020), https://www.theguardian.com/us-news/2020/may/31/minneapolis-george-floyd-protests-saturday-crackdown

differentiates the actions here from the others is that the President and Attorney General of the United States ordered the violence.

8.      Defendants' actions to shut down the Lafayette Square demonstration is the manifestation of the very despotism against which the First Amendment was intended to protect. This action seeks to uphold, against uncivil, unwarranted, unjust, and blatantly unlawful attack, cherished rights enshrined in the First and Fourth Amendment to the Constitution and foundational to our Democracy: the rights to peaceful assembly, petition for redress of grievances, freedom of speech, freedom of the press, and freedom from unwarranted seizures by the government.

## PARTIES

9.      Plaintiff Black Lives Matter DC ("BLMDC") is a District of Columbia limited liability corporation. As the local chapter of the nationwide "Black Lives Matter" movement, BLMDC organizes against systemic racism—in particular the racially disproportionate use of state-sanctioned violence against the Black community—through protests, public accountability campaigns, coalition-building, and other programming. Members of BLMDC were demonstrating in Lafayette Square on June 1, 2020.   Other members of BLMDC were engaged in cop-watch activities and in providing aid to demonstrators.

10.      Plaintiff Toni Sanders is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020 with her 9-year-old stepson, Plaintiff J.N.C., who proceeds here through his mother and next friend Demetria Bright.

11.      Plaintiff Kishon McDonald is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

12.      Plaintiff Garrett Bond is a resident of Maryland who was demonstrating peaceably in Lafayette Square on June 1, 2020.

13.    Plaintiff Keara Scallan is a resident Washington, D.C., who was demonstrating peaceably in Lafayette Square on June 1, 2020.

14.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. He was personally responsible for the actions complained of in this lawsuit.

15.    Defendant William Barr is the Attorney General of the United States. He is sued in his individual and official capacity. He personally issued the order that resulted in the unlawful actions complained of in this lawsuit.

16.    Defendant Mark Esper is the U.S. Secretary of Defense. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. armed forces, including U.S. Military Police officers.

17.    Defendant Gregory T. Monahan is the Acting Chief of the United States Park Police. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. Park Police officers.

18.    Defendant James M. Murray is the Director of the U.S. Secret Service. He is sued in his official capacity. In that capacity, he is responsible for the actions of Secret Service agents.

19.    Defendants Major General William J. Walker, is the Commanding General of the District of Columbia National Guard. He is sued in his official capacity. In that capacity, he is responsible for the actions of the D.C. National Guard troops.

20.    Defendant General James C. McConville is the Chief of Staff of the United States Army. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. Army troops, including U.S. Military Police officers.

21.    Defendants John Does 1-100 are officers of the U.S. Park Police, agents of the U.S. Secret Service, members of the U.S. Armed Forces, officers of other federal law

enforcement agencies, and other federal government officials who authorized, planned, or participated in the attack on peaceful protesters in and near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

22.     Defendants John Poe 1 – 20 are officers of the Arlington County Police Department and other non-federal law enforcement officials who participated in the attack on peaceful protesters in and near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

## JURISDITION AND VENUE

23.     The Court has subject matter jurisdiction over this case under 28 U.S.C. §1331 because this action presents federal questions and seeks to redress the deprivation of rights under the First and Fourth Amendment to the U.S. Constitution, and under 28 U.S.C. §1343 because this action seeks to redress the deprivation of rights pursuant to 42 U.S.C. §§1985 - 1986.

24.     Venue is proper in this District under 28 U.S.C. §1391(e)(1) because all of the events giving rise to the claims took place in this District of Columbia.

## FACTUAL BACKGROUND

25.     Beginning on May 29, 2020, demonstrators began to gather daily in Lafayette Square to protest police brutality against Black people in the United States of America, and specifically the recent murders of George Floyd, a Black man killed by police officers, and Breonna Taylor, a Black woman killed by police officers who broke inter her home and shot her without provocation or reason. Lafayette Square is located directly across Pennsylvania Avenue from the White House and is a public venue frequently and historically used by activists to protest and exercise First Amendment rights. As a public park, and as *the* public park closest to the White House, Lafayette Square is a traditional public forum where First Amendment rights are at their apex.

26.     From May 29, 2020 through May 31, 2020, large crowds of thousands of people gathered in front of the White House in Lafayette Square. Multiple federal police forces gathered to respond to the protests including, at least, the Secret Service and D.C.'s Metropolitan Police Force. Over the course of these three days, law enforcement tactics escalated: they arrested protesters, used riot shields, and released tear gas, increased the presence of federal police presence, and used flash bombs, and rubber bullets.

