**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BLACK LIVES MATTER D.C.
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

and

TONI SANDERS
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

J.N.C., through his mother Demetria Bright,
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

KISHON MCDONALD
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

GARRETT BOND
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

KEARA SCALLAN
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

LIA POTEET
  c/o Washington Lawyers' Committee for Civil
  Rights & Urban Affairs
  700 14th Street, NW, Suite 400
  Washington, D.C. 20005,

Case No. 1:20-cv-01469-DLF

**THIRD AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1

DUSTIN FOLEY
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

and

E.X.F., through her father, Dustin Foley
   c/o Washington Lawyers' Committee for Civil
   Rights & Urban Affairs
   700 14th Street, NW, Suite 400
   Washington, D.C. 20005,

on behalf of themselves and all others similarly
situated,

          *Plaintiffs*,

     v.

DONALD J. TRUMP
   President of the United States of America
   1600 Pennsylvania Avenue, N.W.
   Washington, D.C. 20500,

WILLIAM P. BARR
   Attorney General of the United States
   950 Pennsylvania Avenue, N.W.
   Washington, D.C. 20530,

MARK ESPER
   Secretary of Defense of the United States
   1000 Defense Pentagon
   Washington, D.C. 20301-1000,

GREGORY T. MONAHAN
   Acting Chief of the U.S. Park Police
   1100 Ohio Drive, S.W.
   Washington, D.C. 20242,

JAMES M. MURRAY
   Director, U.S. Secret Service
   950 H Street, NW, Suite 7800
   Washington, D.C. 20223,

MAJOR GENERAL WILLIAM J. WALKER
  Commanding General of the District of
  Columbia National Guard
  2001 E. Capitol Street, S.E.
  Washington, D.C. 20003,

MICHAEL CARVAJAL
  Director, Federal Bureau of Prisons
  320 First Street, N.W.
  Washington, D.C. 20534,

PETER NEWSHAM
  Chief of the Metropolitan Police Department of
  the District of Columbia
  300 Indiana Avenue, N.W., Room 5059
  Washington, D.C. 20001,

MARK ADAMCHIK,
[FIRST NAME UNKNOWN] SEBERLING,
HELMET NUMBER A702,
HELMET NUMBER A704,
HELMET NUMBER A706,
HELMET NUMBER B714,
HELMET NUMBER C723,
HELMET NUMBER S735,
ARM PATCH NUMBER JD97,
ARM PATCH NUMBER LP71,
ARM PATCH NUMBER SK10
  Officers, U.S. Park Police
  1100 Ohio Drive, S.W.
  Washington, D.C. 20242,

JEFFERY CARROLL,
ANTHONY ALIOTO,
S. BUCHANAN,
[FIRST NAME UNKNOWN] HARGROVE,
C.W. MEYER,
C.I. MURPHY,
T.C. PAYNE,
[FIRST NAME UNKNOWN] TAYLOR,
DANIEL M. THAU,
ANTHONY A. WILLIS,
  Officers, D.C. Metropolitan Police Department
  c/o Office of the Attorney General
  441 4th Street, N.W.
  Washington, D.C. 20001,

WAYNE VINCENT
   Captain, Arlington County Policy Department
   1425 N Courthouse Rd,
   Arlington, VA 22201,

JOHN DOES 1–100,

JOHN POES 1–20,

and

JOHN ROES 1–50,

   *Defendants*.

## THIRD AMENDED CLASS ACTION COMPLAINT

### (for injunctive relief and damages; violation of First Amendment rights, Fourth Amendment rights, and conspiracy to violate civil rights)

1.     This case is about the President and Attorney General of the United States ordering the use of violence against peaceful demonstrators who were speaking out against discriminatory police brutality targeted at Black people.

2.     Just after 8:00 pm on May 25, 2020, George Floyd, a 46-year-old father, son, brother, and African American man, was accused of a non-violent offense and arrested by the Minneapolis police. In the process of his arrest, Mr. Floyd was handcuffed and fell to the pavement. Less than ten minutes after the police arrived, a police officer who participated in Mr. Floyd's arrest placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground. For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief. Other officers held his legs or stood by and watched while he died. Among Mr. Floyd's final words were "please, please, please, I can't breathe." These words are reminiscent of the words spoken by Eric Garner before he was killed

by a New York City police officer in 2014, which have since become a tragic rallying cry for people seeking to address racial inequities and reform the American criminal justice system. These are some of the words that a group of peaceful demonstrators chanted on June 1, 2020, in Lafayette Square, across the street from the White House in Washington, D.C.

3.      On June 1, 2020, a group of demonstrators, including Plaintiffs, gathered peacefully in Lafayette Square to protest the gross, systemic injustices perpetrated by law enforcement against Black people in the United States, exemplified by the recent brutal murders of George Floyd and Breonna Taylor, a Black woman who was shot eight times and killed in March 2020 by three Louisville police officers who entered her home in the middle of the night without knocking. This was a continuation of protests in Washington, D.C. and elsewhere since Mr. Floyd's killing. Without provocation, the federal and Arlington County Defendants fired (or ordered to be fired) tear gas, pepper spray capsules, rubber bullets, and flash bangs into the crowd and physically charged at the protestors to shatter the peaceful gathering, forcing demonstrators to flee the area. Demonstrators who fled west away from the Square quickly encountered a formation of Defendant officers of the District of Columbia Metropolitan Police Department, who likewise fired tear gas at demonstrators as they fled. Many peaceful demonstrators were injured, some severely, by this coordinated and unprovoked attack.

4.      Defendants had no legitimate basis to destroy the peaceable gathering. Defendants' professed purpose—to clear the area to permit the President to walk to a photo opportunity at a nearby church—was a wholly illegal reason for abridging the constitutional rights of Plaintiffs and the others assembled in Lafayette Square. Indeed, the President has consistently demonstrated hostility towards viewpoints different than his own, and in the days

and moments leading up to the attack expressed his intent to violently attack protesters and "dominate" them.

5.      The Department of Justice has officially acknowledged that Defendant Barr ordered Lafayette Square cleared minutes before the assault started. Defendant Barr issued this order following a series of statements from Defendant Trump in the days and hours leading up to this attack in which he clearly threatened to use and encouraged violence against protesters.

6.      The police violence that Plaintiffs and other lawful, peaceful demonstrators were met with on June 1, 2020 is a continuation of an unlawful history of oppression of civil rights activists. The peaceful assembly of people seeking systemic change in the criminal justice system, like the assembly of Plaintiffs and others on June 1, 2020 in Lafayette Square, is based on a decades-old history of civil rights activism in this nation. Following the long tradition of those who marched for voting rights on Sunday, March 7, 1965, in Selma, Alabama,[1] Plaintiffs seek to address racial inequities. But like that "Bloody Sunday" fifty-five years ago, Plaintiffs' peaceful, lawful assembly was met by police violence.

7.      For Defendants to describe their actions as "domination" is telling. To dominate is to establish supremacy by subjugation of others. It is precisely such domination—in the form of centuries of white supremacy and subjugation of Black lives—that was the core focus of the

---

[1] Ronald J. Krotoszynski, Jr., *Celebrating Selma: The Importance of Context in Public Forum Analysis*, 104 Yale L.J. 1411 (1995).

peaceful demonstration in Lafayette Square. Just as in Tulsa,[2] Scottsboro,[3] Anniston,[4] Birmingham,[5] Selma,[6] Philadelphia,[7] Los Angeles,[8] Ferguson,[9] New York City,[10] Baltimore,[11] Minneapolis,[12] and countless other times in our nation's bloody history, the Lafayette Square assault was violence against Black people and their supporters committed by state actors. What differentiates the actions here from the others is that the President and Attorney General of the United States ordered the violence.

8.    Defendants' actions to shut down the Lafayette Square demonstration is the manifestation of the very despotism against which the First Amendment was intended to protect. On behalf of themselves and all others similarly situated, Plaintiffs seek to uphold, against

---

[2] Alicia Lee and Sara Sidner, *99 years ago today, America was shaken by one of its deadliest acts of racial violence*, CNN, June 1, 2020, https://www.cnn.com/2020/06/01/us/tulsa-race-massacre-1921-99th-anniversary-trnd/index.html.

[3] N. Jeremi Duru, *The Central Park Five, the Scottsboro Boys, and the Myth of the Bestial Black Man*, 25 Cardozo L. Rev. 1315, 1334 (2004) (describing state violence against nine black boys accused of raping two white women in 1931; while the women eventually recanted and confessed to making up the story, the "Scottsboro boys" spent years in prison).

[4] Terri Gross, *Get On the Bus: The Freedom Riders of 1961*, NPR, Jan. 12, 2006, https://www.npr.org/2006/01/12/5149667/get-on-the-bus-the-freedom-riders-of-1961 (describing a white mob's attack on a bus of freedom riders in 1961, while the city government remained unresponsive).

[5] Steven H. Hobbs, *Alabama's Mirror: The People's Crusade for Civil Rights*, 6 Ala. C.R. & C.L. L. Rev. 1, 2 (2014) (describing the 1963 attack on African American children who were marching peacefully for civil rights by Birmingham Commissioner of Public Safety Eugene "Bull" Connor).

[6] J. Gerald Hebert & Renata E. B. Strause, *The Future of the Voting Rights Act*, 64 Rutgers L. Rev. 953, 953–54 (2012) (describing how police attacked civil rights activists calling for equal voting rights in Selma, Alabama in 1965).

[7] Lindsey Norward, *The day Philadelphia bombed its own people*, Vox, Aug. 15, 2019, https://www.vox.com/the-highlight/2019/8/8/20747198/philadelphia-bombing-1985-move.

[8] Cydney Adams, *March 3, 1991: Rodney King beating caught on video*, CBS News, Mar. 3, 2016, https://www.cbsnews.com/news/march-3rd-1991-rodney-king-lapd-beating-caught-on-video/.

[9] Dep't of Justice,  Report Regarding the Criminal Investigation Into the Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson, Mar. 4, 2015, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/doj_report_on_shooting_of_michael_brown_1.pdf.

