## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Civil Action No. 20-1469 (DLF) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE DISTRICT OF COLUMBIA DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

## INTRODUCTION

On the evening of June 1, 2020, federal law enforcement officers cleared protestors from Lafayette Square by force. The District of Columbia did not. Nevertheless, plaintiffs' Third Amended Complaint (TAC) now asserts claims against ten named officers of the Metropolitan Police Department (MPD) in their personal capacities and MPD Chief Peter Newsham in his official capacity (collectively, the District Defendants). Plaintiffs allege that the District Defendants conspired with the federal defendants against the protestors at Lafayette Square, and that the District Defendants' actions to maintain crowd control more than a block away from Lafayette Square after the protestors were forcefully removed by the federal defendants violated their First and Fourth Amendment rights. Plaintiffs' claims against the District Defendants are baseless and should be dismissed.

First, plaintiffs cannot state a claim under 42 U.S.C. § 1985(3) (Section 1985(3)) because there was no conspiracy to interfere with plaintiffs' civil rights. Plaintiffs' bare allegation of "coordination" between MPD and federal law enforcement falls far short of alleging that any officer or District official agreed to enter any conspiracy, or that any officer's actions were motivated by racial animus. Plaintiffs' claim under 42 U.S.C. § 1986 (Section 1986) for an alleged failure to prevent a conspiracy to deprive plaintiffs' rights cannot be sustained for the same reasons, and also because plaintiffs fail to plausibly allege that the District Defendants had the ability to prevent the federal defendants' conduct in clearing Lafayette Square.

Second, plaintiffs fail to allege that the District Defendants violated their First Amendment rights. Plaintiffs allege no facts to support an inference that any individual District Defendant was involved in the decision to clear Lafayette Square. Plaintiffs also fail to state a claim for First Amendment retaliation because they do not allege: (1) that they were participating in First Amendment activity when they encountered the line of MPD officers, or (2) that the District Defendants acted with the purpose to chill plaintiffs' right to free expression.

Third, plaintiffs fail to state a claim that any District Defendant used excessive force in violation of the Fourth Amendment. Plaintiffs do not allege a seizure, let alone excessive force. And even if the force were excessive, given the full context of the situation (which included three consecutive nights of rioting prior to June 1, 2020), the District Defendants are entitled to qualified immunity; it was not clearly

established that an MPD officer could not use tear gas when abruptly confronted with a surging crowd of protestors driven towards them, after those protestors had been attacked by a different set of law enforcement officers at Lafayette Square, with only minutes remaining before a city-wide curfew went into effect and in the midst of an unprecedented global pandemic.

Finally, plaintiffs' claims against Chief Newsham in his official capacity should be dismissed because they fail to state a claim for municipal liability under 42 U.S.C. § 1983 (Section 1983). Plaintiffs cite to a handful of disconnected incidents, three of which happened more than fifteen years ago, but fall far short of establishing a municipal custom or deliberate indifference, let alone a constitutional violation. The Court should dismiss the claims against the District Defendants with prejudice.

## BACKGROUND

### I.   Protests Erupt Across the District of Columbia.

On May 25, 2020, George Floyd was killed by a police officer in Minneapolis, Minnesota. TAC ¶ 2. As news of Mr. Floyd's death reverberated throughout the country, thousands of people took to the streets to protest. *Id.* ¶¶ 53–59. Beginning on May 29, large-scale protests occurred in Washington, D.C. *Id.* ¶¶ 51–52. While many individuals were peaceful, many were not, as reported by the Washington Post:

> … [T]he protesters launched fireworks and threw bottles at the officers … .
>
> As demonstrators made little headway in their efforts to approach the White House, they dispersed into smaller groups through downtown D.C., burning and breaking windows as they went. A CVS, optometrist's office, liquor store and Indian restaurant several blocks from the White House were looted.

> Around Farragut Square, City Center and Georgetown, they smashed the facades of businesses with rocks and baseball bats.
>
> At least two cars were burned.[1]

The Washington Post reported similar incidents occurring on May 31:

> … another night of mayhem …
>
> American flags and parked cars and buildings were lit ablaze—including St. John's Church.
>
> Downtown, baseball bats bashed through windows at coffee shops, banks and one office building after another. Vandals and looters roamed throughout the city, scrawling graffiti and targeting dozens of businesses well after the mayor's 11 p.m. curfew began.
>
> Some hit a liquor store near Foggy Bottom, where young men, both white and black, snatched handles of alcohol and took swigs while others ran off with all they could carry. In Shaw, a Giant grocery store—with employees still inside—was broken into, as was a Sephora in Gallery Place. On H Street NE, looters ransacked a CVS. In Georgetown, the Nike store's boarded-up doors were broken down and its merchandise plundered. In Friendship Heights and Tenleytown, five miles from the White House, other groups hit a Target and smashed open Rodman's, a beloved drugstore, specialty grocer and housewares shop—all in one.[2]

---

[1]     Marissa J. Lang *et al.*, *Tension Between Police and Protestors Flares in Front of the White House Before Vandalism and Sporadic Fires*, Wash. Post., May 30, 2020, at 1–2, 2020 WLNR 15150068.

[2]     Rebecca Tan *et al.*, *Night of Destruction Across D.C. After Protestors Clash with Police Outside White House*, Wash. Post., May 31, 2020, at 1, 2020 WLNR 15211588.

The violence led to eleven police officers being injured, including one with a fractured leg.[3]

## II.   <u>The District Imposes a Curfew.</u>

In response to the violence, Mayor Muriel Bowser issued an order on June 1, 2020 imposing a city-wide curfew starting at 7:00 p.m. *See* Mayor's Order No. 2020-069, Continuation of District-wide Curfew during COVID-19 Public Emergency and Second Public Emergency, 67 D.C. Reg. 6982–84 (June 5, 2020). The Mayor explained why the curfew was necessary:

> In multiple areas throughout the District of Columbia, numerous businesses, vehicles, and government buildings have been vandalized, burned, or looted. More than eighty (80) individuals were arrested over the past two (2) days in connection with these incidents, with the majority charged with felonies.
>
> On the night of May 31, 2020, looting and vandalism occurred at multiple locations throughout the city, in addition to the rioting in the downtown area. Vandals smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown, and caused extensive damage in the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District. Rioting and looting affected the operations of the District government agencies.

The Mayor's concerns over what might happen that night were well-founded, as reported by the Washington Post:

> Those who remained on the streets seemed more interested in looting than protesting. Around 10 p.m., they began smashing windows on New Jersey Avenue, along with Fourth and Seventh Streets. Chinatown businesses including Dunkin', Legal Seafood and [Bibipop] had windows destroyed.

---

[3]      *Id.* at 4.

One man pried the boards off a CVS and dozens sprinted inside … . He emerged moments later with arms bulging with [merchandise].[4]

## III. Federal Officers Forcefully Remove Protestors from Lafayette Square.

Plaintiffs allege that President Trump was unhappy with the protests around the country and wanted to show he could "dominate" the protestors. TAC ¶¶ 53–64. President Trump was particularly upset with how state and local officials were responding to the protests, including Mayor Bowser's handling of the protests. *See id.*; Pls.' Mot. for Class Cert. Ex. 13 [47-15] ("The president has repeatedly criticized the D.C. government and its mayor, Muriel E. Bowser.").

