**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **BLACK LIVES MATTER D.C., et al.,** )<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**DONALD J. TRUMP, et al.,** )<br>)<br>**Defendants**. )<br>) | **Case No: 1:20-cv-01469-DLF** |

**MAJOR MARK ADAMCHIK'S
MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), U.S. Park Police Commander, Major Mark Adamchik, as sued in his individual capacity, respectfully moves this Court to dismiss the claims against him in plaintiffs' third amended complaint.[1] Plaintiffs fail to state a claim upon which relief may be granted for two primary reasons. First, neither Congress nor the Supreme Court has authorized a damages remedy under the Constitution against Major Adamchik for implementing a high-level plan to protect the safety of the President or the security of the White House, and special factors counsel against implying the constitutional damages remedy that plaintiffs seek. Second, Major Adamchik is entitled to qualified immunity from all constitutional and statutory claims.

The grounds for this motion are set forth in the accompanying memorandum. A proposed order is attached.

---

[1] This motion is submitted solely on behalf of Major Adamchik in his individual capacity. In their third amended complaint, ECF No. 52, plaintiffs have named additional individual-capacity federal defendants who are not represented herein.

Dated: November 16, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Major Mark Adamchik in his*
*individual capacity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al., )
 )
   **Plaintiffs,** )
 )
 **v.** )
 ) **Case No: 1:20-cv-01469-DLF**
DONALD J. TRUMP, et al., )
 )
   **Defendants**. )
 )

## MEMORANDUM IN SUPPORT OF MAJOR MARK ADAMCHIK'S
## MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6313130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov
*Counsel for Major Mark Adamchik in his
individual capacity*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

I.    Civil unrest accompanied racial-justice protests. ................................................. 1

II.    Law-enforcement officers dispersed Lafayette Square protesters. ...................... 3

III.    Claims against Major Adamchik and other defendants ........................................ 4

DISCUSSION ..................................................................................................................... 5

I.    A *Bivens* claim is not available to challenge high-level decisions made to protect the President's safety or White House security in response to civil unrest .............................. 5

    A.    *Bivens* is a disfavored extra-statutory remedy that the Supreme Court has not authorized in this context. ............................................................................................ 6

    B.    *Bivens* should not be extended into this novel context ....................................... 8

    C.    Special factors preclude a *Bivens* remedy in the presidential-security context ............. 12

        i.    Courts should not intrude into sensitive matters of presidential security .................. 12

        ii.    Congress legislated extensively to enhance presidential and White House security but has not created a personal damages remedy in this context. .............................. 16

        iii.    This suit would invite intrusive discovery into high-level decision making and confidential communications involving the President. ............................................. 22

        iv.    Plaintiffs pursue alternative relief that precludes a new *Bivens* remedy. .................. 26

II.    Major Adamchik is entitled to qualified immunity because plaintiffs fail to allege that he was personally involved in violating their clearly established constitutional or statutory rights. ............................................................................................................. 29

    A.    The allegations fail to plausibly show Major Adamchik's personal involvement in violations of clearly established constitutional rights. .................................................. 30

    B.    There is no clearly established First Amendment violation. .......................................... 33

        i.    Relevant First Amendment principles. ...................................................................... 33

        ii.    Major Adamchik's alleged general order did not violate plaintiffs' clearly established First Amendment rights. ...................................................................... 34

        iii.    *Wood v. Moss* and other precedents support dismissal. ........................................ 38

    C.    There is no clearly established Fourth Amendment violation ...................................... 40

    D.    Major Adamchik has qualified immunity from the statutory claims. ........................... 42

CONCLUSION .................................................................................................................. 45

i

# TABLE OF AUTHORITIES

**Cases**

*A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham,*
   845 F.3d 1199 (D.C. Cir. 2017) ........................................................................ 33, 35

*Ashcroft v. al-Kidd,*
   563 U.S. 731, 741 (2011) ......................................................................................... 30

\*   *Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................... passim

*Barber v. D.C. Gov't,*
   394 F. Supp. 3d 49 (D.D.C. 2019) .......................................................................... 43

\*   *Berg v. Kelly,*
   897 F.3d 99 (2d Cir. 2018) ............................................................................... 13, 41

*Bernini v. City of St. Paul,*
   665 F.3d 997 (8th Cir. 2012) ............................................................................ 41, 42

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) ....................................................................................... 4, 6, 7

*Black v. District of Columbia,*
   466 F. Supp. 2d 177 (D.D.C. 2006) ......................................................................... 44

*Bundy v. Sessions,*
   387 F. Supp. 3d 121 (D.D.C. 2019) ........................................................................ 31

*Bush v. Lucas,*
   462 U.S. 367 (1983) ................................................................................................... 9

*Cantu v. Moody,*
   933 F.3d 414 (5th Cir. 2019) .................................................................................. 28

*Carlson v. Green,*
   446 U.S. 14 (1980) .............................................................................................. 7, 28

*Carr v. District of Columbia,*
   587 F.3d 401 (D.C. Cir. 2009) ................................................................................ 41

*Cheney v. U.S. Dist. Court for D.C.,*
   542 U.S. 367 (2004) ................................................................................... 23, 24, 26

*Citizens for Peace in Space v. City of Colo. Springs,*
   477 F.3d 1212 (10th Cir. 2007) .............................................................................. 33

*Clark v. Cmty. for Creative Non-Violence,*
   468 U.S. 288 (1984) .......................................................................................... 33, 35

*Clinton v. Jones,*
   520 U.S. 681 (1997) .......................................................................................... 23, 24

*Cook v. City of Bella Villa,*
   582 F.3d 840 (8th Cir. 2009) .................................................................................. 42

*Corr. Servs. Corp. v. Malesko,*
  534 U.S. 61 (2001) ........................................................................................ 27, 28

*Crawford-El v. Britton,*
  523 U.S. 574 (1998) ............................................................................................ 24

*Cromartie v. District of Columbia,*
  729 F. Supp. 2d 281 (D.D.C. 2010) .................................................................... 42

*Davis v. Billington,*
  681 F.3d 377 (D.C. Cir. 2012) ............................................................................ 27

*Davis v. City of Dearborn,*
  No. 2:09-cv-14892, 2010 WL 3476242 (E.D. Mich. Sept. 2, 2010) ..................... 43

*Davis v. Passman,*
  442 U.S. 228 (1979) .............................................................................................. 7

*Democracy Forward Found. v. White House Off. of Am. Innovation,*
  356 F. Supp. 3d 61 (D.D.C. 2019) ........................................................................ 2

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) ............................................................................................ 13

*Doe v. Rumsfeld,*
  683 F.3d 390 (D.C. Cir. 2012) ........................................................................ 6, 13

*Dundon v. Kirchmeier,*
  No. 1:16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) ................................ 42

*Farah v. Esquire Magazine,*
  736 F.3d 528 (D.C. Cir. 2013) .............................................................................. 2

*FDIC v. Meyer,*
  510 U.S. 471 (1994) ............................................................................................ 26

*Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill,*
  443 U.S. 340 (1979) ............................................................................................ 23

*Felarca v. Birgeneau,*
  891 F.3d 809 (9th Cir. 2018) ............................................................................... 42

*Ford v. Donovan,*
  891 F. Supp. 2d 60 (D.D.C. 2012) ....................................................................... 44

*Graham v. Connor,*
  490 U.S. 386 (1989) ............................................................................................ 41

*Haig v. Agee,*
  453 U.S. 280 (1981) ............................................................................................ 13

*Halperin v. Kissinger,*
  807 F.2d 180 (D.C. Cir. 1986) ............................................................................. 22

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ............................................................................................ 22

*Haus v. City of New York,*
  No. 03 CIV 4915, 2011 U.S. Dist. LEXIS 155735 (S.D.N.Y. Aug. 31, 2011) ........ 31

*Hedgpeth v. Rahim*,
  893 F.3d 802 (D.C. Cir. 2018) ............................................. 30

*Hernandez v. Mesa*,
  137 S. Ct. 2003 (2017) ...................................................... 6

\* *Hernandez v. Mesa*,
  140 S. Ct. 735 (2020) ................................................. passim

*Hernandez v. Mesa*,
  885 F.3d 811 (5th Cir. 2018).............................................. 12

*Hill v. Colorado*,
  530 U.S. 703 (2000) ................................................. 33, 35

*Hoai v. Vo*,
  935 F.2d 308 (D.C. Cir. 1991) ............................................ 44

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984) ......................................... 43, 44

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ................................................. 22, 30

*In re Sealed Case*,
  148 F.3d 1073 (D.C. Cir. 1998) ........................................... 36

*Int'l Action Ctr. v. United States*,
  365 F.3d 20 (D.C. Cir. 2004) ............................................. 31

*K.O. v. U.S. Immigr. & Customs Enf't*,
  No. CV 20-309 (RC), 2020 WL 3429697 (D.D.C. June 23, 2020) ............ 24, 25, 45

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018) ............................................. 2

*Klay v. Panetta*,
  758 F.3d 369 (D.C. Cir. 2014) ............................................ 21

*Kurd v. Republic of Turkey*,
  374 F. Supp. 3d 37 (D.D.C. 2019) ......................................... 43

*Lash v. Lemke*,
  786 F.3d 1 (D.C. Cir. 2015) ....................................... 34, 37, 38

*Lee v. Barr*,
  No. 19-CV-2284 (DLF), 2020 WL 3429465 (D.D.C. June 23, 2020)............... 9

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*,
  881 F.3d 912 (D.C. Cir. 2018) ..................................... 26, 27, 28

*Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*,
  344 F. Supp. 3d 215 (D.D.C. 2018) ................................... 24, 27

*LKQ Corp. v. United States*,
  No. 18-CV-1562 (DLF), 2019 WL 3304708 (D.D.C. July 23, 2019)........... 10, 27, 29

\* *Loumiet v. United States*,
  948 F.3d 376 (D.C. Cir. 2020) ...................................... passim

*Lucas v. United States*,
  443 F. Supp. 539 (D.D.C. 1977) ........................................................... 42

*Lyall v. City of Los Angeles*,
  807 F.3d 1178 (9th Cir. 2015).............................................................. 41

*Mamani v. Berzain*,
  654 F.3d 1148 (11th Cir. 2011)............................................................. 32

*Marcavage v. City of New York*,
  689 F.3d 98 (2d Cir. 2012)............................................................. 37, 40

*McManus v. District of Columbia*,
  530 F. Supp. 2d 46 (D.D.C. 2007) ......................................................... 43

*McNair v. Coffey*,
  279 F.3d 463 (7th Cir. 2002)............................................................... 31

*Mejia-Mejia v. U.S. Immigr. & Customs Enf't*,
  No. CV 18-1445 (PLF), 2019 WL 4707150 (D.D.C. Sept. 26, 2019) .......... 24, 25, 27

*Menotti v. City of Seattle*,
  409 F.3d 1113 (9th Cir. 2005)......................................................... 37, 40

*Meshal v. Higgenbotham*,
  804 F.3d 417 (D.C. Cir. 2015) ....................................................... passim

*Miller v. U.S. Dep't of Agric. Farm Servs. Agency*,
  143 F.3d 1413 (11th Cir. 1998)............................................................. 27

*Minneci v. Pollard*,
  565 U.S. 118 (2012) ....................................................................... 28

*Moore v. Castro*,
  192 F. Supp. 3d 18 (D.D.C. 2016) ......................................................... 45

*Nebraska Beef, Ltd. v. Greening*,
  398 F.3d 1080 (8th Cir. 2005).............................................................. 27

*Nettles v. New Horizons of the Treasure Coast, Inc.*,
  559 F. App'x 946 (11th Cir. 2014).......................................................... 32

*Oliva v. Nivar*,
  973 F.3d 438 (5th Cir. 2020)............................................................... 28

*Oliveras v. Basile*,
  440 F. Supp. 3d 365 (S.D.N.Y. 2020) ...................................................... 28

*Payton v. New York*,
  445 U.S. 573 (1980) ....................................................................... 10

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ....................................................................... 30

*Quaker Action Grp. v. Hickel*, ("*QAG I*")
  421 F.2d 1111 (D.C. Cir. 1969) ..................................................... 11, 13, 15

*Quaker Action Grp. v. Morton*, ("*QAG III*")
  460 F.2d 854 (D.C. Cir. 1971) ............................................................. 23

*Quaker Action Grp. v. Morton*, ("*QAG IV*")
    516 F.2d 717 (D.C. Cir. 1975) ................................................ 14, 15, 34

*Reichle v. Howards*,
    566 U.S. 658 (2012) ................................................ 9, 14, 30

*Roy v. United States*,
    416 F.2d 874 (9th Cir. 1969) ................................................ 13, 14

