# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al.,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, et al.

       *Defendants*.

No. 1:20-cv-01469-DLF

## PLAINTIFFS' OPPOSITION TO DEFENDANT BARR'S, FEDERAL OFFICIAL-CAPACITY DEFENDANTS', AND D.C. DEFENDANTS' MOTIONS TO DISMISS

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

*Not a D.C. Bar member; practicing under supervision pursuant to D.C. App. R. 49(c)(8A)*

November 19, 2020

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Kayla Scott*
Megan Yan*
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 0005
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Tristin Brown (D.C. Bar No. 1671642)
Dennis Corkery (D.C. Bar No. 1016991)
Hannah Lieberman (D.C. Bar No. 336776)
Jonathan Smith (D.C. Bar No. 396578)
Washington Lawyers' Committee for Civil
    Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... v

INTRODUCTION ................................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................... 2

BACKGROUND ..................................................................................................................... 5

    A.  Plaintiffs And Other Civil Rights Activists Demonstrate In Lafayette Square Against Systemic Racism And Police Brutality................................................................................ 5

    B.  Federal And Local Law Enforcement Clear Lafayette Square And Assault Plaintiffs And Other Demonstrators Without Warning Or Justification. ................................................... 6

    C.  The President And Attorney General Were Involved In The Attack.................................. 9

    D.  MPD Failed To Train Its Officers Regarding Demonstrators' Rights............................. 11

    E.  The Lafayette Square Attack Injured Plaintiffs. ......................................................... 12

    F.  Procedural History. .................................................................................................. 13

LEGAL STANDARD ............................................................................................................. 14

ARGUMENT ........................................................................................................................ 15

    I.  Plaintiffs State A Claim For A Violation Of Clearly Established Constitutional Rights; Qualified Immunity Must Therefore Be Denied (Claims 1, 2, 7 & 8)........................... 16

        A.  No reasonable government official or law-enforcement officer could have thought that attacking a peaceful protest was constitutional under the Fourth Amendment. 18

            1.  The Fourth Amendment violation was obvious, as the use of force lacked any semblance of justification. ................................................................................... 18

            2.  Precedent independently places the Fourth Amendment violation beyond debate. ......................................................................................................... 24

        B.  Defendants violated Plaintiffs' clearly established First Amendment rights in a manner that was obvious because of its egregiousness and, independently, contravened binding precedent. ................................................................................ 29

            1.  By assaulting and completely scattering a lawful, peaceful demonstration, Defendants burdened far more speech than necessary. ...................................... 30

            2.  Breaking up the protest was clearly established to be unconstitutional absent a "clear and present danger." ............................................................................... 34

            3.  Defendants' viewpoint discrimination violated Plaintiffs' clearly established rights. ......................................................................................................... 38

II.     The Traditional Damages Remedy Against Federal Officers For Violating Demonstrators' First And Fourth Amendment Rights Has Long Been Recognized In This Circuit And No Special Factors Counsel Hesitation Here (Claims 1 & 2). ..........40

    A.  Circuit precedent refutes the notion that "special factors" preclude recognizing constitutional damages claims for demonstrators' rights here and distinguish this case sharply from those in which special factors exist. ...........................................43

    B.  Presidential security and the other "special factors" invoked by Defendant Barr are misplaced here and do not overcome Circuit precedent. ........................................48

    C.  Attorney General Barr's rank does not automatically exclude him from *Bivens*, nor would discovery against him be unmanageable......................................................53

III.    The D.C. Defendants Seized Plaintiffs Foley And E.X.F. (Claims 7 & 8)....................54

IV.     As Pleaded In The Complaint, Both Defendant Barr And The D.C. Defendants Participated In The Violations Alleged (Claims 1, 2, 7 & 8). .......................................57

    A.  Plaintiffs have sufficiently alleged the personal involvement of Defendant Barr....58

    B.  Plaintiffs have sufficiently alleged the involvement of the D.C. Defendants...........59

V.      Plaintiffs Have Standing, Including For Equitable Relief (Claims 3, 4, 5, 6, 9 & 10). ..60

    A.  Plaintiff BLMDC has plausibly alleged both past and present, ongoing injury. ......60

    B.  Plaintiffs are at substantial risk of future injury because the federal Defendants have asserted both the power and desire to "dominate" protesters like Plaintiffs............65

VI.     Plaintiffs Have Stated Claims Against The District Of Columbia Because The District Was Deliberately Indifferent To The Need To Train Its Officers Regarding Limits On the Use Of Chemical Irritants Against Demonstrators (Claims 9 & 10). ......................69

VII.    Plaintiffs Have Stated Claims Under 42 U.S.C. §§ 1985 & 1986 (Claims 5 & 6). ........73

    A.  Plaintiffs adequately pleaded claims under 42 U.S.C. § 1985(3). ...........................74

        1.  Plaintiffs adequately pleaded a conspiracy that includes officers of the United States, the District of Columbia, and Arlington County....................................75

            a.  *Plaintiffs have adequately pleaded the existence of an "agreement between two or more persons."* ................................................................................75

            b.  *The intracorporate conspiracy doctrine does not apply and Defendant Barr is not entitled to qualified immunity on this ground because Plaintiffs allege an intercorporate conspiracy.*......................................................................81

        2.  Plaintiffs adequately pleaded that the conspiracy was motivated by discriminatory intent. ........................................................................................81

    B.  Plaintiffs adequately pleaded claims under 42 U.S.C. § 1986................................85

C.  Injunctive relief is available under §§ 1985 & 1986, and sovereign immunity is no
bar. ................................................................................................................................88

CONCLUSION ............................................................................................................................89

# TABLE OF AUTHORITIES

*Authorities on which we chiefly rely are marked with asterisks.*

## Cases

*Abay v. City of Denver,* 445 F. Supp. 3d 1286 (D. Colo. 2020) ....................................68

*Acevedo v. Canterbury*, 457 F.3d 721 (7th Cir. 2006)....................................................55

*Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) ........................................................88

*\*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)..............................................................25

*Adams v. New York*, 2016 WL 1169520 (S.D.N.Y. Mar. 22, 2016) ...............................36

*Adickes v. S.H. Kress & Co.*, 398 U.S.144 (1970) ........................................................76

*Aguilar v. ICE*, 2011 WL 13258226 (S.D.N.Y. Jan. 11, 2011) .....................................54

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.,*
 659 F.3d 13 (D.C. Cir. 2011) ..................................................................................64

*A.N.S.W.E.R. Coal. v. Basham*, 845 F.3d 1199 (D.C. Cir. 2017) .................................37

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ...............................................................51

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ...................................41

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..........................................................................24

*Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52 (1st Cir. 2008).....................25

*Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir.2013) ...............................55

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ....................................60, 66, 68

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003)....................................69

*Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005) ...............................72

*\*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ..................14, 22, 80, 81

*\*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006)........................................20, 26, 27

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) ........................................................75

v

*Bedford v. City of Hayward*, 2012 WL 4901434 (N.D. Cal. Oct. 15, 2012) .........................83, 87

*Behrens v. Tillerson*, 264 F. Supp. 3d 273 (D.D.C. 2017) ...........................................15

*Bell v. District of Columbia*, 82 F. Supp. 3d 151 (D.D.C. 2015) ..................................72

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................14

*Berg v. Kelly*, 897 F.3d 99 (2d Cir. 2018) .................................................................28

*Bergman v. United States*, 579 F. Supp. 911 (W.D. Mich. 1984) .................................86

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012) ............................................27

*Bettencourt v. Arruda*, 2012 WL 5398475 (D. Mass. Nov. 1, 2012) ...........................56

*Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82 (D.D.C. 2018) ......................15

*\*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
    403 U.S. 388 (1971) ..................................................................................... *passim*

*Black Lives Matter Seattle-King County v. City of Seattle*,
    2020 WL 3128299 (W.D. Wash. June 12, 2020) .............................................68

*Blakeney v. O'Donnell*, 117 F. Supp. 3d 6 (D.D.C. 2015) ..........................................81

*Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154 (D.D.C. 2013) .........45

*Boumediene v. Bush*, 553 U.S. 723 (2008) ...............................................................50

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) .........................82, 88

*\*Brendlin v. California*, 551 U.S. 249 (2007) ....................................................56, 57

*Brenes-Laroche v. Toledo Davila*, 682 F. Supp. 2d 179 (D.P.R. 2010) .......................25

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ...............................................................16

*Brower v. Cty. of Inyo*, 489 U.S. 593 (1989) .......................................................55, 57

*Bueno Diaz v. Mercucio*, 442 F. Supp. 3d 701 (S.D.N.Y. 2020) ................................52

*Burnett v. Wash. Metro. Area Transit Auth.*, 58 F. Supp. 3d 104 (D.D.C. 2014) .........15

*Bush v. Lucas*, 462 U.S. 367 (1983) ........................................................................47

*Byrd v. District of Columbia*, 297 F. Supp. 2d 136 (D.D.C. 2003) ................................................70

*California v. Hodari D.*, 499 U.S. 621 (1991)................................................................................55

*Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009) ......................................................27

*\*Carlson v. Green*, 446 U.S. 14 (1980) ....................................................................41, 42, 50, 51

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017) ................................................60

*Cigar Ass'n of Am. v. FDA*, 323 F.R.D. 54 (D.D.C. 2017) ..........................................................64

*\*City of Canton v. Harris*, 489 U.S. 378 (1989)...........................................................................69

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983) ..................................................................60, 67

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) .......................................................65

*Clark v. Clabaugh*, 20 F.3d 1290 (3d. Cir. 1994) ..................................................................85, 86

*Clinton v. Jones*, 520 U.S. 681 (1997) .........................................................................................53

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996) .......................................................................35

*Congress of Racial Equality v. Douglas*, 318 F.2d 95 (5th Cir. 1963) ........................................35

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) .....................................................................52

*Cox v. Louisiana*, 379 U.S. 536 (1965) .......................................................................................35

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ..............................................................................53

*Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018) .........................................68

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992) ..46

*Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000)...............................................72

*Davis v. FEC*, 554 U.S. 724 (2008) ..............................................................................................60

*Davis v. Passman*, 442 U.S. 228 (1979) ................................................................................42, 53

*Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011) .......................................................................60

*DeBrew v. Atwood*, 792 F.3d 118 (D.C. Cir. 2015) ......................................................................89

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).............................................................. *passim*

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ....................................................60, 66

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018)................................................................16

*Don't Shoot Portland v. City of Portland,* 2020 WL 3078329 (D. Or. June 9, 2020) .................68

*Dormu v. District of Columbia*, 795 F. Supp. 2d 7 (D.D.C. 2011)................................................70

*Dundon v. Kirchmeier*, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) ..............................................28

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ...............................................................35, 37

*Entick v. Carrington*, (1765) 95 Eng. Rep. 807 (KB)..................................................................40

*Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) .............................62

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) ..................................................................41

*Evangelou v. District of Columbia*, 901 F. Supp. 2d 159 (D.D.C. 2012).........................14, 15, 72

*Ex parte Young*, 209 U.S. 123 (1908) ........................................................................................89

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ..................................................................28

*Fernandors v. District of Columbia*, 382 F. Supp. 63 (D.D.C. 2005) .........................................87

*Fisher v. Shamburg*, 624 F.2d 156 (10th Cir. 1980) ..................................................................76

*Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) .................................67

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ................................................................25

*Food & Water Watch, Inc. v. Vilsack,* 808 F.3d 905 (D.C. Cir. 2015) ................................60, 63

*Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992) ..........................................................41

*Freeman & Bass, P.A. v. State of N.J. Comm'n of Investigation*,
    359 F. Supp. 1053 (D.N.J. 1973) .......................................................................................88

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167 (2000) .........................65

*Garnett v. Zeilinger*, 2020 WL 5411295 (D.D.C. Sept. 9, 2020) ...............................................63

*Gaulter v. Capdeboscq*, 404 F. Supp. 900 (E.D. La. 1975) .......................................................88

*Graber v. Dales*, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019) .................................................49

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................18

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ...........................................77, 82, 83, 85

*Gudger v. District of Columbia*, 74 F. Supp. 3d 47 (D.D.C. 2014) ...........................87

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...........................................75, 76

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...............................................................50

*Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231 (W.D. Wash. 2009) ...............25, 56

*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013) ...............................36, 45, 46

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ............................................83

*Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ...............25

*Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181 (D.D.C. 2017) ...............15

*Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006)...................................................25

*Henderson v. Lujan*, 964 F.2d 1179 (D.C. Cir. 1992) ...........................................32

*Hernandez v. Cremer*, 913 F.2d 230 (5th Cir. 1990) ..............................................68

*Hernandez v. Mesa*, 140 S. Ct. 735 (2020) .........................................41, 42, 43, 46

*Hernandez v. Mesa,* 885 F.3d 811 (5th Cir. 2018) .................................................43

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984) .....................................44, 82, 83, 89

*Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) ...............................67

*Holmes v. Univ. of D.C.*, 244 F. Supp. 3d 52 (D.D.C. 2017) .................................15

*Holt v. Walsh Grp.*, 316 F. Supp. 3d 274 (D.D.C. 2018) ......................................15

*Honig v. Doe*, 484 U.S. 305 (1988) ......................................................................67

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...................................................................16

*Horse v. District of Columbia*, No. 1:17-cv-01216 (D.D.C. Sept. 27, 2019) ...............71

*Huckle v. Money*, (1763) 95 Eng. Rep. 768 (KB)......................................................40

*\*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) .......................................14, 17, 80

*Huthnance v. District of Columbia*, 793 F. Supp. 2d 183 (D.D.C. 2011) ....................................70

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ................................................................38

*Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243 (D.D.C. 2016) ................64

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) .....................22

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012) .................................................66

*Jennings v. City of Miami*, 2009 WL 413110 (S.D. Fla. Jan. 27, 2009).................................56

*Johnson v. District of Columbia*, 67 F. Supp. 3d 157 (D.D.C. 2014)....................................57

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ....................................................89

*\*Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006) ........................................................35

*Jones v. Ritter*, 587 F. Supp. 2d 152 (D.D.C. 2008).....................................................25

*Jo v. District of Columbia*, 582 F. Supp. 2d 51 (D.D.C. 2008) .........................................58

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446 (D.C. Cir. 2018) ................87

*\*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010) .............................................35, 36, 58

*Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322 (D.D.C. 2017) .............................70, 73

*K.O. v. ICE*, 2020 WL 3429697 (D.D.C. June 23, 2020) .............................................52, 54

*\*Kyle v. Bedlion*, 177 F. Supp. 3d 380 (D.D.C. 2016) .................................................55

*\*Lagayan v. Odeh*, 199 F. Supp. 3d 21 (D.D.C. 2016) ..............................................75, 76, 77, 83

*Laird v. Tatum*, 408 U.S. 1 (1972) .....................................................................66

*Lamb v. City of Decatur*, 947 F. Supp. 1261 (C.D. Ill. 1996) .........................................26

*\*Lash v. Lemke*, 786 F.3d 1 (D.C. Cir. 2014) .........................................................44

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)....................................61

*Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993) .........45, 72, 82

*\*Lederman v. United States*, 131 F. Supp. 2d 46 (D.D.C. 2001)..............................................45, 46

*\*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002) ........................................................31

*Liff v. Office of Inspector Gen.*, 881 F.3d 912 (D.C. Cir. 2018) ...................................................47

*\*Linlor v. Polson*, 263 F. Supp. 3d 613 (E.D. Va. 2017) .......................................................49, 52

*Little v. Barreme*, 6 U.S. 170 (1804) ........................................................................................40

*Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D. Wash. 2005)...........................................56

*\*Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020) ...................................................47, 52

*Lucha Unida de Padres y Estudiantes v. Green*,
    2020 WL 3574593 (D. Ariz. Jul. 1, 2020) ................................................................25, 36

*Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015) ......................................................27

*\*Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997) .........................................................38, 39

*Marbet v. City of Portland*, 2003 WL 23540258 (D. Or. Sept. 8, 2003).....................................56

*Marbury v. Madison*, 5 U.S. 137 (1803) ........................................................................40, 52, 56

*Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012) .....................................................33

*\*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ........................................................74, 83, 87

*Masel v. Barrett*, 707 F. Supp. 4 (D.D.C. 1989) ................................................................45, 87

*\*Matthews v. District of Columbia*, 730 F. Supp. 2d 33 (D.D.C. 2010) ...............................71, 72

*McComb v. Ross*, 202 F. Supp. 3d 11 (D.D.C. 2016) ................................................................72

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..............................................................................30

*McCracken v. Freed*, 243 F. App'x 702 (3d Cir. 2007) .............................................................56

*Mejia-Mejia v. ICE*, 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ...............................................54

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) ........................................................34

*Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015) ....................................................44, 47

*Miango v. Democratic Republic of the Congo*, 243 F. Supp. 3d 113 (D.D.C. 2017)..................72

*Minneci v. Pollard*, 565 U.S. 118 (2012) ....................................................................42, 51, 52

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ...................................................................................47

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ....................................................65

*Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D.D.C. 2015) ...........................................70

*Morgan v. District of Columbia*, 550 F. Supp. 465 (D.D.C. 1982) ............................................89

*Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468 (5th Cir. 1970) ...............................................88

*Nader v. Dem. Nat'l. Comm.*, 567 F.3d 692 (D.C. Cir. 2009) ....................................................22

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) ..........................................62

*Nat'l Coalition on Black Civic Participation v. Wohl*,
   2020 WL 6305325 (S.D.N.Y. Oct. 28, 2020) ...............................................................76

*Nat'l Org. for Women v. Operation Rescue*, 929 F. Supp. 461 (D.D.C. 1996) ...........................88

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ........................................................55, 57

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) .................................................................................39

*Norris v. District of Columbia*, 737 F.2d 1148 (D.C. Cir. 1984)...............................................24

*Oliva v. Nivar*, 973 F.3d 438 (5th Cir. 2020) ...........................................................................52

*Osborn v. Haley*, 549 U.S. 225 (2007) ......................................................................................52

*Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir. 1997) ..........................................................85

*Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001)...........................................................................25

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) ...............................................45

*Pearson v. Callahan*, 555 U.S. 223 (2009) ...............................................................................50

*Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81 (D.P.R. 2012) ....................................36, 58

*People for the Ethical Treatment of Animals v. U.S. Dep't of Ag.,*
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................61, 64

*Phila. Co. v. Stimson*, 223 U.S. 605 (1912) ..........................................................89

*Pluma v. City of New York*, 2015 WL 1623828 (S.D.N.Y. Mar. 31, 2015) .................56

*\*Quaker Action Grp. v. Hickel ("Quaker Action I"),*
   421 F.2d 1111 (D.C. Cir. 1969) ...........................................................20, 50

*\*Quaker Action Grp. v. Morton ("Quaker Action IV"),*
   516 F.2d 717 (D.C. Cir. 1975)...................................................34, 35, 36, 49

*Rauen v. City of Miami*, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007) ...........................36

*Richards v. Gelsomino*, 240 F. Supp. 3d 173 (D.D.C. 2017) ..................................15

*Robinson v. District of Columbia*, 403 F. Supp. 2d 39 (D.D.C. 2005)..........................70

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989) ......................52

*Rosenberger v. Rector & Visitors of Univ. of Va,*, 515 U.S. 819 (1995) .....................39

*\*Rudder v. Williams*, 666 F.3d 790 (D.C. Cir. 2012) ........................................18, 24

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364 (2009)...............................16

*Sandvig v. Sessions*, 2018 WL 1568881 (D.D.C. Mar. 30, 2018) ..............................14

*Saucier v. Katz*, 533 U.S. 194 (2001) ..................................................................50

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ........................................................47

*Secot v. City of Sterling Heights*, 985 F. Supp. 715 (E.D. Mich. 1997) ......................26

*Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743 (10th Cir. 1980) ................................82

*Slocum v. Palinkas*, 50 F. App'x 300 (6th Cir. 2002) ...........................................56

*Slusher v. Carson*, 540 F.3d 449 (6th Cir. 2008)...................................................55

*Spann v. Colonial Village, Inc,*, 899 F.2d 24 (D.C. Cir. 1990) .................................64

*Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997) ................................................27

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......................................66

*Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987) ..................................................44

*Symkowski v. Miller*, 294 F. Supp. 1214 (E.D. Wis. 1969) ...............................................87

*\*Tatum v. Morton*, 402 F. Supp. 719 (D.D.C. 1974) ......................................................36

*\*Taylor v. Riojas*, No. 19-1261, 2020 WL 6385693 (U.S. Nov. 2, 2020) ....................................17

*Tolan v. Cotton*, 572 U.S. 650 (2014)................................................................16, 24

*Tolton v. Day*, 2020 WL 2542129 (D.D.C. May 19, 2020) ...............................................15

*Torossian v. Hayo,*45 F. Supp. 2d 63 (D.D.C 1999) ...................................................45

*Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010)....................................................25

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) .....................................................89

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ..............................................................53

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ..............................................................86

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott* ("*Carpenters*"),
463 U.S. 825 (1983) ................................................................................73, 82

*\*United States v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014)..............................................55

*United States v. Claxton*, 685 F.3d 300 (3d Cir. 2012) ...............................................80

*United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104 (D.D.C. 2014) ..............................75

*United States v. Dakins*, 872 F.2d 1061 (D.C. Cir. 1989) ............................................75

*\*United States v. Doe*, 968 F.2d 86 (D.C. Cir. 1992) ........................................17, 32, 35

*United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991) ...........................................79

*United States v. Kassar*, 660 F.3d 108 (2d Cir. 2011) ...............................................80

*United States v. Nixon*, 418 U.S. 683 (1974) ........................................................54

*\*United States v. Scott*, 2020 WL 6494642 (2d Cir. Nov. 5, 2020) ................................77, 79

*United States v. Speed*, 78 F. Supp. 366 (D.D.C. 1948) ..............................................79

*United States v. Wardell*, 581 F.3d 1272 (10th Cir. 2009)  ........................................................76

*United States v. Wood*, 879 F.2d 927 (D.C. Cir. 1989)  ...........................................................76

*\*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)...................................................................25

*\*Vote Forward v. DeJoy*, 2020 WL 5763869 (D.D.C. Sept. 28, 2020) .........................................62

*Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984)  ...........................................................86

*\*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)  .................................................................30

*\*Weingarten v. Devos*, 2020 WL 3412730 (D.D.C. June 22, 2020)  ............................................63

*\*Wesby v. District of Columbia*, 841 F. Supp. 2d 20 (D.D.C. 2012).......................................58, 59

*Westfahl v. District of Columbia*, 75 F. Supp. 3d 365 (D.D.C. 2014)  ........................................29

*White v. City of Markham*, 310 F.3d 989 (7th Cir. 2002)  ..........................................................56

*White v. Jackson*, 865 F.3d 1064 (8th Cir. 2017)  .....................................................................28

*\*White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984)  ..............33, 34

*Williams v. Wilkinson*, 132 F. Supp. 2d 601 (S.D. Ohio 2001)  ..................................................68

*Women Strike for Peace v. Morton*, 472 F.2d 1273 (D.C. Cir. 1972)  .........................................36

*\*Wood v. Moss*, 572 U.S. 744 (2014)  .................................................................28, 31, 33, 38, 50

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ................................................................................20, 26

*Yelverton v. Vargo*, 386 F. Supp. 2d 1224 (M.D. Ala. 2005) ......................................................56

*Young v. Akal*, 985 F. Supp. 2d 785 (W.D. La. 2013)  ...............................................................29

*\*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ....................................................................... *passim*

## Statutes, Regulations, Rules, and Legislative Materials

D.C. Code § 5-101.03 ...............................................................................................................81

D.C. Code § 5-331.16 ...............................................................................................................70

D.C. Code § 49-409 ..................................................................................................................81

Fed. R. Civ. P. 8 ..........................................................................................................14

H.R. Rep. No. 100-700 (1988) ....................................................................................41

5 U.S.C. § 702 .............................................................................................................89

28 U.S.C. § 2680 .........................................................................................................41

*42 U.S.C. § 1983 ............................................................................................... *passim*

*42 U.S.C. § 1985 ............................................................................................... *passim*

*42 U.S.C. § 1986 ............................................................................................... *passim*

Westfall Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 .......................................41

## District of Columbia General Orders and Reports

Metropolitan Police Department Gen. Order, GO-RAR-202.36 ...................................87

## Other Authorities

Carol D. Leoning *et al.*, *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020 ................22

3 W. Blackstone, Commentaries (1783) ......................................................................41

James E. Pfander & David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117 (2009) ........................................................................41

MPD Standard Operating Procedures 16-01, Attach. E, https://go.mpdconline.com/GO/SOP_16_01.pdf .......................................................69

## INTRODUCTION

On the evening of June 1, 2020, law enforcement officers at Lafayette Square near the White House charged, clubbed, tear-gassed, and violently dispersed civil rights demonstrators who were lawfully and peacefully protesting police brutality against Black people in the United States. Officers assaulted journalists and demonstrators alike and endangered children in the crowd. Officers repeatedly hit unarmed, unthreatening people with batons and shields, knocking them to the ground. Demonstrators struggled to breathe amidst the chemical attack. Those who attempted to flee westward were met with a second round of tear gas from local police stationed nearby. This was no routine, orderly clearing of a safety perimeter for the President's movement. Rather, it was an attack by government officers against their own people, of a degree unprecedented on U.S. soil for the past half-century, occurring suddenly and without warning in the heart of the nation's capital.

