**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| BLACK LIVES MATTER D.C., *et al.*, |
| |
| *Plaintiffs*, |
| |
| v. |
| |
| DONALD J. TRUMP, *et al.*, |
| |
| *Defendants*. |

Case No. 1:20-cv-01469-DLF

**CONCERNED LEGAL ACADEMICS AND HISTORIANS'**
**MOTION FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE* IN SUPPORT OF**
**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

With decades of experience studying Reconstruction Era civil rights statutes, certain concerned legal academics and historians ("Concerned Academics") move for leave to file a brief as *amici curiae* under Local Civil Rule 7(o) in support of Plaintiffs Black Lives Matter D.C., *et al.*, as their intimate knowledge of the history and congressional intent of these statutes will assist the Court in deciding certain pending motions to dismiss, as defined below. The Plaintiffs consent to the filing of this amicus brief; all Defendants affirmatively take no position on its filing.

"An *amicus* brief should normally be allowed… when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 137 (D.D.C. 2008) (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997) (Posner, C.J. in chambers)). Moreover, this Court has allowed amicus briefs at the motion to dismiss stage. "Courts in this district have granted leave where a movant sought to provide information

regarding a significant, unclear legal issue, and denied leave where a movant sought to present arguments and insights that were not relevant to the stage of the litigation." *Hopi Tribe v. Trump*, No. 17-CV-2590 (TSC), 2019 WL 2494161, at *3 (D.D.C. Mar. 20, 2019) (citations omitted) (granting four motions for leave to file amicus briefs at the motion to dismiss stage "because their proposed submissions speak to the limited issue").

The Concerned Academics will assist the Court by offering a unique perspective on the historical context of sections 2 and 6 of the Ku Klux Klan Act of 1871, Pub. L. No. 42-22, 17 Stat. 13, currently codified at 42 U.S.C. §§ 1985(3) and 1986, respectively, and their application to Claims 5 and 6 of the Plaintiffs' Third Amended Complaint. The Concerned Academics specialize in the post-Civil War and Reconstruction Eras, the history of civil rights legislation and litigation at issue in this case, and the applications of relevant civil rights legislation over time. As a result, they have significant and specialized insight into the historical and legislative context and interpretation of sections 1985(3) and 1986 that the parties cannot provide.

The *amici* presenting the brief include:

1. **Gregory P. Downs.** Professor Downs is a Professor of History at the University of California, Davis. He specializes in the political and cultural history of the United States in the nineteenth and early-twentieth centuries, and particularly investigates the transformative impact of the Civil War, the end of slavery, and the role of military force in establishing new meanings of freedom. He is the author of two books on the post-Civil War era, including *Declarations of Dependence: The Long Reconstruction of Popular Politics in the South, 1861–1908* (Univ. of North Carolina Press, 2014), is co-editor with Professor Masur of *The World the Civil War Made* (Univ. of North Carolina Press, 2015) and *The Journal of the Civil War Era* (Univ. of North Carolina Press).

2. **Laura F. Edwards.** Professor Edwards is the Peabody Family Distinguished Professor of History in Trinity College of Arts and Sciences at Duke University. She is the author of four books, including *A Nation of Rights: A Legal History of the Civil War and Reconstruction* (Cambridge Univ. Press, 2015) and *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Univ. of North Carolina Press, 2009).

3. **Kate Masur.** Professor Masur is an Associate Professor of American History at Northwestern University. She specializes in the United States in the nineteenth century, with a primary focus on how Americans grappled with questions of race and equality after the abolition of slavery in both the North and South. She is the author of *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (W. W. Norton, forthcoming 2021), and is co-editor with Professor Downs of *The World the Civil War Made* (Univ. of North Carolina Press, 2015) and *The Journal of the Civil War Era* (Univ. of North Carolina Press).

4. **George A. Rutherglen.** Professor Rutherglen is the John Barbee Minor Distinguished Professor of Law at the University of Virginia School of Law. He is the author of *Civil Rights in the Shadow of Slavery: The Constitution, Common Law, and the Civil Rights Act of 1866* (Oxford Univ. Press, 2013) and a co-author of the casebook, *Civil Rights Actions: Enforcing the Constitution* (Foundation Press, 3d ed. 2013).

The unique context and insight that the Concerned Academics provide are not adequately represented by any of the parties, and will greatly assist the Court in adjudicating Defendant United States' Motion to Dismiss Plaintiffs' Official Capacity Claims Against Federal Defendants, and Defendant Attorney General William P. Barr's Motion to Dismiss All Individual-Capacity Claims (the "Federal Defendants"). The proposed brief illuminates the historical origins and extensive legislative history of §§ 1985(3) and 1986, including the original meaning and legislative intent of "conspiracy" as used in these provisions and Congress's legislative intent as to how these provisions should be implemented and applied. The brief additionally provides historical perspective into the case law that has shaped these laws and the practical implications of a ruling granting Federal Defendants' motions to dismiss the Plaintiffs' claims under these provisions.

The Federal Defendants' arguments that Plaintiffs' causes of actions should be dismissed for failure to state a claim and the unavailability of the requested relief directly place at issue the legislative intent and meaning of §§ 1985(3) and 1986. The Concerned Academics are best positioned to provide this Court with relevant insight and context given their careers studying the

historical context, legal development, and applicability of these statutory provisions. As such, the Concerned Academics offer this Court perspective that the parties could not.

The proposed amicus brief is attached as **Exhibit A**. The submission of this brief is consistent with the briefing schedule in this matter and will not result in any delay or prejudice for the parties.

The Concerned Academics wish to ensure that this Court has the benefit of their unique insight in ruling on Defendant's Motion to Dismiss, and respectfully request that the Court grant them leave to file the attached Brief of Amici Curiae Concerned Academics in Support of Plaintiffs' Opposition to Defendants' Motions to Dismiss. A proposed Order is attached for the Court's convenience.

Dated: November 24, 2020                    Respectfully submitted,


                                            _____/s/  *Eric L. Klein*_____
                                            Benjamin F. Wilson (DC Bar No. 965814)
                                            Eric L. Klein (DC Bar No. 993268)
                                            Nessa Horewitch Coppinger (DC Bar No. 477467)
                                            Julius M. Redd
                                            Anthony G. Papetti
                                            Jack B. Zietman
                                            BEVERIDGE & DIAMOND, P.C.
                                            1350 I Street, NW, Suite 700
                                            Washington, DC 20005-3311
                                            202-789-6000 • 202-789-6190 (fax)
                                            bwilson@bdlaw.com
                                            eklein@bdlaw.com
                                            ncoppinger@bdlaw.com

                                            *Counsel For Amici Curiae*
                                            *Concerned Legal Academics and Historians*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., *et al.*,

           *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

           *Defendants*.

