## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., *et al.*,

      *Plaintiffs*,

  v.

DONALD J. TRUMP, President of the United States of America, *et al.*,

      *Defendants*.

Civil Action No. 20-1469 (DLF)

**MOTION OF THE INTERNATIONAL CENTER FOR ADVOCATES AGAINST DISCRIMINATION; THE INTERNATIONAL HUMAN RIGHTS CLINIC, UNIVERSITY OF VIRGINIA SCHOOL OF LAW; THE LEITNER CENTER FOR INTERNATIONAL LAW & JUSTICE, FORDHAM UNIVERSITY SCHOOL OF LAW; THE ROBERT AND HELEN BERNSTEIN INSTITUTE FOR HUMAN RIGHTS, NEW YORK UNIVERSITY SCHOOL OF LAW; AND WILLIAM J. ACEVES, PROFESSOR OF LAW, CALIFORNIA WESTERN SCHOOL OF LAW FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT BARR'S, FEDERAL OFFICIAL-CAPACITY DEFENDANTS', AND D.C. DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' OPPOSITION TO DEFENDANT VINCENT'S MOTION TO DISMISS**

Pursuant to Local Civil Rule 7(o), the International Center for Advocates Against Discrimination ("ICAAD"); the International Human Rights Clinic, University of Virginia School of Law; the Leitner Center for International Law & Justice, Fordham University School of Law; the Robert and Helen Bernstein Institute for Human Rights, New York University School of Law; and William J. Aceves, Professor of Law, California Western School of Law (collectively, the "Movants") respectfully move for leave to file the attached *amicus curiae* brief in support of Plaintiffs' Opposition to Defendant Barr's, Federal Official-Capacity Defendants', and D.C. Defendants' Motions to Dismiss and Plaintiffs' Opposition to Defendant Vincent's

Motion to Dismiss (the "Oppositions").

## INTRODUCTION

1.      Movants are international law centers associated with renowned United States'

law schools, an international law scholar, and a nongovernmental organization focused on

combatting structural discrimination.   As scholars and practitioners in the area of international

law, Movants share the same goal of supporting the public's interests through the application of

the international human rights laws relevant to this case.  Movants' strong interest in ensuring

that the Court reaches a decision that accounts for the interpretive guidance offered by

international law—especially international human rights law—led to their submission of this

motion and its accompanying brief.

2.      Movants seek leave to file the accompanying *amicus curiae* brief on the relevance

of international law to this case in order to assist the Court with resolving Plaintiffs' claims by

providing additional insight on the Court's obligations in regards to the international human

rights blatantly violated by the Defendants.[1]  Neither Plaintiffs nor Defendants have fully

addressed the significance of international law to the claims at issue.

3.      Yet, as discussed in greater detail within the attached brief, international law is

not only a longstanding part of United States law and legal practice but it also serves as a key

interpretive parameter for the rights and protections afforded by the U.S. Constitution and other

sources of U.S. domestic law.  Courts, including the Supreme Court, use international law to

interpret United States domestic law, including constitutional law, and thereby protected

---

[1]  Movants further timely submit this motion, and its accompanying brief, to the Court in
accordance with Local Rule 7(o)(2).  Plaintiffs filed their Oppositions on November 19, 2020,
only seven days prior to this submission (discounting the federal holiday on November 26,
2020).

international human rights within the United States.  *See, e.g., Roper v. Simmons*, 543 U.S. 551,

575 (2005) ("[T]he Court has referred to the laws of other countries and to international

authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel

and unusual punishments.'") (citation omitted).  This Court should follow the Supreme Court's

approach and also consider, when evaluating Plaintiffs' First and Fourth Amendment claims,

how international law protects Plaintiffs' human rights at issue in this case.

      4.      The grounds for this motion are set forth in greater detail below.

## ARGUMENT

## I.  District Courts Can Permit *Amicus Curiae* to Participate in a Proceeding.

      5.      Movants can participate in the proceeding as *amicus curiae*.  All District Courts

"have the inherent authority to appoint or deny *amici*."  *Youming Jin v. Ministry of State Sec.*,

557 F. Supp. 2d 131, 136 (D.D.C. 2008) (quoting *Smith v. Chrysler Fin. Co., L.L.C.*, 2003 WL

328719, at *18 (D.N.J. Jan. 15, 2003)).  Pursuant to that authority, this Court has the "discretion

to determine 'the fact, extent, and manner' of the participation."  *Id.* (quoting *Cobell v. Norton*,

246 F.Supp.2d 59, 62 (D.D.C. 2003)); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of

Eng'rs*, 519 F.Supp.2d 89, 93 (D.D.C. 2007) ("Nevertheless, the court has broad discretion to

permit NRDC's participation in this suit as an *amicus curiae*.").

      6.      *Amici* are normally permitted to participate in a proceeding under certain defined

circumstances.  The District Court for the District of Columbia has determined that

> [a]n *amicus* brief should normally be allowed [(1)] when a party is
> not represented competently or is not represented at all, [(2)] when
> the *amicus* has an interest in some other case that may be affected
> by the decision in the present case (though not enough effected to
> entitle the *amicus* to intervene and become a party in the present
> case), or [(3)] when the *amicus* has unique information or
> perspective that can help the court beyond the help that the lawyers
> for the parties are able to provide.  Otherwise, leave to file an *amicus
> curiae* brief should be denied.

*Jin*, 557 F.Supp.2d at 137 (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997)).

7.      Movants have unique information on the relevance of international law to the Court's decision in this proceeding.  ICAAD is a nonprofit, nongovernmental, human rights organization dedicated to creating a more equitable future.  ICAAD's expertise on human rights education, reform efforts against discriminatory practices and policies, and research studies on human rights issues has brought ICAAD to the forefront of legal innovation and progress on combatting structural discrimination around the world.  The International Human Rights Clinic, University of Virginia School of Law; the Leitner Center for International Law & Justice, Fordham University School of Law; and the Robert and Helen Bernstein Institute for Human Rights each focus on educating law students and the public on international human rights law, and on human rights advocacy both in the United States and abroad.  And Professor William J. Aceves has not only dedicated his career to the study of international law but also works with Amnesty International, the Center for Justice & Accountability, the Center for Constitutional Rights, and the American Civil Liberties Union in regards to the domestic application of international law.  Movants intend to use their collective expertise in international human rights law to inform the Court about the import of international human rights to this case.

8.      Movants should be permitted to present their specialized knowledge to the Court. Courts have granted leave for parties to participate as *amicus* "when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."  *Jin*, 557 F.Supp.2d at 137 (quoting *Ryan*, 125 F.3d at 1064).  This unique information or perspective should "assist the judge 'by presenting ideas, arguments, theories, insights, facts or data that are not to be found in the parties' briefs.'"  *Northern Mariana Islands*

*v. United States*, No. 08-1572, 2009 WL 596986, at *1 (D.D.C. Mar. 6, 2009) (quoting *Voices for Choices v. Illinois Bell Telephone Co.*, 339 F.3d 542, 545 (7th Cit. 2003)).

9.      As described more fully in the attached *amicus curiae* brief, Movants seek to provide guidance to this Court on the significance of international human rights to United States domestic law and on the Defendants' compliance with those rights.  International law is an important aspect of United States law and often used to interpret the rights and protections afforced by the Constitution and other sources of U.S. domestic law.  Hence, this Court's interpretation of U.S. law should be guided by the international human rights treaties ratified by the United States as well as the customary international law of human rights binding on the United States.

10.      Importantly, Defendants' actions violated the obligations contained within several ratified international human rights treaties.  Both the International Covenant on Civil and Political Rights ("ICCPR")[2] and the International Convention on the Elimination of All Forms of Racial Discrimination ("CERD")[3] protect the international human rights to peaceful assembly and freedom of expression, and prohibit (with extremely limited and irrelevant exceptions) restrictions to those rights.  Defendants ignored these rights when they dispersed the demonstrators on June 1, 2020.  And, when impermissibly dispersing the demonstration, Defendants violated the international human rights that restrain the use of force when policing peaceful assemblies.  Defendants would never have taken these actions against the demonstrators had they agreed with their message of opposition to systematic racism and racial discrimination in the United States.

---

[2]  International Covenant on Civil and Political Rights (1966), 999 U.N.T.S. 171.

[3]  International Convention on the Elimination of All Forms of Racial Discrimination (1966), 660 U.N.T.S. 195.

11.     Defendants do not contest that Plaintiffs were acting both lawfully and peacefully when they gathered in Lafayette Square on June 1, 2020 to petition their government.  Third Am. Compl., ECF No. 52, ¶¶ 86-87.  Yet, Defendants nonetheless used physical violence to disperse the demonstration in Lafayette Square.  The United States has long sought to restrain similar conduct in foreign states, and cannot now take the contrary position that such a violent attack on civil liberties is permitted in the United States.[4]  Defendants' actions are not tolerated on the international stage, and should not be tolerated by this Court.

