IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al.    )
                                    )
          Plaintiffs,          )
                                      )
          v.                   )     Case No.: 1:20-cv-01469-DLF
                                      )
DONALD J. TRUMP, et al.,          )
                                      )
          Defendants.       )
_____)

**BRIEF OF FEDERAL COURTS SCHOLARS AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANT BARR'S MOTION TO DISMISS**

Hyland Hunt (D.C. Bar No. 999276)
Ruthanne M. Deutsch (D.C. Bar No. 498091)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amici Curiae*

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* .................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................2

ARGUMENT ....................................................................................................6

*BIVENS* RESTS UPON A CENTURIES-OLD COMMON LAW FOUNDATION THAT
ROUTINELY RECOGNIZED A DAMAGES REMEDY AGAINST FEDERAL
OFFICERS WHO VIOLATED THE CONSTITUTION OR OTHER FEDERAL LAWS............6

    A.  English Common Law Provided a Damages Remedy for Official Misconduct. ................6

    B.  In the Founding Era and Early Republic, Common Law Remedies Were Available
        Against Federal Officers Who Violated the Constitution, Including in Cases
        Implicating National Security. ...........................................................................8

        1.  *There Was a Robust Tradition of Common Law Damages Remedies in the Early
            Republic.* ........................................................................................... 9

        2.  *Courts Commonly Judged the Lawfulness of Federal Officer Conduct in Cases
            Implicating National Security.* .................................................................. 12

    C.  By Expressly Recognizing a Federal Law Basis for these Remedies, *Bivens*
        Continued the Common Law Tradition. ...........................................................16

        1.  *Before* Erie*, Non-Statutory Damages Remedies against Federal Officers Were Not
            Understood to Derive Solely from State Law.* .............................................. 16

        2.  Bivens *and the Westfall Act Preserved the Full Scope of Common Law Remedies for
            Federal Officer Constitutional Violations within a Federal Law Cause of Action.* ... 17

CONCLUSION...............................................................................................21

# TABLE OF AUTHORITIES

## CASES

*Ashby v. White*,
(1703) 92 Eng. Rep. 126 (KB) .............................................................................. 8

*Bates v. Clark*,
95 U.S. 204 (1877) ............................................................................................... 15

*Belknap v. Schild*,
161 U.S. 10 (1896) ............................................................................................... 17

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,
403 U.S. 388 (1971) .................................................................................... 1, 17, 18

*Boyd v. United States*,
116 U.S. 616 (1886) ............................................................................................... 6

*Carlson v. Green*,
446 U.S. 14 (1980) ............................................................................................... 19

*Chambers v. Robinson*,
(1726) 93 Eng. Rep. 787 (KB) .............................................................................. 7

*Entick v. Carrington*,
(1765) 95 Eng. Rep. 807 (KB) ........................................................................... 6, 7

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938) ................................................................................................. 2

*Gelston v. Hoyt*,
16 U.S. (3 Wheat.) 246 (1818) .............................................................................. 9

*Huckle v. Money*,
(1763) 95 Eng. Rep. 768 (KB) .............................................................................. 7

*Imlay v. Sands*,
1 Cai. 566 (N.Y. Sup. Ct. 1804) ........................................................................... 9

*Kidd v. Swartwout*,
14 F. Cas. 457 (C.C.S.D.N.Y. 1843) (No. 7,756) ............................................... 9

*Little v. Barreme*,
6 U.S. (2 Cranch) 170 (1804) ................................................................... 12, 13, 15

*Maley v. Shattuck*,
7 U.S. (3 Cranch) 458 (1806) ....................................................................... 14, 15

*Merriam v. Mitchell*,
13 Me. 439 (1836) ........................................................................................... 9, 10

*Mitchell v. Harmony*,
54 U.S. (13 How.) 115 (1851) ..................................................................... 14, 15, 16

*Mitchell v. Forsyth*,
   472 U.S. 511, 523 (1985) ................................................................................. 12

*Murray v. Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804) ............................................................................ 14

*Phila. Co. v. Stimson*,
   223 U.S. 605 (1912) ......................................................................................... 17

*Swift v. Tyson*,
   41 U.S. (16 Pet.) 1 (1842) ............................................................................... 16

*Tracy v. Swartwout*,
   35 U.S. (10 Pet.) 80 (1836) ............................................................................... 9

*Westfall v. Erwin*,
   484 U.S. 292 (1988) ......................................................................................... 19

*Wheeldin v. Wheeler*,
   373 U.S. 647 (1963) ......................................................................................... 17

*Wilkes v. Wood*,
   (1763) 98 Eng. Rep. 489 (KB) ........................................................................... 7

*Willingham v. Morgan*,
   395 U.S. 402 (1969) ........................................................................................... 9

*Wise v. Withers*,
   7 U.S. (3 Cranch) 331 (1806) ...................................................................... 9, 15

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ................................................................................. 3, 12

## STATUTES

28 U.S.C. § 2679(b)(2)(A) ........................................................................... 19, 20

28 U.S.C. § 2680(h) ........................................................................................ 19

Act for the Relief of George Little, Priv. L. No. 09-02, ch. 4, 6 Stat. 63 (1807) ........................ 13

Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), Pub. L.
   No. 100-694, 102 Stat. 4563 ........................................................................... 19

## REGULATIONS

28 C.F.R. § 50.15 ............................................................................................ 11

## OTHER AUTHORITIES

Anya Bernstein, *Catch-All Doctrinalism and Judicial Desire*, 161 U. Pa. L. Rev. Online 221 (2013) ..................................................................................................................... 19

Br. for the Resp'ts, *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (No. 301), 1970 WL 136799 ......................................................... 18

Alfred Hill, *Constitutional Remedies*, 69 Colum. L. Rev. 1109 (1969) ...................................... 16

H.R. Rep. No. 100-700 (1988).................................................................................. 19, 20

Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1 (1963)........................................................................................................................ 6

Al Katz, *The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in* Bell v. Hood, 117 U. Pa. L. Rev. 1 (1968) ...................................................................... 7, 8

Larry Kramer, *The Lawmaking Power of the Federal Courts*, 12 Pace L. Rev. 263 (1992)........ 16

James E. Pfander, *Constitutional Torts and the War on Terror* (2017) ......................................... 8

James E. Pfander, *Dicey's Nightmare: An Essay on the Rule of Law*, 107 Cal. L. Rev. 737 (2019).................................................................................................................... 6, 15

James E. Pfander, Iqbal, Bivens, *and the Role of Judge-Made Law in Constitutional Litigation*, 114 Penn St. L. Rev. 1387 (2010)................................................................................ 18

James E. Pfander & David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117 (2009).............................................................. 19, 20

James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862 (2010) ......... 10, 11

James E. Pfander, Alexander A. Reinert & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 Stan. L. Rev. 561 (2020) ............................ 11, 12

Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the* Bivens *Question*, 161 U. Pa. L. Rev. 509 (2013)................................................ 6, 8, 9, 18, 20

iv

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are scholars whose research and teaching focus on federal courts, remedies, and the jurisprudence developed under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Carlos M. Vázquez is Professor of Law at Georgetown University Law Center. He has written extensively on sovereign immunity and official liability for constitutional violations, including *Bivens* claims. He is a member of the American Law Institute and served as an adviser to the Restatement (Fourth) of Foreign Relations Law. He has also served as chair of the Federal Courts section of the Association of American Law Schools. He teaches Federal Courts and the Federal System, Conflict of Laws, and Transnational Litigation, among other courses.

Anya Bernstein is Professor of Law at SUNY Buffalo Law School. She has written about *Bivens* actions and congressional legislation; statutory interpretation; and administrative law and practice in the United States and in comparative perspective. She teaches civil procedure, administrative law, and legislation.

James E. Pfander is the Owen L. Coon Professor of Law at Northwestern Pritzker School of Law. He has written extensively on federal and state sovereign immunity, the early republic origins of official liability and indemnity, *Bivens* litigation, and the modern law of qualified immunity. A member of the American Law Institute, Pfander has served as the chair of the sections on civil procedure and federal jurisdiction of the Association of American Law Schools. He teaches conflicts of law and federal jurisdiction, among other subjects.

Stephen I. Vladeck holds the Charles Alan Wright Chair in Federal Courts at the University

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.

of Texas School of Law. He has written extensively on government accountability, and *Bivens* remedies in particular, and has argued three cases before the U.S. Supreme Court, including *Hernández v. Mesa*, 140 S. Ct. 735 (2020). He is an elected member of the American Law Institute, and co-editor of WoltersKluwer's leading *National Security Law* and *Counterterrorism Law* casebooks; he has served as chair of the Association of American Law Schools Section on Federal Courts; and he teaches Federal Courts and constitutional law, among other courses.

*Amici* write to provide relevant historical background and context about the common law roots of the *Bivens* remedy for violations of the Constitution by federal officers. Far from a novel form of relief, the *Bivens* remedy reflects a long tradition of providing compensatory damages to parties injured by unconstitutional acts of federal officials. At the founding, common law damages remedies were routinely available to redress such official misconduct. These non-statutory remedies were made available not only by state law, but also—until *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)—by general common law developed in federal courts. Viewed against this historical backdrop, *Bivens* is best understood not as creating a novel non-statutory remedy, but as confirming an existing one within federal law, alongside state torts.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs are Black Lives Matter D.C. and several individual demonstrators, representing a putative class of protesters who gathered peacefully in Lafayette Square on June 1, 2020, to protest "systemic injustices perpetrated by law enforcement against Black people in the United States, exemplified by the recent brutal murders of George Floyd and Breonna Taylor." Third Am. Compl., Dkt. No. 52, ¶ 3 (Sep. 3, 2020). They claim, *inter alia*, that federal officers violated their rights under the First and Fourth Amendments when the officers used excessive force to clear the square and dispersed the protest without provocation and for no legitimate reason. *See id.* ¶¶ 220-230. Plaintiffs allege that Defendant William Barr, the Attorney General, "personally ordered law

enforcement officers to forcibly remove Plaintiffs and other class members from Lafayette Square and its vicinity," *Id.* ¶ 202, and seek damages for their resulting injuries under *Bivens*.

