# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BLACK LIVES MATTER D.C., et al., | |
| *Plaintiffs*, | |
| v. | No. 1:20-cv-01469-DLF |
| DONALD J. TRUMP, et al. | |
| *Defendants*. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT ADAMCHIK'S MOTION TO DISMISS

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

*Not a D.C. Bar member; practicing under
supervision pursuant to D.C. App. R. 49(c)(8A)*

December 14, 2020

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Kayla Scott*
Megan Yan*
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 0005
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Tristin Brown (D.C. Bar No. 1671642)
Dennis Corkery (D.C. Bar No. 1016991)
Hannah Lieberman (D.C. Bar No. 336776)
Jonathan Smith (D.C. Bar No. 396578)
Washington Lawyers' Committee for Civil
    Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ...............................................................................................................1

SUMMARY OF ARGUMENT ...........................................................................................2

LEGAL STANDARD .........................................................................................................4

ARGUMENT .......................................................................................................................5

I.   Qualified Immunity Must Be Denied Because Plaintiffs State A Claim For Violations
     Of Clearly Established Constitutional Rights (Claims 1 & 2) .....................................5

     A.  No reasonable government official or law-enforcement officer could have thought
         that attacking a peaceful protest was constitutional under the Fourth Amendment.
         ................................................................................................................................6

         1.  The Fourth Amendment violation was obvious, as the use of force
             lacked any semblance of justification. ..............................................6

         2.  Precedent independently places the Fourth Amendment violation
             beyond debate. ...............................................................................11

     B.  Defendants violated Plaintiffs' clearly established First Amendment rights in a
         manner that was obvious because of its egregiousness and, independently,
         contravened binding precedent ...........................................................................15

         1.  By assaulting and completely scattering a lawful, peaceful
             demonstration, Defendants burdened far more speech than
             necessary ......................................................................................16

         2.  Breaking up the protest was clearly established to be
             unconstitutional absent a "clear and present danger." ..................20

         3.  Viewpoint discrimination violated Plaintiffs' clearly established
             rights ............................................................................................22

II.  The Traditional Damages Remedy Against Federal Officers For Violating
     Demonstrators' First And Fourth Amendment Rights Has Long Been Recognized In
     This Circuit And No Special Factors Counsel Hesitation Here (Claims 1 & 2)..........24

     A.  Circuit precedent refutes the notion that "special factors" preclude recognizing
         constitutional damages claims for demonstrators' rights here and distinguishes
         this case sharply from those in which special factors exist ...................................27

B.  Presidential security and the other "special factors" invoked by Adamchik are misplaced here and do not overcome Circuit precedent. .......................................30

C.  Notwithstanding Adamchik's claim that he was implementing a "high-level plan," neither his rank nor the possibility of discovery precludes *Bivens* here. ...............35

III.  The Complaint Details How Adamchik Participated In The Constitutional Violations Alleged (Claims 1 & 2). .............................................................................................37

IV.  Adamchik Is Not Entitled To Qualified Immunity As To Plaintiffs' Claims Under 42 U.S.C. §§ 1985 & 1986 (Claims 5 & 6). .......................................................................39

A.  Plaintiffs adequately pleaded a conspiracy that includes officers of the United States, the District of Columbia, and Arlington County .......................................40

1.  Plaintiffs adequately pleaded an "agreement between two or more persons.". .........................................................................................................40

2.  Plaintiffs have alleged an *intercorporate* conspiracy, not an intracorporate one .........................................................................................42

B.  Plaintiffs adequately pleaded discriminatory intent. .............................................43

CONCLUSION .............................................................................................................................45

# TABLE OF AUTHORITIES

*Authorities on which we chiefly rely are marked with asterisks.*

## Cases

*\*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)...............................................................12

*Adams v. New York*, 2016 WL 1169520 (S.D.N.Y. Mar. 22, 2016) ............................21

*Adickes v. S.H. Kress & Co.*, 398 U.S.144 (1970) ......................................................40

*Aguilar v. ICE*, 2011 WL 13258226 (S.D.N.Y. Jan. 11, 2011) ...................................37

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) .............................................................34

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................11

*Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52 (1st Cir. 2008)....................12

*\*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ...........................4, 10, 39

*\*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006)................................................8, 13

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) ........................................................40

*Bedford v. City of Hayward*, 2012 WL 4901434 (N.D. Cal. Oct. 15, 2012) ...............44

*Behrens v. Tillerson*, 264 F. Supp. 3d 273 (D.D.C. 2017) ............................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................4, 39

*Berg v. Kelly*, 897 F.3d 99 (2d Cir. 2018) ............................................................14, 15

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012) ...........................................14

*Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82 (D.D.C. 2018) ......................5

*\*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
403 U.S. 388 (1971) ...................................................................... *passim*

*Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154 (D.D.C. 2013) .........45

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ...............................43

iv

*Brenes-Laroche v. Toledo Davila*, 682 F. Supp. 2d 179 (D.P.R. 2010) ........................................13

*Bueno Diaz v. Mercucio*, 442 F. Supp. 3d 701 (S.D.N.Y. 2020) ..................................................34

*Burnett v. Wash. Metro. Area Transit Auth.*, 58 F. Supp. 3d 104 (D.D.C. 2014) ..........................5

*Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009) ......................................................14

*\*Carlson v. Green*, 446 U.S. 14 (1980) ...............................................................................25, 33, 34

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996) ........................................................................20

*Congress of Racial Equality v. Douglas*, 318 F.2d 95 (5th Cir. 1963) .........................................20

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ....................................................................34

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992) ..28

*Davis v. Passman*, 442 U.S. 228 (1979) .....................................................................................35

*\*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)..................................................................*passim*

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018)..............................................................5, 38

*Dundon v. Kirchmeier*, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) .............................................15

*\*Edwards v. South Carolina*, 372 U.S. 229 (1963) ...................................................................20, 22

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) .................................................................25

*Evangelou v. District of Columbia*, 901 F. Supp. 2d 159 (D.D.C. 2012)..................................4, 5

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) .................................................................15

*Fisher v. Shamburg*, 624 F.2d 156 (10th Cir. 1980) .................................................................40

*\*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ................................................................12

*Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992) ......................................................24, 25

*\*Graber v. Dales*, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019) .................................................31

*Graham v. Connor*, 490 U.S. 386 (1989) ....................................................................................7

*\*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .................................................................41, 44, 45

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................................................40

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ................................................32

*Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231 (W.D. Wash. 2009) ....................12

*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013) ....................................21, 28, 29

*Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ....................12

*Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006)................................................12

*Henderson v. Lujan*, 964 F.2d 1179 (D.C. Cir. 1992) ................................................18

*Hernandez v. Mesa*, 140 S. Ct. 735 (2020) ....................................25, 26, 29

*Hernandez v. Mesa,* 885 F.3d 811 (5th Cir. 2018) ................................................26

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984) ....................................28, 43, 44

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................5

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) ....................................4, 6, 39

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ................................................22

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) ....................10

*Jennings v. City of Miami*, 2009 WL 413110 (S.D. Fla. Jan. 27, 2009)........................56

*Johnson v. District of Columbia*, 67 F. Supp. 3d 157 (D.D.C. 2014)............................37

*Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006) ................................................20

*Jones v. Ritter*, 587 F. Supp. 2d 152 (D.D.C. 2008)................................................12

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010) ................................................20, 21, 38

*K.O. v. ICE*, 2020 WL 3429697 (D.D.C. June 23, 2020) ....................................34, 35

*Lagayan v. Odeh*, 199 F. Supp. 3d 21 (D.D.C. 2016) ....................................40, 41, 43

*Lamb v. City of Decatur*, 947 F. Supp. 1261 (C.D. Ill. 1996) ....................................13

*Lash v. Lemke*, 786 F.3d 1 (D.C. Cir. 2014) ....................................27, 28

*Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993) ..............28, 43

*\*Lederman v. United States*, 131 F. Supp. 2d 46 (D.D.C. 2001)...........................28, 29

*\*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002) ...............................................17, 28

*Liff v. Office of Inspector Gen.*, 881 F.3d 912 (D.C. Cir. 2018) ........................................30

*\*Linlor v. Polson*, 263 F. Supp. 3d 613 (E.D. Va. 2017) .......................................31, 34

*Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020) ...............................................30

*Lucha Unida de Padres y Estudiantes v. Green*, 470 F. Supp. 3d 1021 (D. Ariz. 2020) .......12, 21

*Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015) ........................................14

*\*Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997) ..........................................22, 23

*Marbury v. Madison*, 5 U.S. 137 (1803) ............................................................24, 35

*Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012) ......................................19

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ...............................................39, 44

*Masel v. Barrett*, 707 F. Supp. 4 (D.D.C. 1989) .........................................................28

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................16

*Mejia-Mejia v. ICE*, 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ...................................35

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) .............................................19

*Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015) ..........................................27, 30

*Minneci v. Pollard*, 565 U.S. 118 (2012) ...............................................................33, 34

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................29

*Nader v. Dem. Nat'l. Comm.*, 567 F.3d 692 (D.C. Cir. 2009) .....................................10

*\*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) .........................................55, 57

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) .................................................................23

*\*Norris v. District of Columbia*, 737 F.2d 1148 (D.C. Cir. 1984)...................................12

*Osborn v. Haley*, 549 U.S. 225 (2007) ........................................................34

*Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001)............................................12

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) ..................28

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................33

*Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81 (D.P.R. 2012) ......................21, 38

*Quaker Action Grp. v. Hickel ("Quaker Action I"),*
  421 F.2d 1111 (D.C. Cir. 1969) ........................................................9, 32

*Quaker Action Grp. v. Morton ("Quaker Action IV"),*
  516 F.2d 717 (D.C. Cir. 1975)...............................................19, 20, 21, 32

*Rauen v. City of Miami*, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007) ..........................21

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989) ......................34

*Rosenberger v. Rector & Visitors of Univ. of Va,*, 515 U.S. 819 (1995) ......................23

*Rudder v. Williams*, 666 F.3d 790 (D.C. Cir. 2012) ..............................................7, 12

*Sandvig v. Sessions*, 2018 WL 1568881 (D.D.C. Mar. 30, 2018) ...............................4, 39

*Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................32

*Secot v. City of Sterling Heights*, 985 F. Supp. 715 (E.D. Mich. 1997) ......................13

*Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743 (10th Cir. 1980) ..................................43

*Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997) ........................................14

*Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987) ....................................27

*Tanzin v. Tanvir*, No. 19-71, 2020 WL 7250100 (U.S. Dec. 10, 2020)............24, 25, 33

*Tatum v. Morton*, 402 F. Supp. 719 (D.D.C. 1974) ......................................21

*Taylor v. Riojas*, No. 19-1261, 2020 WL 6385693 (U.S. Nov. 2, 2020) ......................5

*Tolan v. Cotton*, 572 U.S. 650 (2014)........................................................11

*Torossian v. Hayo,* 45 F. Supp. 2d 63 (D.D.C 1999) ........................................28

*Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010) .......................................................................25

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ...................................................................................37

*United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104 (D.D.C. 2014) ..................................40

*\*United States v. Doe*, 968 F.2d 86 (D.C. Cir. 1992) ................................................................18, 21

*United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991) ............................................................42

*United States v. Nixon*, 418 U.S. 683 (1974) .................................................................................36

*\*United States v. Scott*, 2020 WL 6494642 (2d Cir. Nov. 5, 2020) .......................................41, 42

*United States v. Speed*, 78 F. Supp. 366 (D.D.C. 1948) ................................................................42

*United States v. Wardell*, 581 F.3d 1272 (10th Cir. 2009) ...........................................................40

*United States v. Wood*, 879 F.2d 927 (D.C. Cir. 1989) .................................................................41

*\*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)....................................................................12

*\*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...................................................................16

*\*Wesby v. District of Columbia*, 841 F. Supp. 2d 20 (D.D.C. 2012)............................................37

*Westfahl v. District of Columbia*, 75 F. Supp. 3d 365 (D.D.C. 2014) ..........................................15

*White v. Jackson*, 865 F.3d 1064 (8th Cir. 2017) .........................................................................15

*\*White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984) ....................18

*\*Wood v. Moss*, 572 U.S. 744 (2014) ...........................................................................14, 16, 19, 32

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ........................................................................................8, 13

*Young v. Akal*, 985 F. Supp. 2d 785 (W.D. La. 2013) ..................................................................15

*\*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ........................................................................... *passim*

## Statutes, Regulations, Rules, and Legislative Materials

*\*42 U.S.C. § 1983*........................................................................................................... *passim*

*\*42 U.S.C. § 1985*........................................................................................................... *passim*

*42 U.S.C. § 1986 ...................................................................................................40

D.C. Code § 5-101.03 ...........................................................................................42

D.C. Code § 49-409 ...............................................................................................42

Fed. R. Civ. P. 8 .....................................................................................................14

Fed. R. Evid. 201(b).................................................................................................8

*Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protestors at Lafayette Square: Hearing Before the H. Comm. on Natural Resources*, 116th Cong. (July 28, 2020) (testimony of Gregory T. Monahan)..................................................................38

## Other Authorities

Carol D. Leoning *et al.*, *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020.................10

3 W. Blackstone, Commentaries (1783) ...................................................................25

## INTRODUCTION

Major Adamchik's motion to dismiss rests on a set of facts that bears little relationship to the allegations of the complaint.  His opening sentence says that Plaintiffs have sued him "for his alleged role in implementing a high-level plan designed to ensure the President's safety in response to civil unrest." ECF 97 ("Adam. MTD"), at 1. But taking the facts alleged in the complaint as true, as the Court must do on a motion to dismiss, there was no "high-level plan designed to ensure the President's safety in response to civil unrest." There was no civil unrest. There was no threat to the President's safety. There was, rather, an unprovoked assault by government officers to prevent the peaceful expression of political views by civil rights demonstrators. Major Adamchik is sued here for his role as incident commander in that assault.

