## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 20-1469 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## THE DISTRICT OF COLUMBIA DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

## INTRODUCTION

Plaintiffs' opposition to the District Defendants'[1] motion to dismiss acknowledges that they do not accuse the District Defendants of wrongdoing at Lafayette Square. This crucial fact highlights the insufficiency of plaintiffs' factual allegations against the District Defendants in this case. Plaintiffs' cursory allegations of proximity and conduct similar to that of nearby federal law enforcement officers are simply insufficient to sustain claims of conspiracy, or that the District had a policy that overly burdened plaintiffs' speech or discriminated against their viewpoints in violation of the First Amendment. Plaintiffs also fail to rebut the District's showing that the individual District Defendants did not seize plaintiffs, and that their Fourth

---

[1]    The District Defendants consist of ten individual named officers of the Metropolitan Police Department (MPD) in their personal capacities and MPD Chief Peter Newsham in his official capacity. The claims against Chief Newsham are effectively against the District of Columbia (the District).

Amendment claim should therefore likewise fail, or, in the alternative, that the individual District Defendants are entitled to qualified immunity. Finally, plaintiffs' allegations of a custom or policy are too thin to support claims of municipal liability. The Court should dismiss all claims against the District Defendants.

## ARGUMENT

I.  **Plaintiffs Fail To State a Claim Under Sections 1985 or 1986 Because the Proffered Facts Do Not Plausibly Suggest the District Entered a Conspiracy, Intended To Violate Plaintiffs' Rights, or Had the Power To Prevent the Federal Defendants' Violations of Their Rights.**

A.  **Plaintiffs' Circumstantial Evidence Is Insufficient to Plausibly Suggest that the District Agreed to Join a Conspiracy.**

The District Defendants did not agree to join with the federal defendants in a conspiracy to violate plaintiffs' rights at Lafayette Square, and plaintiffs' claim of a conspiracy under 42 U.S.C. § 1985(3) (Section 1985) therefore fails because it does not adequately plead this essential element of that claim. *See Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). In their opposition, plaintiffs all but concede that they present no direct allegations of such an agreement on the part of any District Defendant, but instead heavily rely on the principle that in evaluating a motion to dismiss all reasonable inferences must be drawn in plaintiffs' favor even if other inferences are possible. *See* Pls.' Opp'n to Def. Barr's, Federal Official Capacity Defs.', and D.C. Defs.' Mots. to Dismiss (Opp'n) [98] at 79–80 (citing *Hurd v. District of Columbia*, 864 F.3d, 671 (D.C. Cir. 2017) and *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)). True enough, but incomplete. Plaintiffs overlook that *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) laid out

the standard required to move a complaint past "the line between possibility and plausibility of entitlement to relief" in the specific context of claims of conspiracy. Critically, plaintiffs must do more than present instances of parallel conduct and conclusory allegations of agreement. *Id*. In other words, it would not be a reasonable inference to conclude that the District agreed to enter a conspiracy if plaintiffs' assertions are "merely consistent with" agreement. *Id*. at 557. And repeating cursory allegations that defendants "communicated and coordinated," Opp'n at 77–78, also does not render plausible a conclusion that plaintiffs satisfied the agreement prong. *Twombly*, 550 U.S. at 557.

By attempting to analogize *United States v. Scott*, 979 F.3d 986, 990 (2d Cir. 2020) and *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30–31 (D.D.C. 2016) to this case, plaintiffs elide these fundamental requirements. First, the *Lagayan* court—in holding that plaintiffs had presented a set of facts sufficient to plausibly infer that an agreement of some kind existed—rejected the contention that plaintiffs were required to identify a specific event, conversation or document constituting such an agreement. 199 F. Supp. 3d at 31. And in *Scott,* the Second Circuit concluded that a tacit agreement was formed by relying on evidence that "the other officers acted in concert and purposefully joined the assault." 979 F.3d at 990. In both cases, however, the key question was whether plaintiffs had shown the existence of an agreement. *Lagayan*, 199 F. Supp. 3d at 31 ("Here, the Complaint contains sufficient facts from which the court can plausibly infer that there existed an agreement among Defendants … ."); *Scott*, 979 F.3d at 990 ("[T]he record here demonstrates that Defendants entered into

a tacit agreement to violate [plaintiff's] civil rights."). Contrary to plaintiffs' assertions, then, an inference that defendants "acted in concert and purposefully joined the assault" is not itself sufficient to support a claim of conspiracy; plaintiffs' assertions must lead to the further inference that an agreement to enter a conspiracy existed. *Lagayan*, 199 F. Supp 3d at 31. In other words, while plaintiffs accurately note that they "need not allege that an express or formal agreement was entered into," Opp'n at 75 (quoting *United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014)), they must still plausibly allege that an agreement of some kind was entered into.

But, here, plaintiffs' factual assertions do not even show that the District "acted in concert and purposefully joined the assault," Opp'n at 77, let alone that in so doing it agreed to join a conspiracy. Plaintiffs allege that the District Defendants interacted with plaintiffs only *after* federal law enforcement officers closed Lafayette Square and dispersed the demonstrators there, causing some demonstrators to proceed westwards where they subsequently encountered MPD officers. *See* Third Am. Compl. (TAC) [50-2] ¶ 100. Plaintiffs do not allege that MPD was stationed there for a conspiratorial purpose; indeed, they do not even allege what conspiratorial purpose the MPD line in that particular location would serve—they merely allege that MPD was nearby. *Id.* ¶ 72. "Knowledge of a conspiracy or proximity to it is by itself insufficient to prove that a defendant joined the conspiracy." *United States v. Al Kassar*, 660 F.3d 108, 128 (2d Cir. 2011); *see also Scott*, 979 F.3d at 990; *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019) (finding allegations that

