## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No: 1:20-cv-01469-DLF |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ATTORNEY GENERAL WILLIAM P. BARR'S REPLY
## IN SUPPORT OF HIS MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6313130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov
*Counsel for Attorney General William P.
Barr in his individual capacity*

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................... 1

**DISCUSSION** ...................................................................................................... 2

I.   A *Bivens* claim is not available in this new context. ........................................... 2

    A.   Plaintiffs concede that their *Bivens* claims present a new context................................. 4

    B.   Special factors preclude a *Bivens* remedy in the presidential-security context................ 5

        i.   Plaintiffs concede presidential-security concerns cut against a novel *Bivens* remedy. 5

        ii.   Plaintiffs concede that Congress has legislated heavily in the presidential security field without authorizing a personal damages remedy. .............................................. 10

        iii.   Plaintiffs do not dispute that they seek sensitive, high-level information................. 11

        iv.   Plaintiffs acknowledge that alternative processes are available to them.................. 13

II.   The Attorney General is entitled to qualified immunity based on his lack of involvement and the lack of a clearly established constitutional violation............................................. 15

    A.   Plaintiffs misconstrue the qualified immunity standard................................................. 15

    B.   Plaintiffs' conclusory allegations fail to show the Attorney General's personal involvement in alleged violations of clearly established constitutional rights. .............. 17

    C.   The Attorney General has qualified immunity from the First Amendment claim........ 20

    D.   The Attorney General has qualified immunity from the Fourth Amendment claim...... 24

    E.   Amici's support of plaintiffs' constitutional claims is unavailing. ............................... 27

    F.   The Attorney General has qualified immunity from the statutory claims...................... 30

        i.   Plaintiffs fail to allege the existence of, or the Attorney General's membership in, a conspiracy under 42 U.S.C. §§ 1985(3) and 1986. .................................................. 30

        ii.   Plaintiffs fail to allege the Attorney General had the requisite animus.................... 33

        iii.   Amici's statutory arguments are contrary to established precedent......................... 38

**CONCLUSION** .................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Adams v. Metiva*,
   31 F.3d 375 (6th Cir. 1994) ............................................................................. 26

*Adams v. Teamsters Local 115*,
   214 F. App'x 167 (3d Cir. 2007) ...................................................................... 33

*Aguilar v. ICE*,
   No. 07 Civ. 8224, 2011 WL 13258226 (S.D.N.Y. Jan. 11, 2011) .................. 11

*Al-Bihani v. Obama*,
   619 F.3d 1 (D.C. Cir. 2010) ............................................................................ 28

*Alharbi v. Miller*,
   368 F. Supp. 3d 527 (E.D.N.Y. 2019) ............................................................ 40

*Allen v. Lang*,
   738 F. App'x 934 (10th Cir. 2018) .................................................................. 19

*Am. Entertainers, L.L.C. v. City of Rocky Mount*,
   888 F.3d 707 (4th Cir. 2018) ........................................................................... 22

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ........................................................................................ 16

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
   138 S. Ct. 1865 (2018) .................................................................................... 29

\*  *Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. passim

*Barham v. Ramsey*,
   434 F.3d 565 (D.C. Cir. 2006) ........................................................................ 27

*Barr v. Clinton*,
   370 F.3d 1196 (D.C. Cir. 2004) ...................................................................... 38

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................... 19, 31

\*  *Berg v. Kelly*,
   897 F.3d 99 (2d Cir. 2018) .............................................................................. 24

*Bernini v. City of St. Paul*,
   665 F.3d 997 (8th Cir. 2012) ........................................................................... 29

*Bible Believers v. Wayne Cty.*,
   805 F.3d 228 (6th Cir. 2015) ........................................................................... 22

*Biswas v. City of New York*,
   973 F. Supp. 2d 504 (S.D.N.Y. 2013) ............................................................ 37

*Bloem v. Unknown Dep't of the Interior Emps.*,
   920 F. Supp. 2d 154 (D.D.C. 2013) .................................................................. 8

\* *Bray v. Alexandria Women's Health Clinic*,
 506 U.S. 263 (1993) ............................................................. 36, 37

*Bridges v. California*,
 314 U.S. 252 (1941) .................................................................. 22

*Bundy v. Sessions*,
 387 F. Supp. 3d 121 (D.D.C. 2019) ........................................ 17

*Burns v. State Police Ass'n*,
 230 F.3d 8 (1st Cir. 2000) ....................................................... 37

*Carlson v. Green*,
 446 U.S. 14 (1980) ........................................................... passim

*City of Omaha Emps. Betterment Ass'n v. City of Omaha*,
 883 F.2d 650 (8th Cir. 1989) ................................................... 37

*Collins v. Hardyman*,
 341 U.S. 651 (1951) ..................................................... 34, 35, 39

*Corr. Servs. Corp. v. Malesko*,
 534 U.S. 61 (2001) ..................................................................... 3

*Davis v. Jefferson Hosp. Ass'n*,
 685 F.3d 675 (8th Cir. 2012) ................................................... 30

*Dellums v. Powell*,
 566 F.2d 167 (D.C. Cir. 1977) ................................................... 7

*Felarca v. Birgeneau*,
 891 F.3d 809 (9th Cir. 2018) ................................................... 26

*Fogarty v. Gallegos*,
 523 F.3d 1147 (10th Cir. 2008) ............................................... 27

*Graber v. Dales*,
 No. CV 18-3168, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019)........................... 8, 9

*Graham v. Connor*,
 490 U.S. 386 (1989) ........................................................... 26, 29

*Gregoire v. Biddle*,
 177 F.2d 579 (2d Cir. 1949) .................................................... 40

*Griffin v. Breckenridge*,
 403 U.S. 88 (1971) ....................................................... 34, 35, 36

*Hartley v. Wilfert*,
 918 F. Supp. 2d 45 (D.D.C. 2013) ............................................. 8

*Headwaters Forest Def. v. Cty. of Humboldt*,
 276 F.3d 1125 (9th Cir. 2002).................................................. 27

*Henderson v. Munn*,
 439 F.3d 497 (8th Cir. 2006).................................................. 26

*Hernandez v. Joliet Police Dep't*,
 197 F.3d 256 (7th Cir. 1999) ................................................... 31

\*     *Hernandez v. Mesa*,
        140 S. Ct. 735 (2020) ................................................................................ passim

      *Hobson v. Wilson*,
        737 F.2d 1 (D.C. Cir. 1984) ...................................................................... 8, 40

      *Hunter v Bryant*,
        502 U.S. 224 (1991) ........................................................................................ 13

      *Islamic Am. Relief Agency v. Gonzales*,
        477 F.3d 728 (D.C. Cir. 2007) ..................................................................... 19

      *K.O. v. U.S. Immigr. & Customs Enf't*,
        468 F. Supp. 3d 350 (D.D.C. 2020) ............................................................ 32

      *Keating v. City of Miami*,
        598 F.3d 753 (11th Cir. 2010) ..................................................................... 18

      *Kelly v. City of Omaha*,
        813 F.3d 1070 (8th Cir. Feb. 18, 2016) ...................................................... 38

      *Knowlton v. United States*,
        111 F. Supp. 2d 1 (D.D.C. 1999) ........................................................... 38, 39

      *Kurd v. Republic of Turkey*,
        374 F. Supp. 3d 37 (D.D.C. 2019) ............................................................. 30

      *Lagayan v. Odeh*,
        199 F. Supp. 3d 21 (D.D.C. 2016) ............................................................. 34

      *Lash v. Lemke*,
        786 F.3d 1 (D.C. Cir. 2015) ......................................................................... 8

      *Lederman v. United States*,
        131 F. Supp. 2d 46 (D.D.C. 2001) ............................................................... 8

      *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*,
        881 F.3d 912 (D.C. Cir. 2018) ...................................................................... 2

      *Linlor v. Polson*,
        263 F. Supp. 3d 613 (E.D. Va. 2017) ........................................................... 8

\*     *Loumiet v. United States*,
        948 F.3d 376 (D.C. Cir. 2020) .................................................................. 5, 6

      *Masel v. Barrett*,
        707 F. Supp. 4 (D.D.C. 1989) ....................................................................... 8

      *Medellin v. Texas*,
        552 U.S. 491 (2008) ...................................................................................... 28

      *Mengert v. TSA*,
        No. 19-cv-304, 2020 WL 7029893 (N.D. Okla. Nov. 30, 2020) ................ 9

      *Menotti v. City of Seattle*,
        409 F.3d 1113 (9th Cir. 2005) ............................................................... passim

      *Meshal v. Higgenbotham*,
        804 F.3d 417 (D.C. Cir. 2015) ............................................................... passim

iv

*Moss v. U.S. Secret Serv.*,
  711 F.3d 941 (9th Cir. 2013)..................................................................................17
*Oliveras v. Basile*,
  440 F. Supp. 3d 365 (S.D.N.Y. 2020)....................................................................14
*Pahssen v. Merrill Cmty. Sch. Dist.*,
  668 F.3d 356 (6th Cir. 2012)..................................................................................38
*Paquete Habana*,
  175 U.S. 677 (1900) ..........................................................................................28, 29
*Patterson v. United States*,
  999 F. Supp. 2d 300 (D.D.C. 2013) .........................................................................8
*Pearson v. Callahan*,
  555 U.S. 223 (2009) ...............................................................................................29
*Personnel Administrator of Mass. v. Feeney*,
  442 U.S. 256 (1979) ...............................................................................................37
*Quaker Action Grp. v. Morton*,
  516 F.2d 717 (D.C. Cir. 1975) .................................................................................6
*Reichle v. Howards*,
  566 U.S. 658 (2012) ...............................................................................................16
*Richards v. Gelsomino*,
  No. CV 16-1002, 2019 WL 1535466 (D.D.C. Apr. 8, 2019) .................................34
*Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*,
  861 F. Supp. 2d 470 (M.D. Pa. 2012) ....................................................................31
*Robinson v. Allstate Ins. Co.*,
  508 F. App'x 7 (2d Cir. 2013)..................................................................................38
*Roper v. Simmons*,
  543 U.S. 551 (2005) ...............................................................................................29
*Santistevan v. Loveridge*,
  732 F.2d 116 (10th Cir. 1984).................................................................................40
*Saucier v. Katz*,
  533 U.S. 194 (2001) ...............................................................................................24
*Schweiker v. Chilicky*,
  487 U.S. 412 (1988) ...............................................................................................11
*Scruggs v. Nielsen*,
  No. 18 cv 2109, 2019 WL 1382159, at *5 (N.D. Ill. Mar. 27, 2019) .......................9
*Seibert v. Baptist*,
  594 F.2d 423 (5th Cir. 1979)...................................................................................40
*Siegert v. Gilley*,
  500 U.S. 226 (1991) ...............................................................................................19
*Simmons v. Poe*,
  47 F.3d 1370 (4th Cir. 1995)...................................................................................38

*Sines v. Kessler*,
    324 F. Supp. 3d 765 (W.D. Va. 2018) ............................................................ 33

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) .......................................................................................... 28

*Startzell v. City of Philadelphia*,
    533 F.3d 183 (3d Cir. 2008) ....................................................................... 22, 38

*Tanzin v. Tanvir*,
    No. 19-71, 2020 WL 7250100 (U.S. Dec. 10, 2020) .................................... 3, 4

