**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BLACK LIVES MATTER, et al., | |
| *Plaintiffs*, | **Case No. 1:20-cv-01469-DLF** |
| v. | |
| TRUMP, et al., | |
| *Defendants*. | |

**MOTION FOR LEAVE TO FILE BRIEF OF THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

Proposed amicus curiae, the Reporters Committee for Freedom of the Press (the

"Reporters Committee"), respectfully moves this Court under Local Civil Rule 7(o) for leave

to file the attached amicus curiae brief in support of neither party.  The proposed brief is

attached to this Motion.

1.  This Court "has broad discretion to permit . . . participat[ion] [of] amici curiae," and

amicus participation is appropriate where amicus has "relevant expertise and a stated concern

for the issues at stake in [the] case."  *Dist. of Columbia v. Potomac Elec. Power Co.*, 826 F.

Supp. 2d 227, 237 (D.D.C. 2011).  This Court has recognized that an amicus brief should

"normally be allowed when . . . the amicus has unique information or perspective that can help

the court beyond the help that the lawyers for the parties are able to provide."  *Cobell v. Norton*,

246 F. Supp. 2d 59, 62 (D.D.C. 2003) (quoting *Ryan v. Commodity Futures Trading Comm'n*,

125 F.3d 1062, 1063 (7th Cir. 1997)); *see also Jin v. Ministry of State Sec.*, 557 F. Supp. 2d

131, 137 (D.D.C. 2008) (same).

2.  The Reporters Committee is an unincorporated nonprofit founded by leading

journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. The Reporters Committee has a powerful interest in ensuring that journalists can gather the news safely and without fear that they will be subject to the unlawful use of force or arrest by law enforcement.  That interest is particularly important when reporters are covering federal law enforcement's response to protests.  *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press and 60 News Media Orgs. in Supp. of Pls.-Appellees, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 829 (9th Cir. 2020); *Reporters Committee Letter*: *Full Committee Hearing: "The U.S. Park Police Attack on Peaceful Protesters at Lafayette Square,"* Reporters Comm. for Freedom of the Press (June 29, 2020), https://perma.cc/97CW-MRSL.

3.   The proposed amicus brief takes no position on the claims in this case and is filed in support of neither party.

4.   The proposed amicus brief is desirable and relevant to the disposition of the case because it highlights the critical importance of the continued availability of a right of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), against federal officers, in their individual capacities, for violations of First Amendment rights, including the right to lawfully report on police activity in public and the right to be free from retaliation for the exercise of that right.  Defendant Major Mark Adamchik has argued in favor of broadly precluding *Bivens* relief for First Amendment violations, which could include violations of established First Amendment protections for members of the news

media.  Major Mark Adamchik's Mot. to Dismiss All Individual-Capacity Claims at 9, *Black Lives Matter D.C. v. Trump*, No. 1:20-cv-01469 (D.D.C. Nov. 16, 2020), ECF No. 97.  The proposed amicus brief also explains that precedent of the Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit does not preclude a First Amendment *Bivens* remedy, especially in clear-cut instances of law enforcement overreach by individual officers, such as the arrest of or use of force against a journalist engaged in lawful newsgathering.  Indeed, as the proposed amicus brief argues, longstanding D.C. Circuit precedent suggests that such cases are exactly the kind of discrete and egregious constitutional violation where the availability of a *Bivens* remedy is both appropriate and necessary.

5.  Plaintiffs are not journalists or members of the news media, and the Reporters Committee's position is not adequately represented by a party.  The Reporters Committee can provide the Court with unique information and insight regarding instances in which federal officers have arrested and used force against journalists engaged in lawful newsgathering at protests across the United States and can explain how *Bivens* remedies for violations of First Amendment newsgathering rights are an indispensable deterrent against such violations.

6.  The Reporters Committee requests that the Court consider the proposed amicus brief only with respect to Defendant Adamchik's motion to dismiss.  Defendant William P. Barr also argued that *Bivens* remedies may be broadly precluded for First Amendment claims.  *See* Mem. in Supp. of Att'y Gen. William P. Barr's Mot. to Dismiss All Individual-Capacity Claims at 9, *Black Lives Matter D.C. v. Trump*, No. 1:20-cv-01469 (D.D.C. Oct. 1, 2020), ECF No. 76.  The proposed amicus brief does not take a position on Defendant Barr's motion to dismiss, and the Reporters Committee does not request consideration of the proposed amicus brief with respect to Defendant Barr's motion to dismiss.

7.   Plaintiffs consent to the filing of the proposed amicus brief.

8.   The Official-Capacity Federal Defendants Donald J. Trump, William P. Barr, Mark T. Esper, Gregory T. Monahan, James M. Murray, William J. Walker, and Michael Carvajal state that they take no position on the Reporters Committee's motion to file an amicus brief as it does not pertain to the issues of standing or sovereign immunity; that they do not plan to file papers opposing the motion; and that they leave the determination of the motion to the Court's discretion.

9.   Defendants William P. Barr, Mark Adamchik, Cara Seiberling, Sean Cox, Jeffrey Hendrickson, Nicholas Jarmuzewski, Lawrence Sinacore, Luis Feliciano, Bryan McDonald, and Jonathan Daniels, in their individual capacities, state that they take no position on the motion to file an amicus brief in connection with Defendant Adamchik's motion to dismiss, and leave the matter to the Court's discretion.  These defendants state that they do not plan to file any papers opposing the motion to file an amicus brief.  In the event the Court allows the brief to be filed, Defendant Adamchik reserves the right to seek an extension of time for his reply or additional pages on his reply in support of his dismissal motion, if needed, to respond to the amicus brief.

