**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BLACK LIVES MATTER D.C., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | |
| ) | **Case No: 1:20-cv-01469-DLF** |
| **DONALD J. TRUMP, et al.,** ) | |
| ) | |
| **Defendants**. ) | |
| ) | |

**MAJOR MARK ADAMCHIK'S REPLY**
**IN SUPPORT OF HIS MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS**

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6313130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Major Mark Adamchik in his*
*individual capacity*

<u>**TABLE OF CONTENTS**</u>

**INTRODUCTION** ................................................................................................................ 1

**DISCUSSION** ..................................................................................................................... 2

I.    A *Bivens* claim is not available in this new context......................................................... 2

    A.   Plaintiffs concede that their *Bivens* claims present a new context....................................... 4

    B.   Special factors preclude a *Bivens* remedy in the presidential-security context. ................. 5

       i.    Plaintiffs concede presidential-security concerns cut against *Bivens*. ............................ 5

       ii.   Plaintiffs concede that Congress has legislated heavily in the presidential-security field without authorizing a personal damages remedy.......................................................... 11

       iii.  Plaintiffs do not dispute that they seek sensitive, high-level information. .................... 12

       iv.   Plaintiffs acknowledge that alternative processes are available to them. ...................... 14

II.   Major Adamchik is entitled to qualified immunity based on his lack of involvement and the lack of a clearly established constitutional violation. .............................................................. 17

    A.   Plaintiffs misconstrue the qualified immunity standard.................................................... 17

    B.   Plaintiffs' conclusory allegations fail to show Major Adamchik's personal involvement in alleged violations of clearly established constitutional rights............................................ 18

    C.   Major Adamchik has qualified immunity from the First Amendment claim.................... 23

    D.   Major Adamchik has qualified immunity from the Fourth Amendment claim. ............... 27

    E.   Amici's support of plaintiffs' constitutional claims is unavailing. ................................... 31

    F.   Major Adamchik has qualified immunity from the statutory claims. ............................... 32

       i.    Plaintiffs fail to allege the existence of, or Major Adamchik's membership in, a conspiracy under 42 U.S.C. §§ 1985(3) and 1986......................................................... 32

       ii.   Plaintiffs fail to allege Major Adamchik had the requisite animus. .............................. 34

       iii.  Amici's statutory arguments are contrary to established precedent. ............................. 38

**CONCLUSION** ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Metiva*,
  31 F.3d 375 (6th Cir. 1994) ........................................................................... 29

*Ahmed v. Weyker*,
  No. 18-3461, 2020 WL 7637930 (8th Cir. Dec. 23, 2020) ........................... 9, 16

*Al-Bihani v. Obama*,
  619 F.3d 1 (D.C. Cir. 2010) .......................................................................... 32

*Alharbi v. Miller*,
  368 F. Supp. 3d 527 (E.D.N.Y. 2019) ........................................................... 39

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ....................................................................................... 18

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018) ................................................................................... 32

\*  *Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................ passim

*Bame v. Dillard*,
  637 F.3d 380 (D.C. Cir. 2011) ...................................................................... 35

*Barham v. Ramsey*,
  434 F.3d 565 (D.C. Cir. 2006) ...................................................................... 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 19, 34

\*  *Berg v. Kelly*,
  897 F.3d 99 (2d Cir. 2018) ............................................................................ 27

*Bernini v. City of St. Paul*,
  665 F.3d 997 (8th Cir. 2012) .................................................................... 31, 32

*Bible Believers v. Wayne Cty.*,
  805 F.3d 228 (6th Cir. 2015) ......................................................................... 25

*Biswas v. City of New York*,
  973 F. Supp. 2d 504 (S.D.N.Y. 2013) ........................................................... 38

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ......................................................................................... 1

\*  *Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ................................................................................. 36, 37

*Bridges v. California*,
  314 U.S. 252 (1941) ....................................................................................... 25

*Bundy v. Sessions*,
  387 F. Supp. 3d 121 (D.D.C. 2019) ............................................................... 19

*Burns v. State Police Ass'n*,
  230 F.3d 8 (1st Cir. 2000) ............................................................................. 37

*Carlson v. Green*,
   446 U.S. 14 (1980) ............................................................................................. 4

*Carr v. District of Columbia*,
   587 F.3d 401 (D.C. Cir. 2009) ........................................................................ 31

*City of Omaha Emps. Betterment Ass'n v. City of Omaha*,
   883 F.2d 650 (8th Cir. 1989) .......................................................................... 37

*Collins v. Hardyman*,
   341 U.S. 651 (1951) ......................................................................................... 39

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) ............................................................................................. 4

*Davis v. Jefferson Hosp. Ass'n*,
   685 F.3d 675 (8th Cir. 2012) .......................................................................... 33

*Dellums v. Powell*,
   566 F.2d 167 (D.C. Cir. 1977) .......................................................................... 8

*Democracy Forward Found. v. White House Office of Am. Innovation*,
   356 F. Supp. 3d 61 (D.D.C. 2019) ................................................................... 7

*Felarca v. Birgeneau*,
   891 F.3d 809 (9th Cir. 2018) .......................................................................... 29

*Felarca v. Birgeneau*,
   No. 11-cv-05719, 2013 WL 663921 (N.D. Cal. Feb. 22, 2013) ..................... 20

*Fogarty v. Gallegos*,
   523 F.3d 1147 (10th Cir. 2008) ...................................................................... 30

*Graber v. Dales*,
   No. CV 18-3168, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019) ................. 8, 10

*Graham v. Connor*,
   490 U.S. 386 (1989) .................................................................................. 28, 32

*Gregoire v. Biddle*,
   177 F.2d 579 (2d Cir. 1949) ........................................................................... 40

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) .................................................................................... 36, 37

*Haynesworth v. Miller*,
   820 F.2d 1245 (D.C. Cir. 1987) ........................................................................ 5

*Headwaters Forest Def. v. Cty. of Humboldt*,
   276 F.3d 1125 (9th Cir. 2002) ........................................................................ 30

*Henderson v. Munn*,
   439 F.3d 497 (8th Cir. 2006) .......................................................................... 29

*Hernandez v. Joliet Police Dep't*,
   197 F.3d 256 (7th Cir. 1999) .......................................................................... 34

\* *Hernandez v. Mesa*,
   140 S. Ct. 735 (2020) ............................................................................... passim

*Hobson v. Wilson*,
　737 F.2d 1 (D.C. Cir. 1984) ............................................................................... 40

*Hunter v. Bryant*,
　502 U.S. 224 (1991) ................................................................................... 14, 29

*Islamic Am. Relief Agency v. Gonzales*,
　477 F.3d 728 (D.C. Cir. 2007) ........................................................................ 19

*Keating v. City of Miami*,
　598 F.3d 753 (11th Cir. 2010) ......................................................................... 20

*Knowlton v. United States*,
　111 F. Supp. 2d 1 (D.D.C. 1999) .................................................................... 38

*Kurd v. Republic of Turkey*,
　374 F. Supp. 3d 37 (D.D.C. 2019) ................................................................... 33

*Lagayan v. Odeh*,
　199 F. Supp. 3d 21 (D.D.C. 2016) ................................................................... 35

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*,
　881 F.3d 912 (D.C. Cir. 2018) .......................................................................... 2

*Linlor v. Polson*,
　263 F. Supp. 3d 613 (E.D. Va. 2017) .............................................................. 8, 9

\*　*Loumiet v. United States*,
　948 F.3d 376 (D.C. Cir. 2020) ........................................................................ 5, 7

*Lyall v. City of Los Angeles*,
　807 F.3d 1178 (9th Cir. 2015) ......................................................................... 31

*Malley v. Briggs*,
　475 U.S. 335 (1986) ......................................................................................... 14

*Medellin v. Texas*,
　552 U.S. 491 (2008) ......................................................................................... 31

*Menotti v. City of Seattle*,
　409 F.3d 1113 (9th Cir. 2005) ............................................................... 25, 26, 28

*Meshal v. Higgenbotham*,
　804 F.3d 417 (D.C. Cir. 2015) ................................................................. passim

*Moss v. U.S. Secret Serv.*,
　711 F.3d 941 (9th Cir. 2013) ........................................................................... 19

*Oliveras v. Basile*,
　440 F. Supp. 3d 365 (S.D.N.Y. 2020) ............................................................. 15

*Paquete Habana*,
　175 U.S. 677 (1900) ......................................................................................... 32

*Pearson v. Callahan*,
　555 U.S. 223 (2009) ......................................................................................... 32

*Quaker Action Grp. v. Morton*,
　516 F.2d 717 (D.C. Cir. 1975) .......................................................................... 6

*Reichle v. Howards*,
   566 U.S. 658 (2012) ............................................................................................. 17, 18

*Reynard v. Washburn Univ. of Topeka*,
   No. 19-4012, 2020 WL 3791876 (D. Kan. July 7, 2020) ........................................ 28

*Richards v. Gelsomino*,
   No. CV 16-1002, 2019 WL 1535466 (D.D.C. Apr. 8, 2019) ................................... 36

*Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*,
   861 F. Supp. 2d 470 (M.D. Pa. 2012) ................................................................... 33

*Robinson v. Allstate Ins. Co.*,
   508 F. App'x 7 (2d Cir. 2013) ................................................................................ 38

*Roper v. Simmons*,
   543 U.S. 551 (2005) .............................................................................................. 32

*Santistevan v. Loveridge*,
   732 F.2d 116 (10th Cir. 1984) ............................................................................... 39

*Saucier v. Katz*,
   533 U.S. 194 (2001) .............................................................................................. 27

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988) .............................................................................................. 12

*Seibert v. Baptist*,
   594 F.2d 423 (5th Cir. 1979) ................................................................................. 40

*Sheller-Paire v. Gray*,
   888 F. Supp. 2d 34 (D.D.C. 2012) ........................................................................ 21

*Simmons v. Poe*,
   47 F.3d 1370 (4th Cir. 1995) ................................................................................. 38

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .............................................................................................. 31

*Startzell v. City of Philadelphia*,
   533 F.3d 183 (3d Cir. 2008) ........................................................................... 25, 38

*Tanzin v. Tanvir*,
   141 S. Ct. 486 (2020) ........................................................................................... 2, 3

*Taylor v. Alvarez*,
   No. 07-23003-civ, 2008 WL 1840719 (S.D. Fla. Apr. 21, 2008) ........................... 19

*Tel-Oren v. Libyan Arab Republic*,
   726 F.2d 774 (D.C. Cir. 1984) ............................................................................... 31

*Tonkovich v. Kansas Bd. of Regents*,
   159 F.3d 504 (10th Cir. 1998) ............................................................................... 33

*United States v. Armstrong*,
   517 U.S. 456 (1996) .............................................................................................. 36

*United States v. Flynn*,
   216 F.2d 354 (2d Cir. 1954) .................................................................................. 36

