## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BLACK LIVES MATTER D.C., et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | |
| ) | **Case No: 1:20-cv-01469-DLF** |
| **JOSEPH R. BIDEN, JR., et al.,**[1] ) | |
| ) | |
| **Defendants**. ) | |
| ) | |

## THE FEDERAL LINE-LEVEL DEFENDANTS'
## MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Sergeant Jonathan Daniels and

Officers Sean Cox, Luis Feliciano, Jeffery Hendrickson, Nicholas Jarmuzewski, Bryan

McDonald, Cara Seiberling, and Lawrence Sinacore of the U.S. Park Police (the "Federal line-

level defendants") respectfully move this Court to dismiss the claims against them in plaintiffs'

third amended complaint.[2] Plaintiffs fail to state a claim upon which relief may be granted for

two primary reasons. First, neither Congress nor the Supreme Court has authorized a damages

remedy under the Constitution against these officers for implementing a high-level plan to

protect the safety of the President or the security of the White House, and special factors counsel

---

[1] Pursuant to Fed. R. Civ. P. 25(d), President Joseph R. Biden, Jr., Secretary of Defense Lloyd J. Austin III, and Acting Attorney General Robert M. ("Monty") Wilkinson in their official capacities are automatically substituted as Defendants in this case.

[2] The complaint identifies Sergeant Daniels by arm patch number JD97, Officer Feliciano by arm patch number LP71, Officer Sinacore by helmet number S735, Officer McDonald by helmet number C723, Officer Cox by helmet number B714, and Officer Hendrickson by helmet number A706. Park Police Officers Thomas LoCascio and Sean Kellenberger are separately represented by other counsel. Officers LoCascio's and Kellenberger's positions are not included in this motion.

against implying the constitutional damages remedy that plaintiffs seek. Second, these officers

are entitled to qualified immunity from all constitutional and statutory claims.

The grounds for this motion are set forth in the accompanying memorandum. A proposed

order is attached.

Dated: February 16, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
U.S. Department of Justice, Civil Division
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
U.S. Department of Justice, Civil Division
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*/s/* Joseph A. Gonzalez
JOSEPH A. GONZALEZ
D.C. Bar No. 995057
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 598-3888; F: (202) 616-4314
Joseph.A.Gonzalez@usdoj.gov

*Counsel for Defendants Jonathan Daniels,
Sean Cox, Luis Feliciano, Jeffery
Hendrickson, Nicholas Jarmuzewski, Bryan*

*McDonald, Cara Seiberling, and Lawrence
Sinacore in their individual capacity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BLACK LIVES MATTER D.C., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | |
| ) | **Case No: 1:20-cv-01469-DLF** |
| **JOSEPH R. BIDEN, JR., et al.,** ) | |
| ) | |
| **Defendants**. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF THE FEDERAL LINE-LEVEL DEFENDANTS' MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6313130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*/s/* Joseph A. Gonzalez
JOSEPH A. GONZALEZ
D.C. Bar No. 995057
Trial Attorney, Constitutional Torts Staff

Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 598-3888; F: (202) 616-4314
Joseph.A.Gonzalez@usdoj.gov

*Counsel for Defendants Jonathan Daniels,
Sean Cox, Luis Feliciano, Jeffery
Hendrickson, Nicholas Jarmuzewski, Bryan
McDonald, Cara Seiberling, and Lawrence
Sinacore in their individual capacity*

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.    Civil unrest in Washington, D.C. ...................................................................... 2

II.   Law-enforcement officers dispersed Lafayette Square protesters...................... 3

III.  The line-level officers aided in dispersing protesters other than plaintiffs. ....... 4

IV.   Claims against the federal line-level officers and other defendants................... 6

DISCUSSION ......................................................................................................... 7

I.    A *Bivens* claim is not available to challenge actions that federal officers allegedly took pursuant to an alleged high-level order to disperse thousands of unscreened demonstrators across from the White House before the President's appearance. ...................................... 7

      A.   *Bivens* is a disfavored extra-statutory remedy that the Supreme Court has not authorized in this context................................................................................................. 8

      B.   *Bivens* should not be extended into this novel context................................................. 10

      C.   Special factors preclude a *Bivens* remedy against line-level officers who allegedly implemented high-level orders to clear a path for the former President by dispersing a large crowd of unscreened demonstrators..................................................................... 14

           i.    Courts should not intrude into sensitive matters of presidential security................. 15

           ii.   Congress legislated extensively to enhance presidential and White House security but has not created a personal damages remedy in this context. ............................... 18

           iii.  Plaintiffs cannot sue line-level officers personally for high-level decisions of others or use them as a surrogate to seek intrusive discovery into high-level decision-making and confidential communications involving the President.......................... 21

           iv.   Plaintiffs pursue alternative relief that precludes a new *Bivens* remedy. ................. 28

II.   The line-level officers are entitled to qualified immunity.................................................. 31

      A.   Plaintiffs fail to allege that the line-level officers had the requisite personal involvement in the acts allegedly committed against Plaintiffs......................................................... 32

           i.    Plaintiffs Ms. Sanders, J.N.C., and Ms. Scallan do not allege contact with any of the defendants........................................................................................................... 35

           ii.   Plaintiffs Mr. Bond, Mr. Foley, E.X.F., Mr. McDonald, and Ms. Poteet allege nothing more than an unspecified proximity to the line-level officers. ................... 36

iii.    Allegations that the line-level officers violated the rights of unnamed and unidentified individuals cannot save plaintiffs' claims. ............................................ 38

B.    Plaintiffs fail to allege that the line-level officers violated their clearly established Fourth Amendment rights. ...................................................................................... 40

i.    The line-level officers that allegedly "rushed forward" acted reasonably. ............... 40

ii.    No clearly established law establishes that the actions allegedly taken by the line-level officers were unlawful. ..................................................................................... 43

iii.    Plaintiffs have failed to allege that Officer Seiberling violated a clearly established Fourth Amendment right. ............................................................................................ 46

C.    Plaintiffs fail to allege that the line-level officers violated their clearly established First Amendment rights. ..................................................................................................... 47

i.    Relevant Legal Principles. .......................................................................................... 47

ii.    Plaintiffs have not plausibly alleged that the line-level officers violated a clearly established First Amendment right. .............................................................................. 49

iii.    *Wood v. Moss* supports dismissal. ............................................................................. 54

D.    The line-level officers have qualified immunity from Plaintiffs' statutory claims under Sections 1985(3) and 1986. ....................................................................................... 56

i.    Plaintiffs fail to allege any of the elements of a Section 1985(3) claim. ................... 56

ii.    Plaintiffs' Section 1986 claim fails because the line-level officers are not liable under Section 1985(3). ............................................................................................... 60

**CONCLUSION** ............................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**

*A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*,
    845 F.3d 1199 (D.C. Cir. 2017) ..................................................................... 47, 50

*Ahmed v. Weyker*,
    984 F.3d 564 (8th Cir. 2020) .................................................................. 12, 13, 27

*Am. Civil Liberties Union of Colo. v. City & Cty. of Denver*,
    569 F. Supp. 2d 1142 (D. Colo. 2008) ............................................................. 53

*Am. Jewish Cong. v. Vance*,
    575 F.2d 939 (D.C. Cir. 1978) ......................................................................... 39

*Arar v. Ashcroft*,
    585 F.3d 559 (2d Cir. 2009) ............................................................................ 34

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) .................................................................................. 32, 45

\*   *Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................... passim

*Barber v. D.C. Gov't*,
    394 F. Supp. 3d 49 (D.D.C. 2019) ................................................................... 57

\*   *Berg v. Kelly*,
    897 F.3d 99 (2d Cir. 2018) ...................................................................... passim

*Bernini v. City of St. Paul*,
    665 F.3d 997 (8th Cir. 2012) ..................................................................... 41, 42

*Birchfield v. North Dakota*,
    136 S. Ct. 2160 (2016) .................................................................................... 40

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ................................................................................. 6, 8, 9

*Black v. District of Columbia*,
    466 F. Supp. 2d 177 (D.D.C. 2006) ................................................................. 59

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) .................................................................................. 58, 59

*Brendlin v. California*,
    551 U.S. 249 (2007) ........................................................................................ 47

*Burke v. Lappin*,
    821 F. Supp. 2d 244 (D.D.C. 2011) ................................................................. 33

*Burns v. City of Concord*,
    No. 14-cv-00535, 2017 WL 5751407 (N.D. Cal. Nov. 28, 2017) ........................... 35

*Bush v. Lucas*,
    462 U.S. 367 (1983) ........................................................................................ 11

*Calvi v. Knox Cty.*,
    470 F.3d 422 (1st Cir. 2006) ............................................................... 36
*Cantu v. Moody*,
    933 F.3d 414 (5th Cir. 2019) ............................................................... 30
*Carawan v. McLarty*,
    No. 5:14-ct-3079, 2017 WL 829193 (E.D.N.C. Mar. 2, 2017) ............... 38
*Carlson v. Green*,
    446 U.S. 14 (1980) ....................................................................... 8, 30
*Carr v. District of Columbia*,
    587 F.3d 401 (D.C. Cir. 2009) ............................................................. 42
*Cheney v. U.S. Dist. Court for D.C.*,
    542 U.S. 367 (2004) ......................................................................... 25
*Chuman v. Wright*,
    76 F.3d 292 (9th Cir. 1996) ............................................................... 35
*Citizens for Peace in Space v. City of Colo. Springs*,
    477 F.3d 1212 (10th Cir. 2007) ........................................................... 48
*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986) ........................................................................... 53
*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) ......................................................................... 47
*Clinton v. Jones*,
    520 U.S. 681 (1997) ......................................................................... 25
*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................... 21, 29, 30
*Crawford-El v. Britton*,
    523 U.S. 574 (1998) ......................................................................... 26
*Dash v. FirstPlus Home Loan Owner, Tr. 996-2*,
    248 F. Supp. 2d 489 (M.D.N.C. 2003) ................................................. 39
*Davis v. Billington*,
    681 F.3d 377 (D.C. Cir. 2012) ............................................................. 29
*Davis v. City of Dearborn*,
    No. 2:09-cv-14892, 2010 WL 3476242 (E.D. Mich. Sept. 2, 2010) ......... 58
*Davis v. Passman*,
    442 U.S. 228 (1979) ........................................................................... 8
*Davis v. Ripa*,
    No. CIV. 12-6128, 2012 WL 5199214 (D.N.J. Oct. 17, 2012) ............... 37
*Democracy Forward Found. v. White House Off. of Am. Innovation*,
    356 F. Supp. 3d 61 (D.D.C. 2019) ........................................................ 2
*District of Columbia v. Wesby*,
    138 S. Ct. 577 (2018) ................................................................. 43, 44

*Doe v. Rumsfeld,*
    683 F.3d 390 (D.C. Cir. 2012) ................................................................. 17

*Estate of Brutsche v. City of Fed. Way,*
    No. C05-1538Z, 2006 WL 3734153 (W.D. Wash. Dec. 14, 2006) ......................... 37

*Farah v. Esquire Magazine,*
    736 F.3d 528 (D.C. Cir. 2013) ................................................................... 2

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ............................................................................. 28

*Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill,*
    443 U.S. 340 (1979) ............................................................................. 25

*Felarca v. Birgeneau,*
    891 F.3d 809 (9th Cir. 2018) .............................................................. 36, 42

*Fleck v. Trustees of Univ. of Pennsylvania,*
    995 F. Supp. 2d 390 (E.D. Pa. 2014) ......................................................... 51

*Ford v. Donovan,*
    891 F. Supp. 2d 60 (D.D.C. 2012) ............................................................ 59

*Graham v. Connor,*
    490 U.S. 386 (1989) ...................................................................... 40, 41, 42

*Grieveson v. Anderson,*
    538 F.3d 763 (7th Cir. 2008) ................................................................. 34

*Griffin v. Breckenridge,*
    403 U.S. 88 (1971) ............................................................................. 58

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................................. 17

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ....................................................................... 27, 32

*Haus v. City of New York,*
    No. 03 CIV. 4915, 2011 U.S. Dist. LEXIS 155735 (S.D.N.Y Aug. 31, 2011)............ 37, 46, 47

*Hernandez v. Mesa,*
    137 S. Ct. 2003 (2017) .......................................................................... 8

\* *Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) .................................................................... passim

*Hill v. Colorado,*
    530 U.S. 703 (2000) ............................................................................. 47

*Hoai v. Vo,*
    935 F.2d 308 (D.C. Cir. 1991) ................................................................. 58

*Hobson v. Wilson,*
    737 F.2d 1 (D.C. Cir. 1984) ............................................................ 57, 58, 59

*Hunter v. Bryant,*
    502 U.S. 224 (1991) .................................................................... 27, 43, 45

*In re G-Fees Antitrust Litig.*,
    584 F. Supp. 2d 26 (D.D.C. 2008) ........................................................................ 39

*Johnson v. Moseley*,
    790 F.3d 649 (6th Cir. 2015) ................................................................................. 33

*Jones v. Williams*,
    297 F.3d 930 (9th Cir. 2002) ................................................................................. 35

*K.O. v ICE*,
    468 F. Supp. 3d 350 (D.D.C. 2020) ................................................................ 25, 26

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
    909 F.3d 446 (D.C. Cir. 2018) ............................................................................... 2

*Kisela v. Hughes*,
    138 S. Ct. 1148 (2018) ......................................................................................... 44

*Klay v. Panetta*,
    758 F.3d 369 (D.C. Cir. 2014) ............................................................................. 21

*Knowlton v. United States*,
    111 F. Supp. 2d 1 (D.D.C. 1999) ......................................................................... 57

*Kurd v. Republic of Turkey*,
    374 F. Supp. 3d 37 (D.D.C. 2019) ....................................................................... 57

*Lash v. Lemke*,
    786 F.3d 1 (D.C. Cir. 2015) ........................................................................... 49, 51

*Lee v. Barr*,
    No. 19-CV-2284 (DLF), 2020 WL 3429465 (D.D.C. June 23, 2020) .................... 11

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................................................. 39

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*,
    881 F.3d 912 (D.C. Cir. 2018) .................................................................. 28, 29, 30

*Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*,
    344 F. Supp. 3d 215 (D.D.C. 2018) ................................................................ 26, 29

*LKQ Corp. v. United States*,
    No. 18-CV-1562 (DLF), 2019 WL 3304708 (D.D.C. July 23, 2019) ................ 29, 31

\* *Loumiet v. United States*,
    948 F.3d 376 (D.C. Cir. 2020) ......................................................... 8, 10, 11, 14

*Loya-Medina v. Gaoutte*,
    No. 1:15-cv-00063, 2015 WL 234144 (D.D.C. Jan. 13, 2015) ............................. 34

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) ........................................................................... 34

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012) ................................................................................... 53

*Marcilis v. Twp. of Redford*,
    693 F.3d 589 (6th Cir. 2012) ............................................................................... 34

*McManus v. District of Columbia*,
   530 F. Supp. 2d 46 (D.D.C. 2007) ........................................................ 57

*Mejia-Mejia v. ICE*,
   No. CV 18-1445, 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ........................................ passim

*Menotti v. City of Seattle*,
   409 F.3d 1113 (9th Cir. 2005) ............................................................ 53

*Meshal v. Higgenbotham*,
   804 F.3d 417 (D.C. Cir. 2015) ...................................................... 14, 17, 29, 31

*Miller v. U.S. Dep't of Agric. Farm Servs. Agency*,
   143 F.3d 1413 (11th Cir. 1998) ............................................................ 29

*Minneci v. Pollard*,
   565 U.S. 118 (2012) ...................................................................... 30

*Moore v. Castro*,
   192 F. Supp. 3d 18 (D.D.C. 2016) ......................................................... 60

*Mullenix v. Luna*,
   577 U.S. 7 (2015) ......................................................................... 44

*Nebraska Beef, Ltd. v. Greening*,
   398 F.3d 1080 (8th Cir. 2005) ............................................................ 29

*Oliva v. Nivar*,
   973 F.3d 438 (5th Cir. 2020) ............................................................. 30