**President Trump Has Made Clear His Intent to Infringe on Demonstrators' Constitutional and Civil Rights.**

27.     In the days and hours leading up to the events of June 1, 2020, President Trump repeatedly advocated the use of force against Black demonstrators and civil rights activists who were protesting in D.C. and around the nation.

28.     On May 29, President Trump posted on social media about the protests, stating that "when the looting starts, the shooting starts," which is a racist slogan used by a former Miami police chief Walter Headley in 1967 to advocate for police brutality and discriminatory practices targeting African Americans. Barbara Sprunt, *The History Behind 'When the Looting Starts, the Shooting Starts'*, NPR (May 29, 2020).[13] On the same day, President Trump issued a tweet describing all protesters as "THUGS."

29.     On May 31, President Trump tweeted, "These people [civil rights protesters] are ANARCHISTS. Call in our National Guard NOW."

30.     On May 31, after a series of tweets about the protests, President Trump retweeted a tweet stating that "This isn't going to stop until the good guys are willing to use overwhelming force against the bad guys.".

---

[13] Barbara Sprunt, *The History Behind 'When the Looting Starts, The Schooting Starts'*, NPR, May 29, 2020, https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts.

31.     On June 1, prior to the violent attack on the demonstrators, President Trump had a conference call with governors. On this call, he urged the governors to take much harsher action, "dominate your city and your state." He then issued an ominous warning of what was to come in a few short hours: "In Washington we're going to do something people haven't seen before."

32.     During the call, in the context of a discussion about arrests, when South Carolina Governor Henry McMaster stated that "I think we have to be careful, but we've got to be tough," President Trump corrected him, stating that "You don't have to be too careful."

33.     On the call with governors, Secretary of Defense Esper said that governors needed to "dominate the battle space," where the so-called "battle space" is the streets of the United States of America where people had gathered to peaceably protest.

34.     On the same day, President Trump told senior advisors that they had to show that they could control the streets of Washington and the area around the White House. A Justice Department spokesperson said that President Trump directed Attorney General Barr to personally lead the response to the unrest.

35.     At the same time law enforcement officers were violently attacking demonstrators in Lafayette Square, President Trump gave remarks in the White House Rose Garden. He painted all the demonstrators as violent and vowed to take immediate action against them, stating "I have strongly recommended to every governor to deploy the National Guard in sufficient numbers that we dominate the streets." and "[if] a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them." Statement by the President, Whitehouse.gov (June 1, 2020 6:43 PM).[14]

---

[14] Statement by the President, Whitehouse.gov, June 1, 2020 6:43 PM, https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/

36.     President Trump's statements about Black demonstrators and civil rights activists were markedly different from his comments about other demonstrators. President Trump has routinely been sympathetic to protesters whose views align with his own.

37.     For example, just one month ago, President Trump expressed support when heavily armed and predominantly white demonstrators threatened lawmakers and stormed statehouses to object to coronavirus stay-at-home rules. In response to the 2017 white nationalist Unite the Right rally in Charlottesville, Virginia, President Trump said, "You had very fine people, on both sides."

38.     President Trump is even happy to have demonstrators in Lafayette Square so long as their message aligns with his views. On May 30, while criticizing the protestors outside the White House, he specifically encouraged his supporters to engage in a counter-demonstration, tweeting: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"

**Violent Attacks on Demonstrators in Lafayette Square**

39.     On June 1, 2020, Plaintiffs and other civil rights activists assembled in Lafayette Square in Washington, D.C. to protest police brutality against Black people. Members and supporters of Plaintiff Black Lives Matter D.C. and Plaintiffs Sanders, J.N.C., McDonald, Bond, and Scallan assembled peacefully in Lafayette Square.  People present in Lafayette Square, including Plaintiffs, chanted "I can't breathe" in remembrance of George Floyd's last words, knelt, raised their hands up, and engaged in other legal activities to protest police brutality against Black people.

40.     Plaintiffs and other civil rights activists were exercising their First Amendment right to assemble, speak, and petition the government in Lafayette Square. Plaintiffs and other

civil rights activists were engaging in political speech to address, through the exercise of their constitutional rights, the infection of overt and systemic racism in the American criminal justice system. Black people are arrested at twice the rate of their population, detained pretrial at a rate three-and-a-half times higher than white people, and imprisoned at a rate of almost six times that of white people. Black people are three times more likely to be killed by the police than white people. This is part of the system that Plaintiffs seek to change.