[10] Joseph Goldstein & Marc Santora, *Staten Island Man Dies From Chokehold During Arrest, Autopsy Finds*,  N.Y. Times, Aug. 1, 2014, https://www.nytimes.com/2014/08/02/nyregion/staten-island-man-died-from-officers-chokehold-autopsy-finds.html.

[11] Leah Donnella, *Reflecting on the Death of Freddie Gray, One Year Later*, NPR, Apr. 20, 2016, https://www.npr.org/sections/codeswitch/2016/04/20/474668796/reflecting-on-the-death-of-freddie-gray-one-year-later.

[12] Chris McGreal, *Dispatch from Minneapolis: The Night the City Cracked Down on George Floyd Protests*, The Guardian, May 31, 2020, https://www.theguardian.com/us-news/2020/may/31/minneapolis-george-floyd-protests-saturday-crackdown.

uncivil, unwarranted, unjust, and blatantly unlawful attack, cherished rights enshrined in the First and Fourth Amendment to the Constitution and foundational to our Democracy: the rights to peaceful assembly, petition for redress of grievances, freedom of speech, freedom of the press, and freedom from unwarranted seizures by the government.

**PARTIES**

9.      Plaintiff Black Lives Matter D.C. ("BLMDC") is a District of Columbia limited liability corporation. As the local chapter of the nationwide "Black Lives Matter" movement, BLMDC organizes against systemic racism—in particular the racially disproportionate use of state-sanctioned violence against the Black community—through protests, public accountability campaigns, coalition-building, and other programming. Members of BLMDC were demonstrating in Lafayette Square on June 1, 2020. Other members of BLMDC were engaged in cop-watch activities and in providing aid to demonstrators.

10.      Plaintiff Toni Sanders is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020 with her 9-year-old stepson, Plaintiff J.N.C., who proceeds here through his mother and next friend Demetria Bright.

11.      Plaintiff Kishon McDonald is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

12.      Plaintiff Garrett Bond is a resident of Maryland who was demonstrating peaceably in Lafayette Square on June 1, 2020.

13.      Plaintiff Keara Scallan is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

14.      Plaintiff Lia Poteet is a resident of Washington, D.C. who was demonstrating peaceably in Lafayette Square on June 1, 2020.

15.     Plaintiffs Dustin Foley and his 15-year-old daughter Plaintiff E.X.F., who proceeds here through her father and next friend Mr. Foley, are residents of Virginia who were demonstrating peaceably in Lafayette Square on June 1, 2020.

16.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. He was personally responsible for the actions complained of in this lawsuit.

17.     Defendant William P. Barr is the Attorney General of the United States. He is sued in his individual and official capacity. He personally issued the order that resulted in the unlawful actions complained of in this lawsuit.

18.     Defendant Mark Esper is the U.S. Secretary of Defense. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. armed forces.

19.     Defendant Gregory T. Monahan is the Acting Chief of the United States Park Police. He is sued in his official capacity. In that capacity, he is responsible for the actions of the U.S. Park Police officers.

20.     Defendant Mark Adamchik is a Major in the United States Park Police. He is sued in his individual capacity. Defendant Adamchik was the incident commander at Lafayette Square on the evening of June 1, 2020, and gave the immediate order for the law enforcement officers at the Square to attack the peaceably assembled protesters at approximately 6:30 pm.

21.     Defendant U.S. Park Police Officer Helmet Number S735 (hereinafter "Defendant USPP S735") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

22.     Defendant U.S. Park Police Officer [First Name Unknown] Seberling is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. She is sued in her individual capacity.

23.     Defendant U.S. Park Police Officer Arm Patch Number SK10 (hereinafter "Defendant USPP SK10") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

24.     Defendant U.S. Park Police Officer Helmet Number C723 (hereinafter "Defendant USPP C723") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

25.     Defendant U.S. Park Police Officer Helmet Number A702 (hereinafter "Defendant USPP A702") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

26.     Defendant U.S. Park Police Officer Helmet Number A704 (hereinafter "Defendant USPP A704") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

27.     Defendant U.S. Park Police Officer Helmet Number A706 (hereinafter "Defendant USPP A706") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

28.     Defendant U.S. Park Police Officer Helmet Number B714 (hereinafter "Defendant USPP B714") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

29.     Defendant U.S. Park Police Officer Arm Patch Number JD97 (hereinafter "Defendant USPP JD97") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

30.     Defendant U.S. Park Police Officer Arm Patch Number LP71 (hereinafter "Defendant USPP LP71") is a U.S. Park Police officer who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

31.     Defendant James M. Murray is the Director of the U.S. Secret Service. He is sued in his official capacity. In that capacity, he is responsible for the actions of Secret Service agents.

32.     Defendant Major General William J. Walker is the Commanding General of the District of Columbia National Guard. He is sued in his official capacity. In that capacity, he is responsible for the actions of the D.C. National Guard troops.

33.     Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons. He is sued in his official capacity. In that capacity, he is responsible for the actions of Federal Bureau of Prisons officers.

34.     Defendant Peter Newsham is the Chief of the District of Columbia Metropolitan Police Department (MPD). He is sued in his official capacity. In that capacity, he is responsible for the actions of the officers of MPD.

35.     Defendant Jeffery Carroll is an Assistant Chief of the MPD who manages its Homeland Security Bureau and who supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

36.     Defendant Anthony Alioto is a sworn member of the MPD who supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

37.     Defendant C. Murphy (badge number S800) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

38.     Defendant C. Meyer (badge number 4895) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

39.     Defendant Daniel Thau (badge number S580) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

40.     Defendant [First Name Unknown] Hargrove (badge number 3176) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

41.     Defendant S. Buchanan (badge number 4790) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

42.     Defendant T.C. Payne (helmet number 5751) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. She is sued in her individual capacity.

43.     Defendant [First Name Unknown] Taylor (helmet number 5705) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

44.     Defendant Anthony A. Willis (helmet number 5453) is a sworn officer of the MPD who participated in dispersing the demonstration at Lafayette Square on June 1. He is sued in his individual capacity.

45.     Defendant Wayne Vincent is a Captain in the Arlington County Police Department ("ACPD"). He is sued in his individual capacity. Defendant Vincent represented

12

ACPD at the Joint Operations Command Center at Lafayette Square on June 1, 2020, and assisted in coordinating the actions of the ACPD officers present at the Square with the federal defendants before and during the attack on the peaceably assembled protesters.

46.     Defendants John Does 1–100 are officers of the U.S. Park Police, agents of the U.S. Secret Service, members of the U.S. Armed Forces, agents of the Federal Bureau of Prisons, officers of other federal law enforcement agencies, and other federal government officials who authorized, planned, or participated in the attack on peaceful protesters in and near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

47.     Defendants John Poes 1–20 are officers of the ACPD and other non-federal law enforcement officials from jurisdictions other than the District of Columbia who participated in the attack on peaceful protesters in and near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

48.     Defendants John Roes 1–50 are officers of MPD who participated in the attack on peaceful protesters near Lafayette Square on June 1, 2020. They are sued in their individual capacities.

### JURISDICTION AND VENUE

49.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress the deprivation of rights under the First and Fourth Amendments to the U.S. Constitution, and under 28 U.S.C. § 1343 because this action seeks to redress the deprivation of rights pursuant to 42 U.S.C. §§ 1985 and 1986.

50.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because all of the events giving rise to the claims took place in this District of Columbia.

## FACTUAL BACKGROUND

51.     Beginning on May 29, 2020, demonstrators began to gather daily in Lafayette Square to protest police brutality against Black people in the United States of America, and specifically the recent murders of George Floyd, a Black man killed by police officers, and Breonna Taylor, a Black woman killed by police officers who broke into her home and shot her without provocation or reason. Lafayette Square is located directly across Pennsylvania Avenue from the White House and is a public venue frequently and historically used by activists to protest and exercise First Amendment rights. As a public park, and as *the* public park closest to the White House, Lafayette Square is a traditional public forum where First Amendment rights are at their apex.

52.     From May 29, 2020 through May 31, 2020, large crowds of thousands of people gathered in front of the White House in Lafayette Square. Multiple federal police forces gathered to respond to the protests including, at least, the Secret Service and D.C.'s Metropolitan Police Force. Over the course of these three days, law enforcement tactics escalated: they arrested protesters, used riot shields, released tear gas, increased the presence of federal police presence, and used flash bangs and rubber bullets.

### President Trump Has Made Clear His Intent to Infringe on Demonstrators' Constitutional and Civil Rights

53.     In the days and hours leading up to the events of June 1, 2020, President Trump repeatedly advocated the use of force against Black demonstrators and civil rights activists who were protesting in D.C. and around the nation.

54.     On May 29, President Trump posted on social media about the protests, stating that "when the looting starts, the shooting starts," which is a racist slogan used by a former Miami police chief Walter Headley in 1967 to advocate for police brutality and discriminatory

practices targeting African Americans.[13] On the same day, President Trump issued a tweet describing all protesters as "THUGS."

55.     On May 31, President Trump tweeted, "These people [civil rights protesters] are ANARCHISTS. Call in our National Guard NOW."

56.     On May 31, after a series of tweets about the protests, President Trump retweeted a tweet stating that "This isn't going to stop until the good guys are willing to use overwhelming force against the bad guys."

57.     On June 1, prior to the violent attack on the demonstrators, President Trump had a conference call with governors. On this call, he urged the governors to take much harsher action, "dominate your city and your state." He then issued an ominous warning of what was to come in a few short hours: "In Washington we're going to do something people haven't seen before."

58.     During the call, in the context of a discussion about arrests, when South Carolina Governor Henry McMaster stated that "I think we have to be careful, but we've got to be tough," President Trump corrected him, stating that "You don't have to be too careful."

59.     On the call with governors, Secretary of Defense Esper said that governors needed to "dominate the battle space," where the so-called "battle space" is the streets of the United States of America where people had gathered to peaceably protest.

60.     On the same day, President Trump told senior advisors that they had to show that they could control the streets of Washington and the area around the White House. A Justice Department spokesperson said that President Trump directed Attorney General Barr to personally lead the response to the unrest. That day, Attorney General Barr directed the Federal

---

[13] Barbara Sprunt, *The History Behind 'When the Looting Starts, The Schooting Starts'*, NPR, May 29, 2020, https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts.