On June 1, plaintiffs allege that President Trump decided to walk through Lafayette Square to St. John's Church. TAC ¶ 4; Pls.' Mot. for Class Cert. Ex. 5 [47-7]. In response, U.S. Attorney General William Barr ordered that protestors currently located near St. John's Church be removed. TAC ¶ 79; Pls.' Mot. for Class Cert. Ex. 5. Plaintiffs allege that many officers used excessive force when clearing H street. TAC ¶¶ 90–99. The officers identified by plaintiffs who cleared H street are federal or non-District officers. *Id.*[5] Mayor Bowser and Chief Newsham criticized the actions of federal law enforcement as "premature and unwarranted." Pls.' Mot. for Class Cert. Ex. 19.[6]

---

[4]    Pls.' Mot. for Class Cert. Ex. 6 [47-8] at 3.

[5]    *See also* Pls.' Mot. for Class Cert. Exs. 5, 6, 19, 21, 28 [47-7, -8, -21, -23, -30].

[6]    *See also* Press Release, Mayor Muriel Bowser, Mayor Bowser Responds to the President's Tweets (May 30, 2020) (available at https://mayor.dc.gov/release/mayor-bowser-responds-presidents-tweets) ("[T]here is no police department in the nation

IV.   **Plaintiffs Foley and E.X.F. Encounter MPD Officers Near Lafayette Square.**

Dustin Foley and his daughter E.X.F. are the only named plaintiffs who allege interacting with MPD officers after being forcefully cleared from Lafayette Square by federal law enforcement officers. At the intersection of 17th and H Streets, N.W., they allege that MPD officers required them to travel south on 17th Street. TAC ¶¶ 189–93. Shortly after turning onto 17th Street, plaintiffs Foley and E.X.F. allege that tear gas was discharged. *Id.* Foley and E.X.F. do not allege that they were specifically targeted by any MPD officers, only that tear gas was deployed "in [their] direction." *Id.* ¶ 196. After pausing under scaffolding on the western sidewalk of 17th Street, an unidentified MPD officer allegedly refused to provide medical assistance for E.X.F. *Id.* ¶¶ 195–97. Foley and E.X.F. subsequently continued down the street, ultimately reaching their car and driving home without being arrested or detained. *Id.* ¶¶ 198–99. Foley and E.X.F. allege that "E.X.F. continu[ed] to experience symptoms of the tear gas following the encounter" as the two drove home, and that both experience "difficulty sleeping because of the trauma … ." *Id.* ¶¶ 199–200.

V.   **Plaintiffs Sue the District for the Clearing of Lafayette Square.**

Plaintiffs' Complaint was filed on June 4, 2020, and first amended on June 9, 2020. *See* Compl. [1]; Am. Compl. [11]. On August 5, 2020, this Court granted leave for plaintiffs to file a Second Amended Complaint which added as defendants MPD

---

better prepared to safely support Americans exercising their First Amendment rights than the Metropolitan Police Department … . [W]e need leaders who recognize this pain and in times of great turmoil and despair, can provide us a sense of calm and a sense of hope. Instead what we've got in the last two days from the White House is the glorification of violence against American citizens.").

Chief Peter Newsham and a set of unnamed "John Roe" defendants, defined as "officers of MPD who participated in the attack on peaceful protestors near Lafayette Square on June 1, 2020." *See* Second Am. Compl. [29] ¶¶ 23, 26. Also on August 5, 2020, plaintiffs moved for leave to conduct early discovery targeted at identifying the Roe defendants, as well as unknown federal officers and unknown officers from other jurisdictions. Mot. for Discovery to Identify Unnamed Defs. [27]. The Court denied that motion on August 19, 2020, and on September 3, 2020, plaintiffs filed the TAC, which introduced, among others, ten MPD officers as named defendants. *See* Aug. 19, 2020 Order [19]; TAC [52].

In total, plaintiffs bring six claims against the District Defendants. First, all plaintiffs allege that all District Defendants conspired with President Trump, Attorney General Barr, and the other defendants to remove them from the area around Lafayette Square in violation of Section 1985(3), and failed to prevent this conspiracy in violation of Section 1986. TAC ¶¶ 241–62 (Claims Five and Six). Plaintiffs Foley and E.X.F. allege that the MPD officers deprived them of their First Amendment rights to speech, assembly and petition through "the suppression of a peaceful demonstration and the viewpoint it represented." *Id.* ¶¶ 264–69 (Claim Seven). Plaintiffs Foley and E.X.F. also allege that the MPD officers violated their right to be free from unreasonable seizures under the Fourth Amendment. *Id.* ¶¶ 271–73 (Claim Eight). Finally, plaintiffs Black Lives Matter DC and some, but not all, of the individual plaintiffs allege that the District failed to properly train MPD

officers in the deployment of chemical irritants in violation of their First and Fourth Amendment rights. *Id.* ¶¶ 274–84 (Claims Nine and Ten).

## LEGAL STANDARDS

In considering a motion to dismiss, a court "must treat the complaint's factual allegations as true and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotations omitted). "It need not accept as true, however, 'a legal conclusion couched as a factual allegation' or an inference unsupported by the facts set forth in the Complaint. *Mills v. Hayden*, 284 F.Supp.3d 14 (D.D.C. 2018) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).

Generally, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). But "there are some narrow exceptions in which a court may, if it chooses, consider extrinsic documents, such as documents the authenticity of which are not disputed by the parties; … official public records; … documents central to the plaintiff's claim; [and] … documents sufficiently referred to in the complaint without turning the 12(b)(6) motion into a motion for summary judgment." *Newman v. Lehman Bros. Holdings Inc.*, 901 F.3d 19, 25 (1st Cir. 2018) (internal quotations omitted); *see, e.g., Shetty v. JP Morgan Chase Bank NA*, 703 F. App'x 599, 599 (9th Cir. 2017) (finding that district court did not abuse its

discretion in considering public records and bankruptcy court documents when deciding motion to dismiss without converting it to a motion for summary judgment).

## ARGUMENT

**I.** **Plaintiffs' Section 1985(3) and Section 1986 Claims Fail Against the District Because They Do Not Adequately Plead That Any District Defendant Joined a Conspiracy To Violate Plaintiffs' Civil Rights.**

Plaintiffs' claim against the District Defendants for violating Section 1985(3) fails as a matter of law. To state a claim under Section 1985(3), plaintiffs must allege:

> (1) A conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, … and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States.

*Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). Here, plaintiffs have failed to allege that the District Defendants conspired with the other defendants or were motivated in any way by racial animus. And plaintiffs' Section 1986 claim fails because it must be predicated on a Section 1985(3) violation, and plaintiffs have not, and cannot, show that the District Defendants had the ability to prevent the alleged Section 1985(3) conspiracy of the other defendants.