*Santiago v. Warminster Township*,
    629 F.3d 121 (3d Cir. 2010) ................................................ 32

*Saucier v. Katz*,
    533 U.S. 194 (2001) ................................................ 41

*Scahill v. District of Columbia*,
    909 F.3d 1177 (D.C. Cir. 2018) ................................................ 38

*Schwarz v. Meinberg*,
    761 F. App'x 732 (9th Cir. 2019) ................................................ 28

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) ................................................ 16, 21

*Sevy v. Barach*,
    815 F. App'x 58 (6th Cir. 2020) ................................................ 37

*Stigile v. Clinton*,
    110 F.3d 801 (D.C. Cir. 1997) ................................................ passim

*Surita v. Hyde*,
    665 F.3d 860 (7th Cir. 2011) ................................................ 31

*Tabb v. District of Columbia*,
    477 F. Supp. 2d 185 (D.D.C. 2007) ................................................ 44, 45

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ................................................ 41

*Time Warner Entm't Co., L.P. v. FCC*,
    93 F.3d 957 (D.C. Cir. 1996) ................................................ 33

*Tracy v. Neuberger*,
    840 F. Supp. 2d 1183 (D. Minn. 2012) ................................................ 31

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*,
    463 U.S. 825 (1983) ................................................ 43

*United States v. Bursey*,
    416 F.3d 301 (4th Cir. 2005) ................................................ 17

*United States v. Caputo*,
    201 F. Supp. 3d 65 (D.D.C. 2016) ................................................ 15, 17, 34

*United States v. Musser*,
    873 F.2d 1513 (D.C. Cir. 1989) ................................................ 15, 34

*United States v. Stanley*,
    483 U.S. 669 (1987) ................................................ 6, 25

*W. Radio Servs. Co. v. U.S. Forest Serv.,*
    578 F.3d 1116 (9th Cir. 2009) .................................................................. 27

*Walsh v. JPMorgan Chase Bank, NA,*
    75 F. Supp. 3d 256 (D.D.C. 2014) ........................................................... 45

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................................................................. 33

*Watts v. United States,*
    394 U.S. 705 (1969) ......................................................................... passim

*Westfahl v. District of Columbia,*
    75 F. Supp. 3d 365 (D.D.C. 2014) ........................................................... 42

*White House Vigil for ERA Comm. v. Clark,*
    746 F.2d 1518 (D.C. Cir. 1984) ....................................................... passim

*White House Vigil for ERA Comm. v. Watt,*
    717 F.2d 568 (D.C. Cir. 1983) ................................................................. 11

*White v. Jackson,*
    865 F.3d 1064 (8th Cir. 2017) .................................................................. 42

*Wilkie v. Robbins,*
    551 U.S. 537 (2007) ............................................................ 12, 26, 28, 29

*Wilson v. Layne,*
    526 U.S. 603 (1999) ................................................................................. 34

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) ........................................................... 25, 28

\*    *Wood v. Moss,*
    572 U.S. 744 (2014) ......................................................................... passim

*Young v. Akal,*
    985 F. Supp. 2d 785 (W.D. La. 2013) ...................................................... 42

\*    *Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ...................................................................... passim

## Statutes, Session Laws, & Regulations

5 U.S.C. App. 3 § 12 ................................................................................... 20

6 U.S.C. § 111(b)(1)(G) .............................................................................. 20

6 U.S.C. § 113(d)(3) .................................................................................... 20

6 U.S.C. § 345 ............................................................................................. 20

6 U.S.C. § 381 ............................................................................................. 19

18 U.S.C. § 111(a)(1) .................................................................................. 42

18 U.S.C. § 1751 ......................................................................................... 17

18 U.S.C. § 1752 ......................................................................................... 17

18 U.S.C. § 3056 ......................................................................................... 16

18 U.S.C. § 3056A(a) .................................................................................. 16

18 U.S.C. § 3056(d) ............................................................................................... 42
28 U.S.C. § 1346(b) ............................................................................................... 28
28 U.S.C. § 2671-80 ............................................................................................... 28
42 U.S.C. § 1985(3) ............................................................................... 42, 43, 44, 45
42 U.S.C. § 1986 ............................................................................................... 45
34 Stat. 708 (1906) ............................................................................................... 16
38 Stat. 23 (1913) ............................................................................................... 16
39 Stat. 919 (1917) (codified at 18 U.S.C. § 871) ........................................... 16
Pub. L. No. 88-202, 77 Stat. 362 (1963) ........................................................... 26
Pub. L. No. 107-117, 115 Stat. 2230 (2002) ..................................................... 19
Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended at 6 U.S.C. § 381) .......................... 19
Pub. L. No. 110-53, 121 Stat. 266 (2007) ......................................................... 19
31 C.F.R. § 413.1 (1995) ..................................................................................... 18
28 Fed. Reg. 12,789 (Dec. 3, 1963) ................................................................... 17
79 Fed. Reg. 63,141 (Oct. 22, 2014) ................................................................. 20

## Other Authorities

Mayor's Order 2020-68 ............................................................................ 2, 3, 36
Mayor's Order 2020-069 ....................................................................... 2, 35, 36, 39

*America's Main Street: The Future of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform*, 107th Cong. (2001) ........................ 18
*Information Hearing on the Closing of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight*, 104th Cong. (1995) 18
*The U.S. Secret Service and Presidential Protection: An Examination of a System Failure: Hearing Before the H. Comm. on Homeland Sec.*, 111th Cong. (2009) ................................. 19
*White House Perimeter Breach: New Concerns about the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014) ................................................. 20

*Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H.R. REP. NO. 95-1828 (1979) ............................................................................. 18
H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916) ............................................. 5, 16
S. REP. NO. 107-109 (2002) ............................................................................... 19

53 CONG. REC. 9378 (1916) ............................................................................... 17
SHAWN REESE, CONG. RSCH. SERV., RL34603, THE U.S. SECRET SERVICE: HISTORY AND MISSIONS (2014) ......................................................................................................... 16

Homeland Security Presidential Directive 7: Critical Infrastructure Identification, Prioritization, and Protection (2003) ............................................................................................... 19

REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY
(1964) ("The Warren Commission Report").......................................................................... 17

United States Secret Service Panel, *Report from the United States Secret Service Protective
Mission Panel to the Secretary of Homeland Security* 1 (Dec. 15, 2014) ............................... 20

*USSS History: 150 Years of Our History*, U.S. SECRET SERVICE ................................................. 16

**INTRODUCTION**

Plaintiffs ask this Court to create a new constitutional remedy for personal damages against Major Mark Adamchik, a U.S. Park Police commander, for his alleged role in implementing a high-level plan designed to ensure the President's safety in response to civil unrest. Major Adamchik acted in the midst of several days of protests over the death of George Floyd, an unarmed Black man, who tragically died while in the custody of the Minneapolis police. While demonstrators gathered to express their grief and to protest alleged police brutality, criminal actors and extremist groups attempted to hijack the protests with a number of lawless and dangerous acts. These acts, which included rioting, arson, and looting, led the Mayor of Washington, D.C., to declare a state of emergency and to impose a District-wide curfew. The day after the Mayor's order, as the curfew approached and thousands of protestors gathered outside the White House, plaintiffs allege that Major Adamchik issued the immediate order to clear the protestors from Lafayette Park so that the President could be photographed offering remarks at St. John's Episcopal Church—which had been set on fire the night before.

Plaintiffs' claims fail for two fundamental reasons: First, neither Congress nor the Supreme Court has authorized a damages remedy under the Constitution for implementing a high-level plan designed to protect the President's safety or the security of the White House. Second, Major Adamchik is entitled to qualified immunity because he did not violate any clearly established constitutional or statutory right in allegedly dispersing thousands of protesters within weapons range of the President and the White House at a time of civil unrest.

**BACKGROUND**

### I.   Civil unrest accompanied racial-justice protests.

On June 1, 2020, the Mayor of Washington, D.C., issued an order declaring a "Public Emergency" and imposing a 7:00 p.m. curfew for the District of Columbia following two violent

days in which "numerous businesses, vehicles, and government buildings ha[d] been vandalized, burned, or looted." Mayor's Order 2020-069 § I ¶ 3, cited in Third Amended Complaint ("TAC") ¶¶ 104, 150, 204.[1] The Mayor noted that "looting and vandalism occurred at multiple locations throughout the city" and caused "extensive damage" in downtown Washington, D.C., including near the White House. Mayor's Order 2020-069 ¶ 4. "Rioting and looting [also] affected the operations of District government agencies." *Id.* More than 80 arrests were made, with the "majority" of individuals "charged with felonies." *Id.* ¶ 3.

The unrest unfolding across Washington, D.C., occurred against the backdrop of massive protests in Lafayette Square over the tragic deaths of George Floyd, Breonna Taylor, and others. TAC ¶ 51. From May 29 through May 31, "large crowds of thousands" assembled "in front of the White House in Lafayette Square" to protest these deaths and alleged police brutality against Black people. *Id.* ¶ 52. On May 31, the Mayor ordered a curfew to start at 11:00 p.m., explaining that, on the past two nights, there had been vandalism, burning, and looting in downtown D.C., including damage to government buildings. Mayor's Order 2020-68 § I ¶ 4.[2] She issued the order based on this "glorification of violence," which was "not representative of peaceful protests or individuals exercising their lawful First Amendment rights." *Id.* When that curfew proved ineffective to stem the unrest, on June 1, the Mayor imposed an earlier 7:00 p.m. curfew. Mayor's Order 2020-069. While acknowledging the right of individuals to protest, the Mayor

---

[1] *Available at*: https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content /attachments/Mayor%27s%20Order%202020-069.pdf. In deciding a motion to dismiss, the Court may consider the Mayor's Order because it is incorporated by reference in plaintiffs' complaint and because it is a public governmental record subject to judicial notice. *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018); *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 69 & nn.5-7 (D.D.C. 2019).

[2] *Available at*: https://www.dcregs.dc.gov/Common/MayorOrders.aspx?Type=Mayor Order&OrderNumber=2020-068. The court may take judicial notice of this order. *Supra* note 1.

imposed the June 1 curfew to "protect the safety of persons and property in the District" and to stem the violence that was occurring "at multiple locations throughout the city, in addition to the rioting in the downtown area." *Id.* § I ¶¶ 4-6.

## II. Law-enforcement officers dispersed Lafayette Square protesters.

Large protests in Lafayette Square continued on June 1 and were ongoing as the city-wide curfew was approaching that evening. TAC ¶¶ 65, 150. These protests were a "continuation" of the prior protests that had created the opportunity for the previous nights' unrest. TAC ¶ 3; *see* Mayor's Order 2020-68 § I ¶ 4. Plaintiffs, Black Lives Matter D.C. (a group that organizes against "state-sanctioned violence against the Black community") and individual activists, participated in these protests. TAC ¶¶ 9-15.

Plaintiffs allege that law-enforcement officers, along with military personnel, surrounded them and other activists and began dispersing them from Lafayette Square. *Id.* ¶¶ 67, 82. According to the complaint, this included U.S. Park Police, Arlington County Police Department (ACPD), U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons personnel. *Id.* ¶ 67. Officers purportedly used a variety of munitions. *Id.* ¶ 88. Immediately after the protesters were dispersed, the President, his Chief of Staff, the Attorney General, the Secretary of Defense, the President's daughter, and senior advisors walked from the White House to St. John's Church, which sits on Lafayette Square. *Id.* ¶ 203. The President paused for a "photo opportunity" and gave "brief remarks." *Id.*

Plaintiffs allege that the government's "professed purpose" for clearing the protesters—to facilitate the President's "photo opportunity"—was "wholly illegal." *Id.* ¶ 4; *see also id.* ¶¶ 80, 202-204. They attribute the decision to the President's alleged desire to use force against Black Lives Matter protesters, *id.* ¶¶ 4, 53, and they cite a speech he gave from the White House before Lafayette Square was cleared in which he allegedly "painted all the demonstrators as violent," *id.*

¶ 61. But in his speech, the President stated "[a]ll Americans were rightly sickened and revolted by the brutal death of George Floyd," said he was "fully committed that, for George and his family, justice will be served," and described himself as an "ally of all peaceful protesters." *Id.*[3]

Plaintiffs allege the Attorney General personally gave the order to disperse Lafayette Square to facilitate the President's "photo opportunity" at St. John's Church. *Id.* ¶¶ 4, 17, 79-80. Major Adamchik allegedly followed with "the immediate order." *Id.* ¶ 20; *see also id.* ¶ 82. Though plaintiffs speculate regarding the motives of the President, *id.* ¶¶ 53-64, they do not allege the details of any statements made by Major Adamchik—either privately or publicly— indicating a desire to use force on peaceful protesters or conspiring to use force illegally, *id.* There is also no suggestion that Major Adamchik or officers under his control could differentiate among lawful protesters and those who might have infiltrated the crowd to do violence. *See generally* TAC. Despite the unrest that led to the curfew, plaintiffs don't claim that any security procedures were in place to screen the massive crowd that had gathered by the White House. *Id.*

### III.    Claims against Major Adamchik and other defendants.

Plaintiffs seek an implied damages remedy against Major Adamchik under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). They allege that Major Adamchik violated their First and Fourth Amendment rights by carrying out a dispersal order, allegedly issued by the Attorney General, to facilitate a presidential photo. *See* Claims 1-2. Plaintiffs also allege that Major Adamchik is liable under 42 U.S.C. §§ 1985(3) and 1986 for conspiring to target Black people or failing to prevent a conspiracy. *See* Claims 5-6.[4]

---

[3] TAC ¶ 61 n.15 (citing Statement by the President, Whitehouse.gov, June 1, 2020 6:43 PM, https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/).