The central issue at stake in the Court's resolution of the various Defendants' motions to dismiss this case is whether anyone can be held accountable for these actions or whether, however blatant the affront to First and Fourth Amendment rights, a high-ranking federal official's incantation of the words "presidential security" ends the judicial inquiry. Under a system committed to the rule of law and checks and balances as two of its fundamental ideals, the answer is clear: Any reasonable officer—indeed, any reasonable person—would have known that the Lafayette Square attack was flagrantly unconstitutional, and no court should hesitate for a moment to hold that the Constitution is enforceable under these circumstances.

The challenges to the constitutional damages claims are also shot through with a more mundane but equally fatal flaw: disregarding the Rules of Civil Procedure, they ignore the well-pleaded allegations of Plaintiffs' complaint and seek dismissal based not on the facts as alleged

but on Defendants' own version of events. It is black-letter law that complaints cannot be dismissed based on Defendants' factual assertions; the time to test both parties' evidence is at summary judgment and, if necessary, trial.

Taken together, these two fundamental problems with Defendants' approach to the constitutional damages claims add up to the view that no matter how clear the constitutional rights involved, and no matter how excessive and unjustified the force used to violate them, these rights are unenforceable as long as the violators say that the magic words, "presidential security," followed by speculative assertions in briefs. That cannot be and is not the law.

For these reasons and the more specific ones below, Defendants' motions should be denied.

## SUMMARY OF ARGUMENT

In this brief, Plaintiffs respond to the October 1 motions to dismiss filed by Defendant Barr, the federal official-capacity Defendants, and the D.C. Defendants. ECF 76, 79, 80. Plaintiffs will separately respond to Defendant Vincent's October 6 Motion to Dismiss, ECF 83, and to Defendant Adamchik's November 16 Motion to Dismiss, ECF 97. Plaintiffs await a response to their Third Amended Complaint from the other individually-named federal Defendants.

**1. Damages claims for First and Fourth Amendment violations.** Defendant Barr and the D.C. Defendants challenge the constitutional damages claims (Claims 1, 2, 7, & 8) on four grounds: qualified immunity; the availability of a *Bivens* claim (Defendant Barr only); whether Plaintiffs Foley and E.X.F were seized under the Fourth Amendment (D.C. Defendants only); and Defendants' alleged lack of personal participation in the constitutional violations.

On qualified immunity, the Court should deny the motions to dismiss for two independent reasons. First, the First and Fourth Amendment violations were so clearly past the constitutional line that their egregiousness alone places the violations beyond debate. Second, reams of precedent

applicable to demonstrations and to the specific types of force used here also made it clear to any reasonable officer that attacking peaceful demonstrators violated the Constitution. Defendants' arguments to the contrary rely on conjuring facts outside of, and often directly at odds, with the allegations of the complaint. *See* Part I below.

On *Bivens*, this Circuit has for decades recognized the availability of both First and Fourth Amendment *Bivens* claims against federal officials for violating demonstrators' rights and has never found that "special factors" counsel hesitation in these circumstances. Although the Supreme Court's approach to *Bivens* has evolved over the years, the new approach does not cast doubt on this Circuit's case law on this point. Additionally, the primary special factor invoked by Defendant Barr—presidential security—is inapplicable here, because the demonstrators here posed no threat to the President. The protestors were law abiding and peaceful. In fact, *Defendants* were the aggressors who initiated the entire confrontation. Defendant Barr's approach would immunize federal officials from accountability for all constitutional violations taken in the name of presidential security, no matter how attenuated that interest might be from officials' unconstitutional conduct. Defendant Barr is also wrong that his high rank or the possibility of an injunction forecloses a *Bivens* claim here—the Supreme Court found that these concerns applied where Plaintiffs sought to use a damages action to challenge a general government policy, not a discrete incident. And Defendant Barr's argument that the Federal Tort Claims Act precludes a *Bivens* claim has been squarely rejected by both Congress and the Supreme Court. *See* Part II below.

The District's argument questioning whether Plaintiffs Foley and E.X.F. were seized is answered by Supreme Court and Circuit precedent holding that even a momentary limitation of a person's freedom of moment is a seizure if it results from means intentionally applied. Here,

Defendants deliberately incapacitated Plaintiffs with tear gas, causing them to cough, choke, and halt in order to try to recover. *See* Part III below.

Defendant Barr and the D.C. Defendants are also wrong that Plaintiffs are trying to impose liability for constitutional violations in which they did not participate. The complaint alleges specifically and in detail the personal involvement of each of the Defendants. *See* Part IV below.

**2. Standing.** The federal official-capacity Defendants challenge Plaintiffs' standing to seek injunctive relief (Claims 3, 4, 5, 6, 9 & 10). But Defendants apply the wrong legal standard to the question of future injury, and under the correct standard, Plaintiffs have alleged sufficient facts to establish standing. Defendants also ignore the ongoing harms to the mission of Black Lives Matter D.C.—the hindrance to its organizing activities and decline in member participation in its events, all caused by Defendants' violent attack—and the concrete diversions of its resources to measures like new programming and communications that the organization has had to undertake to address these injuries just to be able to carry out its normal activities. Plaintiffs have adequately pleaded standing to seek injunctive relief. *See* Part V below.

**3. Municipal liability.** The District argues that Plaintiffs have not adequately pleaded municipality liability (Claims 9 & 10). But Plaintiffs have plausibly alleged that the District's deliberately indifferent failure to train its officers regarding the limits on their use of force caused the constitutional violations here by D.C. police officers, who gratuitously and for no legitimate reason tear-gassed fleeing demonstrators. Specifically, the use of force at demonstrations—and the misuse of chemical irritants in particular—has been a recurring and longstanding problem for the D.C. police. The District clearly understood that its officers needed to know the constitutional limits on the use of chemical irritants against demonstrators. And the magnitude of the violations

here, combined with the prior incidents, provide a solid basis to infer the District's deliberate indifference to this need—which is all that is required at the pleading stage. *See* Part VI below.

**4. Conspiracy claims.** Finally, Defendants' arguments against the conspiracy claims (Claims 5 & 6) fail. All three sets of Defendants misunderstand the type of intent needed to form a conspiracy and the manner in which a conspiracy can be shown. Defendant Barr's reliance on the intracorporate conspiracy doctrine is misplaced because the conspiracy involved at least three separate entities—the District, Arlington County, and the United States. Finally, on the question of injunctive relief, the federal official-capacity Defendants ignore precedent permitting injunctive relief for civil-rights conspiracy claims, and it is black-letter law that sovereign immunity does not preclude injunctive relief against federal official-capacity defendants. *See* Part VII below.

## BACKGROUND

### A. Plaintiffs And Other Civil Rights Activists Demonstrate In Lafayette Square Against Systemic Racism And Police Brutality.

On May 25, 2020, George Floyd, a Black man, was killed by a police officer who held his knee on Mr. Floyd's neck for nearly nine minutes as Mr. Floyd pleaded "please, please, please, I can't breathe." Third Amended Complaint ("TAC") ¶ 2. On June 1, 2020, in the wake of this and other tragic killings of Black people, Plaintiffs and other class members assembled in Lafayette Square in Washington, D.C., directly across the street from the White House. TAC ¶ 65.

The individual Plaintiffs are eight local residents of various races and backgrounds, who came to Lafayette Square to speak out against racism and police brutality. TAC ¶¶ 128-31, 138-39, 146-47, 165-67, 177-79. One of the Plaintiffs is a veteran of the U.S. Navy. TAC ¶ 138. Two others are children who came to demonstrate with their parents. TAC ¶¶ 131, 179. Plaintiff Black Lives Matter D.C. ("BLMDC") is a D.C. corporation that organizes against systemic racism through protests, public campaigns, and other programming. TAC ¶ 9. BLMDC members were

demonstrating, observing law enforcement activities, and providing aid to demonstrators in and around Lafayette Square on June 1, 2020. TAC ¶¶ 9, 119.

Many of the named Plaintiffs arrived at Lafayette Square between 6:00 and 6:20 pm. TAC ¶¶ 140, 149, 156, 169. Plaintiffs Foley and E.X.F. arrived earlier in the afternoon to hand out sandwiches and water to fellow demonstrators. TAC ¶ 180. Plaintiffs Sanders and J.N.C. arrived at about 4:30 pm. TAC ¶ 132. None of the Plaintiffs saw any dangerous or unlawful activities. TAC ¶¶ 133, 140, 149, 158, 169, 182. The demonstrators, including Plaintiffs, chanted "I can't breathe," knelt, raised their hands up, and engaged in other acts of non-violent expressive conduct to protest police brutality against Black people. TAC ¶ 65.

### B. Federal And Local Law Enforcement Clear Lafayette Square And Assault Plaintiffs And Other Demonstrators Without Warning Or Justification.

Federal and local law enforcement officers, including from the U.S. Park Police, U.S. Secret Service, Federal Bureau of Prisons, D.C. National Guard, and Arlington County Police Department ("ACPD"), massed at Lafayette Square. TAC ¶ 67. By 5:30 pm, Defendant Vincent of ACPD was in the Joint Operations Command Center, helping coordinate the actions of ACPD and federal agencies. TAC ¶¶ 45, 76. District of Columbia Metropolitan Police Department ("MPD") officers were in formation one block west of Lafayette Square, forming a line on the north and west sides of the intersection of 17th and H Streets NW. TAC ¶ 72. Both federal and MPD officers donned gas masks in preparation for a chemical attack. TAC ¶¶ 75, 77. MPD regularly acts in coordination with federal law enforcement to police major demonstrations. TAC ¶ 105. At around 6 p.m., an MPD supervisory officer met with U.S. military officers in the presence of the Chief of Staff of the United States Army on 16th Street NW, less than two blocks north of Lafayette Square. TAC ¶ 106.

At 6:08 pm, Defendant Barr entered Lafayette Square behind law enforcement officers and pointed north towards St. John's Church. TAC ¶¶ 78-79.  Barr personally ordered Lafayette Square cleared, as the Department of Justice later acknowledged. TAC ¶ 79. Around the same time, the Secret Service was notified that President Trump planned to make an appearance outside of St. John's Church. TAC ¶ 80.

At approximately 6:30 pm, on the orders of Defendant Adamchik of the U.S. Park Police, federal and Arlington County law enforcement officers clad in riot gear attacked the peaceably assembled protestors. TAC ¶¶ 20, 81-82. At the time the orders were given by Defendants Barr and Adamchik, Plaintiffs and members of the Plaintiff class were not engaging in unlawful conduct or conduct that posed a threat of violence against any person or property, or public safety generally. TAC ¶¶ 86-87, 133, 140, 149, 158, 169, 182. Defendants U.S. Park Police officers Feliciano, Locasico, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Kellenberger, and Seiberling all took part in the attack. TAC ¶¶ 21-30 (identifying many of these individuals by helmet or arm patch numbers); *cf.* ECF 84 (correlating numbers in the complaint with officer names). The D.C. Defendants stationed a block west of the federal officers' charge attacked demonstrators as they fled and drove them farther away from the Square. TAC ¶ 107. The proximity and similarity between the federal and MPD actions reflect a coordinated plan to drive demonstrators away from Lafayette Square and its vicinity by force. TAC ¶¶ 105-07.

Despite the lack of any threat, federal officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and other projectiles and chemical irritants into the crowd. TAC ¶ 88. Rubber bullets fired by Defendants struck Plaintiff Scallan in her face, arm, and leg, TAC ¶¶ 159-60; Defendants' tear-gas cannisters made her struggle to breathe, and she could hear other demonstrators vomiting. TAC ¶¶ 161-62. Plaintiff Bond aided a demonstrator

who had a rubber bullet lodged in his face and was bleeding profusely. TAC ¶¶ 150-51. Irritants caused Plaintiff Sanders to tear up. TAC ¶¶ 135. Plaintiff McDonald witnessed concussion grenades exploding with enough force to put holes in the ground. TAC ¶ 142. Plaintiffs Foley and E.X.F. suffered the effects of tear gas fired by federal officers and then, when they attempted to flee, were injured by more tear gas fired by MPD officers including Defendant Thau under the supervision of Defendants Alioto and Carroll. TAC ¶¶ 101, 103, 187-94. Plaintiffs Foley and E.X.F. experienced burning eyes and difficult breathing; E.X.F. could barely open her eyes. TAC ¶ 194. As a result, they stopped to take shelter and attempt to recover at the end of some scaffolding over the sidewalk. TAC ¶ 195. When Mr. Foley informed MPD officers that his daughter was injured and needed help, the officers ignored his pleas and told them to move, even though the only place to go was into the cloud of more tear gas. TAC ¶¶ 196-97. Plaintiffs Foley and E.X.F. obeyed; the additional gas they encountered exacerbated their symptoms. TAC ¶¶ 198-99. MPD officers, including Defendants Buchanan, Hargrove, Meyer, Murphy, Payne, Taylor, Thau and Willis, under the supervision of Defendants Carroll and Alioto, chased demonstrators south down 17th Street NW, further driving them away from Lafayette Square. TAC ¶¶ 102-03.

Federal officers also hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields; victims included demonstrators whose backs were turned from the police and who were trying to flee the officers. TAC ¶ 90. For example, Plaintiff McDonald was repeatedly struck by multiple officers with their shields. TAC ¶ 141. When the assault began, Plaintiff Poteet stood with her hands up, holding a sign she had brought with her in one hand and her phone in another. TAC ¶ 171. An officer charged her, knocking her down with his riot shield and causing Ms. Poteet to drop her phone. TAC ¶ 172. Even while she was on the ground, the officer beat her with his baton, kicking or striking her in the stomach and knocking the wind out

of her. *Id.* Ms. Poteet attempted to crawl away, briefly stood up, and bent down to pick up her phone. TAC ¶ 173. The officer knocked her over again, hitting her even harder. *Id.* She limped away, struggling to breathe, with flash bangs exploding at her feet. TAC ¶¶ 173-74.

Others class members experienced similar treatment. For example, a protestor holding a bandage to his face and walking down H Street towards 17th Street NW was rushed from behind and slammed into the wall of a building by Defendant Sinacore and other U.S. Park Police officers. TAC ¶ 91. After the protestor tried to run away, Defendant Sinacore chased him down and beat him with his baton. *Id.* Defendant Feliciano used his shield to bash a protestor who was scrambling to avoid the charging line of law enforcement officers. TAC ¶ 92. Some officers, including Defendant Seiberling, pursued demonstrators on horseback. TAC ¶ 90.

Federal officers also committed unprovoked assaults on people who were clearly journalists. TAC ¶ 96. For example, Defendant Kellenberger beat Australian news correspondent Amelia Brace in the back with his baton as she was fleeing. TAC ¶ 97. Defendant Daniels charged and then shoved a journalist holding a microphone and attempting to flee. TAC ¶ 98.

All of this happened without protestors having received any warning to disperse. TAC ¶¶ 85, 107, 135, 141, 159, 188. And at no time before or during the attack did any of the Defendants give any indication that Plaintiffs or any demonstrators would be permitted to resume their demonstration nearby—for instance, after having moved a prescribed distance away. TAC ¶ 108. Indeed, Defendants' use of force to scatter the demonstrators was so overwhelming, and injured so many people, that resuming the demonstration elsewhere was impossible.  See TAC ¶ 88.

### C.  The President And Attorney General Were Involved In The Attack.

The attack occurred at least in part at the behest of Defendants Trump, Barr, and other senior White House officials. TAC ¶ 202. Defendant Barr personally ordered officers to forcibly

remove Plaintiffs and other class members from Lafayette Square and its vicinity. *Id.* Shortly after the attack, the President and his senior advisors, including Attorney General Barr, then-Secretary of Defense Esper, and others, walked from the White House to St. John's Church, located across Lafayette Square from the White House, for photographs. TAC ¶¶ 203-04.

President Trump's statements indicate that the attack was pre-planned and the amount of force used was not in response to any actual or anticipated threat from the demonstrators. In the days and hours leading up to the Lafayette Square attack, President Trump repeatedly advocated for the use of force against Black demonstrators and civil rights activists protesting in D.C. and around the nation. For example, on May 29, President Trump posted on social media about the protests that "when the looting starts, the shooting starts"—a racist slogan used by a police chief in 1967 to advocate for police brutality and discrimination against Black Americans. TAC ¶ 54. On the same day on Twitter, President Trump described racial justice protesters as "THUGS." *Id.* On May 31, President Trump tweeted, "These people [civil rights protesters] are ANARCHISTS. Call in our National Guard NOW," TAC ¶ 55, and retweeted: "This isn't going to stop until the good guys are willing to use overwhelming force against the bad guys." TAC ¶ 56.

On June 1, prior to the violent attack on the demonstrators, President Trump had a conference call with governors, whom he urged to "dominate your city and your state" in response to civil rights protests. TAC ¶ 57. When one governor proposed balancing being "tough" with being "careful," President Trump corrected him, stating, "You don't have to be too careful." TAC ¶ 58. During this call, then-Defense Secretary Esper said that governors needed to "dominate the battle space"—the "battle space" being the streets U.S. cities where people were peaceably protesting. TAC ¶ 59. After the call, the President warned, "In Washington we're going to do something people haven't seen before." TAC ¶ 57. That same day, he told senior advisors that they

had to show they could control the streets of Washington and the White House area. TAC ¶ 60. As the Lafayette Square attack was occurring, President Trump gave remarks in the White House Rose Garden, vowing that "[if] a city or a state refuses to take the actions that are necessary to defend the life and property of their residents, then I will deploy the United States military and quickly solve the problem for them." TAC ¶ 61.

President Trump has taken a different approach to demonstrators with other viewpoints. On May 30, while criticizing the racial justice protesters outside the White House, President Trump specifically encouraged his supporters to engage in a counter-demonstration, tweeting: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???" TAC ¶ 64. Earlier in the year, when heavily armed and predominantly white demonstrators threatened lawmakers and stormed statehouses to object to coronavirus stay-at-home rules, President Trump posted a series of tweets encouraging these armed and predominantly white demonstrators; his messages included "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA, and save your great 2nd Amendment. It is under siege!" TAC ¶ 63.

The day after the attack, President Trump praised it, tweeting: "D.C. had no problems last night. Many arrests. Great job done by all. Overwhelming force. Domination." TAC ¶ 205.

**D. MPD Failed To Train Its Officers Regarding Demonstrators' Rights.**

MPD has a long history of using unjustified, excessive force to attack and interfere with demonstrations, including its response to Inauguration Day protests in 2017 and the January 2005 pepper-spraying and arrest of numerous peaceful protestors demonstrating against the inauguration at the White House and in Adams Morgan, among others. TAC ¶ 110. After the attack at Lafayette

Square, MPD continued to use excessive force and intimidation against Black Lives Matter protestors, including through tear gas and unjustified arrests and detentions. TAC ¶¶ 113-14. The prior incidents of excessive force during demonstrations, many of which involved chemical irritants and related to presidential events, made the need for training so obvious, and the violation of Plaintiffs' rights so likely, that the District was deliberately indifferent to the risk of constitutional violations. *See* TAC ¶¶ 110-15.

### E.  The Lafayette Square Attack Injured Plaintiffs.

Both BLMDC and the individual Plaintiffs were injured by the Lafayette Square attack. Members of BLMDC were in or near Lafayette Square during the attack and were victims of Defendants' use of force. TAC ¶ 120. Defendants' actions have frustrated the mission of BLMDC to fight racial injustice. As a result of Defendants' actions and the fear they caused among its members, BLMDC's organizing activities have been hampered and attendance at its protest events has declined. TAC ¶¶ 122-25. In response, BLMDC has had to divert resources from planned programming like trainings so that it can create safety plans for protests; fund medical support, protective gear (such as goggles), mental health services, and transportation from demonstrations for persons injured by Defendants; and undertake new communications and outreach to counteract the fear that the Lafayette Square attack has instilled in its members. TAC ¶¶ 126-27.