Case No. 1:20-cv-01469-DLF

# CONCERNED LEGAL ACADEMICS AND HISTORIANS' BRIEF AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

STATEMENT PURSUANT TO LOCAL RULE 7(o)(5) ....................................................... v

INTEREST OF *AMICI CURIAE* ............................................................................................. 1

SUMMARY OF THE ARGUMENT ......................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.     DEFENDANTS' ALLEGED ACTIONS IN LAFAYETTE SQUARE MUST BE
UNDERSTOOD IN THE CONTEXT OF A LONG CIVIL RIGHTS HISTORY ............. 2

     A.    The Aftermath of the Civil War ............................................................................. 3

     B.    Continued State-Sanctioned Violence Against Black People Led to Passage
of the Reconstruction Amendments and Enforcement Acts in 1870–1871 ............ 4

          1.    Memphis Massacre of 1866 ....................................................................... 6

          2.    New Orleans Massacre of 1866 .................................................................. 9

     C.    Congress Enacts Legislation Aimed at Strengthening Enforcement of the
Reconstruction Amendments, including Sections 1985(3) and 1986 ................... 12

II.    CONGRESS DESIGNED AND INTENDED SECTIONS 1985(3) AND 1986 TO
ENCOMPASS PLAINTIFFS' CLAIMS ........................................................................ 14

     A.    Plaintiffs' Claims Are Directly Within the Scope and Purpose of Sections
1985(3) and 1986 .................................................................................................. 15

          1.    The history of the 1871 Civil Rights Act supports a finding of a
"conspiracy" in this case under Sections 1985(3) and 1986 .................... 15

          2.    The history of the 1871 Civil Rights Act supports a finding of "racial
animus" in this case under Sections 1985(3) and 1986 ........................... 18

          3.    Plaintiffs' First Amendment rights are protected by Sections 1985(3)
and 1986 ................................................................................................... 20

     B.    Sovereign Immunity Does Not Apply in This Case and Injunctive Relief Is
Available Under Sections 1985(3) and 1986 ........................................................ 20

          1.    Section 1985(3) applies to claims against federal officials and the
federal government ................................................................................... 20

          2.    Section 1985(3) claims against federal officials who violate the
Constitution do not trigger sovereign immunity ..................................... 21

          3.    Sovereign immunity does not otherwise foreclose injunctive relief ........ 22

CONCLUSION ........................................................................................................................ 24

i

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Affiliated Prof'l Home Health Care Agency v. Shalala*,
164 F.3d 282 (5th Cir. 1999) .................................................. 22

*Clark v. Library of Congress*,
750 F.2d 89 (D.C. Cir. 1984) .................................................. 22

*Collins v. Hardyman*,
341 U.S. 651 (1951) .................................................. 14, 17, 18, 20

*Davis v. U.S. Department of Justice*,
204 F.3d 723 (7th Cir. 2000) .................................................. 22

*District of Columbia v. Carter*,
409 U.S. 418 (1973) .................................................. 5

*Dugan v. Rank*,
372 U.S. 609 (1963) .................................................. 21, 22

*Ex parte Young*,
209 U.S. 123 (1908) .................................................. 21

*Fed. Deposit Ins. Corp. v. Meyer*,
510 U.S. 471 (1994) .................................................. 21

*Gray Moving & Storage, Inc. v. Fichback*,
516 F. Supp. 1165 (D. Colo. 1981) .................................................. 23

*Griffin v. Breckenridge*,
403 U.S. 88 (1971) .................................................. 14, 17, 18, 19, 20

*Hobson v. Wilson*,
737 F.2d 1 (D.C. Cir. 1984) .................................................. 21

*Kentucky v. Graham*,
473 U.S. 159 (1985) .................................................. 23

*Kush v. Rutledge*,
460 U.S. 719 (1983) .................................................. 13

*La Union del Pueblo Entero v. Ross*,
353 F. Supp. 3d 381 (D. Md. 2018) .................................................. 21

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ........................................................................ 21, 22, 23

*Life Science Church v. Internal Revenue Serv.*,
525 F. Supp. 399 (N.D. Cal. 1981) .................................................. 22

*Philadelphia Co. v. Stimson*,
223 U.S. 605 (1912) ......................................................................... 23

*Pollack v. Hogan*,
703 F.3d 117 (D.C. Cir. 2012) ....................................................... 21, 22

*Sea-Land Serv., Inc. v. Alaska R.R.*,
659 F.2d 243 (D.C. Cir. 1981) ........................................................ 23

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ........................................................ 21

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*,
463 U.S. 825 (1983) .............................................................. 13, 14, 18, 20

*United States v. Harris*,
106 U.S. 629 (1883) ................................................................... 14, 17

**Constitutional Provisions**

N.C. Const. § II (1776) ...................................................................... 6
U.S. Const. amend. I ......................................................................... 24

**Statutory Authorities**

5 U.S.C. § 702 .................................................................................. 23
42 U.S.C. § 1985(3) ................................................................... *passim*
42 U.S.C. § 1986 ........................................................................ *passim*
Civil Rights Act, ch. 31, § 1 (1866) ................................................ 4

**Additional Authorities**

*Black's Law Dictionary* (11th ed. 2019) ......................................... 16

*Cong. Globe*, 42d Cong., 1st Sess. (1871) .............................. *passim*

Eric Foner, *Reconstruction: America's Unfinished Revolution 1863–1877* (1988) ..................... 12

Joint Select Committee to Inquire into the Condition of Affairs in the Late Insurrectionary States, 42d Cong., 2d Sess., S. Rep. No. 41 ........................................................................ 5, 12

Maj. T. W. Gilbreth, *Report of an investigation of the cause, origin, and results of the late riots in the city of Memphis*, Freedman's Bureau Online (May 22, 1866), http://freedmensbureau.com/tennessee/outrages/memphisriot.htm .................................. 6, 7, 8

Ron Chernow, *Grant* (2017) ...................................................................................................... 10

Rich Condon, *"An Absolute Massacre" – The New Orleans Slaughter of July 30, 1866*, Nat'l Park Serv., (July 30, 2020), https://www.nps.gov/articles/000/neworleansmassacre.htm ................................................... 9

Select Committee on the Memphis Riots, 39th Cong., 1st Sess., H.R. Rep. No. 101 (1866) ................................................................................................................................................... 6, 7, 8

Select Committee on the New Orleans Riots, 39th Cong., 2d Sess., H.R. Rep. No. 16 (1867) ...................................................................................................................................... 10, 11

### STATEMENT PURSUANT TO LOCAL RULE 7(o)(5)

Pursuant to this Court's Local Rule 7(o)(5), the undersigned certifies that no counsel for any party authored this brief, in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person–other than the *amicus curiae*, its members, or its counsel–contributed money that was intended to fund the preparation or submission of this brief.

Dated: November 24, 2020                    Respectfully submitted,

                                          /s/  *Eric L. Klein*

Eric L. Klein (Bar No. 993268)
BEVERIDGE & DIAMOND, P.C.
1350 I Street, NW, Suite 700
Washington, DC 20005-3311
202-789-6000 • 202-789-6190 (fax)
eklein@bdlaw.com

## INTEREST OF *AMICI CURIAE*

Concerned Legal Academics and Historians ("*Amici*") are leading scholars of the post-Civil War era and the history of Reconstruction, the purpose and development of the Reconstruction Era civil rights statutes, and those statutes' application over time.[1] They have devoted their respective careers to understanding the complex issues central to this litigation and believe their informed and insightful perspective will assist the Court in deciding certain pending motions to dismiss concerning Claims 5 and 6 of Plaintiffs' Third Amended Complaint ("Complaint"). The *Amici* bring unique insight into the legal, political, and social histories relevant to their claims.