## II.  The Court Should Grant the Motion Despite Defendants' Objections to Movants' Participation as *Amicus Curiae*.

12.     Given the Court's authority to grant participation by an *amicus curiae* and the significant issues raised by the Oppositions, Movants respectfully submit this motion.  Pursuant to Local Civil Rule 7(m), counsel must confer "in a good faith effort to determine whether there is any opposition to the relief sought" in a nondispositive motion and, "if there is, to narrow the

---

[4]  Indeed, pursuant to international human rights law, the Trump administration encouraged all States to "to avoid using force wherever possible during peaceful protests and to ensure that, where force is absolutely necessary, no one is subjected to excessive or indiscriminate use of force."  U.N. GA, Third Committee, Seventy-Third Session, Agenda item 74(b), *Promotion and protection of human rights and fundamental freedoms, including the rights to peaceful assembly and freedom of association*, at 4, U.N. Doc. A/C.3/73/L.41/Rev.1 (Nov. 14, 2018) (introduced by the United States); *see also* Human Rights Council, Resolution 25/38, U.N. Doc. A/HRC/RES/25/38 (Apr. 11, 2014) (supported by the United States).  The administration thus raised concerns that the Azerbaijani government had "in one recent incident, forcefully dispersed an otherwise peaceful, if unsanctioned, protest."  Ambassador Eileen C. Donahoe, *U.S. Statement at the UPR of Azerbaijan*, U.S. Mission to International Organizations in Geneva (Apr. 30, 2013), https://geneva.usmission.gov/2013/05/01/u-s-statement-at-the-upr-of-azerbaijan/.

areas of disagreement."[5]  The parties have not objected to the submission of this motion.[6]

13.     Pursuant to Local Civil Rule 7(m), Movants contacted counsel for Plaintiffs and Defendants in a good faith effort to determine whether there is any opposition to the relief sought in this motion.  Counsel for Plaintiffs consented to the filing of an *amicus* brief.  The District of Columbia Defendants;[7] the Official-Capacity Federal Defendants;[8] and United States Attorney General William P. Barr, Major Mark Adamchik, Arlington County Police Captain Wayne Vincent, and Officer Cara Seiberling, in their individual capacities, take no position on the motion.

## REQUEST TO PARTICIPATE IN ORAL ARGUMENT

14.     In the event that the Court grants Movants' Motion for Leave to File *Amicus*

---

[5] If a party objects to the participation of an *amicus*, the Court will consider two factors in deciding whether to grant the application: "(1) the movant's interest; and (2) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case."  *Jin*, 557 F.Supp.2d at 137 (quoting *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 130-31 (3d Cir. 2002)).  As explained above, Movants not only have the requisite interest in this proceeding but also seek to provide this Court with unique information relevant to the disposition of this proceeding.  The attached *amicus curiae* brief will help further inform the Court about the international law issues surrounding the Oppositions.

[6] Movants recognize that several Defendants in this case have not been identified (i.e., Defendants John Doe 1-100 and John Roe 1-20) and several Defendants were recently served and have no counsel on record (i.e., Defendants Locasico, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Feliciano, and Kellenberger).  Since these Defendants are presently unrepresented and/or were recently added to the case, we have been unable to contact them in regards to this motion.  Movants recognize, however, that these Defendants have the right to make their position on this motion clear to the Court once they are either identified or obtain representation.

[7] The District of Columbia Defendants consist of the Metropolitan Police Department Chief Peter Newsham, the ten named officers of the Metropolitan Police Department from Plaintiffs' Third Amended Complaint, and John Roes 1-50 in their individual capacities.

[8] The Official-Capacity Federal Defendants consist of the President of the United States; Attorney General William P. Barr; Secretary of Defense Mark Esper; Acting Chief of the U.S. Park Police Gregory T. Monahan; Director of the U.S. Secret Service James M. Murray; Commanding General of the D.C. National Guard William J. Walker; and Director of the Federal Bureau of Prisons Michael Carvajal.

*Curiae* Brief, then Movants would respectfully request permission to participate in oral argument pursuant to Local Civil Rule 7(o)(6).[9]

## CONCLUSION

15.     Wherefore, Movants request that the Court grant it leave to file Movants' attached *amicus curiae* brief in support of Plaintiffs' Oppositions and direct the Clerk of Court to file of record the *amicus curiae* brief.

Respectfully submitted this 27 day of November 2020.

By:  ___//s//_____
Arif Hyder Ali
(DC Bar No. 434075)
Alexandre de Gramont
(DC Bar No. 430640)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006-1110
(202) 261-3333
arif.ali@dechert.com
alexandre.degramont@dechert.com

Counsel for *Amicus Curiae*

---

[9]  In addition, if the Court would find oral argument helpful on Movants' Motion for Leave to File *Amicus Curiae* Brief, Movants would of course be pleased to participate in such argument.

## CERTIFICATE OF SERVICE

I hereby certify that, on November 27, 2020, I electronically filed the foregoing Motion of the International Center for Advocates Against Discrimination; the International Human Rights Clinic, University of Virginia School of Law; the Leitner Center for International Law & Justice, Fordham University School of Law; the Robert and Helen Bernstein Institute for Human Rights, New York University School of Law; and William J. Aceves, Professor of Law, California Western School of Law for Leave to File *Amicus* Curiae Brief in Support of Plaintiffs' Opposition to Defendant Barr's, Federal Official-Capacity Defendants', and D.C. Defendants' Motions to Dismiss and Plaintiffs' Opposition to Defendant Vincent's Motion to Dismiss with the Clerk of the District Court for the District of Columbia by using the electronic CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Dated:  November 27, 2020 By:  _//s//_____

Arif Hyder Ali
(DC Bar No. 434075)
Alexandre de Gramont
(DC Bar No. 430640)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006-1110
(202) 261-3333
arif.ali@dechert.com
alexandre.degramont@dechert.com

Counsel for *Amicus Curiae*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., *et al*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, President of the United States of America, *et al.*,

        *Defendants*.

Civil Action No. 20-1469 (DLF)

**BRIEF OF THE INTERNATIONAL CENTER FOR ADVOCATES AGAINST DISCRIMINATION; THE INTERNATIONAL HUMAN RIGHTS CLINIC, UNIVERSITY OF VIRGINIA SCHOOL OF LAW; THE LEITNER CENTER FOR INTERNATIONAL LAW & JUSTICE, FORDHAM UNIVERSITY SCHOOL OF LAW; THE ROBERT AND HELEN BERNSTEIN INSTITUTE FOR HUMAN RIGHTS, NEW YORK UNIVERSITY SCHOOL OF LAW; AND WILLIAM J. ACEVES, PROFESSOR OF LAW, CALIFORNIA WESTERN SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT BARR'S, FEDERAL OFFICIAL-CAPACITY DEFENDANTS', AND D.C. DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' OPPOSITION TO DEFENDANT VINCENT'S MOTION TO DISMISS**

Arif Hyder Ali
(DC Bar No. 434075)
Alexandre de Gramont
(DC Bar No. 430640)

DECHERT LLP
1900 K Street, NW
Washington, D.C. 2006
Phone: (202)261-3333
Email: arif.ali@dechert.com
Email: alexandre.degramont@dechert.com

Counsel for *Amicus Curiae*

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

CORPORATE DISCLOSURE STATEMENT .................................................................. v

STATEMENT OF INTEREST.......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ..................................................................................................................... 5

    I.     International Law Is Part of the Law of the United States and Should Guide The Interpretation of Domestic Law ............................................................... 5

    II.    The International Law Protecting Peaceful Assembly and Freedom of Expression Was Clearly Violated ......................................................................... 12

        A.    It Was Unlawful to Restrict the Demonstration Based on the Identity of the Demonstrators and the Content of Their Message ............................. 13

        B.    It Was Equally Unlawful to Restrict the Demonstration on Any Other Basis ................................................................................................... 15

    III.    The International Law Restricting the Use of Force  Against Assemblies Was Clearly Violated ......................................................................................... 19

        A.    It Was Unlawful to Disperse the Civil Rights Defenders from Lafayette Square ................................................................................................. 21

        B.    It Was Unlawful to Use Force of Any Sort Against the Civil Rights Defenders ............................................................................................. 22

        C.    It Was Unlawful to Use Overwhelming Force Against the Civil Rights Defenders ............................................................................................. 23

CONCLUSION................................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865 (2018).......................... 6

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ...................................... 6

*Enmund v. Florida*, 458 U.S. 782 (1982) ................................................. 7

*Garcia v. Sessions*, 856 F.3d 27, 42 (1st Cir. 2017) ......................................... 9

*Lawrence v. Texas*, 539 U.S. 558 (2003)................................................. 7

*Maria v. McElroy*, 68 F.Supp.2d 206 (E.D.N.Y. 1999),
    *abrogated on other grounds by Restrepo v. McElroy*, 369 F.3d 627 (2d Cir. 2004)................. 8

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804), *affirmed by Fox Television Stations,*
    *Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 23 (D.D.C. 2015) ................................ 8

*Roper v. Simmons*, 543 U.S. 551 (2005)................................................. 7

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)........................................... 6

*The Nereide*, 13 U.S. 388 (1815) ...................................................... 6

*The Paquete Habana*, 175 U.S. 677 (1900)............................................... 6

**Other Authorities**

136 CONG. REC. 36192 (1990)........................................................... 9

138 CONG. REC. 8070 (1992)......................................................... 8, 9

140 CONG. REC. 14326 (1994)........................................................ 8, 9

Ambassador Eileen C. Donahoe, *U.S. Statement at the UPR of Azerbaijan*, U.S. Mission to
    International Organizations in Geneva (Apr. 30, 2013),
    https://geneva.usmission.gov/2013/05/01/u-s-statement-at-the-upr-of-azerbaijan/ ................ 22