In arguing that this Court should dismiss the *Bivens* claim against him, Defendant Barr describes *Bivens* as a "disfavored extra-statutory remedy" that should not be extended to the novel context of actions taken ostensibly to protect presidential security, due to the national security implications of such cases. *See* Def. Barr's Mot. to Dismiss, Dkt. No. 76, at 6–10 (Oct. 1, 2020) ("Mot. to Dismiss"). Although the Supreme Court has explained that *expansion* of *Bivens* is "disfavored," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), there is no reason to withhold *Bivens* remedies here. *Amici* agree with Plaintiffs that Defendant Barr's arguments fail under the two-step analytical approach set forth in the Supreme Court's cases. *See* Pls.' Opp'n to Mot. to Dismiss, Dkt. No. 98, at 40–54 (Nov. 19, 2020) ("Pls.' Opp'n"). *Amici* write separately, however, to emphasize that from the vantage point of the early Republic, there was nothing exceptional or disfavored about extra-statutory remedies to redress federal officers' violation of the Constitution. To the contrary, in the common law tradition that preceded *Bivens*, federal courts routinely evaluated whether federal officials violated the law and, if so, remedied that harm by awarding damages. What's more, courts frequently did so in contexts that unquestionably implicated national security, far beyond the tenuous connection between national security and policing protests in the District of Columbia asserted by Defendant Barr under the banner of "presidential security."

English common law in the colonial era recognized personal liability for public officials who committed tortious acts against citizens in the course of their duties—often including claims for use of excessive force during searches and seizures. This common law tradition was embraced by American courts in the founding era, and federal officers were not infrequently subject to tort

liability in state and federal courts for official acts that were contrary to the Constitution. Customs collectors who insisted on payment of duties that were not due, postal officials who prosecuted crimes that did not occur, and military officers who seized vessels that could not lawfully be taken were all subject to personal liability under common law—that is, non-statutory—causes of action. Congress sometimes, but not always, indemnified officers against these judgments. And this indemnification practice, which turned on case-specific questions of who should pay and why, nowhere questioned the courts' authority to award damages against officers. Rather, indemnification reflected Congress's endorsement of the use of the courts to hold federal officers accountable through the imposition of damages remedies. Courts left it to Congress to determine if an officer should pay out of personal funds, or if Congress would foot the bill. But both branches accepted the courts' role in determining whether the officer had violated the law, and if so, the quantum of damages due the injured party.

This robust framework for officer liability applied, moreover, to officer misconduct occurring during armed conflict, and where sensitive diplomatic relationships were involved. For example, and in stark contrast to Defendant Barr's conception of courts as wholly unsuited to evaluate a damages remedy so long as a defendant invokes "national security," *see* Mot. to Dismiss at 13–14, the Supreme Court did not balk at deciding whether a military officer's order, during an active military campaign in Mexico, violated a merchant's property rights—despite arguments that such a determination risked interfering with the commander's exercise of discretion in military affairs.

Before the decision in *Erie*, courts did not always clearly identify the source of liability for the unconstitutional acts of federal officers. But such cases did not unambiguously and exclusively involve state law remedies. It was only after *Erie* that courts were more apt to refer to such liability

as arising under state or local law.

Bivens was decided against the backdrop of this common law tradition. Because tort suits alleging that federal officers committed constitutional violations would otherwise have their sole basis in state law after Erie, the Bivens Court was faced with the question of whether a remedy for unconstitutional conduct ought also to be understood to arise out of federal law, given the interests involved. Although, after Erie, the recognition of new federal causes of action without statutory authority was disfavored, that did not prevent the Bivens Court from confirming the existence of a federal remedy.  Given the importance of the interests involved, the Bivens Court re-situated pre-existing damages remedies for unconstitutional conduct within federal law. Congress then brought the transformation full circle in the Westfall Act, in which Congress preempted state tort remedies against federal officers without narrowing the remedies available for constitutional violations. The Act reflects Congress's judgment that the common law remedies that previously existed to redress constitutional violations by federal officials (whether under state or "general" common law) should continue to be available in the form of a Bivens suit.

The Bivens Court thus did not invent personal damages liability for federal officers. Far from it. It merely reaffirmed the existence of a damages remedy that, in substance, has been available since the founding, and even before. Moreover, that centuries-old remedy was long-understood to reach conduct with national security implications. To decline to apply Bivens here on account of asserted special factors that do not counsel hesitation and historically posed no bar to relief would be a sharp break with centuries of law affording such a remedy.

## ARGUMENT

**BIVENS RESTS UPON A CENTURIES-OLD COMMON LAW FOUNDATION THAT ROUTINELY RECOGNIZED A DAMAGES REMEDY AGAINST FEDERAL OFFICERS WHO VIOLATED THE CONSTITUTION OR OTHER FEDERAL LAWS.**

### A.      English Common Law Provided a Damages Remedy for Official Misconduct.

In the colonial era, English common law provided rights of action against military and government officials whose tortious conduct exceeded official authority. *See* Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the* Bivens *Question*, 161 U. Pa. L. Rev. 509, 537–39 (2013) (describing relevant English common law torts); Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 1–2 (1963) ("From time immemorial many claims affecting the Crown could be pursued in the regular courts if they did not take the form of a suit against the Crown."). As reflected in a prominent treatise on the British constitution, a key element of the British rule of law was "the right of individuals to mount common-law claims against government officials, who were held personally accountable for their actions unless able to justify them in accordance with the law of the land." James E. Pfander, *Dicey's Nightmare: An Essay on the Rule of Law*, 107 Cal. L. Rev. 737, 744 (2019) (describing A.V. Dicey, *Introduction to the Study of the Law of the Constitution* (10th ed. 1959)).