As alleged in Plaintiffs' complaint, on the evening of June 1, 2020, law enforcement officers at Lafayette Square near the White House charged, clubbed, tear-gassed, and violently dispersed civil rights demonstrators who were lawfully and peacefully protesting police brutality against Black people in the United States. Officers assaulted journalists and demonstrators alike and endangered children in the crowd. Officers repeatedly hit unarmed, unthreatening people with batons and shields, knocking them to the ground. Demonstrators struggled to breathe amidst the chemical attack. This was no routine, orderly clearing of a safety perimeter for the President's movement. Rather, it was an attack by government officers against their own people, of a degree unprecedented on U.S. soil for the past half-century.

Like Defendant Barr, *see* ECF 76, Defendant Adamchik dangerously proposes that, however blatant an affront to constitutional rights, a federal official's incantation of the words "presidential security" ends the judicial inquiry. The Court should reject that view: Any reasonable officer—indeed, any reasonable person—would have known that the Lafayette Square attack was

flagrantly unconstitutional, and no court should hesitate for a moment to hold that the Constitution is enforceable in these circumstances. Adamchik's challenges to the constitutional damages claims, like Defendant Barr's, fail for another reason also: disregarding the Rules of Civil Procedure, Adamchik ignores the well-pleaded allegations of the complaint and seeks dismissal based on his own version of events. It cannot be the case that no matter how clear the constitutional rights involved, and no matter how excessive and unjustified the force used to violate them, these rights are unenforceable as long as the violators say the magic words "presidential security," followed by speculative assertions at odds with a complaint's plausible allegations.

For these reasons and the more specific ones below, Adamchik's motion should be denied.

## SUMMARY OF ARGUMENT

Because Adamchik's arguments are "nearly identical" to Defendant Barr's, *see* Adam. MTD 4 n.4, Plaintiffs respond with nearly identical (although slightly condensed) arguments as in their response to Defendant Barr, ECF 98, except as to the following:

(1) Plaintiffs explain why, in addition to the other "special factors" both Defendants assert against the *Bivens* claim, Adamchik's appeal to his rank as a "special factor" is particularly unpersuasive, and, relatedly, why the dismissing the *Bivens* claim will have no effect on the amount of discovery required as to any officials' motives. (Part II.C.)

(2) Plaintiffs explain how Adamchik's claim of a "high-level plan" to protect the President contradicts both his own statements elsewhere in his brief and Defendant Barr's principal defense in this case—thus underscoring the importance of taking a plaintiff's plausible allegations, not defendants' assertions in briefs, as true on a motion to dismiss. (Part II.C.)

(3) Plaintiff show that their allegations of Adamchik's personal participation are sufficient and respond to Adamchik's argument regarding "plausibility." (Part III.)

Plaintiffs incorporate by reference their recitation of the facts in their response to the Barr motion, ECF 98, and Plaintiffs cite specific facts from the Third Amended Complaint ("TAC") in their points below as relevant to Adamchik's arguments. In full, Plaintiffs will argue as follows:

**1. Damages claims for First and Fourth Amendment violations** (Claims 1 & 2). Qualified immunity for Adamchik on the *Bivens* claims should be denied both because the egregiousness of the constitutional violations in and of itself placed the violations beyond debate, and, independently, because reams of precedent applicable to demonstrations and to the specific types of force used here also made it clear to any reasonable officer that attacking peaceful demonstrators violated the Constitution. Adamchik's arguments to the contrary rely on conjuring facts outside of, and often directly at odds with, the allegations of the complaint. *See* Part I.

This Circuit has for decades recognized the availability of both First and Fourth Amendment *Bivens* claims against federal officials for violating demonstrators' rights and has never found that "special factors" counsel hesitation in these circumstances. Although the Supreme Court's approach to *Bivens* has evolved over the years, the new approach does not cast doubt on this Circuit's case law on this point. Additionally, the primary special factor invoked by Adamchik—presidential security—is inapplicable here, because the demonstrators here posed no threat to the President. In fact, *Defendants* were the aggressors who initiated the entire confrontation. Adamchik's approach would immunize federal officials from accountability for all constitutional violations taken in the name of presidential security, no matter how attenuated that interest might be from the unconstitutional conduct. Alternative remedies do not foreclose *Bivens* here, because Plaintiffs do not challenge a general government policy, and the Supreme Court has held that the Federal Tort Claims Act does not supplant *Bivens*. See Parts II.A-B.

*Specific to Adamchik*, his rank is not a "special factor" precluding *Bivens* claims, because he is not a high-level official; the *Bivens* claim will not generate disruptive discovery; and Adamchik's allegations that he implemented a "high-level plan" may not be credited at this stage *and* are contradicted by his own brief and the main defense of his co-defendant Barr. *See* Part II.C.

3

*Specific to Adamchik*, the complaint alleges specifically and in detail his personal involvement. If these allegations are deemed insufficient, Plaintiffs should be given leave to amend because they can support their allegations with sworn congressional testimony. *See* Part III below.

**2. Conspiracy claims** (Claims 5 & 6). Adamchik's arguments against these claims misunderstand the type of intent needed to form a conspiracy and the manner in which a conspiracy can be shown. His reliance on the intracorporate conspiracy doctrine is misplaced because the conspiracy involved at least three separate entities—the District (through its Metropolitan Police Department, or "MPD"), Arlington County (through the Arlington County Police Department, or "ACPD"), and the United States. *See* Part IV below.

## LEGAL STANDARD

A complaint need only provide "a short and plain statement … showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). "Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable, *Hurd*, 864 F.3d at 678, and need not be the only possible inferences. *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). Indeed, "[a] complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). Plaintiffs may plead with less specificity, and even "on information and belief," "where the facts are peculiarly within the

4

possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Evangelou*, 901 F. Supp. 2d at 170 (cleaned up).

Critically, the Court cannot resolve factual disputes on a 12(b)(6) motion to dismiss. *E.g.*, *Behrens v. Tillerson*, 264 F. Supp. 3d 273, 278 (D.D.C. 2017); *Burnett v. Wash. Metro. Area Trans. Auth.*, 58 F. Supp. 3d 104, 108-09 (D.D.C. 2014). Rather, "unresolved factual questions preclude dismissal" at this stage. *Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82, 88 (D.D.C. 2018).

## ARGUMENT

### I.  Qualified Immunity Must Be Denied Because Plaintiffs State A Claim For Violations Of Clearly Established Constitutional Rights (Claims 1 & 2).

We begin with the issue at the heart of the case: whether Adamchik violated Plaintiffs' clearly established First and Fourth Amendment rights. *See* Adam. MTD 33-42.

Qualified immunity must be denied if an officer violated clearly established rights of which a reasonable person in his position would have known because either controlling authority or "a robust consensus of cases of persuasive authority" placed the constitutional question beyond debate. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (cleaned up). Plaintiffs need not identify a precisely on-point precedent, *see id.*; rather, the law need only have provided "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). Independently, qualified immunity must also be denied in where the violation is "obvious" "even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590. The Supreme Court recently applied this principle to summarily reverse a grant of immunity because a lower court failed to recognize that the "particularly egregious facts" alone should have alerted any reasonable officer that the conduct at issue was unconstitutional. *Taylor v. Riojas*, No. 19-1261, 2020 WL 6385693, at *2 (U.S. Nov. 2, 2020).

This is a case of obvious unconstitutionality. Attacking a peaceful protest without warning and with unprovoked and overwhelming force, including the use of chemical weapons, rubber bullets, and baton charges, is such a clear violation of both the First and Fourth Amendments that no elaboration through case law is needed. Indeed, this violation was so egregious that none of the Defendants *actually defends the conduct on the merits*. The federal official-capacity defendants do not even attempt to defend the constitutionality of the actions alleged; they contest only Plaintiffs' right to equitable relief. *See* ECF 79-1. For his part, Adamchik (like the other individual-capacity defendants) defends the constitutionality not of the conduct Plaintiffs allege but of other hypothetical conduct he posits—even though deciding a motion to dismiss based on matters outside the pleadings is reversible error. *Hurd*, 864 F.3d at 686-87. That no Defendant can even articulate a defense on the merits regarding the conduct alleged speaks volumes.

Independent of the violation's obviousness, immunity should be denied also because on-point cases exist in droves holding that the type of conduct that occurred here is unlawful. Taking Plaintiffs' detailed factual allegations as true—as required at this stage—the question isn't close.

Plaintiffs explain in turn why each of the constitutional rights at issue was both obviously violated and, independently, clearly established by binding authority or a consensus of persuasive authority such that unlawfulness of Defendants' conduct was beyond debate.

**A. No reasonable government official or law-enforcement officer could have thought that attacking a peaceful protest was constitutional under the Fourth Amendment.**

**1. The Fourth Amendment violation was obvious, as the use of force lacked any semblance of justification.**

It is black-letter law that a "use of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than 'the countervailing governmental

interests at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Under this standard, "a police officer must have some justification for the quantum of force he uses. … [T]he state may not perpetrate violence for its own sake. Force without reason is unreasonable." *Id.* at 977 (cleaned up).

Taking the facts of the complaint as true, *Rudder*'s simple and powerful distillation of the essence of excessive force law—that "[f]orce without reason is unreasonable"—requires denial of this motion. Plaintiffs broke no laws and posed no threat. TAC ¶¶ 86-87. The Defendants gave no audible warning that Plaintiffs were obligated to move. TAC ¶¶ 84-85. Every reasonable law enforcement officer knows that, under the Fourth Amendment, officers cannot use force, much less tear gas and batons, against people who are doing nothing wrong.

The degree of force used underscores how far out of bounds Defendants' conduct was. As the complaint details, Defendants "fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd," TAC ¶ 88, "hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who were trying to flee the officers," TAC ¶ 90, pursued demonstrators on horseback, *id.*, knocked many protestors to the ground, *id.*, and "injected danger into what had been a calm protest as those in the street fled mounted police to avoid being trampled, struck by projectiles or gassed." *Id.* Defendant Sinacore slammed a man into a building from behind and then beat him when he tried to flee. TAC ¶ 91. Defendant Kellenberger used his baton to strike a television journalist in the back as she was trying to flee the onslaught. TAC ¶ 97. Any reasonable officer would have known that these uses of force were grossly impermissible in the circumstances alleged in the complaint.