defendants who were present at the same physical location and assaulted plaintiffs at the same time insufficient to support inference of agreement to participate in a Section 1985 conspiracy). Similarly, plaintiffs' allegation that District Defendants donned certain protective gear, *id.* ¶ 75, Opp'n at 79, is not suggestive of agreement with federal law enforcement. Any such inference is undercut by the surrounding context which reasonably and independently indicated to the District Defendants that tear gas might be deployed, such as the large group of federal law enforcement officers confronting a crowd of demonstrators at Lafayette Square during ongoing demonstrations that had previously resulted in violence and property damage, all just before the looming District curfew. *See* Mem. Supp. District of Columbia Defs.' Mot to Dismiss Pls.' Third Am. Compl. (D.C. MTD) [80-1] at 3–6. Indeed, plaintiffs' allegations that MPD used tear gas renders the use of protective equipment an "independent action," *Twombly*, 550 U.S. at 557, insufficient to support an inference of an agreement to conspire. Opp'n at 79; *see also Kurd*, 374 F. Supp. 3d at 62 (noting that even if there were a common goal among alleged conspirators to physically attack plaintiffs, that does not itself constitute an agreement).

Plaintiffs' allegation that an unidentified MPD supervisory officer met with unidentified U.S. military officers for an unidentified purpose, Opp'n at 79 (citing TAC ¶ 106), is even less indicative of an agreement to conspire on the part of the named District Defendants; plaintiffs' cited cases instead involved contacts between defendants and named individuals specifically alleged to be members of the conspiracy and for the explicit purpose of furthering that conspiracy. *See, e.g., United*

*States v. Claxton*, 685 F.3d 300, 311–12 (3d Cir. 2012) (defendant alleged to have traveled with conspirators to a location designated for use in the conspiracy and frequented by conspirators, and where discussions of the conspiracy took place);[2] *Al Kassar*, 660 F.3d at 128–29 (defendant alleged to have repeatedly traveled and met with other identified conspirators to discuss and take material steps to advance the conspiracy); *see also Halberstam v. Welch*, 705 F.2d 472, 486–87 (D.C. Cir. 1983) (defendant alleged to have coordinated with fellow conspirator by performing tasks to advance the conspiracy in their shared home while living together for over five years and extensively sharing in the conspiracy's profits). Plaintiffs' own pleading provides the starkest illustration of the defects of their allegations against the District Defendants: They proffer specific factual allegations in support of their claim that Attorney General Barr participated in the alleged conspiracy, including that he "himself entered Lafayette Square and personally ordered the attack, and in fact admitted so publicly." Opp'n 78 (citing TAC ¶¶ 5, 17, 60, 79). In contrast, plaintiffs' shot-in-the-dark allegation about what an unidentified and non-defendant MPD officer did are a far cry from showing participation in the alleged conspiracy by any of the identified District Defendants. In the end, plaintiffs' claim that the District

---

[2]    *Claxton* is in any event inapplicable to this case because it analyzed not the inferences required to show an agreement to conspire, but rather to show that the defendant "had knowledge that he was participating in a conspiracy 'involving drugs, as opposed to some other form of contraband,'" in a prosecution for a drug-trafficking conspiracy under 21 U.S.C. § 846. 685 F.3d at 307 (quoting *United States v. Boria*, 592 F.3d 476, 486 (3d Cir. 2012)). In *Claxton*, agreement to conspire was not at issue because the defendant was already "expressly identified as a member of the conspiracy." 685 F.3d at 309.

Defendants joined an alleged conspiracy is supported by nothing more than conjecture that MPD's conduct "would be quite a coincidence," Opp'n at 79, if undertaken independently. But plaintiffs fundamentally misstate their burden to adequately and plausibly allege an agreement to conspire, and this claim should therefore be dismissed against the District Defendants.

> **B.   Plaintiffs' Interpretation of Section 1985 Would Eviscerate Its Purpose Requirement.**

Plaintiffs also assert that they need not plead, or even ultimately prove, that the District Defendants themselves were motivated by discriminatory animus in order to hold them liable under Section 1985. *See* Opp'n at 82. This interpretation excessively strains the plain language of Section 1985 and should be rejected. Section 1985 creates liability "[i]f two or more persons … conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws … ." 42 U.S.C. § 1985(3). By its plain terms the action required of the defendant, here, "[to] conspire," is modified by the phrase which immediately follows it: "for the purpose of depriving." *Id*. The natural conclusion is that plaintiffs must allege that the defendant's own purpose in conspiring is to deprive others of equal protection of the laws.

Plaintiffs' cite no contrary opinion. To begin with, cases that do not differentiate whatsoever among various defendants in a Section 1985 claim simply have no bearing on the question of whether plaintiffs may hold some defendants liable without showing their personal animus or purpose. *See Griffin v. Breckenridge*, 403

U.S. 88, 103 (1971).[3] Cases that dismiss Section 1985 claims by concluding that plaintiffs failed to establish that the targets of the conspiracy were members of a class covered by Section 1985 also do not establish that the intent of an individual defendant in joining the conspiracy is irrelevant. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) ("Respondents' case comes down, then, to the proposition that intent is legally irrelevant … . Our cases do not support that proposition.") In fact, the portion of the quote plaintiffs omit from *Bray* aptly demonstrates the relevance of the participants' intent, rather than that of the conspiracy as a whole: "Discriminatory purpose, we said, implies more than intent as volition or intent as awareness of consequences. It implies that the *decisionmaker* selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." 506 U.S. at 271–72 (internal quotations omitted) (emphasis added).