*Tel-Oren v. Libyan Arab Republic*,
    726 F.2d 774 (D.C. Cir. 1984) ......................................................................... 28

*Tonkovich v. Kansas Bd. of Regents*,
    159 F.3d 504 (10th Cir. 1998) .......................................................................... 31

*Torossian v. Hayo*,
    45 F. Supp. 2d 63 (D.D.C. 1999) ....................................................................... 8

*United States v. Armstrong*,
    517 U.S. 456 (1996) .......................................................................................... 34

*United States v. Flynn*,
    216 F.2d 354 (2d Cir. 1954) ............................................................................. 35

*United States v. Stanley*,
    483 U.S. 669 (1987) ............................................................................................ 9

*Vanderklok v. United States*,
    868 F.3d 189 (3d Cir. 2017) ..................................................................... 6, 9, 14

*Vinyard v. Wilson*,
    311 F.3d 1340 (11th Cir. 2002) ........................................................................ 26

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .......................................................................................... 29

*Watts v. United States*,
    394 U.S. 705 (1969) ............................................................................................ 7

*White House Vigil for ERA Comm. v. Clark*,
    746 F.2d 1518 (D.C. Cir. 1984) .............................................................. 7, 9, 26

*White v. Berger*,
    709 F. App'x 532 (11th Cir. 2017) ................................................................... 35

*White v. Jackson*,
    865 F.3d 1064 (8th Cir. 2017) .......................................................................... 26

*Wilkie v. Robbins*,
    551 U.S. 537 (2007) .......................................................................................... 13

\* *Wood v. Moss*,
    572 U.S. 744 (2014) ................................................................................... passim

*Young v. Akal*,
    985 F. Supp. 2d 785 (W.D. La. 2013) .............................................................. 26

\*       *Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ........................................................................... passim

**Statutes**

18 U.S.C. §§ 241-42 ................................................................................. 14
28 U.S.C. § 2674 ............................................................................... 13, 14
28 U.S.C. § 2679(b)(1) ............................................................................. 14
42 U.S.C. § 1983 ............................................................................... 31, 37
42 U.S.C. § 1985(3) ......................................................................... passim
42 U.S.C. § 1986 ..................................................................................... 30

**Other Authorities**

16 Am. Jur. 2d Conspiracy § 53 ............................................................. 36
*Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*,
    H. Rep. No. 95-1828, pt. 2 (1979) ...................................................... 11
Report of The President's Commission on the Assassination of President Kennedy
    (1964) ...................................................................................................... 7

Mayor's Order 2020-68 ..................................................................... 25, 27
Mayor's Order 2020-69 ........................................................................... 25

## INTRODUCTION

Plaintiffs' opposition to dismissal is mostly about strawmen, attacking arguments that the Attorney General does not make or actions it's not even alleged that he personally took. *See* ECF No. 98 ("Opp."). More telling is what plaintiffs do not dispute, which compels dismissal of their claims. Plaintiffs acknowledge that extensions of *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), are disfavored, concede that their *Bivens* claims arise in a new context, and admit that presidential-security concerns counsel hesitation. Regarding qualified immunity, plaintiffs not only concede that presidential security is a compelling interest but also admit there is no allegation that the Attorney General—himself—gave specific tactical orders, interacted with plaintiffs, or harbored racial animus when he allegedly ordered Lafayette Square cleared minutes before the President's arrival there. These concessions are dispositive.

The Supreme Court has observed that any large crowd within "weapons range" of the President—even an allegedly peaceful one—presents inherent security threats. *Wood v. Moss*, 572 U.S. 744, 763 (2014). Plaintiffs counter that the Attorney General has "magic[ally]" introduced "presidential security" concerns into the case that are not alleged and that are at odds with his testimony to Congress. Opp. at 2; *see id.* at 23, 31, 37. But it is plaintiffs who play a sleight of hand: their own complaint asserts the Attorney General ordered Lafayette Square cleared so that the President could appear with senior officials at a church that sits on Lafayette Square. Third Amended Compl. ("TAC") ¶¶ 4, 78-80, 202-04. And by invoking the words "peaceful protest," Opp. at 17, 18, 32, 36, it is plaintiffs who rely on an empty "talisman," *id*. at 20, hoping to ward off binding precedent like *Moss*. Though the Attorney General disagrees with plaintiffs' characterization of the incident, he must defend against plaintiffs' claims as alleged. And as alleged, the claims against the Attorney General warrant dismissal with prejudice.

## DISCUSSION

### I.  A *Bivens* claim is not available in this new context.

The parties agree that extending *Bivens* liability to new contexts is a "disfavored" judicial activity. Mot. at 6-8; Opp. at 42.[1] Indeed, the Supreme Court reaffirmed that proposition—and the related notion that *Bivens* was the byproduct of an "*ancien regime*"—earlier this year. *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *accord Ziglar v. Abbasi*, 137 S. Ct. 1843, 1848 (2017); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Notwithstanding the weight of recent controlling authority, plaintiffs direct this Court to "pre-Revolutionary English cases" and another "early" decision in which executive officials were held liable in damages. Opp. at 40. While plaintiffs suggest these centuries-old cases (none of which involved alleged violations of the U.S. Constitution) establish a foundation for new extra-statutory remedies under *Bivens*, the Supreme Court simply does not agree: "[F]ederal courts today cannot fashion new claims in the way that they could before 1938." *Hernandez*, 140 S. Ct at 742. And that command isn't strictly limited to implied remedies under "statutory causes of action," as plaintiffs incorrectly suggest. Opp. at 41 n.3. The Supreme Court has been "at least equally," if not more, "reluctant to create new causes of action" for damages in "constitutional cases" like this one. *Hernandez*, 140 S. Ct. at 742. "In both statutory and constitutional cases," the Court's "watchword is caution." *Id.*

Because the Supreme Court has repeatedly cautioned that extending *Bivens* is disfavored, plaintiffs suggest that "Congress indicated its acceptance of the *Bivens* remedy" through amendments to the Federal Tort Claims Act. Opp. at 41 & n.4. But this broad-brush argument was tacitly rejected in *each* of the Supreme Court's special-factors cases that were decided after

---

[1] Although plaintiffs address qualified immunity first, *see* Opp. at 16-40, the Court must "decide[] the availability of a *Bivens* remedy as a threshold question[.]" *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 915 (D.C. Cir. 2018); *see also* Mot. at 6.

these amendments. In any event, the D.C. Circuit opined that expansions to *Bivens* on the basis

of the FTCA amendments are "open to doubt." *Meshal v. Higgenbotham*, 804 F.3d 417, 428

(D.C. Cir. 2015) (rejecting a *Bivens* remedy). Congress may have believed "*Bivens* was a

constitutionally required decision" when it amended the FTCA. *Id.* (quoting *Carlson v. Green*,

446 U.S. 14, 33 n.2 (1980) (Rehnquist, J., dissenting)). But "uncertain interpretations of what

Congress did in 1973 and 1988 cannot overcome the weight of authority against expanding

*Biven*s" that has emerged since then. *Id.*

The Supreme Court reaffirmed that point again this year. *See Hernandez*, 140 S. Ct. at

748 n.9 (rejecting argument that "Congress intended for a robust enforcement of *Bivens*

remedies" through the FTCA amendments) (internal quotation marks and citation omitted).

Rather than addressing *Hernandez*, plaintiffs direct this Court to *Tanzin v. Tanvir*, No. 19-71,

2020 WL 7250100 (U.S. Dec. 10, 2020). *See* Pls.' Notice of Supplemental Authority, ECF No.

121. Though *Tanzin* (like *Hernandez*) recognized the unremarkable proposition that the FTCA

amendments exclude constitutional claims, those amended provisions "simply left *Bivens* where

[Congress] found it." *Hernandez*, 140 S. Ct. at 748 n.9. The FTCA amendments are "not a

license to create a new *Bivens* remedy in a context [the Supreme Court has] never before

addressed." *Id.* (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

If anything, *Tanzin* reinforces the notion that judicially created damages remedies are

disfavored. As plaintiffs concede, *Tanzin* was not a *Bivens* case; it was a case involving an

"express remedies provision" authored by Congress. *Tanzin*, 2020 WL 7250100, at *5. Because

Congress had already provided a remedy, the Supreme Court rejected the government's request

(based on "separation-of-powers") to limit relief under the statute. *Id*. at *5. Unlike *Tanzin*, the

Attorney General is not asking the Court to "create a new policy-based presumption against

damages for individual officials" in cases where Congress already authorized a remedy. ECF No.

121 at 3 (quoting *Tanzin*, 2020 WL 7250100, at *5). Rather, it is plaintiffs who ask the Court to create a new damages remedy that Congress has never approved in this unique context.[2]

**A.  Plaintiffs concede that their *Bivens* claims present a new context.**

The Attorney General identified a host of *Abbasi* factors demonstrating that plaintiffs' claims present a new *Bivens* context: the nature of plaintiffs' claims, the Attorney General's senior rank, the lack of clear judicial guidance balancing protest rights against presidential security, and the risk of disrupting law-enforcement decisions designed to protect the President's safety. Mot. at 8-12. Plaintiffs do not dispute these factors, instead "[a]ssuming for the sake of argument" their case is "new" under the *Abbasi* framework. Opp. at 42-43 (observing that *Bivens* "did not concern the First Amendment or a Fourth Amendment claim about a protest").

That concession is critical: if a case presents a new context, an *Abbasi* special factors analysis is "required." 137 S. Ct. at 1859. Moreover, that the context here is so unique—a fact evident from both the number and nature of the *Abbasi* factors plus plaintiffs' concession—is also "highly probative" of the conclusion that extending *Bivens* far afield is unwarranted. *Meshal*, 804 F.3d at 426; Mot. at 11-12. And that is particularly true where the salient new-context indicators (*e.g.*, presidential security) themselves double as special factors. *Cf. Abbasi*, 137 S. Ct. at 1860 (new context can be inferred from "potential special factors that previous *Bivens* cases did not consider").[3]

---

[2] While plaintiffs also assert (based on *Tanzin*) that *Bivens* "is firmly embedded in, and enjoys strong support from, our nation's legal history," ECF No. 121 at 2, the Supreme Court in *Tanzin* was careful to note that damages against federal officers had historically been made available through "common-law causes of action." *Tanzin*, 2020 WL 7250100, at *5. But "[w]ith the demise of federal general common law, a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress." *Hernandez*, 140 S. Ct. at 742.

[3] While accepting that their claims present a new context under the controlling *Abbasi* framework, plaintiffs cite several cases in which courts in this circuit previously "applied *Bivens*

**B.  Special factors preclude a *Bivens* remedy in the presidential-security context.**

   **i.      Plaintiffs concede presidential-security concerns cut against a novel *Bivens* remedy.**

Plaintiffs acknowledge the "importance" of "national and presidential security" considerations and concede that these important interests "can constitute a special factor for *Bivens* purposes in some circumstances." Opp. at 48. Yet they wrongly assert without any legal basis that any presidential-security justification in this instance is a "canard" for three reasons: plaintiffs were (1) allegedly "law abiding and peaceful," (2) located "in Lafayette Square, not on the White House Lawn," and (3) did not initiate the confrontation. *Id.* at 49. The Supreme Court, in a highly relevant case that plaintiffs conveniently ignore, rejected each of these arguments as a basis to override presidential security in the protest context. *See Moss*, 572 U.S. at 744.