10.   The District Defendants Peter Newsham, Jeffery Carroll, Anthony Alioto, Clifton Murphy, Christopher Meyer, Daniel Thau, Timothy Hargrove, Jeffery Buchanan, Tiffany Payne, Justin Taylor, and Anthony Willis state that they take no position on the filing of the proposed amicus brief.

11.   Defendant Wayne Vincent states that he takes no position on the filing of the proposed amicus brief and will not be filing an objection.

12.   Defendant Thomas Locasico states that he takes no position on the filing of the proposed amicus brief.

13.   Defendant Sean Kellenberger states that he does not consent to the filing of the proposed amicus brief.

14.   This Motion is filed in a timely manner such that it does not unduly delay the Court's ability to rule on any pending matter.  This Motion is filed within seven days after the Plaintiffs filed their memorandum in opposition to the motion to dismiss filed by Defendant Adamchik and twenty-one days before Defendant Adamchik's reply to Plaintiffs' opposition is due.

Dated: December 21, 2020                 Respectfully submitted,

                                         /s/ Bruce D. Brown
                                         Bruce D. Brown
                                         (D.C. Bar No. 457317)
                                            Counsel of Record for Amicus Curiae
                                         Katie Townsend
                                         (D.C. Bar No. 1026115)
                                         Gabriel Rottman
                                         (D.C. Bar No. 992728)
                                         REPORTERS COMMITTEE FOR
                                         FREEDOM OF THE PRESS
                                         1156 15th Street NW, Ste. 1020
                                         Washington, DC 20005
                                         Telephone: 202.795.9300
                                         bbrown@rcfp.org

                                         Counsel for Amicus Curiae

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER, et al.,

                    *Plaintiffs*,

        v.                                          **Case No. 1:20-cv-01469-DLF**

TRUMP, et al.,

                    *Defendants*.

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AS
AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................................................... 1

INTRODUCTION ......................................................................................................................... 3

ARGUMENT .................................................................................................................................. 6

    I.    Federal officers have arrested and used force against journalists engaged in lawful newsgathering on numerous occasions. ............................................................................ 6

    II.   *Bivens* remedies for violations of First Amendment newsgathering rights are an indispensable deterrent against such violations. ............................................................ 10

    III.   Existing precedent does not broadly preclude the availability of *Bivens* remedies for First Amendment violations. ........................................................................................ 12

CONCLUSION ............................................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976)......................................... 15

*\*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ............................................................................................... *passim*

*Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154 (D.D.C. 2013) ................ 15

*\*Bush v. Lucas*, 462 U.S. 367 (1983) ............................................................. 12, 16, 17

*Butz v. Economou*, 438 U.S. 478 (1978)................................................................................. 3

*\*Carlson v. Green*, 446 U.S. 14 (1980) ...................................................... 4, 10, 11, 12

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001)................................................................ 11

*Daugherty v. Sheer*, 248 F. Supp. 3d 272 (D.D.C. 2017), *rev'd on other grounds*, 891 F.3d 386
  (D.C. Cir. 2018).................................................................................................................. 14

*Davis v. Billington*, 681 F.3d 377 (D.C. Cir. 2012) .............................................................. 16, 17

*Davis v. Passman*, 442 U.S. 228 (1979) ............................................................... 3, 11, 12

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977) ....................................................... 14

*FDIC v. Meyer*, 510 U.S. 471 (1994) ...................................................................... 11, 17

*Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174 (D.D.C. 2018) ................................. 15

*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013)............................................................. 14, 15

*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987), *overruled in other part by Hartman v.
  Moore*, 547 U.S. 250 (2006) ........................................................................................... 14

*Hernandez v. Mesa*, 885 F.3d 811 (5th Cir. 2018), *aff'd*, 140 S. Ct. 735 (2020) .......................... 4

*Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) ............................. 9

*Index Newspapers LLC v. City of Portland*, No. 3:20-cv-1035-SI, 2020 WL 4883017 (D. Or.
  Aug. 20, 2020)....................................................................................................................... 9

*Kauffman v. Anglo-Am. Sch. of Sofia*, 28 F.3d 1223 (D.C. Cir. 1994) ......................................... 14

*Lee v. Barr*, No. 19-cv-2284 (DLF), 2020 WL 3429465 (D.D.C. June 23, 2020) ................ 16, 17

*Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020)........................................................ 15, 16

*Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015)............................................................. 17

*Minneci v. Pollard*, 565 U.S. 118 (2012)................................................................................... 12

*Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009), *aff'd sub nom.,
  Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011)...................................................... 15

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) ............................................... 14

*Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211 (D.D.C. 2017)................................... 15, 17

*Pope v. Bond*, 641 F. Supp. 489 (D.D.C. 1986)........................................................................ 15

*Reuber v. United States*, 750 F.2d 1039 (D.C. Cir. 1984) ........................................................... 14

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) ....................................................................... 17

*Wood v. Moss*, 572 U.S. 744 (2014) ....................................................................................... 13

*\*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ........................................................................ *passim*

**Statutes**

28 U.S.C. § 2674 (2016) ............................................................................................................ 4

42 U.S.C. § 1983 ................................................................................................................. 14, 15

**Other Authorities**

Br. of Amici Curiae Reporters Comm. for Freedom of the Press and 60 News Media Orgs. in Supp. of Pls.-Appellees, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) ........................................................................................................................... 1