*United States v. Stanley*,
   483 U.S. 669 (1987) ....................................................................... 9, 15
*Vanderklok v. United States*,
   868 F.3d 189 (3d Cir. 2017) ....................................................... 7, 9, 15
*Vinyard v. Wilson*,
   311 F.3d 1340 (11th Cir. 2002) ............................................................ 29
*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ............................................................................ 32
*Watts v. United States*,
   394 U.S. 705 (1969) .............................................................................. 8
*White House Vigil for ERA Comm. v. Clark*,
   746 F.2d 1518 (D.C. Cir. 1984) ................................................ 8, 10, 29
*White v. Berger*,
   709 F. App'x 532 (11th Cir. 2017) ....................................................... 37
*White v. Jackson*,
   865 F.3d 1064 (8th Cir. 2017) ............................................................. 29
*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ............................................................................ 15
\*  *Wood v. Moss*,
   572 U.S. 744 (2014) ..................................................................... passim
*Ybarra v. Illinois*,
   444 U.S. 85 (1979) .............................................................................. 30
*Young v. Akal*,
   985 F. Supp. 2d 785 (W.D. La. 2013) .................................................. 29
\*  *Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ................................................................. passim

**Statutes**

18 U.S.C. § 241 ...................................................................................... 16
18 U.S.C. § 242 ...................................................................................... 16
28 U.S.C. § 2674 .................................................................................... 15
28 U.S.C. § 2679(b)(1) ........................................................................... 15
42 U.S.C. § 1985(3) ............................................................................... 35

**Other Authorities**

Mayor's Order 2020-68 .......................................................................... 28
Mayor's Order 2020-69 .......................................................................... 28

2 Moore's Federal Practice, § 12.34(2) .................................................. 21
16 Am. Jur. 2d Conspiracy § 53 ............................................................ 36

*Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H. REP. NO. 95-1828, pt. 2 (1979) ................................................................................... 11

*Hearing on Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protesters at Lafayette Square Before the H. Comm. on Nat. Res.*, 116 Cong. (2020) ......... 21, 22

REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY (1964) ...................................................................................................................... 8

## INTRODUCTION

In opposing Major Adamchik's motion to dismiss, plaintiffs improperly recast their own factual allegations to avoid legal arguments they cannot win. *See* ECF No. 122 ("Opp."). While plaintiffs now claim there was "no 'high-level plan designed to ensure the President's safety'" before he appeared in Lafayette Square, Opp. at 1 (quoting Mot. at 1), their complaint speaks for itself: it alleges that the Attorney General ordered the dispersal of Lafayette Square, TAC ¶¶ 78-79, at the behest of the President and other senior officials, *id.* ¶¶ 60, 202, in accordance with a Secret Service request, *id.* ¶ 80, to clear a path for the President, *id.* ¶ 4, in advance of the President's remarks at St. John's Church, *id.* ¶¶ 202-204; Major Adamchik implemented this plan by giving the "immediate order" to disperse. *Id.* ¶ 20. Contrary to plaintiffs' assertion, Major Adamchik doesn't seek dismissal "based on his own version of events," Opp. at 2, which would highlight the danger federal officers faced—and the injuries they sustained—in Lafayette Square. Rather, he seeks dismissal because plaintiffs' allegations implicating presidential-security concerns and high-level decisions do not subject him to personal liability, *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), and because any large, unscreened crowd in close proximity to the President at the edge of the White House grounds presents inherent security threats, *Wood v. Moss*, 572 U.S. 744 (2014).

Notwithstanding a litany of dodges and distractions, plaintiffs offer a host of concessions that require dismissal of their claims. Plaintiffs acknowledge extensions of *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), are disfavored, concede their *Bivens* claims arise in a new context, and admit that presidential-security concerns counsel against a new implied cause of action. Regarding qualified immunity, plaintiffs not only concede that presidential security is a compelling interest but admit there is no allegation Major Adamchik— himself—gave tactical orders, interacted with plaintiffs, or harbored racial animus when he ordered Lafayette Square cleared before the President's appearance. These concessions are dispositive.

1

**DISCUSSION**

**I.   A *Bivens* claim is not available in this new context.**

The parties agree that extending *Bivens* liability to new contexts is a "disfavored" judicial

activity. Mot. at 6-8; Opp. at 26.[1] Indeed, the Supreme Court reaffirmed that proposition—and the

related notion that *Bivens* was the byproduct of an "*ancien regime*"—less than a year ago.

*Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *accord Abbasi*, 137 S. Ct. at 1848; *see also*

*Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Notwithstanding the weight of recent controlling

authority, plaintiffs fall back on "pre-Revolutionary English cases" and another "early" decision in

which executive officials were held liable in damages. Opp. at 24. While plaintiffs suggest these

centuries-old cases establish a foundation for new extra-statutory remedies under *Bivens*, the

Supreme Court simply does not agree: "[F]ederal courts today cannot fashion new claims in the

way that they could before 1938." *Hernandez*, 140 S. Ct at 742.[2]

Contrary to plaintiffs' suggestion that *Tanzin v. Tanvir* supports their claim, *see* Opp. at 24-

25, that decision is wholly in keeping with the Court's repeated caution against extending *non-*

*statutory* damages remedies. 141 S. Ct. 486 (2020). Plaintiffs obscure the key detail: *Tanzin* was

not a *Bivens* case; it was a case involving an "express remedies provision." *Tanzin*, 141 S. Ct. at

493. Because Congress already authorized a remedy, the only question facing the Court was what

Congress meant when it provided for "appropriate relief," and the Court rejected the government's

---

[1] Plaintiffs claim that qualified immunity is the "issue at the heart of the case," Opp. at 5, but the Court must "decide[] the availability of a *Bivens* remedy as a threshold question[,]" *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 915 (D.C. Cir. 2018); *see* Mot. at 6.

[2] That command is not limited to implied remedies under "statutory causes of action," as plaintiffs imply. Opp. at 25 n.8. The Supreme Court has been "at least equally reluctant to create new causes of action" for damages in "constitutional cases." *Hernandez*, 140 S. Ct. at 742. Nevertheless, while implied *damages* remedies are disfavored, the Court retains its "power to enforce the Constitution," Opp. at 25 n.8, through appropriate *equitable* relief, *see* Mot. at 26-27.

request to exclude damages against individual federal officers from that *statutory* provision. *Id*. at 489. By contrast, plaintiffs here seek to create a wholly new damages remedy that Congress has never authorized.

While plaintiffs also cite *Tanzin*'s observation that damages have long been awarded against government officials, *see* Opp. at 24, the Supreme Court was careful to note that these damages had been allowed under "common-law causes of action." *Tanzin*, 141 S. Ct. at 491. "With the demise of federal general common law, a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress[.]" *Hernandez*, 140 S. Ct. at 742. Indeed, it would have been baffling if Justice Thomas—who wrote the Court's decision in *Tanzin*—had somehow endorsed extra-statutory damages remedies against federal officers despite recently calling to "abandon the [*Bivens*] doctrine altogether." *Hernandez*, 140 S. Ct. at 753 (Thomas, J., concurring); *see also Abbasi*, 137 S. Ct. at 1869 (Thomas, J., concurring); Mot. at 7. In sum, *Tanzin* affords no basis for implying a new judicially implied cause of action.

Plaintiffs further cite *Tanzin* in support of a misguided argument that "Congress indicated its acceptance of the *Bivens* remedy" through amendments to the Federal Tort Claims Act. Opp. at 25. This broad-brush argument has been tacitly rejected in *each* of the Supreme Court's special-factors *Bivens* cases that were decided after these amendments. In any event, the D.C. Circuit opined that expansions to *Bivens* based on the FTCA amendments are "open to doubt." *Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015) (rejecting a *Bivens* remedy). Congress may have believed "*Bivens* was a constitutionally required decision" when it amended the FTCA. *Id.* (quoting *Carlson v. Green*, 446 U.S. 14, 33 n.2 (1980) (Rehnquist, J., dissenting)). Simply put, "uncertain interpretations of what Congress did in 1973 and 1988 cannot overcome the weight of authority against expanding *Biven*s" that has emerged since then. *Id.*

3

The Supreme Court reaffirmed that point again last year. *See Hernandez*, 140 S. Ct. at 748 n.9 (rejecting argument that "Congress intended for a robust enforcement of *Bivens* remedies" through the FTCA amendments) (internal quotation marks and citation omitted). Though *Tanzin* (like *Hernandez*) recognized the unremarkable proposition that the FTCA amendments exclude constitutional claims, those amended provisions "simply left *Bivens* where [Congress] found it." *Hernandez*, 140 S. Ct. at 748 n.9. The FTCA amendments are "not a license to create a new *Bivens* remedy in a context [the Supreme Court has] never before addressed," as here. *Id.* (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

Plaintiffs also incorporate arguments by "Federal Courts Scholars" in which amici expound upon the mistaken perception that *Bivens* is well-rooted in the common-law tradition and thus must be available. Opp. at 24 (citing ECF No. 120). But the D.C. Circuit has refused to elevate these academic arguments—offered by the same amici as here—over governing Supreme Court precedent: "[I]f the courts, as amici argue, have radically misunderstood the nature and scope of *Bivens* remedies, a course correction must come from the Supreme Court, which has repeatedly rejected calls for a broad application of *Bivens*." *Meshal*, 804 F.3d at 429 (internal citation omitted). Since then, the Supreme Court has only underscored that it will stay the course. *See Hernandez*, 140 S. Ct. at 742; *id.* at 748. The tacit implication of plaintiffs' and amici's argument— that a *Bivens* remedy is presumed available—turns the Supreme Court's modern and clear approach to these "disfavored" remedies on its head. *Abbasi*, 137 S. Ct at 1857.

### A. Plaintiffs concede that their *Bivens* claims present a new context.

Major Adamchik identified a host of *Abbasi* factors demonstrating that plaintiffs' claims present a new *Bivens* context: the nature of plaintiffs' claims, his role as the commander who allegedly carried out high-level orders, the lack of clear judicial guidance balancing protest rights against presidential security, and the risk of disrupting law-enforcement decisions designed to

protect the President's safety. Mot. at 8-12. Plaintiffs do not dispute these factors and "[a]ssum[e] for the sake of argument" their case is "new" under *Abbasi*. Opp. at 26; *see id.* at 28.[3]

That concession is critical: if a case presents a new context, an *Abbasi* special factors analysis is "required." 137 S. Ct. at 1859. Moreover, that the context here is so unique—a fact evident from the number and nature of the *Abbasi* factors plus plaintiffs' concession—is also "highly probative" of the conclusion that extending *Bivens* far afield is unwarranted. *Meshal*, 804 F.3d at 426; Mot. at 11-12. That is particularly true where the salient new-context indicators (*e.g.*, presidential security) double as special factors. *Cf. Abbasi*, 137 S. Ct. at 1860 (new context can be inferred from "potential special factors that previous *Bivens* cases did not consider").[4]

**B.  Special factors preclude a *Bivens* remedy in the presidential-security context.**

   **i.       Plaintiffs concede presidential-security concerns cut against *Bivens*.**

Plaintiffs acknowledge the "importance" of "national/presidential security" interests and concede that these important interests "can constitute a special factor for *Bivens* purposes in some circumstances." Opp. at 31. Yet they assert without any legal basis that any presidential-security justification in this instance is a "canard" for three reasons: plaintiffs were (1) allegedly "law abiding and peaceful," (2) located "in Lafayette Square, not on the White House Lawn," and (3) did

---

[3] The Reporters Committee erroneously reports that Major Adamchik asserted that "*Bivens* relief is broadly unavailable under the First Amendment." *See* ECF No. 136 at 18. Rather, he argued based on controlling authority that First Amendment *Bivens* claims necessarily arise in a new context. Mot. at 9; *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020).