*Oliveras v. Basile*,
   440 F. Supp. 3d 365 (S.D.N.Y. 2020) ..................................................... 30

*Owen v. City of Buffalo*,
   465 F. Supp. 3d 267 (W.D.N.Y. 2020) .................................................... 50

*Payton v. New York*,
   445 U.S. 573 (1980) ...................................................................... 12

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...................................................................... 32

*Plumhoff v. Rickard*,
   572 U.S. 765 (2014) .................................................................. 44, 50

*Provost v. City of Newburgh*,
   262 F.3d 146 (2d Cir. 2001) .............................................................. 33

*Quaker Action Grp. v. Hickel*, ("*QAG I*"),
   421 F.2d 1111 (D.C. Cir. 1969) .................................................... 12, 15, 17

*Quaker Action Grp. v. Morton*, ("*QAG III*"),
   460 F.2d 854 (D.C. Cir. 1971) ............................................................ 25

*Quaker Action Grp. v. Morton*, ("*QAG IV*"),
   516 F.2d 717 (D.C. Cir. 1975) .................................................. 16, 43, 48, 52

*Reichle v. Howards*,
   566 U.S. 658 (2012) ............................................................... 11, 15, 45

*Richards v. Gelsomino*,
   No. CV 16-1002, 2019 WL 1535466 (D.D.C. Apr. 8, 2019).................................... 58

*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008)....................................................................... 34

*Rogala v. District of Columbia*,
   161 F.3d 44 (D.C. Cir. 1998) ......................................................................... 38

*Roy v. United States*,
   416 F.2d 874 (9th Cir. 1969)..................................................................... 15, 16

*Saucier v. Katz*,
   533 U.S. 194 (2001) ......................................................................... 32, 45, 46

*Schwarz v. Meinberg*,
   761 F. App'x 732 (9th Cir. 2019).................................................................. 30

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988) ................................................................................ 18, 21

*Sevy v. Barach*,
   815 F. App'x 58 (6th Cir. 2020)................................................................... 51

*Shaw v. District of Columbia*,
   944 F. Supp. 2d 43 (D.D.C. 2013) ................................................................ 32

*Shervin v. City of Newark*,
   No. C 08-1631 VRW, 2010 WL 11531095 (N.D. Cal. Sept. 29, 2010) ................... 37

*Stigile v. Clinton*,
   110 F.3d 801 (D.C. Cir. 1997) ................................................................. 12, 25

*Tabb v. District of Columbia*,
   477 F. Supp. 2d 185 (D.D.C. 2007) .............................................................. 60

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ...................................................................................... 40

*Time Warner Entm't Co., L.P. v. FCC*,
   93 F.3d 957 (D.C. Cir. 1996) ...................................................................... 48

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*,
   463 U.S. 825 (1983) .................................................................................. 57

*United States v. Armstrong*,
   517 U.S. 456 (1996) .................................................................................. 58

*United States v. Caputo*,
   201 F. Supp. 3d 65 (D.D.C. 2016) ...................................................... 16, 48, 52

*United States v. Musser*,
   873 F.2d 1513 (D.C. Cir. 1989) ......................................................... 16, 48, 52

*United States v. Stanley*,
   483 U.S. 669 (1987) ............................................................................... 8, 26

*Vanderklok v. United States*,
   868 F.3d 189 (3d Cir. 2017)............................................................... 16, 27

*W. Radio Servs. Co. v. U.S. Forest Serv.*,
  578 F.3d 1116 (9th Cir. 2009) ........................................................................ 29
*Walsh v. JPMorgan Chase Bank, NA*,
  75 F. Supp. 3d 256 (D.D.C. 2014) .................................................................. 60
*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ............................................................ 47, 48, 50, 53
*Wardlaw v. Pickett*,
  1 F.3d 1297 (D.C. Cir. 1993) .......................................................................... 42
*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................. 38, 39
*Watts v. United States*,
  394 U.S. 705 (1969) ...................................................................... passim
*White House Vigil for ERA Comm. v. Clark*,
  746 F.2d 1518 (D.C. Cir. 1984) .................................................... passim
*White House Vigil for ERA Comm. v. Watt*,
  717 F.2d 568 (D.C. Cir. 1983) ........................................................................ 12
*White v. Jackson*,
  865 F.3d 1064 (8th Cir. 2017)........................................................................ 42
*White v. United States*,
  863 F. Supp. 2d 41 (D.D.C. 2012) .................................................................. 34
*Wilkie v. Robbins*,
  551 U.S. 537 (2007) .................................................... 15, 28, 30, 31
*Wilson v. Layne*,
  526 U.S. 603 (1999) ........................................................................ 49
*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008) .............................................................. 26, 29
*Wong v. United States*,
  373 F.3d 952 (9th Cir. 2004)........................................................................ 34
* *Wood v. Moss*,
  572 U.S. 744 (2014) ...................................................................... passim
* *Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) .................................................................. passim

**Statutes & Session Laws**

5 U.S.C. App. 3 § 12 .................................................................................. 20
6 U.S.C. § 111(b)(1)(G) ............................................................................ 20
6 U.S.C. § 113(d)(3) .................................................................................. 20
6 U.S.C. § 345 ........................................................................................... 20
18 U.S.C. § 871 ......................................................................................... 18
18 U.S.C. § 1751 ................................................................................. 18, 19

18 U.S.C. § 1752 ................................................................................................... 18
28 U.S.C. § 1346(b) .............................................................................................. 30
28 U.S.C. §§ 2671-80 ........................................................................................... 30
42 U.S.C. § 1985(3) .................................................................................. 56, 57, 58, 60
42 U.S.C. § 1986 ................................................................................................... 60
Pub. L. No. 107-117, 115 Stat. 2230, 2334 (2002) ............................................... 19

## Other Authorities

Mayor's Order 2020-68 .............................................................................. 3, 4, 41, 46
Mayor's Order 2020-069 ...................................................................... 2, 3, 41, 52, 55

*America's Main Street: The Future of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform*, 107th Cong. (2001) ...................... 19
*Information Hearing on the Closing of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight*, 104th Cong. (1995) 19
*White House Perimeter Breach: New Concerns about the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014) ................................................. 20

*Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H.R. REP. NO. 95-1828 (1979) ....................................................................... 19, 20
H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916) ........................................................ 7
S. REP. NO. 107-109 (2002) ................................................................................. 19

REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY (1964) ("The Warren Commission Report") ................................................................... 19
United States Secret Service Panel, *Report from the United States Secret Service Protective Mission Panel to the Secretary of Homeland Security* 1 (Dec. 15, 2014) ................................ 20

**INTRODUCTION**

Plaintiffs seek to hold eight line-level Park Police officers personally liable for a high-level policy decision to clear and secure Lafayette Square before the former President's appearance there. As the Court knows well from related briefing, this operation was allegedly ordered by the former Attorney General himself at the former President's behest. But imposing a new judicially implied damages remedy on federal line-level officers for the alleged decisions of high-level executive officials in the circumstances presented would mark an unprecedented and unwarranted expansion of personal liability upon federal law enforcement officials into contexts never before recognized by the Supreme Court. Moreover, the Court should be especially wary before minting a new damages remedy that might chill officers who comprise the first line of defense (and who face the risk of personal injury) in circumstances that involve presidential security.

Yet there's another fundamental defect with plaintiffs' suit that requires dismissal of both their constitutional and statutory claims against the line-level officers: Plaintiffs fail to allege that any of the federal officers represented here had any personal interaction—at all—with the plaintiffs themselves. Nowhere do plaintiffs allege that the line-level officers and plaintiffs ever interacted, ever shared the same immediate area, or even observed one another. Instead plaintiffs attempt to hold these line-level officers personally responsible for high-level Executive Branch decisions they never made and for alleged injuries they admittedly did not cause themselves. These officers should not be used to pursue redress for alleged injuries caused by other unidentified officers (or, worse yet, for injuries claimed by individuals who are not even parties to this suit).

Even if plaintiffs had sufficiently alleged personal involvement by the federal line officers represented here, the officers would still be entitled to qualified immunity. No

reasonable officer would have known that following an alleged high-level order to disperse a crowd of unscreened protesters, minutes before the President's appearance in the midst of civil unrest, would have violated clearly established rights. Quite the opposite, the Supreme Court has repeatedly held that the margin of error afforded by qualified immunity is nowhere more important than in the context of presidential security. It is for this reason that it has *without fail* granted officers qualified immunity for actions taken to protect the President's safety. Plaintiffs' claims against the federal line-level officers should be dismissed with prejudice.

## BACKGROUND

### I.   Civil unrest in Washington, D.C.

On June 1, 2020, the Mayor of Washington, D.C., issued an order declaring a "Public Emergency" and imposing a 7:00 p.m. curfew for the District of Columbia following two days of unrest across the city in which "numerous businesses, vehicles, and government buildings ha[d] been vandalized, burned, or looted." Mayor's Order 2020-069 § I ¶ 3, cited in Third Amended Complaint ("TAC") ¶¶ 104, 150, 204.[1] This "looting and vandalism occurred at multiple locations throughout the city" and caused "extensive damage" in downtown Washington, D.C., including near the White House. Mayor's Order 2020-069 ¶ 4. "Rioting and looting [also] affected the operations of District government agencies." *Id.* More than 80 arrests were made, with the "majority" of individuals "charged with felonies." *Id.* ¶ 3.

---

[1] *Available at*: https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content /attachments/Mayor%27s%20Order%202020-069.pdf. In deciding a motion to dismiss, the Court may consider the Mayor's Order because it is incorporated by reference in plaintiffs' complaint and because it is a public governmental record subject to judicial notice. *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018); *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 69 & nn.5-7 (D.D.C. 2019).

The unrest unfolding across Washington, D.C., occurred against the backdrop of massive protests in Lafayette Square over the tragic deaths of George Floyd, Breonna Taylor, and others. TAC ¶ 51. From May 29 through May 31, "large crowds of thousands" assembled "in front of the White House in Lafayette Square" to protest these deaths and alleged police brutality against Black people. *Id.* ¶ 52. On May 31, the Mayor ordered a city-wide curfew to start at 11:00 p.m., explaining that, on the past two nights, there had been vandalism, burning, and looting in downtown D.C., including damage to government buildings. Mayor's Order 2020-68 § I ¶ 4.[2] She issued the order based on this "glorification of violence," which was "not representative of peaceful protests or individuals exercising their lawful First Amendment rights." *Id.* When that curfew proved ineffective to stem the unrest, on June 1, the Mayor imposed an earlier city-wide 7:00 p.m. curfew. Mayor's Order 2020-069. While acknowledging the right of individuals to peacefully and lawfully protest, the Mayor imposed the June 1 curfew to "protect the safety of persons and property in the District" and to stem the violence that was occurring "at multiple locations throughout the city, in addition to the rioting in the downtown area." *Id.* § I ¶¶ 4-6.

## II.    Law-enforcement officers dispersed Lafayette Square protesters.

Large protests in Lafayette Square continued on June 1 and were ongoing as the city-wide curfew was approaching that evening. TAC ¶¶ 65, 150. These protests were a "continuation" of the prior protests that had created the opportunity for the previous nights' unrest. TAC ¶ 3; *see* Mayor's Order 2020-68 § I ¶ 4. Plaintiffs, Black Lives Matter D.C. (a group that organizes against "state-sanctioned violence against the Black community") and individual activists, participated in these protests. TAC ¶¶ 9-15.

---

[2] *Available at*: https://www.dcregs.dc.gov/Common/MayorOrders.aspx?Type=Mayor Order&OrderNumber=2020-068. The court may take judicial notice of this order. *Supra* note 1.

Plaintiffs allege that law-enforcement officers, along with military personnel, surrounded them and other activists and began dispersing them from Lafayette Square. *Id.* ¶¶ 67, 82. According to the complaint, this included U.S. Park Police, Arlington County Police Department (ACPD), U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons personnel. *Id.* ¶ 67. Officers purportedly used a variety of munitions. *Id.* ¶ 88.

Immediately after the protesters were dispersed, the former President, his Chief of Staff, the former Attorney General, the former Secretary of Defense, the President's daughter, and senior advisors walked from the White House to St. John's Church, which sits on Lafayette Square. *Id.* ¶ 203. The President paused for a "photo opportunity" and gave "brief remarks." *Id.*

Plaintiffs allege that the government's "professed purpose" for clearing the protesters—to facilitate the former President's "photo opportunity"—was "wholly illegal." *Id.* ¶ 4; *see also id.* ¶¶ 80, 202-204. They allege the former Attorney General personally gave the order to disperse Lafayette Square to facilitate the President's "photo opportunity" at St. John's Church. *Id.* ¶¶ 4, 17, 79-80. "The Secret Service requested other law enforcement agencies to assist clearing the area." *Id.* ¶ 80. U.S. Park Police Major Mark Adamchik purportedly followed with "the immediate order" to clear the area. *Id.* ¶ 20; *see also id.* ¶ 82. "Law enforcement officers" at the scene allegedly implemented these generalized clearing orders, using physical strikes and non-lethal munitions against the crowd to clear the park. *See id.* ¶¶ 3, 61, 67, 68, 77, 82, 88.

### III. The line-level officers aided in dispersing protesters other than plaintiffs.

At about 6:30 p.m., the "law enforcement officers" at the scene, including Officers Cox and McDonald, formed double lines in the park. *Id.* ¶¶ 81, 93. The "law enforcement officers, including defendants [LoCascio], [Jarmuzewski], [Hendrickson], and [McDonald]," "rushed forward" at the crowd. *Id.* ¶ 83.

Plaintiffs allege that three of these officers had interactions with unidentified protesters that are not named in this lawsuit. Officer Feliciano allegedly "leaned his weight behind his shield" against one protester and used his shield once again after another protester "bumped" into him. *Id.* ¶¶ 92, 95. Sergeant Daniels allegedly "charged into [an unidentified journalist], shoving the journalist aside[.]" *Id.* ¶ 98. Officer Sinacore "and a group of other Park Police officers" allegedly "rushed" an unidentified protester from behind, pushed him against the wall of a building, and allegedly struck him with his baton after he tried to flee. *Id.* ¶ 91. Plaintiffs also allege that officers on horseback assisted in clearing the park. *Id.* ¶ 90. Among them was Officer Seiberling, who allegedly directed unidentified protesters west on H Street toward 17th Street. *Id.* There is no allegation that Officer Seiberling made physical contact with anyone. *See id.* Plaintiffs allege nothing as to the remaining four line-level officers (LoCascio, Jarmuzewski, Hendrickson, and McDonald) beyond their participation in the rush forward following the dispersal order.

As to themselves, plaintiffs make zero allegations of interactions between them and any of the eight line-level officers. There is no allegation that plaintiffs had physical contact with any of the line-level officers, that they personally had any interactions with the line-level officers, or that they personally observed the line-level officers have any interactions with anyone else. Similarly, plaintiffs do not allege a single statement attributable to any of the eight line-level officers made before, during, or after June 1. The conduct attributed to undifferentiated groups of "officers" or "Defendants" made throughout the complaint follows suit. *See id.* ¶¶ 3, 46, 67-68, 88-90, 94, 96, 99, 104, 116, 141, 143, 151, 171, 186. Plaintiffs again make no factual allegation that would include or encompass the line-level officers within these undifferentiated groups. *See id.* In total, the complaint is 295 paragraphs; the eight line-level officers appear in only eight of them.