41.     Law enforcement officers from local and federal law enforcement agencies and the military surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square. This included, at least, U.S. Park Police, Arlington County Police, U.S. Secret Service, D.C. National Guard, and military police from the 82nd Airborne Division of the U.S. Army.

42.     At 6:03 pm, approximately 30 minutes before attacking the assembled demonstrators, law enforcement officers donned gas masks in preparation for their deployment of tear gas, smoke canisters, and/or pepper spray and pepper balls against Plaintiffs and other civil rights activists.

43.     At approximately 6:08 pm, Defendant Barr entered Lafayette Square.

44.     At 6:10 pm, Defendant Barr was behind the law enforcement officials in Lafayette Square pointing north towards St. John's Church. The Department of Justice subsequently acknowledged that Defendant Barr personally ordered that Lafayette Square be cleared.

45.     At approximately the same time, White House Deputy Chief of Operations Tony Ornato contacted the Secret Service to notify them that President Trump planned to make an appearance outside St. John's Church. The Secret Service requested other law enforcement agencies to assist clearing the area.

46.     Additional law enforcement officers appeared at the demonstration and began to stand in double lines, wearing shields and other riot gear.

47.     At approximately 6:30 pm, law enforcement officers rushed and attacked the assembled protesters without warning or provocation, climbing and jumping over barriers behind which the demonstrators were standing.

48.     Plaintiffs did not hear law enforcement officers asking the demonstrators to disperse or leave the Lafayette Square.

49.     Plaintiffs did not hear law enforcement officers issue any warnings before using force to remove demonstrators from Lafayette Square.

50.     Law enforcement officers used force to disrupt the protest and drive Plaintiff and other activists out of Lafayette Square. Officers fired flash-bang shells, tear gas, smoke canisters, pepper balls, and/or rubber bullets into the crowd.[15]

51.     Police canisters gathered after the demonstration confirm that officers used tear gas. Nathan Baca, a reporter with WUSA9, tweeted on June 4, 2020: "Breaking: police canisters gathered by @wusa9 crews Monday night show federal police DID use artificial CS tear gas in addition to natural OC gas on #BlackLivesMatter."  These photographs accompanied the tweet:

---

[15]*See* Ashley Parker, Josh Dawsey & Rebecca Tan, *Inside the Push to Teargas Protesters Ahead of a Trump Photo Op*, Wash. Post, June 1, 2020, https://www.washingtonpost.com/politics/inside-the-push-to-tear-gas-protesters-ahead-of-a-trump-photo-op/2020/06/01/4b0f7b50-a46c-11ea-bb20-ebf0921f3bbd_story.html; . Reuters, *Graphic Warning: Peaceful Protesters Fired at with Tear Gas, Rubber Bullets by U.S. Military Police*, YouTube, June 1, 2020, https://www.youtube.com/watch?v=UrMoqSPZym0; Dan Zak et al., *'This Can't Be Happening': An Oral History of 48 Surreal, Violent, Biblical Minutes in Washington*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/lifestyle/style/this-cant-be-happening-an-oral-history-of-48-surreal-violent-biblical-minutes-in-washington/2020/06/02/6683d36e-a4e3-11ea-b619-3f9133bbb482_story.html.

  

*[Image description:  three silver canisters with labels identifying them a "SPEDE-HEAR CS Long Range 150 YD"; serial numbers, and "SKAT SHELL."]*

52.     The officers hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields. The police action "injected danger into what had been a calm protest as those in the street fled mounted police to avoid being trampled, struck by projectiles or gassed."[16]

53.     Law enforcement officers attacked the civil rights activists with no warning, forcefully ejecting them from Lafayette Square, and pursued them for several blocks thereafter.

54.     Law enforcement officers also made unprovoked assaults on journalists in Lafayette Square who were reporting on the protests. The reporting of these journalists spread the voice of the demonstrators to the world.

55.     Defendants began their attack well before the 7:00 pm curfew.

56.     By the morning of June 3, 2020, federal law enforcement officers blocked access to Lafayette Square entirely, setting up a perimeter on I Street NW between 15th Street NW and 17th Street NW. Lafayette Square is situated just south of H Street NW between 15th Street NW and 17th Street NW and can be accessed from any of those streets. The perimeter prevents demonstrators from using any of the entrances and from demonstrating in Lafayette Square.

---

[16] Jonathan Allen, Dartunorro Clark & Rebecca Shabad, *Police, National Guard Clash with Protesters to Clear Streets Before Trump Photo Op*, NBC News, June 1, 2020, https://www.nbcnews.com/politics/politics-news/after-night-significant-damage-d-c-mayor-bowser-imposes-earlier-n1221126.