Bureau of Prisons and other federal law enforcement agencies to send "riot teams" and other specialized agents to control the protests in Washington, D.C.[14]

61.     At the same time law enforcement officers were violently attacking demonstrators in Lafayette Square, President Trump gave remarks in the White House Rose Garden. He painted all the demonstrators as violent and vowed to take immediate action against them, stating "I have strongly recommended to every governor to deploy the National Guard in sufficient numbers that we dominate the streets," and "[if] a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them."[15]

62.     President Trump's statements about Black demonstrators and civil rights activists were markedly different from his comments about other demonstrators. President Trump has routinely been sympathetic to protesters whose views align with his own.

63.     For example, just over one month ago, President Trump expressed support when heavily armed and predominantly white demonstrators threatened lawmakers and stormed statehouses to object to coronavirus stay-at-home rules. On April 17, President Trump posted a series of tweets encouraging these armed and predominantly white demonstrators, including "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA, and save your great 2nd Amendment. It is under siege!" Similarly, in response to the 2017 white nationalist Unite the Right rally in Charlottesville, Virginia, President Trump said, "You had very fine people, on both sides."

---

[14] Ryan Lucas, *Attorney General Steps Up Federal Law Enforcement Response to Protests*, NPR, June 1, 2020, https://www.npr.org/2020/06/01/867059312/attorney-general-steps-up-federal-law-enforcement-response-to-protests.
[15] Statement by the President, Whitehouse.gov, June 1, 2020 6:43 PM, https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/.

64.     President Trump is even happy to have demonstrators in Lafayette Square so long as their message aligns with his views. On May 30, while criticizing the protesters outside the White House, he specifically encouraged his supporters to engage in a counter-demonstration, tweeting: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"

**Violent Attacks on Demonstrators in Lafayette Square**

65.     On June 1, 2020, Plaintiffs and other civil rights activists assembled in Lafayette Square in Washington, D.C. to protest police brutality against Black people. Members and supporters of Plaintiff Black Lives Matter D.C., Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan, Poteet, Foley, E.X.F., and other class members assembled peacefully in Lafayette Square. People present in Lafayette Square, including Plaintiffs, chanted "I can't breathe" in remembrance of George Floyd's last words, knelt, raised their hands up, and engaged in other legal activities to protest police brutality against Black people.

66.     Plaintiffs and other class members were exercising their First Amendment rights to assemble, speak, and petition the government in Lafayette Square. Plaintiffs and other class members were engaging in political speech to address, through the exercise of their constitutional rights, the infection of overt and systemic racism in the American criminal justice system. Black people are arrested at twice the rate of their population, detained pretrial at a rate three-and-a-half times higher than white people, and imprisoned at a rate of almost six times that of white people. Black people are three times more likely to be killed by the police than white people. This is part of the system that Plaintiffs seek to change.

67.     Law enforcement officers from local and federal law enforcement agencies and the military surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square.

This included, at least, U.S. Park Police, ACPD, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons.

68.     The law enforcement officers who surrounded Plaintiffs and class members at Lafayette Park are largely unidentifiable to Plaintiffs.  Many such officers took steps to deliberately conceal their identities.

69.     Some officers displayed no identifying information, concealing both the agency they are associated with and their identification.

70.     Other officers did not wear name tags or badge numbers.

71.     Other officers wore name tags or badge numbers, but this identifying information was partially or mostly obstructed.

72.     MPD officers took up a position one block west, in a formation lining the north and west sides of the intersection of 17th and H Streets NW.

73.     Defendant Alioto was among the officers who supervised MPD officers in establishing a blockade on 17th Street, facing south.

74.     Defendants Murphy, Meyer, Thau, Hargrove, Buchanan, Payne, Taylor, and Willis formed part of the 17th Street NW MPD blockade.

75.     Defendants Alioto, Murphy, Meyer, Thau, Hargrove, Buchanan, Payne, Taylor, and Willis were wearing gas masks in preparation for the assault on the demonstrators.

76.     By 5:30 pm, Defendant Vincent was present at the Joint Operations Command Center and was coordinating the actions of the ACPD officers present at the Square with the federal defendants, under the command of the U.S. Park Police.

77.     At 6:03 pm, approximately 30 minutes before attacking the assembled demonstrators, law enforcement officers in and around Lafayette Square donned gas masks in

18

preparation for their deployment of tear gas, smoke canisters, and/or pepper spray and pepper balls against Plaintiffs and other class members.

78.     At approximately 6:08 pm, Defendant Barr entered Lafayette Square.

79.     At 6:10 pm, Defendant Barr was behind the law enforcement officials in Lafayette Square pointing north towards St. John's Church. The Department of Justice subsequently acknowledged that Defendant Barr personally ordered that Lafayette Square be cleared.

80.     At approximately the same time, White House Deputy Chief of Operations Tony Ornato contacted the Secret Service to notify them that President Trump planned to make an appearance outside St. John's Church. The Secret Service requested other law enforcement agencies to assist clearing the area.

81.     Additional law enforcement officers, including Defendant USPP C723, appeared at the demonstration and began to stand in double lines, wearing shields and other riot gear.

82.     At approximately 6:30 pm, without warning or provocation, Defendant Adamchik ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters.

83.     Immediately thereafter, law enforcement officers, including Defendants USPP A702, USPP A704, USPP A706, and USPP C723, rushed forward and attacked the assembled protesters without warning or provocation. In doing so, law enforcement officials assaulted Plaintiffs Sanders, J.N.C., Bond, McDonald, Scallan, Poteet, Foley, E.X.F, and the other demonstrators present.

84.     Plaintiffs did not hear law enforcement officers asking the demonstrators to disperse or leave Lafayette Square.

19

85.     Plaintiffs did not hear law enforcement officers issue any warnings before using force to remove demonstrators from Lafayette Square.

86.     At the time of Defendant Barr's and Defendant Adamchik's orders concerning the attack and at the time of the attack itself, the Plaintiffs and the members of the Plaintiff class were not engaging in unlawful conduct.

87.     At the time of Defendant Barr's and Defendant Adamchik's orders concerning the attack and at the time of the attack itself, the Plaintiffs and the members of the Plaintiff class were not engaging in any conduct that posed a threat of violence against any person, property, or public safety generally.

88.     Law enforcement officers used force to disrupt the protest and drive Plaintiffs and other class members out of Lafayette Square and its vicinity. Officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd.[16]

89.     Although the U.S. Park Police initially denied that the agency used "tear gas" on the crowd, an agency spokesperson subsequently clarified that it used "an irritant derived from pepper plants. 'I'm not saying it's not a tear gas, but I'm just saying we use a pepper ball that shoots a powder.'"[17] MPD officers also deployed tear gas cannisters directly at the fleeing demonstrators. Police canisters gathered after the demonstration confirm that officers used tear

---

[16] *See* Ashley Parker, Josh Dawsey & Rebecca Tan, *Inside the Push to Teargas Protesters Ahead of a Trump Photo Op*, Wash. Post, June 1, 2020, https://www.washingtonpost.com/politics/inside-the-push-to-tear-gas-protesters-ahead-of-a-trump-photo-op/2020/06/01/4b0f7b50-a46c-11ea-bb20-ebf0921f3bbd_story.html; Reuters, *Graphic Warning: Peaceful Protesters Fired at with Tear Gas, Rubber Bullets by U.S. Military Police*, YouTube, June 1, 2020, https://www.youtube.com/watch?v=UrMoqSPZym0; Dan Zak et al., *'This Can't Be Happening': An Oral History of 48 Surreal, Violent, Biblical Minutes in Washington*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/lifestyle/style/this-cant-be-happening-an-oral-history-of-48-surreal-violent-biblical-minutes-in-washington/2020/06/02/6683d36e-a4e3-11ea-b619-3f9133bbb482_story.html.

[17] Alex Ward, *US Park Police said using "tear gas" in a statement was a "mistake." It just used the term again*, Vox, June 5, 2020, https://www.vox.com/2020/6/5/21281604/lafayette-square-white-house-tear-gas-protest.

gas, including CS tear gas. Nathan Baca, a reporter with WUSA9, tweeted on June 4, 2020:

"Breaking: police canisters gathered by @wusa9 crews Monday night show federal police DID

use artificial CS tear gas in addition to natural OC gas on #BlackLivesMatter." These

photographs accompanied the tweet:

  

*[Image description: three silver canisters with labels identifying them as "SPEDE-HEAT CS Long Range 150 YD"; serial numbers; and "SKAT SHELL."]*

90.     The officers hit, punched, shoved, and otherwise assaulted the demonstrators with

their fists, feet, batons, and shields, including demonstrators whose backs were turned from the

police and who were trying to flee the officers. Officers mounted on horseback, including

Defendant Seberling, pushed protesters west down H Street toward 17th, and other officers

assaulted protesters as they tried to escape. Many demonstrators were knocked to the ground.

The police action "injected danger into what had been a calm protest as those in the street fled

mounted police to avoid being trampled, struck by projectiles or gassed."[18]

91.     One protester was holding a bandage to his face and walking down H Street

toward 17th Street alongside the U.S. Park Police officers on horseback. Defendant USPP S735

and a group of other Park Police officers rushed him from behind and slammed him against the

---

[18] Jonathan Allen, Dartunorro Clark & Rebecca Shabad, *Police, National Guard Clash with Protesters to Clear Streets Before Trump Photo Op*, NBC News, June 1, 2020, https://www.nbcnews.com/politics/politics-news/after-night-significant-damage-d-c-mayor-bowser-imposes-earlier-n1221126.

wall of a building. The protester tried to run away, but Defendant USPP S735 chased him down and beat him with his baton.

92.     Defendant USPP LP71 joined in the initial charge. When one of the protesters scrambled to get out of the way of the charging line and crossed Defendant USPP LP71's path, Defendant USPP LP71 leaned his weight behind his shield and bashed the protester.

93.     Defendant USPP B714 formed part of the line of officers advancing down H Street NW and charged after the protesters who continued fleeing from the officers' attack down H Street NW.