### A.   **Plaintiffs' Allegations of Coordination Are Insufficient To Show That the District Defendants Agreed To Conspire.**

Plaintiffs' TAC wholly fails to show that the District Defendants took part in an alleged conspiracy of the federal defendants to violate the civil rights of protestors at Lafayette Square. Participation in a conspiracy requires an "agreement or meeting of the minds." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019)

(quoting *McCreary v. Heath*, Civil Action No. 04–0623, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005)). To demonstrate this participation, a plaintiff must proffer "more than just conclusory allegations of an agreement." *Id.* at 61 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Plaintiffs devote much detail to their allegations that President Trump, Attorney General Barr and other federal defendants personally coordinated the actions of federal law enforcement officers at Lafayette Square on June 1, 2020, *see, e.g.*, TAC ¶¶ 60, 79, 80, 82, but they do not allege that *any* District officer or official also proposed, planned or prepared those actions. Plaintiffs' sole factual allegation of a connection between a District and federal official is that "[a]pproximately 30 minutes before the attack began at Lafayette Square on June 1, an MPD supervisory officer met and conferred with U.S. military officers in the presence of the Army Chief of Staff on 16th Street NW less than two blocks north of Lafayette Square." *Id.* ¶ 106. Nowhere do plaintiffs suggest that this MPD officer was even informed of the alleged conspiracy of the federal defendants at this meeting, let alone that he or she committed to joining it.[7] Even if that person had, plaintiffs completely fail to show that any of the named District Defendants were also informed of the conspiracy and also agreed to join it. *See Kurd*, 374 F. Supp. 3d at 62; *see also Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) ("[I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who

---

[7]     Plaintiffs have not named any U.S. military officer or the Army Chief of Staff as a defendant in this case, or otherwise alleged that they are members of the alleged conspiracy.

is to be held responsible for its consequences.") (quoting *Lenard v. Argento*, 699 F.2d 874, 882–83 (7th Cir. 1983)); *Sines v. Kessler*, 324 F. Supp. 3d 765, 784 (W.D. Va. 2018) (evaluating Section 1985(3) allegations against defendants on an individual basis, considering "specificity about the method of agreement, the time or place of the agreement, and the scope of the agreement").

Nevertheless, plaintiffs conclude that "Defendants conspired together to deprive Plaintiffs and all class members of their civil rights in violation of [Section 1985(3)]," and "[t]he remaining Defendants participated in, advised, supported, and/or helped advance the conspiracy." TAC ¶ 242, 247. This amounts to nothing more than precisely the kind of conclusory allegations found to be insufficient to plead a conspiracy in *Twombly*. 550 U.S. at 556–57; *see also Graves v. United States*, 961 F. Supp. 314, 320–21 (D.D.C. 1997) (dismissing Section 1985(3) case because plaintiff failed to allege in a non-conclusory way that any of the named plaintiffs entered into an agreement or "meeting of the minds"); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 70–71 (D.D.C. 1988) (distinguishing between mere communication among parties and agreement to conspire in a Section 1985(3) case).

Instead, plaintiffs rest on mere implication that the District Defendants participated in the alleged conspiracy, by asserting that "MPD regularly acts in coordination with federal law enforcement to police major demonstrations" and concluding that "[t]he actions of federal officers and MPD … were coordinated and reflect a concerted plan to drive demonstrators away from Lafayette Square." TAC

¶¶ 105, 107.[8] Even if, however, the District Defendants had acted with a common goal "to drive demonstrators away from Lafayette Square and its vicinity by force," *id.* ¶ 107, merely alleging "[a] common goal, never discussed explicitly or implicitly among the Defendants, does not constitute an agreement." *Kurd*, 374 F. Supp. 3d at 62; *see also Estate of Phillips v. District of Columbia*, 257 F. Supp. 2d 69, 83 (D.D.C. 2003), *rev'd on other grounds*, 455 F.3d 397 (D.C. Cir. 2006).

In this context, MPD officers' arrival at the intersection of 17th and H Streets, N.W.—more than a block from Lafayette Square—in the hour before a District-imposed 7 p.m. curfew is conduct more sensibly ascribed to preparing to enforce that curfew. *See* TAC ¶¶ 104, 150; *Twombly*, 550 U.S. at 556–57 ("[W]hen allegations of parallel conduct are set out in order to make a [conspiracy] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."); *see also* Pls.' Mot. for Class Cert. Exs. 13, 19, 20 [47-15, -21, -22] (indicating that the District did not coordinate with the federal government and was only informed of the federal government's intention to clear Lafayette Square moments beforehand). Because plaintiffs fail to adequately allege that the District Defendants entered into any kind of conspiracy with the federal defendants, implicit or explicit, their Section 1985(3) claim against the District Defendants must fail.

---

[8]    Plaintiffs further allege that "MPD has a history of using unjustified, excessive force to attack and interfere with demonstrators." *Id.* ¶ 110. But plaintiffs fail to show how the five cited incidents in the past twenty years have any bearing on the District Defendants' alleged conspiracy with the federal defendants here.

**B.**    **Plaintiffs Fail To Allege Any Facts Showing That Any District Defendant Joined the Conspiracy for the Purpose of Violating Plaintiffs' Civil Rights.**

Plaintiffs' TAC is equally deficient as to the second requirement of a Section 1985(3) claim:  that the District Defendants allegedly joined the conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." *Atherton*, 567 F.3d at 688. Although plaintiffs' TAC stresses repeatedly that plaintiffs primarily seek to vindicate First and Fourth Amendment rights, *see, e.g.*, TAC ¶¶ 1, 4, 8, 51, 66, Section 1985(3) explicitly extends to deprivations of "equal protection of the laws." 42 U.S.C. § 1985(3). As such, the Supreme Court has held that a Section 1985(3) claim must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Farber v. City of Paterson*, 440 F.3d 131, 134–43 (3rd Cir. 2006) (discussing history of Section 1985(3) and concluding that it does not cover conspiracies targeted at persons with common political affiliations). And the intent requirement is demanding; "the defendant [must] do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993).

Here, plaintiffs allege that "[t]his conspiracy targeted Black people and their

14

supporters." TAC ¶ 245; *see also id.* ¶ 215(o).[9] Although plaintiffs present facts implying that certain federal defendants were motivated by racial animus against African Americans, TAC ¶¶ 53–64, 246, there are no allegations that any District Defendant shared such sentiments, much less explicitly intended to cause an invidiously discriminatory deprivation. *See Bray*, 506 U.S. at 276. Even if the District Defendants were informed of the federal defendants' plans to clear Lafayette Square, and were aware that such plans could constitute discrimination against plaintiffs,[10] communications alone "clearly do not raise an inference that [Defendants] were conspiratorially motivated by some class-based, invidiously discriminatory animus." *Atherton*, 567 F.3d at 688. Instead, plaintiffs' factual allegations are entirely consistent with the District Defendants acting with any number of other purposes or motivations, including to defend from and control a large group of protestors acting violently after being attacked at Lafayette Square by the federal defendants. *See Kurd*, 374 F. Supp. 3d at 62. Because plaintiffs have failed to show any racial animus or discriminatory purpose on the part of the District Defendants, plaintiffs' Section 1985(3) claim against them fails as a matter of law. *See Graves*, 961 F. Supp. at 321–

---

[9]     Plaintiffs' allegations that "Defendants do not like Plaintiffs' … viewpoints," TAC ¶ 249, are irrelevant as even if the District Defendants did oppose plaintiffs' political viewpoints, that allegation cannot establish a class-based animus. *Cf. Bray*, 506 U.S. at 268–74 (holding that opposition to abortion does not establish a gender-based animus). Regardless, this bare assertion is not supported by any non-conclusory supporting facts as to the District Defendants specifically.

[10]     Plaintiffs fail to show that they were "disadvantaged in favor of a person who was not a member of the protected class," as required to make a prima facie case of discrimination. *See Crawford v. Signet Bank*, 179 F.3d 926, 928 (D.C. Cir. 1999).

22; *Thomas*, 681 F. Supp. at 69–70 (dismissing Section 1985(3) allegation that defendant conspired to attack plaintiffs, who were protesting at Lafayette Park, because plaintiffs did not allege with sufficient specificity that defendants acted "out of racial or religious bias or out of any invidious, class-based animus"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 682–83 (2009).