[4] The Attorney General, who is also sued personally, previously moved to dismiss these same claims. ECF No. 76. Major Adamchik's arguments here are nearly identical.

In addition, plaintiffs seek injunctive relief from various high-level federal officials in their official capacities, *see* Claims 3-4, and sue officials from the D.C. Metropolitan Police Department and the Arlington County Police Department under 42 U.S.C. § 1983, *see* Claims 7-10. These defendants filed motions to dismiss that are not yet fully briefed.

Plaintiffs request class certification under Rule 23 both for their injunctive relief and personal injury claims. TAC ¶¶ 206-219. A motion to certify is pending. ECF No. 47.

## DISCUSSION

### I. A *Bivens* claim is not available to challenge high-level decisions made to protect the President's safety or White House security in response to civil unrest.

The Nation's "interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence" is "overwhelming." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam) (citing H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916)). Indeed, it is a vital national-security concern:

> No one can deny the substantiality or the significance of America's interest in presidential security. At stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world.

*White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (collecting cases). Plaintiffs' complaint directly puts that vital interest at stake: By seeking to hold Major Adamchik personally liable for his alleged role in furthering the Attorney General's purported order to clear Lafayette Square before the President's visit there, plaintiffs challenge the Executive Branch's ability to ensure presidential safety at a time of civil unrest.

Major Adamchik's alleged decision to implement a high-level plan to disperse thousands of demonstrators who had not been screened and were "within weapons range" of the President does not subject him to personal liability. *Wood v. Moss*, 572 U.S. 744, 763 (2014) (granting qualified immunity but reserving question of whether *Bivens* is available in presidential-security

5

context). "Judicial inquiry into the national-security realm," without approval from Congress, "raises concerns for the separation of powers in trenching on matters committed to the other branches." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (internal quotation marks and citation omitted) (refusing to recognize *Bivens* remedy against the Attorney General and FBI Director).

Indeed, in nearly 50 years of *Bivens* litigation, "[t]he Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence." *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012). "[I]n accord with the [Supreme] Court's" frequent warning that it has "refused to extend *Bivens* to any new context or new category of defendants," *Abbasi*, 137 S. Ct. at 1857 (internal quotation marks and citations omitted), this Court should refuse to impose new liability on Major Adamchik for allegedly implementing a high-level plan designed to ensure the security of the President and the White House at a time of unrest.

### A. *Bivens* is a disfavored extra-statutory remedy that the Supreme Court has not authorized in this context.

The "antecedent" question in this case is whether the Court should devise a freestanding damages remedy under the Constitution. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). Indeed, whether to authorize a "damages action under the Constitution for particular *injuries*" in a particular context is a "question logically distinct from immunity to such an action on the part of particular *defendants*." *United States v. Stanley*, 483 U.S. 669, 684 (1987). The Supreme Court's answer to the antecedent question—in a variety of contexts over the past "40 years"— has been frequent and unequivocal: No. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (collecting cases); *accord Loumiet v. United States*, 948 F.3d 376, 380-81 (D.C. Cir. 2020).

In 1971, the Supreme Court took the unprecedented step of creating a private cause of action under the Fourth Amendment—without Congressional authorization—after holding there were "no special factors counselling hesitation." *Bivens*, 403 U.S. at 396. The Supreme Court has

extended *Bivens* only twice since then and only after noting the absence of special factors. *See Davis v. Passman*, 442 U.S. 228, 245 (1979); *Carlson v. Green*, 446 U.S. 14, 18-19 (1980). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Abbasi*, 137 S. Ct. at 1855. Since *Carlson*, the Supreme Court has "consistently rebuffed requests to add to the [three] claims allowed under *Bivens*." *Hernandez*, 140 S. Ct. at 743 (collecting cases).[5]

Authorizing a new *Bivens* action is thus a "'disfavored' judicial activity." *Hernandez*, 140 S. Ct. at 742 (quoting *Abbasi* 137 S. Ct. at 1857) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Twice in the past three years alone, the Supreme Court has forcefully declared that the arguments underpinning *Bivens* have "los[t] their force" and that "the Court's three *Bivens* cases [implying a remedy] might have been different if they were decided today." *Abbasi,* 137 S. Ct. at 1855-56; *accord Hernandez*, 140 S. Ct. at 742-43. While *Bivens* has not been overruled, it is the product of an "'*ancien regime*'" in which the Court effectively "arrogat[ed] legislative power." *Hernandez*, 140 S. Ct. at 741 (quoting *Abbasi*, 137 S. Ct. at 1855); *see also Abbasi*, 137 S. Ct. at 1869 (Thomas, J., concurring) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action.") (internal quotations and citations omitted).

The Supreme Court's retreat from *Bivens* is no accident but a principled return to basics: respect for "separation-of powers" means the creation of damages claims should be "committed to those who write the laws rather than those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (quotation marks and citations omitted). "Congress," not the Judiciary, "is best positioned to

---

[5] Webster Bivens claimed that line-level federal agents violated the Fourth Amendment when they entered and searched his home from "stem to stern" without a warrant, handcuffed him, and arrested him for drug violations. *Bivens*, 403 U.S. at 389, 397. *Davis* and *Carlson* involved, respectively, "a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Abbasi*, 137 S. Ct. at 1860.

evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government' based on constitutional torts." *Hernandez,* 140 S. Ct. at 742 (quoting *Abbasi*, 137 S. Ct. at 1856). As the D.C. Circuit recently echoed, "judges are not well-suited" to decide "how to balance these competing considerations in various contexts." *Loumiet*, 948 F.3d at 381.

### B. *Bivens* should not be extended into this novel context.

Because judges aren't well-suited to these legislative tasks, "the first question a court must ask" before potentially imposing liability on a federal officer is "whether the claim arises in a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1864; *accord id.* at 1860. A case presents a new context when it differs "in a meaningful way" from the three "previous *Bivens* cases" in which the Supreme Court created a damages remedy (*Bivens*, *Davis*, and *Carlson*). *Id.* at 1859. Notably, the inquiry is strictly limited to "[t]hese three" Supreme Court "cases." *Id*. at 1855. That strict limitation means that any earlier lower court decisions extending *Bivens* have now been "overtaken by *Abbasi*'s holding that the new-context analysis may consider *only* Supreme Court decisions approving *Bivens* actions." *Loumiet*, 948 F.3d at 382 (emphasis added).

The Supreme Court in *Abbasi* provided numerous examples of the ways in which a case might meaningfully differ from *Bivens*, *Davis*, and *Carlson*. *Abbasi*, 137 S. Ct. at 1860 (listing seven non-exhaustive factors). Even a case with "significant parallels to one of the [Supreme] Court's [three] previous *Bivens* cases," or a case presenting just a "modest extension" of one of them, "is still an extension" into a brand-new context. *Id.* at 1864. The Supreme Court's "understanding of a 'new context' is," in a word, "broad." *Hernandez*, 140 S. Ct. at 743.

Plaintiffs' case against Major Adamchik contains several of the factors explicitly identified in *Abbasi* as indicative of a new context; thus, it broadly and meaningfully differs from the trio of Supreme Court *Bivens* cases that were decided 40-plus years ago. In Claim 1,

plaintiffs allege that Major Adamchik violated their First Amendment rights to speech, assembly, and to seek redress. But the Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Loumiet*, 948 F.3d at 382 (internal quotation marks and citation omitted). Instead the Court has repeatedly reminded litigants that it has *not* expressly extended a First Amendment *Bivens* claim under any of its clauses to any context—including the presidential-security context. *See Moss*, 572 U.S. at 757; *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012); *Iqbal*, 556 U.S. at 675; *Bush v. Lucas*, 462 U.S. 367, 368 (1983). That alone means that plaintiffs' First Amendment claim presents a new context, as the D.C. Circuit recently held when dismissing a similar claim under the Free Speech Clause. *Loumiet*, 948 F.3d at 382. This Court held the same earlier this year. *See Lee v. Barr*, No. 19-CV-2284 (DLF), 2020 WL 3429465, at *6 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5221 (July 23, 2020).

It is "glaringly obvious" that plaintiffs' Fourth Amendment *Bivens* claim (Claim 2) presents a new context as well. *Hernandez*, 140 S. Ct. at 743. While *Bivens* itself was a Fourth Amendment case, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* (collecting cases). Notably, the Supreme Court in *Abbasi* clarified that *Bivens* authorizes damages for Fourth Amendment violations only in the narrow "search-and-seizure context in which [that case] arose"—*i.e.*, a claim against line-level narcotics agents for "handcuffing a man in his own home without a warrant." 137 S. Ct. at 1856, 1860. *Bivens* simply did not involve anything like the concerns at stake in plaintiffs' class-action suit against Major Adamchik, who allegedly implemented a high-level plan designed to ensure the President's safety. Therefore, plaintiffs' lawsuit here "assume[s] dimensions far greater than those present in *Bivens* itself" for at least three reasons. *Id.* at 1861.

First, "a 'new context' is present whenever the plaintiff seeks damages from a 'new category of defendants.'" *Loumiet*, 948 F.3d at 382 (quoting *Abbasi*, 137 S. Ct. at 1857) (citing *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015)). Major Adamchik, a Park Police commander who allegedly relayed high-level plans to numerous officers under his command, is an obvious example of a new *Bivens* defendant. *Abbasi*, 137 S. Ct. at 1860; *cf. LKQ Corp. v. United States*, No. 18-CV-1562 (DLF), 2019 WL 3304708, at *11 (D.D.C. July 23, 2019).

Second, "the extent of judicial guidance" regarding how the Executive Branch should have "respond[ed] to the problem or emergency" in this case is markedly different from *Bivens*. *Abbasi*, 137 S. Ct. at 1860. The question in *Bivens* was whether a line-level officer could enter a home without a warrant, consent, or exigent circumstances—a question that had been extensively addressed by courts at the time. Indeed, the prohibition on "the physical entry of the home" has deep historical and constitutional roots: it is the "chief evil against which the wording of the Fourth Amendment is directed," and in no setting "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 585, 589 (1980) (internal quotations marks and citation omitted).

Here, in contrast, the key question presented in plaintiffs' complaint is whether (consonant with the Fourth Amendment) Major Adamchik, allegedly at the direction of high-level officials, can disperse thousands of unscreened protesters near the White House, at a time of unrest, minutes before the President and other officials walked by. *Cf. Moss*, 572 U.S. at 762-64 (granting qualified immunity to Secret Service agents at Presidential event). Not only has the Supreme Court never previously extended *Bivens* in this area, taking up that question would require the Court to engage in the sort of judicial balancing of policy considerations that is not appropriate in *Bivens* litigation: "[t]he decisions of the Supreme Court demonstrate the difficulty of balancing the vital right of protest against the legitimate governmental interests of public order

10

and safety." *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1116 (D.C. Cir. 1969) ("*QAG I*") (collecting cases). Indeed, "[t]he balance that must be struck" between individual rights and the public interest "is especially delicate when one of those interests is the safety of the President." *White House Vigil for ERA Comm. v. Watt*, 717 F.2d 568, 572 (D.C. Cir. 1983) (per curiam).

Third, plaintiffs' lawsuit inherently raises "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 137 S. Ct. at 1860. Protecting the President is "undoubtedly" an issue "of the utmost importance." *Stigile v. Clinton*, 110 F.3d 801, 803 (D.C. Cir. 1997). But the Executive Branch's ability to effectively perform that critical function would likely be compromised by judicial intrusion in the form of personal liability. The Supreme Court has already stated as much: "The risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy." *Abbasi*, 137 S. Ct. at 1861.