The individual Plaintiffs were injured emotionally by the trauma of the event and fear of excessive force by law enforcement at future demonstrations. TAC ¶¶ 137, 145, 154, 176, 200-01. They were injured physically, as well—by the tear gas, TAC ¶¶ 135, 142, 162, 174, 187, 193-98, and by other aspects of the attack. Plaintiff Scallan was hit with rubber bullets, which caused pain and bruises on her arm and cuts on her face and lips and made it difficult to eat or brush her teeth. TAC ¶¶ 160, 164. Days after the attack, Plaintiff Poteet still had welts on her torso and bruises

from where the officer beat her, and her knee (on which she had previously had ACL surgery) was bruised and swollen. TAC ¶¶ 173, 175. Plaintiff J.N.C., age 9, is traumatized by the assault and experiences anxiety when Plaintiff Sanders (his stepmother) goes to protests. TAC ¶ 137.

Plaintiffs intend to continue demonstrating against police brutality, TAC ¶¶ 176, 201, including at the White House. TAC ¶ 129.

### F. Procedural History.

Plaintiffs filed this case on June 4, 2020, and have amended the complaint three times, asserting claims on behalf of themselves and two separate classes of similarly situated individuals (one class for damages; one for equitable relief). ECF 1, 11, 29, 52. The individual Plaintiffs (and the damages class) seek damages for First and Fourth Amendment violations under *Bivens* against Defendant Barr and eleven named U.S. Park Police officers and other as-yet-unnamed "John Doe" federal officers (Claims 1 & 2) and (for Plaintiffs Foley and E.X.F. and the damages class) under 42 U.S.C. § 1983 against ten named MPD officers and other "John Doe" MPD officers (Claims 7 & 8). Plaintiff Black Lives Matter D.C., some of the individual Plaintiffs, and the injunctive-relief class seek declaratory and injunctive relief on First and Fourth Amendment grounds against seven federal official-capacity Defendants (Claims 3 & 4) and the Chief of MPD (Claims 9 & 10). Plaintiffs and both classes seek damages (as to all federal and D.C. individual-capacity defendants along with ACPD Captain Vincent) and equitable relief (as to all official-capacity defendants) for conspiracy to deprive plaintiffs of their civil rights, and failure to prevent such a conspiracy, under 42 U.S.C. §§ 1985 and 1986, respectively (Claims 5 & 6).

Plaintiffs sought but were denied early discovery to identify additional individual defendants. ECF 46. Plaintiffs also moved for class certification; the Court stayed briefing pending resolution of Defendants' motions to dismiss. ECF 47; Minute Order of Sept. 3, 2020.

On October 1, separate motions to dismiss were filed by Defendant Barr in his individual capacity, ECF 76 ("Barr MTD"); by all federal Defendants sued in their official capacities, ECF 79-1 ("U.S. MTD"); and by all MPD Defendants, ECF 80-1 ("D.C. MTD"). Defendant Vincent separately moved to dismiss on October 6. ECF 83. The Court granted Plaintiffs permission to file this 90-page consolidated opposition to the Barr, U.S., and D.C. motions. Minute Order of Nov. 6, 2020. Plaintiffs will respond to Defendant Vincent's motion separately.

Additional Defendants—U.S. Park Police officers sued in their individual capacities—have begun to file their own motions to dismiss: Defendant Adamchik did so on November 16, ECF 97; Defendant Seiberling will do so on January 11, *see* Minute Order of Nov. 16, 2020; other individual defendants have been served more recently after difficulties in effectuating service.

## LEGAL STANDARD

A complaint need only provide "a short and plain statement … showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). "Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable, *Hurd*, 864 F.3d at 678, and need not be the only possible inferences. *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). Indeed, "[a] complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). Plaintiffs are permitted to

plead with less specificity, and even "on information and belief," "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Evangelou*, 901 F. Supp. 2d at 170 (cleaned up); *accord, e.g., Tolton v. Day*, 2020 WL 2542129, at \*14 (D.D.C. May 19, 2020); *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 189 (D.D.C. 2017).

Critically, "the Court cannot resolve factual disputes ... on a motion to dismiss" under Rule 12(b)(6). *Burnett v. Wash. Metro. Area Transit Auth.*, 58 F. Supp. 3d 104, 108-09 (D.D.C. 2014); *accord, e.g., Behrens v. Tillerson*, 264 F. Supp. 3d 273, 278 (D.D.C. 2017); *Richards v. Gelsomino*, 240 F. Supp. 3d 173, 178 (D.D.C. 2017). Rather, "unresolved factual questions preclude dismissal" at this stage and must be adjudicated later. *Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82, 88 (D.D.C. 2018); *accord, e.g., Holmes v. Univ. of D.C.*, 244 F. Supp. 3d 52, 54 (D.D.C. 2017).

Under these standards, Plaintiffs' allegations easily clear Rule 8's "low bar." *Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 282 (D.D.C. 2018).

## ARGUMENT

As to the claims for damages for the constitutional violations, Claims 1, 2, 7, & 8, Plaintiffs adequately allege violations of their clearly established First and Fourth Amendments rights (Part I). Those claims can be pursued against federal officials under *Bivens* (Part II). Plaintiffs adequately allege that Plaintiffs Foley and E.X.F were seized within the meaning of the Fourth Amendment (Part III), and that Defendant Barr and the D.C. Defendants personally participated in the constitutional violations (Part IV).

Plaintiffs adequately allege standing, in particular to seek injunctive relief in Claims 3, 4, 5, 6, 9 & 10 (Part V). Plaintiffs adequately allege municipal liability for Claims 9 & 10 based on the District of Columbia's failure to train its officers (Part VI).

Finally, Plaintiffs adequately allege that Defendants are liable for engaging in and failing to prevent a conspiracy to violate their civil rights, Claims 5 & 6 (Part VII).

## I. Plaintiffs State A Claim For Violations Of Clearly Established Constitutional Rights; Qualified Immunity Must Therefore Be Denied (Claims 1, 2, 7 & 8).

We begin with the issue at the heart of the case: whether Defendants violated Plaintiffs' clearly established First and Fourth Amendment rights. Defendant Barr and the D.C. Defendants both assert qualified immunity, and the District Defendants also contest the merits of the First Amendment claim as to them. Barr MTD 33-42; D.C. MTD 20-22, 24-28. Qualified immunity must be denied where the defendants violated clearly established rights of which a reasonable person in defendants' position would have known because either controlling authority or "a robust consensus of cases of persuasive authority" placed the constitutional question beyond debate. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citation and internal quotation marks omitted). Plaintiffs need not identify a precisely on-point precedent, *see id.*; rather, the law need only have provided "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

Independently, qualified immunity must also be denied in the "'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)); *accord Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) ("[O]utrageous conduct obviously will be unconstitutional, this being the reason ... that the easiest cases don't even arise." (cleaned up)). The Supreme Court recently applied this principle to summarily reverse a grant of immunity because a lower court failed to recognize that the "particularly egregious facts" alone should have alerted any reasonable officer that the conduct

at issue was unconstitutional. *Taylor v. Riojas*, No. 19-1261, 2020 WL 6385693, at *2 (U.S. Nov. 2, 2020).

This is a case of obvious unconstitutionality. Attacking a peaceful protest in the "quintessential public forum," of Lafayette Square, *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992), without warning and with unprovoked and overwhelming force, including the use of chemical weapons, rubber bullets, and baton charges, is such a clear violation of both the First and Fourth Amendments that no elaboration through case law is needed. Even so, on-point cases exist in droves and provide an independent reason that immunity must be denied. Taking Plaintiffs' detailed factual allegations as true—as required at this stage—the question isn't even close.

This violation was so egregious that none of the Defendants *actually defends the conduct on the merits*. The federal official-capacity defendants do not even attempt to defend the constitutionality of the actions alleged; they contest only Plaintiffs' right to equitable relief. Defendant Barr and the D.C. Defendants defend the constitutionality not of the conduct Plaintiffs allege but of other hypothetical conduct they posit—in contravention of the basic legal standard applicable to motions to dismiss. The time to dispute the facts, of course, is at trial, not the pleading stage. Indeed, deciding a motion to dismiss based on matters outside the pleadings is reversible error. *See Hurd v. District of Columbia*, 864 F.3d 671, 686-87 (D.C. Cir. 2017). That no Defendant can even articulate a defense on the merits regarding the conduct alleged speaks volumes.

Plaintiffs explain in turn why each of the constitutional rights at issue was both obviously violated and, independently, clearly established by binding authority or a consensus of persuasive authority such that unlawfulness of Defendants' conduct was beyond debate.

**A. No reasonable government official or law-enforcement officer could have thought that attacking a peaceful protest was constitutional under the Fourth Amendment.**

**1. The Fourth Amendment violation was obvious, as the use of force lacked any semblance of justification.**

It is black-letter law that a "use of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than 'the countervailing governmental interests at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Under this standard, "a police officer must have some justification for the quantum of force he uses. … [Although courts] will accord a measure of respect to the officer's judgment about the quantum of force called for in a quickly developing situation, … the state may not perpetrate violence for its own sake. Force without reason is unreasonable." *Id.* at 977 (cleaned up).

Taking the facts of the complaint as true, Judge Griffith's simple and powerful distillation of the essence of excessive force law—that "[f]orce without reason is unreasonable"—requires denial of this motion. Plaintiffs broke no laws and posed no threat. TAC ¶¶ 86-87. The Defendants gave no audible warning that Plaintiffs were obligated to move. TAC ¶¶ 84-85. Every reasonable law enforcement officer knows that, under the Fourth Amendment, officers cannot use force, much less tear gas and batons, against people who are doing nothing wrong.

The degree of force used underscores how far out of bounds Defendants' conduct was. As the complaint details, Defendants "fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd," TAC ¶ 88, "hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who

were trying to flee the officers," TAC ¶ 90, pursued demonstrators on horseback, *id.*, knocked many protestors to the ground, *id.*, and in general "injected danger into what had been a calm protest as those in the street fled mounted police to avoid being trampled, struck by projectiles or gassed." *Id.* And more: Defendant Sinacore slammed a man into a building from behind and then beat him when he tried to run away. TAC ¶ 91. Defendant Kellenberger used his baton to strike a television journalist in the back as she was trying to flee the onslaught. TAC ¶ 97. Defendant Thau discharged a tear gas grenade launcher into the crowd of fleeing protesters. TAC ¶ 101. Any reasonable officer would have known that these uses of force were grossly impermissible in the circumstances alleged in the complaint.

Defendants' attempts to defend their conduct fail because they are premised on logical and legal errors that no reasonable officer would have made and because they dispute the facts as plausibly alleged in the complaint. To start, Defendant Barr and the D.C. Defendants emphasize the conduct of *other* protestors on *other* occasions. For instance, Barr invokes "criminal actors and extremist groups" who "attempted to hijack the protests with a number of lawless and dangerous acts" included "rioting, arson, and looting." Barr MTD 1. The District similarly discusses various acts that it asserts occurred at times *other than* in the early evening June 1 and at places *other than* Lafayette Square. D.C. MTD 3-6 (citing reports of events on May 30, on May 31, and at around 10 p.m. on June 1, at locations—"New Jersey Avenue," Chinatown, and "on Fourth and Seventh Streets"—nowhere near the White House). Based on prior reports of unrest, Defendant Barr argues, the officers in Lafayette Square on June 1 "could have thought it reasonable to use significant force to control the crowd in order to further the government's interest in law enforcement and prevent bad actors from using the crowd as cover to endanger the officers." Barr MTD 41.

19

This guilt-by-association approach to law enforcement is obviously wrong based on first principles. Probable cause to search or seize must be particularized to the persons being seized or searched. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (search); *Barham v. Ramsey*, 434 F.3d 565, 573-74 (D.C. Cir. 2006) (seizure). Nothing in the complaint connects Plaintiffs or the other demonstrators to Defendants' assertions of criminal conduct by other actors at other days, times, or places—except the common message seeking an end to racial injustice and police brutality. If Plaintiffs can be assaulted because other people with the same social or political views engaged in illegal activity at some other time and place, then *every* civil rights demonstrator in the District this past summer was properly subject to beating, tear-gassing, and arrest. That theory is so absurdly wrong that no reasonable officer could have entertained it.

Defendant Barr argues that the "paramount interest" of presidential security justifies apparently any use of force, no matter how excessive the force and no matter how attenuated from its objective. Barr MTD 41. That is plainly incorrect. Would the President's decision to walk across Lafayette Square have justified a decision to shoot the peaceful demonstrators in the vicinity with live ammunition? Of course not. The D.C. Circuit has specifically rejected "the Government's argument that mere mention of the President's safety" defeats a claim of a constitutional right. *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1117 (D.C. Cir. 1969) ("*Quaker Action I*"). Instead, courts must "assure [them]selves that [the Government's] conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat," as "there is a wide gulf between disorderliness on Pennsylvania Avenue and a storming of the White House over a tall, pointed steel fence and across 230 feet of lawn." *Id.* at 1117-18.

Accordingly, presidential security is not a talisman that wards off all Fourth Amendment scrutiny; rather, like any other law enforcement interest (including the weighty interests in the lives

of officers themselves and of civilian bystanders), it is subject to a Fourth Amendment reasonableness analysis. And like any other interest, it may be so attenuated from a particular decision to use force and so plainly inadequate to justify the quantum of force applied that in some circumstances it provides no justification at all. That is the case here. Immunizing any putative presidential security-related use of force from Fourth Amendment scrutiny would effectively permit the President to declare his intent to visit any location and then send officers out ahead of him to attack anyone in the area—as opposed to simply ordering people to move out of the way of a forthcoming presidential movement, audibly, and with enough time to comply.

Again, as alleged in the complaint, Plaintiffs were not asked or ordered to move. They were not disobeying any orders of that kind or any other. They posed no threat to the President or anyone else. Yet Defendants swept them away from Lafayette Square using tear gas, rubber bullets, and an armed charge. None of this was remotely necessary to protect presidential security, and no reasonable officer could possibly have believed that it was.

In arguing otherwise, Defendants manufacture allegations absent from—and in many cases at odds with—the complaint. For instance, Defendant Barr cites "information that members of the crowd were passing rocks amongst themselves, threw a water bottle in the Attorney General's direction, threw projectiles at the officers" and also "intelligence that some had stockpiled bricks and bottles at the church." Barr MTD 36 n.20. These allegations contradict the complaint, which squarely alleges that the crowd was peaceful generally, and specifically that at the moment of Defendants' attack, "the Plaintiffs and the members of the Plaintiff class were not engaging in unlawful conduct" or "any conduct that posed a threat of violence against any person, property, or

public safety generally." TAC ¶¶ 86-87.[1]  A motion to dismiss is not the place to resolve factual

disputes, and the Plaintiffs allegations must be taken as true. The Attorney General will have an

opportunity to present an alternative factual narrative at trial.

Defendant Barr also argues that the complaint contains "no suggestion that the Attorney

General or officers under his control could differentiate among lawful protesters and those who

might have infiltrated the crowd to do violence." Barr MTD 4. But the very premise that anyone

"might have infiltrated the crowd to do violence" such that Defendants *needed* a method for

identifying such people comes solely from Defendant Barr's own brief—not from anything in

Plaintiffs' complaint. If Defendants' position is that some nefarious "infiltrators" justified

Defendants' violent attack on the whole peaceful assembly, that factual claim will have to await

testing at a later stage; it is no part of the complaint. Plaintiffs have alleged in detail that their

peaceful, non-threatening protest was broken up by Defendants' massive and indiscriminate use

---

[1] Defendant Barr attempts to inject his allegations into the complaint itself by claiming they were incorporated by reference when Plaintiffs cited news articles about the demonstration. But the contents of documents cited in complaints are not incorporated where they are not "integral" to the complaint and do not "form the basis for a claim," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015), unless what is at issue is the mere existence of the content, *see Nader v. Dem. Nat'l. Comm.*, 567 F.3d 692, 700 (D.C. Cir. 2009) (in deciding question of "fraudulent concealment" for tolling statute of limitations, court could consider the fact that news articles cited in complaint revealed what plaintiff alleged had been concealed). Applying this principle to news articles, this Court has explained that plaintiffs do not "adopt every word in a cited document as true for pleading purposes." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71 (D.D.C. 2016). Here, the contents of the articles Plaintiffs cite are not integral to their claim; they merely provide corroborating sources for the allegations to underscore their "plausibility." And Defendant Barr mischaracterizes the articles he cites: they do not state as fact any of Barr's allegations regarding anything thrown at the Attorney General; or rocks, bricks and bottles; or projectiles generally; instead, the allegations on which he relies come almost exclusively from *government spokespeople* quoted in the stories. *See, e.g.,* Carol D. Leoning *et al.*, *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020, *cited at* Barr MTD 36 n.20.

of force. Defendants must meet that allegation squarely rather than creating a straw man based on alternative assertions of their own.

In venturing beyond the allegations of the complaint, Defendant Barr cannot even stick to a consistent story. Although he repeatedly posits that Defendants were reacting to a threat or clearing the way for the President, Barr MTD 1, 4, 34-36, 39, 41, he separately "disputes plaintiffs' allegations that he cleared the park for the purpose of allowing the President to deliver his remarks there," Barr MTD 35 n.19, and further cites his own testimony to Congress "that the decision to disperse the protesters was based on an earlier-devised plan within the Executive Branch to expand the White House perimeter and to install fencing at Lafayette Square," Barr MTD 21 n.14. Although parties may argue in the alternative, Barr's contradictory accounts of his conduct—one planned in advance, the other reactive to emerging circumstances—only underscore the importance of the normal requirements in considering motions to dismiss: that allegations in the complaint are presumed true, and that defendants cannot rely on facts outside the complaint. Whether Defendant Barr can provide evidence to support any of his competing justifications is a matter for another stage of the case.

Like Defendant Barr, the D.C. Defendants introduce their own speculations and hypotheses in order to try to justify their conduct. According to the District, its officers faced a "surging crowd," or—elaborating on the theme—"an aggressive crowd that as a whole had turned its ire towards them" and "who were confrontational and threatened to overcome the MPD officers' position." D.C. MTD 3, 26. From the perspective of what is alleged in the complaint, that is pure make-believe. Demonstrators were "fleeing." TAC ¶ 101, 193. The allegations that the demonstrators had "turned" any "ire" toward anyone such that they "threaten[ed]" anyone's "position" are entirely those of the Defendants, not the Plaintiffs.

Defendants also cannot avoid Plaintiffs' allegations by waving around the label "implausible." Plaintiffs' allegations are based on Plaintiffs' personal experience as eyewitnesses to the events of which they complain and also supported by news reports and official statements from the White House and Justice Department—far more than is required for plausible notice pleading. *See* TAC ¶¶ 60-61 & nn. 14-15, ¶¶ 88-90 & nn. 16-18, ¶ 202 & n.19. These well-supported allegations are in no way comparable to those at issue in *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009), which concerned speculation about defendants' motives without a basis for such inference.

Qualified immunity does not suspend the normal rules of civil procedure. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (summarily reversing appellate court's failure to apply settled summary judgment standards in qualified immunity context). Should Defendants be able to substantiate a justification for their uses of force, they may seek qualified immunity again later in the case. That possibility is irrelevant to the unavoidable conclusion that the facts in the complaint state a claim for the violation of Plaintiffs' clearly established Fourth Amendment rights by the use of overwhelming force against peaceful, law-abiding demonstrators.

### 2.  Precedent independently places the Fourth Amendment violation beyond debate.

In addition to their obviousness, each of the uses of force at issue here violated Fourth Amendment rights clearly established by binding authority, a consensus of persuasive authority, or both. The D.C. Circuit has specifically held that baton strikes against non-threatening and non-resisting individuals violate the Fourth Amendment. *See Rudder*, 666 F.3d at 795 (baton strike "unprovoked and without warning" violates the Fourth Amendment). The D.C. Circuit has also specifically recognized the unjustified use of chemical agents to be unconstitutionally excessive. *Norris v. District of Columbia*, 737 F.2d 1148, 1152 (D.C. Cir. 1984) (R.B. Ginsburg, J.).

Additionally, there is a consensus view, both in this Court and among the federal courts of appeals, that the gratuitous use of tear gas (or comparable chemical agents) on a person who is not threatening anyone or resisting officers is excessive force. *See, e.g., Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60-62 (1st Cir. 2008); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160-61 (10th Cir. 2008); *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Vinyard v. Wilson*, 311 F.3d 1340, 1348-49 (11th Cir. 2002); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1128-30 (9th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001); *Adams v. Metiva*, 31 F.3d 375, 385-86 (6th Cir. 1994); *Jones v. Ritter*, 587 F. Supp. 2d 152, 157 (D.D.C. 2008).

Accordingly, courts regularly deny qualified immunity for such uses of force and have done so for decades, *see Henderson*, 439 F.3d at 503-04; *Vinyard*, 311 F.3d at 1355; *Adams*, 31 F.3d at 387, including specifically in the context of protests, *see Fogarty*, 523 F.3d at 1160-62 (denying qualified immunity for 2003 incident in which police forcibly escorted non-threatening, non-resisting antiwar protestor through cloud of tear gas); *Headwaters Forest Def.*, 276 F.3d at 1130 (in 1997, "it would be clear to a reasonable officer that it was excessive to use pepper spray against the nonviolent protestors" who "were sitting peacefully, were easily moved by the police, and did not threaten or harm the officers"); *Lucha Unida de Padres y Estudiantes v. Green*, ___ F. Supp. 3d ___, 2020 WL 3574593 at *15, *19 (D. Ariz. Jul. 1, 2020) (clearly established in 2017 that use of pepper spray against non-threatening and non-resisting protestors was unconstitutional); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241-43 (W.D. Wash. 2009) (clearly established in 2007 that police cannot pepper spray protestor attempting to assist an injured protestor without posing a threat, or use batons and pepper spray on protestor calmly trying to cross the street); *Brenes-Laroche v. Toledo Davila*, 682 F. Supp. 2d 179, 189, 192 (D.P.R. 2010)

(clearly established in 2007 that baton strikes to non-threatening, non-resisting protestors was unconstitutional); *Secot v. City of Sterling Heights*, 985 F. Supp. 715, 721 (E.D. Mich. 1997) (clearly unreasonable in 1995 to "[strike] plaintiff while he was peaceably standing in the picket line and not threatening an officer or other member of the public in any way."); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996) (denying qualified immunity as to firing of pepper spray into crowd of "allegedly excitab[le]" but "peaceful" demonstrators).

Defendants' attempt to resist this broad consensus of both binding and persuasive authority by relying on conduct of *other* demonstrators at *other* times and places, *see supra* Part I.A.1, is itself answered by binding precedent. *Ybarra v. Illinois*, 444 U.S. 85 (1979), emphatically rejected the theory that one person can be searched or seized based on suspicion of someone else: "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91. Instead, the Court explained, "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* The D.C. Circuit applied this principle in *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006). There, after witnessing acts of vandalism by some demonstrators, *id.* at 569, then-Assistant Chief (and here, Defendant) Newsham ordered that hundreds of demonstrators be arrested, *id.* at 570. In the arrestees' ensuing class action, the court affirmed the district court's denial of qualified immunity: the "mass arrest … violated the clearly established Fourth Amendment rights of plaintiffs by detaining them without particularized probable cause." *Id.* at 573.