*Amici* do not address the full merits of the motions to dismiss currently pending before the Court. Rather, *Amici* proffer their significant and specialized knowledge of the historical context, legislative intent, and application of the statutory claims at issue, as well as the potential practical ramifications of a decision adverse to Plaintiffs on Defendants' motions to dismiss.

## SUMMARY OF ARGUMENT

The Civil Rights Act of 1871 (the "Act")—the source of the protections now codified as 42 U.S.C. §§ 1985(3) and 1986—was drafted to protect citizens from conduct just like the events described in Plaintiffs' claims. Plaintiffs' Complaint, and specifically Plaintiffs' Fifth and Sixth Claims, clearly and adequately allege causes of action pursuant to §§ 1985(3) and 1986, including Defendants' racially- and politically-motivated conspiracy to deprive Black activists and their supporters of the rights, privileges, and immunities of the laws of the United States.

---

[1] A listing of the *Amici* is included in Concerned Legal Academics and Historians' Motion for Leave to File Brief as *Amici Curiae*.

The historical context, legislative history, and case law collectively support Plaintiffs' Fifth and Sixth claims.

The period leading up to Congress's consideration of the Act was marked by waves of extreme, concerted violence against Black people and their supporters. In direct response to the violence and political inequality of the Reconstruction Era, the United States enacted several constitutional amendments and new pieces of federal legislation effectuating those amendments, including the Act. Congress explicitly designed the Act to protect Black people and their supporters from, among other things, attacks by groups of police officers acting at the behest of government officials.

The unprovoked violence, and the unconstitutional intrusion on rights and protections of the federal law, that Plaintiffs allege occurred in Lafayette Square on June 1, 2020 would have looked very familiar to the drafters of §§ 1985(3) and 1986. To find otherwise would lead to absurd results inconsistent with historical and current interpretation of the law. Furthermore, Plaintiffs' claims are not prohibited by Defendants' arguments regarding sovereign immunity or the availability of injunctive relief.

## ARGUMENT

### I. DEFENDANTS' ALLEGED ACTIONS IN LAFAYETTE SQUARE MUST BE UNDERSTOOD IN THE CONTEXT OF A LONG CIVIL RIGHTS HISTORY.

An understanding of the historical context of §§ 1985(3) and 1986, and of the Reconstruction Amendments they enforced, is critical to appreciating how these statutes apply to Plaintiffs' claims. The historical context shows that the scene in Lafayette Square on June 1, 2020, as alleged, would have looked regrettably familiar to the drafters of the Thirteenth, Fourteenth, and Fifteenth Amendments (together, "the Reconstruction Amendments"), and of the statutes enforcing them, including §§ 1985(3) and 1986. Analogous scenes played out across the

South during the Reconstruction Era after the American Civil War—violent, purposeful attacks by groups of local officials, police officers, and their associates against unarmed Black people and their political supporters. These attacks were often planned, led, or otherwise encouraged by government officials—including the leadership of police forces, heads of local governments, and even state attorneys general and other state officials.

## A.   The Aftermath of the Civil War

The Civil War resulted from the secession of southern states committed to the preservation and expansion of slavery. The corrosive effects of that slave system tainted the nation's legal and political system more broadly. During the Reconstruction Era, Congress and the American people witnessed racially- and politically-motivated mob violence in states of the former Confederacy and even in states that had not seceded, but where there was support for the Confederacy's white supremacist principles.

Unfortunately, abolition of slavery through the Thirteenth Amendment did not bring legal equality to Black people, as some supporters had hoped. Throughout the post-war period, states of the former Confederacy were reorganizing under President Andrew Johnson's lenient Reconstruction plan. As part of this reorganization, state and local officials passed "Black Codes," which were racially restrictive laws that limited the rights and privileges of Black people. The Black Codes formalized the subordination of Black people and allowed whites to use government authority to enforce that subordination. They also restricted access to the courts, making it difficult, if not impossible, to challenge even the most flagrant acts of fraud, intimidation, or violence. The terminology used to refer to Black people at the time—"persons of color," men and women who were "lately slaves," or simply "inhabitants of this state"—reinforced that, even when nominally "free," they should not be confused with citizens.

On April 5, 1866, Congress overrode Andrew Johnson's veto and passed the Civil Rights Act of 1866, pursuant to its power to enforce the Thirteenth Amendment. The 1866 Act declared that "all Persons born in the United States and not subject to any foreign power" were "citizens of the United States"—regardless of race, color, or previous condition of slavery—and were entitled to "the same right[s] in every State and Territory…as [are] enjoyed by white citizens." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (1866). But the Civil Rights Act of 1866 failed to live up to this grand promise, and its foundation of authority in the Thirteenth Amendment— which does not mention citizenship or equal rights—was questioned from the start. President Johnson refused to enforce broad swaths of the law. State and local officials simply ignored its commands. Instead, state and local leaders often sympathized with white southerners who simultaneously undertook campaigns of organized violence and intimidation against Black people and their supporters.

### B. Continued State-Sanctioned Violence Against Black People Led to Passage of the Reconstruction Amendments and Enforcement Acts in 1870–1871.

State-sanctioned violence was particularly acute in the states of the former Confederacy. There, opposition to the U.S. government and its policies seeking racial equality remained strong after surrender. Vigilante groups—which were numerous and locally based, but which were often referred to generically as the Ku Klux Klan—resisted those policies. Often allied with sympathetic state and local government leaders, these vigilante groups engaged in coordinated acts of violence against Black people and their allies (primarily white Republicans). Violence began during the Civil War and continued for decades afterwards, limiting the efficacy of the Thirteenth Amendment and undermining the Civil Rights Act of 1866. The continued unrest— including the high-profile mob attacks by police described below—led to a fuller federal response in the form of the Fourteenth and Fifteenth Amendments, and of reconstituted state

constitutions that extended civil and political rights to Black people. The results were multiracial Republican coalitions that briefly achieved political power in their states, with the benefit of federal policies and related state measures. However, the racially- and politically-motivated violence only increased under these elected state governments. By keeping all those supportive of the new polices in a "state of terror and dread"—not to mention direct interference in the voting process—the violent actors overturned the new governments and negated many of the laws extending civil and political rights to Black people. *See, e.g.*, Report of the Joint Select Committee to Inquire into the Condition of Affairs in the Late Insurrectionary States, 42d Cong., 2d Sess, pt. 2, at 139 (1872) (witness describing the terror as so "very great" that he could not identify any Republican law enforcement official—from "judge to constable"—who felt "at liberty faithfully to discharge his duty") ("Klan Report").[2] In many places, police and local officials were sympathetic to, and even active participants in, these vigilante KKK-style groups. *See, e.g.*, *id.*, pt. 4, at 1374 (testimony that the only two police officers in his town were both members of the KKK, in addition to some local officials); *Cong. Globe*, 42d Cong., 1st Sess. 445 (1871) (discussing KKK attack by "constable and deputy sheriff").

Shortly after passage of the Civil Rights of 1866, two racial massacres in Memphis and New Orleans gripped the nation and signaled what would come without additional federal protections. Both events involved coordinated acts of mob violence, with local officials commanding the police to attack unarmed Black people.[3]

---

[2] The 42nd Congress jointly published this report as S. Rep. No. 41, pts. 1–13 and H.R. Rep. No. 22, pts. 1–13. *See District of Columbia v. Carter*, 409 U.S. 418, 425 n.13 (1973) (stating that the "voluminous report" provides "an appreciation of the nature and character of the Ku Klux Klan as it appeared to Congress in 1871").