Ambassador Kelley Currie, U.S. Representative for Economic and social Affairs, *Explanation*
    *of Position on a Third Committee Resolution on Freedom of Peaceful Assembly and*
    *Association*, U.S. Mission to the United Nations (Nov. 20, 2018),
    https://usun.usmission.gov/explanation-of-position-on-a-third-committee-resolution-on-
    freedom-of-peaceful-assembly-and-association/ ........................................ 2

Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
    (1984), 1465 U.N.T.S. 112 ......................................................... 5

Convention on the Prohibition of the Development, Production, Stockpiling and Use of
    Chemical Weapons and on their Destruction (1992), 1975 U.N.T.S. 45 ...................... 25

G.A. Res. 217 (III) A, Universal Declaration of Human Rights (Dec. 10, 1948) ............. 7, 12, 15

Harry A. Blackmun, *The Supreme Court and the Law of Nations*, 104 YALE L.J. 39 (1994)........ 6

Human Rights Council, Resolution 25/38, U.N. Doc. A/HRC/RES/25/38 (Apr. 11, 2014)........ 23

International Convention on the Elimination of All Forms of Racial Discrimination (1966),
660 U.N.T.S. 195 ................................................................................ 4, 12, 15, 20

International Covenant on Civil and Political Rights (1966), 999 U.N.T.S. 171 .............. 3, 12, 15

Louis B. Sohn, *The New International Law: Protection of the Rights of Individuals Rather Than States*, 32 Am. U. L. Rev. 1 (1982) ................................................................................ 7

Mark P. Lagon, Deputy Assistant Secretary of State for International Organization Affairs, Statement to UNCHR,
2005 DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW ...................................... 13

Michael W. Reisman, *Sovereignty and Human Rights in Contemporary International Law*, 84(4) Am. J. Int'l L. 866 (1990) ................................................................................ 7

*Observations of the United States of America on the Human Rights Committee's Draft General Comment No. 37 on Article 21: Peaceful Assembly*, Office of the High Commissioner for Human Rights (Feb. 14, 2020), https://www.ohchr.org/Documents /HRBodies/CCPR/GCArticle21/STATE_USA.docx .......................................................... passim

Oliver De Schutter, International Human Rights Law (2010) .................................................... 7

OSCE AND VENICE COMMISSION, GUIDELINES ON FREEDOM OF PEACEFUL ASSEMBLY
(2d ed. 2010) ................................................................................ 19

Paula Sclniefer, Head of the U.S. Delegation to the 25th Session of the United Nations Human Rights Council, *The Right to Protest Peacefully is an Essential Enabler of Other rights and Freedoms*, U.S. Mission to International Organizations in Geneva (Mar. 28, 2014), https://geneva.usmission.gov/2014/03/28/the-right-to-protest-peacefully-is-an-essential-enabler-of-other-rights-and-freedoms/ ................................................................ 19

Rebecca Crootof, *Judicious Influence: Non-Self-Executing Treaties and the Charming Betsy Canon*, 120 YALE L.J. 1784 (2011) ................................................................ 8

THE DECLARATION OF INDEPENDENCE (U.S. 1776) ................................................................ 5

U.N. CCPR, *Alekseev v. Russian Federation*, Views adopted by the Committee at its 109th Session, U.N. Doc. CCPR/C/109/D/1873/2009 (Dec. 2, 2013) .............................................. 13

U.N. CCPR, *Amelkovich v. Belarus*, Views adopted by the Committee at its 125th Session, U.N. Doc. CCPR/C/125/D/2720/2016 (May 29, 2019) .......................................................... 13

U.N. CCPR, *Chebotareva v. Russian Federation*, Views adopted by the Committee at its 104th Session, U.N. Doc. CCPR/C/104/D/1866/2009 (Apr. 26, 2012) ...................................... 15

U.N. CCPR, *Fourth periodic report dated 30 December 2011, by the United States of America*, U.N. Doc. CCPR/C/USA/4 (May 22, 2012) ............................................................ 11

U.N. CCPR, Human Rights Committee, 102nd Session, *General Comment No. 34*, U.N. Doc. CCPR/C/GC/34 (Sept. 12, 2011) ................................................................................ 15

U.N. CCPR, Human Rights Committee, *General Comment No. 36*, U.N. Doc. CCPR/C/GC/36 (Sept. 3, 2019) ................................................................................ 22, 23

U.N. CCPR, Human Rights Committee, *General Comment No. 37 (2020) on the Right of Peaceful Assembly (article 21)*, U.N. Doc. CCPR/C/GC/37 (Sept. 17, 2020) .................. passim

U.N. CCPR, *Kovalenko v. Belarus*, Views adopted by the Committee at its 108th Session, U.N. Doc. CCPR/C/108/D/1808/2008 (Sept. 26, 2013) ...................................................... 13, 14

U.N. CCPR, *Strizhak v. Belarus*, Views adopted by the Committee at its 124th Session, U.N. Doc. CCPR/C/124/D/2260/2013 (Dec. 13, 2018) ..................................................................... 19

U.N. CCPR, *Turchenyak et al. v. Belarus*, Views adopted by the Committee at its 108th Session, U.N. Doc. CCPR/C/108/D/1948/2010 (Sept. 10, 2013)............................................. 19

U.N. GA, HRC Working Group on the Universal Periodic Review, Twenty-Second Session, *National report submitted in accordance with paragraph 5 of the annex to Human Rights Council resolution 16/21, by the United States of America*, U.N. Doc. A/HRC/WG.6/22/USA/1 (Feb. 13, 2015) ............................................................................ 11

U.N. GA, Human Rights Committee, Thirty-First Session, Agenda item 3, *Joint report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association and the Special Rapporteur on extrajudicial, summary or arbitrary execution on the proper management of assemblies, Note by the Secretariat*, U.N. Doc. A/HRC/31/66 (Feb. 4, 2016) ......................................................................................................................... 20, 21, 22

U.N. GA, Human Rights Council Working Group of the Universal Periodic Review, Thirty-Sixth Session, *National report submitted in accordance with paragraph 5 of the annex to Human Rights Council resolution 16/21, by the United States of America*, U.N. Doc. A/HRC/WG.6/36/USA/1 (Aug. 13, 2020)................................................................ 10

U.N. GA, Human Rights Council Working Group on the Universal Periodic Review, Ninth Session, *National report submitted in accordance with Paragraph 15(a) of the Annex to Human Rights Council resolution 5/1, by the United States of America*, U.N. Doc. A/HRC/WG.6/9/USA/1 (Aug. 23, 2010)................................................................... 10

U.N. GA, Third Committee, Seventy-Third Session, Agenda item 74(b), *Promotion and protection of human rights and fundamental freedoms, including the rights to peaceful assembly and freedom of association*, U.N. Doc. A/C.3/73/L.41/Rev.1 (Nov. 14, 2018) ... 2, 23

United Nations Office of the High Commissioner for Human Rights, *Guidance on Less-Lethal Weapons in Law Enforcement* (2020) .......................................................... 24

United States, *Observations on the Human Rights Committee's Draft General Comment 34 on Article 19 of the International Covenant on Civil and Political Rights* (July 5, 2011) *in* Freedom of Expression, 2011 Digest Of United States Practice In International Law, ch. 6, § L................................................................................................................ 16

Vienna Convention on the Law of Treaties (1969), 1155 U.N.T.S. 331 ....................................... 8

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ............................................................................................... 6

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rule 7(o)(5) and Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), counsel certify that, to the best of our knowledge and belief, none of the *Amici* have parent corporations or have issued public stock.  The International Human Rights Clinic, University of Virginia School of Law; the Leitner Center for International Law & Justice, Fordham University School of Law; and the Robert and Helen Bernstein Institute for Human Rights, New York University School of Law are not incorporated separately from the University of Virginia, Fordham University, and New York University, respectively.  The International Center for Advocates Against Discrimination, the University of Virginia, Fordham University, and New York University do not have parent corporations and have not issued public stock.

## STATEMENT OF INTEREST

*Amici curiae*—the International Center for Advocates Against Discrimination

("ICAAD"); the International Human Rights Clinic, University of Virginia School of Law; the

Leitner Center for International Law & Justice, Fordham University School of Law; the Robert

and Helen Bernstein Institute for Human Rights, New York University School of Law; and

William J. Aceves, Professor of Law, California Western School of Law (collectively, the

"*Amici*")[1]—are all scholars and practitioners in the area of international law and human rights.[2]

Each of the *Amici* is dedicated to education, research, or advocacy on the international law of

human rights both in the United States and abroad.

The *Amici* therefore have a strong interest in ensuring that the Court reaches its decision

taking into account the interpretive guidance offered by international law, especially

international human rights law.  This interest serves as the basis for the submission of this

*Amicus Curiae* Brief pursuant to Local Civil Rule 7(o).

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2018, the United States, under the Trump administration, stood before the Third

Committee of the United Nations General Assembly to draw "the international community's

attention to the alarming increase in governments violating fundamental freedoms, particularly

peaceful assembly and association."  Ambassador Kelley Currie, U.S. Representative for

Economic and Social Affairs, *Explanation of Position on a Third Committee Resolution on

Freedom of Peaceful Assembly and Association*, U.S. Mission to the United Nations (Nov. 20,

---

[1]  The *Amici* do not purport to represent the views, if any of, the University of Virginia,
Fordham University, New York University, and California Western School of Law.