For example, *Entick v. Carrington*, (1765) 95 Eng. Rep. 807 (KB)—a "monument of English freedom" with which "every American statesmen, during our revolutionary and formative period as a nation, was undoubtedly familiar," *Boyd v. United States*, 116 U.S. 616, 626 (1886)— was a trespass action seeking damages for an unlawful search and seizure. In that case, the King's Bench affirmed a damages judgment against the officials who conducted a search under the authority of a general warrant that was held unlawful. *Entick*, 95 Eng. Rep. at 817–18. The case is celebrated for its announcement of limits on searches, and for inspiring the Fourth Amendment, *Boyd*, 116 U.S. at 625–27. It is not celebrated for recognizing a cause of action for official

misconduct, because that was already entrenched by the pre-revolutionary period—and went unquestioned in the 1765 decision, *see Entick*, 95 Eng. Rep. at 813, 815 (describing defendants' arguments).

There were several such cases in the pre-revolutionary period, providing remedies against officers in their personal capacity for a variety of unlawful official acts. *See, e.g.*, *Wilkes v. Wood*, (1763) 98 Eng. Rep. 489 (KB) (trespass damages for search and seizure under authority of an unlawful general warrant); *Chambers v. Robinson*, (1726) 93 Eng. Rep. 787 (KB) (damages awarded for malicious prosecution). Of note, damages in these cases were awarded based not only on harms such as physical injury and loss of wages, but also to remedy the injury to liberty caused by the unauthorized or excessive use of official power. In *Huckle v. Money*, (1763) 95 Eng. Rep. 768 (KB), for example, a printer was awarded £300 in damages for trespass, assault, and imprisonment after he was taken into custody for several hours by a King's messenger on suspicion of having printed an allegedly seditious pamphlet. *Id.* at 768. Rejecting the argument that damages were excessive because the plaintiff was treated well and confined for only a few hours, the court held the damages were justified because "it was a most daring public attack made upon the liberty of the subject." *Id.* at 769.

During this period, as well, new torts evolved to redress harms that did not involve a physical invasion of a plaintiff's property or person (required for trespass), where the harm was solely or primarily an infringement of an intangible liberty interest. One such tort that could be committed by official misconduct was "action on the statute," which permitted a plaintiff to sue for damages "resulting from activity in violation of a legislatively created duty or standard." Al Katz, *The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in* Bell v. Hood, 117 U. Pa. L. Rev. 1, 18 (1968). Although statutory remedies could be substituted for the

common law tort when the statutes "themselves provided for damages recovery by injured individuals," Vázquez & Vladeck, *supra*, at 538, the common law tort was otherwise available to recover for a breach of public statutory duty. *See Ashby v. White*, (1703) 92 Eng. Rep. 126, 136 (KB) (Holt, C.J., dissenting) ("Where a new Act of Parliament is made for the benefit of the subject, if a man be hindered from the enjoyment of it, he shall have an action against such person who so obstructed him."); Katz, *supra*, at 25 ("The Chief Justice's dissenting opinion [in *Ashby*] was accepted by the House of Lords, which reversed the King's Bench and entered judgment for the plaintiff.").

In short, the English common law that infused early American law embodied the principle that English courts would generally make non-statutory remedies available to redress the harms caused by English officers who acted outside the scope of the limits on their power.

B.      **In the Founding Era and Early Republic, Common Law Remedies Were Available Against Federal Officers Who Violated the Constitution, Including in Cases Implicating National Security.**

The English tradition of presumptive personal liability for official misconduct was embraced in the early Republic. "From the beginning of the nation's history, federal (and state) officials have been subject to common law suits as if they were private individuals, just as English officials were at the time of the Founding." Vázquez & Vladeck, *supra*, at 531; *see also* James E. Pfander, *Constitutional Torts and the War on Terror* 6 (2017). It was well-accepted in the Nation's earliest years that non-statutory remedies were available, in both state and federal courts, when a federal official transgressed the Constitution or federal statutes while carrying out his official duties. Congress did not perceive these remedies as intruding upon the legislative sphere; rather, it exercised its legislative prerogative in deciding whether to indemnify the officer or not. Courts did not shy from awarding damages even in cases involving the wartime conduct of military officers, from ship seizures on the high seas to battlefield orders during a military campaign.