Adamchik's attempts to defend this conduct fail because they are premised on logical and legal errors that no reasonable officer would have made and because they dispute the facts as plausibly alleged in the complaint. To start, Adamchik emphasizes the conduct of *other* protestors on *other* occasions; he invokes "criminal actors and extremist groups" who "attempted to hijack the protests" with "rioting, arson, and looting." Adam. MTD 1, and he argues that these prior acts elsewhere could have justified Defendants' attack. Adam. MTD 41-42.[1]

This guilt-by-association approach to law enforcement is obviously wrong based on first principles. Probable cause to search or seize must be particularized to the persons being seized or searched. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Barham v. Ramsey*, 434 F.3d 565, 573-74 (D.C. Cir. 2006). Nothing in the complaint connects Plaintiffs or the other demonstrators to alleged criminal conduct by other actors at other days, times, or places—except the common message opposing racial injustice and police brutality. If Plaintiffs can be assaulted because other people with the same views engaged in illegal activity at some other time and place, then *every* civil rights demonstrator in D.C. this past summer was properly subject to beating, tear-gassing, and arrest. This theory is so absurdly wrong that no reasonable officer could have entertained it.

Further, Adamchik's argument that the "paramount interest" of presidential security justifies apparently any use of force, no matter how excessive the force and no matter how attenuated from its objective, Adam. MTD 41, is plainly incorrect. Would the President's decision to walk across Lafayette Square have justified a decision to shoot the peaceful demonstrators in

---

[1] Adamchik requests judicial notice of Mayor Bowser's curfew orders. Adam. MTD 2 nn. 1-2. The Court can take notice of the existence of the orders, but not the underlying facts they assert, which are not "generally known" nor from "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Regardless, even if the Court takes notice of the facts Mayor Bowser asserted, they do not support Adamchik's theory that the attack was necessary for presidential security, because neither order asserts any facts about any events on June 1.

the vicinity with live ammunition? Of course not. The D.C. Circuit has specifically rejected "the Government's argument that mere mention of the President's safety" defeats a claim of a constitutional right. *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1117 (D.C. Cir. 1969) ("*Quaker Action I*"). Instead, courts must "assure [them]selves that [the Government's] conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat." *Id.*

Accordingly, presidential security is not a talisman that wards off all Fourth Amendment scrutiny; rather, like any other law enforcement interest (including the weighty interests in the lives of officers themselves and of civilian bystanders), it is subject to a Fourth Amendment reasonableness analysis. And like any other interest, it may be so attenuated from a particular decision to use force and so plainly inadequate to justify the quantum of force applied that in some circumstances it provides no justification at all. That is the case here. Immunizing any putative presidential security-related use of force from Fourth Amendment scrutiny would effectively permit the President to declare his intent to visit any location and then send officers out ahead of him to attack anyone in the area—as opposed to simply ordering people to move out of the way of a forthcoming presidential movement, audibly, and with enough time to comply.

Again, as alleged in the complaint, Plaintiffs were not asked or ordered to move. They were not disobeying any orders of that kind or any other. They posed no threat to the President or anyone else. Yet Defendants swept them away from Lafayette Square using tear gas, rubber bullets, and an armed charge. None of this was remotely necessary to create a safe path for the President, or otherwise protect presidential security, and no reasonable officer could have believed that it was.

In arguing otherwise, Adamchik manufactures allegations absent from—and in many cases at odds with—the complaint. For instance, Adamchik cites "information that members of the

crowd were passing rocks amongst themselves, threw a water bottle in the Attorney General's direction, threw projectiles at the officers" and also "intelligence that some had stockpiled bricks and bottles at the church." Adam. MTD 36 n.20. These allegations contradict the complaint, which squarely alleges that the crowd was peaceful generally, and specifically that at the moment of Defendants' attack, "the Plaintiffs and the members of the Plaintiff class were not engaging in unlawful conduct" or "any conduct that posed a threat of violence against any person, property, or public safety generally." TAC ¶¶ 86-87.[2]  A motion to dismiss is not the place to resolve factual disputes, and the Plaintiffs' allegations must be taken as true.

Adamchik also argues that the complaint contains "no suggestion that the Attorney General or officers under his control could differentiate among lawful protesters and those who might have infiltrated the crowd to do violence." Adam. MTD 4. This argument concedes that the violence against the protesters was not based on any individualized suspicion. Moreover, the very premise that anyone "might have infiltrated the crowd to do violence" such that Defendants *needed* a method for identifying such people has no basis in the complaint; it comes solely from Adamchik's

---

[2] Adamchik attempts to inject his allegations into the complaint itself by claiming they were incorporated by reference when Plaintiffs cited news articles. But the contents of documents cited in complaints are not incorporated where they are not "integral" to the complaint and do not "form the basis for a claim," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015), unless what is at issue is the mere existence of the content, *see Nader v. Dem. Nat'l. Comm.*, 567 F.3d 692, 700 (D.C. Cir. 2009) (in deciding question of "fraudulent concealment" for tolling statute of limitations, court could consider the fact that news articles cited in complaint revealed what plaintiff alleged had been concealed). Applying this principle to news articles, this Court has explained that plaintiffs do not "adopt every word in a cited document as true for pleading purposes." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71 (D.D.C. 2016). Here, the articles Plaintiffs cite are not integral to their claim; they merely provide corroborating sources to underscore the allegations' "plausibility." And Adamchik mischaracterizes the articles he cites: they do not state as fact any of the allegations regarding anything thrown at the Attorney General; or rocks, bricks and bottles; or projectiles generally; instead, these claims come from *government spokespeople* quoted in the stories. *See, e.g.,* Carol D. Leoning *et al.*, *Barr Personally Ordered Removal of Protesters Near White House, Leading to Use of Force Against Largely Peaceful Crowd*, Wash. Post, June 2, 2020, *cited at* Adam. MTD 36 n.20.

own brief. Plaintiffs have alleged in detail that their peaceful, non-threatening protest was broken up by Defendants' massive and indiscriminate use of force. Adamchik must meet these allegations squarely rather than knocking down a straw man based on alternative assertions of his own.

In venturing beyond the complaint, Adamchik cannot stick to a consistent story—further underscoring the wisdom of the rule that a complaint's facts are taken as true at this stage, with competing assertions to be proved (or disproved) later. *Compare* Adam. MTD 1, 6, 9, 10, 15, 36 (claiming he was carrying out a "high-level plan" or "operation" to protect the President), *with* Adam. MTD 34 (claiming he issued an "on-the-spot clearing order"); *see also* Part II.C *infra*.

Adamchik's attacks on the "plausibility" of Plaintiffs' allegations, *e.g.*, Adam. MTD 37, 40, are misplaced. Unlike *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009), concerning speculation about defendants' motives without a basis for such inference, Plaintiffs' claims are based on their personal experience as eyewitnesses to the events they describe and also supported by news reports and official statements from the White House and Justice Department—far more than is required for plausible notice pleading. *See* TAC ¶¶ 60-61 & nn. 14-15, ¶¶ 88-90 & nn. 16-18, ¶ 202 & n.19.

Qualified immunity does not suspend the normal rules of civil procedure. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). Should Defendants be able to substantiate a justification for their uses of force, they may seek qualified immunity again later in the case. That possibility is irrelevant to the unavoidable conclusion that the facts in the complaint state a claim for the violation of Plaintiffs' clearly established Fourth Amendment rights by the use of overwhelming force against peaceful, law-abiding demonstrators.

### 2. Precedent independently places the Fourth Amendment violation beyond debate.

In addition to their obviousness, each of the uses of force at issue here violated Fourth Amendment rights clearly established by binding authority, a consensus of persuasive authority,

or both. The D.C. Circuit has specifically held that baton strikes against non-threatening and non-resisting individuals violate the Fourth Amendment. *See Rudder*, 666 F.3d at 795 (baton strike "unprovoked and without warning" violates the Fourth Amendment). The D.C. Circuit has also specifically recognized the unjustified use of chemical agents to be unconstitutionally excessive. *Norris v. District of Columbia*, 737 F.2d 1148, 1152 (D.C. Cir. 1984) (R.B. Ginsburg, J.). Additionally, there is a consensus view, both in this Court and among the federal courts of appeals, that the gratuitous use of tear gas (or comparable chemical agents) on a person who is not threatening anyone or resisting officers is excessive force.[3]

Accordingly, courts have for decades denied qualified immunity for such uses of force, *see Henderson*, 439 F.3d at 503-04; *Vinyard*, 311 F.3d at 1355; *Adams*, 31 F.3d at 387, including specifically in the context of protests, *see Fogarty*, 523 F.3d at 1160-62 (denying qualified immunity for 2003 incident in which police forcibly escorted non-threatening, non-resisting antiwar protestor through cloud of tear gas); *Headwaters Forest Def.*, 276 F.3d at 1130 (in 1997, "it would be clear to a reasonable officer that it was excessive to use pepper spray against the nonviolent protestors" who "were sitting peacefully, were easily moved by the police, and did not threaten or harm the officers"); *Lucha Unida de Padres y Estudiantes v. Green*, 470 F. Supp. 3d 1021, 1026, 1046-47 (D. Ariz. 2020) (clearly established in 2017 that use of pepper spray against non-threatening and non-resisting protestors was unconstitutional); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241-43 (W.D. Wash. 2009) (clearly established in 2007 that police cannot

---

[3] *See, e.g., Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010); *Asociacion de Periodistas v. Mueller*, 529 F.3d 52, 60-62 (1st Cir. 2008); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160-61 (10th Cir. 2008); *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Vinyard v. Wilson*, 311 F.3d 1340, 1348-49 (11th Cir. 2002); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1128-30 (9th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001); *Adams v. Metiva*, 31 F.3d 375, 385-86 (6th Cir. 1994); *Jones v. Ritter*, 587 F. Supp. 2d 152, 157 (D.D.C. 2008).

pepper spray protestor attempting to assist an injured protestor without posing a threat, or use batons and pepper spray on protestor calmly trying to cross the street); *Brenes-Laroche v. Toledo Davila*, 682 F. Supp. 2d 179, 189, 192 (D.P.R. 2010) (clearly established in 2007 that baton strikes to non-threatening, non-resisting protestors was unconstitutional); *Secot v. City of Sterling Heights*, 985 F. Supp. 715, 721 (E.D. Mich. 1997) (clearly unreasonable in 1995 to "[strike] plaintiff while he was peaceably standing in the picket line and not threatening an officer or other member of the public"); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996) (denying qualified immunity for firing of pepper spray into crowd of peaceful demonstrators).

Adamchik's attempt to resist this broad consensus of both binding and persuasive authority by relying on conduct of *other* demonstrators at *other* times and places, *see supra* Part I.A.1, is itself answered by binding precedent. *Ybarra v. Illinois*, 444 U.S. 85 (1979), rejected the theory that one person can be searched or seized based on suspicion of someone else: "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* The D.C. Circuit applied this principle in *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006), which affirmed the denial of qualified immunity to a police commander who ordered hundreds of demonstrators arrested after witnessing vandalism by *some* demonstrators, *id.* at 569-70: the "mass arrest … violated the clearly established Fourth Amendment rights of plaintiffs by detaining them without particularized probable cause." *Id.* at 573. Directly refuting the argument that Defendants here could use force against Plaintiffs based on actions of *other* people at *other* times, the court explained that even if the official "had probable cause to believe that *some* people present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining *everyone* who happened to be in the park," *id.*, as he had "no basis for suspecting that all of the occupants of Pershing Park were then breaking the law or that they had broken the law." *Id.* at 574.

Defendants' use of force against Plaintiffs at Lafayette Square based on the actions of other demonstrators on other nights is even more attenuated than the use of force in *Barham*. Whereas the authorities' mistake in *Barham* was arresting many people based on the actions of a few *at around the same time*, here Adamchik is attempting to justify force against Plaintiffs based on the acts of unknown others *at entirely different times and places*. That is obviously impermissible.