And, contrary to plaintiffs' assertions, Opp'n at 82, Section 1985 cases, including those plaintiffs cite elsewhere, *have* evaluated various defendants' intent. *See Hobson v. Wilson*, 737 F.2d 1, 52 (D.C. Cir. 1984) ("Without concluding that no such [Section 1985] conspiracies existed, we agree … that there was not enough

---

[3]     *Griffin* stated that plaintiffs must allege a "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in the context of providing a federal nexus to limit the Court's extension of Section 1985 to private conspiracies. 403 U.S. at 101–02. Because differentiating among defendants was not an issue at stake in that decision, *Bedford v. City of Hayward*, Civil Action No. 12-00294, 2012 WL 4901434, at *14 (N.D. Cal. Oct. 15, 2012), is simply not persuasive in concluding that *Griffin* suggests that Section 1985 does not require a showing of intent of the individual defendants.

evidence for the jury to conclude that the individual MPD defendants shared the 'general conspiratorial objective' of intentionally disrupting plaintiffs' First Amendment rights … . No evidence linked to any individual MPD defendant warrants even an inference of unlawful motive … .") *partially abrogated on other grounds by Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993); *Lagayan*, 199 F. Supp. 3d at 32 (evaluating one alleged conspirator's derogatory remarks about plaintiff and concluding that "her statement cannot be imputed to Defendants for the purpose of establishing *their* racial animus.") (emphasis in original); *see also Thomas v. News World Commc'ns*, 681 F. Supp. 55, 69 (D.D.C. 1988) ("The complaint does not allege, with sufficient specificity, that [one set of defendants] acted in concert with [other defendants] out of racial or religious bias or out of any invidious, class-based animus recognized under [Section 1985]."). To the extent cases such as *Lagayan* have dismissed Section 1985 claims because plaintiffs failed to allege that *any* defendant had an invidiously discriminatory purpose, they do not also imply that plaintiffs would have succeeded as against *all* defendants merely by showing that a *single* defendant possessed such animus. 199 F. Supp. 3d at 31–32.

In short, plaintiffs' approach would lead to the conclusion that a defendant satisfies the purpose requirement of Section 1985 by the mere act of joining a conspiracy of which one of the other members expresses racial animus and causes a constitutional deprivation. But to do so would subject that defendant to liability for mere awareness or acceptance of any resulting deprivation, rather than for the

purpose of causing that deprivation, as is properly required. *See Bray*, 506 U.S at 276. Section 1985's purpose requirement should not be read so narrowly; while conspirators "need not … possess the *same* motives," they "must share the general conspiratorial objective." *Hobson*, 737 F.2d at 51 (emphasis added). In the Section 1985 context, the "general conspiratorial objective" which all defendants must share plainly includes the purpose of invidious discrimination. *See* 42 U.S.C. § 1985(3). Plaintiffs' Section 1985 claim should be dismissed as against the District Defendants for failure to show that any District Defendant had an invidiously discriminatory purpose.

C. <u>Plaintiffs Do Not Plead Any Facts Showing the District Defendants Had the Power To Prevent the Alleged Section 1985 Conspiracy.</u>

Plaintiffs' interpretation of Section 1986 likewise runs counter to its explicit text. Plaintiffs lean on the "aid in preventing" prong of Section 1986, but their conclusion that the District could have refused to participate, directed MPD officers not to engage in violence, or directed MPD officers to render medical assistance and "avenues of escape" puts all of the statute's weight on "aid" at the expense of "power" and "prevent." Opp'n at 86–87. Even if, as plaintiffs allege, these steps would have "mitigat[ed] the harm from the conspiracy," Opp'n at 86, they do not suggest that the District Defendants as a result would have affected, let alone aided in preventing, the federal law enforcement officers' decision to clear Lafayette Square, an action the Third Amended Complaint clearly alleges occurred before any plaintiff even encountered MPD. TAC ¶ 100.

More broadly, plaintiffs' characterization of their allegations against the District Defendants as a "quintessential" Section 1986 claim is unsupported by the cases they provide. Plaintiffs' cited Section 1986 cases alleging a failure of law enforcement officers to stop violence carried out by protestors or mobs are clearly inapposite to this case, in which plaintiffs allege that the District Defendants' attempts to maintain crowd control constituted a violation of plaintiffs' constitutional rights. *See Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir. 1997) (plaintiffs injured by crowd of demonstrators); *Clark v. Clabaugh*, 20 F.3d 1290 (3d Cir. 1994) (plaintiffs injured by crowd of bikers and townspeople); *Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984) (plaintiffs injured by the Ku Klux Klan and American Nazi Party);[4] *Bergman v. United States*, 579 F. Supp. 911 (W.D. Mich. 1984) (plaintiff injured by an angry crowd attacking the Freedom Riders).

As to cases addressing a failure to prevent violence caused by other law enforcement officers, plaintiffs' citations do not suggest that liability should be imposed when defendants were not actually present at the scene of the violence inflicted by other law enforcement officers rather than at a distance, as was the case here between the District Defendants and federal law enforcement. *See Masel v. Barrett*, 707 F. Supp. 4, 9 (D.D.C. 1989) (alleging defendant ordered other officers to arrest plaintiff and observed those officers using excessive force to do so); *Symkowski v. Miller*, 294 F. Supp. 1214, 1217 (E.D. Wis. 1969) (alleging defendants witnessed

---

[4]     Plaintiffs in *Waller* also alleged that two defendants within those respective organizations were informants of law enforcement acting as "agent-provocateurs," an allegation irrelevant to this case. 584 F. Supp. at 923.

11

another law enforcement officer beating plaintiff); *see also Martin v. Malhoyt*, 830 F.2d 237, 260 (D.C. Cir. 1987) (granting defendant officer's claim of qualified immunity because, even taking plaintiff's allegations as true, defendant was too far away to clearly see plaintiff being attacked by another officer). A requirement of physical proximity to the alleged violence is fully consistent with Section 1986's requirement that "the defendant had the power to prevent or aid in preventing the commission of a Section 1985 violation." Opp'n at 85.