In a unanimous ruling, the Supreme Court in *Moss* granted qualified immunity to secret service agents who relocated protesters of President Bush (but not his supporters) to establish a security perimeter. As plaintiffs allege here, the protesters in *Moss* were peaceful and law-abiding. *See id.* at 749-55. They had assembled in Oregon, not within a stone's throw of the White House. *See id.* And they did not provoke any confrontation; Secret Service agents initiated the relocation of the protesters after President Bush decided to dine in their vicinity. *See id.* None of these factors diminished the *inherent* security concerns implicated by the presence of a large crowd near the President. Because the protesters were "within weapons range" of the president, the Court stated the obvious: "the protesters cannot plausibly urge that the agents 'had no valid security reason to request or order the[ir] eviction.'" *Id.* at 763 (quoting protesters).

---

to violations of demonstrators' constitutional rights." Opp. at 42. But each of those cases were decided before *Abbasi,* and as previously shown, Mot. at 8, "those cases have been overtaken by *Abbasi*'s holding that the new-context analysis may consider only Supreme Court decisions approving *Bivens* actions." *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020).

So, too, here. Accepting as true plaintiffs' allegation that the park was cleared for the President's appearance, that allegation reflects the presidential security interests justifying the clearing and refutes plaintiffs' assertion that no valid security justification existed. Indeed, the protesters in Lafayette Square were allegedly dispersed in order to facilitate the President's remarks and photo opportunity at St. John's Church, which sits *on* Lafayette Square. TAC ¶¶ 4, 78-80, 202-04. "[B]ecause of their location, the protesters posed a potential security risk to the President" as he walked from the White House—through Lafayette Square—to the church. *Moss*, 572 U.S. at 762. As the D.C. Circuit has long recognized, "it cannot be denied that a public gathering presents some measure of hazard to the security of the President and the White House." *Quaker Action Grp. v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975). This case squarely implicates presidential-security concerns, which in turn independently counsel against extending *Bivens*. *See Abbasi*, 137 S. Ct. at 1861; *Hernandez*, 140 S. Ct. at 747.[4]

Rather than grappling with *Moss*, Plaintiffs cite lower-court cases in which courts previously held that protesters may bring *Bivens* claims. *See* Opp. at 44-45 (collecting cases). As noted above, however, all of these cases were decided before *Abbasi* and thus do not govern. *See Loumiet*, 948 F.3d at 382; *accord Vanderklok v. United States*, 868 F.3d 189, 199-200 (3d Cir. 2017) (observing that lower courts' "past pronouncements" on *Bivens* are "not controlling" after *Abbasi*, meaning courts must consider the issue "anew"). And none of them presented anything

---

[4] Because any large crowd in the President's vicinity poses innate security threats, the Attorney General's argument does *not* depend on "facts beyond the complaint." Opp. at 48. But we note that plaintiffs' characterization of the protests neither comports with the illegal acts described in the D.C. Mayor's judicially noticeable emergency order nor with facts reported in newspaper articles cited in the complaint. *See* Mot. at 2 nn.2-3. Although plaintiffs do *not* oppose the Court's consideration of facts from the Mayor's order, they do object to certain facts derived from their news articles. Opp. at 22 n.1. Plaintiffs cannot credibly claim these articles are not "integral to their claim." *Id.* The key allegation—that the Attorney General issued the dispersal order—is derived from an official quoted in the Washington Post. *See* Opp. at 58; *see also* Mot. 35 n.18. Regardless, presidential-safety concerns are self-evident from the allegations alone.

like the question at issue: whether the Attorney General's order to disperse thousands of

unscreened protesters in weapons range of the President can be litigated by way of an individual-

capacity damages action against him. Indeed, none of plaintiffs' pre-*Abbasi* cases involved

concerns for the President's safety in a crowd, no less at a time of civil unrest.

The primary case plaintiffs discuss involved the arrest of protesters of the Vietnam War

in front of the U.S. Capitol more than 40 years before *Abbasi*—not the dispersal of thousands of

unscreened protesters in front of the White House and within weapons range of where the

President planned to speak. *See Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977). That

distinction is not trivial, as plaintiffs claim without authority. *See* Opp. at 44. Rather, as the

Supreme Court and D.C. Circuit have repeatedly observed, the President occupies a unique role

in our constitutional structure, and his safety presents an "overwhelming" national-security

concern. *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam); *see also, e.g.*, *White*

*House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (collecting cases);

REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, p.

426 (1964) (describing difficulty of protecting a president given multiple roles as "Head of State,

Chief Executive, Commander in Chief, and leader of a political party").

In addition, to the extent *Dellums* attempted a "special factors" analysis, the court only

assessed whether it could make "the types of judgment concerning causation and magnitude of

injury necessary to accord meaningful compensation[.]" 566 F.2d at 194 (internal quotation

marks and citation omitted). But that standard was retired decades ago. *See Abbasi* 137 S. Ct. at

1858 (collecting cases). The present day analysis is whether "there are sound reasons to think

Congress might doubt the efficacy or necessity of a damages remedy as part of the system for

enforcing the law and correcting a wrong[.]" *Id.* Because there are many reasons Congress might doubt a new remedy in this context, "the court[] must refrain from creating the remedy[.]" *Id.*[5]

The only post-*Abbasi* cases plaintiffs discuss are two district court decisions from other circuits. *See* Opp. at 49 (citing *Linlor v. Polson*, 263 F. Supp. 3d 613 (E.D. Va. 2017); *Graber v. Dales*, No. CV 18-3168, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019)). Like the pre-*Abbasi* cases plaintiffs cite, neither of these cases involved presidential-security considerations. In *Linlor*, the district court expanded *Bivens* to the TSA screening process notwithstanding "the risk that implying a *Bivens* remedy [] might chill legitimate TSA activity and discourage TSA officers from performing appropriately thorough security screenings." 263 F. Supp. 3d at 623. The court opined that it is "the purpose of qualified immunity to provide TSA officers with the breathing room they require to operate effectively," *id.* at 624, a point plaintiffs echo in their brief, *see* Opp. at 50 ("[S]ufficient deference to decisions made based on national security is embodied in the substantive First and Fourth Amendment standards themselves.").

But plaintiffs' argument is undercut by the Supreme Court's warning that courts must— as a threshold matter—tread carefully before minting a damages remedy in the national-security context that "might" cause officers to "refrain from taking urgent and lawful action[.]" *Abbasi*,

---

[5] As noted above, none of the other pre-*Abbasi* cases cited involved the presidential-security concerns at issue. *See Lash v. Lemke*, 786 F.3d 1, 4 (D.C. Cir. 2015) (arrest of protester during anti-camping enforcement); *Hobson v. Wilson,* 737 F.2d 1 (D.C. Cir. 1984) (claims arising from FBI's "COINTELPRO" operation); *Patterson v. United States*, 999 F. Supp. 2d 300, 303 (D.D.C. 2013) (arrest for profanity); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 47 (D.D.C. 2013) (harassing protester on White House sidewalk wearing a vest displaying: "Walking to the White House"); *Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 157 (D.D.C. 2013) (confiscation and destruction of protesters' camping gear); *Lederman v. United States*, 131 F. Supp. 2d 46, 48 (D.D.C. 2001) (arrest of protester leafletting and holding sign in front of the Capitol); *Torossian v. Hayo*, 45 F. Supp. 2d 63, 65 (D.D.C. 1999) (prohibiting protesters from disrupting protest activities of others); *Masel v. Barrett*, 707 F. Supp. 4, 6 (D.D.C. 1989) (arrest and beating of protester carrying banner in front of the White House).

137 S. Ct. at 1863; *cf. United States v. Stanley*, 483 U.S. 669, 681 (1987) (special factors analysis turned on "how much occasional, unintended impairment of military discipline one is willing to tolerate"). And though *Linlor* itself was not appealed, it is an outlier, and its rationale has been repeatedly rejected, even in the airport-security context. *See, e.g.*, *Vanderklok*, 868 F.3d at 207 (declining to extend *Bivens* remedy in part because "[t]he threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers").[6] Ironically, plaintiffs' citation to *Graber*, involving an arrest outside the 2016 Democratic National Convention, proves the point. While the court in *Graber* approved a *Bivens* claim, the court itself suggested that its ruling would have been different had the facts involved *the President's* security: "[t]he potential for chilling decisive action in the course of protecting Presidents would indeed give the Court pause." 2019 WL 4805241, at *5.

Because plaintiffs' cases primarily pre-date *Abbasi*, espouse outdated special-factors analyses, or have nothing at all to do with presidential security, plaintiffs are left drawing irrelevant distinctions between this case and *Abbasi* and *Hernandez*. *See* Opp. at 46. While the specific security concerns that were at issue in those cases differed from the nature of the threat here (*i.e.*, protecting a President in a crowd), those differences don't diminish the "significance" of this particular threat. *White House Vigil for ERA Comm.*, 746 F.2d at 1528. If anything, failing to protect the President's safety—which implicates "the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world," *id.*—presents greater national-security concerns than the considerations that led to the tragic death of the boy in *Hernandez*. *See* Mot. at 5, 13-16.

---

[6] *See also Mengert v. TSA*, No. 19-cv-304, 2020 WL 7029893, at *9 (N.D. Okla. Nov. 30, 2020); *Scruggs v. Nielsen*, No. 18 cv 2109, 2019 WL 1382159, at *5 (N.D. Ill. Mar. 27, 2019); Memorandum and Recommendation, *Osmon v. United States*, No. 1:20-cv-31 (W.D.N.C. Dec. 7, 2020), ECF No. 21, at 25-28.

Though it would have been unthinkable for the Attorney General to risk the President's safety in a large crowd of unscreened protesters at a time of civil unrest, plaintiffs instead posit that the "national security interest" implicated here was "attenuated." Opp. at 46. But whether presidential-security concerns somehow required the crowd's dispersal isn't the relevant inquiry, as the Supreme Court observed when rejecting a similar argument made in *Hernandez*:

> Petitioners protest that shooting people who are just walking down a street in Mexico does not involve national security, but that misses the point. The question is not whether national security requires such conduct—of course, it does not—but whether the Judiciary should alter the framework established by the political branches for addressing cases in which it is alleged that lethal force was unlawfully employed by an agent at the border.

140 S. Ct. at 746 (internal quotation marks and citation omitted). The relevant question here is whether this Court should alter the framework established by Congress for addressing cases in which protesters allege that their rights were violated in the name of presidential security. The answer to that question, which the Attorney General discussed at length in his opening brief and reprises next, goes virtually unanswered by plaintiffs.

### ii. Plaintiffs concede that Congress has legislated heavily in the presidential security field without authorizing a personal damages remedy.