Br. of Amici Curiae Reporters Comm. for Freedom of the Press and 60 News Media Orgs. in Supp. of Pls.-Appellees, *Index Newspapers LLC v. U.S. Marshals Serv.*, No. 20-35739 (9th Cir. Nov. 23, 2020) .................................................................................................................... 6

Dalton Bennett et al., *The Crackdown Before Trump's Photo Op*, Wash. Post (June 8, 2020), https://perma.cc/F94P-M4M2 ..................................................................................................... 6

Exec. Order No. 13,933, 85 Fed. Reg. 40,081 (June 26, 2020) ................................................. 8

Marc Tracy and Rachel Abrams, *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. Times (updated June 12, 2020), https://perma.cc/P75Z-R7VW .... 10

Rachel Abrams & Katie Robertson, *Australia Asks for Investigation After Police Attack 2 Journalists in U.S.*, N.Y. Times (updated June 4, 2020), https://perma.cc/4UAG-FZU2 ......... 7

Sunrise (@sunriseon7), Twitter (June 1, 2020, 6:44 PM), https://bit.ly/3i5pNnF ....................... 7

Testimony of Amelia Brace, "The U.S. Park Police Attack on Peaceful Protesters at Lafayette Square Park," Hr'g Before the H. Comm. on Nat. Res. (June 29, 2020), https://bit.ly/34jHo64 ..................................................................................................................................................... 8

U.S. Customs and Border Prot., Statement on CBP Response in Portland, Oregon (July 17, 2020), https://perma.cc/N39P-XZBG .......................................................................................... 8

U.S. Press Freedom Tracker, https://perma.cc/66UG-X3WC (last visited Dec. 21, 2020)............ 3

Victoria Sanchez, *Australian Journalists 'Brutally Attacked' by U.S. Park Police While Covering DC Protest*, ABC7 WJLA (June 2, 2020), https://perma.cc/DP6U-6WW9 ............................. 7

## INTEREST OF AMICUS CURIAE

Amicus curiae the Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.[1]  Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of journalists and news organizations.

As an organization dedicated to defending the First Amendment and newsgathering rights of journalists, amicus has a powerful interest in ensuring that members of the news media are able to perform their work safely and without fear that they will be subject to the unlawful use of force or arrest by law enforcement.  That interest is omnipresent but is particularly important when members of the news media are covering federal law enforcement's response to protests. *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press and 60 News Media Orgs. in Supp. of Pls.-Appellees, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020).

Amicus takes no position on the claims in this case.  Amicus does, however, have a strong interest in the continued availability of a right of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), against federal officers, in their individual capacities, for violations of First Amendment rights, including the right to lawfully report on police activity in public and the right to be free from retaliation for the

---

[1]     No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of this brief.

exercise of that right.  *Bivens* remedies are an indispensable deterrent against such violations and therefore protect both journalist safety and the free flow of information to the public.  Defendant Major Mark Adamchik has argued in favor of broadly precluding *Bivens* relief for First Amendment violations, which could include violations of established First Amendment protections for members of the news media.

Accordingly, amicus respectfully submits this amicus curiae brief in support of neither party pursuant to Local Civil Rule 7(o).

## INTRODUCTION

Journalists lawfully covering the nationwide protests this spring and summer have been repeatedly injured and arrested by members of law enforcement. *See* U.S. Press Freedom Tracker, https://perma.cc/66UG-X3WC (last visited Dec. 21, 2020) (documenting 313 confirmed attacks against journalists, a significant majority by police, and 120 arrests in 2020). In case after case, the affected journalists clearly identified themselves as members of the press, were identifiable as such by any reasonable officer, were compliant with police orders, were positioned away from protesters, and were indisputably engaged in newsgathering protected by the First Amendment. In the District of Columbia and Portland, Oregon, as detailed further below, many of these arrests and uses of force were at the hands of federal law enforcement officers. In addition to the danger posed by such interactions to journalist safety, many also served to interfere with or outright halt reporting on police responses to the protests, a particularly acute threat to the freedom of the press and an informed electorate.

This is exactly the type of "compensable injury to a constitutionally protected interest" where it is appropriate for federal courts to "invoke [their] general federal-question jurisdiction" to permit a suit for damages directly against the responsible federal official. *Davis v. Passman*, 442 U.S. 228, 234 (1979) (quoting *Butz v. Economou*, 438 U.S. 478, 486 (1978)). These interactions are the "most flagrant and patently unjustified sorts of police conduct." *Bivens*, 403 U.S. at 411 (Harlan, J., concurring). They are one-on-one injuries inflicted by individual officers under color of law against journalists that, "while no less compensable in damages than those inflicted by private parties, are substantially different in kind" than private torts. *Id.* at 409. They are not redressable through alternate forms of relief, given that, while an injunction may deter some of these interactions, there is no way to "obviate the harm" other than damages once

they occur.  *Id.* at 410.  And, while Congress may have authorized actions against the United

States for the intentional torts of federal officers under the Federal Tort Claims Act ("FTCA"),

*Bivens* remedies "recoverable against individuals" are "a more effective deterrent" against

constitutional violations, particularly given that punitive damages are available under *Bivens* but

not the FTCA.  *Carlson v. Green*, 446 U.S. 14, 21–22 (1980); 28 U.S.C. § 2674 (2016).