[4] While plaintiffs accept that their claims present a new context under *Abbasi*, they (and Amicus Reporters Committee) cite cases in which courts previously "applied *Bivens* to violations of demonstrators' constitutional rights." Opp. at 25; *see id.* at 27-29 & n.9; Reporter's Committee Br., ECF No. 136 at 14-15. But each of those protest cases was decided before *Abbasi,* and as shown, Mot. at 8, "those cases have been overtaken by *Abbasi*'s holding that the new-context analysis may consider only Supreme Court decisions approving *Bivens* actions." *Loumiet*, 948 F.3d at 382. For example, the Reporters Committee cites *Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987), even though *Loumiet* explicitly described that case as being "overtaken."

not initiate the confrontation. *Id.* at 32. The Supreme Court, in a highly relevant case that plaintiffs conveniently ignore, rejected each of these arguments as a basis to override the assertion of presidential security in the protest context. *See Moss*, 572 U.S. at 744.

In a unanimous ruling, the Supreme Court in *Moss* granted qualified immunity to secret service agents who relocated protesters of President Bush (but not his supporters) to establish a security perimeter. As plaintiffs allege here, the protesters in *Moss* were peaceful and law-abiding. *See id.* at 749-55. They had assembled in Oregon, not within a stone's throw of the White House. *See id.* And they did not provoke any confrontation; Secret Service agents initiated the relocation of the protesters after President Bush decided to dine in their vicinity. *See id.* None of these factors diminished the *inherent* security concerns implicated by the presence of a large crowd near the President. Because the protesters were "within weapons range" of the president, the Court stated the obvious: "the protesters cannot plausibly urge that the agents 'had no valid security reason to request or order the[ir] eviction.'" *Id.* at 763 (quoting protesters).

So, too, here. Accepting as true plaintiffs' allegation that the park was cleared for the President's appearance, that allegation reflects the presidential security interests justifying the clearing and refutes plaintiffs' assertion that no valid security justification existed. Indeed, the protesters in Lafayette Square were allegedly dispersed in order to facilitate the President's remarks and photo opportunity at St. John's Church, which sits *on* Lafayette Square. TAC ¶¶ 4, 78-80, 202-04. "[B]ecause of their location, the protesters posed a potential security risk to the President" as he walked from the White House—through Lafayette Square—to the church. *Moss*, 572 U.S. at 762; *see also Quaker Action Grp. v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975) (any "public gathering" is a "hazard to the security of the President and the White House."). This case squarely implicates

presidential-security concerns, which in turn independently counsel against extending *Bivens*. *See*

*Abbasi*, 137 S. Ct. at 1861; *Hernandez*, 140 S. Ct. at 747.[5]

Rather than grappling with *Moss*, plaintiffs cite lower-court cases in which courts

previously held that protesters may bring *Bivens* claims. *See* Opp. at 27-28 & n.9 (collecting cases).

As noted above, however, all of these cases were decided before *Abbasi* and thus do not govern

whether a claim arises in a new context. *See Loumiet*, 948 F.3d at 382; *accord Vanderklok v.*

*United States*, 868 F.3d 189, 199-200 (3d Cir. 2017) (observing that lower courts' "past

pronouncements" on *Bivens* are "not controlling" after *Abbasi*, meaning courts must consider the

issue "anew"). And none of them presented anything like the question at issue: whether Major

Adamchik's immediate order to disperse thousands of unscreened protesters in weapons range of

the President—given after the Attorney General allegedly ordered Lafayette Square cleared, TAC

¶¶ 78-79—can be litigated by way of a personal-capacity damages action against him. Indeed, none

of plaintiffs' pre-*Abbasi* cases involved concerns for the President's safety in a crowd, no less at a

time of civil unrest.

The primary case plaintiffs discuss involved the arrest of protesters of the Vietnam War in

front of the U.S. Capitol more than 40 years before *Abbasi*—not the dispersal of thousands of

---

[5] Because any large crowd in the President's vicinity poses innate security threats, Major
Adamchik's argument does *not* depend on "facts beyond the complaint." Opp. at 31. But we note
that plaintiffs' characterization of the protests neither comports with the illegal acts described in the
D.C. Mayor's emergency order nor with facts reported in news articles cited in the complaint. *See*
Mot. at 2 nn.1-2. Although plaintiffs do *not* oppose consideration of the emergency order itself,
they do object to certain facts contained both in the order and from news reports cited in the
complaint. Opp. at 8 n.1 & 10 n.2. Both objections are unfounded. First, the facts cited in a
"government document[]" may be considered here, *Democracy Forward Found. v. White House*
*Office of Am. Innovation*, 356 F. Supp. 3d 61, 63 n.2 (D.D.C. 2019), and plaintiffs cite no case to
the contrary. Second, plaintiffs cannot credibly claim the news reports are not "integral to their
claim." Opp. at 10 n.2. A key allegation—that the Attorney General issued the dispersal order—is
derived from an official quoted in the Washington Post. *See* Opp. at 11; *see also* Mot. 35 n.18.
Regardless, presidential-safety concerns are self-evident from the allegations alone.

unscreened protesters in front of the White House and in close range of where the President planned to speak. *See Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977). That distinction is not trivial, as plaintiffs claim without authority. *See* Opp. at 27-28. Rather, as the Supreme Court and D.C. Circuit have repeatedly observed, the President occupies a unique role in our constitutional structure, and his safety presents an "overwhelming" national-security concern. *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam); *see also, e.g.*, *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (collecting cases); REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, at 426 (1964) (noting President's roles as "Head of State, Chief Executive, Commander in Chief, and leader of a political party").

In addition, to the extent *Dellums* attempted a "special factors" analysis, the court only assessed whether it could make "the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation[.]" 566 F.2d at 194 (internal quotation marks and citation omitted). But that standard was retired decades ago. *See Abbasi* 137 S. Ct. at 1858 (collecting cases). The present day analysis is whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong[.]" *Id*. Because there are many reasons Congress might doubt a new remedy in this context, "the court[] must refrain from creating the remedy[.]" *Id.*[6]

The only post-*Abbasi* cases plaintiffs discuss are two district court decisions (one unpublished) from other circuits. *See* Opp. at 31 (citing *Linlor v. Polson*, 263 F. Supp. 3d 613 (E.D. Va. 2017); *Graber v. Dales*, No. CV 18-3168, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019)). Like

---

[6] As noted above, none of the other pre-*Abbasi* cases plaintiffs cite involved the presidential-security concerns at issue. *See also* Attorney General's Reply Brief, ECF No. 127 at 8 n.5. Likewise, the Reporters Committee's focus on alleged harms to *journalists*, *see generally* ECF No. 136, does not diminish the presidential-security concerns implicated by *this* case.

the pre-*Abbasi* cases plaintiffs cite, neither of these cases involved presidential-security considerations. In *Linlor*, the district court expanded *Bivens* to TSA screening notwithstanding "the risk that implying a *Bivens* remedy [] might chill legitimate TSA activity and discourage TSA officers from performing appropriately thorough security screenings." 263 F. Supp. 3d at 623. The court opined that it is "the purpose of qualified immunity to provide TSA officers with the breathing room they require to operate effectively," *id.* at 624, a point both plaintiffs and the Reporters Committee echo in their briefs, *see* Opp. at 32 ("[S]ufficient deference to decisions made based on national security is embodied in the substantive First and Fourth Amendment standards themselves."); ECF No. 136 at 10-12 (endorsing the "deterrent function" of *Bivens*).

But plaintiffs' argument is undercut by the Supreme Court's warning that courts must—as a threshold matter—tread carefully before minting a damages remedy in the national-security context that "might" cause officers to "refrain from taking urgent and lawful action[.]" *Abbasi*, 137 S. Ct. at 1863; *cf. United States v. Stanley*, 483 U.S. 669, 681 (1987) (special factors analysis turned on "how much occasional, unintended impairment of military discipline one is willing to tolerate"). And though *Linlor* itself was not appealed, its rationale has been repeatedly rejected, even in the airport-security context. *See, e.g.*, *Vanderklok*, 868 F.3d at 207 (declining to extend *Bivens* remedy in part because "[t]he threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers"); *cf. Ahmed v. Weyker*, --- F. 3d ----, No. 18-3461, 2020 WL 7637930, at *5 (8th Cir. Dec. 23, 2020) (declining to allow Fourth Amendment *Bivens* remedy against officer accused of fabricating evidence because a trial would "risk . . . burdening and interfering with the executive branch's investigative . . . functions") (citation omitted). Ironically, plaintiffs' citation to *Graber*, involving an arrest outside the 2016 Democratic National Convention, proves the point. While *Graber* approved a *Bivens* claim, the court suggested that its ruling would have been different had the facts involved *the*

*President's* security: "[t]he potential for chilling decisive action in the course of protecting Presidents would indeed give the Court pause." 2019 WL 4805241, at *5.

Because plaintiffs' cases primarily pre-date *Abbasi*, espouse outdated special-factors analyses, or have nothing at all to do with presidential security, plaintiffs are left drawing irrelevant distinctions between this case and *Abbasi* and *Hernandez*. *See* Opp. at 29. While the specific security concerns that were at issue in those cases differed from the nature of the threat here (*i.e.*, protecting a President in a crowd), those differences do not diminish the "significance" of this threat. *White House Vigil for ERA Comm.*, 746 F.2d at 1528. If anything, failing to protect the President's safety and the effective functioning of the Executive Branch presents greater national-security concerns than the considerations that led to the tragic death of the boy in *Hernandez*. *See* Mot. at 5, 12-16.

Though it would have been unthinkable for the government to risk the President's safety in a large crowd of unscreened protesters at a time of civil unrest, plaintiffs quarrel over whether clearing Lafayette Square was "required by 'presidential security.'" Opp. at 31. But whether presidential-security concerns somehow required the crowd's dispersal isn't the relevant inquiry, as the Supreme Court observed when rejecting a similar argument made in *Hernandez*:

> Petitioners protest that shooting people who are just walking down a street in Mexico does not involve national security, but that misses the point. The question is not whether national security requires such conduct—of course, it does not—but whether the Judiciary should alter the framework established by the political branches for addressing cases in which it is alleged that lethal force was unlawfully employed by an agent at the border.

140 S. Ct. at 746 (internal quotation marks and citation omitted). The relevant question here is whether this Court should alter the framework established by Congress for addressing cases in which protesters allege that their rights were violated in the name of presidential security. The answer to that question, as discussed next, goes virtually unanswered in plaintiffs' response.

ii.    **Plaintiffs concede that Congress has legislated heavily in the presidential-security field without authorizing a personal damages remedy.**

In painstaking detail, Major Adamchik demonstrated that Congress has repeatedly balanced presidential-security concerns against the rights of individuals to peacefully protest without ever authorizing a damages remedy against federal officers. Mot. at 16-21 (discussing Congress's response to presidential assassinations, terrorist attacks, and White House breaches). While conceding that "Congress has legislated heavily in the field of presidential security," plaintiffs bizarrely assert that Major Adamchik has "misidentifie[d] the relevant field" because Congress has not legislated heavily "on the topic of demonstrators' rights." Opp. at 33. But that's the point. Congress's "silence" in declining to provide protesters with a damages remedy against federal officers means the Court should not legislate an extra-statutory remedy now. *Abbasi*, 137 S. Ct. at 1862. As discussed, *see* Mot. at 17-18, Congress was "acutely aware" of and "mindful of the need to weigh the costs that could accrue [to] the individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures" for the President. *Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H. REP. NO. 95-1828, pt. 2, at 464 (1979) (citation omitted). It is not this Court's role to "find[] a balance between liberty and order" in the form of a damages remedy that Congress never thought wise to approve. *Id.*

Notwithstanding Congress's careful attention to the issue, plaintiffs also return to an earlier theme, speculating that lawmakers' refusal to create a personal damages remedy would be "expect[ed]" in light of "Congress's implied acceptance of *Bivens* via the FTCA." Opp. at 33 (citations omitted); *see also id.* at 25. But as noted above, "mere congressional acquiescence to *Bivens* may not be the same as congressional ratification." *Meshal*, 804 F.3d at 428. In any event, the Supreme Court has rejected plaintiffs' interpretation: Congress's silence in the face of "frequent

11

and intense" scrutiny of an issue counsels against a new *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862 (detainee abuse); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (social security); Mot. at 20-21; *see also Hernandez*, 140 S. Ct. at 747-49 & n.9.