Though plaintiffs speculate regarding the motives of the former President, *id.* ¶¶ 53-64, as noted, they do not allege any statements made by the eight line-level officers indicating a desire to use force on the protesters based on their speech or class membership, *id*. There is also no suggestion that those officers could differentiate among lawful protesters and those who might have infiltrated the crowd to do violence. *See generally* TAC. Plaintiffs do not dispute the unrest that led to the curfew, and they do not claim that any security procedures were in place to screen the massive crowd that had gathered by the White House. *Id.*

## IV.    Claims against the federal line-level officers and other defendants.

Plaintiffs seek an implied damages remedy against Sergeant Daniels and Officers McDonald, Seiberling, Cox, Sinacore, Hendrickson, Jarmuzewski, and Feliciano under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). They allege that those officers violated their First and Fourth Amendment rights by carrying out a dispersal order, allegedly issued by the former Attorney General and Major Adamchik, to facilitate a presidential photo. *See* Claims 1-2. Plaintiffs also allege that the above officers are liable under 42 U.S.C. §§ 1985(3) and 1986 for conspiring to target Black people and their supporters or failing to prevent a conspiracy. *See* Claims 5-6. Plaintiffs brought these same claims against the Attorney General and Major Adamchik, who have already filed motions to dismiss.[3]

In addition, plaintiffs seek injunctive relief from various high-level federal officials in their official capacities, *see* Claims 3-4, and sue officials from the D.C. Metropolitan Police Department and the ACPD under 42 U.S.C. § 1983, *see* Claims 7-10. These defendants filed motions to dismiss that are currently pending.

---

[3] The arguments made by the line federal officers are similar but not identical to those made by the former Attorney General and Major Adamchik. *See* ECF Nos. 76 and 97.

Plaintiffs request class certification under Rule 23 both for their injunctive relief and personal injury claims. TAC ¶¶ 206-219. A motion to certify is pending. ECF No. 47.

## DISCUSSION

I.   **A *Bivens* claim is not available to challenge actions that federal officers allegedly took pursuant to an alleged high-level order to disperse thousands of unscreened demonstrators across from the White House before the President's appearance.**

The Nation's "interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence" is "overwhelming." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam) (citing H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916)). "No one can deny," the D.C. Circuit has observed,

> the substantiality or the significance of America's interest in presidential security. At stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world.

*White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (collecting cases). Plaintiffs' complaint implicates that vital interest: By seeking to hold eight line-level officers personally liable for their alleged operational role in implementing high-level orders to clear Lafayette Square before the President's appearance there, plaintiffs challenge the Executive Branch's core ability to ensure presidential safety. The line-level officers' alleged role in implementing a high-level plan to clear thousands of demonstrators who had not been screened does not subject them to personal liability. *Wood v. Moss*, 572 U.S. 744, 763 (2014) (granting qualified immunity where protesters were similarly "within weapons range" of the President, but reserving question of whether *Bivens* is available in presidential-security context). "Judicial inquiry" into matters involving the security of the Commander-in-Chief "raises concerns for the separation of powers in trenching on matters committed to the other branches." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (internal quotation marks and citation omitted). "[I]n accord with

the [Supreme] Court's" frequent warning that it has "refused to extend *Bivens* to any new context or new category of defendants," *Abbasi*, 137 S. Ct. at 1857 (internal quotation marks and citations omitted), this Court should refuse to impose new liability on these federal line officers for dispersing Lafayette Square in furtherance of an alleged high-level plan to clear and secure Lafayette Square before the President's appearance there.

### A.  *Bivens* **is a disfavored extra-statutory remedy that the Supreme Court has not authorized in this context.**

The "antecedent" question in this case is whether the Court should devise a freestanding damages remedy under the Constitution. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). Indeed, whether to authorize a "damages action under the Constitution for particular *injuries*" in a particular context is a "question logically distinct from immunity to such an action on the part of particular *defendants*." *United States v. Stanley*, 483 U.S. 669, 684 (1987). The Supreme Court's answer to the antecedent question—in a variety of contexts over the past "40 years"— has been frequent and unequivocal: No. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (collecting cases); *accord Loumiet v. United States*, 948 F.3d 376, 380-81 (D.C. Cir. 2020).

In 1971, the Supreme Court took the unprecedented step of creating a private cause of action under the Fourth Amendment—without Congressional authorization—after holding there were "no special factors counselling hesitation." *Bivens*, 403 U.S. at 396. The Supreme Court has extended *Bivens* only twice since then and only after noting the absence of special factors. *See Davis v. Passman*, 442 U.S. 228, 245 (1979); *Carlson v. Green*, 446 U.S. 14, 18-19 (1980). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Abbasi*, 137 S.

Ct. at 1855. Since *Carlson*, the Supreme Court has "consistently rebuffed requests to add to the [three] claims allowed under *Bivens*." *Hernandez*, 140 S. Ct. at 743 (collecting cases).[4]

Authorizing a new *Bivens* action is thus a "'disfavored' judicial activity." *Hernandez*, 140 S. Ct. at 742 (quoting *Abbasi*, 137 S. Ct. at 1857) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Twice in the past three years alone, the Supreme Court has forcefully declared that the arguments underpinning *Bivens* have "los[t] their force" and that "the Court's three *Bivens* cases [implying a remedy] might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1855-56; *accord Hernandez*, 140 S. Ct. at 742-43. While *Bivens* has not been overruled, it is the product of an "'*ancien regime*'" in which the Court effectively "arrogat[ed] legislative power." *Hernandez*, 140 S. Ct. at 741 (quoting *Abbasi*, 137 S. Ct. at 1855); *see also Abbasi*, 137 S. Ct. at 1869 (Thomas, J., concurring) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action.") (internal quotations and citations omitted).

Respect for "separation-of powers" means the creation of damages claims should be "committed to those who write the laws rather than those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (quotation marks and citations omitted). "Congress," not the Judiciary, "is best positioned to evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government' based on constitutional torts." *Hernandez*, 140 S. Ct. at 742 (quoting *Abbasi*, 137 S. Ct. at 1856). As the

---

[4] Webster Bivens claimed that federal agents violated the Fourth Amendment when they entered and searched his home from "stem to stern" without a warrant, handcuffed him, and arrested him for drug violations. *Bivens*, 403 U.S. at 389, 397. On the facts of *Bivens*, the officers' decision to proceed without a warrant, and the actions they took on the premises, had no component of (and indeed was insulated from) the sort of high-level decision-making here. *Davis* and *Carlson* involved, respectively, "a claim against a Congressman for firing his female secretary" also a one-on-one action; and a claim against prison officials for failure to treat an inmate's asthma," resulting in his death. *Abbasi*, 137 S. Ct. at 1860.

D.C. Circuit recently echoed, "judges are not well-suited" to decide "how to balance these competing considerations in various contexts." *Loumiet*, 948 F.3d at 381.

### B. *Bivens* should not be extended into this novel context.

Because it is not the judiciary's role to undertake these legislative tasks, "the first question a court must ask" before potentially imposing liability on a federal officer is "whether the claim arises in a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1864; *accord id.* at 1860. A case presents a new context when it differs "in a meaningful way" from the three "previous *Bivens* cases" in which the Supreme Court created a damages remedy (*Bivens*, *Davis*, and *Carlson*). *Id.* at 1859. Notably, the inquiry is strictly limited to "[t]hese three" Supreme Court "cases." *Id.* at 1855. That strict limitation means that any earlier lower court decisions extending *Bivens* have now been "overtaken by *Abbasi*'s holding that the new-context analysis may consider *only* Supreme Court decisions approving *Bivens* actions." *Loumiet*, 948 F.3d at 382 (emphasis added).

The Supreme Court in *Abbasi* provided numerous examples of the ways in which a case might meaningfully differ from *Bivens*, *Davis*, and *Carlson*. *Abbasi*, 137 S. Ct. at 1860 (listing seven non-exhaustive factors). Even a case with "significant parallels to one of the [Supreme] Court's [three] previous *Bivens* cases," or a case presenting just a "modest extension" of one of them, "is still an extension" into a brand-new context. *Id.* at 1864. The Supreme Court's "understanding of a 'new context' is," in a word, "broad." *Hernandez*, 140 S. Ct. at 743.

This case contains several of the factors explicitly identified in *Abbasi* as indicative of a new context and meaningfully differs from the trio of Supreme Court *Bivens* cases that were decided 40-plus years ago. In Claim 1, plaintiffs allege that the officers violated their First Amendment rights to speech, assembly, and to seek redress, but the Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Loumiet*, 948 F.3d at 382 (internal quotation marks and citation omitted). Instead the Court has repeatedly reminded litigants that it

10

has *not* expressly extended a First Amendment *Bivens* claim under any of its clauses to any context. *See Moss*, 572 U.S. at 757; *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012); *Iqbal*, 556 U.S. at 675; *Bush v. Lucas*, 462 U.S. 367, 368 (1983). Plaintiffs' First Amendment claim presents a new context, as the D.C. Circuit held when dismissing a similar claim under the Free Speech Clause, *Loumiet*, 948 F.3d at 382, and this Court held the same last year, *see Lee v. Barr*, No. 19-CV-2284 (DLF), 2020 WL 3429465, at *6 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5221 (July 23, 2020).

Plaintiffs' Fourth Amendment *Bivens* claim (Claim 2) presents a new context as well. While *Bivens* itself was a Fourth Amendment case, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743. (collecting cases). Notably, the Supreme Court in *Abbasi* clarified that *Bivens* authorizes damages for Fourth Amendment violations only in the narrow "search-and-seizure context in which [that case] arose"—*i.e.*, a claim against narcotics agents for "handcuffing a man in his own home without a warrant." 137 S. Ct. at 1856, 1860. *Bivens* simply did not involve anything like the concerns at stake in plaintiffs' class-action suit against the cadre of line-level officers who cleared Lafayette Park— on alleged orders from the Attorney General himself—prior to the arrival of the President. Therefore, plaintiffs' lawsuit here "assume[s] dimensions far greater than those present in *Bivens* itself" for at least three reasons. *Id.* at 1861.

First, "the extent of judicial guidance" regarding how the Executive Branch should have "respond[ed] to the problem or emergency" in this case is markedly different from *Bivens*. *Abbasi*, 137 S. Ct. at 1860. The question in *Bivens* was whether a federal officer could enter a home without a warrant, consent, or exigent circumstances—a question that had been extensively addressed by courts at the time. Indeed, the prohibition on "the physical entry of the home" has

deep historical and constitutional roots: it is the "chief evil against which the wording of the Fourth Amendment is directed," and in no setting "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 585, 589 (1980) (internal quotations marks and citation omitted).

Here, in contrast, the key question presented in plaintiffs' complaint is whether (consonant with the Constitution) federal officers, allegedly at the direction of high-level officials, can disperse thousands of unscreened protesters near the White House, in the midst of unrest, minutes before the President and other officials appear. *Cf. Moss*, 572 U.S. at 762-64 (granting qualified immunity to Secret Service agents at Presidential event); *Abbasi*, 137 S. Ct. at 1864-65 (holding new *Bivens* context in part because "[t]he standard for a claim alleging that a warden allowed guards to abuse pre-trial detainees is less clear under the Court's precedents"); *Ahmed v. Weyker*, 984 F.3d 564, 568 (8th Cir. 2020) (holding that warrantless arrest based on alleged evidence fabrication presented new Fourth Amendment *Bivens* context because "[t]he focus in *Bivens* was on an invasion into a home and the officers' behavior once they got there"). Not only has the Supreme Court never previously extended *Bivens* in this area, but taking up that question would require the Court to engage in the sort of policy considerations inappropriate in *Bivens* litigation: "balancing the vital right of protest against the legitimate governmental interests of public order and safety." *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1116 (D.C. Cir. 1969) ("*QAG I*") (collecting cases); *see also White House Vigil for ERA Comm. v. Watt*, 717 F.2d 568, 572 (D.C. Cir. 1983) (per curiam).

Second, plaintiffs' lawsuit inherently raises "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 137 S. Ct. at 1860. Ensuring that physical spaces the President occupies are appropriately screened and cleared is "undoubtedly" an issue "of the utmost importance." *Stigile v. Clinton*, 110 F.3d 801, 803 (D.C. Cir. 1997). But

the Executive Branch's ability to effectively perform that critical function would likely be compromised by judicial intrusion in the form of personal liability on the line-level officers who simply carried out the alleged dispersal order prior to the President's appearance. The Supreme Court has already stated as much: "The risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy." *Abbasi*, 137 S. Ct. at 1861. While the costs of indecision are serious for the decision-makers themselves, *see id.*, the consequences of inaction are especially serious for the line officers on the ground; they are charged with securing spaces for the President, and they are most at risk of death or injury from potential infiltrators or bad actors in an unscreened crowd. The threat of inaction when charged with presidential security differs immensely from the concerns associated with obtaining a warrant before searching a house and its occupants for drugs, as in *Bivens* itself.

Third, plaintiffs' claims against the line-level officers meaningfully differ from *Bivens* because of the "generality . . . of the official action" at issue. *Id.* at 1860. Except for alleging their participation in dispersing Lafayette Square pursuant to orders from the former Attorney General, plaintiffs fail to allege that the officers otherwise "engaged in some personal misconduct in a direct and particularized interaction with a plaintiff," which is the hallmark of *Bivens* litigation. *Mejia-Mejia v. ICE*, No. CV 18-1445, 2019 WL 4707150, at *4 (D.D.C. Sept. 26, 2019); *see Abbasi*, 137 S. Ct. at 1860; *cf. Ahmed*, 984 F.3d at 569 (finding warrantless-arrest claim presented new *Bivens* context in part because the officer did not personally arrest the plaintiff). Rather, as discussed in detail below, plaintiffs primarily allege that the officers interacted with unnamed protesters who are not even *plaintiffs* to this suit. *See, e.g.*, TAC ¶¶ 91-93, 95, 98. Plaintiffs' additional attempt to skirt this personal-interaction requirement through a proposed *class-action* suit—in which any line-level defendant might be held liable for the acts of other officers in the park—further highlights core differences between this case and *Bivens* itself.

13

Plaintiffs' claims against these federal officers ultimately "bear little resemblance to the three *Bivens* claims the [Supreme] Court ha[d] approved" 40-plus years ago. *Abbasi*, 137 S. Ct. at 1860. Instead, the presidential security concerns inherent in plaintiffs' suit resemble the two most recent *Bivens* cases decided by the Supreme Court in which the Court held there was no Fourth Amendment damages remedy. In *Abbasi*, the Court held that high-level detention policy claims, including a Fourth Amendment strip-search claim, presented a new context to which *Bivens* should not be extended. *Id.* at 1853-54, 1858. And in *Hernandez*, the Court concluded excessive-force claims stemming from a fatal cross-border shooting "assuredly arise in a new context" and held that dismissal was warranted. 140 S. Ct. at 743-44. Plaintiffs' challenge to the actions that federal line officers took in clearing Lafayette Square pursuant to an alleged high-level dispersal order in the context of a Presidential appearance assuredly presents a new context here.

In sum, "[e]ach" of these differences alone is enough to "present[] a new context." *Loumiet*, 948 F.3d at 382. Taken together, they definitively establish that the cause of action plaintiffs ask this Court to endorse would represent a significant and unwarranted extension of this implied remedy into a new area that raises significant separation-of-powers concerns.

**C. Special factors preclude a *Bivens* remedy against line-level officers who allegedly implemented high-level orders to clear a path for the former President by dispersing a large crowd of unscreened demonstrators.**

While "the absence of any *Bivens* remedy in similar circumstances" is itself "highly probative" of the conclusion that plaintiffs' claims should be dismissed, *Meshal v. Higgenbotham*, 804 F.3d 417, 426 (D.C. Cir. 2015), an analysis of the "special factors" the Supreme Court identified in *Abbasi* dictates that this Court should decline plaintiffs' invitation to create a new implied damages remedy. *Abbasi*, 137 S. Ct. at 1858.

The "central" special-factor inquiry derives from "separation-of-powers principles." *Id.* at 1857. As noted above and detailed below, courts are not "well suited" to "weigh the costs and benefits of allowing a damages action to proceed," particularly against the federal officers sued here. *Id*. at 1858. Congress, which *is* well suited to the task, has never enacted the remedy plaintiffs seek. But even if this Court were to assume that legislative task, the availability of alternative processes—several of which plaintiffs pursue in this case—is another "'convincing reason'" for this Court "'to refrain from providing a new and freestanding remedy in damages.'" *Id.* at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

> ### i.   Courts should not intrude into sensitive matters of presidential security.

Injury to the President "does violence" not only to the President but also to "the stability of the nation" and to "the democratic ideals that guide our system of government." *Berg v. Kelly*, 897 F.3d 99, 114 (2d Cir. 2018). It has "worldwide repercussions and affects the security and future of the entire nation." *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969). The "paramount interest" in the President's security has been "underscored in importance by the tragic assassinations" of four presidents. *QAG I*, 421 F.2d at 1117 (citing *Watts*, 394 U.S. 705).