Because of this perimeter, there is no place for demonstrators to gather within sight of the White House.

### Defendants' Illegal Actions Caused and Are Causing Injuries to Plaintiffs

### Plaintiff Black Lives Matter D.C.

57.     Plaintiff Black Lives Matter D.C.'s mission is to end systemic racism, in particular the racially disproportionate use of state-sanctioned violence against the Black community. BLMDC achieves this mission, through protests, public accountability campaigns, coalition-building, and other programming.

58.     BLMDC pursued its mission in the days since the death of George Floyd by directing members and individuals affiliated with the organization to attend protests throughout D.C. The organization sponsored an event on May 30, 2020 in which a caravan of cars drove through D.C. and protestors held signs and made statements raising awareness of police violence and racial justice issues. BLMDC has also provided first aid supplies, snacks, and water to demonstrations arranged by other organizations, while also assisting those organizations by coordinating with them to ensure that, at the events, there are legal observers and individuals prepared to record police officers who commit unlawful actions.

59.     On June 1, 2020, BLMDC provided snacks, masks, waters, and fliers that were disseminated at the Lafayette Square demonstrations. BLMDC also dispatched members to record any officer misconduct and ensured that the demonstration had legal observers present.

60.     Multiple members of BLMDC were standing in or near Lafayette Square at the time law enforcement used force to disrupt the protest on June 1, 2020 and experienced Defendants' use of force and chemical irritants.

61.     Defendants' actions have frustrated the mission of BLMDC to fight racial injustice by chilling BLM members and supporters from exercising their rights to demonstrate and by creating fear when they do.

62.     Members of BLMDC felt so traumatized by law enforcement's violence at Lafayette Square that they had to take time off from organizing work and skipped calls with coalition members as well as calls with people who participated in social actions.

63.     BLMDC leaders and members fear that law enforcement will meet future protests with extreme violence.

64.     Since the Lafayette Square attack, BLMDC has chosen to refrain from participating in multiple demonstrations organized by the Movement 4 Black Lives between June 2 and June 3, 2020. This was done to protect BLMDC members from feared harm at the hands of law enforcement.

65.     April Goggans, a leader of BLMDC, has noticed a significant reduction in the number of people attending in-person protests since June 1, 2020. People who ordinarily attend in-person protests have informed Ms. Goggans that they are afraid to do so because of the violence that occurred at Lafayette Square.

66.     In response to Defendants' actions, BLMDC has been forced to:

    a.   divert resources to assessing and planning for potential violence by police, including increased needs for medical support and supplies to counteract the effects of chemical agents. For example, the organization has purchased goggles to protect demonstrators from chemical irritants and paid for mental health services for a member who was present when

16

Defendants forcibly expelled protestors from Lafayette Square, and
suffered trauma as a result;

b. enhance efforts to educate members and supporters regarding the potential
dangers of police violence, how to protect themselves and what to do if
there is another assault like the one in Lafayette Square;

c. engage in a communications campaign about the events in Lafayette
Square to reduce the deterrent effects of the Defendants' actions on the
participation of their members or supporters;

d. arrange for transportation from the demonstration for persons injured by
the Defendants' conduct; and

e. facilitate medical care for persons injured by the Defendants' actions.

67.     The time and effort BLMDC has expended due to Defendants' conduct has
reduced its capacity to plan events and programming consistent with its mission. For example,
the time BLMDC has spent on assessing safety considerations has prevented it from organizing
trainings, including a know-your-rights training. This is curtailing the organization's capacity to
fulfill its mission by effecting community change through peaceful demonstrations.

**Plaintiffs Toni Sanders and J.N.C.**

68.     Toni Sanders is a Black resident of Southeast Washington, D.C.

69.     Ms. Sanders has joined demonstrations at the White House every night since
Friday May 29, 2020. She intends to continue protesting at the White House every day that the
demonstrations continue.

70.     Ms. Sanders choose to demonstrate at the White House because she wants to stop
the murder of Black people at the hands of law enforcement. She believes that the White House
is the best place to demonstrate because it can help convince President Trump to take action to

combat racism in policing. She believes that protesting at the White House is a powerful symbol

and is much more impactful than protesting in another part of the District.

71.     On the afternoon of June 1, Ms. Sanders traveled to Lafayette Square to

demonstrate with her wife, Demetria Bright, and Ms. Bright's nine-year-old son, J.N.C. Ms.