94.     Law enforcement officers attacked the civil rights activists with no warning, forcefully ejected them from Lafayette Square, and pursued them for several blocks thereafter.

95.     Defendant USPP LP71 continued his charge and pursued protesters westward down H Street NW as they retreated. While fleeing other officers, one protester bumped into Defendant USPP LP71. Defendant USPP LP71 subsequently lashed out with his shield, causing that protester to stumble.

96.     Law enforcement officers also made unprovoked assaults on journalists in Lafayette Square who were reporting on the protests.

97.     For example, Defendant USPP SK10 beat Australian news correspondent Amelia Brace in the back with his baton as she was fleeing with her cameraman.

98.     A journalist holding a microphone in her hand was also among the group of people assembled on the sidewalk of H Street NW. As the journalist attempted to flee alongside the protesters, Defendant USPP JD97 charged into them, shoving the journalist aside.

99.     In coordination with the federal defendants, ACPD officers participated in the attack against the protesters, including by surging up 16th Street NW to drive protesters north of Lafayette Square past St. John's Church.

100.     As some demonstrators attempted to flee west, a formation of MPD officers stationed one block west of the Square attacked these demonstrators, including with tear gas.

101.     Defendant Thau discharged a tear gas grenade launcher into the crowd of fleeing protesters.

102.     MPD officers, including Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau and Willis, chased demonstrators south down 17th Street NW, further driving them away from Lafayette Square.

103.     Defendants Carroll and Alioto directed and oversaw the launching of tear gas by MPD officers and the officers' pursuit of the demonstrators down 17th Street NW.

104.     Defendants began their attack on the Lafayette Square demonstrators, both at and in the vicinity of the Square, well before the 7:00 pm curfew.

105.     MPD regularly acts in coordination with federal law enforcement to police major demonstrations.

106.     Approximately 30 minutes before the attack began at Lafayette Square on June 1, an MPD supervisory officer met and conferred with U.S. military officers in the presence of the Army Chief of Staff on 16th Street NW less than two blocks north of Lafayette Square.

107.     The actions of federal officers and MPD and other non-federal officers were coordinated and reflect a concerted plan to drive demonstrators away from Lafayette Square and its vicinity by force.  Both the officers stationed at Lafayette Square and those stationed a block

west of the Square attacked demonstrators and physically drove them away from Lafayette Square without warning or justification.

108.    At no time before or during the attack on the demonstrators did any of the Defendants give any indication that Plaintiffs or any demonstrators would be permitted to resume their demonstration nearby—either at a prescribed location or after having moved a prescribed distance away from Lafayette Square.

109.    None of the Defendants otherwise provided any alternative means or space for the demonstration that they had forcibly terminated.

110.    MPD has a history of using unjustified, excessive force to attack and interfere with demonstrators.  For example, MPD used unconstitutionally pepper-sprayed and unconstitutionally detained demonstrators and others exercising their First Amendment rights (including, for instance, a clearly designated legal observer and a journalist) during the 2017 Inauguration Day protests; this conduct is the subject of two pending lawsuits that survived motions to dismiss, *see Horse v. District of Columbia*, No. 1:17-cv-01216 (D.D.C., motion to dismiss denied Sept. 27, 2019); *Schultz v. District of Columbia*, No. 1:18-cv-00120, (D.D.C., motion to dismiss denied Sept. 27, 2019). MPD's latest use of excessive force against demonstrators follows a long history of similar incidents where excessive force was deployed, including when MPD:

a.    used excessive force against and unconstitutionally detained demonstrators during the counter-inaugural demonstrations in Adams Morgan in January 2005; the pepper-spraying and arrest of numerous peaceful demonstrators led to lawsuits resolved by large settlement payments to victims of MPD violence;

b.      used excessive force against demonstrators during the counter-inaugural

demonstrations near the White House in January 2005 after other demonstrators

had removed a portion of security fencing; the pepper-spraying of law-abiding

demonstrators led to a lawsuit resolved by large settlement payments to victims of

MPD violence;

c.      used excessive force against and unconstitutionally detained demonstrators during

the World Bank protests in Pershing Park in September 2002; the mass arrests and

hogtying of protestors led to lawsuits resolved by large settlement payments to

victims of MPD violence;

d.      used excessive force against and unconstitutionally detained anti-globalization

demonstrators in April 2000; the kettling, use of pepper spray, and denial food

and water to detainees led to lawsuits resolved by large settlement payments to

victims of MPD violence.

111.    The improper use of chemical irritants, and the resulting harm to persons, was so

foreseeable that the District of Columbia Council prohibited their use to disperse a demonstration

"unless the assembly participants or others are committing acts of public disobedience

endangering public safety and security," as determined by a commanding officer at the scene.

D.C. Code § 5-331.16(b)(2).

112.    MPD has continued to use unjustified, excessive force to attack and discourage

demonstrators.

113.    For example, on the evening of June 1, 2020, after attacking the demonstrators

fleeing Lafayette Square, MPD officers deployed tear gas against demonstrators on Swann Street

NW.

25

114.    In the weeks following the June 1, 2020 attack, MPD officers repeatedly engaged in excessive force and unwarranted destruction of property against demonstrators in Black Lives Matter Plaza, including:

a.    the unjustified and excessive use of batons and chemical irritants causing significant physical injuries;

b.    unjustified arrests and detentions;

c.    the destruction of tents and supplies set up for the purposes of supporting the health and safety needs of the people protesting;

d.    the destruction of protest signs and cultural material; and

e.    the destruction of equipment for the preparation of food.

115.    The actions of Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50 near Lafayette Square on June 1 resulted from the District of Columbia's deliberately indifferent failure to train and/or supervise these officers regarding the appropriate circumstances in which to deploy chemical irritants. The prior incidents of excessive force during demonstrations, many of which involved chemical irritants and related to Presidential events, made the need for training so obvious and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the risk of constitutional violations.

116.    By the morning of June 3, 2020, federal law enforcement officers blocked access to Lafayette Square entirely, setting up a perimeter on I Street NW between 15th Street NW and 17th Street NW that remained in place for more than a week. During this time, there was no place for demonstrators to gather within sight of the White House.

**Defendants' Illegal Actions Caused and Are Causing Injuries to Plaintiffs**

***Plaintiff Black Lives Matter D.C.***

117.    Plaintiff Black Lives Matter D.C.'s mission is to end systemic racism, in particular the racially disproportionate use of state-sanctioned violence against the Black community. BLMDC achieves this mission through protests, public accountability campaigns, coalition-building, and other programming.

118.    BLMDC pursued its mission in the days since the death of George Floyd by directing members and individuals affiliated with the organization to attend protests throughout D.C. The organization sponsored an event on May 30, 2020 in which a caravan of cars drove through D.C. and protesters held signs and made statements raising awareness of police violence and racial justice issues. BLMDC has also provided first aid supplies, snacks, and water to demonstrations arranged by other organizations, while also assisting those organizations by coordinating with them to ensure that, at the events, there are legal observers and individuals prepared to record police officers who commit unlawful actions.

119.    On June 1, 2020, BLMDC provided snacks, masks, waters, and fliers that were disseminated at the Lafayette Square demonstration. BLMDC also dispatched members to record any officer misconduct and ensured that the demonstration had legal observers present.

120.    Multiple members of BLMDC were standing in or near Lafayette Square at the time law enforcement used force to disrupt the protest on June 1, 2020 and experienced Defendants' use of force and chemical irritants.

121.    Defendants' actions have frustrated the mission of BLMDC to fight racial injustice by chilling BLM members and supporters from exercising their rights to demonstrate and by creating fear when they do.

122.     Members of BLMDC felt so traumatized by law enforcement's violence at Lafayette Square that they had to take time off from organizing work and skipped calls with coalition members as well as calls with people who participated in social actions.

123.     BLMDC leaders and members fear that law enforcement will meet future protests with extreme violence.

124.     Since the Lafayette Square attack, BLMDC has chosen to refrain from participating in multiple demonstrations organized by the Movement 4 Black Lives between June 2 and June 3, 2020. This was done to protect BLMDC members from feared harm at the hands of law enforcement.

125.     April Goggans, a leader of BLMDC, has noticed a significant reduction in the number of people attending in-person protests since June 1, 2020. People who ordinarily attend in-person protests have informed Ms. Goggans that they are afraid to do so because of the violence that occurred at Lafayette Square.

126.     In response to Defendants' actions, BLMDC has been forced to:

a.     divert resources to assessing and planning for potential violence by police, including increased needs for medical support and supplies to counteract the effects of chemical agents. For example, the organization has purchased goggles to protect demonstrators from chemical irritants and paid for mental health services for a member who was present when Defendants forcibly expelled protesters from Lafayette Square, and suffered trauma as a result;

b.     enhance efforts to educate members and supporters regarding the potential dangers of police violence, how to protect themselves, and what to do if there is another assault like the one in Lafayette Square;

c.      engage in a communications campaign about the events in Lafayette Square to reduce the deterrent effects of Defendants' actions on the participation of their members or supporters;

d.      arrange for transportation from the demonstration for persons injured by Defendants' conduct; and

e.      facilitate medical care for persons injured by Defendants' actions.

127.    The time and effort BLMDC has expended due to Defendants' conduct has reduced its capacity to plan events and programming consistent with its mission. For example, the time BLMDC has spent on assessing safety considerations has prevented it from organizing trainings, including a know-your-rights training. This is curtailing the organization's capacity to fulfill its mission by effecting community change through peaceful demonstrations.

### *Plaintiffs Toni Sanders and J.N.C.*

128.    Toni Sanders is a Black resident of Southeast Washington, D.C.

129.    Ms. Sanders has joined multiple demonstrations at the White House beginning on Friday, May 29, 2020. She intends to continue protesting at the White House every day that the demonstrations continue.

130.    Ms. Sanders chooses to demonstrate at the White House because she wants to stop the murder of Black people at the hands of law enforcement. She believes that the White House is the best place to demonstrate because it can help convince President Trump to take action to combat racism in policing. She believes that protesting at the White House is a powerful symbol and is much more impactful than protesting in another part of the District.