C.  **Plaintiffs' Section 1986 Claim Against the District Defendants Fails Because the District Defendants Are Not Liable Under Section 1985(3) and Did Not Have the Ability To Prevent the Alleged Conspiracy.**

A valid Section 1986 claim here depends on the existence of a Section 1985(3) conspiracy. *See Avila v. CitiMortgage, Inc.*, 45 F. Supp. 3d 110, 122 (D.D.C. 2014) (citing *Herbin v. Hoeffel*, No. 99-7244, 2000 WL 621304, at *1 (D.C. Cir. Apr. 6, 2000)); *see also Thomas*, 681 F. Supp. at 72. Therefore, plaintiffs' Section 1986 claim against the District Defendants fails for the same reasons as their Section 1985(3) claim.

Even if plaintiffs had stated a valid Section 1985(3) claim, their Section 1986 claim would still fail because plaintiffs do not show that any of the District Defendants had the ability to prevent the members of the alleged conspiracy from carrying it out. *See Bowie v. Maddox*, 642 F.3d 1122, 1128 (D.C. Cir. 2011). Plaintiffs claim, generally, that defendants could have refused to comply with unlawful orders, ordered subordinates to protect plaintiffs, and appealed to their superiors. TAC ¶ 259. But plaintiffs have not shown that any of these steps would have been effective at preventing the alleged conspiracy—neither the President nor any other federal defendant is under the authority of MPD. The District Defendants were thus not in

a position to prevent the federal defendants' alleged conspiracy any more than a general member of the public.

II.   **Plaintiffs' First Amendment Claims Fail Against the District Because the District Defendants Did Not Close Lafayette Park or Retaliate Against Plaintiffs' Rights to Speech, Assembly and Petition.**

Plaintiffs' First Amendment claim fails because they do not show that the District Defendants themselves closed Lafayette Square or retaliated against plaintiffs' First Amendment-protected activities there.

To begin with, plaintiffs do not allege that a District Defendant ordered the closure of Lafayette Square. TAC ¶ 5.[11] And although plaintiffs include conclusory statements that MPD officers "participated in dispersing the demonstration at Lafayette Square," *id.* ¶¶ 37–44, they acknowledge elsewhere that these officers were *not* stationed at the Square itself, *id.* ¶¶ 67, 72–75, nor participated in closing the Square. *Id.* ¶¶ 82–83, 91–99. For these reasons, the District Defendants cannot be liable for alleged interference with plaintiffs' First Amendment rights based on the closure of Lafayette Square. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the [injury]. Plaintiffs cannot rely on

---

[11]   Plaintiffs cannot make this allegation because Lafayette Square is a federal park, not under the District's jurisdiction. *See Thomas*, 681 F. Supp. at 59. Plaintiffs are therefore also not entitled to any injunctive relief against the District involving management of Lafayette Square, because they cannot show redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 568–70 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.*, 528 U.S. 167, 185 (2000) (noting plaintiffs must demonstrate standing separately for each form of relief sought).

speculation about 'the unfettered choices made by independent actors … .'") (quoting *Defs. of Wildlife*, 528 U.S. at 562).

Plaintiffs likewise fail to plausibly allege that the District Defendants retaliated against them for exercising their First Amendment rights at Lafayette Square. To state a claim for retaliation against First Amendment activities, a plaintiff must show that:

> (1) he or she engaged in conduct protected under the First Amendment, (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her.

*Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 221 (D.D.C. 2017) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). Plaintiffs here have failed to plead sufficient facts to support the first or third requirements of this claim, and their First Amendment claim should therefore be dismissed in its entirety.

## A.   Plaintiffs Do Not Assert that They Were Exercising Any First Amendment Right When the District Defendants Allegedly Harmed Them.

Plaintiffs state that they "assembled peacefully in Lafayette Square," and "chanted …, knelt, raised their hands up, and engaged in other legal activities to protest police brutality against Black people." TAC ¶ 65. But that is not what they were doing when they encountered any of the District Defendants. Instead, the protests at Lafayette Square were first forcibly broken up by the federal defendants, driving the plaintiffs away and preventing them from carrying on such First Amendment activities. *Id.* ¶¶ 88, 94. The District Defendants, who plaintiffs

acknowledge were not stationed at Lafayette Square, *id.* ¶ 72, were then abruptly confronted by the crowd of protestors fleeing from the vicinity of the Square. Plaintiffs do not claim that, at the point they confronted the line of MPD officers, they were continuing to engage in any First Amendment-protected activity, or that any of their First Amendment activity was specifically directed at those officers, and therefore fail to meet the first prong of their First Amendment retaliation claim. *See id.* ¶¶ 189–92 (no claim that plaintiffs Foley and E.X.F. were continuing to engage in First Amendment-related activity when they encountered MPD officers).

Furthermore, plaintiffs could not have had a realistic expectation of unfettered First Amendment-related activity under the circumstances. Besides the looming District-wide curfew, large public gatherings were explicitly banned because of the ongoing COVID-19 pandemic.[12] Plaintiffs do not allege that the District lacked the authority to impose either the curfew or the COVID-19 restrictions, that either are unreasonable restrictions on their First Amendment rights, or that the crowd of protestors encountering the District Defendants would not have violated the COVID-

---

[12]     On March 11, 2020, Mayor Bowser declared a public health emergency in the District because of the COVID-19 virus. Mayor's Order No. 2020-045, Declaration of Public Emergency: Coronavirus (COVID-19), 67 D.C. Reg. 2956–60 (Mar. 13, 2020). On March 24, the Mayor banned all public gatherings of more than ten persons. Mayor's Order 2020-053, Closure of Non-Essential Businesses and Prohibition on Large Gatherings During Public Health Emergency for the 2019 Novel Coronavirus (COVID-19), 67 D.C. Reg. 3608–16 (Mar. 27, 2020). That ban remained in effect through the events of June 1, 2020. Mayor's Order No. 2020-066, Extensions of Public Emergency and Public Health Emergency and Preparation for Washington, D.C. Reopening, 67 D.C. Reg. 5171–80 (May 15, 2020).

related orders. *See* TAC ¶ 211 (alleging that hundreds, and perhaps thousands, of people were gathered near Lafayette Square on June 1 around 6:30 p.m.).

      **B.**    <u>Plaintiffs Have Not Alleged That the District Defendants' Actions Were Motivated by Plaintiffs' First Amendment Activity.</u>

      Plaintiffs also fail to show that any District Defendant retaliated against them based on their First Amendment-protected activity. To satisfy this third prong of the retaliation analysis, plaintiffs must not only allege that the District Defendants had an "improper motive," but also show "evidence of causation." *Daugherty v. Sheer*, 891 F.3d 386, 391 (D.C. Cir. 2018) (quoting *Crawford-El v. Britton*, 523 U.S. 574 (1998)); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured— the motive must *cause* the injury.") (emphasis in original). In other words, it is plaintiffs' burden to show that the District Defendants acted based on an improper motivation to chill plaintiffs' First Amendment rights. *See Kimberlin v. Quinlan*, 199 F.3d 496, 502–03 (D.C. Cir. 1999) (citing *Crawford-El*, 523 U.S. at 600).