Plaintiffs' claims against Major Adamchik ultimately "bear little resemblance to the three *Bivens* claims the [Supreme] Court ha[d] approved" 40-plus years ago. *Id.* at 1860. Instead, the national-security concerns inherent in plaintiffs' suit resemble the two most recent *Bivens* cases decided by the Supreme Court in which the Court held there was no Fourth Amendment damages remedy. In *Abbasi*, the Court held that high-level detention policy claims, including a Fourth Amendment strip-search claim, presented a new context to which *Bivens* should not be extended. 137 S. Ct. at 1853-54, 1858. And in *Hernandez*, the Court concluded that claims stemming from a fatal cross-border shooting "assuredly arise in a new context" and held that dismissal was warranted. 140 S. Ct. at 743-44. Plaintiffs' challenge to Major Adamchik's decision to allegedly implement a high-level dispersal order designed to protect the President's safety assuredly presents a new context here.

11

In sum, "[e]ach" of these differences alone is enough to "present[] a new context." *Loumiet*, 948 F.3d at 382. Taken together, they definitively establish that the cause of action plaintiffs ask this Court to endorse would represent a significant and unwarranted extension of this implied remedy into a new area that raises significant separation-of-powers concerns. Given that *Bivens* is a distinctly "disfavored" remedy and subject to strict limitations, "[t]he newness" of the presidential-security context "should alone require dismissal of the plaintiffs' damage claims." *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018), *aff'd*, 140 S. Ct. 735 (2020).

### C.  Special factors preclude a *Bivens* remedy in the presidential-security context.

While "the absence of any *Bivens* remedy in similar circumstances" is itself "highly probative" of the conclusion that plaintiffs' claims should be dismissed, *Meshal*, 804 F.3d at 426, an analysis of the "special factors" the Supreme Court identified in *Abbasi* further dictates that this Court should decline plaintiffs' invitation to create a new implied damages remedy and should dismiss plaintiffs' claims. *Abbasi*, 137 S. Ct. at 1858.

The "central" special-factor inquiry derives from "separation-of-powers principles." *Id.* at 1857. As noted above and detailed below, courts are not "well suited" in the national-security arena to "weigh the costs and benefits of allowing a damages action to proceed," particularly against Major Adamchik. *Id*. at 1858. Congress, which *is* well suited to the task, has never enacted the remedy plaintiffs seek. But even if this Court were to assume that legislative task, the availability of alternative processes—several of which plaintiffs pursue in this very case—is yet another "'convincing reason'" for this Court "'to refrain from providing a new and freestanding remedy in damages.'" *Id.* at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

### i.      Courts should not intrude into sensitive matters of presidential security.

"National-security policy is the [Constitutional] prerogative of the Congress and President." *Abbasi*, 137 S. Ct. at 1861 (citations omitted). By extension, authorizing "money

damages" for injuries arising from national-security decisions is the prerogative of Congress—not the courts. *Id.* Special factors have therefore "foreclosed *Bivens* remedies" in a variety of "cases 'involving the military, national security, or intelligence.'" *Meshal*, 804 F.3d at 425 (quoting *Doe*, 683 F.3d at 394). This case is no exception.

The "strength" of special factors based on "national security" or related concerns is "underlined by precedent beyond the *Bivens* cases" and even by precedent "before the creation of *Bivens* remedies." *Doe*, 683 F.3d at 394-95. For example, the Supreme Court has repeatedly "cautioned that '[m]atters intimately related to . . . national security are rarely proper subjects for judicial intervention.'" *Id.* at 395 (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)); *accord Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). And few matters are more intimately related to national security than the nation's "overwhelming[] interest in protecting the safety" of the President or the security of White House. *Watts*, 394 U.S. at 707.

"Few events debilitate the nation more than the assassination of a President." *Stigile*, 110 F.3d at 803. Assassination or other injury to the President "does violence" not only to the President but also to "the stability of the nation" and to "the democratic ideals that guide our system of government." *Berg v. Kelly*, 897 F.3d 99, 114 (2d Cir. 2018). It has "worldwide repercussions and affects the security and future of the entire nation." *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969). This isn't fearmongering: The "paramount interest" in the President's security has been "underscored in importance by the tragic assassinations" of four presidents. *QAG I*, 421 F.2d at 1117 (citing *Watts*, 394 U.S. 705).

Plaintiffs' *Bivens* claims—which challenge the alleged high-level decision to disperse protesters near the White House at a time of unrest—also implicate "the ability of the executive branch to function in an orderly fashion." *White House Vigil for ERA Comm.*, 746 F.2d at 1528. The presence of thousands of unscreened demonstrators across from the White House presented

an immediate and intrinsic threat that Executive Branch officials had the discretion, and the duty, to evaluate; that is *especially* true if the decision were made, as alleged, so that the President and other government leaders could walk to Lafayette Square to give remarks, regardless of the President's alleged reasons for taking that walk. *Cf. Moss*, 572 U.S. at 759 (observing "[o]fficers assigned to protect public officials must make singularly swift, on the spot, decisions whether the safety of the person they are guarding is in jeopardy") (quoting *Reichle*, 566 U.S. at 671 (Ginsburg, J., concurring)); *Roy*, 416 F.2d at 877. As the Supreme Court has recognized, any large crowd poses a threat to the President's safety due to the inherent and foreseeable risk of infiltration by bad actors; this was particularly true here given the unrest and illegal acts that had prompted the curfew. *See Moss*, 572 U.S. at 760. Simply put, it "cannot be denied that a public gathering" of thousands at a time of unrest "presents some measure of hazard to the security of the President." *Quaker Action Grp. v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975) ("*QAG IV*").

Indeed, security concerns would have undeniably existed even if the President hadn't delivered remarks at St. John's Church but instead remained at the White House while the protests continued. As the D.C. Circuit has long observed, the White House is "a unique situs for considerations of presidential and national security." *White House Vigil for ERA Comm.*, 746 F.2d at 1533. It is the "nerve center for America's national security network." *Id.* Yet it is "singularly exposed to potential terrorist attack." *Id.* And these concerns are magnified by the location of the White House: "[T]he need for effective security in the vicinity of the White House is great, but the geographical position of the Mansion renders it inherently insecure." *Id.* Because protecting the White House is a "security problem of the greatest magnitude," courts have upheld a variety of First Amendment restrictions near or inside the White House perimeter.

*Id.* at 1541 (approving restrictions on signs and parcels on White House sidewalk).[6] In short, the decision to clear Lafayette Park—whether to protect the President as he walked to St. John's Church, as alleged, or to expand the White House perimeter at a time of unrest—"unquestionably has national security implications" that "provide[] reason to hesitate before extending *Bivens* into this field." *Hernandez*, 140 S. Ct. at 747 (citing *Abbasi*, 137 S. Ct. at 1861).

The national-security implications in this field, for example, are unquestionably more pronounced than those that precluded a *Bivens* remedy in *Hernandez*. Earlier this year, the Supreme Court held that the parents of a boy who was shot and killed on the Mexican side of the border—while the boy was allegedly playing with his friends—could not personally sue the line-level Border Patrol agent who fatally shot their son. *Id.* Apart from concerns about interfering in foreign affairs, *see id.* at 744-45, the Court noted important security concerns such as preventing the illegal entry of persons, drugs, and other goods into the United States, *id.* at 746. The Court concluded that the "conduct of agents positioned at the border has a clear and strong connection to national security," rendering a *Bivens* remedy unavailable for the boy's death. *Id.*

Major Adamchik's conduct in allegedly furthering a high-level directive to protect the President has more than a clear and strong connection to national security—it has a connection to an "overwhelming" and "paramount" national interest of the "utmost importance." *Watts*, 394 U.S. at 707; *QAG I*, 421 F.2d at 1117; *Stigile*, 110 F.3d at 803. Judicial encroachment into this area would raise separation-of-powers concerns that can't be easily dismissed: "If *Bivens* liability were to be imposed" on Major Adamchik for allegedly acting on high-level orders to protect the President or the White House, then other "high officers who face personal liability for damages might refrain from taking urgent and lawful action" required to protect this President and others

---

[6] *See also*, *e.g.*, *QAG IV*, 516 F.2d at 731-33; *United States v. Musser*, 873 F.2d 1513 (D.C. Cir. 1989); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016).

in the future. *Abbasi*, 137 S. Ct. at 1863. This Court "must" be "especially wary before allowing a *Bivens* remedy that impinges" on presidential security. *Hernandez*, 140 S. Ct. at 744.

> ii. **Congress legislated extensively to enhance presidential and White House security but has not created a personal damages remedy in this context.**

This Court should also decline to create a new *Bivens* remedy in this case because Congress has never authorized a damages remedy against federal officers who are charged with safeguarding the President or the White House. Given its frequent attention to the issue, it is clear that Congress's refusal has not been "'inadvertent[,]'" and judicial restraint is required here. *Abbasi*, 137 S. Ct. at 1843 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 432 (1988)).

Appropriations for presidential protection were born of a recurring national tragedy: the assassinations of Presidents Lincoln, Garfield, and McKinley in the 35-year period after the Civil War. In 1906, Congress for the first time appropriated funds for the President's protection, *see* 34 Stat. 708 (1906), and in 1913, Congress began yearly authorizations for their permanent protection, *see* 38 Stat. 23 (1913). Since then, Congress has expanded those protections to other critical persons and places, including the White House, 18 U.S.C. §§ 3056; 3056A(a).[7]

In 1917, Congress took another significant step to enhance presidential security when making it a federal crime to threaten the President. 39 Stat. 919 (1917) (codified at 18 U.S.C. § 871). Though Congress made "criminal a form of pure speech," the restriction was justified by the Nation's "overwhelming" interest in presidential security. *Watts*, 394 U.S. at 707 (citing H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916)). Given three presidential assassinations, lawmakers

---

[7] *See also USSS History: 150 Years of Our History*, U.S. SECRET SERVICE, https://www.secretservice.gov/about/history/events/ (last visited Nov. 16, 2020); SHAWN REESE, CONG. RSCH. SERV., RL34603, THE U.S. SECRET SERVICE: HISTORY AND MISSIONS (2014), https://crsreports.congress.gov/product/pdf/RL/RL34603.

had concluded that the President "ought to be protected in *every* way possible." 53 CONG. REC. 9378 (1916) (statement of Rep. Webb) (emphasis added).

President Kennedy's assassination in 1963 invited even greater legislative attention to the issue of presidential security. President Johnson established a commission headed by Chief Justice Warren to investigate the Kennedy assassination, which Congress fully empowered to subpoena witnesses and evidence. *See* 28 Fed. Reg. 12,789 (Dec. 3, 1963); Pub. L. No. 88-202, 77 Stat. 362 (1963). The Commission produced a 900-page report in which it offered numerous proposals, including that Congress make it a crime to assassinate the President. *See* REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, pp. 454-69 (1964) ("The Warren Commission Report"), https://www.archives.gov/research/jfk/warren-commission-report/chapter-8.html.

While observing that those assigned to protect the President face "an immensely difficult and complex task," *id.* at 426, the Commission also understood that there are limits: presidential security should be "thorough but inconspicuous," and "[t]he rights of private individuals must not be infringed," *id.* at 427. Notwithstanding those conspicuous observations, the Commission did *not* recommend legislation that would impose liability on federal officials who might cross the line performing their protective mission. *See id.* Nor did Congress pass legislation to do so.

Congress did, however, act quickly on the Warren Commission's proposals by passing a statute in 1965 making it a federal crime to assassinate the President. *See* 18 U.S.C. § 1751. And in 1971, Congress made it a crime to remain in restricted areas or to disobey law-enforcement instructions to leave an area that the President is (or will be) visiting. *See* 18 U.S.C. § 1752; *e.g.*, *United States v. Bursey*, 416 F.3d 301, 304-09 (4th Cir. 2005); *Caputo*, 201 F. Supp. 3d at 68. But Congress wasn't done. In 1979, the House Select Committee on Assassinations released its own 600-page report. Like the Warren Commission, this Committee was "acutely aware" of "the

17

problem of insuring that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures." *Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H.R. REP. NO. 95-1828, pt. 2, at 464 (1979) (citation omitted) (emphasis added).[8] But despite being "mindful of the need to weigh the costs that could accrue the individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures[,]" the Committee's proposals did not include a damages claim against federal officers. *Id.* at 464-473.

Threats to the President and the White House have continued to attract the attention of Congress and the Executive Branch. For example, after the Oklahoma City bombing in 1995, the government closed the portion of Pennsylvania Avenue in front of the White House to vehicular traffic. *See* Closure of Streets, 31 C.F.R. § 413.1 (1995). Though Congress has held several hearings over the years on whether to reopen the street to vehicles, it remains closed to this day. *See, e.g.*, *Information Hearing on the Closing of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight*, 104th Cong. (1995); *America's Main Street: The Future of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform*, 107th Cong. (2001).