In language that directly refutes the argument that Defendants here could have used force against Plaintiffs based on the actions of *other* people at *other* times, the D.C. Circuit explained that "[e]ven assuming that Newsham had probable cause to believe that *some* people present that

morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining *everyone* who happened to be in the park," *id.*, as he had "no basis for suspecting that all of the occupants of Pershing Park were then breaking the law or that they had broken the law before entering the park." *Id.* at 574. Thus, the court rejected Newsham's attempts to assert probable cause by "refer[ring] generically to what 'demonstrators' were seen doing" and to "excavate probable cause … from the scattered acts of lawlessness that Newsham and others had witnessed that morning." *Id.* at 573.

Defendants' use of force against Plaintiffs at Lafayette Square based on the actions of other demonstrators on other nights is even more attenuated than the use of force in *Barham*. Whereas the authorities' mistake in *Barham* was arresting many people based on the actions of a few *at around the same time*, here Defendants are attempting to justify force against Plaintiffs based on the acts of unknown others *at entirely different times and places*. That is obviously impermissible.

Defendant Barr's reliance on *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009), which distinguished *Barham* in the narrow circumstance where individuals in a group engage in criminal behavior *and* the group is acting "as a unit" such that "all members of the crowd violated the law," *id.* at 408, is misplaced. Plaintiffs' complaint here alleges that they were engaged in peaceful, lawful conduct, and nothing remotely suggests they were acting "as a unit" with some other, unidentified people who allegedly broke the law at other times or places. The narrow *Carr* exception to *Barham*—and Defendant Barr's comparable authorities from other circuits, *see Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012) ("It was reasonable for the officers to believe they could arrest those who were acting as a unit with the protestors who attempted to break through the police barrier[.]"); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015) ("If a group or crowd of people is behaving as a unit and it is not possible ... for the police

to tell who is armed and dangerous or engaging in criminal acts and who is not, the police can have reasonable suspicion as to the members of the group.")—obviously did not apply, and no reasonable officer could have thought that they did.

Defendant Barr's other citations are likewise unavailing. He cites *Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997), which concerned the constitutionality of random drug testing, and *Wood v. Moss*, 572 U.S. 744 (2014), which adjudicated no Fourth Amendment issue at all, for the general proposition that presidential security is very important. Plaintiffs do not dispute that proposition, but it does not resolve this case: however strong that interest is, the use of force against non-violent protestors was utterly unnecessary to serve it. Defendant Barr relies on *Berg v. Kelly*, 897 F.3d 99 (2d Cir. 2018), which concerned the temporary enclosure of protestors, but that could not have provided any guidance to Defendants here because, first, it involved neither police violence nor an excessive force claim, and second, because it did not rule on the constitutional merits, only that the particular facts at issue there did not present a violation of *clearly established* law. *See id.* at 109, 112. Defendant Barr's remaining authorities, Barr MTD 41-42, are even more clearly inapposite: they involved law enforcement responses to protestors who posed threats to officers or the public, broke the law, and/or physically resisted officers' efforts to cajole them into compliance by peaceful means. *See Felarca v. Birgeneau*, 891 F.3d 809, 814-15, 817-18 (9th Cir. 2018) (protestors unlawfully erected tents, ignored police dispersal orders, and locked arms to obstruct police removal of tents); *White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017) (protestor disobeyed orders to stop approaching while "proceeding directly toward the police skirmish line"); *Dundon v. Kirchmeier*, 2017 WL 5894552, at *12, 19 (D.N.D. Feb. 7, 2017) ("law enforcement officers feared for their physical safety due to the imminent threats of serious bodily injury or death they were encountering" in "a very chaotic scenario with law enforcement officers outmanned and

flanked by protesters"); *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 373-74 (D.D.C. 2014) (police officer and civilian "fell to the ground together in an uncontrolled manner" and appeared to be wrestling); *Young v. Akal*, 985 F. Supp. 2d 785, 802 (W.D. La. 2013) (police attempted to clear a street "using verbal instructions, enlisting the assistance of members of the crowd, requesting assistance from event organizers and participants, and other non-physical tactics" and then resorted to tear gas only in light of the "increasingly violent nature of the crowd").

Based on both binding and persuasive authority, qualified immunity should be denied.

**B. Defendants violated Plaintiffs' clearly established First Amendment rights in a manner that was obvious because of its egregiousness and, independently, contravened binding precedent.**

Defendants' attack on a peaceful and lawful demonstration was a blatant suppression of core political speech in one of the nation's most important public forums. Again, the federal official-capacity Defendants do not defend the conduct on the merits. Defendant Barr, invoking presidential security, argues that Defendants' actions were a permissible content-neutral restriction on time, place and manner. Barr MTD 33-40. That is the wrong framework for analysis, as Plaintiffs argue below, but even applying the intermediate-scrutiny standard Defendant Barr proposes, no reasonable officer could have believed the attack here satisfied that standard because it blatantly failed the narrow tailoring requirement by burdening far more speech than necessary.

The correct standard—the one that the Supreme Court has applied to (in Defendant Barr's words) "an on-the-spot crowd clearing order," Barr MTD 34—requires that demonstrations not be dispersed absent a "clear and present danger." Defendants' actions were also plainly unconstitutional under that standard.

Yet another independent, clearly established constitutional flaw in Defendants' conduct is that it discriminated against Plaintiffs on the basis of viewpoint. Defendant Trump's own words make clear that demonstrators with different messages would have been welcome.

Plaintiffs will address in turn the three distinct ways Defendants' conduct clearly violated the First Amendment: (1) by burdening far more speech than necessary to serve the government's asserted interest (i.e., failing intermediate scrutiny); (2) by breaking up a demonstration absent a clear and present danger; and (3) by discriminating based on viewpoint.

**1.  By assaulting and completely scattering a lawful, peaceful demonstration, Defendants burdened far more speech than necessary.**

Defendant Barr argues that Defendants' actions should be analyzed as a content-neutral restriction on the time, place, and manner of speech. He acknowledges that one of the requirements of a valid content-neutral restriction is that it is "narrowly tailored." Barr MTD 33 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). This means that "it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 799).

Assuming the applicability of this standard for the sake of argument,[2] any reasonable officer would have known that Defendants' assault on Plaintiffs was not "narrowly tailored" to the government's interest. The overwhelming use of force put Plaintiffs and the entire class to headlong flight out of the path of projectiles, chemical weapons, and rampaging officers, some on horseback. TAC ¶¶ 81-103. The egregiousness of Defendants' use of force is compounded by its disproportionality to any legitimate government objective. If the goal had been simply to move

---

[2] The time/place/manner standard is generally applied to *regulatory* restrictions on expression, not to on-the-spot police actions that shut down otherwise-permitted demonstrations. The correct standard is discussed in the next section, Part I.B.2.

people out of the President's way for his walk, *see* Barr MTD 35, the demonstrators could have been clearly and audibly instructed which direction to move and how far—something the Secret Service knows how to do. *See Wood v. Moss*, 572 U.S. 744, 751-54 (2014) (Secret Service moved demonstrators away from where President Bush was unexpectedly dining). Although Defendants need not have used the least restrictive means, the existence of substantially less burdensome alternatives is "relevant" under this Circuit's case law, *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002), and Defendants' blitzkrieg was practically the *most* restrictive means they could have used: short of firing on the Plaintiffs with live ammunition, Defendants could not have more forcefully disrupted the demonstration and scattered its participants. Defendants' crackdown, even analyzed as a content-neutral restriction, blatantly fails intermediate scrutiny.

Defendant Barr's argument to the contrary depends on his once again asserting facts not alleged in the complaint. First, he posits a security threat to the President, claiming he acted "in response to the need to protect the President and the White House." Barr MTD 34; *see also id.* at 36 (citing "the potential danger posed by infiltrators within the unscreened crowd of thousands"). The "need to protect the President and the White House" is *Defendant Barr's* claim, not Plaintiffs'. Demonstrations occur at Lafayette Square frequently, TAC ¶ 51, so the location alone could not have made this demonstration a threat, and nothing in the complaint supports Defendant Barr's argument that there was in fact any threat to the President, let alone a threat that justified the level of violence deployed here. Indeed, as discussed, that claim is not just absent from the allegations in the complaint; it is diametrically opposed to them. *See* Part I.A.1 above.

Second, Defendant Barr minimizes the scope of the government response to the demonstration. In his telling, he issued merely "an on-the-spot crowd clearing order covering a one-block area," Barr MTD 34, while posing "no legal obstacle" to protesting outside of some

"expanded perimeter," *id.* at 37 n.21; *see also id.* at 36-37 (suggesting that Plaintiffs were free to speak anywhere but "Lafayette Square and a short distance around it"). The complaint tells a much different story: Defendants gave no indication that anyone would be free to resume demonstrating anywhere in the vicinity "either at a prescribed location or after having moved a prescribed distance away from Lafayette Square." TAC ¶ 108. Indeed, the level of force deployed to shatter the protest was such that even had Defendant Barr made such a promise, it would have been meaningless—it is fanciful to imagine Plaintiffs fleeing from an onslaught of chemical weapons, projectiles, batons, and a mounted charge, and then calmly stopping to resume their demonstration one block away. For the Plaintiffs who ran west, moreover, what they found one block away was not a protected protest zone but the D.C. Defendants firing yet more tear gas at them in coordination with the other Defendants. *See* TAC ¶¶ 100-07. A defendant's alternative facts are an invalid basis for dismissing a complaint.

   If the government, which "bears the burden of showing that its restriction of speech is justified," *United States v. Doe*, 968 F.2d at 90, asserts that the sudden, violent, and complete dispersal of this peaceful protest was narrowly tailored to a legitimate security objective, it can support its position with evidence at a later stage, *see id.* at 90-91 (evaluating tailoring by reference to the record, including what evidence the government had or had not offered). But courts do not simply "defer to the Park Service's [or any other agency's] unexplained judgment," *id.* at 90; *accord Henderson v. Lujan*, 964 F.2d 1179, 1185 (D.C. Cir. 1992). Rather "it is the government's case to prove." *United States v. Doe*, 968 F.2d at 91. Setting aside Defendants Barr's version of the facts and taking the complaint's allegations as true, the Defendants violated the Constitution several times over. Any reasonable person would have known that.

*White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984), cited by Defendant Barr for the proposition that presidential security has "justified substantial limitations on the manner of expressive activity in Lafayette Square," Barr MTD 34, is perfectly consistent with Plaintiffs' analysis. The regulations at issue there concerned restrictions on the "construction, size and placement" of signs displayed by demonstrators and on the manner of displaying signs within a specific twenty-yard zone along the sidewalk (leaving 93% of the sidewalk unrestricted). *Id.* at 1522, 1528. Although the court upheld these restrictions as narrowly tailored regulations of time, place, and manner, it stated that "a strong argument could have been made that a regulation banning all demonstrations on the White House sidewalk and in Lafayette Park would have been unconstitutional." *Id.* at 1527. Thus, it is that dictum, and not the holding of the case—which allowed minor restrictions, but not a total ban, on signs—that speaks to the circumstances presented here. The case did not uphold *any* restriction on the peaceful assembly of *people* in Lafayette Square.

Without Defendant Barr's own version of events, his reliance on *Wood v. Moss*, 572 U.S. 744 (2014), falls apart. Like Defendant Barr here, the defendants there invoked presidential security, but there the similarities end. Unlike here, *Wood* involved the relocation of a protest to a nearby area where it could and did continue. *See id.* at 754 (noting that "[t]he protesters remained" where the Secret Service moved them). And the legal question at issue was different than the one posed here: *Wood* concerned the *relative* placement of two groups of demonstrators with opposing views, *see id.* at 759-61, not the complete scattering of a protest. Defendant Barr's protest-zone cases from other circuits are similarly inapposite, because they did not involve violent dispersals of peaceful demonstrations and because alternative areas to speak were provided. *See Marcavage v. City of New York*, 689 F.3d 98, 102 (2d Cir. 2012) (plaintiffs were asked 17 times to move to

the designated demonstration zone before they were arrested for blocking traffic); *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (considering not the dispersal of a particular protest but a facial challenge to the imposition of a no-demonstration zone beyond which "[t]he protestors could reasonably expect their protest to be visible and audible to" their intended audience).

More generally, presidential security does not preempt the normal constitutional analysis when it comes to restrictions on speech. The D.C. Circuit strongly suggested that presidential security would not justify a blanket speech ban in front of the White House, *White House Vigil*, 746 F.2d at 1527—which the court elsewhere described as "the only absolutely riskless way of avoiding all conceivable danger to the White House from such demonstrations," *Quaker Action Group v. Morton*, 516 F.2d 717, 733 n.49a (D.C. Cir. 1975) ("*Quaker Action IV*")—and the D.C. Circuit struck down a limit on demonstrations in front of the White House that was unduly broad in proportion to the security interest asserted. *See id.* at 721, 723, 731 (affirming judgment striking down as unduly restrictive 500-person limit on demonstrations in Lafayette Square). Thus, binding precedent refutes the view that presidential security concerns, no matter how attenuated they may be in a particular context, automatically justify content-neutral speech restrictions or otherwise displace the requirements of the First Amendment. Because Defendants badly fail at least one of those requirements—narrow tailoring—they violated Plaintiffs' clearly established rights under intermediate scrutiny.

### 2. Breaking up the protest was clearly established to be unconstitutional absent a "clear and present danger."

Although the constitutional violation was clearly established even under Defendant Barr's proposed test, the correct First Amendment test to apply here is provided not by cases dealing with general time/place/manner regulations but with protest dispersals specifically. The leading Supreme Court case in this context holds that the First Amendment forbids the dispersal of lawful

demonstrations in a public forum "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963); *see also Cox v. Louisiana*, 379 U.S. 536, 547-51 (1965) (conviction for breach of the peace unconstitutional where defendant led loud but "not riotous" demonstration on courthouse grounds). This standard has been applied across the decades and across the circuits (including this one), providing a broad consensus of authority to underscore the holding of *Edwards* that absent a serious threat, a peaceful and lawful demonstration may not be dispersed. *See Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (Sotomayor, J.) (applying "clear and present danger" standard to deny qualified immunity for breaking up a demonstration where "the facts as alleged by plaintiffs reveal an orderly, peaceful crowd"); *Quaker Action IV*, 516 F.2d at 729 (D.C. Cir.) (upholding National Park Service standard for denying demonstration permits near the White House because it was limited to circumstances presenting "clear and present danger"); *accord Keating v. City of Miami*, 598 F.3d 753, 758, 766-67 (11th Cir. 2010) (affirming denial of qualified immunity to officers who ordered dispersal of peaceful demonstration via tear gas and projectiles); *Collins v. Jordan*, 110 F.3d 1363, 1367-68, 1371, 1372 (9th Cir. 1996) (affirming denial of qualified immunity for police chief who banned all demonstrations in San Francisco and dispersed peaceful protest;  and noting "[t]he law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence"); *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 102 (5th Cir. 1963) (reversing injunction against peaceful civil rights protest as inconsistent with *Edwards*).

The D.C. Circuit has repeatedly recognized that Lafayette Square is not just a "quintessential public forum," *United States v. Doe*, 968 F.2d at 87, but one with special status, *id.* at 88—"a primary assembly point for First Amendment activity aimed at influencing national

policies," *id.* at 89, "where the government not only tolerates but explicitly permits demonstrations and protests because of its unique location across the street from the White House," *id.* at 88. It is, in short, a "unique situs for the exercise of First Amendment rights." *Quaker Action IV*, 516 F.2d at 725; *accord Women Strike for Peace v. Morton*, 472 F.2d 1273, 1287 (D.C. Cir. 1972) (opinion of Wright, J.) ("There is an unmistakable symbolic significance in demonstrating close to the White House or on the Capitol grounds[.]").

Applying these principles, this Court has held that a peaceful, lawful demonstration on the White House sidewalk may not be dispersed in the absence of a serious threat to public safety, and it has rejected the view that a perceived threat of disorder based on previous events provides such cause. *See Tatum v. Morton*, 402 F. Supp. 719, 722-24 (D.D.C. 1974). More recently, this Court has recognized that the right of an "ordinary person[] [to] express[] her views while standing on the public sidewalk in front of the White House" is "clearly established." *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 57 (D.D.C. 2013).

Other courts have likewise held that the First Amendment does not permit the dispersal of a peaceful protest in circumstances like those here. *See Keating*, 598 F.3d at 758, 766-67; *Lucha Unida de Padres y Estudiantes v. Green*, ___ F. Supp. 3d ___, 2020 WL 3574593 at *13, *18 (D. Ariz. Jul. 1, 2020) (clearly established in 2017 that police could not block a peaceful march where defendants failed to identify a "clear and present danger of substantial evil"); *Adams v. New York*, 2016 WL 1169520, at *1, *3 (S.D.N.Y. Mar. 22, 2016) (dispersal order issued to protestors chanting on a public sidewalk was unconstitutional where there was no suggestion of "immediate threat to public safety or order"); *Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81, 88, 93 (D.P.R. 2012) (peaceful protestors at territorial Capitol building, whom police attacked with tear gas and batons, stated claim for violation of clearly established First Amendment rights); *Rauen v.*

36

*City of Miami*, 2007 WL 686609, at *2, *20 (S.D. Fla. Mar. 2, 2007) (denying qualified immunity to officers who broke up peaceful protest with chemical irritants and rubber bullets, because it was clearly established that "Plaintiffs were entitled to exercise their right to peacefully protest in the absence of a compelling government interest in quashing their protest").

As with the intermediate scrutiny argument, the only way for Defendant Barr to resist the application of these authorities here is to make allegations regarding potential security threats contrary to the facts alleged in the complaint. *See supra* Part I.B.1. But taking the complaint's facts as true, the demonstrators posed no threat to anyone, much less a "clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Edwards*, 372 U.S. at 237. Like the civil rights protestors whose demonstration was unconstitutionally suppressed in *Edwards*, the civil rights protestors here were exercising their "rights of free speech, free assembly, and freedom to petition for redress of their grievances ... in their most pristine and classic form." *Id.* at 235. Thus, breaking up the demonstration was both obviously unlawful based on general principles and clearly established to be unlawful based on the binding authorities and consensus of persuasive authorities cited above. "One of the great accomplishments of our Constitution is its guarantee of the people's right to take to the streets to say what they think." *A.N.S.W.E.R. Coal. v. Basham*, 845 F.3d 1199, 1202 (D.C. Cir. 2017). That accomplishment would be wholly undone if a non-threatening demonstration in one of the nation's most important public forums could be summarily terminated at the whim of the executive.

Defendants' assault on Plaintiffs to shatter their demonstration was obviously unconstitutional, and that conclusion is confirmed beyond debate by *Edwards* and its progeny.

**3. Defendants' viewpoint discrimination violated Plaintiffs' clearly established rights.**

Breaking up Plaintiffs' demonstration based on its viewpoint is an independent—and no less clearly established—constitutional violation. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (principle that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys" is "a core postulate of free speech law"); *Wood v. Moss*, 572 U.S. 744, 756-57 (2014) ("It is uncontested and uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express.").

D.C. Circuit authority specifically establishes that impermissible viewpoint discrimination occurs where the government treats speech expressing one viewpoint differently than it would have treated a different viewpoint. In *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997), the National Park Service revoked a permit for anti-abortion demonstrators at President Clinton's inauguration, and threatened them with arrest, *id.* at 1454, even though the government admitted that "if instead of carrying graphic posters of late term abortions or signs containing criticisms of the President, Mahoney were to carry signs offering congratulations or best wishes to the President, he would not be subject to arrest." *Id.* at 1456. The court struck down this restriction as "blatant discrimination between viewpoints." *Id.* Plaintiffs have plausibly alleged the same type of discrimination here—that Defendants' attack breaking up their civil rights protest would not have been mounted against a demonstration with a pro-Administration message. *Compare* TAC ¶ 64 (Defendant Trump tweet boasting that "'protesters' at the White House" were "handled ... easily" by the Secret Service and calling for "MAGA NIGHT AT THE WHITE HOUSE"), *and* TAC ¶ 63 (promoting civil disobedience at various statehouses in opposition to coronavirus-related safety regulations), *with* TAC ¶¶ 53-61 (Defendant Trump calling civil rights protestors "THUGS,"

38

advocating calling in the National Guard on them, and urging "overwhelming force" to "dominate" the civil rights protestors). That differential treatment is the hallmark of viewpoint discrimination under the D.C. Circuit's binding decision in *Mahoney*, 105 F.3d at 1456. Thus, in addition to the obvious violation of breaking up a peaceful demonstration without sufficient (or really any legitimate) basis, qualified immunity must be denied for the independent reason that Defendants' actions amounted to viewpoint discrimination, as demonstrated by the President's own words.

Defendant Barr and the D.C. Defendants argue that Plaintiffs' viewpoint-discrimination claim cannot succeed against them absent evidence of their own personal animosity. Barr MTD 37 n.22; D.C. MTD 20-22. That confuses viewpoint discrimination with retaliation. Whereas First Amendment retaliation requires "retaliatory animus," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019), one way for viewpoint discrimination to occur is "when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction" of speech. *Rosenberger v. Rector & Visitors of Univ. of Va,*, 515 U.S. 819, 829 (1995) (emphasis added). The rationale in question is the *government's* purpose in taking the challenged action, not the subjective motive of an official who carried it out—as demonstrated by *Mahoney*, where the D.C. Circuit did not inquire if any particular defendant held animosity toward the plaintiff's viewpoint but found it sufficient that the government would have treated a speaker with a different viewpoint differently. Likewise, *Rosenberger* did not suggest that University officials had anti-Christian animus when they denied funding to a religious student publication, and there is no reason to suspect that they had such animus, as they were merely enforcing a preexisting school regulation. *See id.* at 827.

President Trump's statements show that the demonstrators' opinion was the reason for the attacking and disbanding the protest, and thus Plaintiffs have plausibly pleaded viewpoint discrimination in violation of clearly established law.

* * *

In sum, taking the complaint's allegations as true, Defendants' wholly gratuitous use of force to scatter the demonstrators at Lafayette Square violated Plaintiffs' clearly established First Amendment rights in multiple ways. Qualified immunity must be denied.

## II.     The Traditional Damages Remedy Against Federal Officers For Violating Demonstrators' First And Fourth Amendment Rights Has Long Been Recognized In This Circuit And No Special Factors Counsel Hesitation Here (Claims 1 & 2).