[3] On this point, an understanding of the nature of "police" in nineteenth-century America is crucial to appreciating the unique harm posed by large-scale police-involved violence, and how this violence so clearly called Congress to act. The only professional police forces in the early 1800s

### 1.        Memphis Massacre of 1866

In Memphis, ninety percent of the police force were white, and there had long been "an

especial hatred among the city police" for the Black federal soldiers who had been stationed in

the City, and who had been recently discharged from military service. *See* Maj. T. W. Gilbreth,

*Report of an investigation of the cause, origin, and results of the late riots in the city of Memphis*

(May 22, 1866) ("Freedmen's Bureau Report").[4] A week before the massacre started, Memphis

police officers had arrested a Black man "without cause," knocked him down, and "cruelly

beat[]" him so much that he had to be carried out on a cart. Select Comm. on the Memphis Riots,

H.R. Rep. No. 39-101, at 6–7 (1866) ("Memphis Comm. Report"). The incident of police

brutality occurred near the military base, and Black soldiers threatened "that if ever the police

came up again and arrested a man in that way they would resent it." *Id.* at 7. By the afternoon of

May 1, according to a report from the state Freedman's Bureau, a scuffle broke out between

police and "a crowd of colored men, principally discharged soldiers." As a congressional report

explained, this skirmish "was seized upon as a pretext for an organized and bloody massacre of

---

were in large cities. In most other places, the "police" would include local men relied upon by a
sheriff or other local official to enforce local laws. And even in large cities, there was still an
expectation that local people would participate in policing. This approach was consistent with a
longstanding practice in Anglo-American law—reflected in a number of state constitutions—that
only "the people" may regulate local police. *See, e.g.*, N.C. Const. § II (1776), *available at*
https://avalon.law.yale.edu/18th_century/nc07.asp. Indeed, the local population generally played
a significant role in identifying minor criminal offenses, could be relied up by professional law
enforcement to round-up suspects, and could prosecute cases in which they were involved. In this
context, efforts to include Black people as equals in the legal and political order were also about
fundamentally reshaping what most white Americans had considered the basic dynamics of
democratic governance.

[4] Available at Freedman's Bureau Online, *Records of the Asst. Comm'r for the State of Tenn.*,
http://freedmensbureau.com/tennessee/outrages/memphisriot.htm (last accessed Nov. 23, 2020).

the colored people of Memphis…led on by sworn officers of the law composing the city

government, and others." Memphis Comm. Report at 5.

By the evening, the local sheriff had assembled a *posse comitatus* of white citizens to

supplement the white police force. Although any sign of a disturbance had dissipated by this

time, the white mob soon began firing their weapons at any Black people in the streets. A local

government official, City Recorder John C. Creighton, gave an incendiary speech urging the

white residents of Memphis to arm themselves, and to go through the Black districts in

Memphis, including the exhortation: "Boys, I want you to go ahead and kill every damned one of

the nigger race and burn up the cradle." *See* Freedman's Bureau Report.

As a report from the local Freedman's Bureau explained, "[t]he effect of such language

delivered by a municipal office so high in authority, to a promiscuous and excited assemblage

can be easily perceived. From that time they seemed to act as though vested with full authority to

kill, burn and plunder at will." *Id.* Despite no disturbance to provide the catalyst for the next

day's violence, a "posse of police and citizens" in south Memphis began "an indiscriminate

attack upon the Negroes," shooting any Black man, woman, or child unlucky enough to be

simply walking out in public. *Id.* "All the colored people I saw in my neighborhood were running

and trying to get away," a grocer testified, and none were armed or making any resistance.

Memphis Comm. Report at 188. The officers vowed to conduct violence against "all the colored

people" and "all those who sympathized with them." *Id.* at 24.

Additional high-ranking government officials appeared as well, lending an air of

government approval to the unfolding mayhem. These officials included the Attorney General of

Tennessee himself, who functioned as "a leader of a bloodthirsty mob in the work of massacre,

incendiarism, and robbery," and openly exhorted the men under his command to commit violence. *Id.* at 11–12. A select congressional committee summarized the events:

> The mob, finding itself under the protection and guidance of official authority, and sustained by a powerful public sentiment, actuated by feelings of the most deadly hatred to the colored race…proceeded with deliberation to the commission of crimes and perpetration of horrors which can scarcely find a parallel in the history of civilized or barbarous nations, and must inspire the most profound emotions of horror among all civilized people.

Memphis Comm. Report at 5. The city police officers were not merely "the most brutal and violent" components of the coordinated mob violence, they "were generally ringleaders…." *Id.* at 25–27 (calling police "conspicuous leaders in the riotous proceedings" and describing individual officers who acted as such). Other local officials clearly shared sympathies with the mob, including firefighters on the scene, who made "no effort whatever to extinguish the fires of the burning churches and school-houses"—focusing only on preventing the spread of fires to adjoining buildings. *Id.* at 26. White Memphis residents who objected to the riots were labeled "Yankees and Abolitionists" and were menacingly told that "their presence [in Memphis] was unnecessary." *See* Freedmen's Bureau Report.

The massacre continued over three days until the commanding general of the local military base finally issued an order to the mayor, city council, and all other local officials, informing them that he had no choice to but to "interfere with the civil affairs of the city," to forbid any further assemblies of posses, and to install soldiers as guards. Memphis Comm. Report at 3, 40. By then, at least forty-six Black people had been murdered, seventy-five had been wounded, numerous others had been sexually assaulted, and 100 had been robbed. *Id.* at 14, 35–36. The police-led mob had burned down ninety-one Black homes, twelve Black schools, and

four Black churches, and there was nothing the Black residents of Memphis could do other than seek refuge at the military base under the protection of the federal government.

>    2.    New Orleans Massacre of 1866

A similar scene played out in New Orleans only a few months after the Memphis massacre, although this time with more explicit political overtones. As context, two years prior in 1864, Louisianans loyal to the United States had assembled in a state constitutional convention, at which they developed a free-state constitution providing limited rights to Black people (although notably not a right to vote). After the war and President Lincoln's assassination, however, the elected Louisiana legislature enacted racially restrictive laws that reneged on many of the promises from the 1864 constitutional convention.

A potent symbol of Louisiana's backsliding came in 1866, when John T. Monroe became mayor of New Orleans.[5] A Confederate sympathizer, Monroe had been mayor during the Civil War until 1862, when federal troops captured New Orleans, put the city under martial law, and suspended Monroe from office. The decision by New Orleans' (white) voters to return Monroe to office five years later was emblematic of Louisiana's rapid decline into a state that subordinated Black people to a system of legal white supremacy.

Catalyzed in part by Monroe's election, the "Radical Republicans" of Louisiana decided to reconvene the 1864 constitutional convention with the goal of revising the constitution to eliminate racially restrictive laws, to extend suffrage to Black Louisianans, and to disenfranchise former Confederates.[6] Mayor Monroe did not want the convention to assemble—a view shared

---

[5] Rich Condon, *"An Absolute Massacre" – The New Orleans Slaughter of July 30, 1866*, Nat'l Park Serv., https://www.nps.gov/articles/000/neworleansmassacre.htm (last updated July 30, 2020).