[2]  The *Amici* state that no counsel for any party authored this brief in whole or in part and no
entity or person, aside from *amicus curiae*, made any monetary contributions intended to fund
the preparation of this brief.

2018), https://usun.usmission.gov/explanation-of-position-on-a-third-committee-resolution-on-freedom-of-peaceful-assembly-and-association/.

The United States then proposed a resolution—subsequently adopted by the Third Committee and the United Nations General Assembly—urging "States to end their harassment and intimidation of and attacks against individuals participating in peaceful protests against racism and racial discrimination[.]"  U.N. GA, Third Committee, Seventy-Third Session, Agenda item 74(b), *Promotion and protection of human rights and fundamental freedoms, including the rights to peaceful assembly and freedom of association*, ¶ 3(d), U.N. Doc. A/C.3/73/L.41/Rev.1 (Nov. 14, 2018) (hereinafter "U.N. Resolution on Peaceful Assembly").[3]  The United States further urged "States to ensure accountability for human rights violations and abuses through judicial or other national mechanisms, based on law and in conformity with their international human rights obligations and commitments[.]"  *Id.*, ¶ 7.

Yet, some 18 months later, in complete disregard of its commitments to protect and promote international human rights around the globe, and its exhorting of other States to follow the United States' leadership in this regard, the Trump administration launched an attack on hundreds of unarmed persons—predominantly U.S. citizens—who were peacefully protesting systemic racism and police brutality in the United States.  These actions were undertaken in blatant disregard of principles of international human rights law that the Trump administration itself has espoused and defended at the international level.

Consistent with the Trump administration's own position and representations in international fora, this Court must ensure the accountability of Defendants in conformity with

---

[3]  United States was the main sponsor of the resolution.  It was adopted by the Third Committee on November 20, 2018 and by the General Assembly on December 17, 2018 (as Resolution 73/173).

international human rights obligations.  Defendants—all of whom were Trump administration officials or were acting pursuant to instructions and directions of such officials—undertook attacks against Plaintiffs and other class members peacefully demonstrating against racism and racial discrimination in and around Washington, D.C.'s historic Lafayette Square on June 1, 2020.  Defendants' conduct—harassment, intimidation, and attacks against those protesting racism—directly breached international human rights law, even as the United States itself has interpreted it.  Defendants must not be permitted to negate the role of this Court in ensuring accountability for their human rights abuses and violations, particularly where the United States has represented that it is precisely the role of the judiciary to ensure accountability.

International law, including ratified treaties and customary law, is part of United States law and is a key interpretive parameter for the rights and protections afforded by the U.S. Constitution and other sources of U.S. domestic law.  The United States has ratified core international human rights treaties, and is bound by customary international law, establishing rights directly bearing on the legality of Defendants' actions in the present case.  It is longstanding U.S. legal practice to interpret domestic law to give effect to the United States' international obligations whenever such a construction is reasonably possible.

Assuming the facts as pled,[4] Defendants' actions in dispersing the peaceful demonstrations in and around Lafayette Square on June 1, 2020 were in clear violation of the international human rights to peaceful assembly and freedom of expression under the International Covenant on Civil and Political Rights ("ICCPR")[5] and the International

---

[4]  The *Amici* make this assumption throughout this brief due to the procedural posture of the case, which requires assuming Plaintiffs' factual allegations to be true.

[5]  International Covenant on Civil and Political Rights (1966), 999 U.N.T.S. 171.

Convention on the Elimination of All Forms of Racial Discrimination ("CERD"),[6] as well as customary international law.  International law protects the exercise of peaceful protest—in which Plaintiffs were engaged—absent compelling justification for restriction.  With extremely limited (and irrelevant for present purposes) exceptions, it prohibits restrictions based on the identity of the protestors or the message of their protest.  It thus prohibited Defendants from forcibly dispersing the demonstrators, causing them bodily injury, and threatening their lives, simple because President Trump and other government officials openly opposed the demonstrators' message—despite Defendants' pretextual justification that the President and the White House were under threat.

International law prohibits other restrictions on peaceful protest unless strictly necessary for a legitimate public purpose.  There was no need to use excessive and harmful force to clear Lafayette Square and its environs for the safety and security of the President or others; the demonstrators were law abiding, peaceful and would have dispersed in accordance with curfew 30 minutes after Defendants' actions.  The President, members of his administration, and the premises of the White House were under no threat from the demonstration.  Indeed, only days before, the White House perimeter had been reinforced, and additional security was put in place.  In fact, shortly after the demonstrators were dispersed, the President himself emerged from the White House with other senior cabinet members and government officials and took a "walk of triumph" to the central locus of the protests, which was hardly prudent, and would not have been permitted by the President's security detail, had the alleged earlier threat justified the type of force that Defendants used against the demonstrators—at the President's direction.

---

[6] International Convention on the Elimination of All Forms of Racial Discrimination (1966), 660 U.N.T.S. 195.

Defendants' actions also violated the international human rights that require restraint in the use of force when policing peaceful assemblies.  Among others, the human rights to life, to freedom from cruel, inhuman or degrading treatment, to security, and to peaceful assembly contained in the ICCPR, the CERD, the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT")[7] as well as customary international law, limit such law enforcement actions.  Defendants violated these limitations.  First, Defendants were prohibited from dispersing the demonstration at all, even without force, because it was peaceful and posed no imminent threat of any sort.  Second, Defendants were prohibited from using force *at all* because they issued no order to disperse or warning, rendering Defendants' use of force *ipso facto* unnecessary and illegal.  Third, the specific deployment of force was unlawful under international law as it was unnecessary and indeed grossly excessive.

## ARGUMENT

### I.    INTERNATIONAL LAW IS PART OF THE LAW OF THE UNITED STATES AND SHOULD GUIDE THE INTERPRETATION OF DOMESTIC LAW

Respect for fundamental human rights lies at the heart of American democratic values, and since the country's founding, the United States has acknowledged the significance of international law to the American justice system.  The Preamble of the Declaration of Independence recognizes in its opening lines the fundamental importance of "the opinions of mankind."  THE DECLARATION OF INDEPENDENCE ¶ 1 (U.S. 1776).  The Declaration of Independence thus made clear that "the early architects of [the United States] understood that the customs of nations—the global opinions of mankind—would be binding upon the newly forged union."  Harry A. Blackmun, *The Supreme Court and the Law of Nations*, 104 YALE L.J. 39, 39

---

[7] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984), 1465 U.N.T.S. 112.

(1994) (citation and footnotes omitted).  The U.S. Constitution similarly reflects the United

States' early commitment to respect and adhere to international law.  According to the

Supremacy Clause of the U.S. Constitution, "***all Treaties made, or which shall be made, under***

***the Authority of the United States, shall be the supreme Law of the Land***; and the Judges in

every State shall be bound thereby[.]"  U.S. CONST. art. VI, cl. 2 (emphasis added).  Thus, courts

are "bound thereby" to abide by international treaties as if those treaties are acts of Congress.

In accordance with both the Declaration of Independence and the U.S. Constitution, the

Supreme Court has repeatedly affirmed that United States courts recognize international law and,

as a result, has often considered international law in reaching its decisions.  As the Supreme

Court held in *Sosa v. Alvarez-Machain*, "[f]or two centuries we have affirmed that the domestic

law of the United States recognizes the law of nations."  *Sosa v. Alvarez-Machain*, 542 U.S. 692,

729 (2004); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) ("[I]t is, of course,

true that United States courts apply international law as a part of our own in appropriate

circumstances.").  In *The Paquette Habana*, the Supreme Court found that "***[i]nternational law***

***is part of our law***" and that "***where there is no treaty and no controlling executive or legislative***

***act or judicial decision, resort must be had to the customs and usages of civilized nations***[.]"

*The Paquete Habana*, 175 U.S. 677, 700 (1900) (emphasis added); *Banco Nacional de Cuba*,

376 U.S. at 428; *Sosa*, 542 U.S. at 729 ("the domestic law of the United States recognizes the

law of nations").  United States courts are thus "bound by the law of nations which is a part of

the law of the land."  *The Nereide*, 13 U.S. 388, 423 (1815).

In recognition of this fact, the Supreme Court has repeatedly turned towards international

law when evaluating legal issues in seminal cases.  *See, e.g., Animal Sci. Prod., Inc. v. Hebei*

*Welcome Pharm. Co*., 138 S. Ct. 1865, 1875 (2018) ("Although the United States is not a party

to those treaties, they reflect an international practice inconsistent with the Court of Appeals'

'binding, if reasonable' resolution. . . .  We therefore vacate the judgment of the Court of

Appeals and remand the case for renewed consideration consistent with this opinion."); 

*Lawrence v. Texas*, 539 U.S. 558, 576 (2003) ("To the extent *Bowers* relied on values we share

with a wider civilization, it should be noted that the reasoning and holding in *Bowers* have been

rejected elsewhere.  The European Court of Human Rights has followed not *Bowers* but its own

decision."); *Enmund v. Florida*, 458 U.S. 782, 796 n. 22 (1982) ("'[T]he climate of international

opinion concerning the acceptability of a particular punishment' is an additional consideration

which is 'not irrelevant.'" (quoting *Coker v. Georgia*, 433 U.S. 584, 596, n. 10 (1977))).