8

    *1.   There Was a Robust Tradition of Common Law Damages Remedies in the Early Republic.*

In the early years of the Republic, citizens harmed by federal officers who acted outside the constitutional or statutory limits on their authority recovered damages from a wide range of federal officer defendants, including: from a federal postal official for a malicious prosecution, *Merriam v. Mitchell*, 13 Me. 439 (1836); from federal customs agents for wrongful seizures of vessels and their cargo, *Gelston v. Hoyt*, 16 U.S. (3 Wheat.) 246 (1818) (affirming New York state court judgment); *Imlay v. Sands*, 1 Cai. 566 (N.Y. Sup. Ct. 1804); from a federal revenue collector for demanding unlawful customs duties, *Kidd v. Swartwout*, 14 F. Cas. 457 (C.C.S.D.N.Y. 1843) (No. 7,756); and from a federal military officer who attempted to collect a fine assessed by a court-martial that did not possess jurisdiction over the plaintiff, *Wise v. Withers*, 7 U.S. (3 Cranch) 331, 337 (1806) (reversing denial of judgment for plaintiff in trespass action).[2]

Courts in this era were not insensitive to the situation facing federal officers subject to personal liability for acting in good-faith (but erroneous) reliance on federal law or instructions, but they did not think such concerns could or should stop the courts from recognizing a damages remedy. Rather, courts expected any such concerns to be addressed through the process of indemnification. As a New York court explained, courts were "bound to pronounce the law as we find it, and leave cases of hardship, where any exist, to legislative provision." *Imlay*, 1 Cai. at 573; *see also Tracy v. Swartwout*, 35 U.S. (10 Pet.) 80, 98–99 (1836) (upholding damages awarded against federal revenue collector for demanding unlawful customs duty and noting that if "[s]ome personal inconvenience may be experienced by an officer who shall be held responsible in damages

---

[2] These cases were sometimes resolved in state court, but they were also often heard in federal court under diversity jurisdiction or through removal of cases involving federal officers. Vázquez & Vladeck, *supra*, at 540. The first federal-officer removal statute (for a particular set of customs officers) was enacted in 1815. *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).

for illegal acts done under instructions of a superior," it could be remedied by indemnification).

Congress, in turn, commonly granted officers' petitions for indemnification when they had, in fact, acted in good faith; but declined to do so when the officers' acts were beyond the pale. Congress thus made case-specific judgments about whether, once the courts determined liability, the harms should be compensated from the U.S. Treasury or the officers' pockets. *See* James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1866–68 (2010).

To seek indemnification, federal officers petitioned Congress for a private bill authorizing payment of the judgment against them. *Id.* at 1888–91. A study of those petitions demonstrates both the widespread acceptance of personal-liability damages judgments against federal officers and the general rule that Congress would indemnify the officers—but not in every case. The study identified nearly 70 cases of officers petitioning for indemnification or plaintiffs petitioning for payment of a judgment between 1789 and 1860. *Id.* at 1904. The majority were "filed on behalf of military officers who had been held legally responsible for some form of trespassory invasion: a wrongful seizure of property or persons." *Id.* The second most common category encompassed judgments against federal revenue officers for trespass or conversion. *Id.* at 1905. The remaining petitions involved judgments against federal postal officials and federal marshals, among others. *Id.*[3]

Most of the time (roughly 60%), indemnity was granted. *Id.* But where Congress determined the federal officer had not acted in good faith in exceeding the bounds of his authority, indemnity was denied. *See id.* at 1907 (quoting committee report denying indemnity and stating

---

[3] The malicious prosecution judgment in *Merriam v. Mitchell*, 13 Me. 439 (1836), discussed above, is one of the cases in which Congress indemnified a postal official. *See* Pfander & Hunt, *supra*, at 1908–09.

that "it should not be the policy of the United States to screen their officers from making a just remuneration for losses sustained by her citizens, when the acts of such officers are illegal, unjust, and without palliating circumstances").

In sum, during the founding era and throughout the early republic, persons wronged by federal officers who exceeded their statutory or constitutional authority could avail themselves of the same tort remedies available against any other defendant. If courts found the official's misconduct violated the Constitution or federal statutes, they sustained damages awards, regardless of the federal official's good faith. Congress then decided whether the officer had acted in circumstances that suggested the government should bear responsibility for the loss and, if so, indemnified the officer. If not, the officer was responsible to pay for the harm caused by his unlawful official conduct. Whether or not the government chose to indemnify, the courts' role in determining the legality of officer conduct, and awarding relief, went unquestioned.

Concerns about the unfairness of imposing a damages judgment on individual officers thus did not dissuade courts in the early republic from applying non-statutory remedies. In any event, such concerns are further mitigated in the modern era because federal officials no longer need to petition for private bills to be indemnified. Instead, the federal government generally represents the officers in court and almost always pays any settlement or judgment in the case. *See* 28 C.F.R. § 50.15. Payment by the federal government is virtually guaranteed. A study of 171 cases involving *Bivens* judgments against Bureau of Prisons officers revealed that the officer contributed personal (or an insurer's) funds to the judgment in only eight cases. James E. Pfander, Alexander A. Reinert & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 Stan. L. Rev. 561, 566 (2020). Stated another way, "the federal government effectively held its officers harmless in over 95% of the successful cases brought against them, and paid well

11

over 99% of the compensation received by plaintiffs in these cases." *Id.* This practice of routine indemnification addresses any concern that "high officers who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis." *See Ziglar*, 137 S. Ct. at 1863.