Adamchik's reliance on *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009), which distinguished *Barham* in the narrow circumstance where individuals in a group engage in criminal behavior *and* the group is acting "as a unit" such that "all members of the crowd violated the law," *id.* at 408, is misplaced. Plaintiffs' complaint here alleges that they were engaged in peaceful, lawful conduct, and nothing remotely suggests they were acting "as a unit" with some other, unidentified people who allegedly broke the law at other times or places. The narrow *Carr* exception to *Barham*—and comparable authorities from other circuits, *see Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015)—obviously did not apply, and no reasonable officer could have thought that they did.

Adamchik's other citations are likewise unavailing. He cites *Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997), about the constitutionality of random drug testing, and *Wood v. Moss*, 572 U.S. 744 (2014), which adjudicated no Fourth Amendment issue at all, for the general proposition that presidential security is very important. Plaintiffs do not dispute that proposition, but it does not resolve this case: however strong that interest is, the use of force against non-violent protestors was utterly unnecessary to serve it. Adamchik also relies on *Berg v. Kelly*, 897 F.3d 99 (2d Cir. 2018), which concerned the temporary enclosure of protestors, but that could not have provided any guidance to Defendants here because, first, it involved neither police violence nor an excessive force claim, and second, because it did not rule on the constitutional merits, only that the particular

facts there did not present a violation of *clearly established* law. *See id.* at 109, 112. Adamchik's remaining authorities, Adam. MTD 42, are even more clearly inapposite: they involved law enforcement responses to protestors who posed threats to officers or the public, broke the law, and/or physically resisted officers' efforts to cajole them into compliance by peaceful means.[4]

Based on both binding and persuasive authority, qualified immunity should be denied.

### B. Defendants violated Plaintiffs' clearly established First Amendment rights in a manner that was obvious because of its egregiousness and, independently, contravened binding precedent.

Defendants' attack on a peaceful and lawful demonstration was a blatant suppression of core political speech in one of the nation's most important public forums. Invoking presidential security, Adamchik argues that his actions were a permissible content-neutral restriction on time, place, and manner. Adam. MTD 33-40. That is the wrong framework for analysis, as Plaintiffs explain below, but even applying the intermediate-scrutiny standard Adamchik proposes, no reasonable officer could have believed the attack was constitutional: it blatantly failed the narrow tailoring requirement by burdening far more speech than necessary. The correct standard requires that demonstrations not be dispersed absent a "clear and present danger." Adamchik's actions were also plainly unconstitutional under that standard. Yet another independent, clearly established constitutional violation was discrimination against Plaintiffs on the basis of viewpoint—Plaintiffs plausibly allege that demonstrators with different messages would have been welcome.

---

[4] *See Felarca v. Birgeneau*, 891 F.3d 809, 814-15, 817-18 (9th Cir. 2018) (protestors unlawfully erected tents, ignored police dispersal orders, and obstructed police removal of tents); *White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017) (protestor disobeyed orders to stop approaching while "proceeding directly toward the police skirmish line"); *Dundon v. Kirchmeier*, 2017 WL 5894552, at *12, 19 (D.N.D. Feb. 7, 2017) (officers faced "imminent threats of serious bodily injury or death"); *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 373-74 (D.D.C. 2014) (police officer and civilian appeared to be wrestling); *Young v. Akal*, 985 F. Supp. 2d 785, 802 (W.D. La. 2013) (police tried to clear a street by persuasion and non-physical means, "then resorted to tear gas only in light of the "increasingly violent nature of the crowd").

Plaintiffs will address in turn the three distinct ways Defendants' conduct clearly violated the First Amendment: (1) by burdening far more speech than necessary to serve the government's asserted interest (i.e., failing intermediate scrutiny); (2) by breaking up a demonstration absent a clear and present danger; and (3) by discriminating based on viewpoint.

### 1. By assaulting and completely scattering a lawful, peaceful demonstration, Defendants burdened far more speech than necessary.

Adamchik argues that Defendants' actions should be analyzed as a content-neutral restriction on the time, place, and manner of speech. He acknowledges that one of the requirements of a valid content-neutral restriction is that it is "narrowly tailored." Adam. MTD 33 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). This means that "it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 799).

Assuming the applicability of this standard for the sake of argument,[5] any reasonable officer would have known that Defendants' assault on Plaintiffs was not "narrowly tailored" to the government's interest. The overwhelming use of force put Plaintiffs and the entire class to headlong flight out of the path of projectiles, chemical weapons, and rampaging officers, some on horseback. TAC ¶¶ 81-103. The egregiousness of Defendants' use of force is compounded by its disproportionality to any legitimate government objective. If the goal had been simply to move people out of the President's way for his walk, *see* Adam. MTD 35, the demonstrators could have been clearly and audibly instructed which direction to move and how far—something the Secret Service knows how to do. *See Wood v. Moss*, 572 U.S. 744, 751-54 (2014) (Secret Service moved

---

[5] The time/place/manner standard is generally applied to *regulatory* restrictions on expression, not to on-the-spot police actions that shut down otherwise-permitted demonstrations. The correct standard is discussed in the next section, Part I.B.2.

demonstrators away from where President Bush was unexpectedly dining). Although Defendants need not have used the least restrictive means, the existence of substantially less burdensome alternatives is "relevant" under this Circuit's case law, *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002), and Defendants' blitzkrieg was practically the *most* restrictive means they could have used: short of firing on the Plaintiffs with live ammunition, Defendants could not have more forcefully disrupted the demonstration and scattered its participants. Defendants' crackdown, even analyzed as a content-neutral restriction, blatantly fails intermediate scrutiny.

Adamchik's argument to the contrary depends on once again asserting facts not alleged in the complaint. First, he posits a security threat, claiming he acted "to protect the President and the White House." Adam. MTD 34; *see also id.* at 36 (citing "the potential danger posed by infiltrators within the unscreened crowd of thousands"). But that is *Defendant Adamchik's* claim, not Plaintiffs'. Demonstrations occur at Lafayette Square frequently, TAC ¶ 51, so the location alone could not have made this demonstration a threat, and nothing in the complaint supports Adamchik's argument that there was in fact any threat to the President, let alone a threat that justified the level of violence deployed here. Indeed, as discussed, that claim is not just absent from the allegations in the complaint; it is diametrically opposed to them. *See* Part I.A.1 above.

Second, Adamchik minimizes the scope of the government response to the demonstration. In his telling, he issued merely "an on-the-spot crowd clearing order covering a one-block area," Adam. MTD 34, while posing no "legal obstacle" to protesting outside of some "expanded perimeter," *id.* at 37 n.21; *see also id.* at 36-37 (positing that Plaintiffs were free to speak anywhere but "Lafayette Square and a short distance around it"). The complaint tells a much different story: Defendants gave no indication that anyone would be free to resume demonstrating anywhere in the vicinity "either at a prescribed location or after having moved a prescribed distance away from

Lafayette Square." TAC ¶ 108. Indeed, the level of force deployed to shatter the protest was such that even had Adamchik made such a promise, it would have been meaningless—it is fanciful to imagine Plaintiffs fleeing from an onslaught of chemical weapons, projectiles, batons, and a mounted charge, and then calmly stopping to resume their demonstration one block away. For the Plaintiffs who ran west, moreover, what they found was not a protected protest zone but the D.C. Defendants firing yet more tear gas at them in coordination with the other Defendants. *See* TAC ¶¶ 100-07. A defendant's alternative facts are an invalid basis for dismissing a complaint.

If the government, which "bears the burden of showing that its restriction of speech is justified," *United States v. Doe*, 968 F.2d at 90, asserts that the sudden, violent, and complete dispersal of this peaceful protest was narrowly tailored to a legitimate objective, it can support its position with evidence at a later stage, *see id.* at 90-91 (evaluating tailoring by reference to the record, including what evidence the government offered). But courts do not simply "defer to the Park Service's [or any other agency's] unexplained judgment," *id.* at 90; *accord Henderson v. Lujan*, 964 F.2d 1179, 1185 (D.C. Cir. 1992). Rather "it is the government's case to prove." *Doe*, 968 F.2d at 91. Setting aside Adamchik's version of the facts and taking the complaint's allegations as true, any reasonable person would have known Defendants' conduct violated the Constitution.

*White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984), cited by Adamchik, is perfectly consistent with this analysis. That case concerned restrictions on the "construction, size and placement" of signs displayed by demonstrators and on the manner of displaying signs within a twenty-yard zone along the sidewalk (leaving 93% of the sidewalk unrestricted). *Id.* at 1522, 1528. Although the court upheld these time/place/manner restrictions, it stated that "a strong argument could have been made that a regulation banning all demonstrations on the White House sidewalk and in Lafayette Park would have been unconstitutional." *Id.* at 1527.

Thus, it is that dictum, and not the holding of the case—which allowed minor restrictions, but not a total ban, on signs—that speaks to the circumstances presented here. The case did not uphold *any* restriction on the peaceful assembly of *people* in Lafayette Square.

Without Adamchik's own version of events, his reliance on *Wood v. Moss*, *supra*, falls apart. Like Adamchik here, the defendants there invoked presidential security, but there the similarities end. Unlike here, *Wood* involved the relocation of a protest to a nearby area where it could and did continue. *See* 572 U.S. at 754 (noting that "[t]he protesters remained" where the Secret Service moved them). And the legal question at issue was different than the one posed here: *Wood* concerned the *relative* placement of two groups of demonstrators with opposing views, *see id.* at 759-61, not the violent and complete scattering of a protest. Adamchik's protest-zone cases from other circuits are similarly inapposite, because they did not involve violent dispersals of peaceful demonstrations and because alternative areas to speak were provided. *See Marcavage v. City of New York*, 689 F.3d 98, 102 (2d Cir. 2012) (plaintiffs were asked 17 times to move to the designated demonstration zone before they were arrested for blocking traffic); *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (considering not the dispersal of a particular protest but a facial challenge to the imposition of a no-demonstration zone beyond which "[t]he protestors could reasonably expect their protest to be visible and audible to" their intended audience).

More generally, presidential security does not preempt normal First Amendment analysis. As noted, the D.C. Circuit strongly suggested that presidential security would not justify a blanket speech ban in front of the White House. It also struck down a limit on demonstrations in front of the White House that was unduly broad in proportion to the security interest asserted. *See Quaker Action Group v. Morton*, 516 F.2d 717, 721, 723, 731 (D.C. Cir. 1975) ("*Quaker Action IV*") (affirming judgment striking down as unduly restrictive 500-person limit on demonstrations in

Lafayette Square). Thus, binding precedent refutes the view that presidential security concerns, no matter how attenuated they may be in a particular context, automatically justify content-neutral speech restrictions or otherwise displace the requirements of the First Amendment. Because Defendants badly fail at least one of those requirements—narrow tailoring—they violated Plaintiffs' clearly established rights under intermediate scrutiny.

### 2. Breaking up the protest was clearly established to be unconstitutional absent a "clear and present danger."

Although the constitutional violation was clearly established even under Adamchik's proposed test, the correct test to apply here is provided not by cases dealing with general time/place/manner regulations but with protest dispersals specifically. The leading Supreme Court case in this context holds that the First Amendment forbids the dispersal of lawful demonstrations in a public forum "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963). This standard has been applied across the decades and across the circuits (including this one), providing a broad consensus of authority to underscore the holding of *Edwards* that absent a serious threat, a peaceful and lawful demonstration may not be dispersed.[6]

---

[6] *See Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (Sotomayor, J.) (applying "clear and present danger" standard to deny qualified immunity for breaking up a demonstration where "the facts as alleged by plaintiffs reveal an orderly, peaceful crowd"); *Quaker Action IV*, 516 F.2d at 729 (D.C. Cir.) (upholding National Park Service standard for denying demonstration permits near the White House because it was limited to circumstances presenting "clear and present danger"); *accord Keating v. City of Miami*, 598 F.3d 753, 758, 766-67 (11th Cir. 2010) (no qualified immunity for officers who ordered dispersal of peaceful demonstration via tear gas and projectiles); *Collins v. Jordan*, 110 F.3d 1363, 1367-68, 1371, 1372 (9th Cir. 1996) (no qualified immunity for police chief who banned demonstrations citywide and dispersed peaceful protest; "[t]he law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence"); *Cong. of Racial Equality v. Douglas*, 318 F.2d 95, 102 (5th Cir. 1963) (reversing injunction against peaceful civil rights protest as inconsistent with *Edwards*).