Additionally, plaintiffs provide no support for a contention that officers who are not members of the same law enforcement organization as the alleged Section 1985 conspirators can satisfy the "power to prevent or aid in preventing" prong of Section 1986. *See Masel*, 707 F. Supp. at 8 (emphasizing in a case alleging a constitutional duty to intervene the responsibility for officers in a supervisory capacity but cautioning that "[a] merely negligent failure to intervene, however, cannot produce liability"). Here, MPD members are officers of the District of Columbia under the command of the Mayor and thus not even under the same governmental entity as the federal law enforcement defendants, let alone in a supervisory capacity over them. *See* D.C. Code § 5-101.03.[5] Taken together, the stark contrasts between the allegations here and circumstances in which liability is

---

[5] Plaintiffs' conclusory suggestion that the District Defendants' failure to "affirmatively interpose[ ] themselves and shield[ ] the demonstrators against the unlawful violence" violated MPD's Law Enforcement Officer Code of Ethics, Opp'n at 87, is wholly irrelevant to the question of whether the District Defendants under Section 1986 actually had the ability to shield demonstrators from the bevy of federal law enforcement officers present in Lafayette Square, or if doing so would have been effective in any way in preventing or aiding to prevent "the unlawful violence."

typically imposed on officers for failure to prevent constitutional violations demonstrates that plaintiffs have failed to adequately plead that the District Defendants had the ability to prevent or aid in preventing the alleged Section 1985 conspiracy, and that this claim should therefore be dismissed.

II.   **Plaintiffs' First Amendment Claims Should Be Dismissed Because They Fail To Allege Facts Suggesting the District or Any District Defendant Had a Policy that Overly Burdened Their Speech or Discriminated Against Their Viewpoint.**

A.   **Plaintiffs' Allegations of an Overbroad Burden on Speech Are Inapplicable Because the District Did Not Close Lafayette Square.**

The District was not responsible for the closure of Lafayette Square. Plaintiffs' arguments regarding burdens on speech based on a time, place or manner restriction or the "clear and present danger" test are as a result inapplicable as against the District. *See* Opp'n at 30–37. Plaintiffs do not allege that the District made the decision to close Lafayette Square and therefore to disperse the demonstrators there, nor that any District defendant participated in that dispersal. *See* Opp'n at 59. Plaintiffs characterize the District Defendants' alleged actions as "further dispersing them," *id.*, but as the District noted in its motion to dismiss, plaintiffs do not allege that they were continuing to engage in First Amendment activities while fleeing the federal law enforcement action. *See* D.C. MTD at 18–20. To the extent they were, the District Defendants—by directing fleeing protestors down 17th Street, N.W., further away from the "danger," TAC ¶ 90, of the events at the Square—satisfied a legitimate interest of the District in preventing further confrontations between demonstrators and law enforcement officers and did not burden the demonstrators' speech any more than necessary. *See* Opp'n at 30 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486

13

(2014)). For example, plaintiffs do not allege that they were arrested by the District Defendants or otherwise prevented from continuing to demonstrate in any other location in the city. Plaintiffs suggest that the idea that they would have felt at liberty to resume their demonstration after their alleged treatment is "fanciful," Opp'n at 32,[6] but they do not cite any authority for the proposition that the District was required under the First Amendment to affirmatively establish "either a prescribed location or … prescribed distance away from Lafayette Square," *id.* (quoting TAC ¶ 108), at which plaintiffs could resume demonstrating.

Any suggestion otherwise is particularly irrelevant under these circumstances, in which a different governmental entity made the decision to close the Square, leaving the District no reasonable opportunity to designate a prescribed alternative location. In any case, the parties were mere minutes away from a District-wide curfew taking effect. *See* TAC ¶¶ 82; Mayor's Order No. 2020-069, Continuation of District-wide Curfew during COVID-19 Public Emergency and Second Public Emergency, 67 D.C. Reg. 6982–84 (June 5, 2020) (ordering that between 7:00 p.m. of June 1, 2020 and 6:00 a.m. of June 2, 2020, "no person … shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District."); *see also* Mayor's Order 2020-053, Closure of Non-Essential Businesses and Prohibition on Large Gatherings During Public Health Emergency for the 2019 Novel Coronavirus (COVID-19), 67 D.C. Reg. 3608–16 (Mar.

---

[6]    Several plaintiffs, including the two who allege contact with MPD, assert that they intended to continue demonstrating. *See id.* ¶¶ 137, 145, 154, 176, 201.

27, 2020) (banning all public gatherings of more than ten persons). Nowhere in plaintiffs' TAC or opposition to the District Defendants' motion to dismiss do they challenge the validity of that curfew, or the District's COVID-19 restrictions on public gatherings, whether on First Amendment or any other grounds. Plaintiffs' allegations of an overbroad burden on speech should be dismissed as to all District Defendants.

### B. Plaintiffs' Factual Allegations Against the District Are Insufficient To State a Claim of Viewpoint Discrimination Because Plaintiffs Fail To Identify a Discriminatory District Policy.

Plaintiffs have not adequately alleged that the District engaged in viewpoint discrimination, either. *See* Opp'n at 38–40. Viewpoint discrimination is properly understood as a subset of content-based restrictions on speech, *see Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995), but importantly, the plaintiffs have not shown that the District engaged in *any* speech-based discrimination, whether based on content or viewpoint. Crucially, plaintiffs do not allege that any District-specific law, regulation or policy facially infringed their First Amendment rights, and the individual actions of MPD officers cannot as a matter of law support liability against the District itself. *See Monell v. Department of Social Services of New York*, 436 U.S. 658, 691 (1978).[7] For example, plaintiffs do not dispute

---

[7]     In contrast, retaliation against First Amendment-protected activity does not inherently require any official law, regulation or policy to violate the First Amendment, merely instead "some retaliatory action." *See, e.g., Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 215–16, 221 (D.D.C. 2017) (addressing claims that defendants refused to investigate plaintiff's complaints, transferred incarcerated plaintiff to a different facility, and "several other miscellaneous acts of retaliation"). Here, plaintiffs' opposition to the District's motion to dismiss does not even attempt to address the District's showing that plaintiffs have not adequately pled a claim of First Amendment retaliation based on a failure to establish "retaliatory animus." *See*

that the federal government, not the District, closed Lafayette Square and shut down the demonstration there. *See* D.C. MTD at 17 n.11.