In painstaking detail, the Attorney General demonstrated that Congress has repeatedly balanced presidential-security concerns against the rights of individuals to peacefully protest without ever authorizing a damages remedy against federal officers. Mot. at 16-21 (discussing Congress's response to presidential assassinations, terrorist attacks, and White House breaches). While conceding that "Congress has legislated heavily in the field of presidential security," plaintiffs bizarrely assert the Attorney General has "misidentifie[d] the relevant field" because Congress has "*not* 'legislated pervasively' on the topic of demonstrators' rights." Opp. at 50 (quoting Mot. at 21). But that's the point. Congress's "silence" in declining to provide protesters with a damages remedy against federal officers means the Court should not legislate an extra-

statutory remedy now. *Abbasi*, 137 S. Ct. at 1862. As discussed, *see* Mot. at 18, Congress was

"acutely aware" of and "mindful of the need to weigh the costs that could accrue the individual

privacy, group protest, legitimate dissent, political competition and social change against the

benefits of stronger protective measures" for the President. *Final Report: Summary of Findings*

*and Recommendations, H. Select Comm. on Assassinations*, H. REP. NO. 95-1828, pt. 2, at 464

(1979) (citation omitted). It is not this Court's role to "find[] a balance between liberty and

order" in the form of a damages remedy that Congress never thought wise to approve. *Id.*

Notwithstanding Congress's careful attention to the issue, plaintiffs also return to an

earlier theme, speculating that lawmakers' refusal to create a personal damages remedy would be

"expect[ed]" in light of "Congress's implied acceptance of *Bivens* via the FTCA." Opp. at 50

(citing *Carlson*, 446 U.S. at 19-20 & n.5); *see also id.* at 41 & n.4. But as noted above, "mere

congressional acquiescence to *Bivens* may not be the same as congressional ratification."

*Meshal*, 804 F.3d at 428. In any event, the Supreme Court has rejected plaintiffs' interpretation:

Congress's silence in the face of "frequent and intense" scrutiny counsels against a new *Bivens*

remedy. *Abbasi*, 137 S. Ct. at 1862 (detainee abuse); *Schweiker v. Chilicky*, 487 U.S. 412, 425

(1988) (social security); Mot. at 20-21; *see also Hernandez*, 140 S. Ct. at 747-49 & n.9.

> **iii.     Plaintiffs do not dispute that they seek sensitive, high-level information.**

The Attorney General demonstrated that plaintiffs' claims pose the risk of significant

burdens and distractions on the Attorney General—and by extension the President and other

senior officials. Mot. at 22-23. As discussed in *Abbasi*, these burdens could have a devastating

chilling effect on "the proper discharge" of national-security obligations. 137 S. Ct. at 1860.

Plaintiffs respond that these "distraction" concerns are "completely undercut" because the

Attorney General is soon leaving office. Opp. at 54 (citing *Aguilar v. ICE*, No. 07 Civ. 8224,

2011 WL 13258226, at *3 (S.D.N.Y. Jan. 11, 2011)). But the Supreme Court completely

eviscerated plaintiffs' reasoning when it made clear in *Abbasi* that these concerns (like immunity defenses) apply not only to current officeholders but "more precise[ly]" to protect "future officials like them[.]" 137 S. Ct. at 1860. Indeed, former Attorney General Ashcroft and former FBI Director Mueller were both far removed from office—twelve and four years, respectively— when the Court in *Abbasi* dismissed *Bivens* claims against them based in part on these concerns.

The Attorney General also explained that special factors counsel hesitation here because plaintiffs' case is designed to probe sensitive "discussion and deliberations" between the President, cabinet members, and other senior officials. *Abbasi*, 137 S. Ct. at 1860-61; Mot. at 23. Plaintiffs suggest seeking this information but claim the related concerns are mitigated because no "policy" was actually at issue. Opp. at 53. That is a red herring. While the government surely does not have a "policy of attacking peaceful demonstrators," *id.*, *see* Mot. at 3-4, the high-level decision to clear unscreened protesters in the President's vicinity was a "governmental act" that both implicated presidential-security policy and applied "general[ly]" to all persons who were in Lafayette Square. *Abbasi*, 137 S. Ct. at 1860; *cf. Moss*, 572 U.S. at 762-73 (discussing secret service policy regarding protest). Plaintiffs' ultimate conclusion that a *Bivens* claim is available because the Attorney General's alleged acts "involve[d] discrete conduct," Opp. at 54, also ignores Supreme Court guidance that a suit "confined to the conduct of a particular Executive Officer in a discrete instance" can still "call into question the formulation and implementation of a general policy," *Abbasi*, 137 S. Ct. at 1860; Mot. at 26.[7] Regardless of how they characterize it,

---

[7] Plaintiffs' attempt to differentiate recent cases in which D.C. federal courts declined to extend *Bivens* liability to Attorney General Sessions—notwithstanding his alleged role in setting a policy of separating families at the border—fails for similar reasons. Opp. at 54. The plaintiffs in those cases did not claim Attorney General Sessions "personally took or directed specific actions" to separate them, Opp. at 54, and the same is true here: There is no allegation Attorney General Barr personally removed, arrested, or assaulted anyone; it is only alleged that he gave a general dispersal order before the President arrived on scene. There is no allegation the Attorney General gave specific directions about how to clear the area, let alone in an unlawful manner.

plaintiffs seek sensitive information from the President, the Attorney General, and other high-level officials that might chill future decision-making—an especially troubling result in cases where "the specter of Presidential assassination is raised." *Hunter v Bryant*, 502 U.S. 224, 229 (1991); Mot. at 22.

        **iv.**       **Plaintiffs acknowledge that alternative processes are available to them.**

Plaintiffs acknowledge injunctive relief can "foreclose *Bivens*" remedies but maintain that is true only where "large-scale policy decisions" are being challenged. Opp. at 51. As just noted, that is precisely what plaintiffs are challenging: a high-level, large-scale decision that not only affected thousands of persons in Lafayette Square but one that implicated presidential-security policy governing *any* situation where large, unscreened crowds are near the President. Indeed, plaintiffs' request that this Court enjoin the government from making similar presidential-security decisions in the future proves the point. Plaintiffs' secondary argument that obtaining an injunction would not provide them sufficient "compensation," *id.*, dates back to an old-fashioned special-factors analysis that was long ago replaced; the question now is whether there is an "alternative, existing process for protecting the [injured party's] interest." *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

In addition to the equitable remedies plaintiffs seek here, the Attorney General identified multiple avenues for potential compensation under state and federal statutes, including recovery (subject to applicable defenses) under 42 U.S.C. §§ 1983, 1985(3), 1986, and the FTCA. While the Attorney General noted *Carlson*'s holding that the FTCA was not a "special factor" under the *Bivens* framework that governed in 1980, plaintiffs fail to adequately distinguish the four *Bivens* cases since *Carlson* in which the Supreme Court has held or observed that the availability of common-law torts—the very foundation of FTCA liability, 28 U.S.C. § 2674—may preclude

extensions to *Bivens*. *Compare* Mot. at 28-29 *with* Opp. at 51-52.[8] As one court recently opined, the Supreme Court's reformulation of the special factors test—with a focus on "alternative, existing process[es]" rather than on the obsolete requirement that Congress must "explicitly declare[]" a *Bivens* "substitute"—"fatally undermines" *Carlson*'s holding. *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). Even so, the Attorney General does not ask this Court to hold the FTCA alone precludes extension to *Bivens*; he suggests the Court may consider—as many courts do—the possibility of FTCA damages alongside the array of other special factors. *See* Mot. at 29.

The Attorney General's discussion of alternative remedies also undercuts an unfounded and inflammatory argument that plaintiffs repeatedly make. Plaintiffs falsely assert that the Attorney General "posit[s] the alarmingly broad theory that federal law enforcement can disperse protesters near the White House at any time, using any means, without judicial review, because there is always a potential security threat." Opp. at 49. But as just discussed, the Attorney General identified many avenues of judicial review, including equitable remedies and potential damages under statutes like the FTCA. Mot. at 28-29. He also noted accountability in the form of Congressional oversight and Inspector General investigations, both of which have the potential for criminal referral. Mot. at 20-21 & n.14; *see, e.g.*, 18 U.S.C. §§ 241-42. The Attorney General never asserted "the President could demand to go anywhere, at any time, and send officers to beat up anyone along the way" without those officers facing judicial, administrative, and Congressional accountability. Opp. at 49. The Court should not give credence to hyperbolic assertions that are more about garnering headlines than responding to actual legal arguments.

---

[8] Though plaintiffs distinguish two of the cases on grounds that the defendants were "private entities," Opp. at 52, both *Abbasi* and *Wilkie* involved federal actors. Moreover, federal officers may be sued for state torts that occur outside the scope of employment. 28 U.S.C. § 2679(b)(1); *see, e.g.*, *Vanderklok*, 868 F.3d at 204.

* * *

Coming full circle, amici "Federal Courts Scholars" devote their brief to expounding upon plaintiffs' lead argument that *Bivens* is well-rooted in the English common-law tradition. ECF No. 120. But the D.C. Circuit previously refused to elevate these academic arguments—posited by the same amici who now appear here—over governing Supreme Court precedent:

> [I]f the courts, as amici argue, have radically misunderstood the nature and scope of *Bivens* remedies, a course correction must come from the Supreme Court, which has repeatedly rejected calls for a broad application of *Bivens*. Because we follow its lead, we will ship our oars until that Court decides the scope of the remedy *it* created.

*Meshal*, 804 F.3d at 428-29 (internal citation omitted). In the years since, the Supreme Court has only continued to stay the course. *See Hernandez*, 140 S. Ct. at 742 (discounting argument by "petitioners and some of their amici . . . that common-law claims against federal officers for intentional torts were once available"); *id.* at 748.[9] This Court should do the same and reject a new damages remedy against the Attorney General based on his alleged decision designed to protect the President's safety.

## II.  The Attorney General is entitled to qualified immunity based on his lack of involvement and the lack of a clearly established constitutional violation.

### A.  Plaintiffs misconstrue the qualified immunity standard.

Plaintiffs devote much effort, in vain, to distinguishing on their facts certain cases showing that the Attorney General's alleged actions did not violate clearly established constitutional rights under the unique presidential-security circumstances presented by the

---

[9] Indeed, the same amici unsuccessfully presented these arguments before to the Supreme Court and the D.C. Circuit. *See* Brief of Carlos M. Vázquez and Anya Bernstein as Amici Curiae in Support of Petitioners, *Hernandez v. Mesa*, 140 S. Ct. 735 (2020) (No. 17-1678), 2019 WL 3854461; Brief of Douglas Laycock, James E. Pfander, Alexander A. Reinert and Joanna C. Schwartz as Amici Curiae, *Hernandez v. Mesa*, 140 S. Ct. 735 (2020) (No. 17-1678), 2019 WL 3854464; Brief of Amici Curiae Law Professors James E. Pfander, Carlos M. Vázquez, and Stephen I. Vladeck In Support of Appellant, *Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015) (No. 14-5194), 2014 WL 7273787.

complaint. *See* Opp. at 27-29, 33-34. But even if plaintiffs could meaningfully distinguish those cases—they cannot—they would still fail to overcome the Attorney General's qualified immunity. It is *plaintiffs'* burden to overcome qualified immunity. To do that they must show that existing precedent clearly established that the Attorney General's alleged actions under the circumstances were unlawful and placed the constitutional question "beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted). The few cases they cite arise in a very different context from here and involve line-level officers' use of individually targeted and severely injurious force to disperse and arrest peaceful protesters in response to unsubstantiated general law enforcement concerns. *See* Opp. at 24-26; *see also infra* pp. 25-26. Indeed, plaintiffs fail to cite any precedent holding that a cabinet official violated clearly established constitutional rights by issuing an alleged order to peaceably clear a largely unsecured public area near the White House, which was the recent site of unrest and the imminent future site of a presidential appearance. They also fail to identify any decision concluding that the need to protect the President during a public appearance was insufficient to justify such a clearing order.