In the instant case, however, Defendant Major Mark Adamchik, a U.S. Park Police

officer and the alleged incident commander during the Lafayette Square clearing, has suggested

that *Bivens* claims based on First Amendment violations may be categorically precluded in the

name of "presidential security" (or, perhaps, more broadly).  *See* Major Mark Adamchik's Mot.

to Dismiss All Individual-Capacity Claims at 9, *Black Lives Matter D.C. v. Trump*, No. 1:20-cv-

01469 (D.D.C. Nov. 16, 2020), ECF No. 97 (arguing that because the Supreme Court has

"repeatedly reminded litigants that it has *not* expressly extended a First Amendment *Bivens*

claim under any of its clauses to *any context* . . . [t]hat alone means that plaintiffs' First

Amendment claim presents a new context." (internal citations omitted, emphasis in original and

added)); *id.* at 12 ("'[T]he newness' of the presidential-security context '*should alone* require

dismissal of the plaintiffs' damage claims.'" (quoting *Hernandez v. Mesa*, 885 F.3d 811, 818

(5th Cir. 2018), *aff'd*, 140 S. Ct. 735 (2020) (emphasis added)).[2]  While Major Adamchik

invokes "presidential security" in arguing that these claims present a new context, the underlying

constitutional violation—the arrest or assault of an individual lawfully engaged in activity

---

[2]    Major Adamchik cites dicta in the Fifth Circuit's *Hernandez* decision contemplating that
the *Bivens* analysis could end based on the "newness" of the context presented.  885 F.3d at 818.
But the Supreme Court's affirmance in *Hernandez* confirmed that the *Bivens* "two-step inquiry,"
where the Court considers whether the case presents a "new context" and then whether "special
factors" weigh against recognizing an implied right of action, remains in place.  140 S. Ct. at
743; *id.* at 744 ("Because petitioners assert claims that arise in a new context, we *must* proceed to
the next step and ask whether there are factors that counsel hesitation." (emphasis added)).

protected by the First Amendment—is exactly the type of claim where *Bivens* relief is appropriate.  To remove such claims from *Bivens'* orbit would diminish the deterrent function *Bivens* serves with respect to the arrest of or use of force against journalists lawfully engaged in newsgathering, and thus endanger both journalists and government accountability.

Amicus offers three points in response to Defendant's suggestion that such remedies may be broadly unavailable for First Amendment violations of the type at issue here.[3]

***First***, in enforcing dispersal orders such as the one used to clear Lafayette Square, federal officers have repeatedly used force to interfere with lawful newsgathering by clearly identifiable journalists.  Members of the news media continue to face a credible fear of such incidents.

***Second***, and relatedly, these interactions underscore the need for a meaningful deterrent against First Amendment violations by federal officers.  That deterrent is crucial given that journalists have been injured or arrested because their profession requires proximity to protest activity, and the federal government has claimed the broad authority to use coercive means, including less-lethal munitions, to enforce general dispersal orders without reference to specific incidents of violence by identifiable individuals in the relevant assembly.  *See* Br. of Amici Curiae Reporters Comm. for Freedom of the Press and 60 News Media Orgs. in Supp. of Pls.-Appellees at 7, *Index Newspapers LLC v. U.S. Marshals Serv.*, No. 20-35739 (9th Cir. Nov. 23,

---

[3]      Defendant Attorney General William Barr also argued that *Bivens* remedies may be broadly precluded for First Amendment claims.  *See* Mem. in Supp. of Att'y Gen. William P. Barr's Mot. to Dismiss All Individual-Capacity Claims at 9, *Black Lives Matter D.C. v. Trump*, No. 1:20-cv-01469 (D.D.C. Oct. 1, 2020), ECF No. 76.  Defendant Major Adamchik was added in the Third Amended Complaint and likewise contests the availability of *Bivens* relief.  *See* Major Mark Adamchik's Mot. to Dismiss All Individual-Capacity Claims, *supra*, at 5.  Amicus submits this brief only in response to Major Adamchik's submissions regarding *Bivens* and is not requesting consideration of this brief in connection with Defendant Barr's motion to dismiss.

2020), ECF No. 54 (discussing government's position that federal dispersal orders in Portland, Oregon, need not be narrowly tailored to target actual violence at protest).

Finally, **third**, while the Supreme Court has not expressly recognized the availability of *Bivens* remedies in a First Amendment case, nothing in Supreme Court jurisprudence or the precedent of the U.S. Court of Appeals for the District of Columbia Circuit *precludes* a First Amendment *Bivens* remedy. This is especially so in clear-cut instances of law enforcement overreach by individual officers, such as the arrest of or use of force against a journalist engaged in lawful newsgathering. Indeed, longstanding precedent in this Circuit suggests that such cases are exactly the kind of discrete and egregious constitutional violation where the availability of a *Bivens* remedy is both appropriate and necessary.

For all of these reasons, amicus urges the Court to reject Defendant's sweeping argument that the arrest of or use of force against individuals in violation of their First Amendment rights is categorically outside the reach of *Bivens* relief.

## ARGUMENT

### I.   Federal officers have arrested and used force against journalists engaged in lawful newsgathering on numerous occasions.

On June 1, approximately twenty-five minutes before the District of Columbia's seven p.m. curfew went into effect, federal officers in riot gear began dispersing protesters in Lafayette Square with batons, tear gas, rubber bullets, and flash-bang explosives. *See* Dalton Bennett et al., *The Crackdown Before Trump's Photo Op*, Wash. Post (June 8, 2020), https://perma.cc/F94P-M4M2. During the dispersal, an Australian film crew was in the middle of a live report for the morning show Sunrise, airing on Seven Network, one of five major television networks in Australia. *See* Rachel Abrams & Katie Robertson, *Australia Asks for*

*Investigation After Police Attack 2 Journalists in U.S.*, N.Y. Times (updated June 4, 2020),

https://perma.cc/4UAG-FZU2.