      **iii.**     **Plaintiffs do not dispute that they seek sensitive, high-level information.**

      Major Adamchik demonstrated that plaintiffs' claims pose the risk of significant burdens and distractions not only on himself but on senior government officials, including the President and the Attorney General. Mot. at 22-26. As discussed in *Abbasi*, these burdens could have a devastating chilling effect on "the proper discharge" of national-security obligations. 137 S. Ct. at 1860. Plaintiffs respond that these "distracti[on]" concerns are "completely undercut" because the high-level officials allegedly involved in the decision to clear Lafayette Square are soon leaving (or already left) office. Opp. at 37 (citation omitted). But the Supreme Court completely eviscerated plaintiffs' reasoning when it made clear in *Abbasi* that these concerns (like immunity defenses) apply not only to current officeholders but "more precise[ly]" to protect "future officials like them[.]" 137 S. Ct. at 1860. Indeed, former Attorney General Ashcroft and former FBI Director Mueller were both far removed from office—twelve and four years, respectively—when the Court in *Abbasi* dismissed *Bivens* claims against them based in part on these concerns.

      Major Adamchik also never asserted that federal officials have "blanket immunity from discovery," as plaintiffs claim, Opp. at 36, but properly urged based on *Abbasi* that plaintiffs' request to probe "discussion and deliberations" among senior officials cuts against an extra-statutory remedy. 137 S. Ct. at 1860-61; Mot. at 23. Plaintiffs do not dispute seeking this kind of information but claim that any related concerns are mitigated because no "policy" was actually at issue. Opp. at 35. That is a red herring. While the government does not have a "policy of attacking peaceful demonstrators," *id.*, *see* Mot. at 3-4, the alleged high-level decision to clear unscreened protesters in the President's vicinity was a "governmental act" that both implicated presidential-

security policy and applied "general[ly]" to all persons in Lafayette Square. *Abbasi*, 137 S. Ct. at 1860; *cf. Moss*, 572 U.S. at 762-73 (discussing secret service policy regarding protest). Plaintiffs' ultimate conclusion that a *Bivens* claim is available because the dispersal was a "discrete" incident, Opp. at 35, also ignores Supreme Court guidance that a suit "confined to the conduct of a particular Executive Officer in a discrete instance" can still "call into question the formulation and implementation of a general policy," *Abbasi*, 137 S. Ct. at 1860; Mot. at 26.

Plaintiffs also contradict their own pleadings when arguing that there was no alleged high-level government plan to clear Lafayette Square in advance of the President's appearance. *Compare* Opp. at 36 *with* TAC ¶ 78 (the Attorney General appeared in Lafayette Square); *id.* ¶ 79 (the Attorney General "personally ordered" the dispersal); *id.* ¶ 80 (the White House alerted the Secret Service that "President Trump planned to make an appearance outside St. John's Church," which in turn "requested other law enforcement agencies to assist clearing the area"); *id.* ¶ 202 (the dispersal largely occurred "at the behest of President Trump, Attorney General Barr, and/or other senior White House officials"); *id.* ¶ 4 (the "purpose" for dispersal was "to permit the President to walk to a photo opportunity at a nearby church"); *id.* ¶¶ 5, 60, 203-04. Plaintiffs' complaint is premised upon high-level decisions that directly implicate presidential-security policy and high-level planning, which sharply cut against a new *Bivens* remedy. Plaintiffs cannot "transmogrify," Opp. at 36, their own pleadings by pretending these allegations no longer exist.

Plaintiffs play another sleight of hand by asserting that their *Bivens* claims (as opposed to their statutory claims) "do not require investigation of anyone's motives" because there is no allegation of "retaliation." Opp. at 37. But the cat is out of the bag: According to their complaint, Major Adamchik's actions "were based on and/or taken in *retaliation* for the viewpoint being expressed by the demonstrators." TAC ¶ 223 (First Amendment *Bivens* Claim) (emphasis added); *see also id.* ¶ 4 (describing defendants' allegedly unlawful "purpose" for clearing Lafayette

13

Square). And plaintiffs specifically seek punitive damages from Major Adamchik and others based on their alleged "reckless or *callous* indifference." *Id.* ¶ 230 (Fourth Amendment *Bivens* claim) (emphasis added). Even if plaintiffs had not made motive and intent an express feature of their *Bivens* case, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law[,]'" a "principle" that is "nowhere more important than when the specter of Presidential assassination is raised." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)); Mot. at 22. Regardless of how they characterize it, plaintiffs seek to probe discussions between—and the motives of—the President, Attorney General, Major Adamchik, and others, which might chill future decision-making in the course of protecting Presidents and further counsels against recognizing a new judicially implied *Bivens* remedy.[7]

### iv. Plaintiffs acknowledge that alternative processes are available to them.

Plaintiffs acknowledge injunctive relief can "foreclose *Bivens*" remedies but maintain that is true only where "large-scale policy decisions" are being challenged. Opp. at 33. As noted above, that is precisely what plaintiffs are challenging: a high-level, large-scale decision that not only affected thousands of persons in Lafayette Square but one that implicated presidential-security policy governing *any* situation where large, unscreened crowds are near the President. Plaintiffs' request that this Court enjoin the government from making similar presidential-security decisions in the future proves the point.[8] Plaintiffs' secondary argument that an injunction would not provide

---

[7] Leaving aside the condescending way in which plaintiffs refer to Major Adamchik and the agency he has served for 19 years, *see* Opp. at 35-36, Major Adamchik never argued that *Bivens* is unavailable simply because of his rank or position as a Park Police commander. Rather, it is Major Adamchik's purported role in implementing the Attorney General's alleged dispersal order in advance of the President's appearance—not his rank—that implicates the special factors described in *Abbasi*. Mot. at 22. Major Adamchik's arguments, which are based on the facts as alleged, do not "contradict[]" the Attorney General's defenses, Opp. at 36, but reinforce them.

them sufficient compensation, *id.*, dates back to an outdated special-factors analysis; the question now is whether there is an "alternative, existing process for protecting the [injured party's] interest." *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)); *see* Mot. at 27-28; *see also, e.g.*, *Abbasi*, 137 S. Ct. at 1863 (observing that potential habeas relief "would have provided a faster and more direct route to relief than a suit for money damages"); *Stanley*, 483 U.S. at 683 ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [the plaintiff] an 'adequate' federal remedy for his injuries.").

In addition to the equitable remedies plaintiffs seek here, Major Adamchik identified multiple avenues for potential compensation under state and federal statutes, including recovery (subject to applicable defenses) under 42 U.S.C. §§ 1983, 1985(3), 1986, and the FTCA. While Major Adamchik noted *Carlson*'s holding that the FTCA was not a "special factor" under the *Bivens* framework that governed in 1980, plaintiffs fail to adequately distinguish the four *Bivens* cases since *Carlson* in which the Supreme Court has held or observed that the availability of common-law torts—the very foundation of FTCA liability, 28 U.S.C. § 2674—may preclude extensions of *Bivens*. *Compare* Mot. at 28 *with* Opp. at 33-34.[9] As one court recently opined, the Supreme Court's reformulation of the special factors test—with a focus on "alternative, existing process[es]" rather than on the obsolete requirement that Congress must "explicitly declare[]" a *Bivens* "substitute"—"fatally undermines" *Carlson*'s holding. *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). Even so, Major

---

[8] While an injunction might not be appropriate in *this* case, it is neither a hypothetical nor insubstantial remedy. As the Reporters Committee noted, the Ninth Circuit recently upheld an injunction concerning the federal response to protests in Portland. *See* ECF No. 136 at 13.

[9] Though plaintiffs distinguish two of the cases on grounds that the defendants were "private entities," Opp. at 34, both *Abbasi* and *Wilkie* involved federal actors. Moreover, federal officers may be sued for state torts that occur outside the scope of employment. 28 U.S.C. § 2679(b)(1); *see, e.g.*, *Vanderklok*, 868 F.3d at 204.

Adamchik does not ask this Court to hold that the FTCA alone precludes extension to *Bivens*; he suggests the Court may consider—as many courts do—the possibility of FTCA damages alongside the array of other special factors. *See* Mot. at 29.

Major Adamchik's discussion of alternative remedies also undercuts an unfounded and inflammatory argument that plaintiffs repeatedly make. Plaintiffs falsely assert that Major Adamchik "posits the alarmingly broad theory that federal law enforcement can disperse protesters near the White House at any time, using any means, without judicial review, because there is always a potential security threat." Opp. at 32. But as just discussed, Major Adamchik identified many avenues of judicial review, including equitable remedies and potential damages under statutes like the FTCA. Mot. at 28-29. He also noted accountability in the form of Congressional oversight and Inspector General investigations, both of which have the potential for criminal referral. Mot. at 20-21 & n.14; *see, e.g.*, 18 U.S.C. §§ 241-42. Major Adamchik never asserted "the President could demand to go anywhere, at any time, and send officers to beat up anyone along the way" without those officers facing judicial, administrative, and Congressional accountability. Opp. at 32. The Court should not give credence to hyperbolic assertions that are more about garnering headlines than responding to actual legal arguments.

* * *

Coming full circle, Amicus Reporters Committee speculates that deterring wrongful conduct by imposing a *Bivens* remedy in this context would produce "*desirable*" results with "low" costs to the government. ECF No. 136 at 18; *see id.* at 10-12; *see also* Opp. at 34 (arguing that injunctive relief alone is "insufficient to deter" wrongdoing). But given the presidential-security concerns implicated by plaintiffs' complaint, that balance is not one for amicus, the plaintiffs, or the courts to strike; it is one for Congress alone. *See Abbasi*, 137 S. Ct. at 1857, 1861; *cf. Ahmed*, 2020 WL 7637930, at *5 ("It may well be that the costs are worth it, but Congress is better

16

equipped than we are to make the call.") (declining to recognize Fourth Amendment *Bivens* remedy in domestic law-enforcement context). As the Supreme Court reaffirmed last year, the "risk" of deterring acts that have "national security implications" (here, "undermining" the President's safety) is precisely why any personal damages remedy should come from Congress—not the courts. *Hernandez*, 140 S. Ct. at 747 (citing *Abbasi,* 137 S. Ct. at 1861). Not only is the "weight of authority against expanding *Bivens*," but "tort remedies in cases involving matters of national security" or similar import are "generally left to the political branches." *Meshal*, 804 F.3d at 426–27. Put simply, the prospect of chilling high-level decisions or actions taken to protect the President's safety "counsels serious hesitation." *Id.* at 427.