Plaintiffs' *Bivens* suit—which fundamentally challenges the alleged high-level decision to disperse protesters near the White House before a presidential appearance, and in the context of these defendants the implementation of that order—also implicates "the ability of the executive branch to function in an orderly fashion." *White House Vigil for ERA Comm*., 746 F.2d at 1528.  The Third Amended Complaint depicts a large gathering of unscreened demonstrators across from the White House as the former President walked into Lafayette Square to give remarks. *Cf. Moss*, 572 U.S. at 759 (observing "[o]fficers assigned to protect public officials must make singularly swift, on the spot, decisions whether the safety of the person they are guarding is in jeopardy") (quoting *Reichle*, 566 U.S. at 671 (Ginsburg, J., concurring)); *Roy*, 416

F.2d at 877 ("The President and his advisors would therefore be irresponsible if they ignored apparently serious threats against the President's life"). As the Supreme Court has recognized, any large crowd poses a security threat to the President due to the inherent and foreseeable risk of infiltration by bad actors, and concerns about such conduct in this context were not unreasonable given the unrest and illegal acts that had prompted the curfew. *See Moss*, 572 U.S. at 760; *see also Quaker Action Grp. v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975) ("*QAG IV*") (any "public gathering" is a "hazard to the security of the President and the White House").[5]

Regardless of the motives of the alleged decision-makers here, it would have been dangerous and "irresponsible" for the line officers to have "ignored" high-level orders to disperse a large, unscreened crowd minutes before the President's appearance. *Roy*, 416 F.2d at 877. Imposing a damages remedy on the line-level officers under these circumstances would undermine the Supreme Court's repeated warning against chilling the conduct of those who are personally involved in securing the President's safety. *See Moss*, 572 U.S. at 763; *cf. Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017) (declining to imply *Bivens* remedy against line-level employees involved in "securing our nation's airports and air traffic").

Notably, the important security and related separation-of-powers concerns associated with clearing and securing an area before the former President's appearance in the midst of unrest were at least as pronounced as the border security concerns that precluded a *Bivens* remedy against the line-level officer sued in *Hernandez*. The Supreme Court held that the parents

---

[5] Those concerns were also apparent from the location of the unscreened crowd amidst the unrest. As the D.C. Circuit has long observed, the White House is "a unique situs for considerations of presidential and national security." *White House Vigil for ERA Comm.*, 746 F.2d at 1533. Because protecting the White House is a "security problem of the greatest magnitude," courts have upheld a variety of First Amendment restrictions near or inside the White House perimeter. *Id.* at 1541 (approving restrictions on signs and parcels on White House sidewalk). *See also, e.g., QAG IV*, 516 F.2d. at 731-33; *United States v. Musser*, 873 F.2d 1513 (D.C. Cir. 1989); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016).

of a boy who was tragically shot and killed on the Mexican side of the border—while the boy was allegedly playing with his friends—could not personally sue the agent who fatally shot their son. *Hernandez*, 140 S. Ct. at 750. Apart from concerns about interfering in foreign affairs, *see id.* at 744-45, the Court detailed security concerns such as preventing the illegal entry of persons, drugs, and other goods into the United States, *id.* at 746. The Court concluded the "conduct of agents positioned at the border has a clear and strong connection to national security," rendering a *Bivens* remedy unavailable for the boy's death. *Id.*

The alleged actions of federal officers in securing an area before the appearance of the Commander-in-Chief similarly implicates national-security concerns, which are "the [Constitutional] prerogative of the Congress and President." *Abbasi*, 137 S. Ct. at 1861 (citations omitted). Indeed, the Supreme Court has repeatedly observed that the President's safety is "of overwhelming importance in our constitutional system," *Moss*, 572 U.S. at 748 (citing *Watts*, 394 U.S. at 707), and the D.C. Circuit has likewise echoed that failures in presidential protection relate to core national-security concerns, including, for example, the President's ability "to respond to threats and crises" facing the nation, *White House Vigil for ERA Comm.*, 746 F.2d at 1528*; see also QAG I*, 421 F.2d at 1117. The Supreme Court, however, has repeatedly "cautioned that '[m]atters intimately related to . . . national security are rarely proper subjects for judicial intervention[,]'" and courts have uniformly rejected *Bivens* cases in that arena. *Doe v. Rumsfeld*, 683 F.3d 390, 395 (D.C. Cir. 2012) (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)); *see also Meshal*, 804 F.3d at 425. In fact, no decision implying a *Bivens* remedy in areas involving national security has ever survived appeal. *See Doe*, 683 F.3d at 394.

In sum, judicial encroachment into this area would raise separation-of-powers concerns that can't be easily dismissed: "If *Bivens* liability were to be imposed" on these federal officers for allegedly dispersing Lafayette Square on high-level orders to secure a space for a presidential

appearance, then other officers "might refrain from taking urgent and lawful action" required to

secure a space for the President and others in the future. *Abbasi*, 137 S. Ct. at 1863; *cf. Berg*, 897

F.3d at 114 ("Protecting the President's safety is among the most important of law enforcement

duties."). If such a message is to be sent to the first line of defense for the President, that message

*must* come from Congress; yet as discussed next, Congress has repeatedly declined to send that

message, meaning that this Court "must" be "especially wary before allowing a *Bivens* remedy

that impinges" on presidential security. *Hernandez*, 140 S. Ct. at 744.

> ii.    **Congress legislated extensively to enhance presidential and White House security but has not created a personal damages remedy in this context.**

This Court should also decline to create a new *Bivens* remedy in this case because

Congress has never authorized a damages remedy in the context of presidential security. This

was not "'inadvertent.'" *Abbasi*, 137 S. Ct. at 1843 (quoting *Schweiker v. Chilicky*, 487 U.S. 412,

432 (1988)). Rather, over the last 100-plus years, Congress has repeatedly addressed, analyzed,

and enacted legislation on this issue. But never has it exposed federal officers to personal

financial liability for actions taken to safeguard the President or the White House.

The volume of legislation on this subject demonstrates that Congress had more than an

opportunity to do so. Congress has passed laws making it a federal crime to threaten the

President, to assassinate the President, and to remain in restricted areas that the President is (or

will be) visiting. *See* 18 U.S.C. §§ 871 (threats); 1751 (assassination); 1752 (restricted areas).

Congress has also reinforced its concern for presidential security with a variety of supplemental

actions. Over the years—and in response to significant events like the September 11 terrorist

attacks—Congress has provided additional funding to federal agencies to enhance security and

permitted increasingly robust physical security measures to continue.[6] By seeking to improve presidential security, these congressional actions necessarily required Congress to consider the legal limits of those improvements as well as the trade-offs associated with them. This included considering whether to impose civil liability to deter alleged transgressions of those legal limits.

The legislative history of these laws indisputably proves as much. Before enacting 18 U.S.C. § 1751, Congress reviewed the Warren Report, a 900-page report examining presidential security that remains the country's most in-depth treatment on the subject. *See* REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, at 454-69 (1964) ("The Warren Commission Report"). While noting the "immensely difficult and complex task" of protecting the president, the commission discussed civil rights concerns and explicitly stated that "[t]he rights of private individuals must not be infringed[.]" *Id.* at 426-27. Even so, Congress did not enact legislation that would impose liability on federal officials who might cross the line performing their protective mission. Years later, a House committee noted that they were "acutely aware" of this tension and the related need "to weigh the costs that could accrue to individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures." *Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H.R. REP. NO. 95-1828, pt. 2, at 464

---

[6] *See, e.g.*, Pub. L. No. 107-117, 115 Stat. 2230, 2334 (2002); S. REP. NO. 107-109, at 190, 206 (2002) (recommending funds to Secret Service for additional White House security measures and to Park Police for increased patrols, recognizing the Park Police also provides "security patrols around the White House perimeter" and security escorts for the President); *see Information Hearing on the Closing of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight*, 104th Cong. (1995); *America's Main Street: The Future of Pennsylvania Avenue: Hearing Before the Subcomm. on the Dist. of Columbia of the H. Comm. on Gov't Reform*, 107th Cong. (2001).

(1979) (citation omitted) (emphasis added). Yet, once again the Committee's proposals did not include a damages claim against federal officers.[7]

Finally, in the spirit of the costs that could accrue, Congress has authorized Inspectors General throughout the Executive Branch to investigate and report abuses by federal law-enforcement officers. *See* The Inspector General Act of 1978, 5 U.S.C. App. 3 § 12. Congress has likewise required Homeland Security to investigate and report constitutional abuses. 6 U.S.C. §§ 111(b)(1)(G), 113(d)(3), & 345. Despite creating these oversight processes, Congress has remained silent regarding the creation of a damages remedy against federal officers for alleged abuses arising from actions taken to protect the President or the White House.

*Abbasi* holds that this congressional "silence" over the last century further counsels against the extra-statutory remedy plaintiffs seek here. *Abbasi*, 137 S. Ct. at 1862. In *Abbasi*, the plaintiffs claimed that they were harshly treated after the 9/11 terrorist attacks. *Id.* at 1852-53. However, the Supreme Court refused to imply a remedy for them. It reasoned that Congress's "'frequent and intense'" attention to the issue made it "difficult to believe" that the absence of a private right of action was "inadvertent." *Id.* at 1862. Thus, by requesting frequent reports from the Inspector General about possible "abuses of civil rights and civil liberties in fighting terrorism" but ultimately declining to provide a remedy, it followed that "Congress' failure to provide a damages remedy might be more than mere oversight[.]" *Id.*

---

[7] Following a series of White House security breaches in the past decade, Congress held additional oversight hearings in which lawmakers continued to weigh presidential-security concerns against restrictions on individual liberties without ever authorizing a damages remedy. *See, e.g.*, *White House Perimeter Breach: New Concerns about the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014). An executive panel also issued a report on these White House breaches and echoed Congress's century-long concern that presidential security "allows no tolerance for error." United States Secret Service Panel, *Report from the United States Secret Service Protective Mission Panel to the Secretary of Homeland Security* 1 (Dec. 15, 2014).

This case demands the same result because Congress's "silence" is even more "telling" under the circumstances here. Since the early 1900s, Congress has approved federal protection, appropriated funds for presidential security, and authorized or empowered committees and commissions to make findings and recommendations on presidential security. In so doing, it has not only considered the complexities of the issue but also debated the central tension present in this analysis—the balance between preserving civil liberties and enhancing presidential and White House security. Yet "'[a]t no point'" in more than a century of attention to the issue "'did Congress choose to extend to any person the kind of remedies'" that plaintiffs seek. *Id.* (quoting *Schweiker*, 487 U.S. at 426). If "Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*," respect for the separation of powers demands that courts not imply a remedy. *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014); *see also Hernandez*, 140 S. Ct. at 750.

>    iii.   **Plaintiffs cannot sue line-level officers personally for high-level decisions of others or use them as a surrogate to seek intrusive discovery into high-level decision-making and confidential communications involving the President.**

The Supreme Court has repeatedly cautioned that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy'" and may only be "brought against the individual official for his or her own acts, not the acts of others." *Abbasi*, 137 S. Ct. at 1860 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). But plaintiffs' *Bivens* lawsuit violates these cardinal rules by attempting to hold federal line-level officers personally liable in damages for implementing an Executive Branch order—allegedly promulgated by the Attorney General himself and purportedly (albeit in conclusory fashion) at the behest of the President—to disperse thousands of unscreened individuals before the President's appearance in Lafayette Square.

Plaintiffs' core claim is that the former President, the Attorney General, the Secretary of Defense, and senior White House officials conspired to disperse protesters from Lafayette Square to facilitate the President's appearance and photo at St. John's Church. TAC ¶¶ 4, 60, 78-80, 202-203, 246. There is no allegation that the federal line officers represented here were part of these discussions or decisions. *See id.* As discussed more fully below, the only allegation against Officer Seiberling is that she and other "mounted officers on horseback" traveled through Lafayette Square, which "pushed" people back, *id.* ¶ 90; the few allegations against the other line officers similarly describe (also with little detail) their efforts to disperse the crowd before the President's appearance, *see, e.g.*, *id.* ¶¶ 82-83 (describing officers "rushing forward" to clear the area upon receiving Major Adamchik's order to disperse). Even though these defendants were not themselves part of the alleged discussions, deliberations, or decisions that precipitated the dispersal, plaintiffs nevertheless seek to hold them personally liable for carrying out those high-level decisions. *See* TAC ¶¶ 4-5, 20, 78-79, 82-83, 221, 224, 228. That is an entirely inappropriate use of *Bivens* litigation.

First, it is settled law that "[a] *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others." *Abbasi*, 137 S. Ct. at 1860; *see Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Attempting to hold line-level officers accountable for high-level decisions made by senior officials easily violates this fundamental rule of personal-capacity litigation. Second, in light of the Supreme Court's guidance in *Abbasi*, 137 S. Ct. at 1860, courts in this District recognize that "[t]here are serious separation of powers problems with using individual capacity constitutional claims for money damages to lodge facial challenges to generally applicable laws and policies." *Mejia-Mejia*, 2019 WL 4707150, at *4. Indeed, *Bivens* claims are "not" usually permitted "against individuals who have applied a general policy that affected plaintiff and

22

others in similar ways," *id.*, a maxim that plaintiffs violate in attempting to hold the line-level officers liable for implementing a high-level plan. *Bivens* claims instead "have generally been made against individuals—a police officer, a supervisor, or a federal prison guard—who have engaged in some *personal misconduct in a direct and particularized interaction with a plaintiff*." *Id.* (emphasis added).

Apart from generally participating in the dispersal itself, there is not a single well-pleaded allegation that any of the line defendants here directly interacted with any named *plaintiff* (not to mention in an illegal manner).[8] Nor can plaintiffs circumvent the personal-interaction requirement by proposing a class-action *Bivens* lawsuit in which a single line-level officer is on the hook for alleged injuries potentially claimed by thousands of protesters with whom the officer had no direct interaction. To hold otherwise—*i.e.*, to hold an officer personally liable for the alleged acts of others even though his or her own actions were limited to clearing the park under high-level orders—would distort and expand the scope of *Bivens* liability beyond all recognition. *See Abbasi*, 137 S. Ct. at 1860; *Iqbal*, 556 U.S. at 677.[9]

While plaintiffs may attempt to frame their suit against the line-level defendants as one meant to "deter" particular conduct of "individual officers," the complaint is "obviously a collateral challenge" to high-level law-enforcement decisions implicating presidential-security

---

[8] The closest plaintiffs come is alleging in conclusory fashion that officers Hendrickson, Jarmuzewski, and McDonald were part of a large group of law-enforcement officers that "rushed forward and attacked" a group of protesters, which included some of the named plaintiffs. TAC ¶ 83. As discussed below, that allegation is consistent with the line officers merely dispersing the plaintiffs—upon receiving orders to do so, *id.* ¶ 82—by moving forward.

[9] Take Officer Feliciano for example. After first being "bumped" by an unidentified (non-party) protester, he allegedly "lashed out with his shield," which caused the protester that contacted him first to "stumble." TAC ¶ 95. Allowing *all* of the named plaintiffs, not to mention *thousands* of others protesters in the proposed class, to pursue a *Bivens* claim against Officer Feliciano based on that isolated incident—without any personal interaction of their *own* with Officer Feliciano—would trample well-settled *Bivens* law. *See, e.g., Iqbal*, 556 U.S. at 677.