Sanders had explained to her stepson about what had happened to George Floyd and wanted him

to learn about peaceful protesting.

72.     When Ms. Sanders and her family arrived at Lafayette Square they stood between

St. John's Church and the fence that surrounded the park. They arrived around 4:30 that

afternoon.

73.     Ms. Sanders viewed the mood of the demonstrators as peaceful. People were

passing out water and it made her hopeful that there was a diverse crowd nonviolently fighting

for racial justice. The only aggressive behavior she witnessed from the demonstrators was an

occasional obscenity directed towards the President.

74.     After being at the protest for around two hours, a reporter from a local television

affiliate approached Ms. Sanders for an on-camera interview. She was in the middle of giving

that interview when she suddenly heard very loud pops and bangs.

75.     Ms. Sanders looked toward the fence and saw smoke. Federal law enforcement

had released irritants into the air that were causing her to tear up. There had been no warning or

announcement from law enforcement before the chaos started.

76.     Ms. Sanders and Ms. Bright grabbed J.N.C. and ran. Ms. Sanders was very

concerned that J.N.C. would be injured by the police or in the crowd that was trying to get away.

They ran until they reached their car, which was parked near Thomas Circle. They headed home

from the protest.

77.     Ms. Sanders continues to protest because she believes that change is necessary, but J.N.C. is traumatized by having to escape the tear gas from the federal law enforcement officers. J.N.C. speaks about the incident frequently and now worries when Ms. Sanders leaves to go protest.

### Plaintiff Kishon McDonald

78.     Kishon McDonald is a resident of Washington D.C. and former member of the U.S. Navy. As an African American man, he is keenly interested in issues of racial justice.

79.     Mr. McDonald participated in peaceful demonstrations protesting the murder of George Floyd on two occasions in the District of Columbia. The first demonstration that he attended was on the night of May 30, 2020 outside of the United States Capitol. The second demonstration he attended was the June 1, 2020 demonstration outside the White House in Lafayette Square.

80.     Mr. McDonald arrived at Lafayette Square at approximately 6:00 pm on Monday, June 1. There was a large gathering of other demonstrators, peacefully protesting near a security barricade lined with police officers on the opposite side. Mr. McDonald did not witness any acts that were aggressive or dangerous that could be perceived as a threat by law enforcement.

81.     At approximately 6:25 pm, law enforcement officers, suddenly and without warning, began to charge the crowd of demonstrators. Mr. McDonald was repeatedly struck by the shields of multiple officers which left bruises on his body. Officers continued to physically strike Mr. McDonald even after he began to leave the site of the demonstration.

82.     Simultaneously, at approximately 6:25 pm, tear gas canisters and concussion grenades were fired into the crowd. Tear gas obscured Mr. McDonald's vision, stung his eyes, and caused him to severely cough. Mr. McDonald witnessed the concussion grenades exploding with enough force to put holes into the ground.

83.     The efforts of law enforcement forced Mr. McDonald to retreat to the intersection

of 16th Street NW and I Street NW, one block away from Lafayette Square. As Mr. McDonald

approached the intersection, he saw that police officers were arresting demonstrators. Soon after

he left the scene of the protest, he was detained by a police officer, but the officer let him go.

84.      The day after the attack in Lafayette Square, Mr. McDonald still suffered

symptoms related to inhaling tear gas, which included thick discharge from his nose. He also had

bruising in several locations on his body.

85.     Mr. McDonald has protested against police violence towards African Americans

in the past, and had planned to continue demonstrating in D.C. for George Floyd. However, the

events of June 1, 2020 have discouraged him. He fears that he will suffer serious harm at the

hands of law enforcement.

### Plaintiff Garret Bond

86.     Garrett Bond is a white man who lives in Mount Rainier, Maryland.

87.     Mr. Bond participated in peaceful demonstrations protesting the murder of

George Floyd on two occasions in Washington D.C. The first demonstration he attended was as

part of the car caravan throughout the District on May 30, 2020. The second demonstration he

attended was the June 1, 2020 demonstration outside the White House in Lafayette Square.

88.     Mr. Bond is an Eagle Scout and trained in basic first aid methods. He brought a

backpack containing first aid supplies with him to the June 1 demonstration. The supplies

included gauze pads, band aids, water, sanitizer, and extra masks and gloves which he brought

to protect himself and others from COVID-19 infection.

89.     Mr. Bond arrived at Lafayette Square at approximately 6:20 pm on Monday, June

1, 2020. As he arrived, he positioned himself near the security barrier, which was lined with

demonstrators. He did not witness any acts that were aggressive or dangerous or that could be perceived as a threat by law enforcement.