131.    On the afternoon of June 1, Ms. Sanders traveled to Lafayette Square to demonstrate with her wife, Demetria Bright, and Ms. Bright's nine-year-old son, J.N.C.

Ms. Sanders had explained to her stepson about what had happened to George Floyd and wanted him to learn about peaceful protesting.

132.    When Ms. Sanders and her family arrived at Lafayette Square they stood between St. John's Church and the fence that surrounded the park. They arrived around 4:30 that afternoon.

133.    Ms. Sanders viewed the mood of the demonstrators as peaceful. People were passing out water and it made her hopeful that there was a diverse crowd nonviolently fighting for racial justice. The only aggressive behavior she witnessed from the demonstrators was an occasional obscenity directed toward the President.

134.    After being at the protest for around two hours, a reporter from a local television affiliate approached Ms. Sanders for an on-camera interview. She was in the middle of giving that interview when she suddenly heard very loud pops and bangs.

135.    Ms. Sanders looked toward the fence and saw smoke. Federal law enforcement had released irritants into the air that were causing her to tear up. There had been no warning or announcement from law enforcement before the chaos started.

136.    Ms. Sanders and Ms. Bright grabbed J.N.C. and ran. Ms. Sanders was very concerned that J.N.C. would be injured by the police or in the crowd that was trying to get away. They ran until they reached their car, which was parked near Thomas Circle. They headed home from the protest.

137.    Ms. Sanders continues to protest because she believes that change is necessary, but J.N.C. is traumatized by having to escape the tear gas from the federal law enforcement officers. J.N.C. speaks about the incident frequently and now worries when Ms. Sanders leaves to go protest.

### *Plaintiff Kishon McDonald*

138.    Kishon McDonald is a resident of Washington, D.C. and former member of the U.S. Navy. As an African American man, he is keenly interested in issues of racial justice.

139.    Mr. McDonald participated in peaceful demonstrations protesting the murder of George Floyd on two occasions in the District of Columbia. The first demonstration that he attended was on the night of May 30, 2020 outside the United States Capitol. The second demonstration he attended was the June 1, 2020 demonstration outside the White House in Lafayette Square.

140.    Mr. McDonald arrived at Lafayette Square at approximately 6:00 pm on Monday, June 1. There was a large gathering of other demonstrators, peacefully protesting near a security barricade lined with police officers on the opposite side. Mr. McDonald did not witness any acts that were aggressive or dangerous that could be perceived as a threat by law enforcement.

141.    At approximately 6:25 pm, law enforcement officers, suddenly and without warning, began to charge the crowd of demonstrators. Mr. McDonald was repeatedly struck by the shields of multiple officers which left bruises on his body. Officers continued to physically strike Mr. McDonald even after he began to leave the site of the demonstration.

142.    Simultaneously, at approximately 6:25 pm, tear gas canisters and concussion grenades were fired into the crowd. Tear gas obscured Mr. McDonald's vision, stung his eyes, and caused him to severely cough. Mr. McDonald witnessed the concussion grenades exploding with enough force to put holes into the ground.

143.    The efforts of law enforcement forced Mr. McDonald to retreat to the intersection of 16th Street NW and I Street NW, one block away from Lafayette Square. As Mr. McDonald approached the intersection, he saw that police officers were arresting demonstrators. Soon after he left the scene of the protest, he was detained by a police officer, but the officer let him go.

31

144.     The day after the attack in Lafayette Square, Mr. McDonald still suffered

symptoms related to inhaling tear gas, which included thick discharge from his nose. He also had

bruising in several locations on his body.

145.     Mr. McDonald has protested against police violence towards African Americans

in the past, and had planned to continue demonstrating in D.C. for George Floyd. However, the

events of June 1, 2020 have discouraged him. He fears that he will suffer serious harm at the

hands of law enforcement.

### *Plaintiff Garrett Bond*

146.     Garrett Bond is a white man who lives in Mount Rainier, Maryland.

147.     Mr. Bond participated in peaceful demonstrations protesting the murder of

George Floyd on two occasions in Washington, D.C. The first demonstration he attended was as

part of the car caravan throughout the District on May 30, 2020. The second demonstration he

attended was the June 1, 2020 demonstration outside the White House in Lafayette Square.

148.     Mr. Bond is an Eagle Scout and trained in basic first aid methods. He brought a

backpack containing first aid supplies with him to the June 1 demonstration. The supplies

included gauze pads, band aids, water, sanitizer, and extra masks and gloves that he brought to

protect himself and others from COVID-19 infection.

149.     Mr. Bond arrived at Lafayette Square at approximately 6:20 pm on Monday,

June 1, 2020. As he arrived, he positioned himself near the security barrier, which was lined with

demonstrators. He did not witness any acts that were aggressive or dangerous or that could be

perceived as a threat by law enforcement.

150.     Mr. Bond heard an announcement made through a megaphone by law

enforcement, reminding the demonstrators that the curfew would go into effect at 7:00 pm.

Almost simultaneously, Mr. Bond heard explosions from somewhere outside his field of vision. Demonstrators began to flee in all directions. He fled north toward St. John's Church.

151.    As Mr. Bond approached the church, he noticed an obviously injured demonstrator leaning against the wall. The victim was dazed and bleeding profusely. As Mr. Bond neared him, he noticed that victim had an object lodged in his face. At first, Mr. Bond thought it was his tooth, but upon closer inspection Mr. Bond saw it was a rubber bullet that had pierced his lower lip. Mr. Bond asked him to sit down and used gauze from his first aid kit to stem his bleeding. Almost immediately after Mr. Bond applied the gauze, someone yelled, "They're coming!" Mr. Bond then turned around to see several fully-armored police officers charging at him with batons and shields.

152.    Several nearby demonstrators helped him lift the injured man and carry him a block away where they found another medic to give the victim medical assistance.

153.    Mr. Bond left the demonstration area with his hands raised, avoiding further encounters with law enforcement.

154.    The events of June 1, 2020 were intimidating, but Mr. Bond intends to continue participating in demonstrations in the future.

### *Plaintiff Keara Scallan*

155.    Keara Scallan is a white resident of Northwest Washington, D.C.

156.    On June 1, 2020, Ms. Scallan decided to join the demonstrations near the White House with a friend. At approximately 6:20 pm, Ms. Scallan and her friend walked down 16th Street NW and arrived at fence surrounding Lafayette Square.

157.    Ms. Scallan witnessed law enforcement in riot gear when she arrived, all of whom were behind the fence.

158.    The crowd at Lafayette Square was non-violent and chanting. Ms. Scallan did not witness any demonstrators provoking law enforcement.

159.    Suddenly and without warning, Ms. Scallan felt the crowd begin to rush towards 17th Street NW. She was pushed against the fence as other demonstrators were running away, and she was briefly separated from her friend.

160.    Ms. Scallan was hit with rubber bullets and felt sudden pain in her face, arm, and leg.

161.    Ms. Scallan saw and heard three flash bang grenades and then noticed two tear gas canisters thrown at her and at other demonstrators.

162.    The irritants in the air made it very difficult to breathe. She had water and baking soda spray with her, but it did nothing to help her burning eyes. Ms. Scallan could hear other demonstrators retching.

163.    After fleeing the irritants in the air, Ms. Scallan reunited with her friend and they aided demonstrators as they got away from the White House. More law enforcement, including U.S. Drug Enforcement Administration ("DEA") vehicles, were blocking demonstrators from returning to Lafayette Square.

164.    Ms. Scallan received bruises on her arm and cuts on her lips and face, making it painful to use her arm and open her jaw for days. She has had difficulty eating and brushing her teeth because of her swollen lips and jaw.

### *Plaintiff Lia Poteet*

165.    Lia Poteet is a 28-year-old white woman who resides in Washington, D.C. She is a communications specialist.

166.    On June 1, 2020, Ms. Poteet participated in the peaceful demonstration in Lafayette Square protesting the murder of George Floyd.

167.    Ms. Poteet chose to demonstrate at the White House because she wanted to protest systemic racism and the Trump administration's role in contributing to race-based violence in the United States.

168.    Prior to June 1, 2020, Ms. Poteet had been out of town and had not attended any of the recent protests challenging systemic racism in Washington, D.C. She has, however, attended protests outside the White House in Lafayette Square for other causes, and they have been peaceful.

169.    On June 1, 2020, Ms. Poteet arrived in the northeast corner of Lafayette Square around 6:15 pm. She perceived the protest as peaceful and did not observe any acts of violence from the protesters around her.

170.    After she arrived in Lafayette Square, Ms. Poteet moved to the front row against the security barricade in front of the statue of Andrew Jackson. Law enforcement officers stood in a line on the opposite side of the barricade. Officers wore all black uniforms or green military uniforms, and held large riot shields and batons.

171.    Shortly before 6:30 pm, Ms. Poteet noticed the law enforcement officers in Lafayette Square begin to move forward in unison towards the protesters. She then heard flash bangs and people screaming. She continued standing with her hands up, holding a sign she had brought with her to the protest in one hand and her phone in the other.

172.    Approximately a minute later, Ms. Poteet saw a law enforcement officer charging directly at her. The officer pushed Ms. Poteet to the ground with his riot shield and the impact knocked her phone out of her hand. The officer began beating Ms. Poteet with his baton. He kicked and/or struck her in the stomach and knocked the wind out of her.

173.     Ms. Poteet attempted to crawl away from this officer and was able to briefly stand up. She made eye contact with him and pointed at the phone by her feet. The officer did not move so Ms. Poteet bent down to pick up her phone. He knocked her over again and started hitting her even harder. During this abuse, the officer kicked and/or struck Ms. Poteet's knee, where she previously had ACL surgery. Another protester eventually helped Ms. Poteet get away from the officer.

174.     Ms. Poteet limped away as quickly as she could, largely unable to inhale because of the officer's blow to her stomach and the surrounding smoke. A flash bang exploded at her right foot and then another one exploded at her left foot. The smoke from the flash bangs made it impossible to intake air without coughing. She went around the block and doubled over until she could breathe reliably again. She then limped to a friend's house and got a ride home from the protest.