      Here, plaintiffs do not present any facts showing the District Defendants had any animus towards their First Amendment activity, let alone that they acted on such beliefs. Instead, plaintiffs nakedly assert that "Defendants do not like Plaintiffs' … viewpoints," TAC ¶ 249, and point to a few other alleged cases of excessive force scattered across the past twenty years, of which the only similarity to this case is that "many … involved chemical irritants and related to Presidential events … ." *Id.* ¶ 115; *see also Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018) (noting for potential retaliatory arrest claim that plaintiff had failed to show that the specific

20

arresting officer had any knowledge of plaintiff's prior speech or motivation to arrest him). Plaintiffs' failure to allege hostility is made especially stark because plaintiffs do not even produce specific allegations against most of the District Defendants. *See* TAC ¶¶ 102 (conclusory allegation that every District Defendant "chased demonstrators"), 190–98 (plaintiff Foley and E.X.F. failing to allege conduct against them by any specific named District Defendant); *cf. Pinson*, 246 F. Supp. 3d at 221–22 (denying motion to dismiss on claim of retaliation based on lack of personal involvement because plaintiff was able to provide individualized factual allegations against named defendants). In sum, these scattershot allegations fall far short of even circumstantial evidence that plaintiffs' First Amendment-protected activity at Lafayette Square that evening was the motivating factor in the District Defendants' actions. *See Am. Postal Workers Union v. U.S. Postal Service*, 830 F.2d 294, 311 (D.C. Cir. 1987) (relying on stipulation of the parties about defendant's justification for taking allegedly retaliatory action as circumstantial evidence of improper motivation).

Instead, these circumstances are similar to those of a retaliatory arrest claim, in which plaintiffs must establish the absence of probable cause: "[t]he causal inquiry is complex because protected speech is often a wholly legitimate consideration for officers … ." *Nieves*, 139 S. Ct. at 1723–74. Here, the District Defendants' knowledge that a group of people were protesting at Lafayette Square is a perfectly legitimate consideration in their duty to enforce the looming curfew. The officers' subsequent actions are likewise consistent with motivations besides retaliation against First

Amendment-protected speech, as they were suddenly confronted by a surge of panicked and agitated protestors who had just been driven out of Lafayette Square by federal law enforcement officers. *See* TAC ¶¶ 72, 88, 90. Plaintiffs' claim of First Amendment retaliation should be dismissed based on a lack of showing that any District Defendant acted out of a motivation to chill plaintiffs' First Amendment expression. *See Daugherty*, 891 F.3d at 391 (noting that the causation element is a "check against the serious problem of spurious allegations of improper motive by government officials, notoriously easy to allege and hard to disprove") (citing *Crawford-El*, 523 U.S. at 584–85).

III.  **Plaintiffs' Fourth Amendment Claims Should Be Dismissed Because Plaintiffs Were Not Seized by the District Defendants, and the District Defendants Are Entitled to Qualified Immunity.**

   A.  **Plaintiffs Do Not Allege They Were Seized Under the Fourth Amendment.**

Dustin Foley and E.X.F., the only named plaintiffs to allege encountering the District Defendants, were not seized and therefore have not stated a claim for violation of the Fourth Amendment. "The Fourth Amendment's prohibition on unreasonable search and seizures also 'encompasses the right to be free from the use of excessive force during an arrest, investigatory stop, or any other seizure.'" *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 193 (D.D.C. 2015) (quoting *Armbruster v. Frost*, 962 F. Supp. 2d 105, 111 (D.D.C. 2013)). "An excessive-force claim shares with an unreasonable seizure claim the requirement that a Fourth Amendment seizure occurred." *Id.*

A seizure requires significant, intentional governmental termination of freedom of movement. *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (stating that a seizure "does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even when there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.") (emphasis in original).

Plaintiffs Foley and E.X.F. allege that while they and other demonstrators were fleeing federal defendant officers, tear gas canisters were fired by MPD officers in their direction. TAC ¶¶ 100–04.[13] They do not allege that any named District Defendant specifically targeted them with tear gas, or any other munition, or in any other way used force on them. Instead, Foley and E.X.F. assert that they felt the effect of tear gas that was generally present in the air. *Id.* ¶ 194. After an unidentified MPD officer "yelled at Mr. Foley and E.X.F. to move," *id.* ¶ 197, Foley and E.X.F. left the scene without any further interaction with any MPD officer, "reached their car, and drove home." *Id.* ¶ 199. They do not allege that they were arrested or detained by MPD, or that because of the tear gas they did not feel free to leave. *See United States*

---

[13]   The District Defendants dispute plaintiffs' assertions concerning the alleged use of force by MPD officers. Although the Court must treat plaintiffs' allegations as true under the applicable standard, the District Defendants maintain that the TAC does not "state a claim to relief that is plausible on its face." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678).

*v. Hood*, 435 F. Supp. 3d 1, 5 (D.D.C. 2020) (noting individual is seized if "a reasonable person in view of all the circumstances surrounding the incident would have believed that he was not free to leave"). To the contrary, plaintiffs fled, and MPD's use of tear gas was not to take control of plaintiffs, but rather to disperse the crowd.

Because Foley and E.X.F. fail to state a claim under the Fourth Amendment, Claim Eight should be dismissed against District Defendants Carroll, Alioto and Thau.

### B.   All District Defendants Are Entitled to Qualified Immunity Because Their Use of Force Was Not Unreasonable, and There Was Not a Clear Right Prohibiting Their Conduct.

Even if plaintiffs properly alleged a "seizure" under the Fourth Amendment, which they have not, their claim should be dismissed because of the District Defendants' qualified immunity. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658 (2012)).

### 1.   The District Defendants Did Not Violate the Constitution Because the Level of Force They Used Was Not Unreasonable.

For a Fourth Amendment claim in the excessive force context, the plaintiff must prove that the force used to carry out the seizure was objectively unreasonable. *Robinson*, 130 F. Supp. 3d at 193; *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22 (D.D.C. 2011). However, "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham v. Connor*, 490

U.S. 386, 396 (1989). As a result, reasonableness depends on the totality of the particular situation, including the severity of the crime, whether the plaintiff was actively resisting or attempting to evade arrest, whether the plaintiff posed an immediate threat to the officers' or others' safety, and the severity of the plaintiff's injury. *Id.*

In addition, this reasonableness assessment must be "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* Under that standard, "an officer has the authority to use 'some degree of physical coercion or threat thereof' during the course of the arrest, and 'not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Rogala v. District of Columbia*, 161 F.3d 44, 55 (D.C. Cir. 1998) (quoting *Graham*, 490 U.S. at 395-97)).

Contrary to plaintiffs' claims, and as argued above, MPD was not part of any conspiracy with federal officials, but rather had been stationed along 17th and H Streets, N.W., to maintain order after days of unrest that included looting, vandalism and protestor violence. While MPD was stationed at 17th and H Streets, federal officers begun to engage protestors on H Street and to clear the area around Lafayette Square. This confrontation between the protestors and federal officers escalated the situation, sending the agitated protestors fleeing toward MPD's position. *See* TAC ¶ 90 ("The [federal] police action injected danger into what had been a calm protest as those in the street fled … .") (internal quotations omitted).

As a result, MPD officers faced an aggressive crowd that as a whole had turned its ire towards them, even if the conduct of some individuals in that crowd such as Foley and E.X.F. may have been peaceful. The use of tear gas that plaintiffs allege was thus not directed toward a group of individuals peacefully protesting, but a flowing crowd of protestors who were confrontational and threatened to overcome the MPD officers' position. The force plaintiffs allege the District Defendants used here was reasonable given the volatile, dangerous and rapidly evolving situation the officers confronted. *See Lewis*, 523 U.S. at 853 ("[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shot that implicated the large concerns of the governors and the governed."). Without an unreasonable use of force, plaintiffs have failed to allege a constitutional violation.