The terrorist attacks on September 11, 2001, marked another seminal moment in presidential security. Following the attacks, Pennsylvania Avenue in front of the White House was temporarily closed to pedestrian traffic, supplemented by the installation of jersey barriers and, later, retractable bollards.[9] The Department of Interior, including the U.S. Park Police, was

---

[8] *Available at*: https://www.archives.gov/research/jfk/select-committee-report/part-3-recommendations.html#legislative.

later charged with enhancing and expanding security measures at national monuments and icons. *See* Pub. L. No. 110-53, 121 Stat. 266, 544 (2007); Homeland Security Presidential Directive 7: Critical Infrastructure Identification, Prioritization, and Protection (2003).[10]

Congress enacted other significant reforms and convened hearings on security threats. For example, Congress allocated emergency funds to federal agencies, including Secret Service and Park Police, to enhance security. *See, e.g.*, Pub. L. No. 107-117, 115 Stat. 2230, 2334 (2002); *see also* S. REP. NO. 107-109, at 190, 206 (2002) (recommending funds to Secret Service for additional White House security measures and to Park Police for increased patrols, recognizing the Park Police also provides "security patrols around the White House perimeter" and security escorts for the President). Congress also reorganized the Secret Service under the new Department of Homeland Security. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2224 (codified as amended at 6 U.S.C. § 381). This reinforced the notion that any presidential-security failure is a national-security failure, as later exemplified by Congressional scrutiny of a White House breach in which intruders snuck into a State dinner and took photos with the President. *See The U.S. Secret Service and Presidential Protection: An Examination of a System Failure: Hearing Before the H. Comm. on Homeland Sec.*, 111th Cong. (2009).[11]

In 2014, Congress held additional oversight hearings regarding a series of security breaches at the White House, including an incident in which an armed invader jumped the White

---

[9] THE WHITE HOUSE HISTORICAL ASS'N, *History of the White House Fence*, https://www .whitehousehistory.org/press-room/press-timelines/history-of-the-white-house-fence (last visited Nov. 16, 2020).

[10] *Available at*: https://www.cisa.gov/homeland-security-presidential-directive-7.

[11] *Available at*: https://www.govinfo.gov/content/pkg/CHRG-111hhrg55808/pdf/CHRG-111hhrg55808.pdf.

House fence and walked inside. *See*, *e.g.*, *White House Perimeter Breach: New Concerns about the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014).[12] While the hearing covered the importance of keeping areas near the White House accessible to tourists and protesters alike, with 16 fence-jumpers in five years, there was a significant debate over additional fencing that might "include Pennsylvania and Lafayette being restricted." *See id.* (Statement of Chairman Issa).

Following the hearing, an executive panel issued a report on these White House breaches and echoed Congress's concern that presidential security "allows no tolerance for error" as a "single miscue, or even a split-second delay, could have disastrous consequences for the Nation and the world." United States Secret Service Panel, *Report from the United States Secret Service Protective Mission Panel to the Secretary of Homeland Security* 1 (Dec. 15, 2014).[13] Drawing on prior recommendations (including from the Warren Report), the panel offered many proposals, such as new fencing and a zero-tolerance disciplinary system. *Id.* at 7-8.

Finally, in the spirit of the oversight reforms discussed above, Congress has authorized Inspectors General throughout the Executive Branch to investigate and report abuses by federal law-enforcement officers. *See* The Inspector General Act of 1978, 5 U.S.C. App. 3 § 12. Congress has likewise required Homeland Security to investigate and report constitutional abuses. 6 U.S.C. §§ 111(b)(1)(G), 113(d)(3), & 345. Despite creating these oversight processes, Congress has remained silent regarding the creation of a damages remedy against Justice

---

[12] *Available at*: https://www.govinfo.gov/content/pkg/CHRG113hhrg91798/html/CHRG-113hhrg91798.htm.

[13] The executive summary is the only non-classified portion. It is available at: http://www.dhs.gov/sites/default/files/publications/14_1218_usss_pmp.pdf (last visited Nov. 16, 2020); *see also* United States Secret Service Protective Mission Panel, 79 Fed. Reg. 63,141 (Oct. 22, 2014).

Department, Park Police, Secret Service, or any other federal officers for alleged abuses arising from actions to protect the President or the White House.

Congress's repeated "silence" in this regard is "telling" and further counsels against the extra-statutory remedy plaintiffs seek here. *Abbasi*, 137 S. Ct. at 1862. In *Abbasi*, the Supreme Court observed that Congress's failure to provide damages to aliens claiming they were harshly treated after the 9/11 terrorist attacks counseled against *Bivens* relief. *Id.* Congress's attention to the issue was extensive—for example, Congress had authorized DOJ's Inspector General to report on "abuses of civil rights and civil liberties in fighting terrorism." *Id.* (internal quotation marks and citations omitted). Despite "'frequent and intense'" attention to the issue for 16 years, "Congress fail[ed] to provide a damages remedy." *Id.* (quoting *Schweiker*, 487 U.S. at 425).

Congress's failure to provide for damages is even more evident here: Since the early 1900s, Congress has approved federal protection and appropriated funds for presidential security, authorized or empowered committees and commissions to make findings and recommendations on presidential assassinations, and debated the balance between preserving civil liberties and enhancing presidential and White House security. But "'[a]t no point'" in more than a century of attention to the issue "'did Congress choose to extend to any person the kind of remedies'" that plaintiffs seek. *Id.* (quoting *Schweiker*, 487 U.S. at 426). If "Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*," respect for the separation of powers demands that courts not imply a remedy. *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014); *see also Hernandez*, 140 S. Ct. at 750.[14]

---

[14] Congress's attention to this issue remains frequent and intense. As noted in the Attorney General's motion to dismiss, Congress has held several hearings on the underlying incident, and Inspectors General have launched investigations. *See* ECF No. 76 at 21 n.14.

### iii.   This suit would invite intrusive discovery into high-level decision making and confidential communications involving the President.

The Supreme Court has long observed that "the harm produced by 'dampen[ing] the ardor of [public officials] in the unflinching discharge of their duties[]' is particularly severe in the national security field." *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). And the "accommodation for reasonable error" in the unflinching discharge of public duties "is nowhere more important than when the specter of Presidential assassination is raised." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). But invoking an extra-statutory remedy against Major Adamchik as a means to probe the motives, discussions, and deliberations underlying the alleged high-level Executive Branch decision to disperse Lafayette Square—notwithstanding the specter of thousands of unscreened protesters "within weapons range" of the President and White House—would hardly accommodate the Supreme Court's concerns. *Moss*, 572 U.S. at 763.

Plaintiffs' core (albeit conclusory) claim is that the President, the Attorney General, the Secretary of Defense, and senior White House officials conspired to remove protesters from Lafayette Square to facilitate a presidential photo. TAC ¶¶ 4, 60, 79-80, 202-203, 246. There is no allegation that Major Adamchik was part of these discussions. *See id.* Despite suing Major Adamchik, plaintiffs seek to discover the decision-making process and precise motives of the President, the Attorney General, and other senior officials, *see id.* ¶ 215(n), including to learn "whether and to what extent the use of force" that was used "was premeditated and planned in advance," *id.* ¶ 215(b). But probing the alleged reasons for this high-level decision "necessarily require[s] inquiry and discovery into the whole course of the discussions and deliberations" underpinning the alleged conspiracy and the "governmental acts being challenged." *Abbasi*, 137 S. Ct. at 1860. That counsels against a new implied damages remedy for at least two reasons.

The first "significant" factor is "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process." *Abbasi*, 137 S. Ct. at 1856. This consideration is especially relevant where, as here, the plaintiffs seek to subject the Attorney General and Major Adamchik—and by extension the President, the Secretary of Defense, and other high-level officials—to the burdens of discovery, among them depositions.[15] As noted above, "the burden and demand of litigation might well prevent them—or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties." *Id.* at 1860 (citing *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 382 (2004)). That in turn could chill Executive Branch officials from "taking every possible precaution to ensure that [the President] is safe." *Stigile*, 110 F.3d at 804. The issue is simply "too difficult" and "too delicate" for this Court to impose *personal* damages liability without congressional approval. *Quaker Action Grp. v. Morton*, 460 F.2d 854, 860 (D.C. Cir. 1971) ("*QAG III*").

A "closely related problem" arises from a "discovery and litigation process [that] would either border upon or directly implicate the discussion and deliberations that led to the formation of" decision-making by high-level officials, in this case to disperse Lafayette Square. *Abbasi*, 137 S. Ct. at 1860-61 (citing *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979)). Disclosing confidential communications between the President, the Attorney General, and other cabinet officials—particularly regarding presidential or White House security—could "interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.* at 1861 (citing *Clinton v. Jones*, 520 U.S. 681, 701 (1997)). As the Supreme Court reaffirmed in *Abbasi*, "'special considerations control' when a case implicates 'the Executive Branch's

---

[15] Plaintiffs readily acknowledge that "[l]itigating claims against the President, Attorney General, several agencies and department heads, and numerous individual officers will inevitably involve massive amounts of discovery . . . ." ECF No. 47-1 at 48 (class-certification motion).

interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications.'" *Id.* (quoting *Cheney*, 542 U.S. at 385). Those special considerations double as special factors counselling against recognizing a new implied damages remedy here.

Courts in this district recently dismissed *Bivens* claims based on similar concerns. *See Mejia-Mejia v. U.S. Immigr. & Customs Enf't*, No. CV 18-1445 (PLF), 2019 WL 4707150 (D.D.C. Sept. 26, 2019); *K.O. v. U.S. Immigr. & Customs Enf't*, --- F. Supp. 3d ----, No. CV 20-309 (RC), 2020 WL 3429697 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5255 (Aug. 26, 2020). In *Mejia-Mejia*, the court warned of a chilling effect "[i]f the courts were to entertain challenges to Executive Branch policies that are pursued through personal lawsuits against the officials of departments and agencies of government." 2019 WL 4707150, at *5. In particular, "the discovery required to gain details on individual defendants' motivations could dampen the candor of conversations and advice rendered by officials within the executive branch." *Id.* But those concerns are even more pronounced in *this* case given that plaintiffs' claims "reach even further into Executive Branch deliberations," and the "conversations and advice at issue" are not only "closer to the office of the President" but involve the President himself. *K.O.*, 2020 WL 3429697, at *10. Whether or not these conversations are "privileged or discoverable," they provide "more reason to pause before allowing a *Bivens* action that could reach them." *Id.*; *cf. Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 232-33 (D.D.C. 2018) (declining to extend *Bivens* to "high-level policy determinations").

Because bad motive "is easy to allege and hard to disprove," plaintiffs' *Bivens* claims may require this Court to scrutinize high-level communications or to probe intelligence regarding threats to the White House and the President. *Crawford-El v. Britton*, 523 U.S. 574, 584-85 (1998) (internal quotations marks and citation omitted). Given the "high rank[]" of those involved, not to mention the "class nature of the claims," it is hard to "see how prosecution of

24

[plaintiffs'] claims could avoid looking into" deliberations and decisions made "at the highest levels[.]" *K.O.*, 2020 WL 3429697, at *10. Yet that is the crux of this case. Even if Major Adamchik later received immunity, that would not allay the "difficulties" of subjecting high-level communications and sensitive material to "judicial and public scrutiny" through a suit Congress never approved. *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008); *cf. Stanley*, 483 U.S. at 682-83 (discovery into military decisions counseled against *Bivens*); *Moss*, 572 U.S. at 762 (examining security manual before granting immunity).

Those concerns are even more significant here, where plaintiffs seek to convert their case against Major Adamchik into a class action on behalf of thousands of protesters. This underscores a related difficulty, the resolution of which should rest with Congress: *Bivens* claims "have generally been made against individuals—a police officer, a supervisor, or a federal prison guard—who have engaged in some personal misconduct in a direct and particularized interaction with a plaintiff." *Mejia-Mejia*, 2019 WL 4707150, at *4. They are "not" usually made "against individuals who have applied a general policy that affected plaintiff and others in similar ways," *id.*, as plaintiffs claim regarding Major Adamchik's implementation of a high-level directive.

Allowing plaintiffs' class-based claims to proceed by way of an extra-statutory, personal-capacity damages action—or alternatively allowing thousands of separate cases to go forward based on the same high-level decision—would saddle Major Adamchik (and the government) with extraordinarily burdensome and time-consuming discovery while also creating an unacceptable financial disincentive to public servants considering high-level office. *See Abbasi*, 137 S. Ct. at 1857 (constitutional tort suits create "substantial costs" against both the individual federal officer and the government). An avalanche of personal damages claims, based on an alleged Cabinet-level decision to protect the President's safety, would "creat[e] a potentially enormous financial burden" on Major Adamchik—a burden best left "to Congress to weigh."

*FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (declining to extend *Bivens* against a federal agency because doing so would implicate federal fiscal policy). These weighty "burden[s]" are no less concerning where, as here, the claims are "confined to the conduct of a particular Executive Officer in a discrete instance." *Abbasi*, 137 S. Ct. at 1860 (citing *Cheney*, 542 U.S. at 382).

It is true that nobody "knows exactly what discovery will entail" in this case "because no similar *Bivens* claim" involving both presidential and White House security decisions, allegedly made at the President's behest, has been alleged before or "survived the motion to dismiss stage." *Meshal*, 804 F.3d at 426. But when "national security" is at stake, "the unknown itself" is enough to counsel hesitation. *Id.* Because "the costs and difficulties" of this suit "might intrude upon and interfere with the proper exercise" of the Executive Branch in this vital context, the Court should not create a new damages remedy. *Abbasi*, 137 S. Ct. at 1863.

### iv.   Plaintiffs pursue alternative relief that precludes a new *Bivens* remedy.

Another "'convincing reason'" why this Court should not step into Congress's or the Executive Branch's shoes by creating a "'freestanding remedy'" against Major Adamchik is that plaintiffs have an "'alternative, existing process'" to vindicate their interests. *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie*, 551 U.S. at 550) (collecting cases). In fact, plaintiffs in this very case seek an injunction to protect *both* their First and Fourth Amendment rights. *See* Claims 3-4.

The Supreme Court has observed that the opportunity to seek an "injunction" is precisely the kind of alternative process that "usually precludes" extending *Bivens* into a new context. *Abbasi*, 137 S. Ct. at 1865 (observing that detainees' ability to enjoin unconstitutional conditions of confinement counsels against *Bivens* relief). Indeed, the "Supreme Court has declined to extend *Bivens*" not only where Congress has provided a statutory remedy but also "where other causes of action provide redress," including for "equitable relief." *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018) (citations omitted). Through their

request for injunctive relief, plaintiffs effectively seek to modify "large-scale" law-enforcement

decisions regarding where, when, and how individuals can protest near the White House. *Abbasi*,

137 S. Ct. at 1862. That plaintiffs seek this relief on behalf of a class of numerous individuals—

potentially numbering in the thousands—only underscores their core interest: the rights of

plaintiffs and others to protest in Lafayette Square without being forcefully dispersed, if at all.

"[U]nlike the *Bivens* remedy," which the Supreme Court has "never considered a proper vehicle

for altering an entity's policy," plaintiffs' request for "injunctive relief" (on behalf of a proposed

class, no less) "has long been recognized as the proper means for preventing entities from acting

unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001).

Many courts have declined to extend *Bivens* where equitable relief was an alternative

option for vindicating constitutional interests. For example, in *Mejia-Mejia*, the court observed

that in the "numerous cases" of immigrant children separated from their parents (including "two

class actions") the availability of "alternative mechanisms" precluded *Bivens* relief. 2019 WL

4707150, at *5. Those alternative mechanisms included the very relief sought here: "injunctive

relief against the relevant agencies and government officials in their official capacities[.]" *Id.*

Likewise, this Court has twice observed that equitable relief under the Administrative Procedure

Act is enough to preclude *Bivens* relief, "perhaps alone." *LKQ Corp.*, 2019 WL 3304708, at *11

(citing *Lillemoe*, 344 F. Supp. 3d at 232). The availability of equitable relief, under the APA or

otherwise, "leaves no room for *Bivens*." *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116,

1123 (9th Cir. 2009); *accord Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir.

2005); *Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998).

There is also no room for plaintiffs' *Bivens* claims "regardless" of whether their proposed

injunction is "adequate to provide all of the relief [they] seek[]." *Liff*, 881 F.3d at 920. *Bivens*

isn't required even when alternative options offer "no relief whatsoever." *Davis v. Billington*,

27

681 F.3d 377, 383 (D.C. Cir. 2012) (citing *Wilson*, 535 F.3d at 709). So long as plaintiffs have at least an "avenue for some redress" through their proposed injunction, "bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 69. Indeed, "[e]ven if the choice is between *Bivens* or nothing, if special factors counsel hesitation"—as they do here—"the answer may be nothing." *Meshal*, 804 F.3d at 425.

In this case, however, the plaintiffs may have a potential alternative mechanism for attempting to seek recourse even if they fail to obtain an injunction: depending on the facts, for certain claims they could seek to pursue a damages claim under state tort law or the Federal Tort Claims Act, 28 U.S.C. § 1346(b), *id.* §§ 2671-80.[16] While the Supreme Court in 1980 ruled that the FTCA is not an alternative process to *Bivens*, *see Carlson*, 446 U.S. at 23, the Supreme Court has since held or observed—on at least *four* occasions since *Carlson*—that the potential availability of "state tort law" may "provide[] alternative means for relief" precluding a new *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1858; *see Minneci v. Pollard*, 565 U.S. 118, 120 (2012); *Wilkie*, 551 U.S. at 551; *Malesko*, 534 U.S. at 72-73. The D.C. Circuit recently observed the same thing. *See Liff*, 881 F.3d at 918 (citing *Minneci*, 565 U.S. at 120).

Accordingly, numerous courts have now held that the FTCA is an alternative to *Bivens* in a variety of contexts, observing "that *Carlson*'s analysis of that issue may not have survived [*Abbasi*]." *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (collecting cases); *e.g.*, *Oliva v. Nivar*, 973 F.3d 438, 443-44 (5th Cir. 2020) (the FTCA precluded a *Bivens* claim based on excessive force); *Cantu v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019); *Schwarz v. Meinberg*, 761 F. App'x 732, 734-35 (9th Cir. 2019). Because plaintiffs' allegations that they were seized unlawfully "would be so clearly actionable under the general law" (subject to potential FTCA

---

[16] Plaintiffs also seek damages against potential wrongdoers under 42 U.S.C. §§ 1983, 1985(3), and 1986, subject to available defenses. *See* Claims 5-10; *cf. Abbasi*, 137 S. Ct. at 1843.

defenses), their case presents the "weakest argument" for this Court to "recogniz[e] a generally available constitutional tort." *Wilkie*, 551 U.S. at 560. Whether or not this Court recognizes state law or the FTCA as providing a potential standalone alternative to *Bivens*, the possible availability of a claim for damages there (or against state actors under federal civil rights statutes like § 1983)—when paired with all of the special factors above—provides even more reason for this Court to decline to create a new remedy. *See Abbasi*, 137 S. Ct. at 1861; *cf. Meshal*, 804 F.3d at 425 (special factors that might not "alone" preclude *Bivens* may do so "together").

   "In sum, this case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers." *Hernandez*, 140 S. Ct. at 749 (citing *Abbasi*, 137 S. Ct. at 1857-58). When it comes to the President's safety and White House security, Congress is "in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (internal quotation marks and citation omitted). Imposing a judicially implied damages remedy in an area that Congress has resisted for a century would mark a return to the "forgotten era in which courts freely implied private rights of action to promote congressional purposes unmoored from statutory text." *LKQ Corp.*, 2019 WL 3304708, at *10. Because there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" against Major Adamchik for the class of claims pleaded in this novel context, this Court "must refrain from creating the remedy." *Abbasi*, 137 S. Ct. at 1858.

### II.   Major Adamchik is entitled to qualified immunity because plaintiffs fail to allege that he was personally involved in violating their clearly established constitutional or statutory rights.

   Major Adamchik is likewise entitled to qualified immunity because plaintiffs do not plausibly allege that he was personally involved in physically removing them from Lafayette Square, and clearing thousands of unscreened protesters within weapons range of the President

and the White House during a time of civil unrest did not otherwise violate clearly established law. "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). To overcome it, the plaintiff must allege facts that: (1) the defendant violated his statutory or constitutional rights; and (2) "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Id*. at 232 (internal quotation marks and citation omitted). The court has discretion to decide which prong to address first. *See id.* at 236.

For a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate[,]'" such that "'every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle*, 566 U.S. at 664 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]he right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official[.]" *Id*. at 665 (internal quotation marks and citations omitted). Thus, qualified immunity "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229 (internal quotation marks and citation omitted); *see Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018).

### A. The allegations fail to plausibly show Major Adamchik's personal involvement in violations of clearly established constitutional rights.

Under *Bivens*, there is no vicarious liability. *See Iqbal*, 556 U.S. at 676. Hence to survive a dismissal motion the plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*.

A supervisor cannot be liable for a subordinate's retaliatory acts or First Amendment content discrimination unless the supervisor directly instructed the officer to suppress the plaintiff's speech for retaliatory reasons. *See Surita v. Hyde*, 665 F.3d 860, 867, 880 (7th Cir. 2011); *see generally Bundy v. Sessions*, 387 F. Supp. 3d 121, 124, 129-30 (D.D.C. 2019), *aff'd*, 812 F. App'x 1 (D.C. Cir. 2020). Similarly, a government official cannot be liable for a subordinate's Fourth Amendment violation in seizing or using force unless the supervisor knew the circumstances rendering the force excessive and approved the particular tactics at issue. *Cf. Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) (in First Amendment context, observing that "[t]he supervisor[ ] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see") (internal quotation marks and citation omitted); *cf. Tracy v. Neuberger*, 840 F. Supp. 2d 1183, 1190-91 (D. Minn. 2012) (granting qualified immunity as no causal connection was shown between supervisor's mass arrest order and the allegedly unlawful conduct of line officers arresting plaintiff). Thus, a supervisor's alleged generalized order to arrest or move people does not, without more, render him liable for line-level officers' tactics. *See Haus v. City of New York*, No. 03 CIV 4915, 2011 U.S. Dist. LEXIS 155735, at *187-89, 196-97 (S.D.N.Y. Aug. 31, 2011); *cf. McNair v. Coffey*, 279 F.3d 463, 466-67 (7th Cir. 2002) (affirming qualified immunity for officer who requested backup as he was not responsible for the number of officers who held the suspect at gunpoint).

To determine the sufficiency of the allegations of Major Adamchik's involvement in clearing Lafayette Square and his entitlement to qualified immunity, the first step is to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The allegations that Major Adamchik "ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters," TAC ¶ 82, and took unidentified "actions" in "ordering such uses of force," TAC ¶ 228, are

conclusions not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679-81; *cf. Nettles v. New Horizons of the Treasure Coast, Inc.*, 559 F. App'x 946, 949 (11th Cir. 2014) (insufficient to offer "such conclusory descriptions as 'forcibly, unreasonably restrained'"); *Santiago v. Warminster Township*, 629 F.3d 121, 127-133 (3d Cir. 2010) (same for allegations that one defendant "permitted the use of excessive force in restraining plaintiff" including holding her at gunpoint and restraining her for an excessive length of time, and that another defendant created a plan that "specifically sought" the above described force); *cf. Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (allegations that foreign leaders "order[ed]" security forces "to attack and kill scores of unarmed civilians" could not sustain Alien Tort Statute claim because "[t]hese allegations sound much like those found insufficient by the Supreme Court in *Iqbal* . . . .").

Thus pruned, the complaint is devoid of well-pleaded allegations showing Major Adamchik's personal involvement in the line-level officers' purported seizure of plaintiffs, use of force, or suppression of speech. The complaint merely alleges that Major Adamchik was the Park Police "incident commander" and issued some kind of "immediate" order to unspecified individuals or officers regarding the crowd at about 6:30 p.m. TAC ¶ 20.[17] Given the absence of allegations about what Major Adamchik said, the complaint implies, at most, that he issued an order consistent with the Attorney General's alleged request that someone should "clear" the park, *i.e.*, have everyone leave the park by peaceful means. *See id.* at ¶¶ 20, 78-79, 203. Hence the complaint does not allege facts from which it plausibly may be inferred that Major Adamchik ordered any unlawful arrest, use of force, or punishment of the protesters based on their message. Thus, Major Adamchik is qualifiedly immune for lack of involvement in the officers' conduct.

---

[17] Indeed, plaintiffs mention Major Adamchik in only six of the 295 paragraphs in their complaint, and they never once add any substance to their conclusory claims about his conduct. *See* TAC ¶¶ 20, 82, 86, 87, 221, 228.

**B.  There is no clearly established First Amendment violation.**

Plaintiffs' claim against Major Adamchik independently fails because plaintiffs have not alleged the violation of any clearly established constitutional right.

    **i.**    **Relevant First Amendment principles.**

Under the First Amendment, the government may establish reasonable restrictions on the time, place, and manner of protected speech. *See Hill v. Colorado*, 530 U.S. 703, 719-20 (2000). As the Supreme Court explained in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), time, place, and manner restrictions are valid provided that they are "'justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id*. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*, 845 F.3d 1199, 1208 (D.C. Cir. 2017). A restriction is content neutral if it "serves purposes unrelated to the content" of the speech regardless of whether "it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citation omitted).