Apart from qualified immunity, the other principal challenge to Plaintiffs' constitutional damages claims is Defendant Barr's argument, Barr MTD 5-29, that no cause of action is available under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which recognized a cause of action arising out of the Constitution for damages against federal agents who violate a person's constitutional rights. *Bivens* reflected both an ideal and a body of law with deep historical roots extending back to the beginning of the Republic. The ideal, articulated by Chief Justice Marshall, was that "'[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'" *Id.* at 397 (quoting *Marbury v. Madison*, 5 U.S. 137, 163 (1803)). And the body of law, also exemplified by an early Marshall Court case as well as pre-Revolutionary English cases, showed that executive officials acting beyond their authority could be held liable in damages. *See, e.g.*, *Little v. Barreme*, 6 U.S. 170, 178-79 (1804) (holding Navy officer liable for damages in trespass for seizing a ship pursuant to an invalid presidential order); *Entick v. Carrington*, (1765) 95 Eng. Rep. 807, 817-18 (KB) (awarding damages for an unlawful search and seizure without question as to the cause of action). Damages were awarded not just for physical injuries, but also for injuries to liberty interests. *See, e.g.*, *Huckle v. Money*, (1763) 95 Eng. Rep. 768, 769 (KB) (holding damages were justified for wrongful detention even though the detention was brief and

did not cause physical harm because "it was the most daring public attack made upon the liberty of the subject").

Thus, the federal damages remedy recognized in *Bivens* was "hardly ... a surprising proposition" because "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 U.S. at 395; *see generally Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 66 (1992) ("Blackstone described it as 'a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded.'" (citing 3 W. Blackstone, Commentaries 23 (1783)).[3] More recently, Congress indicated its acceptance of the *Bivens* remedy through two laws it passed following the *Bivens* decision: the Federal Tort Claims Act (FTCA) and the Westfall Act.[4]

---

[3] Although today under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), courts cannot invoke a "federal general common law," to recognize "new claims" or recognize statutory causes of action in the absence of statutory authority, *see Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020), the inherent power to enforce the Constitution itself is neither statutory nor new. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing "long history of judicial review of illegal executive action"); *Franklin*, 503 U.S. at 65-70 (discussing presumption that when a cause of action exists, federal courts may order any appropriate relief).

[4] When it amended the FTCA in 1974, Congress made clear that any FTCA suit would operate in parallel with the right to bring a suit for damages under *Bivens*, not replace a *Bivens* action. 28 U.S.C. § 2680(h); *see Carlson v. Green*, 446 U.S. 14, 19-20 (1980) ("[T]he congressional comments accompanying [the FTCA] amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action."); James E. Pfander & David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117, 133 (2009) (noting Congress rejected a proposal that "would have eliminated the *Bivens* action altogether in favor of suits against the government for constitutional violations"). The Westfall Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563, is a further endorsement of a personal *Bivens* remedy, as the Act exempts claims "brought for a violation of the Constitution of the United States" from the Act's immunity/substitution regime. *See* H.R. Rep. No. 100-700 at 6 (1988) ("Since the Supreme Court's decision in *Bivens*, ... the courts have identified this type of tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, [the Act] would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights.").

41

*Bivens* was a Fourth Amendment case. The D.C. Circuit has found the logic of *Bivens* to apply to First Amendment claims, as well. *See Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977) (holding that *Bivens* damages were available for demonstrators' First and Fourth Amendment claims against law enforcement officers). Since *Dellums*, a long line of cases in this Circuit has applied *Bivens* to violations of demonstrators' constitutional rights (as detailed below).

The Supreme Court's approach to *Bivens* claims has evolved since its initial recognition of the remedy. In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Court created a two-step inquiry for deciding whether a *Bivens* claim is available. First, courts must assess whether the claim arises in a "new context," and second, if the context is new, the courts must then ask whether any "special factors" counsel "hesitation" in recognizing a *Bivens* remedy. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (summarizing *Abbasi*, 137 S. Ct. at 1857, 1859). Examples of "special factors" are foreign affairs, national security, *see Hernandez*, 140 S. Ct. at 746-47, and the existence of an "alternative remedial structure." *Abbasi*, 137 S. Ct. at 1858.

Nonetheless, although "expanding" *Bivens* is now "disfavored," *id.* at 1857, the Court did not close the door to all *Bivens* remedies, particularly ones that have long existed. Specifically, the Court in *Abbasi* affirmed that the "opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Id.* at 1856. The Court has not overturned or limited any of its *Bivens* precedents to their facts, despite repeated suggestions that it do so, *see, e.g., Hernandez*, 140 S. Ct. at 750 (Thomas, J., concurring); *Minneci v. Pollard*, 565 U.S. 118, 131-32 (2012) (Scalia, J., concurring).

Assuming for the sake of argument that the context here is "new" under *Abbasi*—as the Supreme Court's decisions recognizing claims in *Bivens*, in *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment), and in *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment) did not

concern the First Amendment or a Fourth Amendment claim about a protest—Plaintiffs nonetheless prevail. The Supreme Court's recent decisions do not cast doubt on Circuit precedent holding that *Bivens* is available for demonstrators' First and Fourth Amendment claims and declining to find "special factors" counseling "hesitation" in this context. Importantly, the existence of "new context" alone does not defeat a claim—otherwise the *Bivens* analysis would end at step one. Defendant Barr suggests that it should, Barr MTD 12 (citing *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018)), but that is not the Supreme Court's view, *see Hernandez*, 140 S. Ct. at 743 (affirming the Fifth Circuit's result but reiterating the *Abbasi* two-step framework rather than adopting the Fifth Circuit's suggestion that context alone ends the inquiry).

Rather, the key question here is whether "special factors" counsel "hesitation." More than four decades of precedent in this Court and the D.C. Circuit reflect that nothing about permitting a damages remedy for a violation of demonstrators' First and Fourth Amendment rights—particularly violations as egregious as those here—should cause a court to hesitate. And the special factors invoked by the Defendants are simply inapplicable to this case. The Court should faithfully apply this Circuit's cases recognizing a *Bivens* action for violating demonstrators' First and Fourth Amendment rights.

### A. Circuit precedent refutes the notion that "special factors" preclude recognizing constitutional damages claims for demonstrators' rights here and distinguishes this case sharply from those in which special factors exist.

Although the Court's two-step framework for assessing the availability of *Bivens* damages is new, the consideration of special factors in determining whether to apply *Bivens* is not. The "special factors" inquiry has existed since *Bivens* itself, 403 U.S. at 396 ("[t]he present case involves no special factors counselling hesitation"), and it existed when *Dellums* and its successor cases were decided. Yet the D.C. Circuit has never suggested that "special factors" preclude the

application of *Bivens* to enforce the First or Fourth Amendment rights of protestors. On the contrary, the D.C. federal courts have a long history of allowing *Bivens* First and Fourth Amendment claims on behalf of protestors.

Defendants do not dispute the availability of *Bivens* for excessive force claims generally—a point the D.C. Circuit has repeatedly reaffirmed. *See, e.g., Lash v. Lemke*, 786 F.3d 1, 5 n.2 ("There is no question that [a tased demonstrator] may pursue an excessive force claim under *Bivens*[.]"); *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015) (when "a federal law enforcement officer uses excessive force, contrary to the Constitution," that is "the classic *Bivens*-style tort" (quoting *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987); internal quotation marks omitted)). More specifically, in *Dellums*, no special factors prevented the court from applying *Bivens* to a context just like this one: where police violated the First and Fourth Amendments by disrupting a large demonstration in front of the seat of one of our three branches of government (in *Dellums*, the Capitol; here, the White House). If no special factors existed there and then, none exist here and now.

In *Dellums*, the D.C. Circuit considered First and Fourth Amendment claims asserted by demonstrators protesting the Vietnam War on the steps of the Capitol Building. 566 F.2d at 173. The court affirmed the verdict on the Fourth Amendment *Bivens* claims, *see id.* at 175-191, and concluded that federal courts were capable of addressing First Amendment *Bivens* claims as well, *see id.* at 194-95. Following *Dellums*, D.C. federal courts have repeatedly recognized *Bivens* damages claims for First and Fourth Amendment claims by demonstrators. *See, e.g., Lash*, 786 F.3d at 5 n.2 (D.C. Cir. 2014) (although U.S. Park Police officers were entitled to qualified immunity for using taser against a demonstrator resisting arrest, "[t]here is no question that Lash may pursue an excessive force claim under *Bivens*"); *Hobson v. Wilson*, 737 F.2d 1, 56, 62-63

(D.C. Cir. 1984) (upholding *Bivens* damages claim against FBI agents involved in targeting anti-war and pro-civil rights leaders, including by impeding protests, in violation of the First Amendment), *partially abrogated on other grounds, Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993); *Patterson v. United States*, 999 F. Supp. 2d 300, 303, 308-311, 317 (D.D.C. 2013) (denying motion to dismiss where demonstrator sued U.S. Park Police officers for retaliatory arrest in violation of his First and Fourth Amendment rights); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 50-54 (D.D.C. 2013) (denying motion to dismiss where plaintiff sued Secret Service agents under the First Amendment for attempting to intimidate her out of protesting near the White House); *Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154, 156-57, 159-61 (D.D.C. 2013) (recognizing *Bivens* claim could lie for violations of the First, Fourth, and Fifth Amendments where agents took and destroyed plaintiff's protest materials); *Lederman v. United States*, 131 F. Supp. 2d 46, 47, 57, 63 (D.D.C. 2001) (allowing *Bivens* claim for Capitol Police officer's arrest of demonstrator in violation of the First and Fourth Amendments), *rev'd on other grounds*, 291 F.3d 36 (D.C. Cir. 2002); *Torossian v. Hayo,* 45 F. Supp. 2d 63, 66 (D.D.C 1999) (dismissing case on qualified immunity grounds, but recognizing that "a *Bivens* action ... has been held to be available to plaintiffs claiming violations of the First and Fourth Amendments" against demonstrators); *Masel v. Barrett*, 707 F. Supp. 4, 11-12 (D.D.C. 1989) (denying defendant summary judgment on a demonstrator's *Bivens* excessive force claim).

Regardless of whether these cases can show that the context is not "new" for purposes of *Abbasi*, the D.C. Circuit's longstanding precedent recognizing *Bivens* remedies for First Amendment claims, Fourth Amendment excessive force claims, and specifically claims under both Amendments *by demonstrators*, show why no special factors counsel hesitation in recognizing such claims. These decisions continue to bind this Court today, in the absence of contrary Supreme

Court authority. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992). And in terms of harm to national security, foreign affairs, or any of the other reasons causing either the D.C. Circuit or the Supreme Court to hesitate in recognizing *Bivens* claims, the sky has not fallen despite the decades-long and ongoing recognition of *Bivens* damages claims in the protest context, including for activity near the White House, *see, e.g.*, *Hartley*, 918 F. Supp. 2d at 50-52, and at the Capitol, *see*, *e.g.*, *Dellums*, 566 F.2d at 173; *Lederman*, 131 F. Supp. 2d at 57, 63. Given that the D.C. Circuit has already recognized *Bivens* claims without finding that "special factors" counsel "hesitation" in the context of demonstrators' First and Fourth Amendment claims, refusing to recognize such a claim here would contravene Circuit precedent.

The contrast between the factual context of this case and those of the recent Supreme Court cases finding special factors counselling hesitation underscores how far apart this one is from those. Whereas *Abbasi* stressed caution in allowing judicially-created damages remedies as a means to change ongoing national security policy decisions made by high-ranking federal officials, 137 S. Ct. at 1860-1863, it did not speak to any "special factors" pertaining to domestic political demonstrators seeking compensation for egregious violations of their First and Fourth Amendment rights when federal forces violently attacked and disbanded their peaceful demonstration. And whereas *Hernandez* refused to extend *Bivens* to a shooting across the international border because foreign affairs, national security, and congressional acts limiting remedies for foreigners on foreign soil counselled hesitation, 140 S. Ct. at 744-47, it did not invite courts to cut off remedies where U.S. citizens exercising core political freedoms on U.S. soil are met with gratuitous brutality by federal officers. And neither of these decisions instructs the lower courts to abdicate judicial responsibility for *every* claim where federal officials assert a national security interest, however attenuated. Quite the contrary: *Abbasi* specifically admonished against the knee-jerk invocation of

security concerns to preclude a *Bivens* remedy, warning that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). Even more to the point here, the Court observed that danger of the "abuse" of this label is "heightened" in purely "domestic cases." *Id.*

Special factors that have recently caused the D.C. Circuit pause in applying *Bivens* are likewise far afield from this case. Although *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020), did involve a First Amendment *Bivens* claim, the plaintiff there sought damages for retaliatory administrative enforcement actions under the Financial Institutions Reform, Recovery, and Enforcement Act—a statute with its own detailed administrative enforcement scheme and circumscribed availability for judicial review. *See id.* at 384-85. The principle that a comprehensive alternative remedy forecloses *Bivens* is not new and has coexisted harmoniously for decades with this Circuit's *Bivens* jurisprudence regarding demonstrators' constitutional rights; indeed, the *Bivens* precedents most critical to the *Loumiet* holding were from the 1980s. *See id.* at 383-85 (focusing on *Schweiker v. Chilicky*, 487 U.S. 412 (1988), and *Bush v. Lucas*, 462 U.S. 367 (1983)); *accord Liff v. Office of Inspector Gen.*, 881 F.3d 912, 914-15 (D.C. Cir. 2018) (holding that comprehensive remedial scheme barred government contractor's suit against various government officials for reputational harm). And *Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015), which found that national security and foreign affairs counseled hesitation in allowing a claim concerning federal agents' actions with respect to a suspected terrorist in East Africa, is (literally) a world away from purely domestic law enforcement.

In sum, the special factors at issue in those cases are all far removed from the contexts of *Dellums* and this case and do not call into question Circuit precedent repeatedly recognizing *Bivens*

First and Fourth Amendment claims by demonstrators and declining to find any special factors counseling hesitation in this field.

**B. Presidential security and the other "special factors" invoked by Defendant Barr are misplaced here and do not overcome Circuit precedent.**

Defendant Barr argues that federal law enforcement officers' assault on demonstrators expressing their opposition to systemic racism and police brutality is impervious to a *Bivens* remedy because of national and presidential security concerns, the absence of congressional legislation providing a remedy, and hypothetical alternative remedies. While these kinds of concerns may preclude *Bivens* claims in some circumstances, they have no bearing here. Stripping Plaintiffs of a remedy would abdicate the judicial responsibility to provide a check against the Executive branch and would authorize brutality with impunity.

Defendant Barr devotes substantial ink to establishing that national/presidential security is, in the abstract, an interest of great weight. But he knocks at an open door; Plaintiffs dispute neither the importance of this interest nor that it can constitute a special factor for *Bivens* purposes in some circumstances. This is simply not such a circumstance.  Baldly asserting that the unprovoked attack on peaceful demonstrators was required by "presidential security" does not make it true. And on a motion to dismiss, a defendant's assertion that his actions were necessary because of facts beyond the complaint is entitled to no weight. That dispute is for trial, not a motion to dismiss.

Heeding *Abbasi*'s warning not to permit "national-security concerns" to "become a talisman used to ward off inconvenient claims," 137 S. Ct. at 1862, and emulating *Abbasi*'s focus on the narrow facts at issue rather than broad generalities, *see id.* at 1860 (considering "the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil" rather than the prison context generally), courts considering security arguments have not accepted them blindly but rather assessed their

relevance to the case at hand. *See Graber v. Dales*, 2019 WL 4805241, at *4 (E.D. Pa. Sept. 30, 2019) (allowing a *Bivens* claim to proceed against a Secret Service agent in connection with an arrest outside the 2016 Democratic National Convention because under the circumstances "the connection to national security is tenuous"); *Linlor v. Polson*, 263 F. Supp. 3d 613, 623 (E.D. Va. 2017) (allowing a *Bivens* remedy where a TSA officer used excessive force during a security screening: "The question is not whether airports present special security concerns—they do—but whether those concerns have any particular bearing on the context at issue in this case.").

Here, Defendants' security justification for the actions they took is, simply, a canard. There was no threat to the President posed by Plaintiffs and other protestors. The protestors were law abiding and peaceful. TAC ¶¶ 65-66. They were in Lafayette Square, not on the White House Lawn. There were no split-second, difficult decisions that needed to be made. On the contrary, the Defendants were the aggressors who initiated the entire confrontation.  TAC ¶¶ 77-88.

Lacking a factual basis in the complaint to assert his security concern, Defendant Barr posits the alarmingly broad theory that federal law enforcement can disperse protestors near the White House at any time, using any means, without judicial review, because there is always a potential presidential security threat. Barr MTD 14-15. That theory would obliterate the D.C. Circuit's instruction regarding Lafayette Square demonstrations to balance "First Amendment freedoms against safety requirements," *Quaker Action IV*, 516 F. 2d at 722, and replace it with the rule that every demonstrator on a public street or park in proximity to the White House is subject to being viciously beaten and tear-gassed at the whim of federal officers. Defendant Barr offers no limiting principle for *when* a presidential security interest legitimately counsels hesitation in applying *Bivens*. Under his theory, the President could demand to go anywhere, at any time, and send officers ahead to beat up anyone along the way. That is clearly wrong.

The Supreme Court has repeatedly reaffirmed that, "[w]hatever power the United States Constitution envisions for the Executive in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion); *accord Boumediene v. Bush*, 553 U.S. 723, 745 (2008); *see also Quaker Action I*, 421 F.2d at 1117 (noting that courts must make independent judgments regarding security threats asserted by the government). Moreover, sufficient deference to decisions made based on national security is embodied in the substantive First and Fourth Amendment standards themselves. *See, e.g.*, *Wood v. Moss*, 572 U.S. 744, 758-59 (2014); *Saucier v. Katz*, 533 U.S. 194, 208-09 (2001), *abrogated on other grounds, Pearson v. Callahan*, 555 U.S. 223 (2009). These standards provide ample latitude for federal officials to make security decisions and protect the President without the need for an extreme rule that federal officers' misconduct is immunized from judicial review merely by *invoking* a presidential security interest no matter the facts.

Defendant Barr's argument that congressional inaction in a heavily regulated field counsels hesitation, Barr MTD 16-21, is misplaced here, because he misidentifies the relevant field. Although Congress has legislated heavily in the field of presidential security, it has *not* "legislated pervasively," Barr MTD 21, on the topic of demonstrators' rights, particularly vis-à-vis federal actors. Nor would one expect it to, in light of the backdrop of Congress's implied acceptance of *Bivens* via the FTCA. *See Carlson*, 446 U.S. at 19-20 & n.5 ("[T]he congressional comments accompanying [the FTCA] amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action.").

Defendant Barr is also wrong that the possibility of injunctive relief or an FTCA remedy counsels against applying *Bivens* here. If the mere ability to sue for injunctive relief foreclosed *Bivens*, then the alternative-remedies exception to *Bivens* would swallow the rule. One can always

*seek* an injunction against threatened future conduct. *Abbasi*'s recognition that injunctive relief could provide an alternative remedy sufficient to foreclose *Bivens* was limited to a particular context: where "large-scale policy decisions" are being challenged. 137 S. Ct. at 1862. Here, Plaintiffs do not challenge a large-scale policy—or any policy at all. Rather, Plaintiffs challenge the acts taken on this specific day against this specific group of protestors (the damages claims) and the implied threat to take similar actions in the future at the President's whim (the injunctive relief claims). Further, *Abbasi*'s brief discussion of alternative remedies for challenges to policies does not purport to supplant the thorough treatment of the alternative remedies question in *Minneci v. Pollard*, 565 U.S. 118, 129-30 (2012), which is cited in *Abbasi* and remains good law. *Minneci* instructs that in general, "alternative remedies" must "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations." 565 U.S. at 130. That standard is not remotely met here. Given the difficulty of obtaining injunctive relief in many cases because of the absence of demonstrable future harm (a point Defendants argue here, U.S. MTD 11-14), injunctive relief alone will often be insufficient to deter officials from unconstitutional acts. Additionally, injunctive relief would not provide "roughly similar compensation to victims," because it would provide no compensation at all. *See Aref v. Lynch*, 833 F.3d 242, 265 n.17 (D.C. Cir. 2016) ("Injunctive relief ... cannot provide relief for past harms."). While an alternative remedy need not be "perfectly congruent" with *Bivens*, *Minneci*, 565 U.S. at 129, injunctive relief here falls so short as not to counsel hesitation.

As for potential recovery under the FTCA, Supreme Court precedent squarely holds that the FTCA is not an "alternative remedy" foreclosing *Bivens*. *Carlson*, 446 U.S. at 18-23. The Supreme Court has held that state tort law constitutes an "alternative remedy" for this purpose only

where the defendants were private entities. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72-73 (2001) (private prison company); *Minneci*, 565 U.S. at 120 (private prison guard). Here, because the *Bivens* Defendants are federal officers, the Westfall Act precludes tort claims against them arising under state law. *See Osborn v. Haley*, 549 U.S. 225, 229 (2007). Defendant Barr cites out-of-circuit cases to suggest that *Abbasi* implicitly overruled *Carlson*, Barr MTD 28, but these decisions go badly astray in arrogating to themselves a power that the Supreme Court has reserved: lower courts "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). One of the decisions on which Defendant Barr relies regarding the FTCA did not even *mention* the FTCA ruling in *Carlson*. *See Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020). And nothing in *Abbasi* comes close to overruling *Carlson*; it nowhere suggested that the FTCA forecloses *Bivens*. This Court should follow the many other courts that have recognized that the FTCA does not preclude a *Bivens* remedy, even after *Abbasi*. *See, e.g. K.O. v. ICE*, 2020 WL 3429697, at *11 n.3 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5255 (Aug. 26, 2020); *Bueno Diaz v. Mercucio*, 442 F. Supp. 3d 701, 710-11 (S.D.N.Y. 2020); *Linlor v. Polson*, 263 F. Supp. 3d 613, 620-21 (E.D. Va. 2017).

In sum, as Chief Justice Marshall recognized two centuries ago, it is the essence of the rule of law that rights be paired with remedies. *Marbury*, 5 U.S. at 163. Although in some instances, special factors require a "hard 'balance to be struck'" that is "best left to Congress," *Loumiet*, 948 F.3d at 385 (quoting *Abbasi*, 137 S. Ct. at 1863), this is not such a case. Rather, this Circuit has for decades applied *Bivens* to protect demonstrators' First and Fourth Amendment rights without finding that "special factors" foreclosed these types of claims. Defendant Barr's arguments provide no basis to disregard the D.C. Circuit's longstanding approach. On the contrary, abdicating judicial

responsibility for enforcing the Constitution would fail to deter a type of grave constitutional affront that is both at the core of *Bivens* and at the core of our democracy—unchecked governmental violence unleashed on those exercising their First Amendment right "peaceably to assemble, and to petition the Government for a redress of grievances."