[6] *Id.*

by the lieutenant governor and attorney general of Louisiana. Select Comm. on the New Orleans Riots, 39th Cong., 2d Sess., H.R. Rep. No. 16, at 17–18 (1867) ("New Orleans Comm. Report").

In anticipation of the July 30, 1866 convention, New Orleans Sheriff Harry T. Hays deputized a posse of white officers to assist in an effort to disrupt the convention. Hays, who had served as a Confederate general, was sympathetic to the goals of the Confederacy and most members of his posse were former Confederate soldiers.

On the afternoon of the convention, the delegates entered the New Orleans Mechanics Institute in order to begin debate on new constitutional protections to protect the rights of Black people. In the streets outside, an assembly of approximately "200 unarmed freedmen, mostly veterans, approached the Institute in parade form to display their support."[7] Marching to the sound of drums, these demonstrators carried a U.S. flag and were unarmed except for canes and walking sticks. New Orleans Committee Report at 5.

When Sheriff Hays and his deputized officers arrived, they began firing into the crowd of freedman, massacring them in the street.[8]  Historian Ron Chernow described the scene:

> The whites stomped, kicked, and clubbed the black marchers mercilessly. Policemen smashed the institute's windows and fired into it indiscriminately until the floor grew slick with blood. When blacks inside shook a white flag from a window, the white policemen ignored it and invaded the building. They emptied their revolvers on the convention delegates, who desperately sought to escape. Some leapt from windows and were shot dead when they landed. Those lying wounded on the ground were stabbed repeatedly, their skulls bashed in with brickbats.

Ron Chernow, Grant 574–75 (2017); *see* New Orleans Comm. Report at 6–8 (describing same). With the exception of a few honorable police officers who tried to intervene, "the police and the

---

[7] *Id.*

[8] *Id*.

mob, in mutual and bloody emulation, continued the butchery in the hall and on the street, until nearly two hundred people were killed and wounded." New Orleans Comm. Report at 11. By the end, "Only the presence of federal troops restored order to the turbulent city." Chernow at 575.

A major congressional investigation determined that the attack on the convention and resulting massacre "was not an accident." Rather, the violence was the "determined purpose" of Mayor Monroe—part of an effort to "break up this convention by armed forces." *Id.* at 16. The factual circumstances surrounding the attack indicated to Congress that it was planned in advance. On the morning of the attack—after being sent home early the night before ("that they might rest")—the "whole police force…were massed at their different stations," provided arms, and "soon after noon an unusual 'alarm' was given" signaling officers from around the city to head toward the Institute. *Id.* at 17. Moreover, "many policeman had their hat bands reversed so that their 'numbers' could not be distinguished." *Id.* Although the massacre involved the concerted efforts of city officials, police officers, and white citizens, "not one" had been punished or charged by the time Congress issued its report six months later.[9] *Id.* at 16.

*   *   *

The Memphis Massacre and New Orleans Massacre were just two high-profile events among many that demonstrated to Congress and the country why additional constitutional amendments and federal laws were necessary to ensure that every citizen of the United States had the same and equal rights—including those guaranteed by the Constitution, especially First Amendment rights. *See, e.g.*, *Cong. Globe*, 42 Cong., 1st Sess. 429 (describing the "oath-bound societies" of former Confederate soldiers that would attack and murder Black people "for no

---

[9] In glaring contrast, several victimized convention delegates were charged with breach of peace under what the congressional report dismissively called an "old law, passed in 1805." New Orleans Comm. Report at 16–17.

other reason than because he dared modestly to…avail himself of the privileges of an American citizen by giving expression through voice and ballot to the honest convictions of the heart"). The massacres featured prominently in the 1866 congressional elections and helped to rally support for the Fourteenth Amendment. *See* Eric Foner, *Reconstruction: America's Unfinished Revolution 1863–1877* at 261–71 (1988).

Regrettably, however, coordinated group violence against Black people continued, as is extensively documented in a thirteen-volume "Report of the Joint Select Committee Appointed to Inquire into the Condition of Affairs in the Late Insurrectionary States," which lays out evidence collected by a joint select congressional committee in 1871.[10] That committee, formed in response to escalating violence by the Klan and other vigilante groups, took testimony from witnesses about atrocities or "outrages," as they were called at the time. The testimony documented numerous instances of government-coordinated group violence by police and other government officials against unarmed Black people and their supporters who had peaceably assembled to advocate for equal treatment.

### C.   Congress Enacts Legislation Aimed at Strengthening Enforcement of the Reconstruction Amendments, including Sections 1985(3) and 1986.

In reaction to these horrific accounts, Congress gave teeth to the Reconstruction Amendments by passing a series of acts to enhance enforcement, making it easier to remove state cases to federal courts, and expanding the definition of civil rights to include access to public spaces, among other things. The 42nd Congress originally enacted the protections codified at 42 U.S.C. §§ 1985(3) and 1986 as part of the Act. Commonly referred to as the "Ku Klux Klan Act," the Act was the third and final in the series of Enforcement Acts enacted between 1870 and

---

[10] *See supra* note 2 and accompanying text (citing the Klan Report).

1871. Representative Shellabarger, a lead drafter of the Act, pointed directly to the violence in

Memphis and New Orleans as examples of actions by the "conspirators":

> Take as your initial proof this, that in every massacre and
> insurrectionary violence, from the first to the last, the attack has been
> by Democrats upon Republicans, either as a Republican or else as a
> colored man. So it was at Memphis, where they killed and wounded
> their scores of defenseless and unoffending Republicans—colored
> people. So it was in 1866, when a Republican State convention,
> engaged in the formation of a free constitution, was murdered or
> dispersed.

*Cong. Globe*, 42d Cong., 1st Sess. 517; *see id.* at 516 ("we cannot, as legislators, afford to let

Memphis and Orleans…become old or be 'by-gones'"); *see also id.* at 442 (Rep. Butler

describing how, "in the New Orleans riot…a peaceful convention was attacked for political

reasons only").

The Enforcement Acts were critical parts of Congress's efforts to make the promises of

the Reconstruction Amendments enforceable in the federal courts and to quell the still-boiling

racial violence of the post-war period. *Kush v. Rutledge*, 460 U.S. 719, 724 (1983); *United Bhd.*

*of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 839 (1983)

("*Carpenters*"). With respect to what is now codified as § 1985(3), the "predominate purpose"

was to protect Black Americans and their white supporters, a group that included "Republicans

generally" and "Northerners who came South with sympathetic views" toward freedmen.

*Carpenters*, 463 U.S. at 836.

At the time of the passing of the Act, congressional Republicans sought to use federal

power to suppress the racially influenced violence across the country. Because much of that

violence was directed at Republican voters and officeholders, advocates of the Act were

concerned not only with the right to vote, but also with the rights to free speech, assembly, and

political expression. The drafters of the Enforcement Acts sought to protect individuals' rights to engage in free speech and, in particular, to express political views disliked by those in power.