The Supreme Court has also turned to international law when interpreting the

Constitution.  *See Roper v. Simmons*, 543 U.S. 551, 575 (2005) ("[T]he Court has referred to the

laws of other countries and to international authorities as instructive for its interpretation of the

Eighth Amendment's prohibition of 'cruel and unusual punishments.'" (citation omitted)).

With respect to applicable international law, the United States has ratified the ICCPR, the

CERD, and the CAT.  The United States is also bound by the customary international law of

human rights, as reflected in the Universal Declaration of Human Rights ("UDHR").[8]  Given that

---

[8]  G.A. Res. 217 (III) A, Universal Declaration of Human Rights (Dec. 10, 1948).  The relevant
international human rights set forth in the UDHR have since become part of customary
international law.  Oliver De Schutter, International Human Rights Law 50 (2010) ("The
growing consensus is that most, if not all, of the rights enumerated in the Universal
Declaration of Human Rights have acquired a customary status in international law . . . .");
Michael W. Reisman, *Sovereignty and Human Rights in Contemporary International Law*,
84(4) Am. J. Int'l L. 866, 867 (1990) (recognizing that the UDHR is "now accepted as
declaratory of customary international law[.]"); Louis B. Sohn, *The New International Law:
Protection of the Rights of Individuals Rather Than States*, 32 Am. U. L. Rev. 1, 15-17 (1982)
("The Declaration, as an authoritative listing of human rights, has become a basic component
of international customary law, binding on all states, not only on members of the United
Nations.").

these instruments set forth extensive protections for the rights to peaceful assembly, freedom of

expression, and freedom from excessive use of force, they are directly relevant to the present

case.  *See infra* Secs. II, III.  That is, U.S. law must be understood to provide protections for

human rights that are no less extensive than those set forth in international law.

Defendants cannot escape accountability by arguing that the applicable treaties are not

self-executing.  138 CONG. REC. 8070, 8071 (1992) ("[T]he United States declares that the

provisions of Articles 1 through 27 of the [ICCPR] are not self-executing."); 140 CONG. REC.

14326 (1994) ("That the United States declares that the provisions of the [CERD] are not self-

executing.").  Even when the United States ratifies treaties on a non-self-executing basis, it

nevertheless "accepts and is bound by the treaty's requirements as a matter of international law."

Rebecca Crootof, *Judicious Influence: Non-Self-Executing Treaties and the Charming Betsy*

*Canon*, 120 YALE L.J. 1784, 1786 (2011) (*citing* Vienna Convention on the Law of Treaties art.

26 (1969), 1155 U.N.T.S. 331).  Although a treaty "is not self-executing, it is an international

obligation of the United States and constitutes a law of the land."  *Maria v. McElroy*, 68

F.Supp.2d 206, 231-32 (E.D.N.Y. 1999), *abrogated on other grounds by Restrepo v. McElroy*,

369 F.3d 627 (2d Cir. 2004).

As the Supreme Court observed in *Murray v. Schooner Charming Betsy*, "an act of

Congress ought never to be constructed to violate the law of nations if any other possible

construction remains, and consequentially can never be construed to violate neutral rights, or to

affect neutral commerce, further than is warranted by the law of nations as understood in this

country."  *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804), *affirmed by Fox*

*Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 23 (D.D.C. 2015).  Courts have

determined that there is no reason why "non-self-executing status . . . bears on the <u>Charming</u>

Betsy canon's potential application." *Garcia v. Sessions*, 856 F.3d 27, 42 (1st Cir. 2017).  The

canon ensures that the United States acts in accordance with its international law obligations.

When ratifying the ICCPR, the United States government promised that "this Covenant

shall be implemented by the Federal Government to the extent that it exercises legislative and

judicial jurisdiction over the matters covered therein, and otherwise by the state and local

governments[.]"  138 CONG. REC. 8070, 8071 (1992).  It also made clear that "States Party to the

Covenant should wherever possible refrain from imposing any restrictions or limitations on the

exercise of the rights recognized and protected by the Covenant, even when such restrictions and

limitations are permissible under the terms of the Covenant."  *Id.*  It then declared that the United

States "will continue to adhere to the requirements and constraints of its Constitution in respect

to all such restrictions and limitations" and, crucially, that "[n]othing in this Covenant requires or

authorizes legislation, or other action, by the United States of America prohibited by the

Constitution of the United States as interpreted by the United States."  *Id.*  Under international

and domestic law, these statements constitute commitments not only to the American people, but

to peoples all around the world aspiring to the freedoms and rights that Americans are

guaranteed under the U.S. Constitution.

The United States made similar statements when ratifying the CERD and the CAT.  140

CONG. REC. 14326 (1994); 136 CONG. REC. 36192 (1990).  For example, regarding the CERD, it

asserted that "the United States understands that this Convention shall be implemented by the

Federal Government to the extent that it exercises jurisdiction over the matters covered

therein[.]"  140 CONG. REC. 14326 (1994).  The United States further emphasized the importance

of the rights to freedom of speech, expression, and association by expressly stating that the

CERD cannot "restrict those rights" (which it does not).  *Id.*

Since the ratification of the ICCPR, the CERD, and the CAT, the United States has repeatedly taken the position that its international human rights obligations have been implemented through domestic law.  It has been a cornerstone of U.S. foreign policy that the United States provides a model of a nation founded on an ideal of individual rights and liberties.

In a statement to the United Nations Human Rights Council, the Trump administration represented that "[t]he United States is a federal republic in which its international and domestic human rights obligations are implemented through a comprehensive system of laws, administrative regulations and enforcement actions."  U.N. GA, Human Rights Council Working Group of the Universal Periodic Review, Thirty-Sixth Session, *National report submitted in accordance with paragraph 5 of the annex to Human Rights Council resolution 16/21, by the United States of America*, ¶ 11, U.N. Doc. A/HRC/WG.6/36/USA/1 (Aug. 13, 2020); *see also* U.N. GA, Human Rights Council Working Group on the Universal Periodic Review, Ninth Session, *National report submitted in accordance with Paragraph 15(a) of the Annex to Human Rights Council resolution 5/1, by the United States of America*, ¶ 9, U.N. Doc. A/HRC/WG.6/9/USA/1 (Aug. 23, 2010) ("The Constitution's first ten amendments, adopted in 1791 and known as the Bill of Rights, along with the Thirteenth, Fourteenth, and Fifteenth Amendments, adopted in the wake of the Civil War, protect many rights that, in the twentieth century, became recognized and protected under international human rights law.").

Regarding the right to peaceful assembly in particular—the primary human right at issue in the present case—the Trump administration represented to the United Nations Human Rights Committee that: "[t]he United States maintains protection for peaceful assembly, as provided for in the U.S. Constitution and the law of the United States" and that "the United States generally meets its obligations regarding Article 21 through the United States Constitution and other

domestic laws." *Observations of the United States of America on the Human Rights Committee's Draft General Comment No. 37 on Article 21: Peaceful Assembly*, Office of the High Commissioner for Human Rights ¶ 2, n. 2 (Feb. 14, 2020), https://www.ohchr.org/ Documents/HRBodies/CCPR/GCArticle21/STATE_USA.docx (hereinafter "U.S. GC 37 Observations"); *see also* U.N. CCPR, *Fourth periodic report dated 30 December 2011, by the United States of America*, ¶ 375, U.N. Doc. CCPR/C/USA/4 (May 22, 2012).

      The United States has further represented at the international level that its domestic judiciary—such as this Court—would provide effective review of governmental actions that affect international human rights.  It has affirmed that "[h]uman rights are embedded in our Constitution, laws, and policies at every level, and governmental action is subject to review by an independent judiciary and debated by a free press and an engaged civil society."  U.N. GA, HRC Working Group on the Universal Periodic Review, Twenty-Second Session, *National report submitted in accordance with paragraph 5 of the annex to Human Rights Council resolution 16/21, by the United States of America*, ¶ 2, U.N. Doc. A/HRC/WG.6/22/USA/1 (Feb. 13, 2015).  It elaborated that "[n]ot only do individuals within the United States have effective legal means to seek policy, administrative, and judicial remedies for human rights violations and abuses, the government itself pursues extensive and comprehensive enforcement actions to create systematic reform."  *Id.*

      As laid out above, there is ample justification for U.S. courts to recognize and consider the "international obligation[s]" imposed on the United States by the ICCPR, the CERD, and the CAT as a consequence of the United States government's decision to ratify these instruments and its subsequent affirmations at the international level of the universal principles they espouse. These human rights treaties, as well as the customary international law of human rights, should

inform this Court's understanding of both the Constitution as well as the other areas of U.S. law implicated in the present case.