> ### 2.   Courts Commonly Judged the Lawfulness of Federal Officer Conduct in Cases Implicating National Security.

One of Defendant Barr's primary arguments is that the Court should decline to apply *Bivens* here because of "national security" concerns. *See* Mot. to Dismiss at 12–16. As Plaintiffs argue, Pls.' Opp'n at 48–50, merely asserting "national security" does not make it so. The Supreme Court has cautioned that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Ziglar*, 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). And in that context, the Supreme Court specifically rejected absolute immunity for the Attorney General's "actions in furtherance of the national security." *Mitchell*, 472 U.S. at 520. Defendant Barr's argument comes close to creating the absolute immunity that the Supreme Court rejected, insofar as Defendant Barr effectively contends that dismissal must follow whenever an official invokes "national security." Such a rule not only contravenes precedent, it would be flatly inconsistent with centuries of tradition. Founding-era state and federal courts' acceptance of tort suits against federal officers for violations of the Constitution or federal law did not draw a sharp line at national security or military affairs, even in cases that (unlike here) actually involved officers' violation of plaintiffs' rights in the midst of military operations.

A foundational case is *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) (Marshall, C.J.). Captain Little was an officer in the U.S. Navy and a commander of a frigate during the Quasi-War with France. *Id.* at 176. During that period, Congress enacted the Non-Intercourse Act, which

authorized the seizure of any American vessel caught sailing to a French port (including ports in French colonies). *Id.* at 177. The Secretary of the Navy issued instructions to Captain Little, directing him to help enforce the Act; the instructions, moreover, told him to seize vessels traveling "*to* or *from*" French ports. *Id.* at 178.

Captain Little did as he was instructed and seized the *Flying Fish*, a vessel caught sailing from a French port that appeared to be American. *Id.* at 176. Captain Little instituted forfeiture proceedings in Boston and the *Flying Fish*'s owner counter-claimed for damages. *Id.* The Supreme Court held that the seizure was unlawful. *Id.* at 177–78. It turned out that the vessel was not American, and it fell outside the scope of the Act, regardless, because it was seized sailing *from* a French port, rather than *to* one—despite the executive instructions that attempted to broaden the authority to seize. *Id.*

The primary question on appeal, though, was not the lawfulness of the seizure, but the question of damages. Chief Justice Marshall "confess[ed]" that "the first bias of [his] mind was very strong in favour of the opinion that though the instructions of the executive could not give a right, they might yet excuse from damages." *Id.* at 179. He considered whether the law ought to draw a distinction on this question between military and civil officials in light of the obedience to orders that is "indispensably necessary to every military system." *Id.* But he became "convinced that [he] was mistaken," and agreed with the rest of the Court that "instructions cannot . . . legalize an act which without those instructions would have been a plain trespass." *Id.* Accordingly, following orders was no defense, and Chief Justice Marshall concluded that Captain Little "must be answerable in damages to the owner of this neutral vessel." *Id.* Captain Little, in turn, sought indemnification from Congress, which granted his petition. Act for the Relief of George Little, Priv. L. No. 09-02, ch. 4, 6 Stat. 63 (1807).

*Little* is but one of several cases from the late 18th and early 19th centuries where the Supreme Court affirmed a damages award resulting from unlawful seizure of a vessel by a naval officer who judged that seizure necessary for security. *See, e.g.*, *Maley v. Shattuck*, 7 U.S. (3 Cranch) 458 (1806) (upholding award of damages against U.S. naval officer for unlawful seizure of vessel when it was entering a Haitian port); *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) (same for vessel seized near Martinique).

Other cases decided by the Supreme Court required the evaluation of judgments made during the heat of a military campaign. For example, in *Mitchell v. Harmony*, 54 U.S. (13 How.) 115 (1851), the Court affirmed a damages judgment exceeding $90,000 against a U.S. Army officer, Colonel Mitchell, for the forcible taking of the plaintiff's property and for compelling the plaintiff to travel with the army during parts of a campaign in the Mexican-American war. The plaintiff was a merchant who had set out on a trading expedition to Mexico before the declaration of war. *Id.* at 129. At first, he and other merchants followed behind army lines as troops invaded Mexican territories and traded in areas that had become occupied by U.S. forces. *Id*. But when the army reached the town of San Elisario, the trader wanted to leave rather than continue on the dangerous expedition to Chihuahua. *Id.* The commander of the campaign determined that the trader needed to stay to "prevent the property from falling into the hands of the enemy." *Id.* at 129, 132. He gave an order to this effect to Colonel Mitchell, who executed the order; "and the plaintiff was forced, against his will, to accompany the American forces with his wagons, mules and goods, in that hazardous expedition." *Id.* at 129.

The trader's fears proved justified, and due to various events thereafter, his property was destroyed or lost. *Id.* at 130. The trader sued for trespass, and the jury determined that no danger or necessity existed to justify the seizure. *Id.* at 133–34. On appeal, the Supreme Court held that

the jury had been properly instructed that danger or necessity was required to justify the seizure

and affirmed the damages judgment. *Id.* at 134, 136. The Court rejected the defendant officer's

argument that "an expedition into the enemy's country" with "dangers that . . . cannot always be

foreseen" required the court to entrust the commander "with some discretionary power" and

absolve him of liability if "he acts honestly, and to the best of his judgment." *Id.* at 134. The Court

explained that the officer's reasonableness could be relevant to indemnification, but the plaintiff

was nonetheless entitled to damages because the seizure was unlawful. *Id.* at 134–35.