The D.C. Circuit has repeatedly recognized that Lafayette Square is not just a "quintessential public forum," *Doe*, 968 F.2d at 87, but one with special status, *id.* at 88—"a primary assembly point for First Amendment activity aimed at influencing national policies," *id.* at 89, "where the government not only tolerates but explicitly permits demonstrations and protests because of its unique location across the street from the White House," *id.* at 88. It is a "unique situs for the exercise of First Amendment rights." *Quaker Action IV*, 516 F.2d at 725.

Applying these principles, this Court has held that a peaceful, lawful demonstration on the White House sidewalk may not be dispersed in the absence of a serious threat to public safety, and it has rejected the view that a perceived threat of disorder based on previous events provides such cause. *See Tatum v. Morton*, 402 F. Supp. 719, 722-24 (D.D.C. 1974). More recently, this Court has recognized that the right of an "ordinary person[] [to] express[] her views while standing on the public sidewalk in front of the White House" is "clearly established." *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 57 (D.D.C. 2013). Other courts have likewise held that the First Amendment does not permit the dispersal of a peaceful protest in circumstances like those here.[7]

As with the intermediate scrutiny argument, the only way for Adamchik to distinguish these authorities is via allegations regarding potential security threats contrary to the facts alleged in the complaint. *See supra* Part I.B.1. But taking the complaint's facts as true, the demonstrators

---

[7] *See Keating*, 598 F.3d at 758, 766-67; *Lucha Unida*, 470 F. Supp. 3d at 1039-40, 1045-46 (clearly established in 2017 that police could not block a peaceful march where defendants failed to identify a "clear and present danger of substantial evil"); *Adams v. New York*, 2016 WL 1169520, at *1, *3 (S.D.N.Y. Mar. 22, 2016) (dispersing protestors on public sidewalk was unconstitutional where no "immediate threat to public safety or order"); *Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81, 88, 93 (D.P.R. 2012) (peaceful protestors at territorial Capitol building, whom police attacked with tear gas and batons, stated claim for violation of clearly established First Amendment rights); *Rauen v. City of Miami*, 2007 WL 686609, at *2, *20 (S.D. Fla. Mar. 2, 2007) (no qualified immunity for officers who broke up peaceful protest with chemical irritants; plaintiffs' "right to peacefully protest in the absence of a compelling government interest in quashing their protest" was clearly established).

posed no threat, much less a "clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Edwards*, 372 U.S. at 237. Like the civil rights protestors whose demonstration was unconstitutionally suppressed in *Edwards*, the civil rights protestors here were exercising their "rights of free speech, free assembly, and freedom to petition for redress of their grievances ... in their most pristine and classic form." *Id.* at 235. Thus, breaking up the demonstration was both obviously unlawful based on general principles and clearly established as unlawful based on binding authorities and a consensus of persuasive authorities.

**3.  Viewpoint discrimination violated Plaintiffs' clearly established rights.**

Attacking Plaintiffs' demonstration based on its viewpoint is an independent—and no less clearly established—constitutional violation. *See generally Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (prohibition on viewpoint-discrimination is "a core postulate of free speech law"). D.C. Circuit authority specifically establishes that impermissible viewpoint discrimination occurs where the government treats speech expressing one viewpoint differently than it would have treated a different viewpoint. In *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997), the National Park Service revoked a permit for anti-abortion demonstrators at President Clinton's inauguration, and threatened them with arrest, *id.* at 1454, even though the government admitted that "if instead of carrying graphic posters of late term abortions or signs containing criticisms of the President, Mahoney were to carry signs offering congratulations or best wishes to the President, he would not be subject to arrest." *Id.* at 1456. The court struck down this restriction as "blatant discrimination between viewpoints." *Id.* Plaintiffs have plausibly alleged the same type of discrimination here—that Defendants' attack breaking up their civil rights protest would not have been mounted against a demonstration with a pro-Administration message. *Compare* TAC ¶ 64 (Defendant Trump tweet boasting that "'protesters' at the White House" were "handled ... easily"

by the Secret Service and calling for "MAGA NIGHT AT THE WHITE HOUSE"), *and* TAC ¶ 63 (promoting civil disobedience at various statehouses in opposition to coronavirus-related safety regulations), *with* TAC ¶¶ 53-61 (Defendant Trump calling civil rights protestors "THUGS," advocating calling in the National Guard on them, and urging "overwhelming force" to "dominate" the civil rights protestors). That differential treatment is the hallmark of viewpoint discrimination under the D.C. Circuit's binding decision in *Mahoney*, 105 F.3d at 1456. Thus, in addition to the obvious violation of breaking up a peaceful demonstration without sufficient (or really any legitimate) basis, qualified immunity must be denied for the independent reason that Defendants' actions amounted to viewpoint discrimination, as demonstrated by the President's own words.

Adamchik argues that Plaintiffs' viewpoint-discrimination claim cannot succeed without evidence of his own personal animosity. Adam. MTD 38 n.22. That confuses viewpoint discrimination with retaliation. Whereas First Amendment retaliation requires "retaliatory animus," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019), one way for viewpoint discrimination to occur is "when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction" of speech. *Rosenberger v. Rector & Visitors of Univ. of Va,*, 515 U.S. 819, 829 (1995) (emphasis added). The rationale in question is the *government's* purpose in taking the challenged action, not the subjective motive of an official who carried it out—as demonstrated by *Mahoney*, where the D.C. Circuit did not inquire if any defendant held animosity toward the plaintiff's viewpoint but found it sufficient that the government would have treated a speaker with a different viewpoint differently. Likewise, *Rosenberger* did not suggest that school officials (who were sued for damages) had anti-Christian animus when they denied funding to a religious student publication, and there was no reason to suspect that they had such animus, as they were merely enforcing a preexisting school rule. *See id.* at 827.

President Trump's statements show that the demonstrators' expressed viewpoint was the reason for attacking and disbanding the protest, and thus Plaintiffs have plausibly pleaded viewpoint discrimination in violation of clearly established law.

## II. The Traditional Damages Remedy Against Federal Officers For Violating Demonstrators' First And Fourth Amendment Rights Has Long Been Recognized In This Circuit And No Special Factors Counsel Hesitation Here (Claims 1 & 2).

Adamchik argues, Adam. MTD 5-29, that no cause of action is available under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which recognized a cause of action arising out of the Constitution for damages against federal agents who violate a person's constitutional rights. *Bivens* reflected both an ideal and a body of law with deep historical roots extending back to the beginning of the Republic. The ideal, articulated by Chief Justice Marshall, was that "'[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'" *Id.* at 397 (quoting *Marbury v. Madison*, 5 U.S. 137, 163 (1803)). And the body of law, also exemplified by an early Marshall Court case as well as pre-Revolutionary English cases, showed that executive officials acting beyond their authority could be held liable in damages. *See Tanzin v. Tanvir*, No. 19-71, 2020 WL 7250100, at *4 (U.S. Dec. 10, 2020); ECF 120 (Br. of Fed. Courts Scholars As Amici Curiae), at 6-16. Indeed, "this exact remedy has coexisted with our constitutional system since the dawn of the Republic." *Tanzin*, 2020 WL 7250100, at *5. Thus, the federal damages remedy recognized in *Bivens* was "hardly ... a surprising proposition" because "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 U.S. at 395; *see also Tanzin*, 2020 WL 7250100, at *4 ("In the context of suits against Government officials, damages have long been awarded as appropriate relief."); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 66 (1992) ("Blackstone described it as 'a general

and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded.'" (citing 3 W. Blackstone, Commentaries 23 (1783)).[8]

More recently, Congress indicated its acceptance of the *Bivens* remedy through two laws it passed following *Bivens*: the Federal Tort Claims Act (FTCA) and the Westfall Act. *See Tanzin*, 2020 WL 7250100, at *4 (noting that Westfall Act "left open claims for constitutional violations"); *Carlson v. Green*, 446 U.S. 14, 19-20 & n.5 (1980) ("[T]he congressional comments accompanying [the FTCA] amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action."); ECF 120 (Br. of Fed. Courts Scholars), at 17-20.

*Bivens* was a Fourth Amendment case. The D.C. Circuit has found the logic of *Bivens* to apply to First Amendment claims, as well. *See Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977) (holding that *Bivens* damages were available for demonstrators' First and Fourth Amendment claims against law enforcement officers). Since *Dellums*, a long line of cases in this Circuit has applied *Bivens* to violations of demonstrators' constitutional rights (as detailed below).

The Supreme Court's approach to *Bivens* claims has evolved since its initial recognition of the remedy. In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Court created a two-step inquiry for deciding whether a *Bivens* claim is available. First, courts must assess whether the claim arises in a "new context," and second, if the context is new, the courts must then ask whether any "special factors" counsel "hesitation" in recognizing a *Bivens* remedy. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (summarizing *Abbasi*, 137 S. Ct. at 1857, 1859). Examples of "special factors" are

---

[8] Although today under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), courts cannot invoke a "federal general common law," to recognize "new claims" or recognize statutory causes of action in the absence of statutory authority, *see Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020), the inherent power to enforce the Constitution itself is neither statutory nor new. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing "long history of judicial review of illegal executive action"); *Franklin*, 503 U.S. at 65-70 (discussing presumption that when a cause of action exists, federal courts may order any appropriate relief).

foreign affairs, national security, *see Hernandez*, 140 S. Ct. at 746-47, and the existence of an "alternative remedial structure." *Abbasi*, 137 S. Ct. at 1858.

Nonetheless, although "expanding" *Bivens* is now "disfavored," *id.* at 1857, the Court did not close the door to all *Bivens* remedies, particularly ones that have long existed. Specifically, the Court in *Abbasi* affirmed that the "opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Id.* at 1856. The Court has not overturned or limited any of its *Bivens* precedents to their facts, despite suggestions that it do so, *see, e.g., Hernandez*, 140 S. Ct. at 750 (Thomas, J., concurring).

Assuming for the sake of argument that the context here is "new" under *Abbasi*, Plaintiffs nonetheless prevail. The Supreme Court's recent decisions do not cast doubt on Circuit precedent holding that *Bivens* is available for demonstrators' First and Fourth Amendment claims and declining to find "special factors" counseling "hesitation" in this context. Importantly, the existence of "new context" alone does not defeat a claim—otherwise the *Bivens* analysis would end at step one. Adamchik suggests that it should, Adam. MTD 12 (citing *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018)), but that is not the Supreme Court's view, *see Hernandez*, 140 S. Ct. at 743 (affirming the Fifth Circuit's result but reiterating the *Abbasi* two-step framework rather than adopting the Fifth Circuit's suggestion that context alone ends the inquiry).

Rather, the key question here is whether "special factors" counsel "hesitation." More than four decades of precedent in this Court and the D.C. Circuit show that nothing about a damages remedy for a violation of demonstrators' First and Fourth Amendment rights—particularly violations as egregious as those here—should cause a court to hesitate. And the special factors invoked by Adamchik are inapplicable to this case. The Court should faithfully apply this Circuit's cases recognizing a *Bivens* action for violating demonstrators' First and Fourth Amendment rights.

26

**A. Circuit precedent refutes the notion that "special factors" preclude recognizing constitutional damages claims for demonstrators' rights here and distinguishes this case sharply from those in which special factors exist.**

Although the Court's two-step framework for assessing the availability of *Bivens* damages is new, the consideration of special factors in determining whether to apply *Bivens* is not. The "special factors" inquiry has existed since *Bivens* itself, 403 U.S. at 396 ("[t]he present case involves no special factors counselling hesitation"), and it existed when *Dellums* and its successor cases were decided. Yet the D.C. Circuit has never suggested that "special factors" preclude the application of *Bivens* to enforce the First or Fourth Amendment rights of protestors. On the contrary, the D.C. federal courts have a long history of allowing *Bivens* First and Fourth Amendment claims on behalf of protestors.