Plaintiffs instead rely on *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997) for the proposition that "impermissible viewpoint discrimination occurs where the government treats speech expressing one viewpoint differently than it would have treated a different viewpoint." Opp'n at 38. Plaintiffs further note that "the D.C. Circuit did not inquire if any particular defendant held animosity toward the plaintiff's viewpoint." Opp'n at 39. Accurate, but irrelevant. In *Mahoney*, the federal government did not contest that it had engaged in viewpoint discrimination by revoking the permit of a particular activist group and threatening to arrest its members for protesting while admitting that demonstrators expressing different views would be welcomed. 105 F.3d at 1455–56. Likewise, the defendant in *Rosenberger* acknowledged that its officially-promulgated policy was content-based, and the Court there concluded that "viewpoint discrimination [was] inherent in the [defendant's] regulation." 515 U.S. at 830, 845. Here, plaintiffs have evinced absolutely nothing to show that the District has *any* policy, official or unofficial, that led to it treating the plaintiffs differently based on their speech.

Plaintiffs conclude that they have plausibly pleaded viewpoint discrimination by pointing to President Trump's expressed animus against Black Lives Matter

---

Opp'n at 39 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). That argument has therefore been conceded. LCvR 7(b); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)).

demonstrators, contending that it reveals a motivation to attack and disband plaintiffs' demonstrations. Opp'n at 39. Even if plaintiffs' assertions regarding the President's attitude towards their viewpoint and the relevance of that attitude to the federal government's decision to close Lafayette Square are taken as true, plaintiffs' focus on the "*government's* purpose in taking the challenged action," *id.* (emphasis in original), aptly demonstrates why these allegations do not support such a claim against the District. Quite simply, the District of Columbia is a separate governmental entity from the United States and the motives and purposes of one in carrying out a particular policy cannot automatically be attributed to the other. *See Pahls v. Thomas*, 718 F.3d 1210, 1237 (10th Cir. 2013) (citing *United States v. Uribe–Rios*, 558 F.3d 347, 356 (4th Cir. 2009)); *see also* D.C. Code § 5-101.03 (establishing that the Mayor of the District commands MPD, not the President). Unlike in the cases plaintiffs cite, plaintiffs here do not challenge any underlying law, regulation or policy of the District that facially discriminated against their viewpoint. *See, e.g., Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) (challenging federal statute); *Wood v. Moss*, 572 U.S. 744, 755 (2014) (challenging alleged unwritten policy of "working with the White House … to eliminate dissent and protest from presidential appearances"); *Rosenberger*, 515 U.S. 819 (challenging public university's promulgated guidelines); *Mahoney*, 105 F.3d 1452 (challenging revocation of a permit).

At most, plaintiffs have alleged that the District was deliberately indifferent in its training "regarding chemical irritants specifically and the constitutional handling of demonstrations generally." Opp'n at 69. As the District has shown, these

allegations fail to rise to a level establishing municipal custom under the standard of *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). *See* D.C. MTD at 28–41. Even if they did, however, these vague and conclusory allegations do not facially support a First Amendment claim, because plaintiffs do not allege that the putative policy of deliberately indifferent training was "adopted … because of disagreement with the message … convey[ed]." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Allegedly unconstitutional "handling of demonstrations," Opp'n at 69, in any case does not constitute even a content-based policy, much less a viewpoint-based one. *See Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 404 (D.C. Cir. 2017) ("[I]njunctions aimed at 'demonstrating' that do not bar other types of expressive conduct are not rendered content based merely because, at a general level, the character of the expressive activity must be taken into account … ."). The Third Amended Complaint's recitation of a handful of allegedly similar incidents over nearly twenty years only reinforces this point; plaintiffs do not contend that any of those prior MPD actions were motivated by the affected demonstrators' content or viewpoint, and instead merely make conclusory assertions that MPD "used excessive force" and "unconstitutionally detained demonstrators." *See* TAC ¶ 110. Without further factual enhancement as to how and why MPD's allegedly deficient "handling of demonstrations" violates the First Amendment, these naked assertions fail, as a matter of law, to establish that the District has a policy that unconstitutionally discriminates based on viewpoint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

C.   **Plaintiffs' Factual Allegations Are Insufficient To Show That Any Individual District Defendant Discriminated Against Plaintiffs' Viewpoint.**

Plaintiffs' claim of viewpoint discrimination also fails as to the individual District Defendants. The crux of plaintiffs' allegations against the individual District Defendants are that "a formation of MPD officers stationed one block west of the Square attacked … demonstrations, including with tear gas." TAC ¶ 100; *see also id.* 190–98 (failing to allege that any named District Defendant interacted with plaintiffs Foley and E.X.F.). This allegation cannot sustain plaintiffs' claim of viewpoint discrimination by the individual District Defendants.

Plaintiffs assert that they need not show evidence of personal animosity by attempting to distinguish viewpoint discrimination from retaliation, but that requirement is more fundamental here because claims under 42 U.S.C. § 1983 "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *see also Wood v. Moss*, 572 U.S. 744, 763–64 (2014) (refusing to "attribute that supposed [unconstitutional] policy to all field-level operatives"). Just as plaintiffs do not include any allegations suggesting that the District itself had a policy to treat plaintiffs' viewpoint differently, so too do they fail to claim that any of the individual District Defendants discriminated against them based on their viewpoint. *See* TAC ¶ 266 (conclusory allegations that District Defendants would have treated demonstrators expressing different views differently); *see also Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). For example, plaintiffs make no allegations that

19

demonstrators representing differing viewpoints were even present at the scene, much less treated differently by any individual District Defendant. *See Pahls*, 718 F.3d at 1239 n.10.