Plaintiffs urge that the "egregious" nature of the line level officers' alleged actions and "obviousness" of their violation of constitutional rights clearly establishes a constitutional violation by the Attorney General. *See* Opp. at 2, 17-18, 24, 29, 30, 43, 73. But, in addition to glossing over the Attorney General's lack of involvement, plaintiffs misstate the relevant legal standards. Qualified immunity is not overcome "simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Plaintiffs' "egregious conduct" formulation is not meaningfully different from this impermissibly abstract view of immunity. *See Reichle*, 566 U.S. at 665.

**B.  Plaintiffs' conclusory allegations fail to show the Attorney General's personal involvement in alleged violations of clearly established constitutional rights.**

Plaintiffs do not dispute that, absent the use of force, a facially neutral order to clear the park in front of the White House to protect the President before his remarks there does not violate clearly established First and Fourth Amendment rights. *See* Opp. at 30-31. Rather, plaintiffs say they have sufficiently alleged the Attorney General's personal participation in *line-level* officers' alleged use of force in clearing the park, which plaintiffs deem contrary to clearly established constitutional law. *See* Opp. at 58-59. But plaintiffs' conclusory allegations do not show the Attorney General's involvement in the alleged use of force by line-level officers.

Plaintiffs rely on the complaint's allegations that the Attorney General "personally ordered that Lafayette Square be cleared," TAC ¶ 79, and "personally ordered law enforcement officers to forcibly remove Plaintiffs and other class members from Lafayette Square and its vicinity." TAC ¶ 202. But the courts have repeatedly deemed such conclusory allegations of a "personal order" to be insufficient to plead a high-ranking official's personal participation in line level officers' actions. *See Iqbal*, 556 U.S. at 669, 680-81 (mere allegations that FBI director and Attorney General created an unconstitutional policy and "each knew of, condoned, and willfully and maliciously agreed to subject" plaintiff to illegal conditions of confinement were insufficient to show personal involvement); *Moss v. U.S. Secret Serv.*, 711 F.3d 941, 968 (9th Cir. 2013) (same for allegations police supervisors "personally directed and approved" other defendants' actions), *rev'd on other grounds*, *Wood v. Moss*, 572 U.S. 744 (2014); *Bundy v. Sessions*, 387 F. Supp. 3d 121, 124, 129-30 (D.D.C. 2019) (same for allegations that high ranking officials "directed" other federal employees to take illegal action and that line level agents acted "upon orders" of those officials to raid plaintiff's ranch), *aff'd*, 812 F. App'x 1 (D.C. Cir. 2020). Such allegations certainly fail to show the Attorney General ordered any of the officers' specific

17

tactics. Indeed, the complaint says that the Attorney General did not even issue the "immediate order" (like the vaguely alleged order attributed to Major Adamchik, TAC ¶ 20) and that the Attorney General merely gave an order that somehow "resulted in" the officers' actions rather than directed them. TAC ¶ 17. By these allegations, plaintiffs essentially concede that the Attorney General did not order any forcible removal.

Plaintiffs' reliance on *Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010), is misplaced. *See* Opp. at 35. There, the plaintiffs offered factual allegations that certain supervisory defendants had ordered line-level officers to use specific tactics. In particular, the complaint described the content of each supervisor's individual order to line-level officers to use a specific tactic, such as advancing on protesters in a line, physically beating protesters, and using particular less-lethal munitions and crowd movement techniques which resulted in plaintiffs' injuries. *See Keating*, 598 F.3d at 763-64. Moreover, the appeal did not focus primarily on whether the allegations about the nature and content of the supervisor's order were wholly insufficient to show any involvement in the challenged tactics of any line-level officers. Rather, the primary issue was whether the plaintiffs had to identify by name each officer that had received an order from a supervisor and each officer who had harmed the plaintiffs in order to state a claim against the supervisor. *See id*. at 764. The Eleventh Circuit merely declined to require such specific identifications of every officer who injured the plaintiffs under the circumstances alleged. *See id*. By contrast, here, plaintiffs' conclusory allegations that the Attorney General appeared on the scene and issued an unspecified order, without any factual allegation that the order directed any particular tactic or use of force, fail to show his involvement in the line-level officers' actions. Furthermore, here, unlike in *Keating*, the flaw in the complaint is not a mere failure to name specific officers but rather failure to plausibly allege that the Attorney General directed any officer to use the tactics challenged by plaintiffs.

Contrary to plaintiffs' argument, the complaint's allegations that the Attorney General appeared in Lafayette Square, stood behind unidentified federal law enforcement officials, and pointed north toward St. John's Church add nothing to plaintiffs' claim of his involvement in the line-level officers' conduct. *See* Opp. at 58; TAC ¶ 79. That the church happened to be in the general direction of one side of the expanded security perimeter, toward which certain line-level officers later moved the crowd, does not support the inference that the Attorney General ordered those officers to use force to push people out of the park. The Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *Iqbal*, 556 U.S. at 678-79, and a court need not indulge unwarranted inferences on a dismissal motion. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). Nor does it follow from what plaintiffs allege that the Attorney General acted unlawfully. What plaintiffs describe is equally consistent with the Attorney General pointing out the site of the President's imminent remarks and cannot support an inference he ordered unlawful force. *See Iqbal*, 556 U.S. at 678, 681; *cf. Allen v. Lang*, 738 F. App'x 934, 940-41 (10th Cir. 2018) (Mayor's mere nodding gesture at scene of search did not show personal participation in alleged unconstitutional search).

Without sufficient well-pleaded factual allegations, plaintiffs fall back on the classic empty-handed pleader's prayer for limited or managed discovery in lieu of dismissal. Opp. at 53-54; *id.* at 58-59. But it is well-settled that "the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process," a limitation that "is especially important" in cases like this one "where Government-official defendants are entitled to assert the defense of qualified immunity." *Iqbal*, 556 U.S. at 684-85; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Indeed, "the basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'" *Iqbal*, 556 U.S. at 685 (quoting *Siegert v. Gilley*, 500 U.S.

226, 236 (1991) (Kennedy, J., concurring in judgment)). In addition to qualified immunity,
discovery is also an especially inappropriate cure for insufficient pleading here, as plaintiffs have
access to ample Congressional testimony, press coverage, and their own eyewitness accounts
from which to learn facts they wish to plead.[10] That Plaintiffs still fail to offer sufficient
allegations is a sign that they have no claim, not that they deserve discovery.

### C. The Attorney General has qualified immunity from the First Amendment claim.

In opposing qualified immunity on their First Amendment claim, plaintiffs argue that
presidential security could not justify the Attorney General's general clearing order because the
protesters were allegedly peaceful. But, as discussed, in *Moss*, the Supreme Court ruled that
presidential security justified qualified immunity for federal agents who removed protesters from
weapons range of the President, notwithstanding that the protesters were allegedly peaceful. *See
Moss*, 572 U.S. at 749-56, 762-63; *supra* pp. 5-6. That makes sense because the President's
safety is endangered not just by previously known threats from specific would-be assassins, but
also by the potential danger of an unscreened crowd—even a peaceful one—providing cover for
assailants to enter within weapons range of the President. For this reason, as *Moss* recognized, it
has not been clearly established that federal agents who direct the clearing of a crowd of
protesters, even peaceful ones, in advance of the President's arrival violate the First Amendment.

Plaintiffs claim that *Moss* was really about equal access to the President—viewpoint
discrimination—not the general permissibility of removing protesters for security reasons. *See*

---

[10] *See, e.g.*, *Oversight of the Department of Justice: Hearing Before the H. Comm. on the
Judiciary*, 116th Cong. (2020), *available at*: https://www.rev.com/blog/transcripts/house-
judiciary-committee-hearing-of-attorney-general-barr-transcript-july-28 at 02:17:46-02:20:38
(last visited Dec. 17, 2020); *Hearing on Unanswered Questions About the U.S. Park Police's
June 1 Attack on Peaceful Protesters at Lafayette Square Before the H. Comm. on Nat. Res.*, 116
Cong. (2020) (statement of Gregory T. Monahan, Acting Chief, U.S. Park Police, U.S. Dep't of
the Interior: *Actions Taken to Protect Life and Liberty*)*, available at*: https://www.doi.gov
/ocl/uspp-and-lafayette-square-protesters  (last visited Dec. 17, 2020); TAC ¶¶ 88 n.16, 89 n.17.

Opp. at 33. But this argument does not help plaintiffs, whose core claim is also viewpoint

discrimination. *See* TAC ¶¶ 62, 64, 223. In any event, *Moss* is not so limited. In *Moss*, the

Supreme Court granted federal agents qualified immunity for doing exactly what the Attorney

General allegedly did here: ordering law enforcement officers to move plaintiffs more than a

block away from the President's planned location to keep him safe. *See Moss*, 572 U.S. at 748-

49. Indeed, the Court broadly framed the question before it, like the question here, in terms of

whether an order to move protesters two blocks away resulted in any form of violation of the

First Amendment:

> The particular question before us is whether the protesters have alleged violation of
> a clearly established First Amendment right based on the agents' decision to order
> the protesters moved from their original location in front of the Inn, first to the
> block just east of the Inn, and then another block farther.

*Id*. at 757. That the Attorney General, unlike the *Moss* agents, is not alleged to have shown

favoritism to anyone in the park only makes this a stronger case for immunity. *See id*. at 759-63.

Plaintiffs contend that the constitutionality of the Attorney General's order should be

judged under a clear and present danger standard rather than the time, place, and manner

framework. *See* Opp. at 34-35. But that has not been clearly established as the standard, as *Moss*

illustrates in not itself applying the clear and present danger standard. Specifically, without

explicitly applying one standard or the other, *Moss* held that federal agents were entitled to

qualified immunity for issuing an "on-the-spot" order, like the Attorney General's alleged order

here, to move protesters two blocks away from the President's planned location. *Moss*, 572 U.S.

at 748-49. Hence, regardless of the proper standard, the Supreme Court previously ruled that it

was not clearly established a federal officer violates the First Amendment by issuing such an

order. Because more recent precedent has not put the issue beyond debate, qualified immunity

still shields a federal officer from suit for a clearing order to protect the President—and should

even more so here, where the officer is the nation's highest ranking law enforcement official protecting both the President and the White House.

Plaintiffs are also wrong because the clear and present danger standard does not inherently apply to orders to remove a crowd from a particular area, like the Attorney General's alleged order here. The clear and present danger standard is a formulation of strict scrutiny, and it has applied only to restrictions which target specific speech based on the government's or hecklers' disagreement with the message, often resulting in criminal punishment. *See, e.g.*, *Bridges v. California*, 314 U.S. 252, 260-63 (1941); *see also Bible Believers v. Wayne Cty.*, 805 F.3d 228, 247-49 (6th Cir. 2015). By contrast, courts apply the time, place, and manner analysis to neutral orders which move protesters from a specific area. *See, e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1131-43 (9th Cir. 2005); *Startzell v. City of Philadelphia*, 533 F.3d 183, 189-203 (3d Cir. 2008); *see also Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 715 (4th Cir. 2018) (intermediate scrutiny applies if the restriction was not intended to suppress particular expression). Consequently, plaintiffs' debate over standards is a mere restatement of their unsupported viewpoint discrimination claim.