Crew member Tim Myers was holding a large news camera in front of his face, and

correspondent Amelia Brace was speaking to the camera.  Both Brace and Myers were standing

to the side of the protest behind a wall—indeed, they were on a raised piece of concrete off the

sidewalk and not among the protesters at all.  *See* Sunrise (@sunriseon7), Twitter (June 1, 2020,

6:44 PM), https://bit.ly/3i5pNnF (footage from Brace and Myers); Victoria Sanchez, *Australian*

*Journalists 'Brutally Attacked' by U.S. Park Police While Covering DC Protest*, ABC7 WJLA

(June 2, 2020), https://perma.cc/DP6U-6WW9 (footage from ABC7).

As can be seen in the footage, *id.*, and as recounted in Brace's testimony at an oversight

hearing of the House Natural Resources Committee on the Lafayette Square clearing, U.S. Park

Police officers appeared to deliberately target Brace and Myers as they advanced on the crowd to

effectuate the dispersal.  Brace's written testimony describes the incident as follows:

> We then began our live cross.  As I started explaining the situation to the in-studio
> hosts, the line of police suddenly—and again, without any verbal warning that I
> could hear—began charging forward at a sprinting pace.  As Tim was capturing
> the footage of this stampede (which was knocking protesters onto the ground), a
> Park Police officer who was running by on the sidewalk stopped just as he was
> passing us, turned towards Tim and rammed him in the chest and stomach with
> the edge of his riot shield, causing Tim to keel over and drop down to a sitting
> position on a plastic crate behind him.  The officer took a half step back and
> seemed to pause for a moment, looking at Tim.  He then punched his hand
> directly into the front of Tim's camera and grabbed the lens, causing Tim's head
> to whiplash backwards.  Tim later told me that this caused him to "see stars" for a
> moment.  As this happened, both Tim and I were repeatedly shouting "Media!
> Media!" at the top of our lungs, to make clear what I would have thought was
> already obvious.
>
> In an instant, a group of four or five Park Police officers surrounded us, as we
> continued to shout "Media!"  I recall instinctively raising my hands near my face
> and almost cowering behind Tim, afraid of what this even larger group of officers
> would now do to us.  . . .  An officer in the group stood behind the first officer,
> and placed his arm between the first officer and us, seemingly trying to restrain

7

him.  That second officer shouted at us to move further down the sidewalk.  We immediately complied.  Tim—despite having been knocked down a second earlier—crouched low and began running down the sidewalk.  Even though Tim was following the officers' instructions, the first officer pushed the face of his shield against Tim's back to physically prod him forward.  I grabbed hold of Tim's backpack, and followed, also crouching low.

As I was running away, I felt something strike me hard across the back and shoulders.  I now know, from seeing the local news crew's footage, that a third U.S. Park Police officer reached around the second officer to smack me with his baton in a backhanded motion as I was running away.  Disturbingly, in the moments before that, as the other officers surrounded us, this third officer appears to be trying to push his way into the scrum while waving his baton.  Unable to get "into the mix" before we started running down the sidewalk, he seemed to go out of his way to make sure to get at least one hit on us.

Testimony of Amelia Brace at 4–5, "The U.S. Park Police Attack on Peaceful Protesters at

Lafayette Square Park," Hr'g Before the H. Comm. on Nat. Res. (June 29, 2020),

https://perma.cc/DYH3-26X8.

      Similar encounters between journalists and federal law enforcement officers occurred

during the recent protests in Portland, Oregon, where the United States Marshals Service,

Customs and Border Protection, and the Federal Protective Service deployed agents for crowd

control duty following the signing of an executive order regarding the protection of federal

property.  *See* Exec. Order No. 13,933, 85 Fed. Reg. 40,081 (June 26, 2020); U.S. Customs and

Border Prot., Statement on CBP Response in Portland, Oregon (July 17, 2020), https://perma.cc/

N39P-XZBG.  For instance, Noah Berger, on assignment for the Associated Press, said that he

encountered the following during protests in Portland on July 19, 2020:

[A]s federal agents "rushed" an area he was photographing, he held up his press pass, identified himself as press, stated he was leaving, and moved away from the area.  While holding his press pass and identifying himself as press, he was hit with a baton by one federal agent.  Two others joined and surrounded him, and he was hit with batons three or four times.  One agent then deployed pepper spray against Mr. Berger from about one foot away.  He was given no warning.

*See Index Newspapers LLC v. City of Portland*, No. 3:20-cv-1035-SI, 2020 WL 4883017, at *5 (D. Or. Aug. 20, 2020) (internal citations omitted).  In another case, after identifying himself as press, photojournalist Nathan Howard received conflicting responses from nearby officers.  One "stated words to the effect of 'okay, okay, stay where you are, don't come closer.'"  *Id.* at *6. The other agent, "standing immediately to the left of the agent who gave Mr. Howard the 'okay,' aimed directly at Mr. Howard and fired at least two pepper balls at him at close range."  *Id.*

These and numerous other incidents prompted a district court to grant a preliminary injunction enjoining federal officers in Portland from, among other things, "arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist."  *Id.* at *27.  On appeal, a divided panel granted an interim administrative stay of the injunction.  A later divided panel, however, then denied the emergency motion for a stay pending appeal and upheld the injunction, finding that:  "Because the district court's findings include so many instances in which plaintiffs were standing nowhere near protesters while photographing and observing the Federal Defendants' actions, they provide exceptionally strong evidentiary support for the district court's finding that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights."  *Index Newspapers*, 977 F.3d at 829.