## II.  Major Adamchik is entitled to qualified immunity based on his lack of involvement and the lack of a clearly established constitutional violation.

### A.  Plaintiffs misconstrue the qualified immunity standard.

Plaintiffs devote much effort, in vain, to distinguishing on their facts certain cases showing that Major Adamchik's alleged actions did not violate clearly established constitutional rights under the unique presidential-security circumstances presented by the complaint. *See* Opp. at 14-15, 19. But even if plaintiffs could meaningfully distinguish those cases—they cannot—they would still fail to overcome Major Adamchik's qualified immunity. It is *plaintiffs'* burden to overcome qualified immunity. To do that they must show that existing precedent clearly established that Major Adamchik's alleged actions under the circumstances were unlawful and placed the constitutional question "beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted). The few cases they cite arise in a very different context from here and involve line-level officers' use of individually targeted and severely injurious force to disperse and arrest peaceful protesters in response to unsubstantiated general law enforcement concerns. *See* Opp. at 11-12; *see also infra* pp. 29-31. Indeed, plaintiffs fail to cite any precedent

17

holding that a supervising officer violated clearly established constitutional rights by allegedly ordering the clearing of a largely unsecured public area near the White House, which was the recent site of unrest and the imminent future site of a presidential appearance. They also fail to identify any decision concluding that the need to protect the President during a public appearance was insufficient to justify such a clearing order.

Plaintiffs say the "egregious" nature of the line level officers' alleged actions and "obviousness" of their violation of constitutional rights clearly establishes a constitutional violation by Major Adamchik. *See* Opp. at 3, 5-6, 15-16. But, in addition to ignoring Major Adamchik's lack of involvement, they misstate the relevant standards. Qualified immunity is not overcome "simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Plaintiffs' "egregious conduct" formulation is not meaningfully different from this improper abstract view of immunity. *See Reichle*, 566 U.S. at 665.

### B. Plaintiffs' conclusory allegations fail to show Major Adamchik's personal involvement in alleged violations of clearly established constitutional rights.

Rather than meaningfully dispute the lawfulness of a neutral order to peaceably clear the park in these circumstances, such as Major Adamchik's alleged order here, plaintiffs argue they have sufficiently alleged his personal participation in *line-level* officers' alleged illegal use of force in clearing the park, which plaintiffs deem contrary to clearly established constitutional law. *See* Opp. at 6-8, 16-17, 37-39. But plaintiffs' vague allegations do not show Major Adamchik's own involvement in line-level officers' alleged use of force.

Plaintiffs rely on two allegations from the complaint: (1) that Major Adamchik "ordered the law enforcement officers present at Lafayette Square to attack the peaceably assembled protesters," TAC ¶ 82; and (2) that he was the "incident commander" at the scene. TAC ¶ 20. But the former is a mere conclusion of the kind regularly deemed insufficient to show personal participation. *See*

18

*Iqbal*, 556 U.S. at 669, 680-81; *Moss v. U.S. Secret Serv.*, 711 F.3d 941, 968 (9th Cir. 2013), *rev'd on other grounds*, *Wood v. Moss*, 572 U.S. 744 (2014); *Bundy v. Sessions*, 387 F. Supp. 3d 121, 124, 129-30 (D.D.C. 2019), *aff'd*, 812 F. App'x 1 (D.C. Cir. 2020). And the latter simply identifies Major Adamchik's supervisory role, which is insufficient to create *Bivens* liability. *See Iqbal*, 556 U.S. at 676. These allegations certainly fail to show Major Adamchik ordered any of the officers' specific tactics. Indeed, the complaint says nothing about the content of the alleged order and makes no claim that Major Adamchik specifically directed the officers to use any particular type of force or munition to convince people to leave the park. Thus, the complaint does not allege facts plausibly showing that he directed a forcible removal of the crowd.

Equally unavailing is plaintiffs' suggestion that Major Adamchik must have ordered the officers to use physical force because multiple officers allegedly used force on June 1. *See* Opp. at 39. That some officers allegedly used illegal physical force at around the same time does not support a plausible inference that Major Adamchik was the one who ordered such force. *See Taylor v. Alvarez*, No. 07-23003-civ, 2008 WL 1840719, at *1, *3 (S.D. Fla. Apr. 21, 2008) (allegations that a group of officers were issued dispersal orders, jointly herded protesters, and arrested plaintiff, coupled with conclusory allegation that supervisors personally ordered the dispersal, did not show the supervisors ordered the particular tactics of the line level officers); *see also Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007) (court should not draw unwarranted inferences on a motion to dismiss); *see generally Iqbal*, 556 U.S. at 678-79. At most, it is merely "'consistent with'" Major Adamchik's non-tactic specific line-level involvement and hence insufficient to plead a claim. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Indeed, what plaintiffs describe is more consistent with officers exercising their discretion to use different types of force against different people during an uncertain situation—one inherently threatening to the President—without receiving tactical orders to do so.

*See Iqbal*, 556 U.S. at 678, 681; *cf. Felarca v. Birgeneau*, No. 11-cv-05719, 2013 WL 663921, at *8 (N.D. Cal. Feb. 22, 2013) (allegations that college administrators "planned, coordinated, and ordered the police attack and indiscriminate arrests of plaintiffs" did not show personal involvement in officers' supposedly coordinated actions).

Plaintiffs' reliance on *Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010), is misplaced. *See* Opp. at 38. There, the plaintiffs offered factual allegations that certain supervisory defendants had ordered line-level officers to use specific tactics. In particular, the complaint described the content of each supervisor's individual order to line-level officers to use a specific tactic, such as advancing on protesters in a line, physically beating protesters, and using particular less-lethal munitions and crowd movement techniques which resulted in plaintiffs' injuries. *See Keating*, 598 F.3d at 763-64. Moreover, the appeal did not focus primarily on whether the allegations about the nature and content of the supervisor's order were wholly insufficient to show any involvement in the challenged tactics of any line-level officers. Rather, the primary issue was whether the plaintiffs had to identify by name each officer that had received an order from a supervisor and each officer who had harmed the plaintiffs in order to state a claim against the supervisor. *See id*. at 764. The Eleventh Circuit merely declined to require such specific identifications of every officer who injured the plaintiffs under the circumstances alleged. *See id*. By contrast, here, plaintiffs' conclusory allegations that Major Adamchik appeared on the scene and issued an unspecified order, without any factual allegation that the order directed any particular use of force, fail to show his involvement in the line-level officers' actions. Furthermore, here, unlike in *Keating*, the flaw in the complaint is not a mere failure to name specific officers but rather failure to plausibly allege that Major Adamchik directed any officer to use the tactics challenged by plaintiffs.

20

Despite ample prior opportunities to amend and the lack of a current motion to do so, plaintiffs seek to add new allegations to the complaint based on USPP Acting Chief Monahan's testimony to Congress, which they say shows Major Adamchik's involvement in the line-level officers' use of force. *See* Opp. at 38-39. But such new allegations should not be considered in response to a motion to dismiss. *See Sheller-Paire v. Gray*, 888 F. Supp. 2d 34, 39 n.3 (D.D.C. 2012); *see also* 2 Moore's Federal Practice, § 12.34(2) (Matthew Bender 3d ed.). This is not a "formalistic" principle. Opp. at 39. Rather it reflects the substantive need to provide a defendant with notice of the plaintiff's allegations and an opportunity to respond to them, as pleaded, with full briefing. Otherwise, a plaintiff could circumvent proper procedure and stymie any dismissal motion with an ever-evolving hydra of surprise allegations offered for the first time in opposition briefs.

At any rate, plaintiffs' effort to amend the complaint via their opposition papers is futile because Chief Monahan's testimony does not establish Major Adamchik's personal involvement in the line-level officers' use of force or that Major Adamchik ordered illegal use of force. *See* Opp. at 38.[10] Chief Monahan did not testify that Major Adamchik ordered the officers to use force on non-resistant protesters, to use the weapons described in the complaint, or to engage in the specific alleged tactics which form the basis of plaintiffs' claims. Rather, in response to questions about who told the officers to "advance," Mon. Tr. at 90, "move forward," or "clear[ ]" the crowd, Mon. Tr. at 115—terms indicative of a peaceable clearing operation—Chief Monahan testified that "the order was given by" Major Adamchik. Mon. Tr. at 90, 115. Chief Monahan also stated that Major Adamchik had command of the operation and "authority to make any and all decisions for that

---

[10] *See also Hearing on Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protesters at Lafayette Square Before the H. Comm. on Nat. Res.*, 116 Cong. (2020) (testimony of Gregory T. Monahan, Acting Chief, U.S. Park Police, U.S. Dep't of the Interior), transcript available at https://www.govinfo.gov/content/pkg/CHRG-116hhrg40718/pdf/CHRG-116hhrg40718.pdf  (last visited 1/8/2020) ("Mon. Tr.").

21

operation," Mon. Tr. at 115, which reflected nothing more than his official position as incident

commander. And while Chief Monahan testified that Major Adamchik distributed rules of

engagement in advance of the clearing operation, he did not suggest that those rules directed

officers to use unlawful force. *See* Mon. Tr. at 115. Instead, his testimony shows that Major

Adamchik distributed rules which expressly *forbade* the use of CS gas and permitted force only in

the event of *violent* resistance, not the sort of peaceful activity plaintiffs allege. *See id.* at 106, 112,

115. Thus, Chief Monahan merely testified that Major Adamchik was the incident commander, had

the authority of such a commander over the operation, and directed a lawful neutral "clearing" or

"advance" without any force. The testimony does not show that Major Adamchik ordered or

participated in the line-level officers' alleged use of force on supposedly peaceful protesters.[11] To

the contrary, it refutes such eleventh-hour assertions.[12]

---

[11] The remainder of Chief Monahan's testimony further contradicts the complaint's conclusory claims that all protesters were peaceful. Like the Attorney General, *see* ECF No. 76 at 21 n.14, Chief Monahan confirmed that, in the days leading up to June 1, members of the crowd in Lafayette Square threw projectiles at officers, caused blunt force trauma injuries to nearly 50 officers, and burned St. John's Church. *See* Mon. Tr. at 78-79, 82, 94. He testified that, throughout the period from May 29 to June 1, people attacked officers with bricks, rocks, caustic substances, frozen water bottles, lit flares, fireworks, and 2x4 sections of lumber. *See id.* at 78-79, 82. And on June 1, members of the crowd threw projectiles at the officers and tried to scale security barriers. *See id.* at 95, 105, 112. Then, after Major Adamchik issued three warnings to disperse (over a long-range acoustic device) and the officers approached the crowd, a member of the crowd punched an officer, lacerating his face, and another individual wrestled an officer to the ground. *See id.* at 101-02, 109, 115. If anything, plaintiffs' request to amend the complaint to incorporate Chief Monahan's testimony would only refute, not support, their claims.