23

"policy," which "affect[ed] thousands of individuals" in Lafayette Square. *Mejia-Mejia*, 2019 WL 4707150, at *4. Because the nature of this *Bivens* suit is a backdoor attempt to challenge these high-level decisions, the claims at issue also implicate the related concerns raised by the former Attorney General and Major Adamchik in their motions to dismiss. Despite suing these line officers personally, plaintiffs ultimately seek to discover the decision-making process and precise motives of the former President, the Attorney General, and other senior officials, *see id.* ¶ 215(n), including to learn "whether and to what extent the use of force" that was used "was premeditated and planned in advance," *id.* ¶ 215(b). Plaintiffs' latest proposal, for instance, to rely on allegations about White House deliberations and the high-level decisions of the Acting Park Police Chief to pursue their claims against Major Adamchik only underscores their intent to use claims against lower ranked officials to probe the rationale for high-level decisions. *See* ECF No. 122 at 38-39, 45 n.17. But probing the reasons for these high-level decisions "necessarily require[s] inquiry and discovery into the whole course of the discussions and deliberations" underpinning the alleged conspiracy and the "governmental acts being challenged." *Abbasi*, 137 S. Ct. at 1860. That counsels hesitation for at least two reasons.

The first "significant" factor is "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process." *Id.* at 1856. This consideration is especially relevant where, as here, the plaintiffs seek to subject the former Attorney General, Major Adamchik, and the line-level officers—and by extension the former President, the former Secretary of Defense, and other high-level officials—to the burdens of discovery, including depositions.[10] As noted above, "the burden and demand of litigation might well prevent them—

---

[10] Plaintiffs readily acknowledge that "[l]itigating claims against the President, Attorney General, several agencies and department heads, and numerous individual officers will inevitably involve massive amounts of discovery . . . ." ECF No. 47-1 at 48 (class-certification motion).

or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties." *Id.* at 1860 (citing *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 382 (2004)). That in turn could chill Executive Branch officers, including line-level officers protecting the President and the White House, from "taking every possible precaution to ensure that [the President] is safe." *Stigile*, 110 F.3d at 804. The issue is "too difficult" and "too delicate" for this Court to impose *personal* damages liability without congressional approval. *Quaker Action Grp. v. Morton*, 460 F.2d 854, 860 (D.C. Cir. 1971) ("*QAG III*").

A "closely related problem" arises from a "discovery and litigation process [that] would either border upon or directly implicate the discussion and deliberations that led to the formation of" decision-making by high-level officials, in this case to disperse Lafayette Square. *Abbasi*, 137 S. Ct. at 1860-61 (citing *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979)). As noted, plaintiffs explicitly tie the actions taken to clear Lafayette Square to high-level decisions and orders (not to mention the alleged desires of the President himself). *See* TAC ¶¶ 4-5, 20, 78-79, 82-83, 221, 228. Disclosing confidential communications between the President, the Attorney General, and other cabinet officials—particularly regarding presidential or White House security—could "interfere in an intrusive way with sensitive functions of the Executive Branch." *Abbasi*, 137 S. Ct. at 1861 (citing *Clinton v. Jones*, 520 U.S. 681, 701 (1997)). As the Supreme Court reaffirmed in *Abbasi*, "'special considerations control' when a case implicates 'the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications[.]'" *Id.* (quoting *Cheney*, 542 U.S. at 385). Those special considerations double as special factors counselling against a new implied damages remedy here.

Courts in this district have dismissed *Bivens* claims based on similar concerns. *See K.O. v ICE*, 468 F. Supp. 3d 350 (D.D.C. 2020), *appeal filed*, No. 20-5255 (Aug. 26, 2020); *Mejia-*

*Mejia*, 2019 WL 4707150. In *Mejia-Mejia*, the court warned of a chilling effect "[i]f the courts were to entertain challenges to Executive Branch policies that are pursued through personal lawsuits against the officials of departments and agencies of government." 2019 WL 4707150, at *5. In particular, "the discovery required to gain details on individual defendants' motivations could dampen the candor of conversations and advice rendered by officials within the executive branch." *Id.* But those concerns are even more pronounced in *this* case given that the nature of plaintiffs' suit "reach[es] even further into Executive Branch deliberations," and the "conversations and advice at issue" are not only "closer to the office of the President" but involve the former President himself. *K.O.*, 468 F. Supp. 3d at 365. Whether or not these conversations are "privileged or discoverable," they provide "more reason to pause before allowing a *Bivens* action that could reach them." *Id.*; *cf. Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 232-33 (D.D.C. 2018) (declining to extend *Bivens* to "high-level policy determinations").

Because bad motive "is easy to allege and hard to disprove," plaintiffs' *Bivens* claims may require this Court to scrutinize high-level communications or to probe intelligence regarding threats to the White House and the President. *Crawford-El v. Britton*, 523 U.S. 574, 584-85 (1998) (internal quotations marks and citation omitted). Given the "high rank[]" of the alleged decision-makers, not to mention the "class nature of the claims," it is hard to "see how prosecution of [plaintiffs'] claims could avoid looking into" deliberations and decisions made "at the highest levels[.]" *K.O.*, 468 F. Supp. 3d at 366. Yet that is the crux of this case. Even if the line-level officers later received immunity, that would not allay the "difficulties" of subjecting high-level communications and sensitive law-enforcement material, implicated by the nature of plaintiffs' lawsuit, to "judicial and public scrutiny" through damages litigation that Congress never approved. *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008); *cf. Stanley*, 483 U.S. at

682-83 (discovery into military decisions counseled against *Bivens*); *Moss*, 572 U.S. at 762

(examining security manual before granting immunity).

      Allowing plaintiffs' class-based claims to proceed by way of an extra-statutory, personal-

capacity damages action—or alternatively allowing thousands of separate cases to go forward

against line-level officers based on the same high-level decision—would also saddle these line

officers (and the government) with extraordinarily burdensome and time-consuming discovery; it

would also create an unacceptable financial disincentive for them to serve as law-enforcement

officials. *See Abbasi*, 137 S. Ct. at 1857 (constitutional tort suits create "substantial costs"

against both the individual federal officer and the government); *cf. Ahmed*, 984 F.3d at 570-71

(declining to allow Fourth Amendment *Bivens* remedy against investigator accused of fabricating

evidence, which caused warrantless arrest and pretrial detention, in part because of the

"'substantial costs' associated with requiring public officials to litigate these types of issues,

including 'the diversion' of public resources and deterring 'able citizens from . . . public office'")

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). Indeed, imposing a new extra-

statutory damages remedy, no less in the context of a class-action suit, would set a dangerous

precedent by putting future first-line officers charged with the President's protection in a catch-

22: either obey the command of senior officers at the risk of significant personal financial

liability or disobey superiors in circumstances that implicate presidential security. *Cf. Hunter v.

Bryant*, 502 U.S. 224, 229 (1991) ("[O]fficials should not err always on the side of caution

because they fear being sued.") (internal quotation marks and citation omitted); *Vanderklok*, 868

F.3d at 207 ("The threat of damages liability could indeed increase the probability that a TSA

agent would hesitate in making split-second decisions about suspicious passengers."). An

avalanche of personal damages claims, based on an alleged Cabinet decision to protect the

President's safety, would "creat[e] a potentially enormous financial burden" on the line-level

officers—a burden best left "to Congress to weigh." *FDIC v. Meyer*, 510 U.S. 471, 486 (1994)

(declining to extend *Bivens* against a federal agency because doing so would implicate federal

fiscal policy). Because "the costs and difficulties" of this suit "might intrude upon and interfere

with the proper exercise" of the Executive Branch in this vital context, the Court should not

create a new damages remedy. *Abbasi*, 137 S. Ct. at 1863.

> ### iv.     Plaintiffs pursue alternative relief that precludes a new *Bivens* remedy.

Another "'convincing reason'" why this Court should not step into Congress's or the

Executive Branch's shoes by creating a "'freestanding remedy'" against the line-level officers is

that plaintiffs have an "'alternative, existing process'" to vindicate their interests. *Id.* at 1858

(quoting *Wilkie*, 551 U.S. at 550) (collecting cases). In fact, plaintiffs in this very case seek an

injunction to protect *both* their First and Fourth Amendment rights. *See* Claims 3-4.

The Supreme Court has observed that the opportunity to seek an "injunction" is precisely

the kind of alternative process that "usually precludes" extending *Bivens* into a new context.

*Abbasi*, 137 S. Ct. at 1865 (observing that detainees' ability to enjoin unconstitutional conditions

of confinement counsels against *Bivens* relief). Indeed, the "Supreme Court has declined to

extend *Bivens*" not only where Congress has provided a statutory remedy but also "where other

causes of action provide redress," including for "equitable relief." *Liff v. Off. of Inspector Gen.*

*for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018) (citations omitted). Through their

request for injunctive relief, plaintiffs effectively seek to modify "large-scale" law-enforcement

decisions regarding where, when, and how individuals can protest near the White House. *Abbasi*,

137 S. Ct. at 1862. That plaintiffs seek this relief on behalf of a class of numerous individuals—

potentially numbering in the thousands—only underscores their core interest: the rights of

plaintiffs and others to protest in Lafayette Square without being forcefully dispersed, if at all.

"[U]nlike the *Bivens* remedy," which the Supreme Court has "never considered a proper vehicle

for altering an entity's policy," plaintiffs' request for "injunctive relief" (on behalf of a proposed class, no less) "has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Malesko*, 534 U.S. at 74.

Many courts have declined to extend *Bivens* where equitable relief was an alternative option for vindicating constitutional interests. For example, in *Mejia-Mejia*, the court observed that in the "numerous cases" of immigrant children separated from their parents (including "two class actions") the availability of "alternative mechanisms" precluded *Bivens* relief. 2019 WL 4707150, at *5. Those alternative mechanisms included the very relief sought here: "injunctive relief against the relevant agencies and government officials in their official capacities[.]" *Id.* Likewise, this Court has twice observed that equitable relief under the Administrative Procedure Act is enough to preclude *Bivens* relief, "perhaps alone." *LKQ Corp. v. United States*, No. 18-CV-1562 (DLF), 2019 WL 3304708, at *11 (D.D.C. July 23, 2019) (citing *Lillemoe*, 344 F. Supp. 3d at 232). The availability of equitable relief, under the APA or otherwise, "leaves no room for *Bivens*." *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009); *accord Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005); *Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998).

There also is no room for plaintiffs' *Bivens* claims "regardless" of whether their proposed injunction is "adequate to provide all of the relief [they] seek[]." *Liff*, 881 F.3d at 920. *Bivens* isn't required even when alternative options offer "no relief whatsoever." *Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012) (citing *Wilson*, 535 F.3d at 709). So long as plaintiffs have at least an "avenue for some redress" through their proposed injunction, "bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 69. Indeed, "[e]ven if the choice is between *Bivens* or nothing, if special factors counsel hesitation"—as they do here—"the answer may be nothing." *Meshal*, 804 F.3d at 425.

In this case, however, the plaintiffs may have a potential alternative mechanism for attempting to seek recourse even if they fail to obtain an injunction: depending on the facts, for certain claims they could seek to pursue a damages claim under state tort law or the Federal Tort Claims Act, 28 U.S.C. § 1346(b), *id.* §§ 2671-80.[11] While the Supreme Court in 1980 found that the FTCA did not displace an otherwise appropriate *Bivens* action for the denial of prison medical care resulting in death, *see Carlson*, 446 U.S. at 23, the Supreme Court has since held or observed—on at least *four* occasions since *Carlson*—that the potential availability of "state tort law" may "provide[] alternative means for relief" precluding a new *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1858; *see Minneci v. Pollard*, 565 U.S. 118, 120 (2012); *Wilkie*, 551 U.S. at 551; *Malesko*, 534 U.S. at 72-73. The D.C. Circuit recently observed the same thing. *See Liff*, 881 F.3d at 918 (citing *Minneci*, 565 U.S. at 120).

Accordingly, numerous courts have now held that the FTCA is an alternative to *Bivens* in a variety of contexts, observing "that *Carlson*'s analysis of that issue may not have survived [*Abbasi*]." *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (collecting cases); *e.g.*, *Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020) (the FTCA precluded a *Bivens* claim based on excessive force), *petition for cert. filed*, No. 20-1060 (U.S. Feb. 3, 2021); *Cantu v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019); *Schwarz v. Meinberg*, 761 F. App'x 732, 734-35 (9th Cir. 2019). Because plaintiffs' allegations that they were seized unlawfully "would be so clearly actionable under the general law" (subject to potential FTCA defenses), their case presents the "weakest argument" for this Court to "recogniz[e] a generally available constitutional tort." *Wilkie*, 551 U.S. at 560. Whether or not this Court recognizes state law or the FTCA as providing a potential

---

[11] Plaintiffs also seek damages against potential wrongdoers under 42 U.S.C. §§ 1983, 1985(3), and 1986, subject to available defenses there. *See* Claims 5-10; *cf. Abbasi*, 137 S. Ct. at 1843.

standalone alternative to *Bivens*, the possible availability of a claim for damages there (or against state actors under federal civil rights statutes like § 1983)—when paired with all of the special factors above—provides even more reason for this Court to decline to create a new remedy. *See Abbasi*, 137 S. Ct. at 1861; *cf. Meshal*, 804 F.3d at 425 (special factors that might not "alone" preclude *Bivens* may do so "together").

"In sum, this case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers." *Hernandez*, 140 S. Ct. at 749 (citing *Abbasi*, 137 S. Ct. at 1857-58). When it comes to the President's safety and White House security, Congress is "in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (internal quotation marks and citation omitted). Imposing a judicially implied damages remedy in an area that Congress has resisted for a century would mark a return to the "forgotten era in which courts freely implied private rights of action to promote congressional purposes unmoored from statutory text." *LKQ Corp.*, 2019 WL 3304708, at *10. Because there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" against the line-level officers for the class of claims pleaded in this novel context—claims that fundamentally challenge the high-level decision designed to protect the former President in the context of a suit against these defendants merely implementing that order—this Court "must refrain from creating the remedy." *Abbasi*, 137 S. Ct. at 1858.

## II.     The line-level officers are entitled to qualified immunity.

Plaintiffs fail to allege that they had any contact—at all—with the federal line-level defendants represented here. That alone entitles these officers to qualified immunity and dismissal from the case. To the extent plaintiffs are attempting to hold the officers liable for merely being present on the scene or part of the broader Executive Branch operation to disperse

Lafayette Square—as allegedly ordered by the Attorney General—their claims fare no better. By following an alleged high-level order to disperse a crowd of unscreened protesters, given minutes before the President's appearance and in the midst of civil unrest, the line-level officers did not violate any clearly established rights of which a reasonable officer would have known. This too entitles them to qualified immunity and dismissal from this case.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). This defense "protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (citation omitted); *see also Harlow*, 457 U.S. at 818 (qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Thus, the "protection of qualified immunity applies regardless of whether the government officials error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). Ultimately a court must determine "(1) 'whether a constitutional right would have been violated on the facts alleged,' and (2) 'whether the right was clearly established' at the time of the violation." *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 54 (D.D.C. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Plaintiffs cannot satisfy either prong for any of their four claims against the line-level officers.

### A. Plaintiffs fail to allege that the line-level officers had the requisite personal involvement in the acts allegedly committed against Plaintiffs.

To determine the sufficiency of the allegations against the line-level officers and their entitlement to qualified immunity for any of the claims, the first step is to "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."

*Iqbal*, 556 U.S. at 679. As a result, plaintiffs must plausibly allege "factual content" supporting the "reasonable inference" that the line-level officers not only violated constitutional and statutory rights, but that that they violated the rights *personally* held by plaintiffs. *Id.*; *see Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) ("[T]he allegations must demonstrate that each defendant officer, through his or her own individual actions, *personally* violated plaintiff's rights under clearly established law.") (emphasis in original); *Burke v. Lappin*, 821 F. Supp. 2d 244, 247 (D.D.C. 2011) ("To be held liable under *Bivens,* the official must have participated personally in the alleged wrongdoing."). Then, and only then, can plaintiffs meet their burden to plausibly allege that the line-level officers' "own individual actions" violated plaintiffs' own individual rights. *See Iqbal*, 556 U.S. at 679. Anything less lacks the requisite personal involvement and thus falls short of plausibility. *See Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award[.]") (internal quotation marks and citation omitted). Plaintiffs' allegations fall short because they allege no personal interaction between the line defendants and any named plaintiff.