90.     Mr. Bond heard an announcement made through a megaphone by law enforcement, reminding the demonstrators that the curfew would go into effect at 7:00 pm. Almost simultaneously, Mr. Bond heard explosions from somewhere outside his field of vision. Demonstrators began to flee in all directions. He fled north towards St. John's Church.

91.     As Mr. Bond approached the church, he noticed an obviously injured demonstrator leaning against the wall. The victim was dazed and bleeding profusely. As Mr. Bond neared him, he noticed that victim had an object lodged in his face. At first, Mr. Bond thought it was his tooth, but upon closer inspection Mr. Bond saw it was a rubber bullet that had pierced his lower lip. Mr. Bond asked him to sit down and used gauze from my first aid kit to stem his bleeding. Almost immediately after Mr. Bond applied the gauze someone yelled, "They're coming!" Mr. Bond then turned around to see several fully-armored police officers charging at him with batons and shields.

92.     Several nearby demonstrators helped him lift the injured man and carry him a block away where they found another medic to give the victim medical assistance.

93.     Mr. Bond left the demonstration area with his hands raised, avoiding further encounters with law enforcement.

94.     The events of June 1, 2020, were intimidating, but Mr. Bond intends to continue participating in demonstrations in the future.

**Plaintiff Keara Scallan**

95.     Keara Scallan is a white resident of Northwest Washington, D.C.

96.     On June 2, 2020, Ms. Scallan decided to join the demonstrations near the White House with a friend. At approximately 6:20 pm, Ms. Scallan and her friend walked down 16th Street NW and arrived at fence surrounding Lafayette Square.

97.     Ms. Scallan witnessed law enforcement in riot gear when she arrived, all of whom were behind the fence.

98.     The crowd at Lafayette Square was non-violent and chanting. Ms. Scallan did not witness any demonstrators provoking law enforcement.

99.     Suddenly and without warning, Ms. Scallan felt the crowd begin to rush towards 17th Street NW. She was pushed against the fence as other demonstrators were running away, and she was briefly separated from her friend.

100.    Ms. Scallan was hit with rubber bullets and felt sudden pain in her face, arm, and leg.

101.    Ms. Scallan saw and heard three flash bang grenades and then noticed two tear gas canisters thrown at her and at other demonstrators.

102.    The irritants in the air made it very difficult to breathe. She had water and baking soda spray with her, but it did nothing to help her burning eyes. Ms. Scallan could hear other demonstrators retching.

103.    After fleeing the irritants in the air, Ms. Scallan reunited with her friend and they aided demonstrators as they got away from the White House. More law enforcement, including U.S. Drug Enforcement Administration ("DEA") vehicles, were blocking demonstrators from returning to Lafayette Square.

104.    Ms. Scallan received bruises on her arm and cuts on her lips and face, making it painful to use her arm and open her jaw for days. She has had difficulty eating and brushing her teeth because of her swollen lips and jaw.

**The White House and the Attorney General Ordered the Lafayette Square Attack.**

105.    President Trump, Attorney General Barr, and/or other senior White House officials ordered law enforcement to take the actions described above to drive demonstrators out of Lafayette Square.[17]

106.    Immediately after Attorney General Barr ordered law enforcement officers to forcibly remove Plaintiffs and other civil rights activists, the President and his senior advisors, including Attorney General Barr, Secretary of Defense Esper, and White House Chief of Staff Mark Meadows, and Ivanka Trump, walked from the White House to St. John's Church, located across Lafayette Square from the White House. The President paused for a few minutes on the sidewalk outside the church for a photo opportunity, made brief remarks, and then walked back to the White House. The President did not enter St. John's Church.

107.    The President and his entourage lingered at the church and encouraged photographs from the press until at least 7:09 pm, nine minutes after the District's curfew went into effect.

108.    On Tuesday, June 2, President Trump praised the results of the prior evening's law enforcement attack, tweeting that "D.C. had no problems last night. Many arrests. Great job done by all. Overwhelming force. Domination."

---

[17] Carol D. Leoning et al., *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/politics/barr-personally-ordered-removal-of-protesters-near-white-house-leading-to-use-of-force-against-largely-peaceful-crowd/2020/06/02/0ca2417c-a4d5-11ea-b473-04905b1af82b_story.html.