175.     Two days after the attack in Lafayette Square, Ms. Poteet still had welts on her torso and bruises from the beating. Her knee continued to be bruised and swollen. Ms. Poteet was never able to locate or recover her phone, which the officer's initial assault had knocked out of her hand and which his continued abuse prevented her from picking up off the ground.

176.     Ms. Poteet continues to protest for George Floyd, but she is traumatized by the unprovoked violence committed against her by law enforcement officers. She no longer feels comfortable protesting if there is any sign of police movement near the protest and is therefore cautious about when and where she engages in such conduct. Although she has returned to the area near Lafayette Square since June 1, 2020, she has done so only briefly and with palpable concern and caution. She also is scared that she will be subjected to further violence by law enforcement at future protests.

### *Plaintiffs Dustin Foley and E.X.F.*

177.    Dustin Foley is a white man who lives in Falls Church, Virginia with his wife and daughter E.X.F.

178.    Mr. Foley worked in law enforcement as a community services officer for approximately a decade in California before moving to Virginia with his family and opening his own business.

179.    Mr. Foley and E.X.F. participated in peaceful demonstrations at the White House to protest the murder of George Floyd and the use of excessive force by law enforcement.

180.    On the afternoon of June 1, Mr. Foley and E.X.F. traveled to Lafayette Square to demonstrate and to distribute peanut butter and jelly sandwiches and water bottles to other protesters.  They parked several blocks west of Lafayette Square and brought the sandwiches and water with them from their car in a wagon.

181.    When Mr. Foley and E.X.F. arrived at Lafayette Square, they came upon a group near the northwest corner of Lafayette Square that had set up a food and beverage station. They decided to leave the wagon of sandwiches and water with this group for ease of access by fellow protesters.

182.    Mr. Foley and E.X.F. then stood near the security barricade on the north perimeter of Lafayette Square, which was lined with demonstrators.  Mr. Foley and E.X.F. perceived the demonstrators as peaceful.

183.    At approximately 6:00 pm, Mr. Foley and E.X.F. saw Defendant Barr enter Lafayette Square and approach law enforcement officials.  Mr. Foley and E.X.F. also saw additional officers in military uniforms begin to gather and join those already in the Square.

184.     Mr. Foley and E.X.F. decided to leave around this time because they were unsettled by the sight of the additional military and concerned about the actions that law enforcement might take against demonstrators.

185.     After a short walk, Mr. Foley and E.X.F. realized that they had forgotten to pick up their wagon, so they returned to food and beverage station at the northwest corner of Lafayette Square.

186.     Within minutes, the law enforcement officers gathered in Lafayette Square began to assault the assembled crowd, including Mr. Foley and E.X.F.

187.     Mr. Foley and E.X.F. heard flash bangs and witnessed people screaming and running frantically. Soon thereafter, Mr. Foley and E.X.F. began to feel the effects of chemical irritants that were wafting through the air, which made them cough.

188.     From the time they returned to the Square for their wagon until the deployment of force against the crowd of which they were a part, neither Mr. Foley nor E.X.F. heard saw any threatening or aggressive behavior by protestors or heard any warnings that they needed to leave the area or that force was about to be deployed against the crowd.

189.     As the officers from Lafayette Square pushed forward and forced demonstrators to retreat, Mr. Foley and E.X.F. hurried west on H Street NW to the intersection with 17th Street NW.

190.     At the intersection of 17th and H Streets NW, Mr. Foley and E.X.F. encountered a line of law enforcement officers wearing riot gear, standing shoulder-to-shoulder, blocking off H Street to the west and the 17th Street to the north.

191.     Mr. Foley and E.X.F. have since learned that these officers were with the Metropolitan Police Department.

192.     Mr. Foley and E.X.F. turned south down 17th Street NW and continued to leave the area by walking along the western sidewalk, which was covered by construction scaffolding.

193.     Shortly after they turned down 17th Street NW, the MPD officers began firing tear gas canisters at the demonstrators, including Mr. Foley and E.X.F., who were fleeing Lafayette Square down 17th Street NW.

194.     Both Mr. Foley and E.X.F. immediately felt the severe effects of the tear gas fired by the MPD officers, including burning eyes and difficulty breathing.  E.X.F. experienced significant symptoms, and had difficulty opening or seeing out of her eyes.

195.     As the street filled up with tear gas, Mr. Foley and E.X.F. attempted to take shelter at the south end of the scaffolding so E.X.F. could recover from the effects of the gas and to avoid additional tear gas that advancing MPD officers had fired further south on 17th Street NW. A fellow demonstrator attempted to help E.X.F. by pouring water into her eyes.

196.     As the MPD officers continued marching down 17th Street NW and deploying tear gas in Mr. Foley and E.X.F.'s direction, Mr. Foley announced to the officers (with hands raised) that his daughter had been injured and pleaded with the officers for medical attention.

197.     The MPD officers provided no assistance and instead yelled at Mr. Foley and E.X.F. to move, even though the only place to go was into the cloud of tear gas that had been deployed further down the street.

198.     Mr. Foley and E.X.F. obeyed the officers, and as a result fled into a cloud of tear gas that further exacerbated their symptoms.

199.     Mr. Foley and E.X.F. ultimately reached the car and drove home, with E.X.F. continuing to experience symptoms of the tear gas following the encounter with MPD.

200.    Mr. Foley and E.X.F. feel very afraid after this experience.  They have had difficulty sleeping because of the trauma and have struggled to come to terms with the unprovoked violence committed against them by the law enforcement officers, as well as the officers' failure to offer any medical attention or support.

201.    Mr. Foley and E.X.F. continue to protest the murder of George Floyd, but they are both scared of being subjected to further harm by law enforcement at future demonstrations.

**Involvement of the White House and the Attorney General in the Lafayette Square Attack**

202.    The actions described above occurred at least in substantial part at the behest of President Trump, Attorney General Barr, and/or other senior White House officials; Attorney General Barr personally ordered law enforcement officers to forcibly remove Plaintiffs and other class members from Lafayette Square and its vicinity.[19]

203.    Shortly after the attack on the demonstrators, the President and his senior advisors, including Attorney General Barr, Secretary of Defense Esper, White House Chief of Staff Mark Meadows, and Ivanka Trump, walked from the White House to St. John's Church, located across Lafayette Square from the White House. The President paused for a few minutes on the sidewalk outside the church for a photo opportunity, made brief remarks, and then walked back to the White House. The President did not enter St. John's Church.

204.    The President and his entourage lingered at the church and encouraged photographs from the press until at least 7:09 pm, nine minutes after the District's curfew went into effect.

---

[19] Carol D. Leoning et al., *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020, https://www.washingtonpost.com/politics/barr-personally-ordered-removal-of-protesters-near-white-house-leading-to-use-of-force-against-largely-peaceful-crowd/2020/06/02/0ca2417c-a4d5-11ea-b473-04905b1af82b_story.html.

205.    On Tuesday, June 2, President Trump praised the results of the prior evening's

law enforcement attack, tweeting that "D.C. had no problems last night. Many arrests. Great job

done by all. Overwhelming force. Domination."

## CLASS ACTION ALLEGATIONS

206.    Plaintiffs Sanders, McDonald, Bond, Scallan, Poteet, and Foley (collectively, the

"Representative Plaintiffs") bring this action on behalf of themselves and, under Federal Rules of

Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of classes defined as

follows:

> The Injunctive Relief Class: All individuals present at Lafayette Square, defined
> here as the area in Washington, D.C. between the north side of the White House
> and H Street NW and between Madison Place and Jefferson Place NW, or the
> streets or sidewalks adjacent to or surrounding Lafayette Square (including
> specifically:  H Street NW between 15th and 17th Streets NW, Vermont Avenue
> between H and I Streets NW, 16th Street between H and I Streets NW, 17th Street
> NW between H and G Streets NW, and Connecticut Avenue between H and I
> Streets NW), on June 1, 2020, at, around, or shortly after 6:30 pm, when the events
> described in paragraphs 43–64 above took place, who may attend or attempt to
> attend protests at this location in the future (hereinafter, "the Injunctive Relief
> Class").

> The Personal Injury Class: All individuals present at Lafayette Square, defined here
> as the area in Washington, D.C. between the north side of the White House and H
> Street NW and between Madison Place and Jefferson Place NW, or the streets or
> sidewalks adjacent to or surrounding Lafayette Square (including specifically: H
> Street NW between 15th and 17th Streets NW, Vermont Avenue between H and I
> Streets NW, 16th Street between H and I Streets NW, 17th Street NW between H
> and G Streets NW, and Connecticut Avenue between H and I Streets NW), on June
> 1, 2020, at, around, or shortly after 6:30 pm, when the events described in
> paragraphs 43–64 above took place, who incurred any injury, illness, or impairment
> as the result of Defendants' actions (hereinafter, "the Personal Injury Class").

207.    The following persons and entities are excluded from the proposed classes:

Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs,

successors and wholly or partly owned subsidiaries or affiliated companies; counsel and their

employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

208.    Plaintiffs McDonald, Bond, Sanders, Scallan, Poteet, and Foley are proposed as representatives of the Personal Injury Class.

209.    Plaintiffs Sanders, Bond, Poteet, and Foley are proposed as representatives of the Injunctive Relief Class.

210.    Each of the proposed classes meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4).

211.    The members of each class are so numerous that joinder is impracticable. The crowd assembled on June 1, 2020 at Lafayette Square and the streets and sidewalks around the Lafayette Square included hundreds, perhaps thousands of people. At approximately 6:30 pm, or shortly thereafter, Defendants used physical force, chemical irritants (i.e., tear gas, pepper spray, pepper balls, and/or other inhalants), and impact munitions to force these individuals to cease all protesting activity, disassemble, and leave Lafayette Square and the surrounding areas immediately or face arrest.

212.    Defendants dispersed these chemical irritants throughout the crowd and thereby assaulted a significant number of people. Moreover, there were hundreds of law enforcement officers in attendance, many wielding riot shields and batons, and many shooting rubber bullets or other impact munitions. The number of people assaulted by these individuals is therefore also numerous, particularly given the sudden and unannounced manner in which law enforcement overran and attacked the protesters.