### 2.  There Was Not a Clearly Established Right Governing Use of Force To Disperse Crowds Rather than To Detain Them.

Even if MPD officers' use of force violated plaintiffs' constitutional rights, the officers should be afforded qualified immunity because it was not clearly established that they would violate plaintiffs' Fourth Amendment rights if they used tear gas on protestors under these circumstances, intending only to disperse the crowd and not to effect a stop or arrest. To defeat this second prong of a claim of qualified immunity, a plaintiff must show that the hypothetical constitutional infringement violated clearly established statutory rights of which a reasonable person would have known. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *see also Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (noting that plaintiff bears

the burden of showing that the constitutional right in question was clearly established). Crucially, the "clearly established law" must not be defined "at a high level of generality," and instead must address the particular facts and circumstances of the individual case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Wesby*, 138 S. Ct. at 590 ("[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced.") (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[E]ven if the degree of force used might, objectively speaking, exceed that allowed by the Fourth Amendment, immunity should be granted where the officer was reasonably mistaken (in light of the then-existing state of the law) about 'whether a particular amount of force [was] legal' under the circumstances." *Qutb v. Ramsey*, 285 F. Supp. 2d 33, 48 (D.D.C. 2003) (quoting *Saucier*, 533 U.S. at 205). In sum, the Supreme Court has noted "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam).

The MPD officers' conduct was not clearly unlawful under this jurisdiction's precedent. The D.C. Circuit has recognized that a seizure occurs "when physical force is used to restrain movement or when a person submits to an officer's show of authority." *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). But the Circuit has not expressly analyzed whether a seizure has occurred in a situation like the one described here: when the use of force—a chemical irritant—is used to disperse a crowd rather than to restrain its movement.

However, other jurisdictions have found that comparable allegations will not constitute a seizure. *See, e.g.*, *White v. City of Markham*, 310 F.3d 989, 995 (7th Cir. 2002) (noting that when officer slightly touched plaintiff and threatened immediate arrest if plaintiff did not comply with order to leave house, it was unclear whether seizure occurred because plaintiff was free to leave and terminate the encounter at any time); *Slocum v. Palinkas*, 50 Fed. Appx. 300, 302 (6th Cir. 2002) (unpublished opinion) (holding that plaintiff had not been seized when an officer told the approaching plaintiff to step back and pushed plaintiff, but otherwise never tried to arrest or detain him during plaintiff's brother's arrest); *see also Fenwick v. Pudimott*, 778 F.3d 133, 138 (D.C. Cir. 2015) ("To assess the officers' claim of qualified immunity, 'we look to cases from the Supreme Court and this court' and, if neither provides an answer, 'to cases from other courts exhibiting a consensus view.'") (quoting *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008)). Without clearly established rules for when the use of force, such as chemical irritants, to disperse rather than to detain constitutes a seizure, there is no "clearly established [right] at the time." *Wesby*, 138 S. Ct. at 589 (internal quotations omitted). The District Defendants are therefore entitled to qualified immunity, and plaintiffs' claim of unreasonable seizure under the Fourth Amendment should be dismissed.

## IV.   Plaintiffs' Section 1983 Claims Fail Because They Do Not Plead a Plausible Basis for Municipal Liability.

In Claims Nine and Ten, plaintiffs allege that the District failed to properly train MPD officers in the deployment of chemical irritants in violation of their First and Fourth Amendment rights. TAC ¶¶ 274–84. But plaintiffs have not pled

sufficient facts to support municipal liability under Section 1983.[14] Local governments, including the District, are "persons" for purposes of Section 1983, but municipal liability cannot be predicated on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). Rather, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691).

The D.C. Circuit has identified four ways official municipal policy can be shown:  (1) express municipal policy; (2) actions of a final municipal "policymaker"; (3) persistent conduct by non-policymakers (*i.e.*, "custom" with force of law); and (4) "deliberate indifference" to a risk of constitutional injury. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003) (citations omitted). Each theory has its own "elements," which a Section 1983 plaintiff bears the burden of pleading in accordance with *Iqbal. Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). Additionally, under any theory, a municipal liability claim separately requires proof of causation—specifically, an "affirmative link" between the alleged municipal

---

[14]    The District of Columbia is not a defendant here. Instead, plaintiffs sued MPD Chief Newsham in his official capacity, and bring no claims against him in his individual capacity or make any allegations about him personally. A suit against a District official solely in his official capacity is "no different from a suit against the [municipality] itself." *Kentucky v. Graham*, 473 U.S. 169, 165-66 (1985). Because such claims are against the District itself, if any claims survive, the Court should dismiss Chief Newsham as a defendant and substitute the District. *See Haight v. O'Bannon*, 102 F. Supp. 3d 179, 181 (D.D.C. 2015) (noting "overwhelming approach" of this court to dismiss claims against official capacity defendants in favor of claims against the District).

policy and the alleged constitutional violation, "such that [the former] was the moving force behind the [latter]." *Baker*, 326 F.3d at 1306.

Plaintiffs contend that the District is liable for the alleged constitutional violations because of its "deliberately indifferent failure to train and supervise MPD officers regarding the appropriate circumstances in which to deploy chemical irritants." TAC ¶¶ 275, 281. Plaintiffs allege that MPD has so often violated the rights of demonstrators that the need for further training was plainly obvious to the District, and that the District was nevertheless indifferent to this need. *Id.* These allegations do not state a valid claim for municipal liability under any of the Circuit's theories for demonstrating a municipal policy.

### A.   Plaintiffs Fail To Allege an Express Municipal Policy.

Plaintiffs do not state or even imply that the District had any *express* policy that facilitated the allegedly unlawful conduct at issue in Claims Nine and Ten (nor could they). The District's written municipal policy governing police conduct relating to First Amendment assemblies is set forth in D.C. Code § 5-331.01, *et seq.*, and specifically provides for "reasonable" policing of peaceful demonstrations on public space, *id.* §§ 5-331.03, 5-5-331.04(a), 5-331.07, explicitly prohibiting restrictions based on viewpoint discrimination, *id.* § 5-331.04(c), and instructing on the use of chemical irritants, *id.* § 5-331.16. Indeed, plaintiffs' reliance on § 5-331.16(b)(2) to allege that the District was on notice of potential risk of the improper use of chemical irritants, TAC ¶ 111, effectively concedes that "[their] true grievance is not with a policy or custom of the District, but rather with … specific [individual] decision[s]." *Coppet v.*

*District of Columbia*, 75 F. Supp. 3d 144, 148 (D.D.C. 2014) (holding that a municipal policy that was "fair [o]n paper" undermined *Monell* claim absent an allegation that a final policymaker's decision caused alleged departure from policy).

**B.**     **Plaintiffs Fail To Allege a Custom.**

Plaintiffs also fail to plead sufficient facts to show municipal liability based on "custom." To establish municipal policy arising from custom, a Section 1983 plaintiff must allege "that the municipality's employees engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (citation omitted). Here, plaintiffs contend that MPD has a history of using unjustified, excessive force to attack and interfere with demonstrators. TAC ¶¶ 110, 113. The TAC lists five prior events involving MPD responses to large-scale protests spanning twenty years, beginning in April 2000. *Id.* ¶ 110. Plaintiffs also allege other instances of purported excessive force by MPD after the clearing of Lafayette Square on the evening of June 1, 2020, and "in the weeks following June 1, 2020." *Id.* ¶¶ 113–14. Plaintiffs contend that these incidents prove the existence of a broader custom of constitutional violations in June 2020. *Id.* ¶ 90. Plaintiffs' assertions fail for the reasons discussed below.