Under *Ward's* narrow tailoring/significant interest prong, "the significance of the government interest bears an inverse relationship to the rigor of the narrowly tailored analysis." *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007). A restriction is narrowly tailored if it does not "burden[ ] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799; *see Time Warner Entm't Co., L.P. v. FCC*, 93 F.3d 957, 978-79 (D.C. Cir. 1996). But the regulation "need not be the least restrictive or least intrusive means." *Ward*, 491 U.S. at 798.

"[T]he safety of the President [i]s a 'paramount interest,'" *White House Vigil for ERA Comm.*, 746 F.2d at 1532-33 (citations omitted), justifying substantial limitations on the manner

33

of expression. *See Moss*, 572 U.S. at 748, 758-59, 761; *Watts*, 394 U.S. at 707-08. The government also has a related, and additional, strong interest in protecting the White House and its occupants. *See QAG IV*, 516 F.2d at 726-27, 729. Both of these interests have previously justified substantial limitations on the manner of expressive activity in Lafayette Square, which abuts the White House grounds, and in other areas in and around the White House. *See White House Vigil for ERA Comm.*, 746 F.2d at 1532-41; *QAG IV*, 516 F.2d at 727-34; *see also Musser*, 873 F.2d at 1516-19; *Caputo*, 201 F. Supp. 3d at 71-72.

ii.     **Major Adamchik's alleged general order did not violate plaintiffs' clearly established First Amendment rights.**

Here, Major Adamchik's alleged order to federal law enforcement officers regarding the clearing of Lafayette Square did not violate any clearly-established First Amendment right. Shorn of bare allegations, the complaint alleges only that he ordered some unspecified action with respect to the crowd, consistent with the planned one-block extension of the security perimeter around the White House, a step that logically furthered White House security and the President's protection before he appeared in Lafayette Square. *See* TAC ¶¶ 5, 20, 78-80, 203-04.

No Supreme Court decision, D.C. Circuit decision, or consensus of persuasive authority, *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Lash v. Lemke*, 786 F.3d 1, 7 (D.C. Cir. 2015), clearly established that Major Adamchik could not issue an on-the-spot crowd clearing order covering a one-block area to protect the President and the White House in the face of a large crowd of unscreened protesters. In fact, there appears to be no reported decision at all evaluating the constitutionality of a supervising Park Police officer's on-the-spot clearing order near the White House, much less in this particular situation. Thus, plaintiffs' First Amendment claim should be dismissed on qualified-immunity grounds.

Furthermore, against the legal backdrop of the *Ward* framework Major Adamchik could have reasonably believed that his alleged conduct implicated none of the speech concerns plaintiffs raise here. Major Adamchik's alleged order to clear the park and extend the perimeter in some way was content neutral on its face because it excluded all people from the park, regardless of what views they expressed. *See Hill*, 530 U.S. at 719; *Clark*, 468 U.S. at 295-96; *Basham*, 845 F.3d at 1208-09. Plaintiffs imply otherwise by citing *the President's* statements addressing violent unrest to speculate that the President disapproved of the protests. But they do not point to any statement or action of *Major Adamchik* showing that *he* wished to suppress speech. TAC ¶¶ 54-55, 63-64; *see Moss*, 572 U.S. at 763-64; *cf. Iqbal*, 556 U.S. at 682-83.

Plaintiffs' own allegations also establish the significance of the governmental interests served by removing everyone from the park. The complaint asserts that the Attorney General directed that the park be cleared allegedly to enable the President to walk to St. John's Church to deliver a speech, and it suggests that Major Adamchik gave an "immediate order" to further that goal. *See* TAC ¶¶ 4, 20, 203-04.[18] In this the complaint reflects at least two compelling governmental interests served by Major Adamchik's alleged order: (1) protecting the President as he walked to the church and delivered remarks; and (2) protecting the White House in response to disorder in the area. *See* TAC ¶¶ 4, 51-52, 203; Mayor's Order 2020-069.[19] The

---

[18] Consistent with his Congressional testimony noted above, the complaint incorporates an article indicating that the Attorney General issued the order to extend the security perimeter around the White House. *See* Carol D. Leonnig, Matt Zapotosky, Josh Dawsey and Rebecca Tan, *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, WASH. POST, June 2, 2020, https://www.washingtonpost.com/politics/barr-personally-ordered-removal-of-protesters-near-white-house-leading-to-use-of-force-against-largely-peaceful-crowd/2020/06/02/0ca2417c-a4d5-11ea-b473-04905b1af82b_story.html ("*Barr Personally Ordered*"); TAC ¶ 202 n.19.

[19] Like the Attorney General, Major Adamchik disputes any allegations that he cleared the park for the purpose of allowing the President to deliver his remarks there. *See supra* note 4.

government's interest in presidential protection was especially acute. The President was about to appear in public, where he faced "the greatest danger . . . ." *In re Sealed Case*, 148 F.3d 1073, 1078 (D.C. Cir. 1998). While there had been peaceful protests in the days immediately before June 1, 2020, there had also been looting, rioting, and vandalism in what the Mayor described as a "glorification of violence" that was "not representative of peaceful protest or individuals exercising their lawful First Amendment rights." Mayor's Order 2020-68 § I ¶ 4. Indeed, to prevent further rioting, the Mayor ordered a 7:00 p.m. curfew on June 1 because an 11:00 p.m. curfew had proven ineffective the night before. *See* Mayor's Order 2020-69 § II ¶ 1; Mayor's Order 2020-68 § II ¶ 1.[20] The recent unrest attending the protests heightened the possible danger to the President in entering the park, and the government had an especially strong interest in his safety. Similarly, given the unrest near the White House, the government had a substantial interest in protecting the White House, with its vital occupants and operations, from the potential danger posed by infiltrators within the unscreened crowd of thousands.

Major Adamchik's "immediate order," which plaintiffs suggest was a directive to carry out a high-level operation to clear the park in some unspecified way, directly advanced the above interests by preventing the protesters from entering within weapons distance of the President or endangering security officers and physical barriers protecting the White House. *See generally*

---

But assuming the truth of plaintiffs' allegations, as we must at this stage, the governmental interest in protecting the President would clearly support Major Adamchik's alleged actions.

[20] The articles plaintiffs cite reflect these security concerns, including information that members of the crowd were passing rocks amongst themselves, threw a water bottle in the Attorney General's direction, threw projectiles at the officers, and also reflected intelligence that some had stockpiled bricks and bottles at the church. *See Barr Personally Ordered*; TAC ¶ 202 n.19; *see also* TAC ¶ 88 n.16; Ashley Parker, Josh Dawsey and Rebecca Tan, *Inside the Push to Tear-gas Protesters Ahead of a Trump Photo Op*, WASH. POST, June 2, 2020, https://www.washingtonpost.com/politics/inside-the-push-to-tear-gas-protesters-ahead-of-a-trump-photo-op/2020/06/01/4b0f7b50-a46c-11ea-bb20-ebf0921f3bbd_story.html.

*Moss*, 572 U.S. at 760-62; *Marcavage v. City of New York*, 689 F.3d 98, 105-07 (2d Cir. 2012). It also did not substantially burden more speech than necessary. It permitted protesters to say whatever they wanted, by whatever lawful means they wanted, in whatever place they wanted except Lafayette Square and a short distance around it. *See* TAC ¶¶ 106, 116. Notably, while courts have upheld time, place, and manner restrictions of unlimited duration, Major Adamchik's alleged order was apparently temporary and therefore even less restrictive than most such limitations. *Cf. White House Vigil for ERA Comm.*, 746 F.2d at 1537-41. And the order was narrowly tailored, leaving adequate alternative channels, including protests in virtually any other permissible location. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1133-39 (9th Cir. 2005).[21]

Lastly, allegations that line-level officers used excessive force to clear the park do not clearly establish that Major Adamchik's order violated the First Amendment. Conclusory use of force allegations do not alone transform an otherwise neutral restriction on speech into impermissible retaliation or viewpoint discrimination. *See Sevy v. Barach*, 815 F. App'x 58, 64 (6th Cir. 2020); *see also Lash*, 786 F.3d at 10 ("A plaintiff pressing a First Amendment retaliatory force claim must show, among other things, that the officer who used force against him had 'retaliatory animus.'") (citations omitted). And as already explained, plaintiffs have not plausibly alleged that Major Adamchik directed the force they say was used. Nor does the

---

[21] Plaintiffs assert there were no alternative channels for communication because no one told them they could remain in the area outside the expanded perimeter or explicitly authorized them to protest there. TAC ¶¶ 106-07. But plaintiffs do not allege that Major Adamchik ordered any area outside the expanded perimeter to be cleared, nor do they even claim that the officers tried to remove them from the areas adjacent to the expanded perimeter. Likewise, plaintiffs do not claim there was any other legal obstacle to their protesting outside the perimeter.

complaint allege specific facts showing that the officers, much less Major Adamchik, had a retaliatory motive for using force. *See Lash*, 786 F.3d at 9-10.[22]

### iii.    *Wood v. Moss* **and other precedents support dismissal.**

*Wood v. Moss* demonstrates Major Adamchik's entitlement to qualified immunity from plaintiffs' First Amendment claim. 572 U.S. 744 (2014). Protesters sued Secret Service agents for moving their protest away from a restaurant after then-President Bush made a last-minute decision to stop there for dinner. They claimed the agents violated the First Amendment by moving them farther from the President than his supporters. *See id.* at 754. In Justice Ginsburg's opinion for a unanimous Supreme Court, the Court approved dismissal on qualified immunity grounds "[b]ecause no 'clearly established law' so controlled the agents' response to the motorcade's detour" as to eliminate immunity. *Id.* at 748-49. No clearly established precedent required the agents to ensure that the plaintiffs and the President's supporters had equal access or were "at comparable locations at all times." *Id.* at 759-60 (internal quotation marks and citation omitted). The security perimeter also did not violate clearly established law because it furthered the government's "'valid, even overwhelming, interest in protecting the safety of its Chief Executive.'" *Id.* at 758 (quoting *Watts*, 394 U.S. at 707) (internal alteration omitted); *see id.* at 760. And no precedent compelled the agents to take alternative separation measures. *See id.* at 760-61. Because removing the protesters directly furthered the government's interest in protecting the President, it was not clearly established that the agents violated the First

---

[22] Plaintiffs allege the mere legal conclusion that the officers' actions "were based on and/or taken in retaliation for" plaintiffs' viewpoint. TAC ¶ 223. But plaintiffs fail to allege facts plausibly indicating that each plaintiff's particular speech was a but-for cause of each officer's actions, much less the unspecified order issued by Major Adamchik. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018). And again, they do not allege that Major Adamchik engaged in specific acts or made statements revealing a desire to retaliate against plaintiffs based on their message. Thus their assertions of retaliation are not well-pleaded.

Amendment by failing to take the plaintiffs' proposed alternative steps. *See id*. While the plaintiffs argued that the Secret Service's alleged past practice of shielding President Bush from disfavored political speech showed that the officers' security concerns were pretextual, the Court held that the alleged practice of other Secret Service employees could not be imputed to the defendant agents. *See id*. at 761-64.

Given this case's parallels to *Moss*, qualified immunity also bars the claims here. In this case and in *Moss*, the President decided to enter a publicly accessible place near a crowd of protesters, and federal officials allegedly issued orders to protect him during that public appearance. *See Moss*, 572 U.S. at 750-51; TAC ¶¶ 202-04. Here, as in *Moss*, the alleged order supporting removal of protesters to a block away from the President's location was facially neutral and did not constitute viewpoint discrimination under clearly established law. *See Moss*, 572 U.S. at 759-60; TAC ¶¶ 5, 17, 79, 202. Major Adamchik's alleged order here served the interest in presidential security just as directly, if not more so, than the removal order in *Moss*: here the order responded both to the inherent risk in the protesters' proximity to the President and to the possibility of violence similar to recent days' unrest. Indeed, plaintiffs' own news reports suggest the crowd was throwing projectiles. *See supra* note 20. In *Moss*, the removal order responded *only* to allegedly peaceful protesters' proximity to the President. *See Moss*, 572 U.S. at 750-51; Mayor's Order 2020-69; TAC ¶¶ 51 n.15, 90 n.20, 104, 150, 204. And here, as in *Moss*, it does not matter whether Major Adamchik could have relied on supposedly less restrictive alternatives to the removal of the protesters to protect the President, for there is no clearly established precedent requiring such alternatives. *See Moss*, 572 U.S. at 760-61. In fact, just as the agents in *Moss* did not have to try to convince the President not to appear at the restaurant near the crowd in order to avoid danger, Major Adamchik did not have to try to convince President Trump not to appear in Lafayette Square. *See id*. at 761. Therefore, here, as

in *Moss*, Major Adamchik is entitled to qualified immunity. Indeed, courts have relied on presidential security and White House protection to permit enforcement of similarly substantial restrictions on the ability to protest in close proximity to the President or the White House, including against allegedly peaceful crowds. *See Marcavage*, 689 F.3d at 105-09 (upholding New York's orders establishing a four-day no-protest area on two blocks around the RNC); *Menotti*, 409 F.3d at 1120, 1130-37 (upholding order excluding everyone, except the President and international delegates, from most of downtown Seattle, even though recent protests were mostly peaceful and protesters could not convey their message directly to the international leaders); *White House Vigil for ERA Comm.*, 746 F.2d at 1532-40 (upholding ban on stationary protest and large signs on White House sidewalk, notwithstanding that the peaceful protesters could not protest in place of symbolic importance and possibility of less restrictive alternatives).