### C. Attorney General Barr's rank does not automatically exclude him from *Bivens*, nor would discovery against him be unmanageable.

Defendant Barr raises one type of "special factor" applicable only to himself and none of the other federal Defendants: his status as a high-ranking official. But high-ranking officials are not categorically immune from *Bivens*. Rather, where a high-ranking official participates personally in a violation (as Plaintiffs have plausibly alleged here, *see* Part IV below), liability can attach—as both the Supreme Court and D.C. Circuit have held. *See Davis*, 442 U.S. 228 (Member of Congress liable under *Bivens*); *Dellums*, 566 F.2d at 173 n.1 (defendants in proper *Bivens* action included U.S. Attorney General and Deputy Attorney General).

The Court has said that *Bivens* claims against high-ranking officials are inappropriate if they "would call into question the formulation and implementation of a general policy," and in turn lead to intrusive discovery that would "border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question." *Abbasi*, 137 S. Ct. at 1860-61. Defendant Barr invokes both concerns, but neither applies here. Plaintiffs do not allege that the U.S. government has a policy of attacking peaceful demonstrators, and Defendant Barr does not suggest that it does. Accordingly, discovery would not touch upon "the discussion and deliberations that led to the formation of [any] policy." The Court has noted that careful judicial supervision of the timing and scope of discovery can make litigation against high-ranking officials, even Presidents, manageable. *See Clinton v. Jones*, 520 U.S. 681, 691-92 (1997); *accord Trump v. Vance*, 140 S. Ct. 2412, 2430 (2020); *Crawford-El v. Britton*, 523 U.S. 574, 598-600 (1998). And

53

the distraction concern is completely undercut by the fact that both Defendants Trump and Barr will be out of office by the time discovery commences in this case. *See Aguilar v. ICE*, 2011 WL 13258226, at *3 (S.D.N.Y. Jan. 11, 2011) (rejecting government defendants' concerns about burdens of discovery as "misplaced" where certain defendants "no longer work for the Government"). The Court has also rejected the proposition that conversations between the President and his aides must always be shielded from discovery. *See United States v. Nixon*, 418 U.S. 683, 703-13 (1974). In any event, even if conversations between President Trump and Attorney General Barr were protected from discovery, that protection would be enforced by a specific limitation on discovery, not the wholesale dismissal of claims.

Defendant Barr's authorities regarding dismissal of *Bivens* claims against a former Attorney General are easily distinguishable, as they involved challenges to government policies, not to specific actions taken on a particular occasion. *See Mejia-Mejia v. ICE*, 2019 WL 4707150, at *4-*5 (D.D.C. Sept. 26, 2019); *K.O.*, 2020 WL 3429697, at *10. Indeed, the plaintiffs in those cases made no allegations that the then-Attorney General personally took or directed specific actions toward them. *Mejia-Mejia*, 2019 WL 4707150, at *4 n.5; *accord K.O.*, 2020 WL 3429697, at *10 (noting that the challenged conduct and legal theories were the same as in *Mejia-Mejia*). Therefore, these suits were "collateral challenge[s] to a government-wide policy[,]" not "discrete conduct" amenable to a *Bivens* claim. *Mejia-Mejia*, 2019 WL 4707150, at *4. Because this case involves discrete conduct, a *Bivens* claim is available against Defendant Barr.

## III.    The D.C. Defendants Seized Plaintiffs Foley And E.X.F. (Claims 7 & 8).

Independent of their claim to qualified immunity based on the circumstances of their use of force, the D.C. Defendants—but not any of the federal defendants—try to avoid the Fourth Amendment inquiry entirely by arguing that tear-gassing people does not "seize" them. D.C. MTD

22-24. It is clear under both binding and persuasive authority that they are wrong. The "application of physical force to restrain movement, even when it is ultimately unsuccessful" is sufficient to constitute a seizure. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *accord United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). Indeed, the concept of a seizure encompasses "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee." *Hodari D.*, 499 U.S. at 624; *accord id.* at 625 (arrest occurs at "the slightest application of physical force, despite the arrestee's escape"). The means to restrain the subject's movement must be "intentionally applied." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596-97 (1989). An arrest need not have resulted. *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 391 (D.D.C. 2016).

The D.C. Circuit and this Court have recognized that even a momentary limitation of a person's freedom of movement (or the person's submission to authority) is a seizure if it results from means intentionally applied. *See Brodie*, 742 F.3d at 1061 (seizure occurred for the moment suspect put his hands on a car as directed by police, even though he subsequently fled); *Kyle*, 177 F. Supp. 3d at 390-92 (partygoer seized when she was shoved into a barbeque by police officer, because "a seizure can be accomplished in an instant, and there is no minimum time that a plaintiff's freedom of movement must be terminated in order to establish that a seizure has occurred" (citation and internal quotation marks omitted)). Other circuits agree. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1208-09 (8th Cir. 2013) (where officer's "bull rush" knocked subject ten to fifteen feet backward, "a seizure occurred the moment [the officer] charged into [the subject]"); *Nelson v. City of Davis*, 685 F.3d 867, 875-76 (9th Cir. 2012) (person rendered temporarily "immobile" by a projectile filled with pepper spray was seized); *Slusher v. Carson*, 540 F.3d 449, 452, 454-55 (6th Cir. 2008) (plaintiff seized when an officer momentarily grabbed her hand); *Acevedo v. Canterbury*, 457 F.3d 721, 723-25 (7th Cir. 2006) (subject seized by single

punch that caused him to fall, in spite of the fact that he got back to his feet; "[t]he fact that the restraint on the individual's freedom of movement is brief makes no difference").[5]

That principle answers Defendants' argument. Plaintiffs Foley and E.X.F. allege that Defendants intentionally applied physical force—specifically, tear gas—to restrain their movement by making them choke and cough and by making their eyes burn. TAC ¶¶ 193-96. And in fact the tear gas did force Plaintiffs to halt and "take shelter" as they attempted to recover. *Id.* ¶ 195. The result was not merely a restraint but a nonconsensual bodily intrusion as the gas entered Plaintiffs' lungs.[6]

---

[5] The District's purportedly contrary authorities prove little. *White v. City of Markham*, 310 F.3d 989 (7th Cir. 2002), which did not involve chemical irritant, *did not even resolve* whether a seizure had occurred on the facts of that case. *See id.* at 955 ("[I]t is unclear whether a seizure occurred. We do not need to answer that question ...."). And *Slocum v. Palinkas*, 50 F. App'x 300, 302 (6th Cir. 2002), involved a push, not chemical irritant, and although that unpublished case is arguably in some tension with the decisions cited above, the Sixth Circuit's authoritative view of the matter is set forth in its subsequent *precedential* decision (cited above) in *Slusher*.

[6] Although the Court need not reach the question because Plaintiffs did halt, federal courts applying these rules routinely hold that, when an officer intentionally sprays a person with pepper spray, that person is seized, *regardless* of whether the person halts. *See McCracken v. Freed*, 243 F. App'x 702, 708 (3d Cir. 2007) (plaintiff seized when law enforcement threw pepper spray canisters into her house "with the intent of temporarily debilitating any persons occupying the home" (citation and footnote omitted)); *Bettencourt v. Arruda*, 2012 WL 5398475, at *7-*8 (D. Mass. Nov. 1, 2012) (evidence showed seizure where plaintiff "was subjected to physical force that was applied by [Officer] Arruda for the purpose of restraining his movement" when "Arruda pulled him by the arm and sprayed him with pepper spray," even though it "did not stop him" and plaintiff was able to drive away afterward); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005) (plaintiffs seized when pepper-sprayed "because the Defendant Officers dispersed [pepper spray] in an attempt to gain physical control over those individuals"); *Yelverton v. Vargo*, 386 F. Supp. 2d 1224, 1228 (M.D. Ala. 2005) ("Officer Vargo's pepper spraying of McConnell constituted a seizure even though it did not stop him."); *accord Pluma v. City of New York*, 2015 WL 1623828, at *4 (S.D.N.Y. Mar. 31, 2015); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241 (W.D. Wash. 2009). And courts have specifically held that using pepper spray to *redirect* demonstrators constitutes a seizure. *See Jennings v. City of Miami*, 2009 WL 413110, at *9 (S.D. Fla. Jan. 27, 2009); *Marbet v. City of Portland*, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003); *see generally Brendlin v. California*, 551 U.S. 249, 254 (2007) (seizure occurs when officer "terminate or *restrains* [subject's] freedom of movement" (emphasis added)).

That Plaintiffs were not individually targeted by Defendants, but instead were part of a larger group at which Defendants' use of force was aimed, does not alter the fact that they were seized (contrary to the D.C. Defendants' argument, D.C. MTD 23). As the Supreme Court has explained, an "unintended person may be the object" of a seizure so long as the act itself is "willful" rather than "unknowing." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up); *accord Brower*, 489 U.S. at 596. Applying this principle to circumstances like those here, one federal court of appeals held that where officers shot projectiles at a group of demonstrating students, a student struck by one of them was seized even if he had not been individually targeted:

> [T]he officers' conduct resulted in Nelson being hit by a projectile that they intentionally fired towards a group of which he was a member. Their conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's person as well as the termination of his movement. Nelson was therefore intentionally seized under the Fourth Amendment.

*Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012). The same reasoning applies here: by firing pepper spray at the group of fleeing demonstrators that included Plaintiffs Foley and E.X.F., Defendant officers intentionally applied physical force to restrain their movement. Plaintiffs Foley and E.X.F. have sufficiently alleged that the D.C. Defendants seized them within the meaning of the Fourth Amendment.

## IV. As Pleaded In The Complaint, Both Defendant Barr And The D.C. Defendants Participated In The Violations Alleged (Claims 1, 2, 7 & 8).

Defendant Barr and the D.C. Defendants are incorrect that the complaint seeks to impose liability for constitutional violations in which they did not participate. Barr MTD 30-32; D.C. MTD 17-20. Although *respondeat superior* liability is not permitted for constitutional torts, both *Bivens* and 42 U.S.C. § 1983 impose liability where a defendant was "personally and directly involved" in the constitutional violation. *Johnson v. District of Columbia*, 67 F. Supp. 3d 157, 164 (D.D.C.

2014) (discussing *Bivens*); *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 59 (D.D.C. 2008) (discussing § 1983). It is not necessary that a defendant be solely responsible for the violation; rather, under ordinary tort-law principles applicable to § 1983 and *Bivens* actions, "where several independent actors concurrently or consecutively produce a single, indivisible injury," each is liable. *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 41 (D.D.C. 2012), *aff'd*, 765 F.3d 13 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018). The personal-involvement standard is satisfied as to both Defendant Barr and the D.C. Defendants.

**A.  Plaintiffs have sufficiently alleged the personal involvement of Defendant Barr.**

As alleged in the complaint, on June 1, "[a]t approximately 6:08 pm, Defendant Barr entered Lafayette Square," and minutes later, after "pointing north towards St. John's Church ... Defendant Barr personally ordered that Lafayette Square be cleared," TAC ¶¶ 78-79; *see also* TAC ¶¶ 202 ("Attorney General Barr personally ordered law enforcement officers to forcibly remove Plaintiffs and other class members from Lafayette Square and its vicinity"). These allegations are based on a Justice Department statement and reporting by the Washington Post.

These plausibly-pleaded allegations show that Barr directly and personally participated in the alleged unconstitutional conduct. Ordering something to be done is a form of participating and has nothing to do with *respondeat superior,* which holds a supervisor liable for conduct of which he may not even have knowledge. Accordingly, officials are liable for ordering unconstitutional conduct. *See Keating v. City of Miami*, 598 F.3d 753, 758, 766-67 (11th Cir. 2010) (rejecting qualified immunity for supervisory officers who ordered dispersal of peaceful protest); *Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81, 91-94 (D.P.R. 2012) (same). It does not matter that Plaintiffs do not at this stage have the exact words that Defendant Barr used and cannot precisely parcel out how much of the instructions came from Defendant Barr and how much from other

Defendants; that is what discovery is for, not motions to dismiss. Were the law otherwise, Plaintiffs would be required to plead facts they could not reasonably be expected to have.

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), on which Defendant Barr relies, cannot be read to rule out every allegation against a high-ranking official. That would make the most powerful the least accountable. Rather, the allegations in *Iqbal* failed because they made a wholly conclusory inference—a "formulaic recitation of the elements"—for which Plaintiffs had no factual basis. *Id.* at 681 (citation and internal quotation marks omitted). Here, by contrast, the Department of Justice admitted the fact on which Plaintiffs rely: that Defendant Barr ordered the challenged conduct. TAC ¶ 79.

**B. Plaintiffs have sufficiently alleged the involvement of the D.C. Defendants.**

The Court need not tarry long with the D.C. Defendants' efforts to disclaim responsibility for *any* wrongdoing simply because they are not accused of wrongdoing at Lafayette Square itself. D.C. MTD 17-20. As the complaint makes clear, the D.C. Defendants' attack on the fleeing demonstrators constituted excessive force (because Plaintiffs posed no threat and broke no laws) and violated Plaintiffs' First Amendment rights by further dispersing them. TAC ¶¶ 72-75, 84-87, 100-03, 107, 190-98. Just because the D.C. Defendants are not responsible for the entire course of unlawful conduct does not mean they can escape liability for the part in which they participated. *Wesby*, 841 F. Supp. 2d at 41.

And there is obviously no excuse for what the D.C. Defendants did. No force at all was needed to ensure that the protestors fleeing the federal attack were channeled south down 17th Street NW; all the D.C. Defendants had to do was maintain their formation blocking off the north and west sides of the intersection of 17th and H Streets NW, and the demonstrators would have

continued south on their own. There was no threat to the officers or to anyone else from the fleeing

demonstrators. The D.C. Defendants heaped violence on top of violence—for no reason at all.

## V.      Plaintiffs Have Standing, Including For Equitable Relief (Claims 3, 4, 5, 6, 9 & 10).

The federal official-capacity Defendants challenge Plaintiffs' standing. U.S. MTD 9-22.

To establish standing, a plaintiff must "present an injury that is concrete, particularized, and actual

or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by

a favorable ruling." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Davis*

*v. FEC*, 554 U.S. 724, 733 (2008)).[7] At the motion-to-dismiss stage, "the factual allegations in the

complaint are assumed to be true" and a plaintiff need only "'state a *plausible* claim' that each of

the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625, 627 (D.C. Cir. 2017)

(internal citation omitted). The case may proceed if even one plaintiff has standing. *Carpenters*

*Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017). Plaintiffs seeking prospective relief must

show "an ongoing injury or ... an immediate threat of injury." *Dearth v. Holder*, 641 F.3d 499, 501

(D.C. Cir. 2011). Plaintiffs here have plausibly alleged both.

### A.   Plaintiff BLMDC has plausibly alleged both past and present, ongoing injury.

To establish organizational standing, an organization must show "actual or threatened

injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a

favorable court decision." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir.

2015) (citation and internal quotation marks omitted). One way to establish such an injury is to

show: (1) "the [defendant's] action or omission to act injured the [organization's] interest" and (2)

---

[7] Defendants suggest there are four elements to standing—the three traditional Article III elements and an additional likelihood-of-injury element under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). U.S. MTD 10. In fact, *Lyons* considered the likelihood question under the injury prong of Article III standing. 461 U.S. at 101-02. Regardless, whether the likelihood question is a part of the injury showing or a freestanding requirement is irrelevant to the outcome.

"the organization used its resources to counteract that harm." *Id.* (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Ag.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) ("*PETA*")). BLMDC has met both parts of this test. Its past injuries justify damages (Claims 5 & 6), and its ongoing injuries entitle it to seek injunctive relief (Claims 3, 4, 5, 6, 9 & 10).

As to the first prong of the inquiry, BLMDC's mission "is to end systemic racism, in particular the racially disproportionate use of state-sanctioned violence against the Black community"; it carries out this mission "through protests [and] public accountability campaigns," among other tactics. TAC ¶ 117. Defendants' unconstitutional attack at Lafayette Square injured BLMDC's mission by hindering one of its primary means for carrying out its mission—protests against government violence. The hindrance has arisen both because of the fear among BLMDC's members that future demonstrations will be met with government violence of the type challenged here, TAC ¶ 123, and because the injuries to BLMDC's members are causing a drop in organizational activity. Specifically, traumatized members took time off from organizational activities like organizing and outreach, the organization refrained from participating in demonstrations, and attendance at organizational activities has dropped. TAC ¶¶ 122, 124, 125. Accordingly, Defendants' actions "have perceptibly impaired the organization's programs" by making "the organization's *activities* more difficult." *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up).

As to the second organizational-standing element, BLMDC has diverted and is diverting resources to "assess[] and plan[] for potential violence by police," and to meet "increased needs for medical support and supplies to counteract the effects of chemical agents." TAC ¶ 126a. BLMDC has also diverted resources to "arrange for transportation from the demonstration for

[injured] persons" and "facilitate medical care." *Id.* ¶ 126d-e. These measures are directly "[i]n response to Defendants' actions." TAC ¶ 126.

Additionally, because of Defendants' wanton use of force at Lafayette Square, members and supporters have become fearful of attending BLMDC protest events, TAC ¶ 125—thereby further undermining BLMDC's effectiveness and requiring BLM to spend resources to counteract this fear by "enhanc[ing] efforts to educate members and supporters regarding the potential dangers of police violence, how to protect themselves, and what to do if there is another assault like the one in Lafayette Square" and launching a "communications campaign about the events in Lafayette Square to reduce the deterrent effects of Defendants' actions on the participation of their members or supporters." TAC ¶ 126b-c. Thus, Defendants' Lafayette Square attack has caused a "'drain on the organization's resources,' not 'simply a setback to the organization's abstract social interests.'" *Vote Forward v. DeJoy*, 2020 WL 5763869, at *5 (D.D.C. Sept. 28, 2020) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011)).

That BLMDC has taken these actions voluntarily "does not automatically mean that it cannot suffer an injury sufficient to confer standing." *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). The inquiry "focus[es] on whether [the organization] undertook the expenditures *in response to, and to counteract*, the effects" of defendants' actions. *Id.* Here, as the complaint makes clear, BLMDC's actions are in direct response to, and attempt to counteract, the effects of Defendants' actions on BLMDC's activities. *See* TAC ¶¶ 125-27.

Contrary to Defendants' suggestion that BLMDC "says nothing of a likelihood of a future constitutional violation," U.S. MTD 20, BLMDC's diversions of resources are ongoing. As stated in the complaint, "[t]he time and effort BLMDC has expended due to Defendants' conduct has reduced its capacity" to carry out its usual activities and "[t]his *is curtailing* the organization's

capacity to fulfill its mission." TAC ¶ 127 (emphasis added); *see Garnett v. Zeilinger*, 2020 WL 5411295, at *7 (D.D.C. Sept. 9, 2020) (finding standing where "at least some of [plaintiff organization's] increased expenditures ... are ongoing, and there is no indication in the record that [plaintiff] will cease these expenditures in the future" (record citations omitted)).

BLMDC's claim is different from that of the plaintiff in *Food & Water Watch*, on which Defendants rely. There, the plaintiff consumer-advocacy organization claimed that new regulations would result in inadequate food inspections and thus would require the organization to spend resources educating its members. 808 F.3d at 920. But the organization failed to show that its "organizational *activities* have been perceptibly impaired in any way." *Id.* at 921 (emphasis added). The organization continued to communicate with members as before, even if the challenged actions motivated it to say new things. By contrast, BLMDC's activity of organizing people to participate in protests *has* been impeded; as discussed, its work has been interrupted and obstructed in concrete ways. This distinction—between concretely hindering an organization's activities (as here) and a mere "abstract injury to its interests," *id.*—is critical to the first prong of the organizational standing analysis. As this Court recently explained, where an organization cannot "identify any organizational activities the Department's actions have impeded directly," it simply does not meet the first prong of the test, no matter how many resources it diverts in response to the alleged harm. *Weingarten v. Devos*, 2020 WL 3412730, at *8 (D.D.C. June 22, 2020). In both *Food & Water Watch* and *Weingarten*, the government's regulatory failures may have made the organizations feel that they had to work harder to educate their members, but the government's actions did not hinder the education work itself. That is not the case here; BLMDC's organizational activities have been directly impeded by Defendants' actions.

And, unlike the plaintiffs in *Food & Water Watch* and *Weingarten*, BLMDC has been forced to divert its resources in response, just to try to maintain levels of participation in its actions. TAC ¶ 126b-c. In other words, the government's actions have forced BLMDC to make expenditures to counteract the direct effect those actions are having on the organization's activities. This effect amounts to an "inhibition of [plaintiff's] daily operations, an injury both concrete and specific to the work in which [it is] engaged"—which suffices for standing. *PETA*, 797 F.3d at 1094 (citation and internal quotation marks omitted). *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13 (D.C. Cir. 2011), which Defendants cite, is not to the contrary; the court there did not rule out standing based on a diversion of resources to educate and communicate with members to counteract a harm to the organization; rather, it held that the challenged practice did not cause the injury to which the plaintiff organization was responding. *See id.* at 26-28. Additionally, beyond education, BLMDC has had to plan for medical support and supplies protecting against chemical irritants; arrange for transportation; and facilitate medical care. TAC ¶ 126. These efforts have reduced BLMDC's capacity to carry out its ordinary programming. TAC ¶ 127. Thus, these expenditures are "concrete drains on [its] time and resources" that "are sufficiently tangible to satisfy Article III's injury-in-fact requirement." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 29 (D.C. Cir. 1990).

Defendants' other authorities, U.S. MTD 20-21, are plainly inapposite: the plaintiffs in those cases, unlike the Plaintiffs here, alleged no impairment of activities requiring concrete diversions of resources. *See Cigar Ass'n of Am. v. FDA*, 323 F.R.D. 54, 62 (D.D.C. 2017) (no standing where "[e]ach organization does no more than assert that it will have to expend some undefined amount of additional resources"); *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 259 (D.D.C. 2016) (no standing where organization "has not explained how the

[challenged action] has forced it to divert or modify its activities in any meaningful way from its standard programmatic efforts").