The core principles of the law have remained constant since its enactment: a § 1985(3) violation occurs when individuals, motivated by racial animus, conspire and overtly act to deprive Black individuals and their supporters of rights, privileges, or immunities of the laws of the United States. *See* 42 U.S.C. §§ 1985(3), 1986; *United States v. Harris*, 106 U.S. 629, 641 (1883); *Collins v. Hardyman*, 341 U.S. 651, 660 (1951), *disapproved of by Griffin v. Breckenridge*, 403 U.S. 88 (1971); *Griffin*, 403 U.S. at 103; *Carpenters*, 463 U.S. at 836. The Act's legislative history and judicial precedent (both historical and modern) support this view, and the instant case squarely falls within its ambit. As described below, the Supreme Court's § 1985 cases have also found the requisite conspiracy and racial animus to exist in similar circumstances.

## II.   CONGRESS DESIGNED AND INTENDED SECTIONS 1985(3) AND 1986 TO ENCOMPASS PLAINTIFFS' CLAIMS.

The violence by law enforcement against protestors in Lafayette Square on June 1, 2020 is exactly the type of event that Congress designed the scope of §§ 1985(3) and 1986 to encompass and prevent. As Plaintiffs allege in their Complaint, they were peaceful demonstrators gathered in a traditional public forum to speak out against discriminatory police brutality targeted at Black people. Third. Am. Compl. ¶¶ 1, 51. The demonstrators organized this protest in response to the violent killing of George Floyd, Breonna Taylor, and other Black people at the hands of police, as well as the systemic injustice that allows such violence by government actors to repeatedly occur. *Id*. at ¶¶ 2, 3. Without any meaningful warning, and purportedly to clear a path for Defendant President Donald J. Trump to walk to a photo opportunity, Defendants violently dispersed the demonstrators from the park with tear gas,

14

pepper spray, rubber bullets, and flash bangs. *Id*. at ¶¶ 3, 80, 84. Defendants had no legitimate

basis for taking such action, as clearing a path for a photo opportunity is no sufficient reason for

assaulting demonstrators and violating their constitutional rights. *See id*. at ¶ 4. The President

and other Defendants did not take any such actions against demonstrators with other viewpoints

at other times and in the same location, Lafayette Square. *Id*. at ¶¶ 4, 62, 63. In fact, President

Trump repeatedly and publicly advocated on Twitter for the use of force specifically against

Black civil rights activists and their allies, while encouraging his supporters to stage a counter-

demonstration. *Id*. at ¶¶ 53–56. President Trump also called other political leaders to take action

against protestors and to "dominate" their jurisdictions. *Id*. at ¶¶ 57, 60, 61. The Defendants'

actions on June 1, 2020, including the coordinated violent disbanding of peaceful demonstrators,

is part of a long history of oppression and attempted "domination" of Black civil rights activists

and their supporters. *Id*. ¶¶ 6, 7. These allegations fall squarely within the scope of §§ 1985(3)

and 1986 claims.

### A.   Plaintiffs' Claims Are Directly Within the Scope and Purpose of Sections 1985(3) and 1986.

Sections 1985 and 1986 of the Act have been the subject of extensive legislative history

and, at times, contradictory U.S. Supreme Court decisions. This historical development and

judicial interpretation of §§ 1985 and 1986 provide a necessary background to understand the

purpose, scope, and intent of the Act, as it was drafted and as it is applied today.

### 1.   The history of the 1871 Civil Rights Act supports a finding of a "conspiracy" in this case under Sections 1985(3) and 1986.

Section 1985 is titled, "Conspiracy to interfere with civil rights" and subsection (3)

targets, *inter alia*, "conspirac[ies]" and "conspirators" acting to deprive others of equal

protection of the laws, or of equal privileges and immunities under the laws. 42 U.S.C.

§ 1985(3). Although members of Congress plainly meant to encompass within these laws a broad range of conspiracies in the legal sense,[11] they also had in mind a more colloquial use based on events of the day: violent, group attacks on Black people and their supporters. This often included the efforts of vigilante organizations such as the Ku Klux Klan, as well as of private individuals and public actors aligned with these groups. *See, e.g.*, *Cong. Globe*, 42d Cong., 1st Sess. 439 (Rep. Cobb discussing the "Ku Klux conspiracy"); *id.* at 504 (Rep. Pratt describing vigilantes as part of "a vast conspiracy against human rights"). More broadly, the drafters used the group-oriented term "conspiracy" to emphasize that Congress sought to provide federal protection for people whom others might attempt to silence through violent, concerted group action. *See, e.g.*, *id.* at 517 ("the conspiracy has its origins in political aims" to "trample into dust" the rights of Black people). The drafters understood that any coordinated group action, like those discussed above involving police and local officials, could fit within that rubric. *See supra* § I.C. In the present case, the parties dispute whether a conspiracy occurred, with certain Defendants arguing that there was no explicit agreement among Defendants to conspire. Yet an agreement or meeting of the minds is not a requirement or element of §§ 1985(3) or 1986 conspiracy; actions with a common purpose indicate an organized conspiracy. *Cong. Globe*, April 3, 1871, 42d Cong., 1st Sess. 412 ("the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy.").

This is not to say that Congress intended the conspiracy element of § 1985(3) to apply differently than its usage in other federal conspiracy statutes. Rather, in developing a prohibition on conspiracies to interfere with civil rights under § 1985(3), Congress intended to address

---

[11] "Conspiracy" encompasses agreements between "two or more persons" to commit unlawful acts. *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "conspiracy" and dating it to the fourteenth century).

coordinated, violent group actions—just as Plaintiffs allege here. Congress recognized and sought to frustrate the inherent power imbalance present when a group of people acts in concert to prevent individuals from enjoying their rights, an imbalance all the more concerning when the group includes armed police officers acting under politically motivated or pretextual orders from government officials. Moreover, the Act was intended to be construed broadly. *See, e.g.*, *Cong. Globe*, 42d Cong., 1st Sess. 68 (original sponsor Rep. Shellabarger stating that laws to protect constitutional rights should be given "the largest latitude consistent with the words employed").

Early Supreme Court cases interpreting the relevant sections of the Act support this broad interpretation of "conspiracy." While the early cases, including *United States v. Harris*, considered the since-repealed criminal provisions of the Act, the *Harris* court interpreted "conspiracy" in the same way subsequent courts have interpreted it: to include scenarios in which two or more individuals coordinate to deprive a third individual of their federal rights. *See* 106 U.S. 629, 641 (1883). Section 1985(3) did not reach the Supreme Court again until 1951, when the Court considered a case involving facts similar to those in Plaintiff's Complaint. *See Collins v. Hardyman* 341 U.S. at 651 (1951), *disapproved on other grounds by Griffin*, 403 U.S. at 88. In *Collins*, the plaintiffs alleged a conspiracy to deprive their political group of federal rights, including the right to "peaceably [] assemble for the purpose of discussing and communicating upon national public issues." *Id.* at 654. The Court described the defendants' actions—including arriving at the plaintiffs' meeting place and, by force and threats of force, assaulting and intimidating individuals at the meeting—as overt acts in furtherance of a conspiracy to deprive the individual group members of their rights. *Id*. at 654–55. The defendants knew of many public meetings in the area, but did not interfere or conspire to interfere with those other meetings; rather, the plaintiffs alleged that the defendants interfered

with their meeting because defendants opposed their views. *Id*. at 654. The Court found that the claims of conspiracy were sufficient to allege a § 1985(3) action. *Id.* at 660. *Collins* again defined "conspiracy" within the Act to include conspiring "for the purpose of depriving of the equal protection of the laws, or of equal privileges and immunities under the laws." *Id*. Although the Court in *Collins* ultimately found no violation of § 1985(3), this was based solely on the Court's determination that the law did not apply to private actors, *id*. at 662, a holding later overruled based on the Act's plain text and legislative history. *See Griffin*, 403 U.S. at 96.