## II.    THE INTERNATIONAL LAW PROTECTING PEACEFUL ASSEMBLY AND FREEDOM OF EXPRESSION WAS CLEARLY VIOLATED

Like the Bill of Rights, the international law of human rights applicable to the United States directly protects the rights of peaceful assembly and freedom of expression.  The ICCPR and the CERD each protect the right of peaceful assembly, ICCPR art. 21; CERD art. 5(d)(ix). Providing further protection for individuals engaged in peaceful assembly, the ICCPR and the CERD also protect the right to freedom of expression, ICCPR art. 19(2); CERD art. 5(d)(viii). Although the ICCPR and CERD are independently binding, these same rights are also part of customary international law, as reflected in the Universal Declaration of Human Rights.  UDHR arts. 19, 20.  By virtue of these provisions in its ratified treaties and in customary international law, the United States—including at the federal, state, and local level—is subject to the legal obligation to respect these rights.

Defendants' actions unquestionably violated these international human rights, as endorsed by the laws of the United States.  Following George Floyd's murder, civil rights defenders were engaged in peaceful protest against police brutality and systemic racism in and around Lafayette Square—"a traditional public forum where First Amendment rights are at their apex."  Third Am. Compl. (hereinafter "TAC"), ECF No. 52, ¶ 51.  Defendants attacked the civil rights defenders at 6:30 pm on June 1, 2020 without forewarning and with overwhelming force simply because of their identity and message condemning systemic racism in the United States. These actions were a gross violation of the right of individuals in a free society to "assemble peacefully" including "for political advocacy . . . and for individuals who may espouse minority or dissident religious or political beliefs."  Mark P. Lagon, Deputy Assistant Secretary of State

for International Organization Affairs, Statement to UNCHR, 2005 DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW, ch. 6, § I at 434-35.

### A. It Was Unlawful to Restrict the Demonstration Based on the Identity of the Demonstrators and the Content of Their Message

International human rights law categorically prohibits any restriction on the rights to peaceful assembly and freedom of expression based on the identity of the participants, especially their race or color, or based on the message or content of an assembly—absent compelling justification. U.N. CCPR, Human Rights Committee, *General Comment No. 37 (2020) on the Right of Peaceful Assembly (article 21)*, ¶¶ 22, 25, U.N. Doc. CCPR/C/GC/37 (Sept. 17, 2020) (hereinafter "GC 37"); U.N. CCPR, *Kovalenko v. Belarus*, Views adopted by the Committee at its 108th Session, ¶¶ 8.6, 8.8, U.N. Doc. CCPR/C/108/D/1808/2008 (Sept. 26, 2013). The U.N. Human Rights Committee ("U.N. HRC")—the expert body empowered to safeguard the ICCPR (arts. 40-42)—has held that "a rejection of the author's right to organize a public assembly addressing the chosen subject . . . is one of the most serious interferences with the freedom of peaceful assembly." U.N. CCPR, *Alekseev v. Russian Federation*, Views adopted by the Committee at its 109th Session, ¶ 9.6, U.N. Doc. CCPR/C/109/D/1873/2009 (Dec. 2, 2013); U.N. CCPR, *Amelkovich v. Belarus*, Views adopted by the Committee at its 125th Session, ¶ 6.6, U.N. Doc. CCPR/C/125/D/2720/2016 (May 29, 2019).

The Trump administration itself has confirmed that identity and content-based restrictions are highly disfavored in international law. It has avowed that the ICCPR—which requires "States Parties to respect and ensure the rights recognized in the Covenant 'without distinction of any kind, such as race, colour, sex, . . . or other status'" (art. 2(1))—excludes ***any*** identity-based restrictions. U.S. GC 37 Observations, ¶ 34. It further expressed its agreement that content-based restrictions are permissible only in strictly limited circumstances. *Id.*, ¶ 30.

Nevertheless, the Trump administration flouted the very interpretation of human rights law that it espoused before the international community.  The forceful dispersal of the civil rights defenders in and around Lafayette Square occurred at the behest of Defendants Trump, Barr, and other senior White House officials.  TAC, ¶ 202.  Prior to the assault on the demonstrators, Defendant Trump "repeatedly advocated the use of force against Black demonstrators and civil rights activists who were protesting in D.C." against systemic racism in the United States.  *Id.*, ¶ 53.  By contrast, Defendant Trump has encouraged protestors with viewpoints aligned with his own.  *Id.*, ¶ 62.  Defendants undoubtedly would have treated such individuals differently had they been in Lafayette Square on June 1, 2020.  Indeed, it is difficult to make sense of Defendants' unannounced and unrestrained use of overwhelming force against the peaceful civil rights defenders in and around Lafayette Square except in light of who they were and the views they were espousing.  There can be no legitimate basis in a democratic society to stop those protesting against racism from conveying their message—this basic fact eviscerates any possible legitimacy of the Defendants' actions under international human rights law.

To the contrary, it was flatly unlawful for the United States to silence the demonstrators' message.  This is confirmed by the U.N. HRC's decision in *Kovalenko v. Belarus*.  Like the United States in the present case, Belarus dispersed an assembly because of the message it conveyed—in that case, "the commemoration of the victims of the Stalinist repressions . . . ." *Kovalenko*, ¶ 8.8.  Like Plaintiffs' message in the present case, the message conveyed by the victims in *Kovalenko* also sought to defend and promote the core values of a democratic and pluralistic society.  *Id.*, ¶¶ 2.1, 8.8.  The Human Rights Committee held that Belarus' suppression of such a message was irreconcilable with both the right to freedom of expression and the right to freedom of peaceful assembly.  *Id.*, ¶¶ 8.6, 8.8.

Defendants' attack against the demonstration based on identity and content further violated the United States' obligations to combat racial discrimination. The CERD, in particular, demands that the United States "engage in no act or practice of racial discrimination" and not "sponsor, defend or support racial discrimination . . . ." CERD art. 2; see also CERD art. 7 (demanding that the United States adopt immediate and effective measures . . . with a view to combating prejudices which lead to racial discrimination . . . ."). Defendants unlawfully attacked and thereby thwarted a peaceful protest against racial discrimination in the United States.

### B. It Was Equally Unlawful to Restrict the Demonstration on Any Other Basis

Plaintiff recognize that the international rights to peaceful assembly and to freedom of expression are not absolute. However, the United States may restrict those rights only when strictly necessary. The ICCPR demands that any restriction on the right to peaceful assembly be "necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others." ICCPR art. 21; GC 37, ¶ 36; U.N. CCPR, *Chebotareva v. Russian Federation*, Views adopted by the Committee at its 104th Session, ¶ 9.3, U.N. Doc. CCPR/C/104/D/1866/2009 (Apr. 26, 2012). The ICCPR similarly demands that the right to freedom of expression only be restricted when "necessary: (a) For respect of the rights or reputations of others; (b) For the protection of national security or of public order (*ordre public*), or of public health or morals." ICCPR art. 19(1); U.N. CCPR, Human Rights Committee, 102nd Session, *General Comment No. 34*, ¶ 33, U.N. Doc. CCPR/C/GC/34 (Sept. 12, 2011). The other applicable human rights instruments do not, in their text, admit restrictions of either right. CERD arts. 5(d)(viii), (ix); UDHR arts. 19, 20.

Restrictions on the human rights to peaceful assembly and to freedom of expression are considered necessary only when (1) they are provided for by law, (2) serve a legitimate

objective, (3) are the least intrusive means to secure that objective, and (4) are proportionate to the objective.  GC 37, ¶¶ 36-37.  "While the right of peaceful assembly may in certain cases be limited, the onus is on the authorities to justify any restrictions."  *Id.*, ¶ 36.

The United States—in official comments on the ICCPR—has accepted that any limitations must be the least restrictive available.  It affirmed that the ICCPR provides "a strict and exhaustive list of the requirements for limiting peaceful assembly," U.S. GC 37 Observations, ¶ 21, and prohibits "any restrictions on freedom of expression" that do not "meet a strict test of justification,"  United States, *Observations on the Human Rights Committee's Draft General Comment 34 on Article 19 of the International Covenant on Civil and Political Rights* (July 5, 2011) (hereinafter "U.S. GC 34 Observations") *in* Freedom of Expression, 2011 DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW, ch. 6, § L at 226; U.S. GC 37 Observations, ¶ 9.  The United States further declared that any restriction on either right must be the least restrictive means to protect a governmental interest enumerated in the relevant provision of the ICCPR and, in addition, must be narrowly tailored to fulfill that interest.  U.S. GC 37 Observations, ¶ 21; U.S. GC 34 Observations, ¶¶ 4, 9.

Certain of the Defendants have asserted that their actions were lawful as they were necessary to protect the President and the safety and security of the White House and its occupants.  *See* Barr Mot. to Dismiss 47, ECF No. 76.  Plaintiffs' detailed allegations of fact draw into serious doubt whether this was the actual motivation—as opposed to President Trump's publicly stated animosity toward the demonstrators and their message of anti-racism. *See* TAC, ¶¶ 63-64.  And, even if the purpose of Defendants' actions was what they allege, the invocation of presidential security is far from adequate to justify the assault on the civil rights defenders.  The assault was not necessary on any of the grounds enumerated in the ICCPR, and

16

specifically was not necessary out of concern for national security or public safety.  As the

Human Rights Committee has interpreted the ICCPR, public safety may be invoked to restrict a

peaceful assembly only when "the assembly creates a real and significant risk to the safety of

persons (to life or security of person) or a similar risk of serious damage to property."  GC 37, ¶

43.  Far from posing a real and significant risk to public safety, the civil rights defenders in and

around Lafayette Square were lawful and peaceful, TAC, ¶¶ 86-87, and therefore could not have

posed any such risk to the President, other White House occupants, or the White House itself.