And *Mitchell* was but one of several cases to make it to the Supreme Court in which

military officers were subject to liability for official acts that infringed on plaintiffs' rights. *See,*

*e.g.*, *Bates v. Clark*, 95 U.S. 204 (1877) (holding personally liable military officials who followed

orders and wrongly seized private property they mistakenly believed was within Indian country);

*Wise*, 7 U.S. at 337; *Maley*, 7 U.S. at 490; *Little*, 6 U.S. at 179. There were many other cases in

lower courts where military officers were subject to damages judgments—sometimes very large

ones—for the unlawful seizure and arrest of citizens. *See* Pfander, *Dicey's Nightmare*, *supra*, at

754–55 (collecting cases). For example, two military officers were subject to a damages award

totaling over $12,000 (in 1810s dollars) for seizing and holding nine Americans during the War of

1812 based on a revenue collector's allegation that the nine had engaged in treasonable practices.

*See id.* Upon application for a private bill, Congress indemnified the officers. *Id.*

As these cases show, the jurists in the generation that framed the Constitution did not

hesitate to meet their judicial obligation to determine what the law required when federal officers

infringed on liberty or property rights in the course of military operations. Confident in the courts'

ability—indeed, duty—to determine the law, they rejected the idea that declaring whether a

military commander had infringed a person's rights risks undue supervision of "the discretion he

may exercise in his military operations," *Mitchell*, 54 U.S. at 134, and likewise dismissed the suggestion that military officers should be exempt from damages to avoid undermining their ability to perform duties essential to national security, *Little*, 6 U.S. at 179.

### C. By Expressly Recognizing a Federal Law Basis for these Remedies, *Bivens* Continued the Common Law Tradition.

#### 1. Before Erie, *Non-Statutory Damages Remedies against Federal Officers Were Not Understood to Derive Solely from State Law.*

In the early years of recognizing non-statutory, common law damages remedies for federal constitutional violations, federal courts did not always expressly situate those remedies in state or federal law, instead referring to the officer as being liable in "'tort,' or under the 'general law' or 'common law.'" Alfred Hill, *Constitutional Remedies*, 69 Colum. L. Rev. 1109, 1124 & nn.59–63 (1969) (footnotes omitted) (collecting cases). This lack of focus on the source of liability was unsurprising in the era before *Erie*, when federal courts understood their role as discovering "a body of principles … through the exercise of reason," Larry Kramer, *The Lawmaking Power of the Federal Courts*, 12 Pace L. Rev. 263, 281 (1992), and believed there to be a body of general law that federal courts could adduce that was "not at all dependent upon local statutes or local usages of a fixed and permanent operation," *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 18-19 (1842).

Perhaps because the question was not then deemed essential, in the pre-*Erie* era, the Supreme Court never specifically "held that rights against the officer based on [unconstitutional or statute-violating] behavior must be sought under state law." Hill, *supra*, at 1124. In some cases, the Supreme Court described the right at issue in terms that suggested the right originated in the federal Constitution, not state tort law. *See, e.g.*, *Mitchell*, 54 U.S. at 136 (citing an English case holding an officer personally liable for property destroyed purportedly for military necessity and stating "the rights of private property … are certainly not less valued nor less securely guarded under the Constitution and laws of the United States"). More generally, when describing the

16

principle that sovereign immunity did not shield federal officers from personal liability, the Supreme Court did not specify that the officer's personal liability was limited to that provided under state law. *See, e.g.*, *Phila. Co. v. Stimson*, 223 U.S. 605, 619–20 (1912) ("The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded."); *Belknap v. Schild*, 161 U.S. 10, 18 (1896) ("But the exemption of the United States from judicial process does not protect their officers and agents . . . from being personally liable to an action of tort by a private person whose rights or property they have wrongfully invaded or injured, even by authority of the United States."). Post-*Erie* and pre-*Bivens*, the Supreme Court sometimes referred to state law as governing non-statutory damages remedies against federal officers for wrongful official acts, but it did so in cases where it was not clear that the federal official's *ultra vires* acts violated the plaintiff's constitutional rights. *See, e.g.*, *Wheeldin v. Wheeler*, 373 U.S. 647, 652 (1963) ("When it comes to suits for damages for abuse of power, federal officials are usually governed by local law.").