Adamchik does not dispute the availability of *Bivens* for excessive force claims generally—a point the D.C. Circuit has repeatedly reaffirmed. *See, e.g., Lash v. Lemke*, 786 F.3d 1, 5 n.2 ("There is no question that [a tased demonstrator] may pursue an excessive force claim under *Bivens*[.]"); *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015) (when "a federal law enforcement officer uses excessive force, contrary to the Constitution," that is "the classic *Bivens*-style tort" (quoting *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987); internal quotation marks omitted)). More specifically, in *Dellums*, no special factors prevented the court from applying *Bivens* to a context just like this one: where police violated the First and Fourth Amendments by disrupting a large demonstration in front of the seat of one of our three branches of government (in *Dellums*, the Capitol; here, the White House). If no special factors existed there and then, none exist here and now.

In *Dellums*, the D.C. Circuit considered First and Fourth Amendment claims asserted by demonstrators protesting the Vietnam War on the steps of the Capitol Building. 566 F.2d at 173.

27

The court affirmed the verdict on the Fourth Amendment *Bivens* claims, *see id.* at 175-191, and concluded that federal courts were capable of addressing First Amendment *Bivens* claims as well, *see id.* at 194-95. Following *Dellums*, D.C. federal courts have repeatedly recognized *Bivens* damages claims for First and Fourth Amendment claims by demonstrators.[9]

Regardless of whether these cases can show that the context is not "new" for purposes of *Abbasi*, the D.C. Circuit's longstanding precedent recognizing *Bivens* remedies for First Amendment claims, Fourth Amendment excessive force claims, and specifically claims under both Amendments *by demonstrators*, show why no special factors counsel hesitation in recognizing such claims. These decisions continue to bind this Court today, in the absence of contrary Supreme Court authority. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992). And in terms of harm to national security, foreign affairs, or any of the other reasons causing either the D.C. Circuit or the Supreme Court to hesitate in recognizing *Bivens* claims, the sky has not fallen despite the decades-long and ongoing recognition of *Bivens* damages claims in the protest context, including for activity near the White House, *see, e.g.*, *Hartley*, 918

---

[9] *See, e.g.*, *Lash*, 786 F.3d at 5 n.2 (D.C. Cir. 2014) (although Park Police officers were entitled to qualified immunity for tasing demonstrator resisting arrest, "[t]here is no question that Lash may pursue an excessive force claim under *Bivens*"); *Hobson v. Wilson*, 737 F.2d 1, 56, 62-63 (D.C. Cir. 1984) (*Bivens* First Amendment damages claim against FBI agents who impeded protests), *partially abrogated on other grounds, Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993); *Patterson v. United States*, 999 F. Supp. 2d 300, 303, 308-311, 317 (D.D.C. 2013) (demonstrator's *Bivens* First and Fourth Amendments claims for retaliatory arrest); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 50-54 (D.D.C. 2013) (*Bivens* First Amendment claim for trying to intimidate plaintiff out of protesting near the White House); *Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154, 156-57, 159-61 (D.D.C. 2013) (First and Fourth Amendment claims where agents destroyed plaintiff's protest materials); *Lederman v. United States*, 131 F. Supp. 2d 46, 47, 57, 63 (D.D.C. 2001) (*Bivens* First and Fourth Amendment claim for Capitol Police officer's arrest of demonstrator), *rev'd on other grounds*, 291 F.3d 36 (D.C. Cir. 2002); *Torossian v. Hayo*, 45 F. Supp. 2d 63, 66 (D.D.C 1999) (granting qualified immunity but recognizing that "a *Bivens* action ... has been held to be available to plaintiffs claiming violations of the First and Fourth Amendments" against demonstrators); *Masel v. Barrett*, 707 F. Supp. 4, 11-12 (D.D.C. 1989) (demonstrator's *Bivens* excessive force claim).

F. Supp. 2d at 50-52, and at the Capitol, *see*, *e.g.*, *Dellums*, 566 F.2d at 173; *Lederman*, 131 F. Supp. 2d at 57, 63. Given that the D.C. Circuit has already recognized *Bivens* claims without finding that "special factors" counsel "hesitation" in the context of demonstrators' First and Fourth Amendment claims, refusing to recognize such a claim here would contravene Circuit precedent.

The contrast between the factual context of this case and those of the recent Supreme Court cases finding special factors counselling hesitation underscores how far apart this one is from those. Whereas *Abbasi* stressed caution in allowing judicially-created damages remedies as a means to change ongoing national security policy decisions made by high-ranking federal officials, 137 S. Ct. at 1860-1863, it did not speak to any "special factors" pertaining to domestic political demonstrators seeking compensation for egregious violations of their First and Fourth Amendment rights when federal forces violently attacked and disbanded their peaceful demonstration. And whereas *Hernandez* refused to extend *Bivens* to a shooting across the international border because foreign affairs, national security, and congressional acts limiting remedies for foreigners on foreign soil counselled hesitation, 140 S. Ct. at 744-47, it did not invite courts to cut off remedies where U.S. citizens exercising core political freedoms on U.S. soil are met with gratuitous brutality by federal officers. And neither of these decisions instructs the lower courts to abdicate judicial responsibility for *every* claim where federal officials assert a national security interest, however attenuated. Quite the contrary: *Abbasi* specifically admonished against the knee-jerk invocation of security concerns to preclude a *Bivens* remedy, warning that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). Even more to the point here, the Court observed that danger of the "abuse" of this label is "heightened" in purely "domestic cases." *Id.*

29

Special factors that have recently caused the D.C. Circuit pause in applying *Bivens* are likewise far afield from this case. Although *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020), did involve a First Amendment *Bivens* claim, the plaintiff there sought damages for retaliatory administrative enforcement actions under the Financial Institutions Reform, Recovery, and Enforcement Act—a statute with its own detailed administrative enforcement scheme and circumscribed availability for judicial review. *See id.* at 384-85. The principle that a comprehensive alternative remedy forecloses *Bivens* is not new and has coexisted harmoniously for decades with this Circuit's *Bivens* jurisprudence regarding demonstrators' constitutional rights; indeed, the *Bivens* precedents most critical to the *Loumiet* holding were from the 1980s. *See id.* at 383-85; *accord Liff v. Office of Inspector Gen.*, 881 F.3d 912, 914-15 (D.C. Cir. 2018) (holding that comprehensive remedial scheme barred government contractor's suit against various government officials for reputational harm). And *Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015), which found that national security and foreign affairs counseled hesitation in allowing a claim concerning federal agents' actions with respect to a suspected terrorist in East Africa, is (literally) a world away from purely domestic law enforcement.

In sum, the special factors at issue in those cases are all far removed from the contexts of *Dellums* and this case and do not call into question Circuit precedent repeatedly recognizing *Bivens* First and Fourth Amendment claims by demonstrators and declining to find any special factors counseling hesitation in this field.

## B. Presidential security and the other "special factors" invoked by Adamchik are misplaced here and do not overcome Circuit precedent.

Adamchik argues that federal law enforcement officers' assault on demonstrators expressing their opposition to systemic racism and police brutality is impervious to a *Bivens* remedy because of national and presidential security concerns, the absence of congressional

legislation providing a remedy, and hypothetical alternative remedies. While these kinds of concerns may preclude *Bivens* claims in some circumstances, they have no bearing here. Stripping Plaintiffs of a remedy would abdicate the judicial responsibility to provide a check against the Executive branch and would authorize brutality with impunity.

Adamchik devotes substantial ink to establishing that national/presidential security is, in the abstract, an interest of great weight. But he knocks at an open door; Plaintiffs dispute neither the importance of this interest nor that it can constitute a special factor for *Bivens* purposes in some circumstances. This is simply not such a circumstance.  Baldly asserting that the unprovoked attack on peaceful demonstrators was required by "presidential security" does not make it true. And on a motion to dismiss, a defendant's assertion that his actions were necessary because of facts beyond the complaint is entitled to no weight. That dispute is for trial, not a motion to dismiss.

Heeding *Abbasi*'s warning not to permit "national-security concerns" to "become a talisman used to ward off inconvenient claims," 137 S. Ct. at 1862, and emulating *Abbasi*'s focus on the facts at issue rather than broad generalities, *see id.* at 1860 (considering "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack" rather than prison context generally), courts have not accepted security arguments blindly but rather assessed their relevance to the case at hand. *See Graber v. Dales*, 2019 WL 4805241, at *4 (E.D. Pa. Sept. 30, 2019) (allowing *Bivens* claim against Secret Service agent in connection with arrest outside 2016 Democratic National Convention because under the circumstances "the connection to national security is tenuous"); *Linlor v. Polson*, 263 F. Supp. 3d 613, 623 (E.D. Va. 2017) (allowing *Bivens* remedy where TSA officer used excessive force during security screening: "The question is not whether airports present special security concerns—they do—but whether those concerns have any particular bearing on the context at issue in this case.").

31

Here, Defendants' security justification for the actions they took is, simply, a canard. There was no threat to the President posed by the protestors at Lafayette Square on June 1. The protestors were law abiding and peaceful. TAC ¶¶ 65-66. They were at Lafayette Square, not on the White House Lawn. There were no split-second decisions to be made. On the contrary, the Defendants were the aggressors who initiated the entire confrontation.  TAC ¶¶ 77-88.

Lacking a factual basis in the complaint to assert his security concern, Adamchik posits the alarmingly broad theory that federal law enforcement can disperse protestors near the White House at any time, using any means, without judicial review, because there is always a potential presidential security threat. Adam. MTD 13-16. That theory would obliterate the D.C. Circuit's instruction regarding Lafayette Square demonstrations to balance "First Amendment freedoms against safety requirements," *Quaker Action IV*, 516 F. 2d at 722, and replace it with the rule that every demonstrator on a public street or park in proximity to the White House is subject to being viciously beaten and tear-gassed at the whim of federal officers. Adamchik offers no limiting principle for *when* a presidential security interest legitimately counsels hesitation in applying *Bivens*. Under his theory, the President could demand to go anywhere, at any time, and send officers ahead to beat up anyone along the way. That is clearly wrong.

"Whatever power the United States Constitution envisions for the Executive in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion); *see also Quaker Action I*, 421 F.2d at 1117 (noting that courts must make independent judgments regarding security threats asserted by the government). Moreover, sufficient deference to decisions made based on national security is embodied in the substantive First and Fourth Amendment standards themselves. *See, e.g.*, *Wood v. Moss*, 572 U.S. 744, 758-59 (2014); *Saucier v. Katz*, 533 U.S. 194, 208-09 (2001),

*abrogated on other grounds, Pearson v. Callahan*, 555 U.S. 223 (2009). These standards provide ample latitude for federal officials to make security decisions and protect the President without the need for an extreme rule that federal officers' misconduct is immunized from judicial review merely by *invoking* a presidential security interest no matter the facts.

Adamchik's argument that congressional inaction in a heavily regulated field counsels hesitation, Adam. MTD 16-21, is misplaced, because he misidentifies the relevant field. Although Congress has legislated heavily in the field of presidential security, it has *not* done so on the topic of demonstrators' rights, particularly vis-à-vis federal actors. Nor would one expect it to, given Congress's implied acceptance of *Bivens* via the FTCA and the Westfall Act. *See Tanzin*, 2020 WL 7250100, at *4; *Carlson*, 446 U.S. at 19-20 & n.5.