Even if plaintiffs had adequately pled that the District or MPD as a whole may have had a discriminatory purpose—which they have not—that would not absolve plaintiffs of their responsibility to allege that each individual defendant actually took actions which violated plaintiffs' First Amendment rights. *See id.* at 1232–33 ("Plaintiffs must establish that *each* defendant caused plaintiffs to be subjected to viewpoint discrimination and acted with a viewpoint-discriminatory purpose") (emphasis in original). By failing to present factual allegations showing that any individual District Defendant discriminated against plaintiffs' viewpoint, or that might tend to support a finding of purpose on the part of any individual District Defendant to discriminate on the basis of plaintiffs' viewpoint, this claim fails against the individual District Defendants as well. *See Weise v. Jenkins*, 796 F. Supp. 2d 188, 200 (D.D.C. 2011) (dismissing claim of viewpoint discrimination because plaintiffs failed to sufficiently allege personal involvement of defendants in alleged misconduct); *see also Iqbal*, 556 U.S. at 683; *Ross v. Early*, 746 F.3d 546, 560–61 (4th Cir. 2014).[8]

---

[8]    At the very least, the individual officers should be afforded qualified immunity on plaintiffs' First Amendment claim because plaintiffs have not shown that it was "clearly established" that when a particular set of demonstrators were first dispersed by officers of a different law enforcement entity and driven towards them, and the District Defendants merely redirected demonstrators further away from the scene of the confrontation, the District Defendants discriminated based on viewpoint or overly

III.  **Plaintiffs' Fourth Amendment Claim Should Be Dismissed Because Plaintiffs Have Not Alleged a Seizure and Individual District Defendants Are Entitled to Qualified Immunity.**

A.  **Even Taking Plaintiffs' Allegations Regarding the Use of Chemical Munitions as True, Plaintiffs Fail To Allege a Seizure.**

As explained by the District Defendants, plaintiffs have failed to plausibly allege they were seized under the Fourth Amendment. D.C. MTD at 22–23. Plaintiffs argue that any restriction upon their movement through any force intentionally applied by officers constitutes a seizure. Opp'n at 55. The District Defendants agree. However, plaintiffs ignore that for a seizure to exist there must be an objective manifestation of intent by the officer to acquire physical control of a person's movement. *See United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980). Said differently, the test is whether, based on the officers' actions and in view of all the circumstances surrounding the incident, a reasonable person would feel free to leave. *See id.* at 554; *see also United States v. Hood*, 435 F. Supp. 3d 1, 5 (D.D.C. 2020).

Plaintiffs contend that officers allegedly firing tear gas in their direction, causing them to take shelter, was a "restraint." Opp'n at 56. However, plaintiffs have not alleged that they were detained or told they were not free to walk away from the officers. Indeed, plaintiffs' TAC alleges that they were at all times free to leave the area by heading south on 17th Street. *See* TAC ¶¶ 100–04. Based on these allegations, the officers' actions do not objectively manifest an intent to control plaintiffs, but rather to disperse the crowd from the protest area. "An officer's request to leave an

_____

burdened the demonstrators' speech. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

area, even with use of force, is not a seizure unless 'accompanied by the use of sufficient force intentionally to restrain a person and gain control of his movements.'" *Edrei v. City of New York*, 254 F. Supp. 3d 565, 574 (S.D.N.Y. 2017) (quoting *Salmon v. Blesser*, 802 F.3d 249, 255 (2d Cir. 2015)); *Sheppard v. Berman*, 18 F.3d 147, 153 (2d Cir. 1994) (noting that other than the area restricted by law enforcement, plaintiff did not allege he was not "free to go anywhere else that he desired"); *Buck v. Albuquerque*, No. 04-JP-1000 DJS, 2007 U.S. Dist. LEXIS 105714, at *98–99 (D.N.M. Apr. 11, 2007) (holding that because certain plaintiffs did not argue that the police's use of tear gas caused them to feel that they were not free to leave, none of those plaintiffs were seized within the meaning of the Fourth Amendment by the police's use of chemical agents to disperse); *see also Dundon v. Kirchmeier*, Civil Action No. 16-00406, 2017 U.S. Dist. LEXIS 222696, at *58 (D.N.D. Feb. 7, 2017) (questioning whether the Fourth Amendment applied to plaintiffs given that police sought to disperse rather than arrest or detain them, and plaintiffs failed to allege they were informed they could not leave) *aff'd per curiam*, 701 Fed. Appx. 538 (8th Cir. 2017).

Plaintiffs' reliance on *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) is misplaced because the facts are plainly distinguishable from this case. The Court in *Nelson* noted the officers' use of force actually resulted in a termination of the plaintiff's movement and resulted in the plaintiff's submission. 685 F.3d at 875–76 ("[Plaintiff] was hit in the eye by a projectile filled with pepper spray, and after being struck, was rendered immobile until he was removed by an unknown individual."). In this case, after their encounter with the officers, plaintiffs Foley and E.X.F. left

the scene without any further interaction with any MPD officer; they simply "reached the car and drove home … ." TAC ¶ 199. Based on the objective facts of this case, plaintiffs have failed to allege a seizure by MPD officers and their Fourth Amendment claim should be dismissed against the District Defendants.

> **B.** **The District Defendants Should Be Granted Qualified Immunity Because Plaintiffs Have Not Shown that the District Defendants' Use of Force Was Clearly Established to Be Unreasonable Under the Circumstances.**

Plaintiffs argue that the District Defendants violated their Fourth Amendment rights by firing tear gas in their direction. TAC ¶¶ 100–04. But plaintiffs fail to sufficiently allege this use of force was unreasonable under the totality of the circumstances. *See* D.C. MTD at 25–26 (citing *Graham v Connor*, 490 25 U.S. 386, 396 (1989)). Plaintiffs argue that no reasonable officer would have "discharged a tear gas grenade launcher into the crowd of fleeing protestors," Opp'n at 19, but they fail to consider the aggressive nature of the crowd that plaintiffs were a part of, advancing towards MPD officers on 17th and H Streets. *See* D.C. MTD at 26. Given the totality of the circumstances here, defendants' alleged application of force was not unreasonable.

Even if MPD officers' use of force violated plaintiffs' constitutional rights, the officers should be afforded qualified immunity because it was not clearly established that they would violate plaintiffs' Fourth Amendment rights if they used tear gas on protestors under these circumstances, intending only to disperse the crowd and not to effect a stop or arrest. Plaintiffs' excessive force claim under the Fourth Amendment is dependent on whether there was a seizure. D.C. MTD at 22–24.