On that claim, plaintiffs do not dispute their failure to allege that the Attorney General did or said anything to target their speech. Instead, they claim that President Trump's alleged statements of disapproval of civil rights protesters reveal a content-based "rationale" behind the clearing of the park and that the Attorney General is impermissibly insisting on allegations of "personal animosity" toward the protesters in pointing out that he did not exhibit any viewpoint bias in crafting his order. Opp. at 39. But the problem here is not merely lack of personal animus allegations. Rather the plaintiffs have failed to allege facts showing the particular restriction on which they seek to hold the Attorney General liable, *i.e.*, his alleged clearing order, was designed to suppress speech supportive of civil rights.

In that regard, it is the Attorney General, not the President, who allegedly designed and issued the challenged clearing order; the complaint alleges no facts showing the President ordered the park to be cleared on June 1 or dictated the nature or terms of the Attorney General's clearing order. *See* TAC ¶¶ 17, 79. Hence, it is the Attorney General's rationale, not the President's opinions, which reflects the purpose of the alleged order. Consequently, the allegations about the President's general opposition to racial justice protests nationwide have no bearing on the purpose of the challenged on-the-scene clearing order. *See Moss*, 572 U.S. at 755-56, 762-64 (allegations that other secret service agents hewed to a government policy of moving protesters to suppress dissent did not show the defendant agents designed their immediate clearing orders to suppress speech).

Lastly, plaintiffs insist that, in past cases dismissing First Amendment challenges to the removal of protesters from a particular area, the government granted the protesters permission to protest elsewhere, whereas here the Attorney General did not expressly permit the protest to continue outside the expanded security perimeter. *See* Opp. at 31-32. But plaintiffs overstate those cases, which no more involved affirmative authorization to protest elsewhere than this one does. *See, e.g.*, *Moss*, 572 U.S. at 754 (merely noting that the protesters "remained" in the location beyond weapons range of the President, without indicating that the government had expressly permitted them to protest there); *Menotti*, 409 F.3d at 1124-25 (emergency order, and operating order implementing it, cleared all protesters from large area of downtown Seattle, without expressly permitting an alternative protest site). Rather, as here, the government simply cleared the protesters from one area and left them free to protest, or not, in such other areas as local law might permit. *See id.*; TAC ¶¶ 90, 95, 116. Despite the lack of express permission for alternative protest sites, the courts in those cases dismissed the plaintiffs' claims because the narrow tailoring and ample alternative prongs of the First Amendment analysis require only that

the government "*refrain from denying* a reasonable opportunity for communication," not affirmatively provide such opportunity. *Menotti*, 409 F.3d at 1141 (internal quotation marks and citation omitted, emphasis added); *see also id*. at 1130-42; *Moss*, 572 U.S. at 754, 764. This Court should do the same.

### D.  The Attorney General has qualified immunity from the Fourth Amendment claim.

In support of their Fourth Amendment claims, plaintiffs primarily assert that the Attorney General was personally involved in the line-level officers' alleged use of force and physical exclusion of the protesters from the park. *See* Opp. at 18-24, 57-58. But, as explained above, *see supra* pp. 17-20, that is not true. Likewise, while plaintiffs claim that neither the Attorney General nor the officers had legitimate presidential-security concerns that could support their alleged intrusion on plaintiffs' Fourth Amendment rights based on the supposedly peaceful nature of the protests, *see* Opp. at 20-23, the complaint's allegations reveal their actions served compelling presidential-security interests, as explained above and in the dismissal motion. *See supra* pp. 4-8; Mot. at 5, 13-14, 35-36, 41; *see also Berg v. Kelly*, 897 F.3d 99, 108-13 (2d Cir. 2018) (granting qualified immunity because presidential security could potentially justify penning protesters); *Saucier v. Katz*, 533 U.S. 194, 207-09 (2001) (same where vice presidential security could potentially justify throwing protester in a van).[11] Moreover, though plaintiffs repeatedly assert that the protesters were peaceful—which, even if true, would not show a

---

[11] Plaintiffs contend that the Attorney General cannot rely on the unscreened nature of the crowd to support the clearing of the park because the complaint does not allege that criminals had succeeded in entering the crowd to harm the President. *See* Opp. at 22. But plaintiffs miss the point. As discussed, an unscreened crowd creates a *potential risk* that such bad actors *could* use the crowd as cover to threaten the President. *See supra* pp. 4-8; *Moss*, 572 U.S. at 749-55, 763*; Berg*, 897 F.3d at 108-13. Thus, the Attorney General's reliance on this potential risk represents an established principle of law and common sense informed by tragic past experience, not a dispute of fact.

violation of clearly established rights—the articles supplying the complaint's core allegations indicate members of the crowd were violent. *See* Mot. at 36 n.20, 41-42; TAC ¶ 202 n.19.[12]

As for the line-level officers' actions (as opposed to the Attorney General's own actions), plaintiffs do not dispute that the court can consider the Mayor's orders and findings regarding the unrest leading up to the clearing of Lafayette Square. *See* Mayor's Order 2020-68; Mayor's Order 2020-69. Plaintiffs do claim that the violence reported in the Mayor's orders, on prior occasions possibly involving different protesters, cannot support the line-level officers' use of force to remove plaintiffs from the park. *See* Opp. at 19-20. But it was not clearly established that the line-level officers had to turn a blind eye to the recent unrest at the very location where the crowd gathered on June 1 in removing protesters before the President's arrival. *Menotti*, *supra*, is instructive on this point. There, the officers lawfully enforced an order requiring protesters to leave the area, despite the peaceful nature of most of the particular protests at issue, in part because those protests were preceded by days of violence in the same downtown area. *See Menotti*, 409 F.3d at 1121-26, 1132-37.[13] Thus, while *Menotti* was not an excessive force case, it establishes that the government generally has a legitimate interest in removing or excluding a protester from a particular location in response to earlier incidents of violence committed by others in the same area. Accordingly, that "countervailing government interest[ ]" reflected in recent instances of violence in this case weighs in the government's favor in the "careful balancing" between such interests and the individual interest in avoiding Fourth Amendment

---

[12] While the articles form the core of the complaint's narrative and support the Attorney General's position, the complaint should be dismissed regardless of whether the court concludes that the articles are incorporated into the factual allegations of the complaint. Leaving aside the articles, the complaint's conclusory allegations still fail to state a plausible claim.

[13] In *Menotti*, the court found issues of fact as to the lawfulness of the arrest of certain protesters. *See Menotti*, 409 F.3d at 1146-47. That is not an issue here because the federal officers are not alleged to have arrested anyone.

intrusion. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted).

Furthermore, the officers' alleged forcible removal of protesters from the White House perimeter in the wake of unrest served both the aforementioned law enforcement interest and the government's "paramount interest" in protecting the President, *White House Vigil for ERA Comm.*, 746 F.2d at 1533 (internal quotation marks and citations omitted), so their actions were not clearly unconstitutional. Plaintiffs fail to identify any precedent or consensus of authority clearly establishing that this uniquely powerful combination of governmental interests could not justify the officers' actions, especially under the particular circumstances of this case. Moreover, in some instances, courts have declined to impose individual liability on law enforcement officers whose use of force on crowds harmed violent and peaceful protesters alike, including in cases involving the use of batons, *Felarca v. Birgeneau*, 891 F.3d 809, 816-19 (9th Cir. 2018) (some protesters refusing orders, but non-violent, could also be hit in extremities with batons), tear gas, *Young v. Akal*, 985 F. Supp. 2d 785, 791, 801-03 (W.D. La. 2013) (tear-gassing unruly crowd, including nearby peaceful residents, did not clearly violate peaceful residents' rights), and non-lethal projectiles, *White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017) (same for firing non-lethal projectiles at peaceful person near a violent crowd and walking toward police).

The cases cited by plaintiffs are distinguishable and do not clearly establish that the Attorney General's or the line-level officers' conduct violated the Constitution. In some of plaintiffs' non-protest cases, the defendants were line-level officers who allegedly singled out specific peaceful individuals, targeted them for arrest without cause, and physically assaulted them with weapons (sometimes even while handcuffed), often causing substantial injury. *See Henderson v. Munn*, 439 F.3d 497, 499-504 (8th Cir. 2006); *Adams v. Metiva*, 31 F.3d 375, 377-78, 383-87 (6th Cir. 1994); *Vinyard v. Wilson*, 311 F.3d 1340, 1342-55 (11th Cir. 2002).

26

Plaintiffs' protest cases do not involve the sort of undisputed record of multiple days of violence at issue here. *See* Mayor's Order 2020-68. In some of those cases, the defendants were either line-level officers who used targeted substantial force on particular peaceful individuals and arrested them without cause, or officers who arrested every person near a protest site without cause and despite the absence of any cohesive crowd or prior violence save for a single window smashing before the protest. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1151-53, 1155-62 (10th Cir. 2008); *see also Barham v. Ramsey*, 434 F.3d 565, 569-70, 572-79 (D.C. Cir. 2006). In another case, line-level officers specifically targeted peaceful individuals for torture on three occasions by applying pepper spray directly to their eyeballs with cotton swabs, while they were restrained, and then refusing to wash the spray from their eyes. *See Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1127-31 (9th Cir. 2002). By contrast, in this presidential security and protest case, the Attorney General had no involvement in any use of force, and the line-level federal officers allegedly did not arrest anyone. And while the line-level officers allegedly used force to disperse the crowd as a whole, none of the named line-level defendants are alleged to have targeted a particular named plaintiff based on unfounded routine law enforcement justifications.

Since some judicial decisions suggest the legality of the officers' alleged forcible removal of protesters from the square and none definitively condemn it, the officers would be entitled to qualified immunity, as is the Attorney General, who did not participate in their actions.

**E.  Amici's support of plaintiffs' constitutional claims is unavailing.**

The arguments of amici International Center for Advocates Against Discrimination cannot salvage plaintiffs' constitutional claims. Amici essentially repeat plaintiffs' arguments in support of their constitutional claims, dressing them in international law garb by citing U.S. diplomats' comments and the general principles of the International Covenant on Civil and

Political Rights, the International Convention on the Elimination of All Forms of Racial

Discrimination, and the Convention against Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment. *See* International Center Brief, ECF No. 114, at 12-26. But

aspirational treaties and diplomatic comments are irrelevant to the viability of plaintiffs' claims

under the U.S. Constitution. *See generally Medellin v. Texas*, 552 U.S. 491 (2008); *Sosa v.*

*Alvarez-Machain*, 542 U.S. 692 (2004). Additionally, amici fail to demonstrate that international

law meaningfully differs from United States courts' interpretation of the First and Fourth

Amendments, which does not clearly establish that the Attorney General's alleged conduct

violated constitutional rights. *See supra* pp. 15-27. And even if those international conventions

provided extra protections from speech restrictions or government seizures, individuals cannot

sue federal officials for damages in U.S. courts based on violations of those unenforceable

conventions. *See, e.g.*, *Meshal*, 804 F.3d at 420-29 (denying *Bivens* remedy, despite dissent's

claim remedy was supported by violation of ICCPR); *id.* at 438-39 (Pillard, J., dissenting); *see*

*also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 799, 816-20 (D.C. Cir. 1984) (Bork, J.,

concurring).

> The decisions that amici cite reflect a view of the law abandoned in more recent years:

> To be sure, there was a time when U.S. courts stated that customary international
> law was "part of our law" so that "where there is no treaty, and no controlling
> executive or legislative act or judicial decision, resort must be had to the customs
> and usages of civilized nations; and, as evidence of these, to the works of jurists
> and commentators." But that oft-quoted statement reflected the notion, common in
> the early years of the Nation *but now discredited*, that international law was part of
> the general common law that federal courts could apply.