In response to that "shocking pattern of misconduct," *id.*, even the dissent wrote, "Remarkably, some of the allegations in the complaint regarding 'retaliation' may well support *Bivens* actions and claims of excessive force against individual officers, but that is not what is before us today," *id.* at 851, n.10 (O'Scannlain, J., dissenting).

In sum, these and other recent incidents involving federal officers' interference with lawful newsgathering underscore the credible and ongoing concern among members of the news media that similar constitutional violations may recur.

## II.   *Bivens* remedies for violations of First Amendment newsgathering rights are an indispensable deterrent against such violations.

Damages claims against individual federal officers under *Bivens* are a particularly potent deterrent against violations of First Amendment newsgathering protections, such as the right to be free from retaliation for lawful reporting and the right to report on government activity in public.  This is always true, but it is especially so in the context of newsgathering during protests, when, as described above, journalists have been subjected to the use of force or arrest because of their proximity to protest activity.  *See* Marc Tracy and Rachel Abrams, *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. Times (updated June 12, 2020), https://perma.cc/P75Z-R7VW ("Journalists are [at protests] as representatives of the public, and if law enforcement is attacking them, they can't do their job, and that hurts everybody." (quoting Sarah Matthews, Reporters Committee staff attorney)).  During the tumult of a protest, foreknowledge by individual officers that the unlawful arrest of or use of force against a journalist may lead to the burden of defending a lawsuit as well as personal financial jeopardy serves both to discipline law enforcement and safeguard the press's constitutionally recognized watchdog role.  *See Carlson*, 446 U.S. at 21 ("It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." (internal citation omitted)).

Indeed, the stated rationale behind *Bivens* is both to provide compensation for constitutional violations that would otherwise escape meaningful redress, and to deter such violations.  *See id.* at 15 (finding that Congress expressly refused to preclude individual damages

10

remedies because of their greater deterrent effect when enacting FTCA).  In cases *declining* to

extend *Bivens* remedies to federal agencies or contractors—rather than individual officers—a

significant element of the Supreme Court's reasoning was that "the purpose of *Bivens* is to deter

*the officer[s]*" in their individual capacities.  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69

(2001) (quoting *FDIC v. Meyer*, 510 U.S. 471, 485 (1994)).  That is, "[i]f we were to imply a

damages action directly against federal agencies, thereby permitting claimants to bypass

qualified immunity, there would be no reason for aggrieved parties to bring damages actions

against individual officers . . . [and] the deterrent effects of the *Bivens* remedy would be lost."

*Meyer*, 510 U.S. at 485.  Further, "the threat of litigation and liability will adequately deter

federal officers for *Bivens* purposes no matter that they may enjoy qualified immunity, are

indemnified by the employing agency or entity, or are acting pursuant to an entity's policy."

*Malesko*, 534 U.S. at 70 (internal citations omitted).

        In other words, the deterrent function of the *Bivens* remedy is one of its primary

animating forces and, with respect to egregious violations of constitutional rights, that function

weighs in favor of recognizing its availability.  *See Carlson*, 446 U.S. at 20–22 (finding that two

factors—recoverability of damages against individual officers and the availability of punitive

damages—are relevant to whether the FTCA is "less effective than a *Bivens* action as a deterrent

to unconstitutional acts").  Further, the need for a *Bivens* remedy is particularly acute where there

are no alternative forms of judicial relief sufficient to redress the constitutional wrong.  *Compare

Bivens*, 403 U.S. at 409–10 (Harlan, J., concurring) ("[I]t is apparent that some form of damages

is the only possible remedy for someone in Bivens' alleged position."), *and Davis*, 442 U.S. at

245 ("[T]here are available no other alternative forms of judicial relief.  For Davis, as for Bivens,

'it is damages or nothing.'" (quoting *Bivens*, 403 U.S. at 410)), *with Minneci v. Pollard*, 565 U.S.

118, 120 (2012) (declining to extend *Bivens* remedy to employees of private prison because state tort law authorizes damages that "provide both significant deterrence and compensation"); *cf. Bush v. Lucas*, 462 U.S. 367, 388 (1983) (declining to extend *Bivens* remedy to First Amendment retaliation claim by federal employee against supervisors in light of "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations").

 With respect to violations of the First Amendment that follow the fact pattern described in the preceding section—where federal law enforcement officers target journalists engaged in lawful newsgathering with arrest or the use of force—there would be no alternative remedy that would serve as strong a deterrent function as the possibility of a damages suit against the individual officers.  And, that deterrence is exceptionally important in light of recent encounters between federal officers and journalists, who have been arrested or subjected to the use of force because their profession requires them to be in the vicinity of protest activity.

**III.** **Existing precedent does not broadly preclude the availability of *Bivens* remedies for First Amendment violations.**

 While the Supreme Court has clarified the test for when to extend *Bivens* to a "new context" beyond the three cases recognizing an implied right of action (*Bivens*, *Davis*, and *Carlson*), *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1849 (2017), in operation, the current approach does not differ markedly from the framework established in *Bivens*, where remedies may be inappropriate in the presence of "special factors counseling hesitation in the absence of affirmative action by Congress."  *Bivens*, 403 U.S. at 396.  With respect to those "special factors," the "necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Abbasi*, 137 S. Ct. at 1857–58.  A

"special factor" is one that causes "a court to hesitate before answering that question in the affirmative." *Id.*