[12] Plaintiffs also suggest that, if the complaint is dismissed, the court should grant them leave to amend it to include new allegations supposedly derived from an unidentified "former White House staffer." Opp. at 45 n.17. That staffer purportedly claims that: unspecified "senior Administration officials" were "involved in planning" the clearing of the park; unidentified people had a "discussion" of the need to "'mow down' protesters and 'show' them who is in charge"; and unidentified "White House officials" made "discriminatory comments in relation to" George Floyd and the protests. *Id.* But the court should dismiss the claims against Major Adamchik with prejudice because these conclusory allegations cannot cure the deficiencies in plaintiffs' claims against Major Adamchik. The new proposed allegations say nothing about Major Adamchik's

**C.  Major Adamchik has qualified immunity from the First Amendment claim.**

In opposing qualified immunity on their First Amendment claim, plaintiffs argue that presidential security could not justify Major Adamchik's general clearing order because the protesters were allegedly peaceful. But, as discussed, in *Moss*, the Supreme Court ruled that presidential security justified qualified immunity for federal agents who removed protesters from weapons range of the President, notwithstanding that the protesters were allegedly peaceful. *See Moss*, 572 U.S. at 749-56, 762-63; *supra* pp. 5-7. That makes sense because the President's safety is endangered not just by previously known threats from specific would-be assassins, but also by the potential danger of an unscreened crowd—even a peaceful one—providing cover for assailants to enter within weapons range of the President. For this reason, as *Moss* recognized, it has not been clearly established that federal agents who direct the clearing of a crowd of protesters, even peaceful ones, in advance of the President's arrival violate the First Amendment.

Plaintiffs claim that *Moss* was really about equal access to the President—viewpoint discrimination—not the general permissibility of removing protesters for security reasons. *See* Opp. at 19. But this argument does not help plaintiffs, whose core claim is also viewpoint discrimination. *See* TAC ¶¶ 62, 64, 223. In any event, *Moss* is not so limited. In *Moss*, the Supreme Court granted federal agents qualified immunity for doing exactly what the Attorney General allegedly did here: ordering law enforcement officers to move plaintiffs more than a block away from the President's planned location to keep him safe. *See Moss*, 572 U.S. at 748-49. Indeed, the

conduct (or any other defendant's). He is not a "White House official[ ]" and is not alleged to have had any involvement in, or knowledge of, the unnamed officials' comments or actions. Thus, these vague assertions do not show his personal involvement in violations of clearly established rights and continue to underscore plaintiffs' alleged theory that the decision to disperse was ordered or planned at a high level—not by Major Adamchik.

Court broadly framed the question before it, like the question here, in terms of whether an order to move protesters two blocks away resulted in a First Amendment violation:

> The particular question before us is whether the protesters have alleged violation of a clearly established First Amendment right based on the agents' decision to order the protesters moved from their original location in front of the Inn, first to the block just east of the Inn, and then another block farther.

*Id*. at 757. That Major Adamchik, unlike the *Moss* agents, is not alleged—nor could it plausibly be alleged—to have shown favoritism to anyone in the park only makes this a stronger case for immunity. *See id*. at 759-63.

Plaintiffs contend that the constitutionality of Major Adamchik's order should be judged under a clear and present danger standard rather than the time, place, and manner framework. *See* Opp. at 20-21. But that has not been clearly established as the standard, as *Moss* itself illustrates in not applying the clear and present danger standard. Specifically, without explicitly applying one standard or the other, *Moss* held that federal agents were entitled to qualified immunity for issuing an "on-the-spot" order, like Major Adamchik's alleged order here, to move protesters two blocks away from the President's planned location. *Moss*, 572 U.S. at 748-49. Hence, regardless of the proper standard, the Supreme Court previously ruled that it was not clearly established a federal officer violates the First Amendment by issuing such an order. Because more recent precedent has not put the issue beyond debate, qualified immunity still shields a federal officer from suit for a clearing order to protect the President.

Plaintiffs are also wrong because the clear and present danger standard does not inherently apply to orders to remove a crowd from a particular area, like Major Adamchik's alleged order here. The clear and present danger standard is a formulation of strict scrutiny, and it has applied only to restrictions which target specific speech based on the government's or hecklers' disagreement with the message, often resulting in criminal punishment. *See, e.g.*, *Bridges v.*

*California*, 314 U.S. 252, 260-63 (1941); *see also Bible Believers v. Wayne Cty.*, 805 F.3d 228, 247-49 (6th Cir. 2015). By contrast, courts apply the time, place, and manner analysis to neutral orders which move protesters from a specific area. *See, e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1131-43 (9th Cir. 2005); *Startzell v. City of Philadelphia*, 533 F.3d 183, 189-203 (3d Cir. 2008). Consequently, plaintiffs' debate over standards is a mere restatement of their unsupported viewpoint discrimination claim.

On that claim, plaintiffs do not dispute their failure to allege that Major Adamchik did or said anything to target their speech. Instead, they claim that the President's alleged statements of disapproval of civil rights protesters reveal a content-based "rationale" behind the clearing of the park and that Major Adamchik is impermissibly insisting on allegations of "personal animosity" toward the protesters in pointing out that he did not exhibit any viewpoint bias in crafting his order. Opp. at 23. But the problem here is not merely lack of personal animus allegations. Rather plaintiffs have failed to allege facts showing the particular restriction on which they seek to hold Major Adamchik liable, *i.e.*, his alleged clearing order, was designed to suppress speech supportive of civil rights.

In that regard, it is Major Adamchik, not the President, who allegedly designed and issued the challenged immediate clearing order; while offering the mere conclusion that complained-of "actions" may have occurred "at the behest" of the President "or" perhaps other officials, TAC ¶ 202, the complaint alleges no facts showing the President ordered the park to be cleared on June 1 or dictated the nature or terms of Major Adamchik's immediate clearing order. *See* TAC ¶¶ 20, 82.[13] Hence, it is Major Adamchik's rationale, not the President's opinions, which reflects the

---

[13] According to the complaint, the Attorney General issued a more general and less immediate order of some kind to clear the park. TAC ¶¶ 79, 202. To the extent Major Adamchik is alleged to have followed that order, there is no factual allegation showing that the Attorney

purpose of the alleged order. Consequently, the allegations about the President's general opposition to racial justice protests nationwide have no bearing on the purpose of the challenged on-the-scene clearing order. *See Moss*, 572 U.S. at 755-56, 762-64 (allegations that other secret service agents hewed to a government policy of moving protesters to suppress dissent did not show the defendant agents designed their immediate clearing orders to suppress speech).

Lastly, plaintiffs insist that, in past cases dismissing First Amendment challenges to the removal of protesters from a particular area, the government granted the protesters permission to protest elsewhere, whereas here Major Adamchik did not expressly permit the protest to continue outside the expanded security perimeter. *See* Opp. at 19. But plaintiffs overstate those cases, which no more involved affirmative authorization to protest elsewhere than this one does. *See, e.g.*, *Moss*, 572 U.S. at 754 (merely noting that the protesters "remained" in the location beyond weapons range of the President, without indicating that the government had expressly permitted them to protest there); *Menotti*, 409 F.3d at 1124-25 (emergency order, and operating order implementing it, cleared all protesters from large area of downtown Seattle, without expressly permitting an alternative protest site). Rather, as here, the government simply cleared the protesters from one area and left them free to protest, or not, in such other areas as local law might permit. *See id.*; TAC ¶¶ 90, 95, 116. Despite the lack of express permission for alternative sites, the courts in those cases dismissed the plaintiffs' claims because the narrow tailoring and alternative prongs of the First Amendment analysis require only that the government "*refrain from denying* a reasonable opportunity for communication," not affirmatively provide such opportunity. *Menotti*, 409 F.3d at 1141 (internal quotation marks and citation omitted, emphasis added); *see also id.* at 1130-42; *Moss*, 572 U.S. at 754, 764. This Court should do the same.

_____

General's order was designed to suppress disfavored speech. *See* Attorney General's Motion to Dismiss, ECF No. 76, at 35; TAC ¶¶ 7, 17, 202.

### D.  Major Adamchik has qualified immunity from the Fourth Amendment claim.

In support of their Fourth Amendment claim, plaintiffs primarily assert that Major Adamchik was personally involved in the line-level officers' alleged use of force and physical exclusion of the protesters from the park. *See* Opp. at 6-15. But, as explained above, *see supra* pp. 18-23, that is not true. Likewise, while plaintiffs claim that neither Major Adamchik nor the officers had legitimate presidential-security concerns that could support their alleged intrusion on plaintiffs' Fourth Amendment rights based on the supposedly peaceful nature of the protests, *see* Opp. at 8-9, the complaint's allegations reveal that the challenged actions served compelling presidential-security interests, as explained above and in the dismissal motion. *See supra* pp. 5-7, 23-24; Mot. at 5-6, 10-11, 13-15, 35-36, 41-42; *see also Berg v. Kelly*, 897 F.3d 99, 108-13 (2d Cir. 2018) (granting qualified immunity because presidential security could potentially justify penning protesters); *Saucier v. Katz*, 533 U.S. 194, 207-09 (2001) (same where vice presidential security could potentially justify throwing protester in a van).[14] Moreover, though plaintiffs repeatedly assert that the protesters were peaceful—an immaterial assertion as explained above—the articles supplying the complaint's core allegations indicate members of the crowd were violent. *See* Mot. at 36 n.20, 41-42; TAC ¶ 202 n.19.[15]

---

[14] Plaintiffs contend that Major Adamchik cannot rely on the unscreened nature of the crowd to support the clearing of the park because the complaint does not allege that criminals had succeeded in entering the crowd to harm the President. *See* Opp. at 9. But plaintiffs miss the point. As discussed, an unscreened crowd creates a *potential risk* that such bad actors *could* use the crowd as cover to threaten the President. *See supra* pp. 5-7; *Moss*, 572 U.S. at 749-55, 763*; Berg*, 897 F.3d at 108-13. Thus, Major Adamchik's reliance on this potential risk represents established law and common sense informed by tragic past experience, not a dispute of fact.

[15] While the articles form the core of the complaint's narrative and yet support Major Adamchik's position, the complaint should be dismissed regardless of whether the court concludes that the articles are incorporated into the factual allegations of the complaint.

As for the line-level officers' actions (as opposed to Major Adamchik's own actions), the Mayor's orders, which reflect factual findings subject to judicial notice and confirmed by the articles incorporated into plaintiffs' complaint, *see* Mayor's Order 2020-68; Mayor's Order 2020-69, reveal substantial unrest leading up to the clearing of the park. *See supra* n.5; *see also Reynard v. Washburn Univ. of Topeka*, No. 19-4012, 2020 WL 3791876, at *3 (D. Kan. July 7, 2020) (notice of legislative fact findings in COVID order). Plaintiffs claim that the violence reported in the Mayor's orders, on prior occasions possibly involving different protesters, cannot support the line-level officers' use of force to remove plaintiffs from the park. *See* Opp. at 8. But it was not clearly established that the line-level officers had to turn a blind eye to the recent unrest where the crowd gathered on June 1 in removing protesters before the President's arrival. *Menotti*, *supra*, is instructive on this point. There, the officers lawfully enforced an order requiring protesters to leave the area, despite the arguably peaceful nature of most of the particular protests at issue, in part because those protests were preceded by days of violence in the same downtown area. *See Menotti*, 409 F.3d at 1121-26, 1132-37.[16] Thus, while *Menotti* was not an excessive force case, it establishes that the government generally has a legitimate interest in removing or excluding a protester from a particular location in response to earlier incidents of violence committed by others in the same area. Accordingly, that "countervailing governmental interest[ ]" reflected in the recent violence in this case weighs in the government's favor in the "careful balancing" between such interests and the individual interest in avoiding Fourth Amendment intrusion. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted).