As to themselves and the seven line-level officers on foot, plaintiffs allege only that they were among thousands of protesters and that these seven were part of a group of "law enforcement" that "rushed forward and attacked" the protesters (the "rushing forward" group). TAC ¶ 83.[12] This necessarily fails to support a plausible entitlement to relief because generic allegations attributing wrongdoing to an undifferentiated group of "officers" or "defendants"

---

[12] Paragraph 83 alleges that line-level officers Jarzmuzewski, Hendrickson, McDonald, and LoCascio were among the group of "law enforcement officers" that "rushed forward." Paragraphs 92 and 93 allege that line-level officers Cox and Feliciano were also part of this group. There are no explicit allegations that line-level officers Daniels and Sinacore were part of the group that rushed forward. But plaintiffs do allege that both used force against *unnamed* protesters in the context of their allegations about the rush forward. *See* TAC ¶¶ 91, 98.

lack the requisite specificity. *See, e.g.*, *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009) (en banc) (rejecting conclusory allegation that all "Defendants" violated plaintiff's rights because it "fails to link [the alleged constitutional violation] to any defendant" and "a plaintiff in a *Bivens* action is required to allege facts indicating that the defendants were personally involved in the claimed constitutional violation").[13] Rather, plaintiffs must specify wrongful acts *these* particular line-level officers took against *these* particular plaintiffs. *See Loya-Medina v. Gaoutte*, No. 1:15-cv-00063, 2015 WL 234144, at *1 (D.D.C. Jan. 13, 2015) ("Plaintiff has not stated any facts connecting each named defendant to the alleged wrongdoing and, thus, has failed to provide adequate notice of a claim."); *White v. United States*, 863 F. Supp. 2d 41, 46 (D.D.C. 2012) (refusing to hold assisting officers liable for constitutional violations "because one officer may not be held liable for the actions of another officer under *Bivens*"). Yet nowhere do plaintiffs allege that the line-level officers and plaintiffs ever interacted, ever shared the same immediate area, or even knew that the other existed.

The same holds true for Officer Seiberling. The complaint is devoid of any allegations showing that Officer Seiberling used physical force against plaintiffs and suppressed their speech, as well as any allegation that she was ever in plaintiffs' immediate area. Instead plaintiffs merely allege that some officers "mounted on horseback, including Defendant Se[i]berling,

---

[13] *See also, e.g.*, *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596-97 (6th Cir. 2012) ("categorical references to 'Defendants'" fail to "allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right"); *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (discounting allegations against "Defendants" because individual defendants could not ascertain which unconstitutional acts they were alleged to have committed); *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (rejecting "[v]ague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct"); *Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004) (dismissing *Bivens* claims that "fail[ed] to identify what role, if any, each individual defendant had in" the alleged constitutional deprivation); *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (rejecting allegation that defendants "engaged in certain conduct" where complaint "mak[es] no distinction among the fourteen defendants charged").

pushed protesters west down H Street toward 17th . . . ." TAC ¶ 90. As such the allegations with respect to Officer Seiberling are even more attenuated. She was not even part of the group that allegedly rushed forward.

This casts plaintiffs and the line-level officers as just a handful of people among the "hundreds, perhaps thousands of people" at Lafayette Square that evening. *See* TAC ¶ 211. The line-level officers' proximity to this crowd cannot alone render them liable to Plaintiffs. Their alleged membership in a larger team of law enforcement fails to establish liability for the same reason. *See Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002) ("[P]laintiff could not hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct."). And even if other officers in that team did allegedly commit constitutional violations, the same result lies. "Liability cannot be premised on a theory that the constitutional violation was the result of a 'team effort'—each individual officer can only be held liable based on his or her own individual conduct." *Burns v. City of Concord*, No. 14-cv-00535, 2017 WL 5751407, at *10 (N.D. Cal. Nov. 28, 2017) (citing *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996)). Plaintiffs need allegations of (1) specific unconstitutional acts (2) committed by these specific line-level officers (3) against these specific Plaintiffs. They have none. The alleged incidents specific to each plaintiff underscore the point.

  **i.**    **Plaintiffs Ms. Sanders, J.N.C., and Ms. Scallan do not allege contact with any of the defendants.**

Three of the plaintiffs do not allege that they had any direct contact with any of the defendants here, including the law enforcement group that allegedly "rushed forward and attacked" the protesters. TAC ¶ 83. Ms. Sanders and J.N.C. only vaguely allege that "Federal law enforcement [] released irritants," which caused "chaos" and compelled them to run "until they reached their car[.]" *Id.* ¶¶ 135-36. Ms. Scallan's allegations fare no better. She allegedly was

"pushed against the fence" by other demonstrators—not law enforcement—as the "demonstrators were running away[.]" *Id*. ¶ 159. Thus, nowhere do these three plaintiffs state facts that would support an unconstitutional act or related conspiracy by *any* officer that was part of the law enforcement group that rushed forward, let alone against the line-level officers allegedly within that group. This precludes a finding that plaintiffs have sufficiently alleged the personal involvement of the line-level officers as to Ms. Sanders, J.N.C., and Ms. Scallan. The line-level officers' mere presence at Lafayette Square, contrary to plaintiffs' allegations, is insufficient to support a cause of action against them as to plaintiffs. *See Calvi v. Knox Cty.*, 470 F.3d 422, 428 (1st Cir. 2006) (holding that an officer's "mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer"). Argument otherwise disregards that "[o]fficers may not be held liable merely . . . for being a member of the same operational unit as a wrongdoer." *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018). Allegations premised on membership in a group, like presence allegations, cannot save a flawed claim from its failure to satisfy *Iqbal*.

      **ii.    Plaintiffs Mr. Bond, Mr. Foley, E.X.F., Mr. McDonald, and Ms. Poteet allege nothing more than an unspecified proximity to the line-level officers.**

Although the allegations specific to the remaining five plaintiffs at least allege some connection to the rushing forward group, plaintiffs still fail to allege sufficient personal involvement by the line-level officers represented here. Mr. Bond alleges that he fled when "[d]emonstrators began to flee" and that shortly thereafter unnamed "fully-armored police officers charg[ed] at him" while he was attempting to assist an injured person. TAC ¶¶ 150-51. Similarly, Mr. Foley and E.X.F. allege that the rushing group began "to assault the assembled

crowd, including Mr. Foley and E.X.F.," and then they "hurried" several blocks away.[14] *Id*. ¶¶
186, 189. Mr. McDonald allegedly made actual contact with the rushing group but neglects to
identify any of the "multiple officers" that "repeatedly struck" him with shields. *Id*. ¶ 141. Ms.
Poteet made contact with only one unidentified officer, who allegedly pushed her to the ground
with his shield, "began beating Ms. Poteet with his baton[,]" and pushed her down and hit her
again as she attempted to escape. *Id*. ¶¶ 172-73.

  Absent for all five of these plaintiffs is any mention that the line-level officers were the
officers responsible for these acts or that they even observed the acts. Rather, at worst, plaintiffs
have alleged that the line-level officers were part of a large team of officers, some of whom were
on horseback, which had within it a single unidentified officer that struck a single plaintiff (Ms.
Poteet). *See Estate of Brutsche v. City of Fed. Way*, No. C05-1538Z, 2006 WL 3734153, at *8
(W.D. Wash. Dec. 14, 2006) (rejecting liability premised on membership in a group of officers
because it would "allow[] a jury to find a defendant liable on the ground that even if the
defendant had no role in the unlawful conduct, he would nonetheless be guilty if the conduct was
the result of a 'team effort'"), *on reconsideration in part*, 2007 WL 562818 (W.D. Wash. Feb.
15, 2007). The inability to identify the offending officer dooms Ms. Poteet's claims, just as the
same failing dooms the claims of the other four plaintiffs. *See Haus v. City of New York*, No. 03
CIV. 4915, 2011 U.S. Dist. LEXIS 155735, at *182-84 (S.D.N.Y Aug. 31, 2011) (holding that
plaintiff-protester "cannot assert an excessive-force claim" alleging that she was "clubbed in the

---

[14] The fact that Mr. Foley and E.X.F. allege, at their most precise, an "assault" by the
unidentified officers renders it fatally conclusory. *See Davis v. Ripa*, No. CIV. 12-6128, 2012
WL 5199214, at *2 (D.N.J. Oct. 17, 2012) ("this Complaint does not state an excessive force
claim because the word 'assault' is conclusory, and [plaintiff] does not set forth facts describing
what force was used or which officers (other than [one]) used it."); *Shervin v. City of Newark*,
No. C 08-1631 VRW, 2010 WL 11531095, at *4 (N.D. Cal. Sept. 29, 2010) (same).

back by an unknown police officer . . . entirely without provocation" because she "cannot

identify the offending officer").

Accordingly, despite these five plaintiffs having at least some connection to the group of

officers rushing forward, they still fail to allege sufficient personal involvement as to the line-

level officers in that group, as well as Officer Seiberling, who was not part of that group.

### iii. Allegations that the line-level officers violated the rights of unnamed and unidentified individuals cannot save plaintiffs' claims.

Plaintiffs cannot remedy the defect in their allegations by alleging that other unidentified

and unknown *non-parties* had tortious interactions with certain line-level officers.[15] Rather, a

"plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to

relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

This axiom applies no less to the same claims plaintiffs bring here—alleged violations of the

First and Fourth Amendments. *See Rogala v. District of Columbia*, 161 F.3d 44, 45 (D.C. Cir.

1998) ("Fourth Amendment rights are personal rights which, like some other constitutional

rights, may not be vicariously asserted.") (internal quotation marks and citation omitted);

*Carawan v. McLarty*, No. 5:14-ct-3079, 2017 WL 829193, at *7 (E.D.N.C. Mar. 2, 2017)

("Plaintiff does not have standing to assert a [] First Amendment claim on behalf

of another inmate in connection with that inmate's religious practice."). As a result, the

---

[15] *See* TAC ¶ 91 ("Defendant [Sinacore] and a group of other Park Police officers rushed him from behind and slammed him against the wall of a building. The protester tried to run away, but Defendant [Sinacore] chased him down and beat him with his baton.); *id.* ¶ 92 ("When one of the protesters scrambled to get out of the way of the charging line and crossed Defendant [Feliciano's] path, Defendant [Feliciano] leaned his weight behind his shield and bashed the protester."); *id.* ¶ 93 ("Defendant [Cox] formed part of the line of officers advancing down H Street NW and charged after the protesters who continued fleeing from the officers' attack down H Street NW."); *id.* ¶ 98 ("As the journalist attempted to flee alongside the protesters, Defendant [Daniels] charged into them, shoving the journalist aside."); *see also* ¶¶ 81, 83, 93 (generalized allegations of engaging with the protesters).

allegation that Officer Sinacore allegedly chased "down and beat [a protester] with his baton" or that Officer Feliciano allegedly "lashed out with his shield, causing [a] protester" who bumped him first to "stumble," do not save plaintiffs' claims. *See* TAC ¶¶ 91, 95. These allegations, as well as all other alleged interactions between the line-level officers and other unidentified persons, bring plaintiffs no closer to plausibly alleging that *these* particular officers violated the rights of *these* particular Plaintiffs.

Plaintiffs' putative class action claims falter for the same reason. "[P]laintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quoting *Warth*, 422 U.S. at 502). Otherwise "any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim." *Dash v. FirstPlus Home Loan Owner Tr. 1996-2*, 248 F. Supp. 2d 489, 503 (M.D.N.C. 2003); *see In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 36 (D.D.C. 2008) ("Because the allegations do not support an inference that any of the named plaintiffs have been personally injured such as to provide them with the causes of action . . . plaintiffs lack standing to bring those claims[.]"). This is precisely the situation here. Plaintiffs' failure to allege a viable claim as to themselves against the line-level officers forecloses them from bringing a claim against the line-level officers for themselves or any other purported class member. *See Am. Jewish Cong. v. Vance*, 575 F.2d 939, 944 (D.C. Cir. 1978) ("[T]he possibility that other members of the class might have had standing had they brought suit does not thereby confer standing on the named representatives; the actual plaintiffs must show that they have personally suffered an injury redressable by the courts."). Plaintiffs still need, and still lack, facts establishing that the line-level officers performed a wrongful act against these named plaintiffs.

**B. Plaintiffs fail to allege that the line-level officers violated their clearly established Fourth Amendment rights.**

**i.      The line-level officers that allegedly "rushed forward" acted reasonably.[16]**

"[R]easonableness is always the touchstone of Fourth Amendment analysis[.]" *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2186 (2016). To determine whether an intrusion was reasonable courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). This "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations omitted). Only then can courts account for the reality "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Plaintiffs fail to allege that the line-level officers acted unreasonably with respect to plaintiffs. The significant governmental interest of presidential security against the backdrop of unrest in the preceding days justifies their allegedly responding to an order by rushing forward with shields and batons to establish a security perimeter in advance of the President's appearance. Thus, even if the plaintiffs could overcome their failure to allege tortious actions committed by the line-level officers as to them (which they cannot), their Fourth Amendment claims against the line-level officers would still require dismissal.

Here, plaintiffs' allegations establish both the presidential security interest inherent in any presidential appearance (see above at I.C.i), as well as the acute need to protect that interest

---

[16] The allegations related to the Fourth Amendment claim against Officer Seiberling are addressed in Section II.B.3.

under the circumstances. The former President was about to make a public appearance where dangerous acts of violence had *already* happened. Leading up to June 1, 2020, there had been looting, rioting and vandalism all across the District—including downtown D.C. near the White House. In a succession of increasingly stringent Emergency Orders, the Mayor described this unrest as a "glorification of violence" that necessitated drastic measures "to protect the safety of persons and property in the District." Mayor's Order 2020-68 § I ¶ 4; Mayor's Order 2020-069 § I ¶ 6. These emergency measures included ordering a 7:00 p.m. curfew on June 1 because an 11:00 p.m. curfew had proven ineffective the night before. *See* Mayor's Order 2020-69 § II ¶ 1; Mayor's Order 2020-68 § II ¶ 1. This unrest attending the protests heightened the inherent danger attending any public appearance by the President, rendering the corresponding government interest especially strong.

These same allegations inform the "perspective of a reasonable officer on the scene[.]" *Graham*, 490 U.S. at 396. The line-level officers were deployed following two days in which "numerous businesses, vehicles, and government buildings ha[d] been vandalized, burned, or looted." Mayor's Order 2020-069 § I ¶ 3. More to the point, they were deployed when, as the Mayor's Order explains, the civil unrest had occurred "at multiple locations throughout the city, in addition to the rioting in the downtown area" and was *still* ongoing. *Id*. § I ¶ 4. Thus, the line-level officers faced a crowd of "hundreds, perhaps thousands of people," TAC ¶ 211, in downtown D.C. at the very same time there was still "rioting in the downtown area," Mayor's Order 2020-069 § I ¶ 4.

Limited crowd control intrusions are constitutionally valid in similar situations even without the fundamental concern alleged here of presidential security. For example, in *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012), a protest of the Republican National Convention resulted in "broken building windows, objects thrown at cars and buses, and vandalized police

cars" throughout the city thereby causing the police commander to close the downtown area. *Id.* at 1001. As part of that effort, a large group of officers used "non-lethal munitions, including smoke, blast balls, and chemical irritants, in an apparent effort to keep the crowd moving west" away from the city. *Id.* at 1002. The plaintiffs, who were protesters among the crowd, alleged that the force used was unconstitutionally excessive, among other things. *Id.* But the court disagreed. It held that officers reasonably "believe[d] that a growing crowd intended to penetrate a police line and access downtown" and thus the "use of non-lethal munitions to direct the crowd away . . . did not violate clearly established rights." *Id.* at 1006.

Here too, the line-level officers, following a day of civil unrest, were faced with a large crowd during a city-wide state of emergency prompted by a host of illegal acts attending the protests. The act of "rush[ing] forward" with shields and batons, TAC ¶ 83, to accomplish what they were allegedly ordered to do—disperse the crowd before the President's imminent arrival— was reasonable under the circumstances. *See Felarca*, 891 F.3d at 818-19 (holding the officers use of batons to "hit" "jab" and "push" the plaintiffs to disperse a protest used "minimal force" that was reasonable); *White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017) (qualified immunity for officers firing non-lethal projectiles at peaceful individual who was near a violent crowd and walking toward police); *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment.") (quoting *Graham*, 490 U.S. at 396). And given the limited and brief nature of the incursion—clearing a block in mere minutes—the fact that most members of the crowd were allegedly not bad actors does not diminish the reasonableness. *Cf. Carr v. District of Columbia,* 587 F.3d 401, 408 (D.C. Cir. 2009) (holding that to lawfully *arrest* individuals in a riotous crowd based on the unlawful actions of persons within the crowd "the police are obliged to show that the crowd acted unlawfully as a unit").