## CLAIMS FOR RELIEF

### CLAIM 1:
**Violation of First Amendment Rights to Speech, Assembly, and Petition/*Bivens***
**(Plaintiffs Sanders, J.N.C., McDonald, Bond, and Scallan against Defendants Barr, John**
**Does 1-100, and John Poes 1-20)**

109.    The actions of Defendants John Does 1-100 and John Poes 1-20—namely, the suppression of a peaceful demonstration and the viewpoint it represented—and the actions of Defendants Barr in ordering such suppression, deprived Plaintiffs of their rights under the First Amendment to the United States Constitution to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

110.    Defendants deliberately violated well-established limitations on the exercise of speech in and assembly in public places.

111.    Defendants' actions were based on the viewpoint being expressed by the demonstrators.

112.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiff's First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest justifying the infringement of Plaintiffs' First Amendment rights. Even assuming, arguendo, that there was a compelling government interest in clearing Lafayette Square of demonstrators,  Defendants' actions were not narrowly tailored to serve that government interest in a lawful manner.

113.    Defendants are jointly and severally liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, (1971), for this violation of their rights.

114.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and therefore are liable for punitive damages.

## CLAIM 2:
### Violation of Fourth Amendment Right to Freedom from Unreasonable Seizure/*Bivens*
### (Plaintiffs Sanders, J.N.C., McDonald, Bond, and Scallan against Defendants Barr, John Does 1-100, and John Poes 1-20)

115.     The actions of Defendants John Does 1-100 and John Poes 1-20—namely the use of physical force, including but not limited to chemical agents, frightening loud munitions, batons and shields, and a physical charge at Plaintiffs themselves in order to forcibly remove or force them to move from the area in and around Lafayette Square, without a warrant or probable cause to arrest them—and the actions of Defendant Barr, in ordering such uses of force, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures.

116.     Defendants are jointly and severally liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, (1971), for this violation of their rights.

117.     Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and therefore are liable for punitive damages.

## CLAIM 3:
### First Amendment/Threatened Violation of Freedoms of Speech, Assembly, and Petition
### (Plaintiffs Black Lives Matter D.C., Sanders, and Bond, against Defendants Trump, Barr, Esper, Monahan, Murray, Walker, and McConville)

118.     Defendants' practice of deploying physical force against demonstrators to remove them from places in which they have gathered with others to express their political opinions, as manifest by their actions against Plaintiffs in and around Lafayette Square on June 1, 2020, by their repeated threats to deploy violence against protestors demonstrating against racial injustice generally and in D.C. specifically; and by President Trump's statements at ¶¶ 27-38, threatens Plaintiffs with violations of their First Amendment rights of freedom of speech and assembly

when they carry out their stated intention to return to Lafayette Square when it is again open to the public to express their political views.

119.    By depriving Plaintiffs of the opportunity to express their views on such future occasions, Defendants will impose irreparable harm upon those Plaintiffs.

120.    Plaintiff Black Lives Matter D.C. also faces imminently the harm of diverting resources to protect its members' and supporters' ability to engage in free speech and assembly, in responses to Defendants' practices. Its effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by Defendants' threats of unjustified violence.

## CLAIM 4:
### Fourth Amendment/Threatened Unreasonable Seizure
**(Plaintiffs Black Lives Matter D.C., Sanders, and Bond against Defendants Trump, Barr, Esper, Monahan, Murray, Walker, and McConville)**

121.    Defendants' practice of deploying physical force without provocation, warning, or legal grounds to do so, against demonstrators to force them to halt or to move, as manifest by their actions against Plaintiffs in and around Lafayette Square on June 1, 2020, by their repeated threats to deploy violence against protestors demonstrating against racial injustice generally and in D.C. specifically; and by President Trump's statements at ¶¶ 27-38, threatens Plaintiffs with unreasonable seizures in violation of their Fourth Amendment rights when they carry out their stated intent to return to Lafayette Square when it is again open to the public to express their political views.

122.    By subjecting Plaintiffs to such unreasonable seizures, Defendants will impose irreparable harm upon Plaintiffs.

123.    Plaintiff Black Lives Matter D.C. also faces imminently the harm of diverting resources to protect its members and supporters from unreasonable seizures in responses to Defendants' practices. Its effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by Defendants' threats of unjustified violence.

**CLAIM 5:**
**Violation of 42 U.S.C. § 1985(3) (Conspiracy to Deprive Rights)**
**(Plaintiffs Black Lives Matter DC, Sanders, J.N.C., McDonald, Bond, and Scallan against Defendants Barr, John Does 1-100, and John Poes 1-20)**

124.    Defendants conspired together to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3).

125.    The conspiracy included those involved with law enforcement actions in and around Lafayette Square on June 1, 2020 between 6:00 and 7:00 pm including President Trump, Defendant Barr, Defendants John Does 1-100, and Defendants John Poes 1-20.