213.    Representative Plaintiffs' claims are typical of the claims of all class members. Representative Plaintiffs' claims arise out of the same events and course of conduct that gives

rise to the claims of the other class members. Representative Plaintiffs and all class members had their constitutional rights violated and were harmed by the same wrongful conduct. Representative Plaintiffs and the Injunctive Relief Class are, additionally, subject to similar harm in the future.

214.    Representative Plaintiffs will fairly and adequately protect and represent the interests of the classes. Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes. In addition, Representative Plaintiffs are represented by counsel who are experienced and competent in the prosecution of civil rights litigation and have particular expertise with respect to class actions based on civil rights violations.

215.    Questions of law and fact common to the classes include:

a.    whether the Classes were entitled under the First Amendment to peacefully demonstrate at that time and location;

b.    whether and to what extent the use of force on the Classes was premeditated and planned in advance;

c.    whether law enforcement officers adequately informed protesters that they should disperse or leave Lafayette Square on June 1, 2020 before using force against them;

d.    whether law enforcement officers rushed and attacked the protesters who had assembled at Lafayette Square on June 1, 2020;

e.    whether and to what extent law enforcement officers' conduct was justified by a government interest and appropriately tailored to that interest;

f.    what the rules of engagement issued to law enforcement officers were and who authorized them;

g.    who authorized the use of flash-bang shells, tear gas, smoke canisters, pepper balls, other chemical irritants, rubber bullets and/or other projectiles on the crowd;

h.    whether and to what extent law enforcement officers fired flash-bang shells, tear gas, smoke canisters, pepper balls, and/or rubber bullets into the crowd;

i.    whether and to what extent the law enforcement officers' use of force on the Classes was related to the President's photo opportunity at St. John's Church immediately after these events;

43

j.      whether Defendants encouraged the use of force to remove protesters, such as those included within the Classes, from Lafayette Square;

k.      whether and to what extent the use of force to overrun and disperse the peaceful protest at Lafayette Square violated the First Amendment rights of the Class members to assemble, speak and petition the government;

l.      whether and to what extent the use of physical force to overrun and disperse a peaceful protest violated the rights of the Class members under the Fourth Amendment to be free from unreasonable seizures;

m.      whether Defendants acted in reckless or callous indifference to the rights of the Class members;

n.      whether Defendants, including but not limited to the President and Attorney General Barr, acted because of the viewpoints being expressed by the protesters;

o.      whether the acts of Defendants targeted Black people and their supporters in violation of 42 U.S.C. § 1985(3);

p.      whether the failure of law enforcement officers to stop Defendants' violations of 42 U.S.C. § 1985(3) violated 42 U.S.C. § 1986;

q.      whether and to what extent Defendants' actions may impair or threaten future activities protected by the First Amendment; and

r.      what equitable and injunctive relief for the Injunctive Relief Class is warranted.

216.    Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

217.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in the same forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that

might not be practicable to pursue individually, substantially outweigh any difficulties that may

arise in the management of this class action.

218.     Class treatment is also manageable, and Plaintiffs know of no management

difficulties that would preclude class certification in this case.

219.     Representative Plaintiffs reserve the right to seek to certify common questions

related to Defendants' knowledge, intent, and actions.

## CLAIMS FOR RELIEF

## CLAIM 1:
## VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH, ASSEMBLY, AND PETITION/*BIVENS*

**(Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan, Poteet, Foley, and E.X.F., and the Personal Injury Class, against Defendants Barr, Adamchik, Seberling, USPP A702, USPP A704, USPP A706, USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10, and John Does 1–100)**

220.     Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury

Class.

221.     The actions of Defendants Seberling, USPP A702, USPP A704, USPP A706,

USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10, and John Does 1–

100—namely, the suppression of a peaceful demonstration and the viewpoint it represented—

and the actions of Defendants Barr and Adamchik in ordering such suppression, deprived

Plaintiffs and the Personal Injury Class of their rights under the First Amendment to the United

States Constitution to freedom of speech, freedom of assembly, and freedom to petition the

government for a redress of grievances.

222.     Defendants deliberately violated well-established protections for the exercise of

speech and assembly in public places.

223.    Defendants' actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators.

224.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Personal Injury Class's First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest. Even assuming, arguendo, that there was a government interest in clearing Lafayette Square of demonstrators, Defendants' actions were not narrowly tailored to serve that government interest in a lawful manner.

225.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury Class pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for this violation of their rights.

226.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

## CLAIM 2:
## VIOLATION OF FOURTH AMENDMENT RIGHT TO FREEDOM FROM UNREASONABLE SEIZURE/*BIVENS*

**(Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan, Poteet, Foley, and E.X.F., and the Personal Injury Class, against Defendants Barr, Adamchik, Seberling, USPP A702, USPP A704, USPP A706, USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10 and John Does 1–100)**

227.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

228.    The actions of Defendants Seberling, USPP A702, USPP A704, USPP A706, USPP B714, USPP C723, USPP S735, USPP JD97, USPP LP71, USPP SK10, and John Does 1–100—namely, the use of physical force, including but not limited to chemical agents, frightening loud munitions, batons and shields, and a physical charge at Plaintiffs themselves in order to

46

forcibly cause their movement to halt or force them to move from the area in and around

Lafayette Square, without a warrant or probable cause—and the actions of Defendants Barr and

Adamchik, in ordering such uses of force, violated the rights of Plaintiffs and the Personal Injury

Class under the Fourth Amendment to the United States Constitution to be free from

unreasonable seizures.

229.   Defendants are jointly and severally liable to Plaintiffs and the Personal Injury

Class pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971), for this violation of their rights.

230.   Defendants acted with reckless or callous indifference to the federally protected

rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

## CLAIM 3:
## FIRST AMENDMENT/THREATENED VIOLATION OF FREEDOMS OF SPEECH, ASSEMBLY, AND PETITION

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, Foley, and E.X.F., and the
Injunctive Relief Class against Defendants Trump, Barr, Esper, Monahan, Murray,
Walker, and Carvajal)**

231.   Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive

Relief Class.

232.   Defendants' practice of deploying physical force against demonstrators to remove

them from places in which they have gathered with others to express their political opinions, as

manifested by their actions against Plaintiffs and class members in and around Lafayette Square

on June 1, 2020, by their repeated threats to deploy violence against protesters demonstrating

against racial injustice generally and in D.C. specifically, and by President Trump's statements at

¶¶ 53–64, threatens Plaintiffs and the Injunctive Relief Class with violations of their First

Amendment rights to freedom of speech and assembly when they carry out their stated intention

to return to Lafayette Square to express their political views.

233.    By depriving Plaintiffs and the Injunctive Relief Class of the opportunity to express their views on such future occasions, Defendants will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

234.    Plaintiff Black Lives Matter D.C. also faces the continuing harm of diverting resources to protect its members' and supporters' ability to engage in free speech and assembly, in response to Defendants' practices. Its effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by Defendants' threats of unjustified violence.

235.    The Court has inherent equitable power to enjoin violations of federal law by federal officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## CLAIM 4:
## FOURTH AMENDMENT/THREATENED UNREASONABLE SEIZURE

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, Foley, and E.X.F., and the Injunctive Relief Class against Defendants Trump, Barr, Esper, Monahan, Murray, Walker, and Carvajal)**

236.    Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive Relief Class.

237.    Defendants' practice of deploying physical force without provocation, warning, or legal grounds to do so, against demonstrators to force them to halt or to move, as manifested by their actions against Plaintiffs and class members in and around Lafayette Square on June 1, 2020, by their repeated threats to deploy violence against protesters demonstrating against racial injustice generally and in D.C. specifically, and by President Trump's statements at ¶¶ 53–64, threatens Plaintiffs and the Injunctive Relief Class with unreasonable seizures in violation of their Fourth Amendment rights when they carry out their stated intent to return to Lafayette Square when it is again open to the public to express their political views.

48

238.    By subjecting Plaintiffs and the Injunctive Relief Class to such unreasonable seizures, Defendants will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

239.    Plaintiff Black Lives Matter D.C. also faces imminently the continuing harm of diverting resources to protect its members and supporters from unreasonable seizures in responses to Defendants' practices. Its effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by Defendants' threats of unjustified violence.

240.    The Court has inherent equitable power to enjoin violations of federal law by federal officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## CLAIM 5:
## VIOLATION OF 42 U.S.C. § 1985(3) (CONSPIRACY TO DEPRIVE RIGHTS)

### (all Plaintiffs, including both Classes, against all Defendants)

241.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury and Injunctive Relief Classes.

242.    Defendants conspired together to deprive Plaintiffs and all class members of their civil rights in violation of 42 U.S.C. § 1985(3).

243.    The conspiracy included those involved with law enforcement actions in and around Lafayette Square on June 1, 2020 between 6:00 and 7:00 pm including all Defendants.

244.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to using violent force against civil rights activists in and around Lafayette Square.

245.    This conspiracy targeted Black people and their supporters. Both groups are protected classes under 42 U.S.C. § 1985(3).

246.     President Trump, Defendant Barr, and Defendant Esper directed the conspiracy to take these actions because of their adverse effects upon an identifiable group—namely, Black activists and their supporters.

247.     The remaining Defendants participated in, advised, supported, and/or helped advance the conspiracy.

248.     The conspiracy targeted protected rights of Plaintiffs and all class members, who are civil rights activists.

249.     The conspiracy targeted Plaintiffs' and all class members' protected First Amendment activities because Defendants do not like Plaintiffs' and the Personal Injury Class members' viewpoints. The violent actions of the conspirators directly and unlawfully interfered with these activities.

250.     The conspiracy targeted Plaintiffs' and all class members' right to be free from unreasonable seizures under the Fourth Amendment. The violent actions of the conspirators directly and unlawfully interfered with these rights.

251.     The conspiracy targeted and violently interfered with Plaintiffs' and all class members' right to use public accommodations, and therefore their right to be free from the badges and incidents of slavery. Lafayette Square and its environs are a place of public accommodation.

252.     The conspiracy targeted and violently interfered with Plaintiffs' and all class members' right to be free from racial violence, as protected by the Thirteenth Amendment of the United States Constitution.