When unconstitutional practices become sufficiently widespread, they will assume the quality of custom for Section 1983 purposes. *See Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) ("To clear this high hurdle, plaintiffs ordinarily couch custom or practice liability on allegations of practices so persistent and widespread

31

as to practically have the force of law.") (quotation omitted). Although plaintiffs list various instances of purported misconduct, they fail to show how these events represent a widespread pattern of wrongdoing to establish municipal liability. Plaintiffs provide no facts that would suggest that their few alleged instances of wrongdoing spanning twenty years, in a metropolis the size of the District and with such a large police force responding to countless demonstrations each year, could amount to a persistent, widespread practice of misconduct. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) ("Given the department's size [of over 1500 officers], and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct."); *Ramos v City of Chicago*, 707 F. Supp. 345, 347 (N.D. 111. 1989) ("[A]lleging six incidents of police brutality over a ten[-]year period in a city as large as Chicago with a police force in excess of 10,000 members is unremarkable, and in no way indicates a policy or custom.").

Indeed, it is well settled that the "persistent" and "pervasive" pattern necessary to show municipal custom cannot be inferred from events with no temporal proximity to the conduct allegedly giving rise to a Section 1983 plaintiff's constitutional injury. For example, in *Page*, the Court held that plaintiff's reference to two cases that previously recognized a District policy of authorizing the complained-of conduct could not support a claim of municipal liability and dismissed

that claim. 999 F. Supp. 2d at 285–86. The Court in *Page* noted that the "policy being addressed [in the earlier cases] was one that existed at least seven years prior," and the plaintiff supplied no facts suggesting "the District persisted in its unconstitutional actions." *Id.* at 285–86. The Court reached substantially the same result in *Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014), by declining to credit as evidence of municipal custom a report, compilation of statistics, and Court opinion that predated the plaintiff's alleged injury by six, nine and four years, respectively. *Id.* at 43. Here, the same rationale results from plaintiffs' claim of a municipal custom. Plaintiffs allege events *three*, *fifteen*, *eighteen* and *twenty years* before this incident. Those occurrences are simply too scattered and too far removed to plausibly infer an underlying municipal custom.

Additionally, to prove the existence of a municipal custom, a Section 1983 plaintiff must identify past events involving government actions that are identical to the alleged wrongdoing underlying plaintiff's claim. *Egudu*, 72 F. Supp. 3d at 41 (holding report "analyz[ing] data related to disorderly conduct arrests [but] tailored toward exposing racial disparities" could not show policy or custom of "violat[ing] an individual's free speech right or the right to be free from an unlawful seizure"); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133-34 (D.D.C. 2011) (holding report could not evidence municipal custom where "plaintiff was not arrested for the offense examined in the report"). Plaintiffs here likewise fail to show that the examples they cite are in fact similar to the underlying claims in this case. They allege that MPD has "a history of using unjustified, excessive force to attack and interfere

with demonstrators," TAC ¶ 110, but when describing the incidents in the evening and subsequent weeks after Lafayette Square was cleared, they fail to make any reference to the type or size of demonstrations occurring, and the actions of the demonstrators themselves.  That is, there is no mention of whether the demonstrators were "peaceful," or "law abiding." It stands to reason that, if the demonstrators in those instances were engaged in unlawful, riotous acts then officers would be justified in using reasonable force to detain or subdue protestors. "[W]ithout some further factual enhancement," *Iqbal*, 556 U.S. at 678, there is simply no way to determine whether any of these events to which plaintiffs refer are relevant to their claim of municipal liability based on custom. *Cf. Blue*, 811 F.3d at 20 (requiring Section 1983 plaintiff to plead "elements" of municipal liability with "adequate factual support to 'state a claim to relief that is plausible on its face,'" as required by *Iqbal*).

Because the various incidents cited by plaintiffs do not support a custom of MPD using unjustified, excessive force to attack and interfere with demonstrators, plaintiffs' Section 1983 claim cannot stand on the basis of an unlawful custom or practice.

C.    **Plaintiffs Fail To Allege Deliberate Indifference.**

Plaintiffs also fail to plausibly demonstrate municipal liability on a "deliberate indifference" theory. Plaintiffs rely in particular on the assertion that the alleged unlawful actions underlying Claims Nine and Ten resulted from "the District's failure to train MPD officers." TAC ¶¶ 275, 281. As the Supreme Court has cautioned, "A municipality's culpability for a deprivation of rights is at its most tenuous where a

claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). A municipality's failure to train must amount to "'deliberate indifference' to the rights of [the municipality's] inhabitants," such that it can "be properly thought of as a city 'policy or custom,'" for it to be "actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Deliberate indifference in this context is a "stringent standard of fault," *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997), requiring that city policymakers "knew or should have known of the risk of constitutional violations, but did not act." *Harvey v. District of Columbia*, 798 F.3d 1042, 1053 (D.C. Cir. 2015) (quoting *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011); *see also Connick*, 563 U.S. at 61 (notice prong requires "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights"); *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials"). Here, the TAC does not establish a plausible basis for either element.

### 1.   Plaintiffs Do Not Allege Notice.

To establish the notice element of their deliberate indifference failure-to-train claim, plaintiffs rely on the same prior incidents that underlie their assertion of a municipal custom, TAC ¶¶ 115, 281, which similarly fails here. The notice element of a deliberate indifference municipal liability claim "ordinarily" requires proof of "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563

U.S. at 61. "[T]he need for more or different training [must be] obvious," and the inadequacy in the training program must be "likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390.

As in the municipal custom context, temporal proximity is crucial to establishing government notice for deliberate indifference claims. For example, in *Dormu*, the Court refused to assume "that the District continued to be on notice [of a practice of improper conduct] four years [after first receiving notice that the conduct was occurring]." 795 F. Supp. 2d at 26. Likewise, in *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 55 (D.D.C. 2005), the Court rejected the plaintiff's evidence as to notice, despite finding that it "reflect[ed] an awareness by the District of serious allegations relating to [the conduct at issue]," explaining that "a mere awareness of a problem in January 1999 and a need for improvement is not, as a matter of law, sufficient to impose municipal liability for an incident that occurred in October 2000." *See also Moore v. District of Columbia*, 79 F. Supp. 3d 121, 140 (D.D.C. 2015) (finding an approximately eight-year-old study showing a pattern of challenged conduct "too remote" to support plaintiff's deliberate indifference claim); *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 140 (D.D.C. 2003) (holding notice of problem in 1999 insufficient to impose municipal liability for an incident in 2001). As mentioned above, the prior incidents plaintiffs refer to occurred three, fifteen, eighteen and twenty years before this incident, TAC ¶ 110, with countless demonstrations on District streets during that time; it is not plausible, without more, that those prior events put the District on notice of a risk that plaintiffs were "likely" to suffer

36

constitutional injury absent some additional training. *City of Canton*, 489 U.S. at 390 (notice requires that constitutional injury is "likely to result").

Moreover, plaintiffs do not allege anything about "particular omission[s]," *Connick*, 563 U.S. at 61, in the District's training regarding police handling of activity arising out of demonstrations. In fact, the TAC states nothing about the training— let alone the subject matter or frequency of such training—that MPD officers receive, nor does it identify particular deficiencies in any training program or how it could have been improved. A Section 1983 plaintiff who "includes no specific details about police training in the District or how it might be deficient," fails to "supply [necessary] facts from which a court could draw the inference that the District ignored a known risk [of constitutional injury]." *Miango v. Democratic Republic of the Congo*, 243 F. Supp. 3d 113, 128 (D.D.C. 2017); *see also Bell v. District of Columbia*, 82 F. Supp. 3d 151, 158 (D.D.C. 2015) ("The complete absence of any factual allegations concerning a specific shortcoming in training forecloses any plausible inference of actual or constructive knowledge by District policymakers that its officers will probably violate constitutional rights.") (quotations omitted). Plaintiffs' deliberate indifference theory of municipal liability therefore fails as a matter of law: "Since the [C]omplaint contains no factual allegations detailing any deficiencies in MPD training … plaintiffs' § 1983 allegations amount to nothing more than simpl[e] formulaic recitation of the elements of a deliberate indifference claim, and dismissal is warranted." *Miango*, 243 F. Supp. 3d at 128–29 (citation and internal quotation marks omitted).