Because substantial authority supported Major Adamchik's alleged order and no controlling authority made it obvious to all reasonable officials that such an order was unconstitutional, it was not clearly established that the alleged order violated plaintiffs' First Amendment rights. Consequently, plaintiffs' First Amendment claim should be dismissed.

**C.  There is no clearly established Fourth Amendment violation.**

As previously explained, plaintiffs fail to allege facts plausibly showing Major Adamchik was personally involved in the actions of the line-level officers who allegedly seized and used force on plaintiffs. That alone is dispositive of the plaintiffs' claims against Major Adamchik. But qualified immunity bars the Fourth Amendment claims for additional reasons. At the intersection of presidential security, protest, and crime control that this case presents, no clear principle of law makes it indisputable that the officers used excessive force.

The general standards governing excessive force claims do not clearly establish that the officers could not forcibly disperse the crowd in Lafayette Square. The reasonableness of an

officer's use of force to seize an individual depends on a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Significantly, the government's interest in presidential security weighs heavily in the Fourth Amendment balance and can justify forcible seizure without particularized suspicion of criminality. *See Berg*, 897 F.3d at 108-13 (qualified immunity for police officers who placed protesters in pens and noting presidential protection is a special need potentially justifying the detention); *cf. Saucier v. Katz*, 533 U.S. 194, 207-09 (2001) (qualified immunity from excessive force claim based on agent's allegedly seizing a protester and shoving him in a van to protect the Vice President); *Stigile*, 110 F.3d at 803-07 (presidential protection is a special need justifying random drug testing of employees with access to the White House). Separately, the government's interest in public order and law enforcement can sometimes permit law enforcement officers to "seize" in the Fourth Amendment sense a large cohesive crowd based on probable cause to believe that some, though not all, of its members engaged in criminal behavior, for example when acting as a unit. *See Bernini v. City of St. Paul*, 665 F.3d 997, 1003-04 (8th Cir. 2012); *cf. Carr v. District of Columbia*, 587 F.3d 401, 407-10 (D.C. Cir. 2009); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015).

Here, because the government had a paramount interest in protecting the President during his arrival in the park and his speech at the church, that interest strongly supports the conclusion that the officers' use of force was lawful. *See generally Stigile*, 110 F.3d at 803-07; *cf. Moss*, 572 U.S. at 748, 758-59; *Berg*, 897 F.3d at 108-13. Additionally, based on the Mayor's reports about unrest in the days leading up to the clearing of the park (and the media reports cited by plaintiffs), the officers could have thought it reasonable to use crowd control techniques to move the crowd in order to protect the President and further the government's interest in law

41

enforcement and prevent bad actors from using the crowd as cover to endanger the officers. *See generally* 18 U.S.C. §§ 111(a)(1), 3056(d) (prohibiting even minor forcible, non-contact interference with federal officers' duties); *see also Lucas v. United States*, 443 F. Supp. 539, 544 (D.D.C. 1977), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979); *supra* note 20 (press reports suggest bottles thrown at officers). Moreover, given the important government interests at stake and the limited nature of plaintiffs' injuries,[23] the balance of competing interests supported the officers' conduct. Ultimately, plaintiffs cannot point to binding cases clearly establishing that the officers used an unreasonable degree of force, and their *Bivens* claims should be dismissed on qualified immunity grounds. *See, e.g.*, *Bernini*, 665 F.3d at 1003-06; *Felarca v. Birgeneau*, 891 F.3d 809, 817-19 (9th Cir. 2018); *Young v. Akal*, 985 F. Supp. 2d 785, 801-03 (W.D. La. 2013); *see also White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017); *Dundon v. Kirchmeier*, No. 1:16-cv-406, 2017 WL 5894552, at *17-19 (D.N.D. Feb. 7, 2017), *aff'd*, 701 F. App'x 538 (8th Cir. 2017); *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 373-74 (D.D.C. 2014); *see also* TAC ¶¶ 135, 141-42, 160-61, 171-74, 187.

### D. Major Adamchik has qualified immunity from the statutory claims.

Section 1985(3) authorizes a damages suit against one who commits an act in furtherance of a "conspir[acy] . . . for the purpose of depriving, either directly or indirectly, any person or

---

[23] Plaintiff Bond was not injured at all. TAC ¶¶ 149-54. Most plaintiffs allegedly experienced only temporary irritation from chemical irritants or the incidental release of smoke from concussion grenades, with no lasting effect. *Id.* ¶¶ 135, 142, 144, 187, 194-95. Two of them sustained minor bruising or welts from physical strikes, with the injuries and alleged pain lasting a couple days. *Id.* ¶¶ 164, 175. These alleged injuries are not inconsequential, but they indicate the officers used proportional force that did not clearly exceed that needed to clear the park, address threats made against them, and protect the President. *See Cook v. City of Bella Villa*, 582 F.3d 840, 850 (8th Cir. 2009) ("However, the lack, or minor degree, of any injury sustained during an arrest is relevant in considering the reasonableness of the force used."); *Cromartie v. District of Columbia*, 729 F. Supp. 2d 281, 286 (D.D.C. 2010) ("The fact that Plaintiff apparently suffered only minor injuries to his wrists further undermines his excessive force claim."), *aff'd,* 479 F. App'x 355 (D.C. Cir. 2012).

class of persons of the equal protection of the laws . . . ." *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C.

Cir. 1984). "[A] plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the

purpose of depriving, either directly or indirectly, any person or class of persons of the equal

protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in

furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or

deprived of any right or privilege of a citizen of the United States." *Id.*; *see United Bhd. of

Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).

Major Adamchik has qualified immunity from plaintiffs' § 1985(3) claim because they

fail to plead facts showing that Major Adamchik entered into a conspiracy with another person to

violate plaintiffs' equal protection rights. The complaint does not allege Major Adamchik was

involved in specific "'events, conversations, or documents indicating . . . an agreement or

meeting of the minds' amongst the defendants to violate [plaintiffs'] rights based on [their]

membership in a protected class." *Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019)

(quoting *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 75 (D.D.C. 2007)); *see Kurd v.

Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019). Rather the complaint merely suggests

Major Adamchik was possibly at the scene with other federal officers and issued some type of

order. That does not reflect the required agreement to violate plaintiffs' equal protection rights.

Therefore, plaintiffs do not sufficiently plead the conspiracy element of their claim.[24]

---

[24] Plaintiffs claim Arlington County Police Captain Vincent "assisted in coordinating the
actions of the ACPD officers present at the Square with the federal defendants[,]" TAC ¶ 45, and
that the Arlington County officers acted "[i]n coordination with the federal defendants . . . ." *Id.* ¶
99. But this conclusory allegation merely implies that Captain Vincent, not Major Adamchik,
entered into a conspiracy. And it does not even establish that much because it is a conclusion not
entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679; *Davis v. City of Dearborn*, No. 2:09-
cv-14892, 2010 WL 3476242, at *7-8 (E.D. Mich. Sept. 2, 2010).

Moreover, plaintiffs fail to sufficiently allege that Major Adamchik's actions were "'motivated by some class-based, invidiously discriminatory animus.'" *Hoai v. Vo*, 935 F.2d 308, 314 (D.C. Cir. 1991) (quoting *Hobson*, 737 F.2d at 14). While plaintiffs claim that the President expressed dislike of the protesters, which they further assert was based on their race or support of racial equality, plaintiffs do not make "nonconclusory allegations" that Major Adamchik said or did anything constituting "evidence" that he shared "such intent" to clear the park out of class-based animus. *Hobson*, 737 F.2d at 31; *see Black v. District of Columbia*, 466 F. Supp. 2d 177, 181 (D.D.C. 2006). Plaintiffs do not allege that only "Black people and their supporters[,]" TAC ¶ 245, were cleared—rather, *everyone* there was cleared. Thus, Major Adamchik is entitled to qualified immunity based on plaintiffs' failure to sufficiently plead a discriminatory motive. *See Abbasi*, 137 S. Ct. at 1867-68; *Iqbal*, 556 U.S. at 681-83; *Ford v. Donovan*, 891 F. Supp. 2d 60, 65 (D.D.C. 2012).

Furthermore, Major Adamchik is entitled to qualified immunity because it was not clearly established that he could be liable under § 1985(3) for an intracorporate conspiracy of the kind alleged by plaintiffs. Under the intracorporate conspiracy doctrine, "an agreement between or among [officers] of the same legal entity, when the [officers] act in their official capacities, is not an unlawful conspiracy." *Abbasi*, 137 S. Ct. at 1867. In *Abbasi*, the Supreme Court held that federal officials were qualifiedly immune from a § 1985(3) claim because it was not clearly established that an alleged conspiracy among federal agents could support such a claim; "the fact that the courts are divided as to whether or not a § 1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on the point is not well established." *Id*. at 1868. Significantly, "[f]ederal district courts in the District of Columbia . . . consistently have applied the intracorporate conspiracy doctrine to Section 1985." *Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007) (collecting cases). Thus, a

federal employee who allegedly conspires with another federal employee is immune even if the conspirator works for the same agency. *See K.O.*, 2020 WL 3429697, at \*11-12.

Major Adamchik is qualifiedly immune from plaintiffs' § 1985(3) claim because the claim is based on an alleged intracorporate conspiracy. Notably, plaintiffs allege that "President Trump, Defendant Barr, and Defendant Esper[,]" all federal officials, "directed the conspiracy[.]" TAC ¶ 246. While mentioning that Major Adamchik interacted with unidentified "law enforcement officers[,]" plaintiffs do not allege that Major Adamchik reached an agreement with non-federal officials at the park to violate plaintiffs' rights. *Id.* ¶ 82. Because federal employees are members of the same entity for purposes of the intracorporate conspiracy doctrine, Major Adamchik's alleged interactions with them could not expose him to liability under § 1985(3). *See Abbasi*, 137 S. Ct. at 1867-68; *see K.O.*, 2020 WL 3429697, at \*11-12; *Tabb*, 477 F. Supp. 2d at 190.

Finally, plaintiffs also claim Major Adamchik violated § 1986 because he allegedly knew about, but failed to prevent, wrongs conspired to be done under § 1985. But "[a] plaintiff who has not stated a claim under § 1985 has no basis for relief under § 1986." *Moore v. Castro,* 192 F. Supp. 3d 18, 36 (D.D.C. 2016), *aff'd sub nom. Moore v. Carson,* 775 F. App'x 2 (D.C. Cir. 2019). Again, plaintiffs fail to allege facts showing that Major Adamchik or anyone else in the park entered into a conspiracy to violate their equal protection rights, that Major Adamchik knew about such a conspiracy, that the conspiracy fell outside the intracorporate conspiracy doctrine, or that he had an opportunity to prevent conspirators from harming plaintiffs. Thus, plaintiffs §§ 1985 and 1986 claims fall together. *See Walsh v. JPMorgan Chase Bank, NA*, 75 F. Supp. 3d 256, 265 (D.D.C. 2014).

## CONCLUSION

The claims against Major Adamchik should be dismissed with prejudice.

Dated: November 16, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Major Mark Adamchik in his
individual capacity*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **BLACK LIVES MATTER D.C., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Case No: 1:20-cv-01469-DLF** |
| ) | |
| **DONALD J. TRUMP, et al.,** ) | |
| ) | |
| **Defendants**. ) | |

---

### [PROPOSED] ORDER

Having considered Defendant Mark Adamchik's Motion to Dismiss All Individual-Capacity Claims in Plaintiffs' Third Amended Complaint, and upon further consideration of the entire record herein, it is hereby **ORDERED** that the motion is **GRANTED**.

It is further **ORDERED** that all of Plaintiffs' claims against Defendant Adamchik, in his individual capacity, are dismissed in their entirety with prejudice.

It is so **ORDERED**.


Dated: _____              _____
                                        The Honorable Dabney L. Friedrich
                                        United States District Judge