BLMDC's actions are not comparable to the fears of "potential future surveillance" rejected in *Clapper v. Amnesty International USA*, 568 U.S. 398, 414 (2013), because unlike that case, where the plaintiffs could not state whether they had *ever* been surveilled, *see id.* at 411 (noting that uncertainty in and of itself "substantially undermines [plaintiffs'] standing theory"), there is no question even at this preliminary stage that the Lafayette Square attack has had a direct effect on BLMDC's members. The fact that BLMDC is taking self-protective steps based on a probabilistic harm is no barrier to standing; the Supreme Court has repeatedly recognized such steps as sufficiently related to the challenged harm to ground standing. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154-55 (2010) (farmers had standing to challenge agency decision to deregulate genetically modified crops because they had to take protective measures for their crops based on the possibility that they would become contaminated with modified genes); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181-84 (2000) (individuals' decisions to stop using river for recreational activities based on possibility it was contaminated were sufficient for standing). The problem in *Clapper* was that the required inference supporting the plaintiffs' changed behavior was "highly speculative," 568 U.S. at 410; *see also id.* at 419-20 (distinguishing, but not casting doubt on, *Friends of the Earth* and *Monsanto*), not that an inference was required at all.

### B.  Plaintiffs are at substantial risk of future injury because the federal Defendants have asserted both the power and desire to "dominate" protesters like Plaintiffs.

As a threshold matter, Defendants misstate the law when they claim that Plaintiffs must show "that a threatened injury is 'certainly impending.'" U.S. MTD 11, 22. Recent Supreme Court decisions hold that an allegation of future injury "may suffice if the threatened injury is certainly

65

impending, *or there is a substantial risk* that the harm will occur." *Dep't of Commerce*, 139 S. Ct. at 2565 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); emphasis added). The Supreme Court case that comes closest to suggesting otherwise, *Clapper*, predated these authorities and discussed the issue only in dicta. *See* 568 U.S. at 414 n.5 (holding that plaintiffs failed to meet the standing requirement under either test). Recognizing that point, the D.C. Circuit has specifically held that "substantial risk" is sufficient and has repeatedly applied that test. *See Attias*, 865 F.3d at 626-27 (citing examples).

Plaintiffs here have shown a substantial risk of future injury. Plaintiffs need not allege the specifics of how or when Defendants carry out their threatened actions. At this stage, this Court need only conclude that Plaintiffs' allegations have "plausibly alleged a risk of future injury that is substantial enough to create Article III standing." *Id.* at 626; *see also In re Navy Chaplaincy*, 697 F.3d 1171, 1177 (D.C. Cir. 2012) (plaintiffs' allegations that challenged conduct will likely result in harm need only be "sufficiently non-speculative to support standing").[8]

The threat of repetition of Defendants' deployment of violence against lawful and peaceful demonstrators is substantial because Defendants themselves have made clear they believe they are entitled to respond that way to any demonstration. The day after the Lafayette Square attack, Defendant Trump gloated on Twitter about the use of "overwhelming force" to achieve "[d]omination" in the District of Columbia. TAC ¶ 205. Defendant Trump has additionally urged governors to "dominate" protesters, TAC ¶ 57, and stated that "when the looting starts, the

---

[8] Because the individual Plaintiffs do not rely on a "chilling effect" alone but also the threat of future harm, Defendants' discussion of *Laird v. Tatum*, 408 U.S. 1 (1972), is inapposite. *See id.* at 13 (finding plaintiffs lacked standing where "their claim, simply stated, is that they disagree with the judgments made by the Executive Branch with respect to the type and amount of information the Army needs and that the very existence of the Army's data-gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights").

shooting starts." TAC ¶ 54. And Defendant Trump has threatened to deploy military forces to confront protesters. TAC ¶ 61. Defendant Esper has described public spaces as "battlespaces" which law enforcement should "dominate" during protests. TAC ¶ 59. These statements come from officials with the power to order the threatened violence, and they come on the heels of the actual use of unlawful violence against Plaintiffs and others—reflecting intent to continue violating Plaintiffs' and other protestors' constitutional rights.

Defendants' argument that Plaintiffs' standing fails because their risk of future harm "depend[s] on a series of speculative events," U.S. MTD 13, is based on a misreading of both *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983), and the complaint here. *Lyons* involved a "*sequence of individually improbable events*"; it did not create a "per se rule denying standing to prevent probabilistic injuries." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1162 (11th Cir. 2008) (emphasis added). Defendants overstate the chain of contingencies required for the challenged harm to recur. Defendants' suggestion that, for further governmental violence to occur, "the demonstration would need to *prompt* a response by federal law enforcement," U.S. MTD 14 (emphasis added), ignores the gravamen of the complaint: that Defendants' wanton acts of violence here were entirely unprovoked. Further, Defendants have asserted authority to "dominate" protesters and put them to flight *without regard* for whether protesters were engaged in unlawful activity. Unlike in *Lyons*, no unlawful conduct by Plaintiffs is necessary here for them to be once again subject to Defendants' violence. Plaintiffs cannot be expected to avoid future injury when their conduct is "entirely innocent" and "there is no tenable argument that [P]laintiffs should avoid" such behavior. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (en banc); *cf. Honig v. Doe*, 484 U.S. 305, 320 (1988) (Court is generally "unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or

her at risk of that injury"). Plaintiffs' "engag[ing] in an activity protected by the Constitution" is a "critical factual distinction between *Lyons* and the instant case ... dictat[ing] a different result." *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990). Not only were Plaintiffs "not engaged in any form of misconduct"; they were "exercising a fundamental Constitutional right." *Id.* at 234-35.

Plaintiffs have specifically alleged that they intend to continue demonstrating against police brutality, TAC ¶ 176, 201, including at the White House. TAC ¶ 129. Thus, the only question is whether Defendants will once again wield force to disperse protesters—far from the long parade of contingencies Defendants invoke. *See, e.g., Williams v. Wilkinson*, 132 F. Supp. 2d 601, 605-06 (S.D. Ohio 2001) (finding standing where "only one step would be necessary to reach the complained of conduct"). That possibility poses a substantial risk because of Defendants' broad assertions of authority, their demonstrated willingness to deploy it, and their rank: the threat of future harm here comes from the most powerful officials in the federal government—hardly a "sporadic, random practice of government officers gone rogue." *Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276, 1290 (S.D. Fla. 2018).

Unsurprisingly, courts around the country considering lawsuits over unlawful policing tactics in response to protests have issued injunctive relief. *See, e.g., Black Lives Matter Seattle-King County v. City of Seattle*, 2020 WL 3128299, at *5 (W.D. Wash. June 12, 2020); *Don't Shoot Portland v. City of Portland,* 2020 WL 3078329, at *4-*5 (D. Or. June 9, 2020); *Abay v. City of Denver,* 445 F. Supp. 3d 1286, 1294-95 (D. Colo. 2020). Plaintiffs here likewise state a "plausible" claim for standing. *Attias*, 865 F.3d at 625.

**VI.    Plaintiffs Have Stated Claims Against The District Of Columbia Because The District Was Deliberately Indifferent To The Need To Train Its Officers Regarding Limits On The Use Of Chemical Irritants Against Demonstrators (Claims 9 & 10).**

Defendant District of Columbia contends that Plaintiffs have not sufficiently pleaded municipal liability, D.C. MTD 28-41, but the complaint plausibly alleges that the District's failure to train its officers amounts to deliberate indifference. Municipalities are liable for constitutional violations caused by their deliberately indifferent failures of training. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference is shown where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390; *accord Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003). This may occur where (1) "police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need" or where (2) city policymakers "know to a moral certainty that their police officers will be required to" engage in a particular task, yet fail to train them for this task. *Id.* at 390 n.10.  The District's failure to train its officers regarding the circumstances of June 1, 2020 meets both standards.

No specific incidents were necessary here to put the District on notice of the need for training regarding chemical irritants specifically and the constitutional handling of demonstrations generally. As the nation's capital, the District of Columbia is a unique venue for demonstrations. And the District was of course aware that it had issued chemical irritants to its officers policing demonstrations. *See* MPD Standard Operating Procedures 16-01, Attach. E, § F(3) & F(5) (discussing uses of "chemical force" and "OC spray dispensers," i.e., pepper spray),

69

https://go.mpdonline.com/GO/SOP_16_01.pdf. Indeed, this is a tactic that the D.C. Code specifically regulates. *See* D.C. Code § 5-331.16(b) (limiting uses of "chemical irritant"). District officials therefore "kn[e]w to a moral certainty" that MPD officers would be required at some point to police demonstrations at which they would need to determine how and when to deploy (or not deploy) their chemical weapons.

Additionally, the District has a history of using excessive force against peaceful demonstrators. TAC ¶ 110. The District objects that the incidents Plaintiffs cite, even the use of force against unresisting demonstrators during the 2017 Inauguration Day protests, are too dated to put the District on notice that it needed training prior to the June 2020 assault at issue here. But the District provides no basis to conclude that the need for training regarding the constitutional limits on the use of chemical irritants would have diminished with the passage of time. And the District's authorities on this point, *see* D.C. MTD 36-37, all resolved motions for judgment (summary or otherwise), not motions to dismiss. *See Moore v. District of Columbia*, 79 F. Supp. 3d 121, 123 (D.D.C. 2015); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 15 (D.D.C. 2011); *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 41 (D.D.C. 2005); *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 138 (D.D.C. 2003). Therefore, the question in those cases was whether plaintiffs had *evidence* of what the District should have known. Prior to discovery, however, such evidence is much harder for plaintiffs to obtain, so less fully developed allegations are acceptable. *Kelleher v. Dream Catcher, LLC*, 263 F. Supp. 3d 322, 325-26 (D.D.C. 2017). And none of Defendants' authorities imposed a hard-and-fast rule about how recent incidents must be to provide relevant notice. *Cf. Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 187, 197-200 (D.D.C. 2011) (rejecting judgment as a matter of law for District where plaintiff sued the District over a constitutional violation that occurred in 2005 and relied on a Civilian Complaint

Review Board report from 2003 that in turn looked at statistics regarding police conduct from 1995-2000). In denying in part the motion to dismiss in *Horse v. District of Columbia*, No. 1:17-cv-01216 (D.D.C. Sept. 27, 2019), this Court held that, at the motion to dismiss stage, examples from more than a decade before the conduct at issue (including many of the same examples Plaintiffs cite in their complaint here), sufficed to state a plausible claim for municipal liability on a failure-to-train theory. *See* Tr. of Oral Decision 70-72 (copy attached).

There are two possible inferences one might draw from the fact that some of Plaintiffs' examples are not recent: either these incidents reflect outdated information about a problem the District could reasonably expect to have gone away, or they show a pervasive, tenacious problem that has gone inadequately addressed for more than a decade. Plaintiffs have alleged a number of incidents of excessive force in which chemical irritants were deployed against unresisting demonstrators, TAC ¶ 110, followed by repeated "unjustified and excessive use of batons and chemical irritants causing significant physical injuries" in the weeks after the Lafayette Square attack. TAC ¶ 114a. These facts suggest a pervasive problem that the Department had failed to fix previously rather than a spontaneous reemergence of a problem that had subsided or that the Department had addressed. *See Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 38 (D.D.C. 2010) ("[T]he Court can plausibly infer from the facts animating plaintiffs' allegations that the [violations] were not the result of rogue officers acting contrary to their training. In other words, given the variety of abuses, the number of officers, and time period during which these abuses allegedly took place, plaintiffs have raised an inference that the combination of these factors can demonstrate that the District of Columbia was deliberately indifferent to plaintiff's constitutional rights." (citation, source's alteration marks, and internal quotation marks omitted)). These facts also provide far more detail than an allegation of a single instance of unconstitutional conduct

followed by conclusory recitation of the municipal liability standard or a "generalized assertion of ignored and unanswered complaints of harassment and police misconduct," so Defendants' citations to *Miango v. Democratic Republic of the Congo*, 243 F. Supp. 3d 113, 128 (D.D.C. 2017), and *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 159 (D.D.C. 2015), are inapposite. Plaintiffs' plausible inference of a persistent, ongoing problem need not be the *only possible* inference to be credited at the pleading stage. *See Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012).

Regarding whether the District was deliberately indifferent to the need for training, the District's long pattern of excessive and unlawful use of chemical irritants supports an inference of deliberate indifference. Defendants contend that Plaintiffs' allegations of a lack of training are implausible in light of the passage of the First Amendment Assembles Act, which mandated specific standards and training. D.C. MTD 38. However, a "paper" policy cannot insulate a municipality from liability where a municipality was deliberately indifferent to the policy's violation. *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000); *Banks v. Booth*, 459 F. Supp. 3d 143, 156 (D.D.C. 2020) And this Court has recognized that orders proscribing the conduct at issue do not render allegations of deliberate indifference implausible. *See Matthews*, 730 F. Supp. 2d at 38 (holding that plaintiff stated municipal liability claim despite MPD General Order prohibiting the cavity searches alleged in complaint); *accord McComb v. Ross*, 202 F. Supp. 3d 11, 18 (D.D.C. 2016) (same).

Defendants complain that Plaintiffs do not allege with specificity that training was inadequate, D.C. MTD 37, but there is no "heightened pleading standard" for cases alleging municipal liability under 42 U.S.C. § 1983. *Leatherman v. Tarrant Cty. Narcotics Intel. & Coord.*

*Unit*, 507 U.S. 163, 168 (1993). Plaintiffs may plead on information and belief regarding subjects known only to defendants prior to discovery. *Kelleher*, 263 F. Supp. 3d at 325-26.

Finally, the widespread and egregious nature of the constitutional violations at issue here—including the involvement of an Assistant Chief supervising the conduct—gives rise to a plausible inference that the District has defaulted in training obligations. MPD officers "fired tear gas at demonstrators as they fled," injuring peaceful demonstrators. TAC ¶ 3; *see also id.* ¶ 89. That night, MPD officers continued using chemical irritants against demonstrators elsewhere in the District after attacking those fleeing Lafayette Square. TAC ¶ 113. Even when confronted with demonstrators injured as a result of the tear gas, MPD officers "provided no assistance and instead yelled at [Plaintiffs] to move, even though the only place to go was into the cloud of tear gas that had been deployed further down the street." TAC ¶ 197. Given these detailed and alarming allegations, Plaintiffs' deliberate indifference claim is quite plausible. Whether or not the District was deliberately indifferent is, accordingly, a question of fact, not a basis for dismissal.

## VII.    Plaintiffs Have Stated Claims Under 42 U.S.C. §§ 1985 & 1986 (Claims 5 & 6).

In 1871, Congress enacted the Ku Klux Klan Act, which included today's 42 U.S.C. §§ 1985 and 1986, as a means of combatting the violence directed at newly-freed, formerly enslaved people and "their supporters" by creating causes of action for conspiracies to deprive civil rights. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983) ("*Carpenters*").

Defendants all challenge Plaintiffs' civil-rights conspiracy claims under 42 U.S.C. §§ 1985 and 1986. U.S. MTD 22-26; Barr MTD 42-45; D.C. MTD 10-17. With regard to the § 1985 claim, Defendants all argue that the complaint fails to allege that they joined a conspiracy; Defendant Barr additionally contends that the intracorporate conspiracy doctrine defeats the claim.

Defendants Barr and the D.C. Defendants further argue that they did not share President Trump's discriminatory intent (an element that the federal official-capacity Defendants do not contest). On § 1986, all Defendants argue that the claim fails because Plaintiffs failed to plead a § 1985 conspiracy, which is a predicate for a § 1986 claim. The D.C. Defendants also contest the § 1986 claim by arguing that MPD had no authority over the federal law enforcement officers and therefore had no ability to prevent or aid in preventing the § 1985 conspiracy. Finally, the federal official-capacity Defendants argue that injunctive relief is unavailable under §§ 1985 and 1986, and that sovereign immunity shields it from liability.

Plaintiffs have stated claims under both statutory sections, including for injunctive relief.

## A. Plaintiffs adequately pleaded claims under 42 U.S.C. § 1985(3).

To plead a claim under 42 U.S.C. § 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, … and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States." *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987) (citation omitted). Plaintiffs have plausibly pleaded the elements of this claim. All Defendants challenge the first element: presence of a conspiracy. Defendant Barr and the D.C. Defendants challenge a component of the second element: that the conspiracy had discriminatory intent. The other components of the second element, as well as the other elements, are uncontested: Defendants do not contest that Plaintiffs are a class or classes of persons protected by § 1985, that the rights Plaintiffs allege Defendants violated are rights protected by § 1985, that Plaintiffs have alleged acts in furtherance of the conspiracy, or that Plaintiffs pleaded injury.

1. **Plaintiffs adequately pleaded a conspiracy that includes officers of the United States, the District of Columbia, and Arlington County.**

All Defendants contend that Plaintiffs failed to adequately allege Defendants' participation in a conspiracy, U.S. MTD 25-26; Barr MTD 43; D.C. MTD 10-13—which depends on the existence of an "agreement between two or more persons." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) (standard for establishing a conspiracy under § 1985(3) is the same as civil conspiracy). First, all Defendants argue incorrectly that evidence of explicit agreement is required. As a matter of law, however, no explicit agreement is required to establish a conspiracy, and Plaintiffs have adequately pleaded facts from which an agreement can be inferred. Second, Defendant Barr (alone) argues that there is no "agreement between two or more persons" on the grounds that all federal defendants must be treated as a single "person" for the purposes of conspiracy—the intracorporate conspiracy doctrine. Barr MTD 44.  But Plaintiffs have plausibly pleaded a conspiracy between employees of the Executive Branch and those of two other independent entities: agents of the District of Columbia and of Arlington County, Virginia.[9]

> a.  *Plaintiffs have adequately pleaded the existence of an "agreement between two or more persons."*

Plaintiffs have pleaded more than enough to survive a motion to dismiss. To establish a conspiracy, Plaintiffs "need not allege that an express or formal agreement was entered into." *United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014); *accord Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016). Instead, "courts have to infer an agreement from

---

[9]  Even if the Court decides to grant the motion to dismiss of one or more defendants, the remaining defendant(s) remain liable for the conspiracy. *See United States v. Dakins*, 872 F.2d 1061, 1065 (D.C. Cir. 1989) (explaining that even "if charges are dismissed against all other coconspirators … dismissal of charges against the remaining conspirator is not required.").

indirect evidence in most civil conspiracy cases." *Halberstam*, 705 F.2d at 486; *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) (observing, in context of § 1985(3), that "[d]irect evidence of a conspiracy is rarely available, and the existence of a conspiracy must usually be inferred from the circumstances."); *Nat'l Coal. on Black Civic Participation v. Wohl*, __ F. Supp. 3d __, 2020 WL 6305325, at *22 (S.D.N.Y. Oct. 28, 2020) (§ 1985(3) conspiracy does not require proof of explicit agreement). Plaintiffs therefore need only allege facts sufficient to allow an "infer[ence] from the circumstances that the [conspirators] had a 'meeting of the minds.'" *Adickes v. S.H. Kress & Co.*, 398 U.S.144, 157-158 (1970). "Factors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity" bear on whether an agreement was reached between the parties. *Halberstam*, 705 F.2d at 486.

Agreement can therefore be shown through circumstantial evidence, such as "the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; mutual representations of defendants to third parties; and other evidence suggesting unity of purpose or common design and understanding' among conspirators to accomplish the objects of the conspiracy." *United States v. Wardell*, 591 F.3d 1279, 1287-88 (10th Cir. 2009) (cleaned up); *see also United States v. Wood*, 879 F.2d 927, 938 (D.C. Cir. 1989) (in criminal context, "[c]ircumstantial evidence, including inferences from a 'development and a collocation of circumstances,' suffices to prove participation in a conspiracy"). For instance, in *Lagayan*, this Court considered defenses to a civil conspiracy and § 1985 claim arising from an alleged conspiracy to traffic the plaintiff to the United States and enslave her. 199 F. Supp. 3d at 24, 30-32. The defendants asserted similar defenses to those raised here—namely, that the plaintiff had "set forth only conclusory allegations of an agreement between the ... Defendants and [had] failed to allege any particulars ... showing that there was an agreement." *Id.* at 30 (internal

quotation marks omitted). The court rejected this argument, holding that a plaintiff is not required to allege "the existence of an event, conversation, or document" in which an agreement was reached and that even if such a requirement existed, the plaintiff had satisfied it. *Id*. at 31. Instead, the court inferred the existence of a conspiracy from the mere fact that the defendants had "coordinated Plaintiff's international travel to Defendants' home in the United States." *Id*.

And the necessary agreement can be made in an instant. In *United States v. Scott*, 2020 WL 6494642 (2d Cir. Nov. 5, 2020), the Second Circuit affirmed convictions under § 1985's criminal analogue, 18 U.S.C. § 241, which provides criminal penalties for engaging in conspiracies to deprive civil rights. *See Griffin v. Breckenridge*, 403 U.S. 88, 98 (1971) (describing § 241 as "the closest remaining criminal analogue to § 1985(3)" and looking to its case law to interpret § 1985(3)). In *Scott*, corrections officers were charged under § 241 for a group beating of an inmate. They claimed that there was no "conspiracy" because "the assault was spontaneous" and "there was insufficient evidence of an agreement." *Scott*, 2020 WL 6494642, at *3. The Second Circuit rejected this position, noting that there is no requirement of "an extended period of meditation or a distinct verbal agreement" to find a conspiracy. *Id*. Although one officer's "initial punch may have been spontaneous," the conspiracy could be established by evidence showing that "the other officers acted in concert and purposefully joined the assault." *Id*.

Here, as in *Lagayan* and *Scott*, even the barest description of the June 1 attack on protesters at Lafayette Square and the various parties who effectuated that attack supports a reasonable inference that the Defendants "acted in concert" and "purposefully joined the assault." *Id.* And there are additional allegations here establishing—or from which one can reasonably infer—that the Defendants *also* engaged in an "extended period of meditation" or reached a "distinct verbal agreement" prior to the assault. *Id.* For example, Plaintiffs have alleged that the various defendants

communicated and "coordinated" with each other, TAC ¶¶ 45, 76, 99, 107; that the federal and Arlington defendants had a "command center" from which the attack was directed, TAC ¶¶ 45, 76, 99, 107; that the District and United States "regularly act[] in coordination" with each other, TAC ¶ 105; and that an MPD officer met with U.S. military officers in close proximity to and shortly prior to the attack, TAC ¶ 106. The coordinated nature of the attack is further supported by the fact that tear gas was deployed ahead of officers advancing on foot and the fact that federal, D.C., and Arlington officers used the same type of force against protesters throughout the incident. TAC ¶¶ 141-143, 151, 160-163, 170-174, 186-190, 193.