Similarly, Plaintiffs in this case have alleged § 1985(3) and § 1986 violations resulting from Defendants' conspiracy and violent actions against "peaceful demonstrators who were speaking out against discriminatory police brutality targeted at Black people" and their supporters. Third Am. Compl. ¶ 1. As in *Collins*, Plaintiffs allege that Defendants forcefully dispersed Plaintiffs' lawful, peaceful protest and purposefully targeted the Black Lives Matter group because Defendants opposed their views. *Id*. at ¶¶ 3, 4, 53–56, 62–64.

## 2.   The history of the 1871 Civil Rights Act supports a finding of "racial animus" in this case under Sections 1985(3) and 1986.

Sections 1985 and 1986, and all their related forms over time, have been intended to protect Black people and their supporters from an infringement of their rights, privileges, and immunities under the laws of the United States. The law was firmly intended to address "animus against Negroes and those who championed their cause." *Carpenters*, 463 U.S. at 836. As the Supreme Court has elaborated:

> The central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power. The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro.

*Id.* As discussed above in § I, the Act was spurred by increasingly aggressive attacks by racially- and politically-motivated groups to subordinate Black people and stymie efforts to ensure equal rights. Legislative history makes clear that the 42nd Congress—including key drafters of the 1871 Act—wanted to protect against violence motivated by racial animus. *See, e.g.*, *Cong. Globe*, 42d Cong., 1st Sess. 478 (Rep. Shellabarger) (describing as the chief aim of § 1985(3) those "deprivations" that "attack the equality of rights of American citizens"); *id.* ("any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section"). Although some have questioned the full scope of classes protected by § 1985(3), that the law protects Black people and their supporters has never been questioned. *See, e.g.*, *Griffin*, 403 at 102 n.9.

The Supreme Court has found requisite racial animus in § 1985(3) conspiracy cases where—as here—defendants have allegedly targeted plaintiffs for associating, or having a perceived association, with a group associated with Black people. For example, the requisite animus was found to exist in a case where the plaintiffs alleged that the defendants conspired to carry out an assault against Black individuals by blocking the path of the plaintiffs' car and blocking passage over a public road, forcing the plaintiffs to step out of their car, preventing them from escaping by threat of deadly force, and physically assaulting the plaintiffs because the defendants believed—mistakenly—that plaintiffs were associated with the group Civil Rights for Negroes. *Griffin*, 403 U.S. at 103. In that case, the alleged detention, threats, and battery satisfied the requirement of acts done "in furtherance of" a § 1985 conspiracy. *Id*. For these reasons, and because plaintiffs alleged personal injury as a result of defendants' actions, the Court definitively stated that "the conduct here alleged lies so close to the core of the coverage intended by

Congress that it is hard to conceive of wholly private conduct that would come within the statute if this does not." *Id*.

The resulting rule from *Griffin*, that § 1985(3) claims require a showing of race-based or possibly class-based animus, *see id*. at 102, is met in the present case. Here, Plaintiffs allege that Defendants targeted and disbanded the peaceful Black Lives Matter protest through police force, yet did not target or use force against other peaceful protests in the same location and around the same time. *See* Third Am. Compl. ¶¶ 62–64. As such, Plaintiffs have sufficiently alleged that Defendants targeted Black people and their supporters in particular, causing them physical injury and preventing them from expressing their First Amendment rights.

### 3. Plaintiffs' First Amendment rights are protected by Sections 1985(3) and 1986.

First Amendment rights, as are invoked in the present case, fall within the scope of § 1985 and § 1986 violations. The Supreme Court in *Carpenters* confirmed this when it upheld the applicability of § 1985(3) to First Amendment rights. 463 U.S. at 830. Allegations of conspiracy to deprive individuals of First Amendment rights pursuant to § 1985 must claim government involvement in the conspiracy, or that the conspiracy aimed to influence government activity. *See id*. Plaintiffs' Complaint, which clearly alleges the involvement of both federal and state government actors, plainly satisfies this requirement. *See Collins,* 341 U.S. at 661 (holding act applies to state actors).

### B. Sovereign Immunity Does Not Apply in This Case and Injunctive Relief is Available Under Sections 1985(3) and 1986.

### 1. Section 1985(3) applies to claims against federal officials and the federal government.

Under D.C. Circuit precedent, claims under § 1985(3) are actionable against federal officials and the federal government. Section 1985(3) prohibits any "two or more persons" from

undertaking a prohibited conspiracy, with no limitations on the scope of persons covered. 42

U.S.C. § 1985(3). In *Hobson v. Wilson*, the D.C. Circuit "resolve[d] any lingering doubts" that

"this Circuit has previously permitted actions to be brought under section 1985(3) against federal

officers" and "h[e]ld that section 1985(3) encompasses actions against federal officers, subject,

of course, to considerations of qualified immunity." 737 F.2d 1, 19 (1984) (affirming findings of

liability against FBI defendants).

### 2.      Section 1985(3) claims against federal officials who violate the Constitution do not trigger sovereign immunity.

For well over a century, the Supreme Court has made clear that when a government

official has acted in violation of the Constitution, "he is in that case stripped of his official or

representative character and is subjected in his person to the consequences of his individual

conduct." *Ex parte Young*, 209 U.S. 123, 159 (1908). Such officials lose the protection of their

"official" capacities as well as the right to invoke sovereign immunity, and thus are subject to

injunctive relief and to damages in their personal capacity. In general, "[a]bsent a waiver,

sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit*

*Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). But under the so-called *Larson-Dugan* exception,

federal officers are entitled to sovereign immunity only when they act (1) within the scope of

their official functions, *and* (2) within the scope of the Constitution. *Pollack v. Hogan*, 703 F.3d

117, 120 (D.C. Cir. 2012) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S.

682, 689, 693 (1949)); *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (citing *Larson*, 337

U.S. at 689 and *Dugan v. Rank*, 372 U.S. 609, 621–23 (1963)).

At least one court has found that a claim under § 1985(3) falls within the *Larson-Dugan*

exception to sovereign immunity. In *La Union del Pueblo Entero v. Ross*, the District Court of

Maryland found that the federal government's "allegedly unconstitutional conspiracy [] is

precisely the type of claim that is not barred by sovereign immunity." 353 F. Supp. 3d 381, 396 (2018). Relying on *Larson* and *Dugan*, the court reasoned that "actions that are within the scope of an official's authority but are exercised in a constitutionally void manner may be challenged." *Id.* The court distinguished appellate decisions holding that sovereign immunity bars § 1985(3) claims, highlighting that one was a suit for damages and not injunctive relief, *id.* (discussing *Davis v. U.S. Dep't of Justice*, 204 F.3d 723 (7th Cir. 2000)), and the other, while recognizing the exceptions to sovereign immunity, did not provide analysis of the issue. *Id.* (distinguishing *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282 (5th Cir. 1999)).