Indeed, the idea that unarmed and non-violent civil rights defenders could pose a threat to White

House, one of the most secure buildings on the planet, or the President of the United States, one

of the most securely protected individuals on the planet, strains credulity.

Frankly, Defendants' arguments contradict the position on freedom of assembly that the

Trump administration has previously set forth before the international community.  There it

underscored that, even when "some members of an assembly resort to violence" or "unlawful

activity," any limitation to the right would remain strictly subject to "the applicable exceptions

articulated in Article 21 . . . ."  U.S. GC 37 Observations, ¶¶ 12, 14.  It further explained that,

even if "some members of an assembly resort to violence, . . . law enforcement may be able to

lawfully arrest and/or detain individuals engaging in violence while allowing the majority of

those engaging in peaceful protest to continue; widespread arrests or dispersing an assembly

should only be done when necessary."  *Id.*, ¶ 12.  This same commitment must also apply to

those protesting legitimate concerns of systemic racism and police brutality in the United States.

Regardless, the notion that the Defendants' actions were necessary for any enumerated

grounds is belied by the facts.  The Defendants' assault on the demonstrators commenced at 6:30

pm on June 1, 2020, a mere 30 minutes before the evening curfew went into effect at 7:00 pm.

TAC, ¶ 82.  But restrictions on the right of peaceful assembly are necessary only if they are "appropriate responses to a pressing social need" and are "the least intrusive among the measures that might serve the relevant protective function."  GC 37, ¶ 40.  There was no necessity that precluded the President and White House occupants from simply waiting 30 (or more) minutes until the assembly had concluded for the evening—even if the President had the desire to walk across Lafayette Square to Saint John's Church.  The minor delay that waiting until curfew would have entailed, pursuant to international law, "must be accommodated" because "assemblies are a legitimate use of public and other spaces . . . ."  *Id.*, ¶ 47.

In fact, there was no necessity of any sort for the President to walk across Lafayette Square, and no necessity that could override the right of the civil rights defenders to peaceful assembly in the leading public forum in the United States.  The President of the United States cannot be permitted to decide on the basis of personal whim to take a non-essential walk and then use that as a pretext to abuse the rights of demonstrators without depriving the fundamental human and constitutional right to peaceful assembly of all meaning and significance.

Defendants have also sought to minimize their conduct by alleging it was a mere "one-block extension of the security perimeter . . . ."  Barr Mot. to Dismiss 47, ECF No. 76.  But this defense inadmissibly rests on contesting the facts as Plaintiffs' have pled, as "[n]one of the Defendants . . . provided any alternative means or space for the demonstration that they had forcibly terminated." *Id.*, ¶ 109.  Even accepting Defendants' disputed factual allegation, TAC, ¶¶ 108-9, 116, the Defendants' actions were nevertheless illegal under international human rights law.  The right of peaceful assembly under international human rights law entails the "right to choose a location within sight and sound of their target audience and no restriction to this right is permissible, unless (a) imposed in conformity with the law, and (b) necessary in a democratic

society, in the interests of national security or public safety, public order, protection of public health or morals or protection of the rights and freedoms of others."  U.N. CCPR, *Turchenyak et al. v. Belarus*, Views adopted by the Committee at its 108th Session, ¶ 7.4, U.N. Doc. CCPR/C/108/D/1948/2010 (Sept. 10, 2013); U.N. CCPR, *Strizhak v. Belarus*, Views adopted by the Committee at its 124th Session, ¶ 6.5, U.N. Doc. CCPR/C/124/D/2260/2013 (Dec. 13, 2018); GC 37, ¶ 22; *see also* OSCE AND VENICE COMMISSION, GUIDELINES ON FREEDOM OF PEACEFUL ASSEMBLY, Guideline 3.5 (2d ed. 2010).  Lafayette Square is directly across Pennsylvania Avenue from the White House and thus the only public space within similar proximity. Removing the protestors from Lafayette Square and its environs violated the right to protest within sight and sound of the target audience—President Trump and his administration.

Indeed, the United States has explicitly cautioned the international community against accepting at face value justifications for the use of force such as the one that defendants assert in the present litigation.  It has affirmed that "[n]ational security is too often interpreted overly broadly and is used as a pretext to restrict protests which are essentially political in nature." Paula Schriefer, Head of the U.S. Delegation to the 25th Session of the United Nations Human Rights Council, *The Right to Protest Peacefully is an Essential Enabler of Other rights and Freedoms*, U.S. Mission to International Organizations in Geneva (Mar. 28, 2014), https://geneva.usmission.gov/2014/03/28/the-right-to-protest-peacefully-is-an-essential-enabler-of-other-rights-and-freedoms/ ("In my own country, the demonstrations for racial equality led by Martin Luther King Jr. were wrongly restricted by security officials using such pretexts.").

### III.    THE INTERNATIONAL LAW RESTRICTING THE USE OF FORCE AGAINST ASSEMBLIES WAS CLEARLY VIOLATED

International human rights law also protects against the excessive use of force in law enforcement through the multiple rights that safeguard bodily integrity against both risks and

infringements.  The ICCPR protects the right to life and to security of the person, ICCPR arts. 6, 9, while both the ICCPR and the CAT protect against cruel, inhuman or degrading treatment, ICCPR art. 7; CAT art. 16.  The CERD specifically protects "[t]he right to security of person and protection by the State against violence or bodily harm, whether inflicted by government officials or by any individual group or institution . . . ."  CERD art. 5(b).  Customary international law similarly protects the rights to life, security, and freedom from cruel, inhuman or degrading treatment.  UHDR arts. 3, 5.

Pursuant to these rights, any use of force must be only (i) pursuant to domestic law (legality), (ii) when unavoidable after taking all feasible steps (precaution), (iii) to the minimum degree necessary (necessity), and (iv) in strict proportion to the threat from the targeted individual (proportionality).  U.N. GA, Human Rights Committee, Thirty-First Session, Agenda item 3, *Joint report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association and the Special Rapporteur on extrajudicial, summary or arbitrary execution on the proper management of assemblies, Note by the Secretariat*, ¶¶ 50-52, 57, U.N. Doc. A/HRC/31/66 (Feb. 4, 2016) (hereinafter "U.N. Special Rapporteur Joint Report"); GC 37 ¶ 89.

The protection that these rights provide against law enforcement violence is underscored and amplified by the right to peaceful assembly when law enforcement is engaged in policing an assembly.  *See generally* GC 37, ¶¶ 74-95; U.S. GC 37 Observations, ¶¶ 28, 37.  The applicable international legal protections against law enforcement violence when policing an assembly are well established and have, in many cases, been restated by the United States itself.  Defendants knew or should have known that it was wrongful under U.S. law and international human rights law to attack the civil rights defenders peacefully protesting racism and racial discrimination.

### A.  It Was Unlawful to Disperse the Civil Rights Defenders from Lafayette Square

Because "[d]ispersing an assembly carries the risk of violating the rights to freedom of expression and to peaceful assembly as well as the right to bodily integrity," international human rights law broadly prohibits dispersing an ongoing assembly—even through non-violent means. U.N. Special Rapporteur Joint Report, ¶ 61; GC 37, ¶ 85.  It is only in exceptional circumstances that an ongoing peaceful assembly may be dispersed, GC 37, ¶ 85; U.N. Special Rapporteur Joint Report, ¶ 62, such as when the "assembly as such is no longer peaceful, or if there is clear evidence of an imminent threat of serious violence that cannot be reasonably addressed by more proportionate measures, such as targeted arrests."  GC 37, ¶ 85; U.N. Special Rapporteur Joint Report, ¶ 61.  The Trump administration has itself recognized that, pursuant to international human rights law, "widespread arrests or dispersing an assembly should only be done when necessary."  U.S. GC 37 Observations, ¶ 12.[9]

It was illegal under the applicable rules of international law for the Defendants to disperse the civil rights defenders gathered in and around Lafayette Square on June 1, 2020—regardless of the means that the Defendants employed.  There were no exceptional circumstances present that could have justified such an extreme measure of repression.  The civil rights defenders gathered to petition their government were acting both lawfully and peacefully (TAC, ¶¶ 86-87), and, as such, clearly did not pose an imminent threat of serious violence.  Nor did the demonstration cause a high level of disruption, let alone the serious and sustained disruption that might merit dispersal under international law.  GC 37, ¶ 85.  The demonstration took place in and

---

[9]   In fact, it is the Trump administration's stated position that even "the disruption of vehicular or pedestrian traffic or economic activity does not necessarily call into question the protection such (peaceful) assemblies should enjoy."  U.S. GC 37 Observations, ¶ 17.

around Lafayette Square, which "is a public venue frequently and historically used by activists to protest and exercise First Amendment rights."  TAC, ¶ 51.

This repression of a peaceful demonstration is precisely the sort of conduct for which the United States regularly criticizes foreign governments.  For example, the United States registered before the United Nations its concern that the Azerbaijani government had "forcefully dispersed an otherwise peaceful, if unsanctioned, protest."  Ambassador Eileen C. Donahoe, *U.S. Statement at the UPR of Azerbaijan*, U.S. Mission to International Organizations in Geneva (Apr. 30, 2013), https://geneva.usmission.gov/2013/05/01/u-s-statement-at-the-upr-of-azerbaijan/.  The United States cannot legitimately sit in judgment of foreign governments while it condones the very same behavior when committed at home by its own government officials.