> 2.  Bivens *and the Westfall Act Preserved the Full Scope of Common Law Remedies for Federal Officer Constitutional Violations within a Federal Law Cause of Action.*

When the Supreme Court decided *Bivens* in 1971, it did so against the backdrop of this unbroken line of cases recognizing that federal officers were routinely subject to personal damages liability for unconstitutional conduct. The only question facing the *Bivens* Court was thus *where* a right to sue federal officers for unconstitutional conduct should be located, not *whether* it should exist: should the right to sue sound in state law only, or in federal law as well? No one argued that there should be *no* remedy; issue was joined only on whether the state law remedy was inadequate and should be supplemented by a federal remedy when constitutional violations by federal officials were at stake. *Bivens*, 403 U.S. at 390 ("Respondents do not argue that petitioner should be entirely without remedy for an unconstitutional invasion of his rights by federal agents."). The federal

government agreed that "[i]n America, as in England, government officers were to be subject to the same common-law actions for damages as those applicable to private persons." Br. for the Resp'ts at 10, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (No. 301), 1970 WL 136799. It simply argued that those actions should proceed only under state law. *Id.*

Indeed, *Bivens* can best be understood as validating a federal right to sue that builds on the common law past and tailors the common law suit for use in a post-*Erie* world, thus obviating some of the difficulties that stemmed from grounding the remedy for violations of the Constitution in potentially inadequate and varying state laws. *See* James E. Pfander, Iqbal, Bivens, *and the Role of Judge-Made Law in Constitutional Litigation*, 114 Penn St. L. Rev. 1387, 1415 (2010) ("*Erie* created the very real possibility that in tort suits aimed at enforcing constitutional rights, both the right to sue the federal official and the incidents of official liability would be governed by state law."); Vázquez & Vladeck, *supra*, at 541 (noting that the decision to frame remedial issues in state law terms after *Erie* "tied" the federal courts to "state precedents" and prevented them from taking account of "the federal interests involved, including the need to give efficacy to the Constitution"). After *Erie*, when pushed to resolve the question whether a remedy arose under federal law in addition to state tort law, the *Bivens* Court said yes, calling it "hardly . . . a surprising proposition" because "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 U.S. at 395.

Congress quickly accepted and ratified the *Bivens* remedy. In 1974, Congress amended the Federal Tort Claims Act (FTCA) to add the federal government as a defendant in certain law-enforcement tort suits, while making clear that any FTCA suit would operate in parallel with the right to bring a suit for damages under *Bivens*. 28 U.S.C. § 2680(h); *see Carlson v. Green*, 446

U.S. 14, 19–20 & n.5 (1980) ("[T]he congressional comments accompanying [the FTCA] amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action."); James E. Pfander & David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117, 133 (2009) (noting that Congress rejected language proposed by the Department of Justice that "would have eliminated the *Bivens* action altogether in favor of suits against the government for constitutional violations").

Moreover, Congress has endorsed the importation of pre-existing common law remedies (including those made available under state law) into the *Bivens* suit form.  In 1988, responding to a ruling recognizing the continued viability of state tort claims against federal officers, *Westfall v. Erwin*, 484 U.S. 292 (1988), Congress passed the Westfall Act. Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), Pub. L. No. 100-694, 102 Stat. 4563. The Act made the FTCA the exclusive remedy for tort suits against federal officers and substituted the federal government as defendant in those cases. But it preserved suits against officers in their individual capacities if plaintiffs alleged "a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), thus leaving the *Bivens* regime intact. *See* H.R. Rep. No. 100-700 at 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949-50 ("Since the Supreme Court's decision in *Bivens*, . . . the courts have identified this type of tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, [the Act] would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights."); Anya Bernstein, *Catch-All Doctrinalism and Judicial Desire*, 161 U. Pa. L. Rev. Online 221, 223–30 (2013) (exploring the interplay of Westfall Act transformation, substitution, and immunity).

Those preserved claims for constitutional torts, moreover, would evidently include the full

panoply of remedies available before the Westfall Act, whether they had been (before the Act) brought under state law or under *Bivens*. Both in the text of the Act—which refers to "a civil action … brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), not only a *Bivens* or federal law action—and in its legislative history, Congress made clear that the Act did not narrow the claims available to plaintiffs. *See* H.R. Rep. No. 100-700, at 6 (stating that the Act "would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights"). Although those claims may no longer be brought under state law after the Act, *see Minneci v. Pollard*, 132 S. Ct. 617, 623 (2012), the Act endorses a scope of *Bivens* that is at least as expansive as its common law past. *See* Vázquez & Vladeck, *supra*, at 570–80; *see also* Pfander & Baltmanis, *supra*, at 122 ("T]he Westfall Act supports our argument for the routine availability of *Bivens* claims."). By specifically preserving plaintiffs' ability to sue for constitutional torts, Congress effectively chose the officer suit, a remedy reflected in centuries of common law development, as the mechanism best suited to remedy alleged constitutional tort violations.

\* \* \* \* \*

At bottom, this case raises no spectre of judicial expansion of a newly-begotten right. Nor does the federal officer's invocation of "national security" mean that this Court would be breaking new ground in providing for a judicial remedy for excessive force. On the contrary, to refuse to allow a *Bivens* remedy here would curtail a remedy that has been available since the very first days of the Republic.

**CONCLUSION**

The Court should deny Defendant Barr's motion to dismiss.

Dated: November 30, 2020

Respectfully Submitted,

/s/Hyland Hunt
Hyland Hunt (D.C. Bar No. 999276)
Ruthanne M. Deutsch (D.C. Bar No. 498091)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

On November 30, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court for the District of Columbia, using the electronic case filing system of the court. I hereby certify that I have served counsel for all parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Hyland Hunt
Hyland Hunt