Adamchik is also wrong that the possibility of injunctive relief or an FTCA remedy counsels against applying *Bivens* here. If the mere ability to sue for injunctive relief foreclosed *Bivens*, then the alternative-remedies exception to *Bivens* would swallow the rule. One can always *seek* an injunction against threatened future conduct. *Abbasi*'s recognition that injunctive relief could provide an alternative remedy sufficient to foreclose *Bivens* was limited to a particular context: where "large-scale policy decisions" are being challenged. 137 S. Ct. at 1862. Here, Plaintiffs do not challenge a large-scale policy—or any policy at all. Rather, Plaintiffs challenge the acts taken on this specific day against this specific group of protestors (the damages claims) and the implied threat to take similar actions in the future at the President's whim (the injunctive relief claims). Further, *Abbasi*'s brief discussion of alternative remedies for challenges to policies does not purport to supplant the thorough treatment of the alternative remedies question in *Minneci v. Pollard*, 565 U.S. 118, 129-30 (2012), which is cited in *Abbasi* and remains good law. *Minneci* instructs that in general, "alternative remedies" must "provide roughly similar incentives for

potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations." 565 U.S. at 130. That standard is not remotely met here. Given the difficulty of obtaining injunctive relief in many cases because of the absence of demonstrable future harm (a point that federal official-capacity Defendants argue here, ECF 79-1, at 11-14), injunctive relief alone will often be insufficient to deter officials from unconstitutional acts. Additionally, injunctive relief would not provide "roughly similar compensation to victims," because it would provide no compensation at all. *See Aref v. Lynch*, 833 F.3d 242, 265 n.17 (D.C. Cir. 2016) ("Injunctive relief ... cannot provide relief for past harms."). While an alternative remedy need not be "perfectly congruent" with *Bivens*, *Minneci*, 565 U.S. at 129, injunctive relief here falls so short as not to counsel hesitation.

As for potential recovery under the FTCA, Supreme Court precedent squarely holds that the FTCA is not an "alternative remedy" foreclosing *Bivens*. *Carlson*, 446 U.S. at 18-23. The Supreme Court has held that state tort law constitutes an "alternative remedy" for this purpose only where the defendants were private entities. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72-73 (2001) (private prison company); *Minneci*, 565 U.S. at 120 (private prison guard). Here, because the *Bivens* Defendants are federal officers, the Westfall Act precludes tort claims against them arising under state law. *See Osborn v. Haley*, 549 U.S. 225, 229 (2007).[10]

---

[10] Adamchik's out-of-circuit cases suggesting that *Abbasi* implicitly overruled *Carlson*, Adam. MTD 28, violate a cardinal rule of judicial restraint: lower courts "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). This Court should follow the many other courts that have recognized that the FTCA does not preclude a *Bivens* remedy, even after *Abbasi*. *See, e.g. K.O. v. ICE*, 2020 WL 3429697, at *11 n.3 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5255 (Aug. 26, 2020); *Bueno Diaz v. Mercucio*, 442 F. Supp. 3d 701, 710-11 (S.D.N.Y. 2020); *Linlor v. Polson*, 263 F. Supp. 3d 613, 620-21 (E.D. Va. 2017).

In sum, as Chief Justice Marshall recognized two centuries ago, it is the essence of the rule of law that rights be paired with remedies. *Marbury*, 5 U.S. at 163. Abdicating judicial responsibility for enforcing the Constitution would fail to deter a type of grave constitutional affront that is both at the core of *Bivens* and at the core of our democracy—unchecked governmental violence unleashed on those exercising their First Amendment right "peaceably to assemble, and to petition the Government for a redress of grievances."

### C. Notwithstanding Adamchik's claim that he was implementing a "high-level plan," neither his rank nor the possibility of discovery precludes *Bivens* here.

Although Adamchik is not himself a high-level official, he parrots the Attorney General's argument that high-level officials should not be subjected to *Bivens* actions. Adam. MTD 22-26. That argument is misplaced even as to Defendant Barr himself, as Plaintiffs explain in their response to the Barr motion to dismiss, ECF 98, at 53-54. First, where a high-ranking official participates personally in a violation, *Bivens* liability can attach. *See Davis v. Passman*, 442 U.S. 228 (1979) (Member of Congress); *Dellums*, 566 F.2d at 173 n.1 (Attorney General and Deputy Attorney General). Second, an official's rank can counsel hesitation where a suit "would call into question the formulation and implementation of a general policy," *Abbasi*, 137 S. Ct. at 1860-61— which this one does not, as no one alleges that the U.S. government has a policy of attacking peaceful demonstrators. This point distinguishes the cases on which Adamchik (and Barr) rely, as they involved challenges to government policies, not discrete actions. *See Mejia-Mejia v. ICE*, 2019 WL 4707150, at *4-*5 (D.D.C. Sept. 26, 2019); *K.O.*, 2020 WL 3429697, at *10.

Adamchik is not a high-level official; his argument that "special factors" based on his rank counsel against *Bivens* liability is even weaker than Defendant Barr's. He is not the Attorney General, or a cabinet official, or even the head of the agency for which he works. His agency, the Park Police, is merely a component of the National Park Service, which in turn is a component of

the Department of the Interior. He cites no case holding or suggesting that a mid-level supervisory officer of a subcomponent of a subcomponent of a cabinet-level agency can invoke the rank-based "special factor" argument that might sometimes apply to the highest officials in government. If officers of Adamchik's rank are exempted from *Bivens*, then any supervisor, no matter how malevolent, can escape accountability for all manner of constitutional wrongdoing.

Adamchik attempts to transmogrify his argument into one about high-level policy by repeating over and over that he was engaged in a "high-level plan" (or "directive" or "operation") to protect the President. Adam. MTD 1, 6, 9, 10, 15, 25, 36. But Adamchik cannot substitute his own ipse dixit for the facts in the complaint. Adamchik's allegations about a "high-level plan" are, furthermore, contradicted by his own assertion that he issued an "on-the-spot clearing order," Adam. MTD 34, and by his insinuations that he acted in the face of a sudden danger, *see* Adam. MTD 39. The "high-level plan" contention also contradicts the chief defense of Defendant Adamchik's co-defendant, the Attorney General, who focuses mainly (although not exclusively) on alleging that he was reacting to a threat or clearing the way for the President. *See* ECF 76, at 1, 4, 34-36, 39, 41. The contradiction between Adamchik's principal explanation and Defendant Barr's—one a "high-level" operation planned in advance, the other reactive to emerging circumstances—highlights yet another reason courts should not, on a motion to dismiss, stray from the complaint into Defendants' various versions of the story: without evidence, the Court has no basis for choosing between them.

Finally, Adamchik raises the specter of invasive discovery—not against himself but against other, higher-ranking officials. This argument is triply flawed. First, executive officials do not have blanket immunity from discovery; even the highest executive official—the President—cannot categorically shield himself from the duty to provide "every man's evidence." *United States v.*

*Nixon*, 418 U.S. 683, 710 (1974); *accord Trump v. Vance*, 140 S. Ct. 2412, 2430 (2020). Second, the concern about distracting top officials is completely undercut by the fact that both Defendants Trump and Barr will be out of office by the time discovery commences in this case. *See Aguilar v. ICE*, 2011 WL 13258226, at *3 (S.D.N.Y. Jan. 11, 2011) (rejecting government defendants' concerns about burdens of discovery as "misplaced" where certain defendants "no longer work for the Government"). Third, dismissing the *Bivens* claims is neither necessary nor sufficient to prevent discovery into anyone's motives. Plaintiffs advance First and Fourth Amendment theories that (unlike, say, retaliation) do not require investigation of anyone's motives. *See* Part I, *supra*. What might require discovery into Defendants motives are not the *Bivens* claims but Plaintiffs' conspiracy claims—which are statutory and not subject to being defeated by any "special factors."[11]

In sum, Adamchik's own rank is no bar to *Bivens*, and his effort to hide behind the high rank of his co-defendants or a "high-level plan" does not withstand scrutiny.

### III.    The Complaint Details How Adamchik Participated In The Constitutional Violations Alleged (Claims 1 & 2).

Adamchik is wrong that Plaintiffs seek liability for constitutional violations in which he did not participate. Adam. MTD 30-32. Although *respondeat superior* liability is not permitted, a defendant who was "personally and directly involved" in the violation may be liable under *Bivens*. *Johnson v. District of Columbia*, 67 F. Supp. 3d 157, 164 (D.D.C. 2014). He need not be solely responsible for the violation; rather, under ordinary tort-law principles applicable to constitutional tort claims, "where several independent actors concurrently or consecutively produce a single, indivisible injury," each is liable. *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 41 (D.D.C.

---

[11] In any event, courts can manage discovery against high-ranking officials, and any applicable privileges would at most limit the scope of discovery, not require dismissal. *See* ECF 98, at 53-54.

2012), *aff'd*, 765 F.3d 13 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018). Ordering something to be done is a form of participating and has nothing to do with *respondeat superior,* which holds a supervisor liable for conduct of which he may not even have knowledge. Accordingly, officials are liable for ordering unconstitutional conduct. *See Keating v. City of Miami*, 598 F.3d 753, 758, 766-67 (11th Cir. 2010) (rejecting qualified immunity for supervisory officers who ordered dispersal of peaceful protest); *Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81, 91-94 (D.P.R. 2012) (same). Adamchik also participated in the conspiracy to violate Plaintiffs' rights, *see infra*, thereby exposing himself to liability for his co-conspirators' actions not under the doctrine of *respondeat superior* but rather of conspiracy.

Here, as alleged in the complaint, "[a]t approximately 6:30 pm [on June 1], without warning or provocation, Adamchik ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters." TAC ¶ 82; *see also* TAC ¶ 20 (noting that Adamchik was the incident commander).

Plaintiffs' allegations are the opposite of "conclusory": they are specific about what Adamchik did. Presumably (based on his citations), what Adamchik means by "conclusory" is that the allegations are not plausible. *See* Adam. MTD 31-32. But Plaintiffs did not pull Adamchik's name out of a hat. Defendant Monahan, Acting Chief of the Park Police, testified to Congress that Major Adamchik was the incident commander who gave the order to more forward, who authorized the use of weapons, and who had "full command and control of that operation."[12]

---

[12] *See Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protestors at Lafayette Square: Hearing Before the H. Comm. on Natural Resources*, 116th Cong. (July 28, 2020)        (testimony        of        Gregory        T.        Monahan),        *at* https://naturalresources.house.gov/hearings/unanswered-questions-about-the-us-park-polices-june-1-attack-on-peaceful-protesters-at-lafayette-square (video at 2:22:31 to 2:22:59; and 2:23:34 to 2:24:04; and 2:24:50 to 2:25:21).

Plaintiffs are not required to provide evidence at the complaint stage; rather, it is sufficient that the truth of the allegation is more than "speculative." *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If Plaintiffs' failure to include a footnote to the congressional testimony is dispositive, then Plaintiffs should be granted leave to amend—but even requiring that step would be unduly formalistic.

Adamchik's further suggestion that officers under his command might have carried out lawful orders in an unlawful way, *see* Adam. MTD 32, cannot justify dismissal. To the extent showing liability requires drawing inferences, they must merely be reasonable. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). Here, it is a perfectly reasonable inference that the officers who charged, beat up, and tear-gassed Plaintiffs were carrying out orders Adamchik gave them—rather than all spontaneously deciding to use wildly excessive force against people who posed no threat. On a motion to dismiss, where two competing explanations are plausible, the plaintiff's is credited. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

The complaint sufficiently alleges Adamchik's culpability to survive a motion to dismiss.

## IV.  Adamchik Is Not Entitled To Qualified Immunity As To Plaintiffs' Claims Under 42 U.S.C. §§ 1985 & 1986 (Claims 5 & 6).

A § 1985(3) claim requires "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, … and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured ... or deprived of any right or privilege of a citizen of the United States." *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987) (citation omitted). Adamchik claims qualified immunity by disputing the presence of a conspiracy (the first element) and discriminatory intent (a component of the second element). He does not, however, dispute that Plaintiffs are protected by § 1985, that the rights violated are protected by § 1985, that Plaintiffs have alleged acts in furtherance of the conspiracy, or injury.

The only argument that Adamchik makes against Plaintiffs' § 1986 claim is that it fails if Plaintiffs' § 1985 claim fails. Adam. MTD 45. Because Plaintiffs have stated a § 1985 claim, as explained below, Adamchik's argument to dismiss the § 1986 claim must be rejected.

### A. Plaintiffs adequately pleaded a conspiracy that includes officers of the United States, the District of Columbia, and Arlington County.

A conspiracy requires "agreement between two or more persons." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) (same conspiracy standard under § 1985(3) as civil conspiracy). Adamchik argues that the § 1985 claim must fail (1) because Plaintiffs' allegations do not to show an agreement and (2) because of the "intracorporate conspiracy" doctrine. Adam. MTD 43-45. The first argument is wrong on the law. The second disregards Plaintiffs' plausible allegations of an *inter*corporate conspiracy.