However, broader, clearly established principles of the Fourth Amendment do not give fair warning here as to whether defendants' conduct was a seizure. Though plaintiffs contend precedent places the Fourth Amendment violation here beyond debate, Opp'n at 24, plaintiffs cite no law involving the use of tear gas to disperse protestors under a totality of circumstances similar to those in the present case. As explained, the "clearly established law" must not be defined "at a high level of generality," and instead must address the particular facts and circumstances of the individual case. *See* D.C. MTD at 36 (citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Plaintiffs cite a large number of cases from other jurisdictions that do not involve protests, tear gas, freedom of movement or the intent to disperse. *See Tracy v. Freshwater*, 623 F.3d 90, 98–99 (2d Cir. 2010); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60–62 (1st Cir. 2008); *Henderson v. Munn*, 439 F.3d 497, 502–03 (8th Cir. 2006); *Vinyard v. Wilson*, 311 F.3d 1340, 1348–49 (11th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 852–53 (4th Cir. 2001); *Adams v. Metiva*, 31 F.3d 375, 385–86 (6th Cir. 1994); *Jones v. Ritter*, 587 F. Supp. 2d 152, 157 (D.D.C. 2008).

Among cases plaintiffs do cite that involve protests, plaintiffs fail to establish that in this jurisdiction and under these circumstances, the actions the individual District Defendants took clearly violated plaintiffs' rights. *See Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) (alleging officers hit plaintiff with a rifle fired projectile, grabbed and threw him to the ground, carried him through tear gas, and bent his wrist); *Headwaters Forest Def. v. County of Humboldt Headwaters Forest Def.*, 276 F.3d 1125 (9th Cir. 2002) (alleging officers used pepper spray on nonviolent

protestors, to force them to release themselves from lock-down devices, by applying the irritant directly to their eyes as close as three feet away); *Lucha Unida de Padres y Estudiantes v. Green*, Civil Action No. 18-00085, 2020 U.S. Dist. LEXIS 115250 (D. Ariz. June 30, 2020) (alleging officers repeatedly sprayed pepper spray into plaintiffs' eyes); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231 (W.D. Wash. 2009) (alleging officers directly pepper sprayed plaintiff twice, and plaintiff was not free to move); *Brenes-Laroche v. Toledo Davila*, 682 F. Supp. 2d 179 (D.P.R. 2010) (alleging officers closed off all means of egress to plaintiff and indiscriminately beat demonstrators); *Secot v. City of Sterling Heights*, 985 F. Supp. 715 (E.D. Mich. 1997) (alleging officer struck plaintiff peacefully standing in a picket line); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996) (record showed that officers previously met and discussed demonstration with protestors, then pepper sprayed the demonstrators twice when the crowd surged). Because those cases do not match the particular facts and circumstances of this case, they fail to establish whether the officers acted unreasonably here. *White*, 137 S. Ct. at 552 (2017). And other jurisdictions have found that comparable allegations will not constitute a seizure. *See* Section III.A.

Without clearly established rules for when the use of force, such as chemical irritants, to disperse rather than to detain constitutes a seizure, there is no "clearly established [right] at the time." *Wesby*, 138 S. Ct. at 589 (internal quotations omitted). The District Defendants are therefore entitled to qualified immunity, and plaintiffs' claim of unreasonable seizure under the Fourth Amendment should be dismissed.

## IV. Plaintiffs' Fourth Amendment Claims Against the District Should Be Dismissed Because Plaintiffs Have Not Alleged a Plausible Theory of Municipal Liability Under Section 1983.

Without adequately pleading a basis for municipal liability, plaintiffs' claims against the District cannot stand. *See Monell*, 436 U.S. 658. Plaintiffs contend that the District's deliberately indifferent training policies regarding officers' use of chemical irritants at demonstrations resulted in violations of their constitutional rights. Opp'n at 69. Plaintiffs contend that the District must have had notice that more or different training was necessary because the District of Columbia is a "unique venue for demonstrations" and officers are issued chemical irritants which may be used at such demonstrations, and because MPD purportedly has a long pattern of using excessive force against demonstrators. *Id.* at 70. Plaintiffs also assert that the egregious nature of the constitutional violations at issue here support an inference of widespread misconduct by MPD officers and a need for more or different training. *Id.* at 72–74. All of plaintiffs' contentions are unavailing. Because plaintiffs fail to adequately allege notice of and indifference to an unconstitutional custom, their claims against the District should be dismissed.

### A. Plaintiffs' Failure-To-Train Theory of Municipal Liability Is Deficient Because It Fails To Allege Notice.

None of plaintiffs' assertions plausibly imply that the District had notice of an unconstitutional custom or policy. First, plaintiffs assert that, even without specific prior examples of misconduct, the District's need to train officers was obvious since, based on the District's "unique venue for demonstrations," it "knew to a moral certainty" officers would be called upon to police demonstrations during which they

would need to know how and when to deploy chemical weapons. Opp'n at 70. This argument, however, rests upon an inaccuracy. As plaintiffs concede, the District *does* provide guidance to MPD officers regarding chemical irritants and control tactics. *See id.* at 72; D.C. MTD at 38. Indeed, plaintiffs suggest it is this very guidance to which the District was deliberately indifferent. *See* FAC ¶ 111. But to establish a failure to train claim—in which "[a] municipality's culpability for a deprivation of rights is at its most tenuous," *Connick v. Thompson*, 563 U.S. 51, 61 (2011)—plaintiffs must plead facts suggesting that "the need for *more* or *different* training is … obvious … ." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (emphasis added). Accordingly, because the District does provide training, and plaintiffs have not pled what more or different training is constitutionally required of the District, plaintiffs' argument that no specific incidents of misconduct are required to allege notice is flawed.