*Al-Bihani v. Obama*, 619 F.3d 1, 17 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (emphasis

added, internal citation omitted, quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)).

> Moreover, amici's cases are irrelevant to the issues here: they merely indicate that, in

Eighth Amendment and international commerce contexts not dealing with qualified immunity,

domestic courts might look to international law as persuasive authority in the absence of binding

authority or a consensus of persuasive authority from United States courts. *See, e.g.*, *The Paquete*

*Habana*, 175 U.S. at 678-80, 685-714 (citing U.S. law and some international law to resolve

dispute over capture of Cuban fishing vessel that ran in international waters between Cuba and

the U.S.); *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co*., 138 S. Ct. 1865, 1869-75

(2018) (citing international law to resolve plaintiffs' international law claims against Chinese

manufacturer, but foreign government's interpretation of that law was not binding); *Roper v.*

*Simmons*, 543 U.S. 551, 566-78 (2005) (finding evolving standards of U.S. law and precedent,

with incidental reference to international law, bar execution of juveniles under 18). Those

decisions have no application here because domestic courts have provided extensive binding

guidance on the scope of the First Amendment, the Fourth Amendment, and qualified immunity,

notwithstanding that they have not ruled on a case presenting the precise scenario alleged here.

*See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Moss*, 572 U.S. at 754-64; *Graham*,

490 U.S. at 396; *Ward v. Rock Against Racism*, 491 U.S. 781, 791-99 (1989); *Bernini v. City of*

*St. Paul*, 665 F.3d 997, 1003-04 (8th Cir. 2012). Plaintiffs' constitutional claims should be

dismissed with prejudice.[14]

---

[14] Amici Veterans of the Civil Rights Movement and Civil Rights Leaders simply claim the line-level officers' conduct here resembles past violence against civil rights advocates. *See* Veterans of the Civil Rights Movement Brief, ECF No. 116 (VetBrf.), at 3-14, 21-26. Regardless of amici's view of the similarity between historical incidents and this case, they point to no authority holding that such similarity warrants a damages action against the Attorney General. At any rate, the Attorney General's alleged neutral order seeking the departure of all people from the square to ensure the President's safety during an appearance bears no resemblance to segregationists' vile assaults on civil rights activists.

**F.  The Attorney General has qualified immunity from the statutory claims.**

   **i.       Plaintiffs fail to allege the existence of, or the Attorney General's membership in, a conspiracy under 42 U.S.C. §§ 1985(3) and 1986.**

Plaintiffs do not dispute that, if their 42 U.S.C. § 1985(3) claim fails, their 42 U.S.C. § 1986 claim should be dismissed. Opp at 85. Furthermore, plaintiffs concede that, under § 1985(3), they must allege facts showing directly or circumstantially that the Attorney General reached an agreement with another person to participate in a conspiracy to violate plaintiffs' rights, and they do not dispute that it has not been clearly established that one can be liable for an intracorporate conspiracy under § 1985(3). Plaintiffs merely argue that they have sufficiently alleged an *inter*corporate conspiracy between the Attorney General, other federal defendants, and state law enforcement officers because they allege "coordinated" action among those defendants. Opp. at 76-81; TAC ¶¶ 45, 75-76, 106-07. But plaintiffs' allegations that the federal defendants and state officers "coordinated" with each other are mere conclusions not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679-81; *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 52 (D.D.C. 2019) ("Plaintiffs' claims that the Defendants broke through the police cordon in a 'coordinated fashion' and that Defendants had a common goal are conclusory allegations, insufficient to withstand a motion to dismiss."); *see generally Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685 (8th Cir. 2012) ("Moreover, the plaintiff must *allege with particularity* and specifically demonstrate with *material facts* that the defendants reached an agreement.") (internal quotation marks and citation omitted, emphases added).

Plaintiffs' allegations about a joint command center, where some other federal employee —not the Attorney General—"coordinated" with an ACPD officer does not establish a conspiracy to violate plaintiffs' constitutional rights, much less the Attorney General's involvement in it. TAC ¶¶ 45, 76. Absent any indication of these individuals' discussion of a

particular proposed action, tactic, or objective, the fact that an ACPD commander was present in a facility and communicated or "coordinated" in some way with unspecified federal officers cannot support a plausible inference that the Attorney General reached an agreement to jointly use excessive force on plaintiffs or suppress their speech. The same is true of the conclusory allegation that unknown military officers met an MPD officer near the park, as nothing about the mere existence of a meeting shows the requisite agreement to violate plaintiffs' rights. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (dismissing conspiracy claim under § 1983 because it is not "reasonable to infer, for example, that because certain Law School faculty members met with certain administrators during the investigation [which allegedly violated plaintiff's rights and caused his termination], they were conspiring with one another and with the Hearing Committee who ultimately found against [plaintiff]."); *see also Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470, 481-82 (M.D. Pa. 2012).

The allegations that federal defendants used force in the park and that MPD officers used force in arresting some individuals outside the park do not show a specific federal-state agreement to use unlawful force against the protesters. Indeed, even if plaintiffs successfully alleged parallel action between federal and state officers, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.

Plaintiffs are mistaken in their belief that the Attorney General could join an intercorporate conspiracy without interacting with state officials or the federal employees who allegedly dealt with those state officials. While one can join a conspiracy without knowing every conspirator's identity, one cannot join without reaching an agreement with the conspirators about the general objectives of the conspiracy. *See Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263

31

(7th Cir. 1999) ("The conspirators must act with a single plan, the general nature and scope of which is known to each would-be conspirator."). And the Attorney General could not have reached an agreement with any member of a federal-state conspiracy to violate plaintiffs' rights because he is not alleged to have had a meeting of minds on the unlawful objectives of a conspiracy with Captain Vincent, the ACPD member who was supposedly in a joint command center coordinating with unspecified ACPD and federal officers, or with the unidentified MPD commander seen with unnamed military officers "in the presence of" the Army Chief of Staff two blocks outside the park. TAC ¶¶ 76, 106. The Attorney General is not even alleged to have met those people or known about the meetings between them, much less agreed with them to violate plaintiffs' equal protection rights. Accordingly, plaintiffs have not plausibly alleged the Attorney General's membership in a conspiracy with state officers, and it is undisputed that any conspiracy with federal officers is not actionable under the intracorporate conspiracy doctrine.

Plaintiffs contend that one can infer the Attorney General's agreement to join a conspiracy with line-level federal officers—a non-actionable intracorporate conspiracy—from his alleged assignment of BOP personnel to the park, his alleged pointing north toward St. John's Church, and his alleged appointment by the President to oversee the federal government's response in general to the multi-day period of unrest. *See* Opp. at 78-79; *see also K.O. v. U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350, 367-70 (D.D.C. 2020) (conspiracies between federal employees, both within a single federal agency and across multiple agencies, are not actionable under § 1985(3)). Even if the intracorporate-conspiracy doctrine did not apply here (it does), the Attorney General's position as a high ranking government official charged with general, non-tactical oversight of the federal government's response to the unrest does not establish agreement to join with specific line-level officers to violate plaintiffs' civil rights, *see* TAC ¶ 60, and his alleged request at an unspecified time on June 1 to assign BOP personnel to

respond to protests in "Washington, D.C." as a whole, TAC ¶ 60, does not show that he directed

their tactics in the park or agreed with them to achieve some unlawful goal. *Cf. Iqbal*, 556 U.S. at

680-81 (allegation that Attorney General was "principal architect" of harsh conditions of

confinement was insufficient to sustain claim of his involvement in specific unlawful conduct);

*Adams v. Teamsters Local 115*, 214 F. App'x 167, 172-75 (3d Cir. 2007) (governor's request that

teamsters appear at the scene to drown out protesters' speech did not show agreement to conspire

with teamsters to assault the protesters).

Furthermore, as discussed above, *see supra* pp. 19, the Attorney General's alleged

pointing at St. John's Church does not show that he reached an agreement with line-level officers

to forcibly disperse the crowd. This brief gesture, like the Attorney General's presence at the

scene and alleged responsibility for high level decisions about the overall response to unrest in

the city, does not establish a § 1985(3) conspiracy. *Cf. Sines v. Kessler*, 324 F. Supp. 3d 765,

777-95 (W.D. Va. 2018) (while defendant neo-Nazis with admitted racial animus joined in a §

1985(3) conspiracy via specific acts of planning, communication, encouragement of violence,

and/or personally committing acts of violence at the scene, another defendant was not a member

of the conspiracy due to mere presence at the scene, acquaintance with the other defendants, and

pre- and post-attack praise of violence).

### ii.      Plaintiffs fail to allege the Attorney General had the requisite animus.

Plaintiffs do not dispute that they failed to sufficiently allege that the Attorney General

acted based on discriminatory animus toward Black people and their supporters. Nonetheless,

plaintiffs claim that § 1985(3) does not require them to allege that each individual defendant was

motivated by racial animus, as long as they allege that the defendant entered into a conspiracy

and that other members of the conspiracy formed the conspiracy based on racial animus. In

plaintiffs' view, "it is the *conspiracy*, not each individual *conspirator*, that must be 'motivated'

by a 'discriminatory purpose.'" Opp. at 83 (quoting *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31 (D.D.C. 2016). But plaintiffs fail to identify any controlling precedent or consensus of persuasive authority clearly establishing that the statute protects them from the acts of an individual defendant who lacked class-based animus and merely had some alleged association with others who, plaintiffs have claimed in conclusory fashion, might have harbored such animus. Hence plaintiffs cannot overcome the Attorney General's qualified immunity.

The statutory text also refutes the claim that a person acting without discriminatory animus faces liability under § 1985(3). The statute makes actionable only "conspir[ing] . . . *for the purpose of depriving*, either directly or indirectly, any person or class of persons of *the equal protection of the laws* . . ." 42 U.S.C. § 1985(3) (emphases added). Under the statute, it is not the act of agreeing to take some particular action, by itself, which is illegal. Rather, it is the entry into an agreement to do something "for the purpose of" denying someone's equal protection rights. By invoking equal protection principles in defining the "purpose" requirement, the statute logically incorporates the critical requirement of an equal protection claim, namely that "the [defendant] officer's conduct . . . 'was motivated by a discriminatory purpose,'" *Richards v. Gelsomino*, No. CV 16-1002, 2019 WL 1535466, at *8 (D.D.C. Apr. 8, 2019) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)), *aff'd*, 814 F. App'x 607 (D.C. Cir. 2020).

Moreover, as the Supreme Court has repeatedly emphasized, the animus requirement is a vital limitation on the statute's scope that prevents it from devolving into a general tort law, and therefore courts have repeatedly required plaintiffs to demonstrate that each individual defendant was motivated by discriminatory animus.