First Amendment violations of the type described above—the arrest or assault of a clearly identifiable journalist lawfully covering a protest—are indistinguishable from the constitutional violation in *Bivens* itself, an unreasonable search and seizure under the Fourth Amendment. Neither context should prompt a court to "hesitate" before finding that it is "well suited" to adjudicate such a claim. That is, both are discrete instances of law enforcement overreach by individual officers where the availability of a damages remedy would have no effect on "governmental operations systemwide," *Abbasi*, 137 S. Ct. at 1858; where there is no "alternative remedial structure," *id.*; and where there is no reason to doubt the "efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong," *id.* Major Adamchik may argue that "presidential security" in the instant case is the "systemwide" consideration, but the practical effect of permitting *Bivens* remedies for clear-cut violations of the First Amendment, even in the context of police activity to protect the President, is just that individual officers will be less likely to commit such violations. That is less a burden on the executive branch than the desired outcome under *Bivens* itself, and differs markedly from the type of "systemwide" disruption found by the Supreme Court when refusing to extend *Bivens*' reach (such as when *Bivens* would merely supplement, and possibly interfere with, a comprehensive remedial scheme like civil service protections). Indeed, in the one Supreme Court case touching on the intersection between presidential security and *Bivens*, the Court assumed without deciding that *Bivens* remedies *are* available for First Amendment violations by federal officers in the presidential security context, but decided the case on qualified immunity grounds. *See Wood v. Moss*, 572 U.S. 744, 757, 764 (2014).

13

Crucially, the D.C. Circuit has long recognized the availability of a *Bivens* remedy for First Amendment violations, precisely because no special factors counsel hesitation in many such contexts.  This is particularly so in cases of overreach by individual officers.  *See Dellums v. Powell*, 566 F.2d 167, 194–96 (D.C. Cir. 1977) (extending *Bivens* to cases of retaliatory arrest by U.S. Capitol police of protesters exercising First Amendment rights and finding no special factors counseling hesitation); *see also Haynesworth v. Miller*, 820 F.2d 1245, 1257 n.96 (D.C. Cir. 1987) (citing *Dellums* approvingly regarding judicial capability to adjudicate *Bivens* claims in First Amendment contexts), *overruled in other part by Hartman v. Moore*, 547 U.S. 250 (2006); *Reuber v. United States*, 750 F.2d 1039, 1054–61 (D.C. Cir. 1984) (finding that *Bivens* claims encompass retaliatory actions of private actors acting under color of federal law, and noting absence of any special factors counseling otherwise); *but see Kauffman v. Anglo-Am. Sch. of Sofia*, 28 F.3d 1223 (D.C. Cir. 1994) (holding that a private entity that has "lesser" links to the federal government is exempt from *Bivens* liability).

The district courts have faithfully and routinely followed these precedents as well.  *See Daugherty v. Sheer*, 248 F. Supp. 3d 272, 283 (D.D.C. 2017), *rev'd on other grounds*, 891 F.3d 386 (D.C. Cir. 2018) (plaintiffs sufficiently pled First Amendment *Bivens* claim for retaliatory administrative enforcement action, and, after conducting special factors analysis, the court found that lack of alternative compensation scheme counseled in favor of remedy); *Patterson v. United States*, 999 F. Supp. 2d 300, 307–10 (D.D.C. 2013) (finding *Bivens* remedy available for a retaliatory arrest by U.S. Park Police in violation of the First Amendment, and pointing to the "nonsensical" result of allowing such actions against state and local police under 42 U.S.C. § 1983 and not against federal police under *Bivens*); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 50–52 (D.D.C. 2013) (finding a First Amendment *Bivens* remedy available, and focusing on

14

inconsistency of allowing some claims in the § 1983 context and not in the *Bivens* context, as well as the importance of providing some form of redress for lost opportunity to exercise First Amendment rights); *Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 159–61 (D.D.C. 2013) (echoing *Hartley*'s reasoning); *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 73–76 (D.D.C. 2009) (denying motion to dismiss where plaintiff sued for *Bivens* damages based on retaliatory contract termination for private speech, and noting lack of alternative meaningful remedy and judicial manageability), *aff'd sub nom., Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011); *Pope v. Bond*, 641 F. Supp. 489, 494–95 (D.D.C. 1986) (finding *Bivens* claim available for First Amendment retaliation against federal employee because nothing counseled hesitation, including no meaningful alternative available remedy); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 160–61 (D.D.C. 1976) (allowing *Bivens* damages against officials responsible for an intelligence program in West Berlin that permitted retaliation on the basis of plaintiff's speech, noting need for damages as remedy); *see also Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 181–82 (D.D.C. 2018) (finding federal prisoner adequately stated a First Amendment *Bivens* claim); *Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 219–21 (D.D.C. 2017) (finding *Bivens* claim available for First Amendment retaliation against prisoner and reviewing Circuit precedent).