---

[16] In *Menotti*, the court found issues of fact as to the lawfulness of the arrest of certain protesters. *See Menotti*, 409 F.3d at 1146-47. That is not an issue here because the federal officers are not alleged to have arrested anyone.

Furthermore, the officers' alleged forcible removal of protesters from the White House perimeter in the wake of unrest served both the aforementioned law enforcement interest and the government's "paramount interest" in protecting the President, *White House Vigil for ERA Comm.*, 746 F.2d at 1533 (internal quotation marks and citations omitted), so their actions were not clearly unconstitutional. Plaintiffs fail to identify any precedent or consensus of authority clearly establishing that the uniquely powerful combination of governmental interests here could not justify the officers' actions, especially under the particular circumstances of this case. That is not surprising because the "accommodation for reasonable error" in the unflinching discharge of public duties "is nowhere more important than when the specter of Presidential assassination is raised." *Hunter*, 502 U.S. at 229. Moreover, courts have sometimes declined to impose liability on law enforcement officers whose use of force on crowds harmed violent and peaceful protesters alike, including in cases where they used batons, *Felarca v. Birgeneau*, 891 F.3d 809, 816-19 (9th Cir. 2018), tear gas, *Young v. Akal*, 985 F. Supp. 2d 785, 791, 801-03 (W.D. La. 2013), and non-lethal projectiles, *White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017).

The cases plaintiffs cite are distinguishable and do not clearly establish that Major Adamchik's or the line-level officers' conduct violated the Constitution. In some of plaintiffs' non-protest cases, the defendants were line-level officers who allegedly singled out specific peaceful individuals, targeted them for arrest without cause, and physically assaulted them with weapons (sometimes even while handcuffed), often causing substantial injury. *See Henderson v. Munn*, 439 F.3d 497, 499-504 (8th Cir. 2006); *Adams v. Metiva*, 31 F.3d 375, 377-78, 383-87 (6th Cir. 1994); *Vinyard v. Wilson*, 311 F.3d 1340, 1342-55 (11th Cir. 2002). Plaintiffs' protest cases do not involve the sort of record of multiple days of violence at issue here. *See* Mayor's Order 2020-68. In some of those cases, the defendants were either line-level officers who used targeted substantial force on particular peaceful individuals and arrested them without cause, or officers who arrested every

person near a protest site without cause and despite the absence of any cohesive crowd or prior violence save for a single window-smashing before the protest. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1151-53, 1155-62 (10th Cir. 2008); *see also Barham v. Ramsey*, 434 F.3d 565, 569-70, 572-79 (D.C. Cir. 2006). In another case, line-level officers specifically targeted peaceful individuals for torture on three occasions by applying pepper spray directly to their eyeballs with cotton swabs, while they were restrained, and then refusing to wash the spray from their eyes. *See Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1127-31 (9th Cir. 2002). By contrast, in this presidential security and protest case, Major Adamchik had no involvement in any use of force, and the line-level federal officers allegedly did not arrest anyone. And while the line-level officers allegedly used force to disperse the crowd as a whole, none of the named line-level defendants are alleged to have targeted a particular named plaintiff based on unfounded routine law enforcement justifications.

Plaintiffs argue that *Ybarra v. Illinois*, 444 U.S. 85 (1979), prevented the line-level officers from dispersing the crowd based on the previous day's violence and the unrest on June 1 reported in the articles incorporated into their complaint. *See* Opp. at 13. But *Ybarra* involved an arrest without probable cause and multiple suspicion-less searches of everyone in a bar beyond the scope of a warrant, whereas here federal officers allegedly used force to move a large crowd, without arresting or searching them, from within weapons distance of the President based on recent unrest and violence on the part of some members of the crowd. *See Ybarra*, 444 U.S. at 87-94; *see also* Mayor's Order 2020-69; TAC ¶ 202 n.19. As a result, *Ybarra* does not clearly establish that the officers' actions were unlawful here. Additionally, several courts have distinguished *Ybarra* from protest cases, explaining that it does not prevent law enforcement officers from dispersing or seizing a cohesive unruly crowd, including members not suspected of criminality, based on suspicion that some members of the crowd have acted unlawfully. *See Bernini v. City of St. Paul*,

665 F.3d 997, 1003-05 (8th Cir. 2012); *cf. Carr v. District of Columbia*, 587 F.3d 401, 407-10

(D.C. Cir. 2009) (upholding seizure of members of crowd without relying on *Ybarra*); *id.* at 412-13

(Griffith, J., concurring in part) (criticizing the majority for not applying *Ybarra* to the seizure of

protest crowd); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1194-95 (9th Cir. 2015).

Since some judicial decisions suggest the legality of the officers' alleged forcible removal

of protesters from the square and none definitively condemn it, the officers would be entitled to

qualified immunity, as is Major Adamchik, who did not participate in their actions. To hold Major

Adamchik liable for the alleged actions of other officers would constitute the very "guilt-by-

association" that plaintiffs concede is "obviously wrong . . . on first principles." Opp. at 8.

### E. Amici's support of plaintiffs' constitutional claims is unavailing.

The arguments of amici International Center for Advocates Against Discrimination cannot

salvage plaintiffs' constitutional claims. Amici essentially repeat plaintiffs' arguments in support of

their constitutional claims, dressing them in international law garb by citing U.S. diplomats'

comments and the general principles of various international conventions. *See* International Center

Brief, ECF No. 114, at 12-26. But aspirational treaties and diplomatic comments are irrelevant to

the viability of plaintiffs' claims under the U.S. Constitution. *See generally Medellin v. Texas*, 552

U.S. 491 (2008); *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Additionally, amici fail to

demonstrate that international law meaningfully differs from United States courts' interpretation of

the First and Fourth Amendments, which does not clearly establish that Major Adamchik's alleged

conduct violated constitutional rights. *See supra* pp. 17-32. Moreover, individuals cannot sue

federal officials for damages in U.S. courts based on violations of those unenforceable conventions.

*See, e.g.*, *Meshal*, 804 F.3d at 420-29 (denying *Bivens* remedy, despite dissent's claim remedy was

supported by violation of ICCPR); *id.* at 438-39 (Pillard, J., dissenting); *see also Tel-Oren v.

Libyan Arab Republic*, 726 F.2d 774, 799, 816-20 (D.C. Cir. 1984) (Bork, J., concurring).

31

The decisions that amici cite reflect a view of the law that, while "common in the early years of the Nation," is "now discredited . . . ." *Al-Bihani v. Obama*, 619 F.3d 1, 17 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (emphasis added, internal citation omitted, quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). Those cases are also irrelevant, focusing on international commerce disputes, as well as international consensus on punishment in the unique context of the Eighth Amendment. *See, e.g.*, *The Paquete Habana*, 175 U.S. at 678-80, 685-714; *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869-75 (2018); *Roper v. Simmons*, 543 U.S. 551, 566-78 (2005). Those decisions have no application here because domestic courts have provided extensive binding guidance on the scope of the First Amendment, the Fourth Amendment, and qualified immunity, notwithstanding that they have not ruled on a case presenting the precise scenario alleged here. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Moss*, 572 U.S. at 754-64; *Graham*, 490 U.S. at 396; *Ward v. Rock Against Racism*, 491 U.S. 781, 791-99 (1989); *Bernini*, 665 F.3d at 1003-04. Plaintiffs' constitutional claims should be dismissed with prejudice.[17]

### F. Major Adamchik has qualified immunity from the statutory claims.

#### i. Plaintiffs fail to allege the existence of, or Major Adamchik's membership in, a conspiracy under 42 U.S.C. §§ 1985(3) and 1986.

Plaintiffs do not dispute that, if their 42 U.S.C. § 1985(3) claim fails, their 42 U.S.C. § 1986 claim should be dismissed. Opp at 40. Furthermore, plaintiffs concede that, under § 1985(3), they must allege facts showing directly or circumstantially that Major Adamchik reached an agreement with another person to participate in a conspiracy to violate plaintiffs' rights, and they do not

---

[17] Amici Veterans of the Civil Rights Movement and Civil Rights Leaders simply claim the line-level officers' conduct here resembles past violence against civil rights advocates. *See* Veterans of the Civil Rights Movement Brief, ECF No. 116, at 3-14, 21-26. But they point to no authority holding this alleged similarity warrants a damages action against Major Adamchik. At any rate, Major Adamchik's alleged neutral order seeking the departure of all people from the square to ensure the President's safety during an appearance bears no resemblance to segregationists' vile assaults on civil rights activists.

dispute that it has not been clearly established that one can be liable for an intracorporate conspiracy under § 1985(3). Plaintiffs merely argue that they have sufficiently alleged an *inter*corporate conspiracy between the Major Adamchik, other federal defendants, and state law enforcement officers because they allege "coordinated" action among those defendants. Opp. at 41-43; TAC ¶¶ 45, 75-76, 105-07. But plaintiffs' allegations that the federal defendants and state officers "coordinated" with each other are mere conclusions not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679-81; *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 52 (D.D.C. 2019) ("Plaintiffs' claims that the Defendants broke through the police cordon in a 'coordinated fashion' and that Defendants had a common goal are conclusory allegations, insufficient to withstand a motion to dismiss."); *see generally Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685 (8th Cir. 2012).

Plaintiffs' allegations that some other federal employee—not Major Adamchik— "coordinated" with an ACPD officer in a command center do not establish a conspiracy to violate plaintiffs' constitutional rights or Major Adamchik's involvement in it. TAC ¶¶ 45, 76. Absent any sign these individuals discussed a particular action, tactic, or objective, the fact that an ACPD commander and unspecified federal officers were present together and communicated or "coordinated" in some way cannot support an inference that Major Adamchik reached an agreement to jointly use excessive force on plaintiffs or suppress their speech. The same is true of the conclusory claim that unknown military officers met an MPD officer near the park, as the mere existence of a meeting does not show the requisite agreement to violate plaintiffs' rights. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); *see also Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470, 481-82 (M.D. Pa. 2012).

The allegations that federal defendants used force in the park and that MPD officers used force in arresting some individuals outside the park do not show a specific federal-state agreement

to use unlawful force against the protesters. Indeed, even if plaintiffs successfully alleged parallel action between federal and state officers, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.

Plaintiffs are mistaken in their belief that Major Adamchik could join an intercorporate conspiracy without interacting with state officials or the federal employees who allegedly dealt with those state officials. One cannot join a conspiracy without reaching an agreement with the conspirators about the general objectives of the conspiracy. *See Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999) ("The conspirators must act with a single plan, the general nature and scope of which is known to each would-be conspirator."). And Major Adamchik could not have reached an agreement with any member of a federal-state conspiracy to violate plaintiffs' rights because he is not alleged to have had a meeting of minds on the unlawful objectives of a conspiracy with Captain Vincent, the ACPD member who was supposedly in a joint command center coordinating with unspecified ACPD and federal officers, or with the unidentified MPD commander seen with unnamed military officers "in the presence of" the Army Chief of Staff two blocks outside the park. TAC ¶¶ 76, 106. Major Adamchik is not even alleged to have met those people or known about the meetings between them, much less agreed with them to violate plaintiffs' equal protection rights. Accordingly, plaintiffs have not plausibly alleged Major Adamchik's membership in a conspiracy with state officers, and any conspiracy with federal officers is not actionable under the intracorporate conspiracy doctrine.