At 6:30 p.m. on June 1, this civil unrest and the interest of presidential security, both independently sufficient to establish reasonableness, converged to demonstrate that the line-level officers acted reasonably under the circumstances. They allegedly received a high-level order to clear Lafayette Square which reflected the fact that any "public gathering presents some measure of hazard to the security of the President and the White House[.]" *QAG IV*, 516 F.2d at 731. The line-level officers' response to that order—allegedly rushing forward with shields and batons—both reasonably addressed this hazard inherent to any unscreened crowd and demonstrated their reasonable reliance on the orders of high-level officials allegedly aware of the President's movements. But the line-level officers acted on more than just a hypothetical risk or a high-level order. They established a security perimeter in the midst of unsecure circumstances, which included looting, violence, and acts of arson in that same area in the days prior. *See Berg*, 897 F.3d at 107 ("Those who guard the life of the President properly rely on the slightest bits of evidence—nothing more than hunches or suspicion—in taking precautions to avoid the ever-present danger of assassination.") (quoting *Hunter*, 502 U.S. at 229-30 (1991) (Stevens, J., dissenting)). This rendered their actions even more reasonable because the danger they sought to mitigate was based on far more than "hunches of suspicion[.]" *Id.* Accordingly, the line-level officers did not violate plaintiffs' Fourth Amendment rights.

      **ii.**    **No clearly established law establishes that the actions allegedly taken by the line-level officers were unlawful.**

Even if plaintiffs could plausibly allege a Fourth Amendment violation by the line-level officers, they remain unable to establish that the line-level officers violated clearly established law. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018) ("To be clearly established, a legal principle must be settled law, and it must clearly prohibit the officer's conduct in the particular circumstances before him[.]") (internal citations and quotations omitted). In the

context of excessive force, this consideration "'depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (*per curiam*)). The inability to make this showing precludes an allegation from moving "beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provid[ing] an officer notice that a specific use of force is unlawful." *Id.*

No "settled law" "clearly prohibit[s]" the line-level officers' "conduct in the particular circumstances" set forth in the Complaint. *See Wesby*, 138 S. Ct. at 581. In fact, plaintiffs would be hard-pressed to identify any cases involving the mix of factors presented by their complaint: a presidential appearance, an alleged dispersal order emanating from the Attorney General himself, a city-wide curfew and emergency order, a large and potentially dangerous crowd near the President, and a use of force no greater and no longer in duration than being pushed away from a small area. Without a body of case law to ensure the "right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it[,]" plaintiffs' claim fails. *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014).

The scant case law that addresses comparable, albeit, more significant intrusions, explicitly recognizes the absence of case law establishing the unlawfulness of moderate security measures in the context of presidential security. For example, in *Berg*, N.Y.P.D. detained a group of protesters for two hours in a pen across the street from a hotel where the President was scheduled to make an appearance. 897 F.3d at 103-04. The police department asserted "unique security concerns" and unlawful activity by the group "weeks earlier," but provided no additional justification. *Id.* at 109, 112. Ultimately, the Second Circuit reversed the district court's denial of qualified immunity as to the plaintiffs' Fourth Amendment claim for the confinement. Noting the

"government's well-recognized overwhelming interest in the President's safety," it concluded that "the absence of clearly established law prohibiting the challenged detentions" entitled the officers to qualified immunity. *Id.* at 111-12. In *Saucier*, the Supreme Court came to the same conclusion when a military police officer dragged a protester from an event attended by the Vice President, threw him in van, and briefly detained him at a police station. 533 U.S. at 198-99. In granting the officer qualified immunity, the Court stated:

> In the circumstances presented to this officer, which included the duty to protect the safety and security of the Vice President of the United States from persons unknown in number, neither respondent nor the Court of Appeals has identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did, nor are we aware of any such rule.

*Id.* at 209.

Both cases evince a value judgment that the margin of error afforded by qualified immunity "is nowhere more important" than in the context of presidential security. *Hunter*, 502 U.S. at 229. Officers must have "breathing room," *al-Kidd*, 563 U.S. at 743, to "make singularly swift, on the spot, decisions whether the safety of the person they are guarding is in jeopardy," *Moss*, 572 U.S. at 759 (quoting *Reichle*, 566 U.S. at 671 (Ginsburg, J., concurring)). Plaintiffs cannot withstand the weight of this authority. When both the Supreme Court and a Circuit explicitly hold that neither "has identified any case demonstrating a clearly established rule prohibiting [an] officer" from using similar force in similar situations, *Saucier*, 533 U.S. at 209, qualified immunity must lie.

Comparison of the facts in these cases to this case underscores the point. In *Berg*, N.Y.P.D. detained an entire group of protesters, numbering only 50, for two hours. 897 F.3d at 103-04. Here, none of the plaintiffs were detained, as the protesters, which numbered far more, were subject to no more than being briefly pushed out of a small area no larger than a few blocks. Moreover, in *Berg*, there was no allegation of civil unrest except that "weeks earlier"

other protesters supporting the same cause shut down the Brooklyn Bridge. *Id*. at 112. Here, a reasonable officer in the shoes of the line-level officers would have acted reasonably by executing a high-level dispersal order in the context of violent acts that took place at the *very location* over the last several days. *See* Mayor's Order 2020-68 § I ¶ 4; *Saucier*, 533 U.S. at 208 (granting immunity for use of force and detention of a singular protester that only unfolded a concealed banner because that officer "did not know the full extent of the threat [the protester] posed"). If these comparatively more significant uses of force, taken in response to comparatively less dangerous circumstances, entitled the officers to qualified immunity, then so too are the line-level officers in this case.

### iii. Plaintiffs have failed to allege that Officer Seiberling violated a clearly established Fourth Amendment right.

The above also establishes that Officer Seiberling's alleged actions did not violate a clearly established Fourth Amendment right. No case holds that it would be unlawful for an officer to position a horse in some way to encourage a crowd to leave an area. *See* TAC ¶ 90. The sparse authority with somewhat similar circumstances, although lacking the presidential security element, suggests that a plaintiff would at least need an allegation of significant physical injury. In *Haus*, where a plaintiff needed surgery after being trampled by a horse, the Court held that if mounted police "use[d] their mounts to physically push demonstrators . . . [that] had no means to disperse" then a protester would have a triable claim. 2011 U.S. Dist. LEXIS 155735, at *169-72. Here, plaintiffs provide no allegation that Officer Seiberling physically contacted them or any other protester, much less that she seriously injured anyone. Additionally, instead of alleging that the protesters had no means to disperse, the critical allegation in *Haus*, plaintiffs allege that the mounted officers directed protesters "west down H Street toward 17th" which permitted them to "escape" the mounted officers. *See* TAC ¶ 90.

This leaves plaintiffs with the legally flawed assertion that using mounted officers to clear an area implicates an unconstitutional seizure. Even setting aside the unique presidential security interests present in this case—and alleged orders from the Attorney General himself to clear the area—that argument has no merit. "There is no case law suggesting" that "it is constitutionally improper to use horses to assist in clearing a street during a mass demonstration." *Haus*, 2011 U.S. Dist. LEXIS 155735, at *192. Seizures, by contrast, involve "physical force or show of authority [that] terminates or restrains [] freedom of movement" regardless of lawfulness. *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citation omitted). Plaintiffs make no factual allegation supporting the inference that Officer Seiberling's maneuvers amounted to as much. Accordingly, qualified immunity bars plaintiffs' Fourth Amendment challenge to Officer Seiberling's horseback maneuvers.

### C. Plaintiffs fail to allege that the line-level officers violated their clearly established First Amendment rights.

#### i. Relevant Legal Principles.

Under the First Amendment, the government may establish reasonable restrictions on the time, place, and manner of protected speech. *See Hill v. Colorado*, 530 U.S. 703, 719-20 (2000). But as the Supreme Court explained in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), restrictions on these characteristics must satisfy certain requirements to be valid. *Id.* at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*, 845 F.3d 1199, 1208 (D.C. Cir. 2017).

First, the restrictions must be made "without reference to the content of the regulated speech" so that the restriction is content neutral. A restriction is content neutral if it "serves purposes unrelated to the content" of the speech regardless of whether "it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citation omitted). Second,

the restriction must be "narrowly tailored to serve a significant governmental interest[.]" *Id.*

"[T]he significance of the government interest bears an inverse relationship to the rigor of the

narrowly tailored analysis." *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212,

1221 (10th Cir. 2007). A restriction is narrowly tailored if it does not "burden[ ] substantially

more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S.

at 799; *see Time Warner Entm't Co., L.P. v. FCC*, 93 F.3d 957, 978-79 (D.C. Cir. 1996). But the

regulation "need not be the least restrictive or least intrusive means." *Id.* at 798. Finally, the

restriction must "leave open ample alternative channels for communication of the information."

*Id.* at 791 (citation omitted).

      This case, as do many under the *Ward* framework, turns upon the governmental interests

served by the restrictions, which are indisputably significant here. Both the U.S. Supreme Court

and the D.C. Circuit hold that "the safety of the President [i]s a 'paramount interest,'" *White

House Vigil for ERA Comm.*, 746 F.2d at 1532-33 (citations omitted), justifying substantial

limitations on the manner of expression. *See Moss*, 572 U.S. at 748, 758-59, 761; *Watts*, 394

U.S. at 707-08. The related interest in protecting the White House and its occupants is yet

another well recognized strong interest. *See QAG IV*, 516 F.2d at 726-27, 729. Both have

previously justified substantial limitations on the manner of expressive activity in Lafayette

Square, which abuts the White House grounds, and in other areas in and around the White

House. *See White House Vigil for ERA Comm.*, 746 F.2d at 1532-41; *QAG IV*, 516 F.2d at 727-

34; *see also Musser*, 873 F.2d at 1516-19; *Caputo*, 201 F. Supp. 3d at 71-72. The limitations in

this case were not nearly as substantial and thus so too both pass constitutional scrutiny and

entitle the line-level officers to qualified immunity.

ii.   **Plaintiffs have not plausibly alleged that the line-level officers violated a clearly established First Amendment right.**

Plaintiffs' First Amendment claim fails on the straightforward ground that no Supreme Court decision, D.C. Circuit decision, or consensus of persuasive authority, *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Lash v. Lemke*, 786 F.3d 1, 7 (D.C. Cir. 2015), clearly establishes that the line-level officers acted unlawfully. No court has held that rushing forward with batons and shields to create a security perimeter for the President in front of the White House in the midst of civil unrest violates the First Amendment. Authority that has at least similar facts holds that, in the context of presidential security, even hours-long seizures of an entire group that is ostensibly peaceful does not violate the First Amendment. *See Berg*, 897 F.3d at 112-13 (granting qualified immunity on First Amendment claim because "officers in the position of protecting the President, as here, would have an objectively reasonable belief under the circumstances that the special needs presented in this case justified their limited detention of the protesters"). The allegation that the President's decision to appear was unknown to the line-level officers until they received a high-level order around 6:10 p.m. casts their need to make on-the-spot security decisions with respect to his appearance as even more unique, and thus lacking in adverse precedent. *See* TAC ¶ 80; *Moss*, 572 U.S. at 749 (holding that secret service officers did not violate the First Amendment by relocating protesters after "President Bush made a spur-of-the-moment decision" that "unsettled" the original security plan).

Officer Seiberling's alleged riding and positioning of her horse in an unspecified way to persuade people to leave the park is no different. TAC ¶ 90. No case or consensus of authority would have put her on notice that these actions violated plaintiffs' First Amendment rights. In fact, there appears to be no reported decision at all evaluating the constitutionality of a Park Police officer's mounted presence near the White House, much less in this particular situation

49

and in the context of a First Amendment claim. Thus, just as with the other line-level officers, plaintiffs fail to allege that Officer Seiberling violated a right with "contours [] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 779.

Against the legal backdrop of the *Ward* framework, a reasonable officer would have also reasonably believed that the line-level officers' alleged conduct satisfied each of the *Ward* factors. The act of rushing forward on foot by the line-level officers, as well as Officer Seiberling persuading people to leave the park, was content neutral on its face. Indeed, plaintiffs lack factual allegations supporting the inference that the line-level officers' action did not apply "equally to all demonstrators, regardless of viewpoint[.]" *Basham*, 845 F.3d at 1209. Rather, the allegations demonstrate the improbability of making such distinctions under the circumstances. The Secret Service allegedly told "other law enforcement agencies to assist clearing the area" sometime after 6:10 p.m., and the Attorney General allegedly only gave the actual order "minutes before" the dispersal occurred. TAC ¶¶ 5, 79–80. This gave the federal Defendants mere minutes to execute steps to clear the area before the President's appearance—not nearly enough time to formulate a plan that could differentiate according to the "content of the regulated speech[.]" *Ward*, 491 U.S. at 791.

The alleged acts by the line-level officers reflect as much. They allegedly rushed forward toward *all* individuals presently within the space designated for the security perimeter. *See* TAC ¶ 83; *Owen v. City of Buffalo*, 465 F. Supp. 3d 267, 274 (W.D.N.Y. 2020) (finding officers' actions content neutral because "[t]here is no evidence of others with different messages being permitted" to take the actions at issue). Similarly, there is no allegation that Officer Seiberling tried to move along only people whose views she disagreed with, that she said anything suggesting as much, or that she could have even made that distinction among the chaos. *See*

*Fleck v. Trustees of Univ. of Pennsylvania*, 995 F. Supp. 2d 390, 403 (E.D. Pa. 2014) (finding crowd control measures content neutral where no "officer made any reference to the content of plaintiffs' speech—nor did plaintiffs identify any [officers'] statement as suggesting their actions were spurred by disagreement with their message").

Plaintiffs attempt to side-step this conclusion by speculating that the former *President's* statements about violent unrest throughout the country suggest animus against the protesters at Lafayette Square. But these statements cannot be imputed to the line-level officers. *See Moss*, 572 U.S. at 755-56, 762-64 (allegations that other secret service agents hewed to a government policy of moving protesters to suppress dissent did not show the defendant agents executed their immediate clearing orders to suppress speech). Plaintiffs need, but lack, allegations that these line-level officers made statements suggesting animus. *See Sevy v. Barach*, 815 F. App'x 58, 64 (6th Cir. 2020); *see also Lash*, 786 F.3d at 10 ("A plaintiff pressing a First Amendment retaliatory force claim must show, among other things, that the officer who used force against him had 'retaliatory animus.'") (citations omitted). The fact that plaintiffs do not even allege a single statement attributable to any of the eight line-level officers prevents plaintiffs from contending otherwise.

Plaintiffs' own allegations also establish the significance of the governmental interests served by seeking to create a circumscribed security perimeter. Plaintiffs claim that the Attorney General directed that the park be cleared allegedly to enable the President to walk to St. John's Church to deliver a speech. TAC ¶¶ 79-80. The line-level officers on foot allegedly furthered this goal by rushing forward to disperse protesters, and Officer Seiberling allegedly furthered it by positioning her horse to guide people down H Street. TAC ¶¶ 83, 90. These actions serve two compelling government interests: (1) protecting the President as he walked to the church and delivered remarks; and (2) protecting the White House in response to disorder in the area. *See*

TAC ¶¶ 4, 51-52, 203; Mayor's Order 2020-069.[17] Both of these interests have previously justified substantial limitations on the manner of expressive activity in Lafayette Square, which abuts the White House grounds, and in other areas in and around the White House. *See White House Vigil for ERA Comm.*, 746 F.2d at 1532-41; *QAG IV*, 516 F.2d at 727-34; *see also Musser*, 873 F.2d at 1516-19; *Caputo*, 201 F. Supp. 3d at 71-72.