126.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to using violent force against civil rights activists in Lafayette Square.

127.    This conspiracy targeted Black people and their supporters. Both groups are protected classes under 42 U.S.C. §1985(3).

128.    President Trump, Defendant Barr, and Defendant Esper directed the conspiracy to take these actions because of their adverse effects upon an identifiable group—namely, civil rights activists.

129.    The conspiracy targeted protected rights of Plaintiffs, who are civil rights activists.

130.    The conspiracy targeted Plaintiffs' protected First Amendment activities. because Defendants held animus towards Plaintiffs' viewpoints. The violent actions of the conspirators directly and unlawfully interfered with these activities.

131.    The conspiracy violently interfered with Plaintiffs' right to use public accommodations, and therefore their right to be free from the badges and incidents of slavery. Lafayette Square and its environs are a place of public accommodation.

132.    The conspiracy targeted and violently interfered with Plaintiffs' right to be free from racial violence, as protected by the Thirteenth Amendment of the United States Constitution.

**CLAIM 6:**
**Violation of 42 U.S.C. § 1986 (Failure to Prevent a Conspiracy to Deprive Rights)**
**(Plaintiffs Black Lives Matter DC Sanders, J.N.C., McDonald, Bond, and Scallan against**
**Defendants Barr, John Does 1-100, and John Poes 1-20)**

133.    Defendant Barr, Defendants John Does 1-100, and Defendants John Poes 1-20 violated 42 U.S.C. § 1986 by failing to meet their duty to prevent or aid in preventing conspiracies to deprive civil rights. Defendant Barr, Defendants John Does 1-100, and Defendants John Poes 1-20 knew that a Section 1985 violation was about to occur or was occurring, had the power to prevent or aid in preventing it, and neglected or refused to prevent or aid in preventing it.

134.    Law enforcement's failure to stop unlawful violence by a Section 1985(3) conspiracy when they know it is about to occur is a quintessential Section 1986 violation.

135.    As discussed above in ¶ 125-133, the Section 1985 conspiracy consisted of using violence against peaceful civil rights activists. Defendant Barr, Defendants John Does 1-100, and Defendants John Poes 1-20 knew that such violence was planned and could have taken actions to

28

stop or limit that violence. Defendant Barr, Defendants John Does 1-100, and Defendants John Poes 1-20 willfully or negligently took no such action.

136.    Defendant Barr, Defendants John Does 1-100, and Defendants John Poes 1-20 could and should have refused to comply with unlawful orders, refused to use force when clearing Lafayette Square, or attempted to appeal to superiors to take a different course of action.

137.    As a result of Defendants' failure to prevent or aid in preventing the Section 1985 conspiracy, Plaintiffs were injured and their rights were violated.

138.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and therefore are liable for punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray that the Court:

139.    Issue a judgment declaring that the acts of Defendants described herein violate the First Amendment, the Fourth Amendment, 42 U.S.C. § 1985, and 42 U.S.C. §1986.

140.    Issue an injunction ordering Defendants to cease engaging in the unlawful acts described herein.

141.    Award compensatory and punitive damages to Plaintiffs according to proof at trial, including damages for pain and suffering.

142.    Award costs of suit and attorney's fees; and

143.    Provide such other and further relief as the Court may deem just, proper, and appropriate.

## JURY DEMAND

144.    Plaintiffs request a trial by jury on any and all issues raised by this Complaint which are triable by right of a jury.

Dated June 4, 2020

Respectfully submitted,

/s/ Kaitlin Banner

Kaitlin Banner (D.C. Bar No. 1000436)
Dennis Corkery (D.C. Bar No. 1016991)
Hannah Lieberman (D.C. Bar No. 336776)
Jonathan Smith (D.C. Bar No. 396578)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th Street, NW, Suite 400
Washington, D.C. 20005
Phone: (202) 319-1000
Fax: (202) 319-1010
kaitlin_banner@washlaw.org
dennis_corkery@washlaw.org
hannah_lieberman@washlaw.org
jonathan_smith@washlaw.org

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org
aspitzer@acludc.org
mperloff@acludc.org

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)*
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
aago@lawyerscommittee.org
dspence@lawyerscommittee.org
dbrody@lawyerscommittee.org

agordon@lawyerscommittee.org
nbaron@lawyerscommittee.org

*Application to this Court pending*

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar. No. 1001890)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com
David.Kouba@arnoldporter.com
Tom.McSorley@arnoldporter.com