253.     The individual-capacity Defendants are liable under § 1985(3) for damages, and the official-capacity Defendants should be enjoined from further violations.

254.    The individual-capacity Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and class members and therefore are liable for punitive damages.

## CLAIM 6:
## VIOLATION OF 42 U.S.C. § 1986 (FAILURE TO PREVENT A CONSPIRACY TO DEPRIVE RIGHTS)

### (all Plaintiffs, including both Classes, against all Defendants)

255.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury and Injunctive Relief Classes.

256.    Defendants violated 42 U.S.C. § 1986 by failing to meet their duty to prevent or aid in preventing conspiracies to deprive civil rights. Defendants knew that a Section 1985 violation was about to occur or was occurring, had the power to prevent or aid in preventing it, and neglected or refused to prevent or aid in preventing it.

257.    Law enforcement's failure to stop unlawful violence by a Section 1985(3) conspiracy when they know it is about to occur is a quintessential Section 1986 violation.

258.    As discussed above, the Section 1985 conspiracy consisted of using violence against peaceful civil rights activists. Defendants knew that such violence was planned and could have taken actions to stop or limit that violence. Defendants willfully or negligently took no such action.

259.    Defendants could and should have refused to comply with unlawful orders, refused to use force when clearing Lafayette Square and the surrounding area, refused to order or allow officers or soldiers under their command to carry out unlawful acts, affirmatively ordered officers or soldiers under their command to shield the demonstrators from unlawful acts, or attempted to appeal to superiors to take a different course of action.

260.    As a result of Defendants' failure to prevent or aid in preventing the Section 1985 conspiracy, Plaintiffs and all class members were injured, and their rights were violated.

261.    The individual-capacity Defendants are liable under § 1985(3) for damages, and the official-capacity Defendants should be enjoined from further violations.

262.    The individual-capacity Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and class members and therefore are liable for punitive damages.

**CLAIM 7:**
**VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH, ASSEMBLY, AND PETITION/42 U.S.C. § 1983**

**(Plaintiffs Foley and E.X.F., and the Personal Injury Class, against Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50)**

263.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

264.    The actions of Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50—namely, the suppression of a peaceful demonstration and the viewpoint it represented—and the actions of Defendants Carroll and Alioto in directing and overseeing these actions, deprived Plaintiffs and the Personal Injury Class of their rights under the First Amendment to the United States Constitution to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

265.    Defendants deliberately violated well-established protections for the exercise of speech and assembly in public places.

266.    Defendants' actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators.

267.    Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Personal Injury Class's First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest. Even assuming, arguendo, that there was a government interest in clearing Lafayette Square and its vicinity of demonstrators, Defendants' actions were not narrowly tailored to serve that government interest in a lawful manner.

268.    Defendants are jointly and severally liable to Plaintiffs and the Personal Injury Class pursuant to 42 U.S.C. § 1983 for this violation of their rights.

269.    Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

**CLAIM 8:**
**VIOLATION OF FOURTH AMENDMENT RIGHT TO FREEDOM FROM**
**UNREASONABLE SEIZURE/42 U.S.C. § 1983**

**(Plaintiffs Foley and E.X.F., and the Personal Injury Class, against Defendants Carroll, Alioto, Thau and John Roes 1–50)**

270.    Plaintiffs bring this claim on their own behalf and on behalf of the Personal Injury Class.

271.    The actions of Defendants Thau and John Roes 1–50—namely, the use of physical force, including but not limited to chemical agents in order to forcibly cause Plaintiffs' and Personal Injury Class members' movement to halt or to force them to move from the area around Lafayette Square, without a warrant or probable cause—and the actions of Defendants Carroll and Alioto in directing and overseeing these actions, violated the rights of Plaintiffs and the Personal Injury Class under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures.

53

272.     Defendants are jointly and severally liable to Plaintiffs and the Personal Injury

Class pursuant to 42 U.S.C. § 1983 for this violation of their rights.

273.     Defendants acted with reckless or callous indifference to the federally protected

rights of Plaintiffs and the Personal Injury Class and therefore are liable for punitive damages.

## CLAIM 9:
## FIRST AMENDMENT/THREATENED VIOLATION OF FREEDOMS OF SPEECH, ASSEMBLY, AND PETITION/42 U.S.C. § 1983

### (Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, and Foley, and the Injunctive Relief Class, against Defendant Newsham)

274.     Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive

Relief Class.

275.     The actions of Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy,

Payne, Taylor, Thau, Willis, and John Roes 1–50 near Lafayette Square on June 1 resulted from

the District of Columbia's deliberately indifferent failure to train and/or supervise MPD officers

regarding the appropriate circumstances in which to deploy chemical irritants. The prior

incidents of MPD's use of excessive force during demonstrations, many of which involved

chemical irritants and were related to Presidential events, made the need for training so obvious

and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the

risk of constitutional violations.

276.     This failure to train or supervise, in conjunction with the regular coordination

between MPD and federal law enforcement, who, as discussed, have threatened to deploy

violence against protesters demonstrating against racial injustice generally and in D.C.

specifically, threatens Plaintiffs and the Injunctive Relief Class with violations of their First

Amendment rights to freedom of speech and assembly when they carry out their stated intention

to return to Lafayette Square and the surrounding area to express their political views.

277.    By depriving Plaintiffs and the Injunctive Relief Class of the opportunity to express their views on such future occasions, Defendant Newsham and MPD will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

278.    Plaintiff Black Lives Matter D.C. also faces the continuing harm of diverting resources to protect its members' and supporters' ability to engage in free speech and assembly, in response to the threat of excessive force by MPD. Black Lives Matter D.C.'s effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by the threat of unjustified violence.

279.    Injunctive relief is authorized under 42 U.S.C. § 1983.

### CLAIM 10:
### FOURTH AMENDMENT/THREATENED UNREASONABLE SEIZURE/42 U.S.C. § 1983

**(Plaintiffs Black Lives Matter D.C., Sanders, Bond, Poteet, and Foley, and the Injunctive Relief Class, against Defendant Newsham)**

280.    Plaintiffs bring this claim on their own behalf and on behalf of the Injunctive Relief Class.

281.    The actions of Defendants Carroll, Alioto, Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau, Willis, and John Roes 1–50 near Lafayette Square on June 1 resulted from the District of Columbia's deliberately indifferent failure to train and/or supervise MPD officers regarding the appropriate circumstances in which to deploy chemical irritants. The prior incidents of MPD's use of excessive force during demonstrations, many of which involved chemical irritants and were related to Presidential events, made the need for training so obvious and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the risk of constitutional violations.

282.     This failure to train or supervise, in conjunction with the regular coordination between MPD and federal law enforcement, who, as discussed, have threatened to deploy violence against protesters demonstrating against racial injustice generally and in D.C. specifically, threatens Plaintiffs and the Injunctive Relief Class with violations of their Fourth Amendment rights to be free from unreasonable seizures when they carry out their stated intention to return to Lafayette Square and the surrounding area to express their political views.

283.     By subjecting Plaintiffs and the Injunctive Relief Class to such unreasonable seizures, Defendant Newsham and MPD will impose irreparable harm upon Plaintiffs and the Injunctive Relief Class.

284.     Plaintiff Black Lives Matter D.C. also faces imminently the continuing harm of diverting resources to protect its members and supporters from unreasonable seizures in response to the threat of excessive force by MPD. Black Lives Matter D.C.'s effectiveness as a political entity will also be irreparably harmed by its inability to generate participation in protest events, because potential participants will have been deterred from participating by threats of unjustified violence.

285.     Injunctive relief is authorized under 42 U.S.C. § 1983.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray that the Court:

286.     Certify the case as a class action on behalf of the proposed Classes;

287.     Designate Plaintiffs McDonald, Bond, Sanders, Scallan, Poteet, and Foley as representatives of the Personal Injury Class;

288.     Designate Plaintiffs Sanders, Bond, Poteet, and Foley as representatives of the Injunctive Relief Class;

289.     Designate Plaintiffs' counsel as Class Counsel;

290.     Issue a judgment declaring that the acts of Defendants described herein violate the

First Amendment, the Fourth Amendment, 42 U.S.C. §§ 1983, 1985, and 1986;

291.     Issue an injunction ordering Defendants Barr, Esper, Monahan, Murray, Walker,

Carvajal, and Newsham to cease engaging in the unlawful acts described herein;

292.     Award compensatory and punitive damages to Plaintiffs and the Personal Injury

Class according to proof at trial, including damages for pain and suffering;

293.     Award costs of suit and attorney's fees; and

294.     Provide such other and further relief as the Court may deem just, proper, and

appropriate.

## JURY DEMAND

295.     Plaintiffs request a trial by jury on any and all issues raised by this Complaint

which are triable by right of a jury.

Dated September 1, 2020                    Respectfully submitted,

                                           /s/ Kaitlin Banner

                                           Kaitlin Banner (D.C. Bar No. 1000436)
                                           Tristin Brown (D.C. Bar No. 1671642)
                                           Dennis Corkery (D.C. Bar No. 1016991)
                                           Hannah Lieberman (D.C. Bar No. 336776)
                                           Jonathan Smith (D.C. Bar No. 396578)
                                           WASHINGTON LAWYERS'
                                           COMMITTEE FOR CIVIL RIGHTS AND
                                           URBAN AFFAIRS
                                           700 14th Street, NW, Suite 400
                                           Washington, D.C. 20005
                                           Phone: (202) 319-1000
                                           Fax: (202) 319-1010
                                           kaitlin_banner@washlaw.org
                                           tristin_brown@washlaw.org
                                           dennis_corkery@washlaw.org
                                           hannah_lieberman@washlaw.org
                                           jonathan_smith@washlaw.org

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org
aspitzer@acludc.org
mperloff@acludc.org

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)*
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
aago@lawyerscommittee.org
dspence@lawyerscommittee.org
dbrody@lawyerscommittee.org
agordon@lawyerscommittee.org
nbaron@lawyerscommittee.org

*Application to this Court pending*

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com
David.Kouba@arnoldporter.com
Tom.McSorley@arnoldporter.com
Sonia.Tabriz@arnoldporter.com