## 2. Plaintiffs Fail To Allege Deliberate Indifference.

Even if plaintiffs could establish notice, other evidence reasonably inferred from plaintiffs' pleadings undermines their contention that the District made a "deliberate choice" not to act, *Pembaur*, 475 U.S. at 483, in response to the prior purported instances of misconduct. TAC ¶¶ 90-91. Most notably, plaintiffs refer to D.C. Code § 5-331.16(b)(2), a section of the First Amendment Assemblies Act (FAAA). That legislation, which explicitly requires, among other things, "regular and periodic training" for MPD personnel "on the handling of, and response to, First Amendment assemblies," was passed by the Council after, and as the legislative history confirms, D.C. Comm. Rep., B. 15-968 (2004), *in response to*, certain incidents cited by plaintiffs. D.C. Code § 5-331.15. It is simply not plausible to conclude that the District remained deliberately indifferent to the risk of constitutional violations at public assemblies, having passed comprehensive legislation to reform municipal policy relating to that subject matter. Plaintiffs do not challenge that legislation, or the training program it required, as inadequate, further showing that the District responded to those incidents appropriately, not with deliberate indifference. *Egudu*, 72 F. Supp. at 45 (finding District's change in training and procedures following events serving as notice of potential constitutional violations, in conjunction with plaintiff's failure to challenge changes as inadequate, "tend[ed] to support the conclusion that the District did not remain deliberately indifferent").

**D.**   <u>Plaintiffs Fail To Allege Actions of a Final Policymaker</u>.

Finally, plaintiffs have not alleged facts to establish that their alleged constitutional injuries were caused by the actions of a final municipal policymaker. Although plaintiffs name Chief Newsham as a defendant, they fail to allege that he either ordered, or later ratified, the actions of the individual officers who directly caused plaintiffs' harm. Even if Chief Newsham's actions proximately caused plaintiffs' injuries or could be characterized as deliberately indifferent—two highly doubtful propositions discussed further below—they are not attributable to the District because the Chief is not a final municipal policymaker.

"The Supreme Court narrowly interprets [the term municipal] 'policymaker' for the purposes of § 1983 liability, and discretion in a job function is not enough." *Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 42 (D.D.C. 2014) (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (O'Connor, J., plurality op.)); *see also Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014) (holding discretion to make final decisions in individual cases "is insufficient to create municipal liability [for those decisions] unless the decisionmaker [also] had been granted final policymaking authority under D.C. Law in the [relevant] area."). Rather, "an individual must 'speak with final policymaking authority for the local governmental actor' as established by state law." *Allen-Brown*, 54 F. Supp. 3d at 42 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 709 (1989)). "'[W]hen [according to state law] a subordinate's decision is subject to review by the municipality's authorized policymakers,' those policymakers 'have retained the authority to measure the

official's conduct for conformance with *their* policies.'" *Miner v. District of Columbia*, 87 F. Supp. 3d 260, 266 (D.D.C. 2015) (quoting *Praprotnik*, 485 U.S. at 127) (emphasis in original).

Under District law, all members of the police force, including the Chief of Police, are subordinate to the Mayor and (ultimately) the Council, and thus non-policymakers for purposes of municipal liability. As the Court in *Miner* explained:

> In the District of Columbia, the Mayor is ultimately responsible for the police department, *see* D.C. Code § 5-101.03, and the Mayor appoints a Chief of Police, 'with the advice and consent of the [City] Council," D.C. Code § 5-105.01(a-1)(1), to administer the police department. All police officers are required to "respect and obey the Chief of Police as the head and chief of the police force, subject to the rules, regulations, and general orders of the Council [ ] and the Mayor [ ]." D.C. Code § 5-127.03.

87 F. Supp. 3d at 266. These provisions establish that all police officers and command officials, including the Chief, are subordinate to the policymaking authority of the Mayor, as ultimately constrained by the "rules, regulations, and general orders," which are within the Council's purview to issue. *See id.* ("Thus, by law, police officers below the level of the Chief of Police—and, arguably, the Chief [himself] … are subordinates [under Supreme Court precedent]"); *see also Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (holding fire chief and assistant fire chief are not policymakers for municipal liability purposes because the "Mayor and the City Council have expressly reserved supervisory powers to themselves"). Against this backdrop, none of the individually-named District Defendants' involvement in the events here are attributable to the District for municipal liability purposes.

This conclusion makes particular sense in the context of policing First Amendment assemblies, where the Council has generated comprehensive, express municipal policy governing police conduct. *See* D.C. Code § 5-331.01, *et seq.* It is true that all members of the police force, including the Chief, are authorized to make arrests based on probable cause, *Wesby*, 138 S. Ct. at 585–86, and use force when reasonably necessary, *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 193 (D.D.C. 2015); however, as the Circuit has reminded, "discretion is insufficient to create municipal liability unless the decision maker had been granted final policy making authority under D.C. law in the area [at issue in plaintiffs' complaint]." *See Singletary*, 766 F.3d at 74 (citing *Pembaur*, 475 U.S. at 480-83 and n.12; *Praprotnik*, 485 U.S. at 129–30).

Here, against the backdrop of the policies and procedures set forth in the FAAA, that authority was lacking. The Chief was constrained by those policies and procedures when he allegedly directed the MPD response to the protest activities on June 1, 2020; any alleged decision that departed from express District policy was not an act of the municipality for purposes of Section 1983. *See Singletary*, 766 F.3d at 74 ("The Board thus was 'constrained by polices not of [its] making,' and its decision to 'depart[ ]' from those policies by revoking [the plaintiff's] parole based on unreliable hearsay was not an 'act of the municipality' for purposes of § 1983."). Plaintiffs therefore fail to show that a final municipal policymaker caused their alleged injuries, and cannot establish municipal liability under Section 1983. Thus, Claims Nine and Ten, should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and dismiss with prejudice plaintiffs' claims against the District of Columbia Defendants.

Dated: October 1, 2020.          Respectfully submitted,

                                 KARL A. RACINE
                                 Attorney General for the District of Columbia

                                 TONI MICHELLE JACKSON
                                 Deputy Attorney General
                                 Public Interest Division

                                 /s/ Fernando Amarillas
                                 FERNANDO AMARILLAS [974858]
                                 Chief, Equity Section

                                 /s/ Duane Blackman
                                 DUANE BLACKMAN*
                                 RICHARD SOBIECKI [500163]
                                 BRENDAN HEATH [1619960]
                                 Assistant Attorneys General
                                 400 Sixth Street, N.W., Suite 10100
                                 Washington, D.C. 20001
                                 Phone: (202) 805-7640; (202) 805-7512;
                                 (202) 442-9880
                                 Fax: (202) 703-0646
                                 duane.blackman@dc.gov; richard.sobiecki@dc.gov;
                                 brendan.heath@dc.gov

                                 *Counsel for the District of Columbia Defendants*

---

*        Admitted to practice only in the State of New York. Practicing in the District of Columbia under the direct supervision of Fernando Amarillas, a member of the D.C. Bar, under LCvR 83.2(f).