Plaintiffs have alleged—with far more specificity than is required—that Defendant Barr was a member of the conspiracy. Defendant Barr himself entered Lafayette Square and personally ordered the attack, and in fact admitted so publicly. TAC ¶¶ 5, 17, 60, 79. Defendant Trump had charged Defendant Barr with "personally lead[ing] the response to the unrest"; as a result, Defendant Barr had "directed the Federal Bureau of Prisons and other federal law enforcement agencies to send 'riot teams' and other specialized agents to control the protests in Washington, D.C." TAC ¶ 60. On June 1, Defendant Barr met with federal law enforcement personnel minutes before the attack commenced, TAC ¶¶ 5, 183, and "point[ed] north towards St. John's Church." TAC ¶ 79. That meeting followed a "series of statements from Defendant Trump in the days and hours leading up to [the] attack in which he clearly threatened to use and encouraged violence against protesters." TAC ¶ 5. In light of the temporal proximity between Defendant Barr's meeting with military and law enforcement leadership in front of Lafayette Square, and the fact that Defendant Barr pointed in the direction in which the attack ultimately proceeded, a reasonable jury

78

could easily infer the existence of an agreement between Defendant Barr and the members of the conspiracy.[10]

The D.C. Defendants' participation in a conspiracy is likewise readily inferable from Plaintiffs' plausible and detailed allegations about MPD officers' conduct. Immediately before the attack on protesters began, "an MPD supervisory officer met and conferred with U.S. military officers in the presence of the Army Chief of Staff on 16th Street NW less than two blocks north of Lafayette Square." TAC ¶ 106. MPD established police lines only one block west of Lafayette Square. TAC ¶¶ 72-74. Like their federal counterparts, MPD officers donned gas masks in preparation for the deployment of tear gas. TAC ¶¶ 75, 77. It would be quite a coincidence if MPD officers just happened to decide to set up a police line, outfitted in riot gear, at a location to which the federal Defendants were about to drive the demonstrators.

Then the MPD officers acted simultaneously with the federal officers to attack protesters. TAC ¶ 107. Like federal law enforcement, MPD officers deployed tear gas against protesters. TAC ¶¶ 89, 100-101, 103, 195-198. This is, on a grand scale, the sort of "act[ing] in concert and purposefully join[ing] the assault" that the Second Circuit found sufficient to prove a conspiracy. *Scott*, 2020 WL 6494642 at *3.

The District Defendants' protestations that these facts are mere coincidence, *see* D.C. MTD 15, strain credulity. More importantly, they contravene the standard on a motion to dismiss, under which all reasonable inferences must be drawn in plaintiffs' favor even if others are possible. *Hurd*,

---

[10] It is immaterial whether Defendant Barr himself met with officers from MPD or ACPD because members of a conspiracy do not all need to meet each other to be co-conspirators. *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991) ("[T]here is no requirement that each conspirator [even] know the identity of every other conspirator."); *United States v. Speed*, 78 F. Supp. 366, 368 (D.D.C. 1948) ("An individual member of the combination need not be aware of all of its ramifications or be cognizant of the number or identity of all of the other participants.").

864 F.3d at 678; *Banneker Ventures*, 798 F.3d at 1129. Given the history of coordination between MPD and federal law enforcement, the physical proximity of where MPD established its lines to the location of federal law enforcement, the direct meeting of the MPD supervisory officer with federal officers near the scene of and shortly before the attack, and the contemporaneous and complementary actions of MPD and federal officers during the attack, it is certainly plausible to conclude, and a reasonable jury could find, coordination and, therefore, an agreement between MPD officers and the other Defendants. *Cf., e.g.*, *United States v. Claxton*, 685 F.3d 300, 311 (3d Cir. 2012) ("[T]he jury could draw inferences about Claxton's knowledge of drugs based on his association with, and close proximity to, other conspiracy members and the facilities of the organization[.]"); *United States v. Kassar*, 660 F.3d 108, 128 (2d Cir. 2011) ("[T]he government may prove a defendant's involvement in a conspiracy through circumstantial evidence, such as the defendant's presence at critical moments of the conspiracy[.]").

The complaint squarely places ACPD officers in the conspiracy as well. Federal law enforcement officers, together with ACPD officers, "surrounded Plaintiffs and other civil rights activists assembled in Lafayette Square," TAC ¶ 67, and then these officers simultaneously donned gas masks in preparation for the impending attack. TAC ¶ 77. ACPD officers participated in the assault on the peaceful racial justice demonstrators alongside military and federal law enforcement officers. TAC ¶ 99. Defendant Vincent of ACPD was present at the Joint Operations Command Center and "coordinat[ed] the actions of the ACPD officers present at the Square with the federal defendants." TAC ¶ 76. His presence and the presence of ACPD officers on the line in Lafayette Square were obviously not coincidences. ACPD officers do not ordinarily patrol the streets of Washington, D.C. And, again, even if there were some other possible explanation for their

presence, all reasonable inferences at this stage must be drawn in favor of Plaintiffs. *Banneker*

*Ventures*, 798 F.3d at 1129.

> *b. The intracorporate conspiracy doctrine does not apply and Defendant Barr is not entitled to qualified immunity on this ground because Plaintiffs allege an intercorporate conspiracy.*

Defendant Barr alone contends that there was no "agreement between two or more persons"

because of the "intracorporate conspiracy doctrine," Barr MTD 44, under which there can be no

conspiracy where a corporation "conspire[d] with its employees" or where its "employees, when

acting within the scope of their employment" conspired with each other. *Blakeney v. O'Donnell*,

117 F. Supp. 3d 6, 14 (D.D.C. 2015). But Plaintiffs have plausibly pleaded the existence of an

*inter*-corporate conspiracy: between employees of the District of Columbia,[11] employees of

Arlington County, and employees of the United States—three distinct "corporations." *E.g.*, TAC

¶¶ 3, 67, 76, 99; *see also supra* Part VII.A.1.a. Agents of all three entities participated in planning

the attack, and agents of all three entities participated in the attack.

Defendant Barr asserts qualified immunity on the ground that the applicability of the

intracorporate conspiracy doctrine to § 1985(3) claims is not settled in this Circuit. Barr MTD 44-

45. But that dispute is irrelevant here, because even assuming the doctrine does apply, Plaintiffs

have alleged an *inter*corporate conspiracy.

## 2. Plaintiffs adequately pleaded that the conspiracy was motivated by discriminatory intent.

Defendants Barr and the D.C. Defendants (but not the federal official-capacity Defendants)

argue that Plaintiffs did not adequately allege discriminatory intent for the § 1985 conspiracy.

---

[11] Although the President commands the D.C. National Guard, D.C. Code § 49-409, MPD reports to the independently-elected Mayor of the District of Columbia. D.C. Code § 5-101.03.

Plaintiffs have pleaded facts sufficient to establish that all Defendants participated in a discriminatory conspiracy. Under § 1985(3), the discriminatory intent requirement is met where the conspiracy was targeted at plaintiffs because of their membership in a protected group.  For example, in *Griffin*, the Court found the requirement met where the respondents had conspired to "prevent [the] plaintiffs and other Negro-Americans ... from seeking the equal protection of the laws and from enjoying ... equal rights" because of their race. 403 U.S. at 103. The Court made no mention of a requirement to show personal prejudice. *Id*. The Supreme Court and lower courts have used similar reasoning in other cases. *See. e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993) (the conspiracy must have "selected or reaffirmed a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group"); *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 746 (10th Cir. 1980) ("In order to support a section 1985(3) claim, the plaintiff must be a member of a statutorily protected class, and the *actions taken by defendant must stem from plaintiff's membership in the class*." (emphasis added)).

Plaintiffs are Black Americans and civil rights activists. TAC ¶¶ 65, 67, 94, 128, 138, 167, 246, 248. Those who, like Plaintiffs, advocate equal rights for Black Americans, regardless of their own racial identity, are themselves a protected class under 42 U.S.C. § 1985(3). *Carpenters*, 463 U.S. at 836 (§ 1985(3) applies to "class-based animus" directed "against Negroes and those who championed their cause"); *Hobson v. Wilson*, 737 F.2d 1, 21 (D.C. Cir. 1984) (holding that "*[a]t a minimum* ... section 1985(3) reaches conspiracies motivated by animus against Blacks and those who support them"), *partially abrogated on other grounds, Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993).

Defendant Barr and the District Defendants insist that no § 1985 claim can lie against them because Plaintiffs did not allege that each of them shared President Trump's "animus" against

Plaintiffs. Barr MTD 43-44; D.C. MTD 14-16. These arguments fail because it is the *conspiracy*, not each individual *conspirator*, that must be "motivated" by a "discriminatory purpose." *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31 (D.D.C. 2016) (noting that a § 1985(3) claim requires a plaintiff to prove "that the *conspiracy* was 'motivated by some class-based, invidiously discriminatory animus.'" (emphasis added) (quoting *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987)); *see also Hobson*, 737 F.2d at 14 (explaining that "the alleged *conspiracy* in *Griffin* was motivated by racial basis" (emphasis added)); *Bedford v. City of Hayward*, 2012 WL 4901434, at *14 (N.D. Cal. Oct. 15, 2012) (finding "no authority that Plaintiff must allege racial animus on behalf of each individual conspirator, rather than merely alleging 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" (quoting *Griffin*, 403 U.S. at 102)). "The conspirators 'must share the general conspiratorial objective, but they need not know all of the details of the plan … or possess the same motives .... [I]t simply must be shown that there was 'a single plan, the essential nature and general scope of which [were] known to each person who is to be held responsible for its consequences.'" *Hobson*, 737 F.2d at 51-52 (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979)).

Defendants Barr and the D.C. Defendants do not and cannot deny that Plaintiffs have amply alleged facts from which a discriminatory purpose on the part of Defendant Trump can be inferred.[12] Specifically: in the "days and hours leading up" to the attack in Lafayette Square, Defendant Trump "repeatedly advocated the use of force against Black demonstrators and civil

---

[12] Although Plaintiffs need not allege that Defendant Barr had animus, he implicitly admits that he shared the intent of the Executive Branch—and thus the President—by arguing that he is part of the federal "corporation" for the purposes of the intracorporate conspiracy doctrine. If the Executive Branch speaks with one voice, it is the President's, and no one contests that he expressed discriminatory intent.

rights activists," TAC ¶ 53; he invoked violent and racist slogans from the civil rights era, TAC ¶ 54; he demanded the use of violence against "the bad guys" (referring to civil rights protesters), TAC ¶ 56; and on June 2 he praised the law enforcement attack: "Great job done by all. Overwhelming force. Domination," TAC ¶ 205. Tellingly, Defendant Trump spoke quite differently about demonstrators not advocating for racial justice—in fact, he urged them to gather at the White House. TAC ¶ 64. President Trump expressed support for heavily armed and predominantly white demonstrators who threatened lawmakers and stormed statehouses to protest coronavirus restrictions, encouraging them to "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA." TAC ¶ 63. As discussed above, *see supra* Part VII.A.1.a, Plaintiffs have adequately alleged that Defendant Barr and the District Defendants joined this conspiracy, the object of which was Defendant Trump's unlawful discriminatory purpose.[13]

Defendant Barr's additional argument that "*everyone* [in the park] was cleared" not just "Black people and their supporters," Barr MTD 44, is beside the point. Even if such bystanders were present, recklessly causing collateral damage is not an excuse for the assault. What matters is the intent of the conspiracy, not whether the conspirators incidentally harmed others along the way. In *Griffin*, for example, a group of white conspirators attacked a car driven by a nonparty,

---

[13] If the Court deems these allegations insufficient, it should grant leave to amend, as Plaintiffs have unearthed additional information since filing the previous amended complaint that further buttresses the claim of discriminatory intent. Specifically, undersigned counsel have been in contact with a former White House staffer who has personal knowledge that other senior Administration officials were involved with the planning of the Lafayette Square attack; that there was a discussion of the need to "mow down" the protesters and "show" them who is in charge; and that White House officials made discriminatory comments in relation to the death of George Floyd and subsequent racial justice protests. Plaintiffs are not attempting to amend the complaint via briefing; because these allegations are not a part of the complaint, Plaintiffs do not contend that they should not be a basis to determine whether to dismiss the complaint. However, they do counsel in favor in granting leave to amend *if* any claims *are* dismissed.

with a number of Black passengers, on their "erroneous belief that [the driver] was a worker for Negro civil rights." 403 U.S. at 106. Nonetheless, "the petitioners [the car's passengers]—whether or not the nonparty Grady was the main or only target of the conspiracy—allege personal injury resulting from [conspiracy's] acts" and therefore had a viable § 1985(3) claim. *Id.* at 103. Just because Defendants may have *also* violated the rights of other people in the vicinity does not mean they did not intentionally violate Plaintiffs' rights.

### B. Plaintiffs adequately pleaded claims under 42 U.S.C. § 1986.

The only argument that the federal official-capacity Defendants and Defendant Barr make against Plaintiffs' § 1986 claim is that it fails if Plaintiffs' § 1985 claim fails. U.S. MTD 26; Barr MTD 45. Because Plaintiffs have stated a § 1985 claim, Defendants' argument to dismiss the § 1986 on this ground must be rejected.

The District Defendants raise an additional objection to the § 1986 claim: that they did not have the ability to prevent or aid in preventing the attack on protesters because they have no authority over the federal Defendants. This argument is also without merit.

For a 42 U.S.C. § 1986 claim, a plaintiff must show that (1) the defendant had actual knowledge of a § 1985 conspiracy; (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation; (3) the defendant neglected or refused to try to prevent a § 1985 violation; and (4) a § 1985 violation was committed. *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d. Cir. 1994). For the third element, "negligence is sufficient to maintain a § 1986 claim." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997); *accord Clark*, 20 F.3d at 1298.

The actions of Defendants here—the willful or negligent failure of law enforcement officers to attempt to stop violence carried out in violation of § 1985—are quintessential § 1986 violations. *See, e.g.*, *Park*, 120 F.3d at 1159-61 (alleging police did not adequately intervene to

reduce or halt racially-motivated violence); *Clark*, 20 F.3d at 1296 (same); *Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984) (same); *Bergman v. United States*, 579 F. Supp. 911 (W.D. Mich. 1984) (federal government liable for failing to prevent racially motivated conspiracy against Freedom Riders).

The District Defendants argue that they did not have authority to stop the federal officers. But defendants are not excused from liability for failing to intervene merely because their intervention may not have *completely* stopped or mitigated the conspiracy. The plain text of the statute imposes liability on those who had the "power to prevent *or aid in preventing*" wrongs pursuant to a section 1985 conspiracy. 42 U.S.C. § 1986 (emphasis added). That is, defendants are liable for failing to act as long as their actions could have reduced the likelihood of the conspiracy being carried out or the degree of harm inflicted by the conspiracy. District Defendants cite no authority for the proposition that the phrase "aid in preventing" should be read out of the statute or that, despite its plain text, § 1986 liability attaches only where defendants could have *completely* prevented the conspiracy. To require that a defendant needs to be able to fully prevent a conspiracy to be liable under § 1986 puts all of the statute's weight on "to prevent" and renders the disjunctive clause "or aid in preventing" surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (citation and quotation marks omitted)).

There are a number of actions the District Defendants *could* have taken to mitigate the harm from the conspiracy. For example, the District Defendants could have (1) refused to participate in the conspiracy; (2) directed their officers not to engage in violence against Plaintiffs; or (3) directed their officers to provide medical assistance and avenues of escape to Plaintiffs

fleeing the other Defendants' attacks. TAC ¶ 259; *cf.* TAC ¶¶ 193-98 (describing MPD officers firing tear gas at Plaintiffs Foley and E.X.F., denying them medical assistance when requested, and then yelling at them to move into another cloud of tear gas). Any of these efforts would have reduced the harm of the § 1985 conspiracy.

Moreover, MPD officers could have, and should have, affirmatively interposed themselves and shielded the demonstrators against the unlawful violence, pursuant to the MPD Law Enforcement Officer Code of Ethics, which states, "As a law enforcement officer, my fundamental duty is to serve the community, to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder, and to respect the Constitutional rights of all to liberty, equality and justice." Gen. Order, Metro. Police Dep't, Sworn Law Enforcement Officer Code of Ethics, GO-RAR-202.36 (June 1, 2017).[14] The MPD officers on the scene, and those commanding them, failed to uphold their commitment. *See Symkowski v. Miller*, 294 F. Supp. 1214, 1217 (E.D. Wis. 1969) (§ 1986 claim could proceed where plaintiff claimed that two police officers failed to intervene to stop a beating by a third officer); *see also Bedford*, 2012 WL 4901434, at *15 (supervisors can be liable under § 1986 for § 1985 violation predicated on Fourth Amendment violation by inferior officers).[15]

---

[14] *Available at* https://go.mpdconline.com/GO/GO_201_36.pdf. The Court may take judicial notice of this document because it is a public governmental record. *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018).

[15] Although there is little case law under § 1986, courts enforce a similar requirement under § 1983 that police officers intervene to stop constitutional violations by other law enforcement officers. *See Gudger v. District of Columbia*, 74 F. Supp. 3d 47, 53 (D.D.C. 2014); *Fernandors v. District of Columbia*, 382 F. Supp. 63, 72 (D.D.C. 2005); *Masel v. Barrett*, 707 F. Supp. 4, 8 (D.D.C. 1989) ("Other circuits that have addressed the issue have uniformly found a constitutional duty for a police officer, particularly one in a supervisory capacity, to intervene affirmatively to prevent the violation of constitutional rights by another officer." (collecting cases)); *see also Martin v. Malhoyt*, 830 F.2d 237, 259 (D.C. Cir. 1987) (negligence claim available for failing to intervene).

Thus, Plaintiffs pleaded that the District Defendants could have taken actions to prevent or aid in preventing the harms of the § 1985 conspiracy. It will be a question for summary judgment or the factfinder whether and to what degree the District Defendants failed to discharge their duty under § 1986.

**C.   Injunctive relief is available under §§ 1985 & 1986, and sovereign immunity is no bar.**

The federal official-capacity Defendants are incorrect that injunctive relief is unavailable under §§ 1985 and 1986. U.S. MTD 24. In fact, among federal courts that have considered this issue, there is widespread agreement that injunctive relief is available. *E.g.*, *Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) ("We think the same power [to issue equitable relief] is available to a trial court in an action brought under Section 1985, even though that section refers in precise terms only to a suit for damages."); *Action v. Gannon*, 450 F.2d 1227, 1238 (8th Cir. 1971) (finding injunctive relief appropriate under § 1985(3) because "Federal courts have the power to afford all remedies necessary to the vindication of federal substantive rights defined in statutory and constitutional provisions except where Congress has explicitly indicated that such remedy is not available"); *Gaulter v. Capdeboscq*, 404 F. Supp. 900, 904 (E.D. La. 1975) ("An injunction may properly issue on a cause of action founded on 42 U.S.C. §§ 1983, 1985(3)."); *Freeman & Bass, P.A. v. State of N.J. Comm'n of Investigation*, 359 F. Supp. 1053, 1059 (D.N.J. 1973) ("The contention by defendants that the § 1985 allegations of conspiracy must fall because § 1985 does not provide for injunctive relief is without merit."); *see also Nat'l Org. for Women v. Operation Rescue*, 914 F.2d 582 (4th Cir. 1990) (affirming district court's grant of injunctive relief pursuant to § 1985(3)), *judgment rev'd in part and vacated in part on other grounds sub nom. Bray*, 506 U.S. 263 (1993). Defendants provide no basis for disregarding this precedent.

88

Defendants' opposition to injunctive relief relies heavily on § 1983's express provision for injunctive relief and the absence of a similar provision in § 1985. Yet injunctive relief is available under other Reconstruction statutes where no such relief is provided in the text. For example, in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court noted that equitable relief was available under 42 U.S.C. § 1982, even though that statute "provides no explicit method of enforcement." *Id.* at 414 n.13. Because "section 1985(3) is facially more akin to section 1982 ... than to section 1983," *Hobson*, 737 F.2d at 17, Defendants' invocation of § 1983 to de-fang § 1985(3) is misguided and this Court should reject it. *See also Morgan v. District of Columbia*, 550 F. Supp. 465, 470-71 (D.D.C. 1982) (looking to § 1982 instead of § 1983, due to similarity of statutes, in analyzing term "State or Territory").

Finally, Defendants' invocation of sovereign immunity, U.S. MTD 23-24, is misplaced. Plaintiffs do not seek damages from the official-capacity Defendants. *See* TAC ¶¶ 253, 261. And sovereign immunity does not preclude suits against federal official-capacity defendants for equitable relief—both under the doctrine of *Ex parte Young*, 209 U.S. 123, 159-60 (1908), *see Phila. Co. v. Stimson*, 223 U.S. 605, 620 (1912) (applying *Ex parte Young* principle to federal official), and because of the federal government's general-purpose express statutory waiver of sovereign immunity in 5 U.S.C. § 702 as to claims for non-monetary relief, *see, e.g., DeBrew v. Atwood*, 792 F.3d 118, 124 (D.C. Cir. 2015); *Trudeau v. FTC*, 456 F.3d 178, 185-87 (D.C. Cir. 2006).

## CONCLUSION

Defendants' motions to dismiss should be denied. Because of the number and complexity of the arguments raised in the motions, Plaintiffs respectfully request oral argument.

November 19, 2020                              Respectfully submitted,

                                              /s/ Scott Michelman
Jon Greenbaum (D.C. Bar No. 489887)           Scott Michelman (D.C. Bar No. 1006945)
Arthur Ago (D.C. Bar No. 463681)              Arthur B. Spitzer (D.C. Bar No. 235960)
David Brody (D.C. Bar No. 1021476)            Michael Perloff (D.C. Bar No. 1601047)
Arusha Gordon (D.C. Bar No. 1035129)          Kayla Scott*
Noah Baron (D.C. Bar No. 1048319)             Megan Yan*
Lawyers' Committee for Civil Rights Under Law American Civil Liberties Union Foundation
1500 K Street N.W., Suite 900                     of the District of Columbia
Washington, D.C. 20005                        915 15th Street NW, Second Floor
(202) 662-8600                                Washington, D.C. 0005
jgreenbaum@lawyerscommittee.org               (202) 457-0800
                                              smichelman@acludc.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)          Kaitlin Banner (D.C. Bar No. 1000436)
Thomas D. McSorley (D.C. Bar No. 1001890)     Tristin Brown (D.C. Bar No. 1671642)
Sonia Tabriz (D.C. Bar No. 1025020)           Dennis Corkery (D.C. Bar No. 1016991)
Arnold & Porter Kaye Scholer LLP              Hannah Lieberman (D.C. Bar No. 336776)
601 Massachusetts Avenue, N.W.                Jonathan Smith (D.C. Bar No. 396578)
Washington, D.C. 20004                        Washington Lawyers' Committee for Civil
(202) 942-5000                                    Rights and Urban Affairs
John.Freedman@arnoldporter.com                700 14th Street, NW, Suite 400
                                              Washington, D.C. 20005
*Not a D.C. Bar member; practicing under      (202) 319-1000
supervision pursuant to D.C. App. R. 49(c)(8A) kaitlin_banner@washlaw.org

 November 19, 2020                             *Counsel for Plaintiffs*[16]

---

[16] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp and Harvard Law School student Julianna Astarita in the preparation of this motion and the development of the facts.