Moreover, in the D.C. Circuit, to overcome a defendant's motion to dismiss, a plaintiff's claim "falls within the *Larson-Dugan* exception" where the "sole allegation is that the named officers acted unconstitutionally, and [the plaintiff] requests only injunctive and declaratory relief." *Pollack*, 703 F.3d at 120 (reversing district court's order dismissing complaint); *see Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) (holding that sovereign immunity does not bar injunctive relief where officials act unconstitutionally); *Life Science Church v. Internal Revenue Serv.*, 525 F. Supp. 399, 405 (N.D. Cal. 1981) (holding that a motion to dismiss is "not the proper time" to decide whether defendants were acting within the full scope of authority). Since Plaintiffs have alleged that the officers acted unconstitutionally and only request injunctive and declaratory relief against Defendants acting in their official capacity, this Court should deny Defendants' Motions to Dismiss. Third Am. Compl. ¶¶ 49–52.

### 3. Sovereign immunity does not otherwise foreclose injunctive relief.

Even if sovereign immunity applied to the federal defendants acting in their official capacity in the instant suit, sovereign immunity does not prevent Plaintiffs from obtaining injunctive relief against unconstitutional actions. As has long been the law of injunctive relief:

> [I]n case of an injury threatened by his illegal action, the officer
> cannot claim immunity from injunction process. The principle has
> frequently been applied with respect to state officers seeking to
> enforce unconstitutional enactments. And it is equally applicable to
> a Federal officer acting in excess of his authority or under an
> authority not validly conferred.

*Philadelphia Co. v. Stimson*, 223 U.S. 605, 619 (1912) (internal citations omitted); *see Larson*, 337 U.S. at 690 (quoting same); *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("official-capacity actions for prospective relief are not treated as actions against the State").

In addition, the Administrative Procedure Act provides a limited waiver of sovereign immunity allowing plaintiffs harmed by agency action to obtain injunctive relief. *See* 5 U.S.C. § 702 (waiving sovereign immunity for certain claims "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority"); *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) (citing 5 U.S.C. § 702) ("Insofar as appellants seek equitable relief, we conclude that sovereign immunity does not bar the way."). In the context of Section 1985, at least one court has found that "Congress…made plaintiff's task simple when it waived sovereign immunity for most actions seeking non-monetary relief." *Gray Moving & Storage, Inc. v. Fichback*, 516 F. Supp. 1165, 1166–67 (D. Colo. 1981) (citing 5 U.S.C. § 702). The court held that "[s]overeign immunity does not bar injunctive relief in this case" where "[p]laintiffs' primary claim is that defendants' actions violated the Civil Rights Act, 42 U.S.C. § 1985(3)." *Id.*

Here, the agency action was the order and subsequent actions to violently clear Lafayette Square. Accordingly, this Court should also find that the Administrative Procedure Act waives sovereign immunity for injunctions against federal officials who violate §§ 1985(3) and 1986.

**CONCLUSION**

Plaintiffs' Fifth and Sixth Claims properly allege causes of action pursuant to §§ 1985(3) and 1986. To decide otherwise would deprive American citizens of equal protection under the law and undermine our country's noblest traditions of respecting the rights of all citizens—regardless of race or associational status—to peaceably assembly, and to petition their government for redress of grievances. *See* U.S. Const. amend. I. This case represents a paradigmatic deprivation of civil and constitutional rights motivated by racial animus against citizens exercising their most basic rights to assemble and demonstrate in a traditional public forum. At this early stage of the litigation, where plausibly pled facts are assumed to be true and are viewed in the light most favorable to Plaintiffs, dismissal of these claims would open the door for significant future mischief and violence by federal officials and others.

Looking to history, many historically significant events would have been thwarted, and civil rights progress reversed, if the behavior at issue here were permissible. Imagine that federal officials, uncomfortable with the rising cries of "Votes for Women," had conspired to order Capitol Police to attack and violently remove suffragettes and their supporters peacefully protesting in front of the White House. Or, that federal officials had conspired to clear the 1963 March on Washington from the National Mall, under the guise that President Kennedy was visiting the area. Such actions would have been obviously contrary to fundamental civil and constitutional rights and would have changed the course of history for the worse.

Looking to the future, granting Defendants' Motions to Dismiss would result in a more inequitable America, where citizens have no remedy at law for conspiracies to deprive them of equal protection of the laws—no matter how egregious or racially motivated—so long as such deprivation involves a dubious, pretextual explanation. Such a decision would invite federal

24

officials and others to conspire to deprive citizens of their basic rights, driven by racial motives under a thin veil of pretense ("a federal official wanted to take a stroll through a public forum where citizens happened to be peacefully assembling").

The Court should carry on our nation's tradition of protecting citizens from flagrant abuses of their civil and constitutional rights, and hold that Plaintiffs have sufficiently alleged causes of action pursuant to §§ 1985(3) and 1986. As noted above, the Civil Rights Act of 1871 was passed in response to terrible violence against Black people and their supporters and in order to protect citizens from the exact types of conspiracies detailed in Plaintiffs' Complaint. Defendants conspired to deprive Black people and their supporters of their most fundamental rights, in many of the same ways that §§ 1985(3) and 1986 were intended to prevent, as exemplified in the historical context, legislative history, and case law described herein.

Dated: November 24, 2020

Respectfully submitted,

_____/s/ Eric L. Klein_____

| | |
|---|---|
| Roy D. Prather III | Benjamin F. Wilson (DC Bar No. 965814) |
| BEVERIDGE & DIAMOND, P.C. | Eric L. Klein (DC Bar No. 993268) |
| 201 North Charles Street, Suite 2210 | Nessa Horewitch Coppinger (DC Bar No. 477467) |
| Baltimore, MD 21201-4150 | Julius M. Redd |
| 410-230-1300 • 202-789-6190 (fax) | Alan J. Sachs |
| | Zachary B. Pilchen[12] |
| Anthony G. Papetti | Brooklyn N. Hildebrandt |
| Jessica H. Maloney | Dacia T. Meng |
| BEVERIDGE & DIAMOND, P.C. | Jack B. Zietman[13] |
| 477 Madison Avenue, 15th Floor | BEVERIDGE & DIAMOND, P.C. |
| New York, NY 10022-5835 | 1350 I Street, NW, Suite 700 |
| 212-702-5400 • 202-789-6190 (fax) | Washington, DC 20005-3311 |
| | 202-789-6000 • 202-789-6190 (fax) |
| | eklein@bdlaw.com |

*Counsel For Amici Curiae*
*Concerned Legal Academics and Historians*

---

[12] *Admitted only in Virginia; practicing under supervision per D.C. App. Rule 49(c)(8).*
[13] *Admitted only in Massachusetts; practicing under supervision per D.C. App. Rule 49(c)(8).*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BLACK LIVES MATTER D.C., *et al.*,

                *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

                *Defendants*.

Case No. 1:20-cv-01469-DLF

**PROPOSED ORDER**

Upon consideration of the Concerned Legal Academics and Historians' Motion for Leave to File Brief as Amici Curiae in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss, and the entire record herein, it is hereby

**ORDERED** that the motion is **GRANTED**, and

**FURTHER ORDERED** that the Brief of Amici Curiae Concerned Legal Academics and Historians in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss is deemed, and hereby is, filed in this action.

Date: _____

_____
DABNEY L. FRIEDRICH
United States District Judge