### B.  It Was Unlawful to Use Force of Any Sort Against the Civil Rights Defenders

Even when exceptional circumstances permit the authorities to disperse an assembly, the use of force remains *prohibited* unless—at a bare minimum—it is strictly necessary in the circumstances.  GC 37, ¶ 86; U.N. CCPR, Human Rights Committee, *General Comment No. 36*, ¶ 4, U.N. Doc. CCPR/C/GC/36 (Sept. 3, 2019) (hereinafter "GC 36"); U.N. Special Rapporteur Joint Report, ¶ 9.  The use of force is never necessary unless the participants in the assembly are "clearly and audibly informed" that they must disperse and are "given reasonable time to disperse voluntarily."  *Id.*, ¶ 63.  The Trump administration recognized that "a verbal warning to non-violent assembly participants" is a viable alternative "to force that could achieve the same objective[.]"  U.S. GC 37 Observations, ¶ 24.

The Defendants' use of force did not meet the minimum requirements of international law.  It was not necessary at all, let alone strictly necessary and proportionate, as the civil rights defenders were "gathered peacefully in Lafayette Square to protest the gross, systemic injustices perpetrated by law enforcement against Black people in the United States . . . ."  TAC, ¶ 3.  Nor

did the Defendants satisfy the essential prerequisite for the lawful use of force—a clear and audible order to disperse.  None of the Plaintiffs heard any order "to disperse or leave Lafayette Square," nor "any warnings before using force to remove demonstrators from Lafayette Square." *Id.*, ¶¶ 84, 85, 107, 134, 141, 159, 188.  To assert that the use of force was strictly necessary absent such orders and warnings fails the most basic test of logic; the demonstrators might have voluntarily dispersed had such an order and warning been given.  And, as a matter of international law, the failure to issue the order or warning *ipso facto* rendered the use of force unnecessary and illegal and, therefore, a violation of binding international human rights law.

This use of violence against the gathered civil rights defenders in fact violated international law as the Trump administration itself has interpreted it.  The administration has, internationally, "[e]ncourag[ed] all States to avoid using force wherever possible during peaceful protests and to ensure that, where force is absolutely necessary, no one is subjected to excessive or indiscriminate use of force."  U.N. Resolution on Peaceful Assembly, at 2 (introduced by the United States); *see also* Human Rights Council, Resolution 25/38, U.N. Doc. A/HRC/RES/25/38 (Apr. 11, 2014) (supported by the United States).

**C.  It Was Unlawful to Use Overwhelming Force Against the Civil Rights Defenders**

Even when the use of force is permitted against an assembly (when strictly necessary and proportionate), "only the minimum force necessary may be used."  GC 37, ¶ 86; GC 36, ¶ 14.  It remains prohibited to direct force indiscriminately against an assembly; "[a]s far as possible, any force used should be directed against a specific individual or group engaged in or threatening violence."  GC 37, ¶ 86.  Because "[l]ess-lethal weapons with wide-area effects, such as tear gas . . . , tend to have indiscriminate effects[,]" they "should be used only as a measure of last resort, following a verbal warning, and with adequate opportunity given for assembly participants to disperse."  *Id.*, ¶ 87.  Similarly, "[g]iven the threat that such weapons pose to life, this minimum

threshold [strict necessity due to imminent threat of death or serious injury] should also be applied to the firing of rubber-coated metal bullets." *Id.*, ¶ 88; United Nations Office of the High Commissioner for Human Rights, *Guidance on Less-Lethal Weapons in Law Enforcement* ¶ 7.5.8 (2020); IACHR, *Protest and Human Rights*, ¶ 122, OAS Doc. CIDH/RELE/INF.22/19 (2019).  The violence that Defendants deployed was far from necessary—and certainly not proportionate—to disperse the civil rights defenders.  To the contrary, it was an outright assault on unthreatening and unarmed people designed to shatter their demonstration.

Law enforcement officers "hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who were trying to flee the officers."  TAC, ¶ 90.  Law enforcement officers actively pursued the civil right defenders who had been ejected from Lafayette Square "for several blocks thereafter."  *Id.*, ¶ 94.  It was not necessary—whether to disperse the demonstrators or for any other legitimate purpose—to chase down and assault civil rights defenders fleeing the overwhelming show of force that law enforcement had deployed.  And, as it was not necessary, this use of force was also not proportionate to any legitimate purpose.  To the contrary, this was violence used to intimidate and dominate those who were peacefully protesting systemic racism and police brutality in the United States.

The weaponry that the law enforcement officers employed against the civil rights defenders was indiscriminate and grossly excessive—and thus forbidden by international law.  "Officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd."  *Id.*, ¶ 88.  The use of rubber bullets is permitted to control an assembly *only* when strictly necessary to confront an

imminent threat of death or serious injury, GC 37, ¶ 88, and yet Defendants shot them at peaceful and law abiding demonstrators—causing serious injury.  TAC, ¶¶ 159-60.

And, after firing tear gas into the crowd, Defendants fired more tear gas at individuals attempting to flee, and refused to help those injured from the effects of the gas.  *Id.*, ¶¶ 88, 135, 101, 103, 161-162, 187-199.  They did so despite the potential severe health impact of tear gas on individuals with respiratory ailments—particularly critical during the COVID-19 pandemic.  Although Defendants deployed tear gas indiscriminately as a first resort against civil rights defenders, international law allows the use of these weapons *only* as a last resort because of their indiscriminate effects.  GC 37, ¶ 87.  Indeed, tear gas is not permitted for use *even* in armed conflicts (Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction art. I(5) (1992), 1975 U.N.T.S. 45)—and yet Defendants deployed it against civil rights defenders who were doing nothing wrong.

## CONCLUSION

Even while the Trump administration has espoused strong international human rights standards to restrain the conduct of foreign states, it flouted those very same standards when it forcefully disbanded the peaceful civil rights demonstration in Lafayette Square on June 1, 2020.  There was no justification for the actions taken other than animus toward the civil rights defenders themselves and toward their message of opposition to racism and racial discrimination in the United States.  This was a subversion of the very foundations of a liberal democracy—the right to seek redress from the government for legitimate grievances—and yet was part of a long history of brutal attacks on civil rights activists in the United States.  These actions would not have been tolerated by the United States if committed by a foreign government and must not be tolerated by this Court when committed by and at the behest of the United States government.  It is the role of this Court to ensure that those responsible are held to account.

Dated: November 27, 2020          By: __//s//_____

Arif Hyder Ali
(DC Bar No. 434075)
Alexandre de Gramont
(DC Bar No. 430640)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006-1110
 (202) 261-3333
arif.ali@dechert.com
alexandre.degramont@dechert.com

Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

We hereby certify that, on November 27, 2020, we electronically filed the foregoing Brief of the International Center for Advocates Against Discrimination; the International Human Rights Clinic, University of Virginia School of Law; the Leitner Center for International Law & Justice, Fordham University School of Law; the Robert and Helen Bernstein Institute for Human Rights, New York University School of Law; and William J. Aceves, Professor of Law, California Western School of Law as *Amicus Curiae* in Support of Plaintiffs' Opposition to Defendant Barr's, Federal Official-Capacity Defendants', and D.C. Defendants' Motions to Dismiss and Plaintiffs' Opposition to Defendant Vincent's Motion to Dismiss with the Clerk of the District Court for the District of Columbia by using the electronic CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Dated: November 27, 2020          By:  _//s//_____
                                       Arif Hyder Ali
                                       (DC Bar No. 434075)
                                       Alexandre de Gramont
                                       (DC Bar No. 430640)
                                       DECHERT LLP
                                       1900 K Street, NW
                                       Washington, D.C. 20006-1110
                                        (202) 261-3333
                                       arif.ali@dechert.com

                                       Counsel for *Amicus Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

BLACK LIVES MATTER D.C., *et al.*,

               *Plaintiffs*,

     v.

DONALD J. TRUMP, President of the United States of America, *et al.*,

               *Defendants*.

</td><td>

Civil Action No. 20-1469 (DLF)

</td></tr>
</table>

**[PROPOSED] ORDER**

AND NOW, on this _____ day of _____ 2020, upon consideration of the Motion of Motion of the International Center for Advocates Against Discrimination; the International Human Rights Clinic, University of Virginia School of Law; the Leitner Center for International Law & Justice, Fordham University School of Law; the Robert and Helen Bernstein Institute for Human Rights, New York University School of Law; and William J. Aceves, Professor of Law, California Western School of Law for Leave to File *Amicus* Curiae Brief in Support of Plaintiffs' Opposition to Defendant Barr's, Federal Official-Capacity Defendants', and D.C. Defendants' Motions to Dismiss and Plaintiffs' Opposition to Defendant Vincent's Motion to Dismiss, it is HEREBY ORDERED that the Motion for Leave to File an *Amicus Curiae* Brief is GRANTED, and the Clerk of Court is directed to file of record the *Amicus Curiae* Brief attached to this Motion.

                                     BY THE COURT:

                                     _____

                                     Hon. Dabney L. Friedrich
                                     United States District Judge