### 1. Plaintiffs adequately pleaded an "agreement between two or more persons."

Plaintiffs "need not allege … an express or formal agreement." *United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014); *accord Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016). Instead, "courts have to infer an agreement from indirect evidence in most civil conspiracy cases." *Halberstam*, 705 F.2d at 486; *accord Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980). Plaintiffs need only allege facts that allow an "infer[ence] from the circumstances that the [conspirators] had a 'meeting of the minds.'" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-158 (1970), based on "[f]actors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity." *Halberstam*, 705 F.2d at 486.

Agreement can be shown through circumstantial evidence, such as "the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; ... and other evidence suggesting unity of purpose or common design and understanding' among conspirators to accomplish the objects of the conspiracy." *United States v.*

*Wardell*, 591 F.3d 1279, 1287-88 (10th Cir. 2009) (cleaned up); *see also United States v. Wood*, 879 F.2d 927, 938 (D.C. Cir. 1989) (in criminal context, "[c]ircumstantial evidence, including inferences from a 'development and a collocation of circumstances,' suffices to prove participation in a conspiracy"). For instance, in *Lagayan*, this Court considered defenses to a § 1985 claim for human trafficking. 199 F. Supp. 3d at 24, 30-32. Like Adamchik, the defendants there asserted that plaintiff had "failed to allege any particulars ... showing that there was an agreement." *Id.* at 30 (internal quotation marks omitted). The court rejected this argument, as a plaintiff is not required to allege "the existence of an event, conversation, or document" in which an agreement was reached and that even if such a requirement existed, the plaintiff had satisfied it because the court could infer the existence of a conspiracy from the mere fact that the defendants had "coordinated Plaintiff's international travel to Defendants' home in the United States." *Id.* at 31.

The necessary agreement can even be made in an instant and implicitly. *United States v. Scott*, 2020 WL 6494642 (2d Cir. Nov. 5, 2020), affirmed convictions under § 1985's criminal analogue, 18 U.S.C. § 241. *See Griffin v. Breckenridge*, 403 U.S. 88, 98 (1971) (describing relationship between § 241 and § 1985(3)). In *Scott*, corrections officers were charged under § 241 for a group beating of an inmate. They claimed that there was no conspiracy because "the assault was spontaneous" and "there was insufficient evidence of an agreement." *Scott*, 2020 WL 6494642, at *3. The Second Circuit rejected this position, noting that there is no requirement of "an extended period of meditation or a distinct verbal agreement." *Id*. Although one officer's "initial punch may have been spontaneous," the conspiracy could be established by evidence showing that "the other officers acted in concert and purposefully joined the assault." *Id*.

Here, as in *Lagayan* and *Scott*, even the barest description of the June 1 attack supports a reasonable inference that the Defendants "acted in concert" and "purposefully joined the assault."

*Id.* Plaintiffs have alleged that Adamchik "gave the immediate order for the law enforcement officers at the Square to attack the peaceably assembled protesters." TAC ¶ 20; *see also* TAC ¶¶ 82, 86, 87. In doing so, Adamchik necessarily communicated and coordinated with the other defendants. *See supra* Part III.[13] Likewise, Plaintiffs have alleged that the various other defendants communicated and "coordinated" with each other, TAC ¶¶ 45, 76, 99, 107; that the federal and Arlington defendants had a "command center" from which the attack was directed, TAC ¶¶ 45, 76, 99, 107; that the District and United States "regularly act[] in coordination" with each other, TAC ¶ 105; and that an MPD officer met with U.S. military officers in close proximity to and shortly prior to the attack, TAC ¶ 106. The coordinated nature of the attack is further supported by the fact that tear gas was deployed ahead of officers advancing on foot and the fact that federal, D.C., and Arlington officers used the same type of force against protesters throughout the incident. TAC ¶¶ 141-143, 151, 160-163, 170-174, 186-190, 193.

### 2. Plaintiffs have alleged an *inter*corporate conspiracy, not an intracorporate one.

Adamchik contends there was no "agreement between two or more persons" because of the "intracorporate conspiracy doctrine," under which there can be no conspiracy between a corporation and its own employees (or among its employees). But Plaintiffs have plausibly pleaded the existence of an *inter*corporate conspiracy between employees of the District of Columbia,[14] of Arlington County, and of the United States—three distinct "corporations." *E.g.*, TAC ¶¶ 3, 67, 76, 99; *see* Part IV.A.1. Adamchik asserts qualified immunity on the ground that the applicability of the intracorporate conspiracy doctrine to § 1985(3) claims is not settled in this Circuit. Adam.

---

[13] It is immaterial whether Adamchik met with officers from MPD or ACPD because members of a conspiracy do not all need to meet each other to be co-conspirators. *See United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991); *United States v. Speed*, 78 F. Supp. 366, 368 (D.D.C. 1948).

[14] Although the President commands the D.C. National Guard, D.C. Code § 49-409, MPD reports to the independently-elected Mayor of the District of Columbia. D.C. Code § 5-101.03.

MTD 44-45. But that dispute is irrelevant here, because even assuming the doctrine does apply, Plaintiffs have alleged an *inter*corporate conspiracy as explained above.

### B. Plaintiffs adequately pleaded discriminatory intent.

Plaintiffs have pleaded facts sufficient to establish that all Defendants, including Adamchik, participated in a discriminatory conspiracy. Under § 1985(3), discriminatory intent exists if the conspiracy was targeted at plaintiffs because of their membership in a protected group. For example, in *Griffin*, plaintiffs stated a claim where they alleged defendants conspired to "prevent [the] plaintiffs and other Negro-Americans ... from seeking the equal protection of the laws and from enjoying ... equal rights" because of their race. 403 U.S. at 103.[15]

Plaintiffs are Black Americans and civil rights activists. TAC ¶¶ 65, 67, 94, 128, 138, 167, 246, 248. Those who, like Plaintiffs, advocate equal rights for Black Americans, regardless of their own racial identity, are a protected class under 42 U.S.C. § 1985(3). *Hobson v. Wilson*, 737 F.2d 1, 21 (D.C. Cir. 1984) (holding that "*[a]t a minimum* ... section 1985(3) reaches conspiracies motivated by animus against Blacks and those who support them"), *partially abrogated on other grounds, Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993).

Adamchik argues that Plaintiffs' claims fail for lack of an allegation that he shared President Trump's "animus" against Plaintiffs, Adam. MTD 43-44, but it is the *conspiracy*, not each individual *conspirator*, that must be "motivated" by a "discriminatory purpose." *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31 (D.D.C. 2016) (concluding that a § 1985(3) claim requires proof

---

[15] *See also*, *e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993) (the conspiracy must have "selected or reaffirmed a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group"); *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 746 (10th Cir. 1980) ("In order to support a section 1985(3) claim, the plaintiff must be a member of a statutorily protected class, and the *actions taken by defendant must stem from plaintiff's membership in the class*." (emphasis added)).

"that the *conspiracy* was 'motivated by some class-based, invidiously discriminatory animus'" (emphasis added) (quoting *Martin*, 830 F.2d at 258); *see also Hobson*, 737 F.2d at 14 (explaining that "the alleged *conspiracy* in *Griffin* was motivated by racial basis" (emphasis added)); *Bedford v. City of Hayward*, 2012 WL 4901434, at *14 (N.D. Cal. Oct. 15, 2012) (finding "no authority that Plaintiff must allege racial animus on behalf of each individual conspirator, rather than merely alleging 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" (quoting *Griffin*, 403 U.S. at 102)). "The conspirators must share the general conspiratorial objective, but they need not know all of the details of the plan … or possess the same motives .... [I]t simply must be shown that there was a single plan, the essential nature and general scope of which [were] known to each person who is to be held responsible for its consequences." *Hobson*, 737 F.2d at 51-52 (cleaned up).

Adamchik does not deny that Plaintiffs have amply alleged facts from which a discriminatory purpose on the part of Defendant Trump can be inferred.[16] In the "days and hours leading up" to the attack in Lafayette Square, Defendant Trump "repeatedly advocated the use of force against Black demonstrators and civil rights activists," TAC ¶ 53; he invoked violent and racist slogans from the civil rights era, TAC ¶ 54; and he called for violence against "the bad guys" (referring to civil rights protesters), TAC ¶ 56. On June 2, he praised the law enforcement attack: "Great job done by all. Overwhelming force. Domination," TAC ¶ 205. Tellingly, Defendant Trump spoke quite differently about demonstrators not advocating for racial justice. He urged his own supporters to gather at the White House. TAC ¶ 64. He expressed support for heavily armed

---

[16] Although Plaintiffs need not allege that Adamchik had animus, he implicitly admits that he shared the intent of the Executive Branch by arguing that he is part of the federal "corporation" for purposes of the intracorporate conspiracy doctrine. If the Executive Branch speaks with one voice, it is the President's.

and predominantly white demonstrators who threatened lawmakers and stormed statehouses to protest coronavirus restrictions, encouraging them to "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA." TAC ¶ 63. As discussed above, *see supra* Part IV.A.1, Plaintiffs have adequately alleged that Adamchik joined this conspiracy, the object of which was Defendant Trump's unlawful discriminatory purpose.[17]

Adamchik's argument that "*everyone* [in the park] was cleared" not just "Black people and their supporters," Adam. MTD 44, is beside the point. What matters is the intent of the conspiracy, not whether the conspirators incidentally harmed others along the way. In *Griffin*, for example, white conspirators attacked a car driven by a nonparty, with a number of Black passengers, on the misimpression that the driver was a civil rights worker. 403 U.S. at 106. The Court held that the passengers stated valid § 1985(3) claims regardless of whether the nonparty driver was the intended target. *See id.* at 103. Just because Defendants may have *also* violated the rights of other people in the vicinity does not mean they did not intentionally violate Plaintiffs' rights.

## CONCLUSION

Adamchik's motion to dismiss should be denied. Because of the number and complexity of the arguments raised in the motions, Plaintiffs respectfully request oral argument.

---

[17] If the Court deems these allegations insufficient, it should grant leave to amend, as Plaintiffs have unearthed additional information since filing the last amended complaint that further buttresses the claim of discriminatory intent. Specifically, undersigned counsel have been in contact with a former White House staffer who has personal knowledge that other senior Administration officials were involved with planning the Lafayette Square attack; that there was a discussion of the need to "mow down" the protesters and "show" them who is in charge; and that White House officials made discriminatory comments in relation to the death of George Floyd and subsequent racial justice protests. Plaintiffs are not attempting to amend the complaint via briefing; because these allegations are not a part of the complaint, Plaintiffs do not contend that they should not be a basis to determine whether to dismiss the complaint. However, they do counsel in favor in granting leave to amend *if* any claims *are* dismissed.

45

December 14, 2020

Respectfully submitted,

/s/ Scott Michelman
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Kayla Scott*
Megan Yan*
American Civil Liberties Union Foundation
        of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 0005
(202) 457-0800
smichelman@acludc.org

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

Kaitlin Banner (D.C. Bar No. 1000436)
Tristin Brown (D.C. Bar No. 1671642)
Dennis Corkery (D.C. Bar No. 1016991)
Hannah Lieberman (D.C. Bar No. 336776)
Jonathan Smith (D.C. Bar No. 396578)
Washington Lawyers' Committee for Civil
        Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

*Not a D.C. Bar member; practicing under
supervision pursuant to D.C. App. R. 49(c)(8A)

Counsel for Plaintiffs[18]

---

[18] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp and Harvard Law School student Julianna Astarita in the preparation of this brief and the development of the facts.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, et al.

*Defendants*.

Case No. 1:20-cv-01469-DLF

[PROPOSED] **ORDER**

Upon consideration of Defendant Adamchik's Motion to Dismiss Plaintiffs' Third Amended Complaint, ECF 97, and all briefing thereon, it is hereby ORDERED that the motion is DENIED.

Date: _____

_____

Dabney L. Friedrich
United States District Judge