Second, plaintiffs assert that their interactions with the District Defendants, along with various purported incidents in the weeks that followed, flowed from a "pervasive problem" that the District had failed to fix. Opp'n at 70-72. This reasoning is also flawed. Plaintiffs first argue that "a pervasive problem" exists, but fail to plausibly allege a history of MPD mishandling demonstrations on a scale that could reasonably be construed as setting a pattern of constitutional abuse. *Id.* Five prior alleged incidents over twenty years do not illustrate a "persistent, tenacious problem" putting the District on notice that more or different training was necessary to avoid constitutional violations. *Id.* at 70; TAC ¶ 110. As the District Defendants explained, temporal proximity is crucial to establishing government notice for deliberate

indifference claims. *See* D.C. MTD at 36 (citing *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22 (D.D.C. 2011), *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 55 (D.D.C. 2005), *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 140 (D.D.C. 2015) and *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 140 (D.D.C. 2003)). Plaintiffs argue these cases are unavailing because they do not involve motions to dismiss, and involve "whether plaintiffs had evidence of what the District should have known." Opp'n at 70. But this argument ignores that the cited cases provide clear guidance as to the facts and allegations needed to sustain a deliberate indifference claim.

Plaintiffs here have conspicuously failed to plead such sufficient facts. "When a plaintiff seeks to establish municipal liability in the absence of an explicit policy, he must allege 'concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists.'" *Ryan v. District of Columbia*, 306 F. Supp. 3d 334, 346 (D.D.C. 2018) (quoting *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013)). "To clear this high hurdle, plaintiffs ordinarily couch 'custom or practice' liability on allegations of practices so persistent and widespread as to practically have the force of law." *Id.* (quoting *Page*, 999 F. Supp. 2d at 284). Here, plaintiffs contend that their allegations suffice to establish notice, but would have the Court decide this issue in a factual vacuum ignoring the time period of the incidents, the size of the District of Columbia's police department, the number of demonstrations policed, and the nature of the police actions involved. D.C. MTD at 31 (citing *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) and *Ramos v. City of Chicago*, 707 F. Supp. 345, 347 (N.D. 111. 1989)). And although plaintiffs

receive the benefit of reasonable inferences, plaintiffs must offer factual allegations to support those inferences. *Twombly*, 550 U.S. at 570. It is simply unreasonable to infer from plaintiffs' allegations a widespread pattern of wrongdoing leading up to June 1, 2020.

Plaintiffs are also mistaken in arguing that the Court can plausibly infer an "inadequately addressed" need for training based on instances of purported excessive force that followed June 1, 2020. Opp'n at 71–72. Plaintiffs aver that these alleged subsequent incidents flowed from a persistent pattern of MPD misconduct. Opp'n at 71. The flaw in plaintiffs' reasoning however, is that it assumes the incidents of officers deploying chemical irritants and using batons as described in the TAC are all incidents of unconstitutional uses of force, which plaintiffs have not sufficiently pled. *See Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 76–77 (D.D.C. 2005); TAC ¶¶ 113–14. As such, plaintiffs' theory of notice—and, in turn, deliberate indifference—based on the alleged events and the weeks after June 1, 2020 fails.

B.   <u>Plaintiffs Do Not Plausibly Allege the District Was Indifferent to a Need for Training</u>.

Plaintiffs have also failed to show that the District was indifferent to unconstitutionally deficient training. Plaintiffs argue that despite the passage of the First Amendment Assemblies Act (FAAA), D.C. Code § 5–331.01, *et seq.*, the District was deliberately indifferent to officers' need for training on the use of chemical irritants, asserting that an allegedly "paper" policy cannot insulate the District from its purported history of excessive force. Opp'n at 72. Plaintiffs' argument belies the legislative history of the FAAA. As explained, the legislation was passed in response

to certain incidents cited by plaintiffs. D.C. MTD at 38 (citing provisions of FAAA requiring training). Consequently, for plaintiffs to suggest the District was deliberately indifferent to training here is implausible. Plaintiffs' silence in their allegations as to any deficiencies in the District's training of officers as to FAAA standards, or indeed any deficiencies in the FAAA itself, further evince plaintiffs' failure to plausibly allege that the District was deliberately indifferent to constitutionally inadequate training. *See Canton v. Harris*, 489 U.S. 378, 390 (1989) ("*Monell's* rule that a city is not liable under [Section 1983] unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.").

Finally, plaintiffs allege that the "detailed and alarming allegations" of the District Defendants' conduct as alleged in this lawsuit independently provide a basis for concluding that plaintiff's deliberate indifference claim is "quite plausible." Opp'n at 73. However, to properly establish their claim, plaintiffs are required to show a course deliberately pursued by the District, and a pattern or policy of "concentrated, fully, packed, precisely delineated scenarios." *Ryan*, 306 F. Supp. 3d at 342–43 (quoting *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013)). Simply pointing to a single event that plaintiffs allege occurred to them, even if assumed to amount to a constitutional violation, does not meet this requirement. *See Doe v. District of Columbia*, 796 F.3d 96, 105 (D.C. Cir. 2015).

Plaintiffs have not provided any plausible basis for inferring municipal liability, and all claims should therefore be dismissed against the District.

## CONCLUSION

For the foregoing reasons, and the reasons in the District Defendants' motion to dismiss, the Court should grant the motion and dismiss with prejudice plaintiffs' claims against the District of Columbia Defendants.

Dated: December 17, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Duane Blackman
DUANE BLACKMAN*
RICHARD SOBIECKI [500163]
BRENDAN HEATH [1619960]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
Phone: (202) 805-7640; (202) 805-7512;
(202) 442-9880
Fax: (202) 703-0646
duane.blackman@dc.gov; richard.sobiecki@dc.gov;
brendan.heath@dc.gov

*Counsel for the District of Columbia Defendants*

---

\* Admitted to practice only in the State of New York. Practicing in the District of Columbia under the direct supervision of Fernando Amarillas, a member of the D.C. Bar, under LCvR 83.2(f).