The Supreme Court has declared that the animus requirement is the critical limiting component of § 1985(3), without which the statute cannot be fairly applied. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court overruled *Collins v. Hardyman*, 341 U.S. 651

(1951), which had barred § 1985 suits based on entirely private conspiracies. *See Griffin*, 403

U.S. at 92, 95-96.[15] In overruling *Collins* and allowing the plaintiffs' claim to proceed, the

Supreme Court emphasized that *Collins*'s demise would not unduly broaden § 1985(3) because

the discriminatory animus requirement would substantially limit the statute's scope. *See id.* at

101-02. The Court explained:

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a
> general federal tort law can be avoided by giving full effect to the congressional
> purpose—by requiring, as an element of the cause of action, the kind of invidiously
> *discriminatory motivation* stressed by the sponsors of the limiting amendment. The
> language requiring *intent* to deprive of *equal* protection, or *equal* privileges and
> immunities, means that there must be some racial, or perhaps otherwise class-based,
> invidiously discriminatory animus behind *the conspirators'* action. The conspiracy,
> in other words, must aim at a deprivation of the equal enjoyment of rights secured
> by the law to all.

*Id.* at 102 (internal citation omitted, some emphases added). Thus, the Supreme Court used terms

indicative of an individualized mental state and responsibility to strongly signal that the animus

element of an individual capacity claim for damages under § 1985 requires individual intent, not

just the existence of animus on the part of other members of the conspiracy. *Cf. United States v.*

*Flynn*, 216 F.2d 354, 360 (2d Cir. 1954) (while a person's criminal "intent" can be shown

circumstantially, "under criminal statutes involving proof of a specific intent a person may not be

---

[15] Plaintiffs assert their allegations of a discriminatory conspiracy were similar to those
found sufficient in *Griffin*. But, in *Griffin*, the plaintiffs alleged that each and every defendant
personally surrounded the plaintiffs and beat them with the specific shared purpose of targeting
Black people and denying them their rights. *See id.* at 90-92, 103. By contrast, plaintiffs here do
not allege the Attorney General personally surrounded or struck anyone; nor do they allege facts
showing discriminatory animus. Moreover, because *Griffin* pre-dates *Iqbal*'s clarification of
pleading requirements, as well as subsequent cases which elaborate upon § 1985(3)'s animus
requirement, the allegations in *Griffin* may no longer suffice given further developments in the
law. *See Iqbal*, 556 U.S. at 677-80; *White v. Berger*, 709 F. App'x 532, 538-39 (11th Cir. 2017)
(conclusory allegations that the defendants conspired with animus toward religion and speech did
not sufficiently allege the defendants' class based animus); *see also infra* pp. 34-36.

convicted simply on the basis of an 'imputed' intent. He himself must be shown to have had the requisite intent."); *see also* 16 Am. Jur. 2d Conspiracy § 53 ("The concept of guilt by association is repugnant to notions of elemental justice and fair play, and that is why, generally speaking, for a conspiracy, it is necessary to establish that the group possessed unlawful goals and that *the individual held a specific intent* to further those illegal aims.") (emphasis added).[16]

The Supreme Court hit upon this theme again in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). There the Court essentially dismissed a claim that § 1985(3) covered conspiracies to deny access to abortion. *See Bray*, 506 U.S. at 267-85. The Court reiterated the central importance of the animus requirement, and it again spoke of the requirement in terms of each individual's motivation. *See id*. at 268-69; *see also id*. at 270, 275-76 (referring to the need to show that "*petitioners'* demonstrations" are "motivated by a purpose . . . directed specifically at women as a class," and noting that the animus element of  § 1985(3) "requires that *the defendant* have taken his action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (internal quotation marks and citation omitted, emphases added). By rejecting the notion that "intent is irrelevant" and that "a class-based animus can be determined solely by effect," *id*. at 270, the Court suggested that the animus requirement turned on an individual's intent rather than some association with other people, some of whom might be motivated by animus. Indeed, the Court analogized the animus requirement to the discriminatory purpose requirement of equal protection claims, saying:

> "'Discriminatory purpose,'" we [have] said, "implies more than intent as volition or intent as awareness of consequences. It implies that *the decisionmaker* . . .

---

[16] To support their theory that no individual animus need be shown, plaintiffs rely on the last sentence of the above passage, which states "*[t]he conspiracy*, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin*, 403 U.S. at 102. But, in the context of a passage that discusses the animus requirement in terms of individual intent and the need to limit the scope of § 1985(3), this remark is merely a rephrasing of that individual animus requirement, not, as plaintiffs would have it, a radical expansion of § 1985(3).

> *selected or reaffirmed* a particular course of action at least in part '*because of*,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" [*Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)] (citation omitted). The same principle applies to the "class-based, invidiously discriminatory animus" requirement of § 1985(3).

*Bray*, 506 U.S. at 271-72 (emphases added). Thus, the Supreme Court again emphasized that the animus requirement is an important limit on § 1985(3), operates as an individual intent element, and should not be narrowly construed to require only lessened showings of a culpable motive.

Following *Griffin* and *Bray*, courts have required § 1985(3) plaintiffs to allege and prove that each defendant acted based on a class-based discriminatory animus. That animus is the *sine qua non* of a race or class-based equal protection violation. Without it there could be no conspiratorial meeting of the minds. *See City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651-53 (8th Cir. 1989) (despite evidence of the defendant city's discriminatory personnel policies driven by animus, the co-defendant union's knowledge of such discrimination, the union's work with the city on personnel policies, and the union's work on a contract that harmed plaintiff, the union did not share the city's discriminatory animus and was not liable); *Burns v. State Police Ass'n*, 230 F.3d 8, 9-14 (1st Cir. 2000) (evidence that some members of a defendant state police association had racist views and opposed a minority association promoted by plaintiff failed to establish the co-defendant vice president of the association acted out of racial animus in forwarding unsubstantiated misconduct complaint against Black plaintiff); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533-35 (S.D.N.Y. 2013) (although plaintiff sufficiently showed a 42 U.S.C. § 1983 conspiracy, she failed to allege the racial animus element of a § 1985(3) claim because the alleged facts showed racial animus only among some defendants, who were shielded by the intracorporate conspiracy doctrine, and no animus was shown for the rest).

As in those cases, here, the Attorney General's association with others via his official position and alleged general oversight of the government response to the unrest in Washington, D.C., cannot show that the Attorney General harbored any class-based animus. And the Attorney General's alleged general involvement in the government's overall response to unrest, including his vaguely alleged neutral clearing order delivered to unspecified people and his pointing toward the church, fails to demonstrate that he entered into an agreement with others to violate plaintiffs' constitutional rights based on their race. Rather than showing invidious discrimination, the "obvious alternative explanation" for the Attorney General's alleged dispersal order reflects a legitimate law-enforcement objective: protecting the President's safety from a large, unscreened crowd at a time of civil unrest. *Iqbal*, 556 U.S. at 682.

### iii.    Amici's statutory arguments are contrary to established precedent.

Amici Concerned Legal Academics and Historians assert based on legislative history that plaintiffs can pursue their § 1985(3) claims despite failing to allege facts showing an agreement between the Attorney General and the other alleged conspirators to violate plaintiffs' rights. *See* Concerned Academics Brief, ECF No. 115 (ConBrf.), at 16-18. But their argument runs afoul of precedent. Courts in this circuit and others have determined that, under § 1985(3), a plaintiff must offer specific factual allegations demonstrating that the defendants had a meeting of the minds and agreed to the objectives of the conspiracy. *See Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995); *Robinson v. Allstate Ins. Co*., 508 F. App'x 7, 9 (2d Cir. 2013); *Startzell*, 533 F.3d at 205; *Pahssen v. Merrill Cmty. Sch. Dist*., 668 F.3d 356, 368 (6th Cir. 2012); *Kelly v. City of Omaha*, 813 F.3d 1070, 1078 (8th Cir. Feb. 18, 2016); *see also Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) ("Among other things, section 1985 plaintiffs must allege the elements of civil conspiracy. . . ."); *Knowlton v. United States*, 111 F. Supp. 2d 1, 8 (D.D.C. 1999) ("In order to establish a conspiracy, plaintiff must allege facts showing the existence of an

agreement, or 'meeting of the minds', between defendants to violate plaintiff's civil rights."), *aff'd sub nom. Knowlton v. Alouri*, No. 96cv02467, 2000 WL 1093323 (D.C. Cir. June 27, 2000). Amici fail to offer any convincing reason to depart from these authorities.

Amici claim that in *Collins*, *supra*, the Supreme Court merely required parallel action under § 1985(3), not an agreement, because the Court allegedly found that the defendants formed a conspiracy by gathering and jointly attacking the plaintiffs' political meeting while declining to attack meetings of political groups with different views. *See* ConBrf. at 17-18. But in *Collins*, a pre-*Iqbal* case, the Court merely "*assume[d]*, *without deciding*, that the facts pleaded show that defendants did deprive plaintiffs 'of having and exercising' a federal right which, *provided* [i.e., assuming that] the defendants were engaged in a 'conspiracy set forth in this section,' *would* bring the case within the Act." *Collins*, 341 U.S. at 660 (emphases added). The Court ultimately dismissed the § 1985(3) claim based on a since-abrogated statutory element. *See id.* at 662.

The Court's comments on the conspiracy element of the statute were consistent with a requirement of a meeting of the minds: The Court described the requisite conspiracy as an "*agreement or understanding* for concerted action," *id.* at 659 (emphasis added), and it noted that the plaintiffs alleged the defendants "entered into an agreement" to personally commit acts of violence jointly and simultaneously against the plaintiffs. *Id.* at 654. The Court also observed that, because the conspiracy must be specifically aimed at denying equal protection of the laws, "[i]t is apparent that this part of the Act defines conspiracies of a very limited character." *Id.* at 660. Thus, *Collins* is consistent with the meeting-of-the-minds and animus requirements.

Moreover, even if amici were correct that Congress originally intended § 1985(3) to require only some form of parallel action that harmed Black people and their supporters (a proposition that *Griffin* and *Bray* rejected), they ignore other aspects of original intent that would doom plaintiffs' claims. Chief among those aspects is that "[i]t is palpably clear that the

39

proponents of the Civil Rights Act did not envision that it would apply against the federal government, because through the Civil Rights Act the federal government was vindicating citizens' civil rights against discriminatory state (or arguably private) action." *Alharbi v. Miller*, 368 F. Supp. 3d 527, 567 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020). For that reason, courts historically interpreted the statute to exempt federal officials because the original proponents of the statute sought to end only state-organized racial violence and to protect, rather than penalize, federal officers. *See, e.g.*, *Santistevan v. Loveridge*, 732 F.2d 116, 118 (10th Cir. 1984); *Seibert v. Baptist*, 594 F.2d 423, 429 (5th Cir. 1979); *Gregoire v. Biddle*, 177 F.2d 579, 580-81 (2d Cir. 1949); *see also Hobson*, 737 F.2d at 19-20 (concluding that *Griffin* changed the law and rendered the statute applicable to federal officers). That historical understanding of the statute would require dismissal of plaintiffs' claims against a federal officer such as the Attorney General. In urging the court to follow only the aspects of the statute's supposed original meaning favorable to plaintiffs, Concerned Academics simply argue "originalism for thee, but not for me." Amici's approach should be rejected as incompatible with principled judicial decisionmaking and the currently prevailing law, which requires dismissal.

Finally, because it is undisputed that plaintiffs' 42 U.S.C. § 1986 claim must fall with their § 1985(3) claim, both of their statutory claims are subject to dismissal.

## CONCLUSION

The claims against the Attorney General should be dismissed with prejudice.

Dated: December 17, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.

Acting Director, Torts Branch

/s/ John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

/s/ David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Attorney General William P.
Barr in his individual capacity*