Contrary to the assertion of Major Adamchik, recent cases in the D.C. Circuit and this Court do *not* hold that First Amendment *Bivens* claims must be broadly precluded.  While *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020), is the primary D.C. Circuit case decided after *Abbasi* involving First Amendment damages claims, it arose in an entirely different context than an arrest or assault at a protest, and the *Loumiet* court limited its holding to the facts of that case.  *Id.* at 385.  *Loumiet* involved an allegedly retaliatory administrative enforcement

proceeding by the Office of the Comptroller of the Currency under the Financial Institutions

Reform, Recovery, and Enforcement Act ("FIRREA"), and presented one special factor

counseling hesitation that "st[ood] out":  the availability of an "alternative, existing process for

protecting [plaintiff's] interests," the FIRREA enforcement scheme itself.  *Id.* at 382–84 (quoting

*Ziglar*, 137 S. Ct. at 1858).  Among other things, FIRREA enforcement required notice, a

hearing with numerous procedural protections for the target of an enforcement action, and the

availability of both administrative and judicial review.  *Id.* at 384.  Further, prevailing parties

may recover fees and expenses under the Equal Access to Justice Act, thus providing "a sword as

well as a shield."  *Id.*  Finally, the court in *Loumiet* emphasized that FIRREA itself "carefully

circumscribed" judicial review, and those provisions "come close to foreclosing a *Bivens* action

expressly."  *Id.*  In short, *Loumiet* involved an exotic claim in an indisputably new context,

governed by a comprehensive administrative enforcement scheme, along with specific

instructions from Congress on the scope and nature of judicial review.  That is a far cry from an

individual federal officer subjecting a journalist to arrest or the use of force in violation of

established newsgathering rights, where recognizing a *Bivens* claim poses little risk to a carefully

calibrated alternative remedial scheme (because there is none with respect to the officer) and

where only the possibility of individual liability would serve as an effective deterrent against

such violations.

Major Adamchik also cites a recent opinion by this Court, *Lee v. Barr*, No. 19-cv-2284

(DLF), 2020 WL 3429465 (D.D.C. June 23, 2020), for the proposition that First Amendment

claims are broadly exempt from *Bivens* relief.  *Lee*, however, arose in the more complicated

context of a First Amendment retaliation claim by a federal employee against his employers.  *Id.*

at *6.  Citing *Bush* and *Davis v. Billington*, 681 F.3d 377 (D.C. Cir. 2012), *Lee* found that

plaintiff's First Amendment *Bivens* claim could not survive a motion to dismiss.  *Lee*, 2020 WL 3429465, at *6.  But, again, the federal employee cases turn not on the fact they sound in the First Amendment, but on the existence of comprehensive remedial schemes that have been "constructed step by step, with careful attention to policy considerations."  *Bush*, 462 U.S. at 368.  In these cases, the attendant risk of judicial interference with legitimate executive functions is higher and the Supreme Court has reasoned that "Congress is in a better position to decide whether or not the public interest would be served by" a supplementary remedy.  *Id*. at 368, 390. In *Billington*, the existence of a comprehensive remedial scheme was determinative, and the *Billington* court expressly found that such a scheme evinced the "considered judgment of Congress that certain remedies are not warranted."  *Billington*, 681 F.3d at 388 (quoting *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008)).  This Court in *Lee* also distinguished *Pinson* as having been decided before *Abbasi*, but that was a First Amendment retaliation case by a federal *prisoner*, not a federal employee, and, respectfully, should be distinguished on that basis.

Amicus grants that "the Supreme Court has proceeded cautiously" in expanding *Bivens* claims to new contexts.  *Meshal v. Higgenbotham*, 804 F.3d 417, 421 (D.C. Cir. 2015).  But even *Abbasi* emphasized that the Court's "opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose."  137 S. Ct. at 1856.  The *Abbasi* Court further recognized that "individual instances of . . . law enforcement overreach" are by "their very nature . . . difficult to address except by way of damages actions after the fact," *id.* at 1862, and that *Bivens* claims are "brought against the individual official for his or her own acts, not the acts of others," *id.* at 1860.  That, the Court wrote, is because the whole "purpose of *Bivens* is to deter the *officer*."  *Id.* (quoting *Meyer*, 510 U.S. at 485).  *Bivens*, the Court held, remains "settled law."  *Id.* at 1857.

If anything, the command of *Abbasi* is not to draw into doubt the longstanding precedent in this Circuit recognizing First Amendment *Bivens* claims for individual instances of law enforcement overreach.  It is only to put a finer point on the "special factors" analysis, where separation-of-powers considerations arise in cases where an implied right of action could work true mischief in impairing legitimate executive functions.  But the arrest or assault of journalists engaged in lawful newsgathering remain the archetypal cases where *Bivens* can and should apply, as its deterrent value is irreplaceable and its costs on executive functioning are low (or even *desirable* in service of that deterrent role).  The sweep of Major Adamchik's suggestion— that *Bivens* relief is broadly unavailable under the First Amendment—would therefore not only diminish the well-established rights of the press in the abstract, but also imperil the physical safety of individual journalists by eviscerating *Bivens'* deterrent effect.

## CONCLUSION

For all of these reasons, amicus respectfully submits that the Court should reject Defendant's argument that *Bivens* remedies are broadly precluded under the First Amendment.

Dated:  December 21, 2020                          Respectfully submitted,

*/s/ Bruce D. Brown*
Bruce D. Brown
(D.C. Bar No. 457317)
  *Counsel of Record for Amicus Curiae*
Katie Townsend
(D.C. Bar No. 1026115)
Gabriel Rottman
(D.C. Bar No. 992728)
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bbrown@rcfp.org

*Counsel for Amicus Curiae*

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BLACK LIVES MATTER, et al.,

               *Plaintiffs*,

   v.

TRUMP, et al.,

               *Defendants*.

**Case No. 1:20-cv-01469-DLF**

### [PROPOSED] ORDER

Upon consideration of the Motion for Leave to File Brief of the Reporters Committee for Freedom of the Press as Amicus Curiae in Support of Neither Party, it is hereby

ORDERED that the Motion is granted, and further

ORDERED that the brief of the Reporters Committee for Freedom of the Press as amicus curiae is hereby deemed filed in the above-captioned case.

Dated: _____

_____
Hon. Dabney L. Friedrich
United States District Court Judge

1