### ii. Plaintiffs fail to allege Major Adamchik had the requisite animus.

Plaintiffs do not dispute that they failed to sufficiently allege that Major Adamchik acted based on discriminatory animus toward Black people and their supporters. Nonetheless, plaintiffs

34

claim that § 1985(3) does not require them to allege that each individual defendant was motivated by racial animus, as long as they allege that the defendant entered into a conspiracy and that other members of the conspiracy formed the conspiracy based on racial animus. In plaintiffs' view, "it is the *conspiracy*, not each individual *conspirator*, that must be 'motivated' by a 'discriminatory purpose.'" Opp. at 43-44 (quoting *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31 (D.D.C. 2016).[18] But plaintiffs fail to identify any controlling precedent or consensus of persuasive authority clearly establishing that the statute protects them from the acts of an individual defendant who lacked class-based animus and merely had some alleged association with others who, plaintiffs have claimed in conclusory fashion, might have harbored such animus. Hence plaintiffs cannot overcome Major Adamchik's qualified immunity.

The statutory text also refutes the claim that a person acting without discriminatory animus faces liability under § 1985(3). The statute makes actionable only "conspir[ing] . . . *for the purpose of depriving*, either directly or indirectly, any person or class of persons of *the equal protection of the laws* . . . ." 42 U.S.C. § 1985(3) (emphases added). Under the statute, it is not the act of agreeing to take some particular action, by itself, which is illegal. Rather, it is the entry into an agreement to do something "for the purpose of" denying someone's equal protection rights. By invoking equal protection principles in defining the "purpose" requirement, the statute logically

---

[18] Because *Lagayan* is a single district court decision which cannot clearly establish the law, it cannot defeat Major Adamchik's qualified immunity. *See Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (Supreme Court cases, D.C. Circuit cases, and consensus of persuasive authority can establish the law). In any event, *Lagayan* does not help plaintiffs. There the defendants allegedly communicated with their co-conspirator repeatedly about arrangements pertaining to their plan to subject the plaintiff to labor trafficking and other abuse, and the close familial relationship between the defendants and their co-conspirator further supported an inference there was a conspiracy. *See Lagayan*, 199 F. Supp. 3d at 24-26, 31-32. By contrast, here, Major Adamchik is not alleged to have had such discussions with line-level officers about plans to violate plaintiffs' rights. Moreover, in *Lagayan*, the court ultimately dismissed the § 1985(3) claim, refusing to impute the co-conspirator's animus to the defendants. *See id.* at 31-32. Similarly, here, this Court should not impute the President's conclusory-alleged class-based animus to Major Adamchik.

incorporates the critical requirement of an equal protection claim, namely that "the [defendant] officer's conduct . . . 'was motivated by a discriminatory purpose,'" *Richards v. Gelsomino*, No. CV 16-1002, 2019 WL 1535466, at *8 (D.D.C. Apr. 8, 2019) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)), *aff'd*, 814 F. App'x 607 (D.C. Cir. 2020).

Moreover the Supreme Court has emphasized the animus requirement is a vital limitation on the statute's scope that prevents it from devolving into a general tort law, and hence courts have repeatedly required that each individual defendant be motivated by discriminatory animus. In particular, the Supreme Court has declared that the animus requirement is the critical limiting component of § 1985(3), without which the statute cannot be fairly applied. *See Griffin v. Breckenridge*, 403 U.S. 88, 101-02 (1971). And the Court has repeatedly spoken of the animus requirement in terms reflective of an individualized mental state, suggesting that each individual defendant must have the requisite animus to be liable. *See id*. at 102 (describing the "invidiously discriminatory animus" requirement as one of "discriminatory motivation" and an "intent" behind "the conspirators'" conduct to deprive plaintiffs of "equal protection"); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270, 275-76 (1993) (referring to the need to show that "*petitioners'* demonstrations" are "motivated by a purpose . . . directed specifically at women as a class," and noting that the animus element of § 1985(3) "requires that *the defendant* have taken his action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group[.]") (internal quotation marks and citation omitted, emphases added); *cf. United States v. Flynn*, 216 F.2d 354, 360 (2d Cir. 1954) (while criminal "intent" can be shown circumstantially, "under criminal statutes involving proof of a specific intent a person may not be convicted simply on the basis of an 'imputed' intent. He himself must be shown to have had the requisite intent."); 16 Am. Jur. 2d Conspiracy § 53 ("The concept of guilt by association is repugnant to notions of elemental justice and fair play, and that is why, generally speaking, for a conspiracy, it is necessary

to establish that the group possessed unlawful goals and that *the individual held a specific intent* to further those illegal aims.") (emphasis added).[19]

Similarly, by rejecting the notion that "intent is irrelevant" and that "a class-based animus can be determined solely by effect," *Bray*, 506 U.S. at 270, the Court has suggested the animus requirement turns on an individual's intent rather than an association with other people, some of whom might be motivated by animus. Indeed, the Court has analogized the animus requirement to the discriminatory purpose element of an equal protection claim, which requires the relevant individual "decisionmaker," *i.e.*, the individual defendant, to have a "[d]iscriminatory purpose." *Bray*, 506 U.S. at 271-72 (internal quotation marks and citation omitted).

Following the Supreme Court's teachings*,* courts have required § 1985(3) plaintiffs to allege and prove that each defendant acted based on a class-based discriminatory animus. That animus is the *sine qua non* of a race or class-based equal protection violation. Without it there could be no conspiratorial meeting of the minds. *See City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651-53 (8th Cir. 1989) (despite evidence of the defendant city's discriminatory personnel policies driven by animus, the co-defendant union's knowledge of such discrimination, the union's work with the city on personnel policies, and the union's work on a contract that harmed plaintiff, the union did not share the city's discriminatory animus and was not liable); *Burns v. State Police Ass'n*, 230 F.3d 8, 9-14 (1st Cir. 2000) (evidence some members of

---

[19] Plaintiffs assert their allegations of a discriminatory conspiracy are similar to those found sufficient in *Griffin*. But, in *Griffin*, the plaintiffs alleged that each and every defendant personally surrounded the plaintiffs and beat them with the specific shared purpose of targeting Black people and denying them their rights. *See id.* at 90-92, 103. By contrast, plaintiffs here do not allege Major Adamchik personally surrounded or struck anyone; nor do they allege facts showing discriminatory animus. Moreover, subsequent developments in the law of pleading and the animus requirement suggest the allegations in *Griffin* may no longer suffice. *See Iqbal*, 556 U.S. at 677-80; *White v. Berger*, 709 F. App'x 532, 538-39 (11th Cir. 2017) (conclusory allegations of conspiracy and religious animus insufficient); *see also infra* pp. 37-38.

defendant state police association had racist views and opposed minority association promoted by plaintiff failed to establish the co-defendant vice president of the association acted out of racial animus in forwarding unsubstantiated misconduct complaint against Black plaintiff); *see also Biswas v. City of New York*, 973 F. Supp. 2d 504, 533-35 (S.D.N.Y. 2013).

As in those cases, here, Major Adamchik's association with others via his official position cannot show he harbored any class-based animus. And his presence at the scene and role as incident commander, including his vaguely alleged immediate clearing order, fail to show that he entered into an agreement with others to violate plaintiffs' constitutional rights based on their race. Rather than showing discrimination, the "obvious alternative explanation" for Major Adamchik's alleged dispersal order is a legitimate law-enforcement objective: protecting the President from a large unscreened crowd at a time of civil unrest. *Iqbal*, 556 U.S. at 682.

### iii.    Amici's statutory arguments are contrary to established precedent.

Amici Concerned Legal Academics and Historians assert based on legislative history that plaintiffs can pursue their § 1985(3) claims despite failing to allege facts showing an agreement between Major Adamchik and the other alleged conspirators to violate plaintiffs' rights. *See* Concerned Academics Brief, ECF No. 115 (ConBrf.), at 16-18. But courts in this circuit and others have determined that, under § 1985(3), a plaintiff must offer specific factual allegations demonstrating that the defendants had a meeting of the minds and agreed to the objectives of the conspiracy. *See, e.g.*, *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995); *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013); *Startzell*, 533 F.3d at 205; *see also Knowlton v. United States*, 111 F. Supp. 2d 1, 8 (D.D.C. 1999), *aff'd sub nom. Knowlton v. Alouri*, No. 96cv02467, 2000 WL 1093323 (D.C. Cir. June 27, 2000). Amici fail to offer any convincing reason to depart from these authorities.

Amici claim that in *Collins v. Hardyman*, 341 U.S. 651 (1951), the Supreme Court merely required parallel action under § 1985(3), not an agreement, because the Court allegedly found the defendants formed a conspiracy by gathering and jointly attacking the plaintiffs' political meeting while declining to attack meetings of groups with different views. *See* ConBrf. at 17-18. But in *Collins*, a pre-*Iqbal* case, the Court merely "*assume[d]*, *without deciding*, that the facts pleaded show that defendants did deprive plaintiffs 'of having and exercising' a federal right which, *provided* [i.e., assuming that] the defendants were engaged in a 'conspiracy set forth in this section,' *would* bring the case within the Act." *Collins*, 341 U.S. at 660 (emphases added). The Court then dismissed the § 1985(3) claim based on a since-abrogated statutory element. *See id*. at 662. Furthermore, the Court's comments on the conspiracy element of the statute were consistent with a requirement of a meeting of the minds. *See id*. at 654, 659. It also emphasized that "[i]t is apparent that this part of the Act defines conspiracies of a very limited character." *Id*. at 660. Thus, *Collins* is consistent with the meeting-of-the-minds and animus requirements.

Moreover, even if amici were correct that Congress originally intended § 1985(3) to require only some form of parallel action that harmed Black people and their supporters (a proposition that *Griffin* and *Bray* rejected), they ignore other aspects of original intent that would doom plaintiffs' claims. Chief among those aspects is that "[i]t is palpably clear that the proponents of the Civil Rights Act did not envision that it would apply against the federal government, because through the Civil Rights Act the federal government was vindicating citizens' civil rights against discriminatory state (or arguably private) action." *Alharbi v. Miller*, 368 F. Supp. 3d 527, 567 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020). For that reason, courts historically interpreted the statute to exempt federal officials because the original proponents of the statute sought to end only state-organized racial violence and to protect, rather than penalize, federal officers. *See, e.g.*, *Santistevan v. Loveridge*, 732 F.2d 116, 118 (10th Cir. 1984); *Seibert v.*

39

*Baptist*, 594 F.2d 423, 429 (5th Cir. 1979); *Gregoire v. Biddle*, 177 F.2d 579, 580-81 (2d Cir. 1949); *see also Hobson v. Wilson*, 737 F.2d 1, 19-20 (D.C. Cir. 1984) (concluding that *Griffin* changed the law and rendered the statute applicable to federal officers). That historical understanding of the statute would require dismissal of plaintiffs' claims against a federal officer such as Major Adamchik. In urging the court to follow only the aspects of the statute's supposed original meaning favorable to plaintiffs, amici simply argue "originalism for thee, but not for me." Amici's approach should be rejected as incompatible with principled judicial decisionmaking and the currently prevailing law, which requires dismissal.

Finally, because it is undisputed that plaintiffs' 42 U.S.C. § 1986 claim must fall with their § 1985(3) claim, both of their statutory claims are subject to dismissal.

## <u>CONCLUSION</u>

The claims against Major Adamchik should be dismissed with prejudice.

Dated: January 11, 2021

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER

IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Major Mark Adamchik in his
individual capacity*