       As discussed with respect to the Fourth Amendment claim, the underlying circumstances rendered both the President and the White House especially vulnerable and thus elevated the need to take steps to address that vulnerability. *See supra* pp. 44-48. The President was about to appear in public after days of civil unrest in the very downtown area where much of the civil unrest was focused. *See* Mayor's Order 2020-69; TAC ¶ 61 n.15. The President also was about to do so near a crowd which, according to plaintiffs, viewed him as an instrument "of centuries of white supremacy[.]" TAC ¶ 7. Thus, while as a general matter the government's "interest in protecting the safety of its Chief Executive" is "overwhelming," *Watts*, 394 U.S. at 707, here the danger was immediate and acute. Similarly, given the unrest near the White House, the government had a substantial interest in protecting the White House, with its vital occupants and operations, from the potential danger posed by infiltrators within the unscreened crowd of thousands.

       The line-level officers' efforts to move people out of the park directly advanced the above interests. No longer could protesters come within weapons distance of the President or risk the integrity of the physical barriers protecting the White House. *See generally Moss*, 572 U.S. at

---

[17] Like the former Attorney General and Major Adamchik, the line-level officers dispute any allegations that they helped clear the park for the purpose of allowing the former President to deliver his remarks there. *See supra* note 3. But assuming the truth of plaintiffs' allegations, as the Court must at this stage, the governmental interest in protecting the President would clearly support the line-level officers' alleged actions.

760-62; *Marcavage v. City of New York*, 689 F.3d 98, 105-07 (2d Cir. 2012). But by the same token, until the 7:00 p.m. curfew went into effect, the protesters could still say whatever they wanted, by whatever lawful means they wanted, in whatever place they wanted, except for Lafayette Square—where the President specifically appeared. *See* TAC ¶ 90. This demonstrates that the alleged actions of the line-level officers burdened no more speech than was necessary. They made "assumptions as to what threats there are, how likely they are to occur, and what harm might result if they do" and then took actions sufficiently tailored to address those threats. *See Am. Civil Liberties Union of Colo. v. City & Cty. of Denver*, 569 F. Supp. 2d 1142, 1175-77 (D. Colo. 2008) (holding "that there is a sufficient fit between the concern for explosive-based attacks and the closure of some of the streets" to protesters because Secret Service officer cited past events where explosives on the streets caused significant damage.). The limited duration of the clearing—just for the 30 minutes left until curfew—underscores its relatively slight burden in comparison to other such limitations. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1133-35 (9th Cir. 2005) (finding narrowly tailored a restriction that prohibited protesters from protesting at "various hotels and meeting venues . . . spread out across several blocks of downtown Seattle" for a period of days.); *Marcavage*, 689 F.3d at 105-09 (upholding New York's orders establishing a four-day no-protest area on two blocks around the RNC).

These same allegations establish that the line-level officers' actions left "open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (citation omitted). By being temporarily removed from Lafayette Square, the "protestors could reasonably expect their protest to be visible and audible . . . even if not as proximate as the protestors might have liked." *Menotti*, 409 F.3d at 1138. Moreover, "the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *Id*. (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S.

41, 54 (1986)). With both the rest of the city and the area just beyond Lafayette Square at their disposal, plaintiffs still had a reasonable opportunity to communicate their message in whatever medium they chose wherever else they wanted.[18]

        **iii.**     ***Wood v. Moss* supports dismissal.**

*Wood v. Moss* illustrates the gravity of presidential security concerns in the qualified immunity analysis, and in particular the Supreme Court's heavy deference to these concerns in the face of a First Amendment challenge. As such, *Moss* also establishes the line-level officers' entitlement to qualified immunity with respect to plaintiffs' First Amendment claim.

In *Moss*, "protesters alleged that [Secret Service] agents engaged in viewpoint discrimination when they moved the protesters away" from an inn where President Bush "made a spur-of-the-moment decision to stop for dinner." 572 U.S. at 749. In support, the protesters pointed out that the Secret Service agents allowed the President's supporters to remain a block closer to the inn and cited to media reports stating that other Secret Service agents had previously engaged in similar conduct. *Id*. at 755. A unanimous Supreme Court rejected the claim, holding that the Secret Service agents had qualified immunity.

The Court provided three justifications. First, no clearly established precedent required the agents to ensure that the plaintiffs and the President's supporters had equal access or were "at comparable locations at all times." *Id*. at 759-60 (internal quotation marks and citation omitted). Second, unlike the President's supporters, the protesters' initial location gave "them a direct line of sight to the outdoor patio where the President stopped to dine" and therefore put them "within

---

[18] Plaintiffs assert there were no alternative channels for communication because no one told them they could remain in the area outside the expanded perimeter or explicitly authorized them to protest there. TAC ¶¶ 106-07. But plaintiffs do not allege that the line-level officers tried to remove them from any area outside the expanded perimeter, nor do they even claim that the other officers tried to remove them from the areas adjacent to the expanded perimeter. Likewise, plaintiffs do not claim there was any other legal obstacle to their protesting outside the perimeter.

weapons range of his location." *Id*. at 760, 763. Thus, the government's "valid, even . . . overwhelming, interest in protecting the safety of its Chief Executive" conferred immunity upon the steps taken to vindicate that interest. *Id*. at 758. This remained so "[e]ven accepting as true the submission that Secret Service agents, at times, have assisted in shielding the President from political speech[.]" *Id*. at 763. Finally, invoking *Iqbal*, the Court summarily "declin[ed] to infer from alleged instances of misconduct on the part of particular agents" that the Secret Service agents acted in conformity with that "supposed policy." *Id*. at 763-64.

This case parallels key facts in *Moss* and thus so too requires a finding of qualified immunity. Here, as in *Moss*, the President decided to enter a publicly accessible place near a crowd of protesters. *See Moss*, 572 U.S. at 749; TAC ¶¶ 61 n.15, 80. This decision, like in *Moss*, was not only unexpected by these defendants but also created a "security risk" because the protesters would now be "within weapons range of his location." *See id.* at 762-63; TAC ¶ 61 n.15. The line-level officers' response to that security risk—creating a security perimeter and encouraging protesters to disperse—vindicated the same "overwhelming[] interest in protecting" the President present in *Moss*. *See id.* at 758; TAC ¶¶ 83, 90. This firmly aligns the line-level officers' response with *Moss*'s holding that moderate crowd relocation tactics taken in response to valid presidential security concerns are subject to qualified immunity. *See id.* at 759-61.

A comparison between the presidential security concerns in *Moss*, to those in this case, demonstrates that here the interest was even stronger and thus so too the basis for qualified immunity. Here, the rush forward by the line-level officers and Officer Seiberling's encouragement to move along responded both to the inherent risk of an indeterminate number of protesters in immediate proximity to the President and to the possibility of violence similar to recent days' unrest. *See supra* note 1; Mayor's Order 2020-69; TAC ¶¶ 61 n.15, 83, 90. In *Moss*, conversely, the removal order responded only to a defined group of allegedly peaceful protesters

that were already a block from the President before they were relocated. *See Moss*, 572 U.S. at 750-51. Thus, *Moss* confirms that the line-level officers' did not violate clearly established First Amendment rights by creating a security perimeter.

Finally, *Moss* also rejects plaintiffs' attempts to avoid qualified immunity as implied in their allegations. It makes no difference that the line-level officers could have arguably relied on less restrictive alternatives to remove the protesters to protect the President. Just as no clearly established precedent required that agents in *Moss* to try to convince President Bush not to appear at the restaurant to avoid danger, the line-level officers had no obligation to convince President Trump not to appear in Lafayette Square. *See id.* at 761. Plaintiffs' reference to the actions of other unnamed officers or reliance on statements made by other Defendants similarly flounders under *Moss*. TAC ¶¶ 61, 135-36, 141, 186-89. Regardless of what other unidentified line-level officers did or what officials have said on other occasions, *Moss* holds that courts should "decline to infer from alleged instances of misconduct on the part of particular" colleagues that defendants acted in conformity with those instances. *See Moss*, 572 U.S. at 763-64. Rather, as the Court has repeatedly instructed in the years since *Iqbal*, "individual government officials cannot be held liable in a *Bivens* suit unless they themselves acted unconstitutionally." *Id.* at 763. (citation, quotation, and internal brackets removed). Thus, the line-level officers remain entitled to qualified immunity irrespective of plaintiffs' allegations regarding others.

### D. The line-level officers have qualified immunity from Plaintiffs' statutory claims under Sections 1985(3) and 1986.

#### i.    Plaintiffs fail to allege any of the elements of a Section 1985(3) claim.

Section 1985(3) authorizes a damages suit against one who commits an act in furtherance of a "conspir[acy] . . . for the purpose of depriving, either directly or indirectly, any person or

class of persons of the equal protection of the laws . . . ." *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C. Cir. 1984). "[A] plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Id.*; *see United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983).

The line-level officers have immunity from plaintiffs' § 1985(3) claim because plaintiffs fail to plead facts showing that the line-level officers entered into a conspiracy with another person to violate plaintiffs' equal protection rights. "In order to establish a conspiracy [under § 1985(3)], plaintiff must allege facts showing the existence of an agreement, or 'meeting of the minds', between defendants to violate plaintiff's civil rights." *Knowlton v. United States*, 111 F. Supp. 2d 1, 8 (D.D.C. 1999), *aff'd sub nom. Knowlton v. Alouri*, No. 96cv02467, 2000 WL 1093323 (D.C. Cir. June 27, 2000). No such meeting of the minds is alleged here. Indeed, the Complaint is devoid of any reference to "'events, conversations, or documents indicating . . . an agreement or meeting of the minds' amongst the defendants to violate [plaintiffs'] rights based on [their] membership in a protected class." *Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (quoting *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 75 (D.D.C. 2007)); *see Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019). It merely alleges discrete and brief interactions between the line-level officers and protesters, *not other Defendants*, made in furtherance of the goal to create a security perimeter.[19]

---

[19] Plaintiffs claim Arlington County Police Captain Vincent "assisted in coordinating the actions of the ACPD officers present at the Square with the federal defendants[,]" TAC ¶ 45, and that the Arlington County officers acted "[i]n coordination with the federal defendants . . . ." *Id.* ¶

Plaintiffs also lack allegations supporting an inference that the line-level officers' actions were "'motivated by some class-based, invidiously discriminatory animus.'" *Hoai v. Vo*, 935 F.2d 308, 314 (D.C. Cir. 1991) (quoting *Hobson*, 737 F.2d at 14). Instead, plaintiffs focus on the former President's alleged expressions of dislike for protesters based on their support of racial equality. But the class-based animus element of § 1985(3), which is critical to the statute's scope and applicability to individual defendants, cannot be satisfied by plaintiffs' cursory assertions of guilt by association.

The Supreme Court has explained that strict application of the animus requirement is necessary to "avoid the constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law" and honor the statutory text's command that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). That strict requirement does not permit liability based on mere association with others who might harbor animus, as plaintiffs imply, but rather, like any equal protection claim, requires that "the [defendant] officer's conduct . . . 'was motivated by a discriminatory purpose.'" *Richards v. Gelsomino*, No. CV 16-1002, 2019 WL 1535466, at *8 (D.D.C. Apr. 8, 2019) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)), *aff'd*, 814 F. App'x 607 (D.C. Cir. 2020). Thus, "a class-based animus" cannot be "determined solely by effect," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), and it is a matter of the "intent" of the individual defendant "decisionmaker" to "select[ ] or reaffirm[ ] a particular course of action at least in part because

---

99. But this conclusory allegation merely implies that Captain Vincent, not the line-level officers, entered into a conspiracy. And it does not even establish that much because it is a conclusion not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679; *Davis v. City of Dearborn*, No. 2:09-cv-14892, 2010 WL 3476242, at *7-8 (E.D. Mich. Sept. 2, 2010).

of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* at 271-72 (internal quotation marks and citation omitted).

Given the need for individual possession of class-based animus, plaintiffs' reliance on the former President's vaguely alleged disapproval of racial justice protests falls short of the demanding standards of the statute. If anything, plaintiffs' focus on the President's alleged comments exposes the stark absence of "nonconclusory allegations" as to the line-level officers, as plaintiffs lack an analogous allegation that they said or did anything constituting "evidence" that their park clearing was motivated by class-based animus. *Hobson*, 737 F.2d at 31; *see Black v. District of Columbia*, 466 F. Supp. 2d 177, 181 (D.D.C. 2006). The alleged clearing itself demonstrates as much. Plaintiffs do not allege that only "Black people and their supporters[,]" TAC ¶ 245, were cleared—rather, *everyone* there was cleared in advance of the President's appearance. Thus, the line-level officers are entitled to qualified immunity based on plaintiffs' failure to sufficiently plead a discriminatory motive. *See Abbasi*, 137 S. Ct. at 1867-68; *Iqbal*, 556 U.S. at 681-83; *Ford v. Donovan*, 891 F. Supp. 2d 60, 65 (D.D.C. 2012).

The line-level officers are also entitled to qualified immunity because plaintiffs allege that "President Trump, Defendant Barr, and Defendant Esper[,]" all federal officials, "directed the conspiracy[.]" TAC ¶ 246. Under the intracorporate conspiracy doctrine, "an agreement between or among [officers] of the same legal entity," as plaintiffs' allege here, "is not an unlawful conspiracy." *Abbasi*, 137 S. Ct. at 1867. Thus, plaintiffs cannot sufficiently satisfy the conspiracy element of the § 1985(3) claim unless plaintiffs allege an agreement between the line-level officers and non-federal officials at the park to violate plaintiffs' rights. Plaintiffs make no such allegation and the alleged chaos of the park suggests that it would not even be possible. The claim therefore fails to overcome *Abbasi*'s holding that the "law on the point is not well established" because circuits disagree "as to whether or not a § 1985(3) conspiracy can arise

from official discussions between or among agents of the same entity[.]" *Id.* at 1868. That this

disagreement exists at all entitles the line-officers to qualified immunity; that this jurisdiction

sides with the refusal to recognize a conspiracy among officers of the same entity makes it even

more so. *See Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007) ("Federal

district courts in the District of Columbia . . . consistently have applied the intracorporate

conspiracy doctrine to Section 1985.").

> **ii.     Plaintiffs' Section 1986 claim fails because the line-level officers are not liable under Section 1985(3).**

Finally, plaintiffs claim that the line-level officers violated § 1986 because they allegedly

knew about, but failed to prevent, wrongs conspired to be done under § 1985. TAC ¶¶ 258-59.

But "[a] plaintiff who has not stated a claim under § 1985 has no basis for relief under § 1986."

*Moore v. Castro,* 192 F. Supp. 3d 18, 36 (D.D.C. 2016); *aff'd sub nom. Moore v. Carson,* 775 F.

App'x 2 (D.C. Cir. 2019). Again, plaintiffs fail to allege facts showing that the line-level officers

or anyone else in the park entered into a conspiracy to violate their equal protection rights, that

the line-level officers knew about such a conspiracy, that the conspiracy fell outside the

intracorporate conspiracy doctrine, or that they had an opportunity to prevent conspirators from

harming plaintiffs. Thus, plaintiffs' §§ 1985 and 1986 claims fall together. *See Walsh v.

JPMorgan Chase Bank, NA*, 75 F. Supp. 3d 256, 265 (D.D.C. 2014).

**CONCLUSION**

The claims against the federal line-level officers should be dismissed with prejudice.

Dated: February 16, 2021                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General
                                            Civil Division

                                            C. SALVATORE D'ALESSIO, JR.
                                            Acting Director, Torts Branch

*/s/* John B. F. Martin
JOHN B. F. MARTIN
NY Bar No. 4682928, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*/s/* Joseph A. Gonzalez
JOSEPH A. GONZALEZ
D.C. Bar No. 995057
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 598-3888; F: (202) 616-4314
Joseph.A.Gonzalez@usdoj.gov

*Counsel for Defendants Jonathan Daniels,
Sean Cox, Luis Feliciano, Jeffery
Hendrickson, Nicholas Jarmuzewski, Bryan
McDonald, Cara Seiberling, and Lawrence
Sinacore in their individual capacity*