# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al.,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, et al.

        *Defendants*.

No. 1:20-cv-01469-DLF

## PLAINTIFFS' OPPOSITION TO DEFENDANT LOCASCIO'S MOTION TO DISMISS

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

*Not a D.C. Bar member; practicing under
supervision pursuant to D.C. App. R. 49(c)(8A)*

February 24, 2021

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Megan Yan*
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Tristin Brown (D.C. Bar No. 1671642)
Dennis Corkery (D.C. Bar No. 1016991)
Jonathan Smith (D.C. Bar No. 396578)
Washington Lawyers' Committee for Civil
    Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

*Counsel for Plaintiffs*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

LEGAL STANDARD ........................................................................................... 3

ARGUMENT ...................................................................................................... 4

I.   Plaintiffs Have Standing To Sue LoCascio Because He Is Responsible For Their Harms Under Ordinary Tort Law Principles And Because He Personally Violated Their First Amendment Rights (Claims 1, 2, 5 & 6). ............................................................................... 4

II.  Qualified Immunity Must Be Denied Because Plaintiffs State Claims For Violations Of Clearly Established Constitutional Rights (Claims 1 & 2). ................................................. 7

    A.  No reasonable government official or law-enforcement officer could have thought that attacking a peaceful protest was constitutional under the Fourth Amendment. ..... 8

        1.  The Fourth Amendment applies to Defendants' conduct. ................................. 8

        2.  The Fourth Amendment violation was obvious, as the use of force lacked any semblance of justification. ............................................................................ 11

        3.  Precedent independently places the Fourth Amendment violation beyond debate. ....................................................................................................... 14

    B.  LoCascio and his co-defendants violated Plaintiffs' clearly established First Amendment rights in a manner that was obvious because of its egregiousness and, independently, contravened binding precedent. ........................................................ 16

        1.  By assaulting and completely scattering a lawful, peaceful demonstration, Defendants burdened far more speech than necessary. ................................... 17

        2.  Breaking up the protest was clearly established to be unconstitutional absent a "clear and present danger." .......................................................................... 19

        3.  Viewpoint discrimination violated Plaintiffs' clearly established rights. ....... 22

III. The Traditional Damages Remedy Against Federal Officers For Violating Demonstrators' First And Fourth Amendment Rights Has Long Been Recognized In This Circuit And No Special Factors Counsel Hesitation Here (Claims 1 & 2). ...................... 24

A. Circuit precedent refutes the notion that "special factors" preclude recognizing constitutional damages claims for demonstrators' rights here and distinguishes this case sharply from those in which special factors exist. ...............................................27

B. Presidential security and the other "special factors" invoked by LoCascio are misplaced here and do not overcome Circuit precedent. ...............................................31

IV. LoCascio Is Not Entitled To Qualified Immunity As To Plaintiffs' Claims Under 42 U.S.C. §§ 1985 & 1986 (Claims 5 & 6)...........................................................................36

A. Plaintiffs adequately pleaded claims under 42 U.S.C. § 1985(3). ..............................36

1. Plaintiffs adequately pleaded an agreement.....................................................37

2. Plaintiffs adequately pleaded discriminatory intent........................................40

B. Plaintiffs adequately pleaded claims under 42 U.S.C. § 1986....................................43

CONCLUSION ...........................................................................................................................44

## TABLE OF AUTHORITIES

*Authorities on which we chiefly rely are marked with asterisks.*

### Cases

*Acevedo v. Canterbury*, 457 F.3d 721 (7th Cir. 2006) ....................................................9

*\*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)............................................................15

*Adams v. New York*, 2016 WL 1169520 (S.D.N.Y. Mar. 22, 2016) .............................21

*Adickes v. S.H. Kress & Co.*, 398 U.S.144 (1970) .......................................................37

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ..............................................................35

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ..................................25

*Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52 (1st Cir. 2008).....................15

*Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013) ...............................9

*\*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ...................3, 6

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) ........................................................37

*Bedford v. City of Hayward*, 2012 WL 4901434 (N.D. Cal. Oct. 15, 2012) ...............41

*Behrens v. Tillerson*, 264 F. Supp. 3d 273 (D.D.C. 2017) ..............................................4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................................3

*Bergman v. United States*, 579 F. Supp. 911 (W.D. Mich. 1984) .................................43

*Bettencourt v. Arruda*, 2012 WL 5398475 (D. Mass. Nov. 1, 2012) ...........................10

*Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82 (D.D.C. 2018) ........................4

*\*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
      403 U.S. 388 (1971) ........................................................................ *passim*

*Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154 (D.D.C. 2013) .........29

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ...............................40

*Brenes-Laroche v. Toledo Davila*, 682 F. Supp. 2d 179 (D.P.R. 2010) .......................16

*Brendlin v. California*, 551 U.S. 249 (2007) ................................................................10

iv

*Brower v. Cty. of Inyo*, 489 U.S. 593 (1989) ..................................................................9

*Burnett v. Wash. Metro. Area Transit Auth.*, 58 F. Supp. 3d 104 (D.D.C. 2014) ..........................4

*Busche v. Burkee*, 649 F.2d 509 (7th Cir. 1981)....................................................................42

*California v. Hodari D.*, 499 U.S. 621 (1991).......................................................................9

*\*Carlson v. Green*, 446 U.S. 14 (1980) ........................................................................25, 34

*Clark v. Clabaugh*, 20 F.3d 1290 (3d. Cir. 1994) ................................................................43

*Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996) ................................................................20

*Cong. of Racial Equality v. Douglas*, 318 F.2d 95 (5th Cir. 1963) ............................................20

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) .............................................................36

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992) ..29

*\*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).....................................................26, 28, 30

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018)....................................................4, 7, 42

*Dubner v. City & County of S.F.*, 266 F.3d 959 (9th Cir. 2001)....................................................5

*\*Edwards v. South Carolina*, 372 U.S. 229 (1963) ..........................................................20, 21

*Egervary v. Young*, 366 F.3d 238 (3d Cir. 2004)....................................................................4

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) .............................................................25

*Evangelou v. District of Columbia*, 901 F. Supp. 2d 159 (D.D.C. 2012) ......................................3

*Fernandors v. District of Columbia*, 382 F. Supp. 63 (D.D.C. 2005) ..........................................44

*Fisher v. Shamburg*, 624 F.2d 156 (10th Cir. 1980) .............................................................37

*\*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ...........................................................15

*Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992) ....................................................24, 25

*\*Graber v. Dales*, 2019 WL 4805241 (E.D. Pa. Sept. 30, 2019) ...........................................32, 33

*Graham v. Connor*, 490 U.S. 386 (1989) .........................................................................11

v

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ......................................................39, 40

*Gudger v. District of Columbia*, 74 F. Supp. 3d 47 (D.D.C. 2014) .............................44

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................................................37

*Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231 (W.D. Wash. 2009) ..............10, 16

*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013) ....................................21, 29, 30

*Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) .......................15

*Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006)......................................................15

*Henderson v. Lujan*, 964 F.2d 1179 (D.C. Cir. 1992) ................................................18

*Hernandez v. Mesa*, 140 S. Ct. 735 (2020) ....................................................25, 26, 30

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007)........................................................4

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984) ............................................28, 40, 41

*Hooks v. United States*, 208 A.3d 741 (D.C. 2019) ....................................................10

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................................7, 15

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) ..................................3, 5

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ................................................................22

*Jennings v. City of Miami*, 2009 WL 413110 (S.D. Fla. Jan. 27, 2009)......................10

*Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006) ..........................................................20

*Jones v. Ritter*, 587 F. Supp. 2d 152 (D.D.C. 2008)..................................................15

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010) ....................................20, 21

*Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010) ....................................42

*Kyle v. Bedlion*, 177 F. Supp. 3d 380 (D.D.C. 2016) ..................................................9

*Lagayan v. Odeh*, 199 F. Supp. 3d 21 (D.D.C. 2016) ....................................37, 38, 41

*Lamb v. City of Decatur*, 947 F. Supp. 1261 (C.D. Ill. 1996) ....................................16

vi

*Lash v. Lemke*, 786 F.3d 1 (D.C. Cir. 2014) ................................................................28

*Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993) ..............29, 40

*Lederman v. United States*, 131 F. Supp. 2d 46 (D.D.C. 2001)...............................................29, 30

*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002) ....................................................18, 29

*Liff v. Office of Inspector Gen.*, 881 F.3d 912 (D.C. Cir. 2018) ..................................................31

*Linlor v. Polson*, 263 F. Supp. 3d 613 (E.D. Va. 2017) ...............................................................32

*Little v. Barreme*, 6 U.S. 170 (1804)...........................................................................................42

*Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D. Wash. 2005) ...........................................10

*Louis v. District of Columbia*, 59 F. Supp. 3d 135 (D.D.C. 2014) ..............................................4, 5

*Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020) ....................................................27, 31

*Lucha Unida de Padres y Estudiantes v. Green*, 470 F. Supp. 3d 1021 (D. Ariz. 2020) .......16, 21

*Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997) ...........................................................22, 23

*Marbet v. City of Portland*, 2003 WL 23540258 (D. Or. Sept. 8, 2003) ......................................10

*Marbury v. Madison*, 5 U.S. 137 (1803) ...............................................................................24, 36

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ...........................................................36, 40, 44

*Masel v. Barrett*, 707 F. Supp. 4 (D.D.C. 1989) ...................................................................29, 44

*McCracken v. Freed*, 243 F. App'x 702 (3d Cir. 2007) ...............................................................10

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................................17

*Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015) ..............................................25, 26, 28, 31

*Minneci v. Pollard*, 565 U.S. 118 (2012) ...................................................................................35

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................................................30

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)...................................................................34

*Monroe v. Pape*, 365 U.S. 167 (1961)........................................................................................34

*Mullenix v. Luna*, 577 U.S. 7 (2015)................................................................15

*Nanko Shipping, Guinea v. Alcoa, Inc.*, 330 F. Supp. 3d 439 (D.D.C. 2018) .............................37

*\*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ...............................................9

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ..........................................................23

*\*Norris v. District of Columbia*, 737 F.2d 1148 (D.C. Cir. 1984)....................................14

*O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004)..................................................42

*Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009) .......................................7

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1 (D.D.C. 2015) ...........6

*Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir. 1997) ............................................43

*Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001)......................................................15

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2013) .....................................29

*Pearson v. Callahan*, 555 U.S. 223 (2009) ..........................................................33

*Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81 (D.P.R. 2012) ...................................21

*Pluma v. City of New York*, 2015 WL 1623828 (S.D.N.Y. Mar. 31, 2015) ..............................10

*\*Quaker Action Grp. v. Hickel ("Quaker Action I")*,
    421 F.2d 1111 (D.C. Cir. 1969) ..................................................................13

*\*Quaker Action Grp. v. Morton ("Quaker Action IV")*,
    516 F.2d 717 (D.C. Cir. 1975)..........................................................19, 20, 21, 34

*Rauen v. City of Miami*, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007) ..................................21

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .............................23

*\*Rudder v. Williams*, 666 F.3d 790 (D.C. Cir. 2012) .......................................11, 12, 14

*Sandvig v. Sessions*, 2018 WL 1568881 (D.D.C. Mar. 30, 2018) .....................................3

*Saucier v. Katz*, 533 U.S. 194 (2001) ..............................................................33

*Secot v. City of Sterling Heights*, 985 F. Supp. 715 (E.D. Mich. 1997) .............................16

*Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743 (10th Cir. 1980)  ................................................40

*Slusher v. Carson*, 540 F.3d 449 (6th Cir. 2008) ..........................................................................9

*Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987) ...............................................................28

*Symkowski v. Miller*, 294 F. Supp. 1214 (E.D. Wis. 1969) .........................................................44

*\*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020)...........................................................................24, 25, 34

*\*Tatum v. Morton*, 402 F. Supp. 719 (D.D.C. 1974) ...................................................................21

*\*Taylor v. Riojas*, 141 S. Ct. 52 (2020) ........................................................................................7

*Tolan v. Cotton*, 572 U.S. 650 (2014)......................................................................................7, 14

*Torossian v. Hayo,* 45 F. Supp. 2d 63 (D.D.C 1999) ...................................................................29

*Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010).........................................................................15

*United States v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014)...............................................................9

*United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104 (D.D.C. 2014)  .................................37

*\*United States v. Doe*, 968 F.2d 86 (D.C. Cir. 1992)  .................................................18, 19, 20, 21

*United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991) ...........................................................38

*\*United States v. Scott*, 979 F.3d 986 (2d Cir. 2020) .............................................................39, 40

*United States v. Speed*, 78 F. Supp. 366 (D.D.C. 1948)  .............................................................39

*United States v. Wardell*, 581 F.3d 1272 (10th Cir. 2009)  ....................................................37, 38

*United States v. Wood*, 879 F.2d 927 (D.C. Cir. 1989)  ...............................................................37

*\*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)....................................................................15

*Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984) ...........................................................43

*\*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)  .................................................................17

*\*Wesby v. District of Columbia*, 841 F. Supp. 2d 20 (D.D.C. 2012)..........................................4, 5

*\*Wesby v. District of Columbia,* 765 F.3d 13 (D.C. Cir. 2014)..................................................4, 42

ix

*White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984)  ...................19

*Williams v. Hill*, 74 F.3d 1339 (D.C. Cir. 1996)............................................................4

*Wood v. Moss*, 572 U.S. 744 (2014)  ...................................................................18, 33

*Yelverton v. Vargo*, 386 F. Supp. 2d 1224 (M.D. Ala. 2005)  .......................................10

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)  .......................................................... *passim*

### Statutes, Regulations, Rules, and Legislative Materials

18 U.S.C. § 241........................................................................................................39

*42 U.S.C. § 1983..................................................................................................4, 34

*42 U.S.C. § 1985.....................................................................................................36

*42 U.S.C. § 1986.................................................................................................36, 43

Fed. R. Civ. P. 8(a)(2)................................................................................................3

### Other Authorities

3 W. Blackstone, Commentaries (1783) ......................................................................24

Restatement (Second) of Torts (1965) .........................................................................5

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this case, Plaintiffs seek redress for a concerted, coordinated governmental attack on peaceful demonstrators: As alleged in Plaintiffs' Third Amended Complaint, ECF 52, on the evening of June 1, 2020, law enforcement officers at Lafayette Square near the White House charged, clubbed, tear-gassed, and violently dispersed civil rights demonstrators who were lawfully and peacefully protesting police brutality against Black people in the United States. Officers assaulted journalists and demonstrators alike and endangered children in the crowd. Officers repeatedly hit unarmed, unthreatening people with batons and shields, knocking them to the ground. Demonstrators struggled to breathe amidst the chemical attack. This was no routine, orderly clearing of a safety perimeter for the President's movement. Rather, it was an attack by government officers against their own people, of a degree unprecedented on U.S. soil for the past half-century. Defendant LoCascio of the U.S. Park Police is one of the officers who participated, by charging forward and attacking the group of demonstrators without cause or warning.

In moving to dismiss, ECF 143-1 ("LoC. MTD"), Defendant LoCascio embraces much of the erroneous reasoning advanced by his co-defendants Barr, Adamchik, and the individual District of Columbia defendants: LoCascio refuses to accept the well-pleaded allegations of the complaint—dismissing them wholesale as "quite implausibl[e]" at the very start of his motion, LoC. MTD 1, despite Plaintiffs' detailed account in their complaint based on firsthand experience and news reports corroborating the allegations. LoCascio asks the Court to reduce the *Bivens* cause of action to the vanishing point, LoC. MTD 5-9, in spite of precedent showing its continued vitality in vindicating demonstrators' rights. LoCascio follows the District Defendants' erroneously narrow definition of a "seizure," LoC. MTD 10-11, which even most of his other co-defendants decline to embrace. LoCascio invokes qualified immunity, LoC. MTD 16, in the face of a wealth

of binding and persuasive authority demonstrating the unconstitutionality of his conduct. LoCascio cites the importance of presidential security, LoC. MTD 11, but never explains how Defendants' onslaught was at all justified by that interest; indeed, as the complaint alleges, the President was not present but instead in the Rose Garden giving a speech when the attack on Plaintiffs occurred. And LoCascio's analysis of the conspiracy claims, LoC. MTD 11-14, misunderstands the elements of those claims. Plaintiffs' responses on these points will largely track their arguments in their principal motion-to-dismiss opposition brief, ECF 98, responding to similar arguments by LoCascio's various co-defendants on the damages claims, and Plaintiffs also address particular subpoints, authorities, and facts LoCascio raises. *See* Part II below (qualified immunity and the constitutional merits, including the plausibility of Plaintiffs' allegations); Part II.A.1 (explaining how Plaintiffs were seized); Part III (*Bivens*); Part IV (claims under §§ 1985 and 1986).

LoCascio's additional arguments are equally erroneous. First, he argues (both as a matter of standing and the merits) that he cannot be sued because Plaintiffs have not alleged that he interacted with any of them personally. LoC. MTD 3-4, 10. This argument ignores basic principles of tort law applicable to constitutional tort claims and basic principles of conspiracy law applicable to conspiracy claims: wrongdoers acting in concert are responsible for each other's actions. LoCascio's argument is, moreover, inapplicable to the First Amendment claims, because his own actions in attacking protestors directly violated the named Plaintiffs' First Amendment rights by dispersing the demonstration and terminating Plaintiffs' speech. *See* Part I below.

Second, LoCascio supplements his *Bivens* argument with a purported "special factor" of remarkable breadth for which he musters no support in the case law: the notion that otherwise actionable constitutional torts become non-actionable if they are carried out by many officers instead of a few. LoC. MTD 8-9. That argument stands *Bivens* on its head as a tool of official

accountability by denying accountability for the violations of the largest scope—i.e., just when official deterrence, the central purpose of *Bivens*, is most needed. *See* Part III.B below.

Plaintiffs incorporate by reference their recitation of the facts in their omnibus brief, ECF 98, and Plaintiffs cite specific facts from the Third Amended Complaint ("TAC") in their points below as relevant to LoCascio's arguments.

For the reasons that follow, LoCascio's motion to dismiss should be denied.

## LEGAL STANDARD

A complaint need only provide "a short and plain statement … showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). "Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable, *Hurd*, 864 F.3d at 678, and need not be the only possible inferences. *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). Indeed, "[a] complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). Plaintiffs may plead with less specificity, and even "on information and belief," "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Evangelou*, 901 F. Supp. 2d at 170 (cleaned up).

Critically, the Court cannot resolve factual disputes on a 12(b)(6) motion to dismiss. *E.g.,* *Behrens v. Tillerson*, 264 F. Supp. 3d 273, 278 (D.D.C. 2017); *Burnett v. Wash. Metro. Area Trans. Auth.*, 58 F. Supp. 3d 104, 108-09 (D.D.C. 2014). Rather, "unresolved factual questions preclude dismissal" at this stage. *Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82, 88 (D.D.C. 2018).

## ARGUMENT

**I.      Plaintiffs Have Standing To Sue LoCascio Because He Is Responsible For Their Harms Under Ordinary Tort Law Principles And Because He Personally Violated Their First Amendment Rights (Claims 1, 2, 5 & 6).**

LoCascio is wrong that he cannot be sued—either as a matter of standing, LoC. MTD 3-4, or the merits, LoC. MTD 10—in the absence of discrete encounters between him and the named Plaintiffs. As elaborated below, ordinary tort-law principles applicable to constitutional tort cases render LoCascio responsible for the actions of other tortfeasors with whom he acted in concert; an analogous conspiracy-law rule applies to the conspiracy claims; and LoCascio personally violated the Plaintiffs' First Amendment rights by participating in dispersing the demonstration.

*First*, joint tortfeasors are liable for each other's coordinated actions. Except where courts have specifically held otherwise, such as regarding the doctrine of *respondeat superior* liability, ordinary tort-law principles apply to constitutional tort claims under 42 U.S.C. § 1983, *see, e.g.*, *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 41 (D.D.C. 2012), *aff'd*, 765 F.3d 13 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018); *accord Louis v. District of Columbia*, 59 F. Supp. 3d 135, 147 (D.D.C. 2014), and "the bodies of law relating to the two forms of litigation (42 U.S.C. § 1983 and *Bivens*) have been assimilated in most respects," *Williams v. Hill*, 74 F.3d 1339, 1340 (D.C. Cir. 1996) (cleaned up); *see, e.g., Higazy v. Templeton*, 505 F.3d 161, 175–76 (2d Cir. 2007) (applying ordinary tort principles to *Bivens* action); *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (same).

LoCascio's position—that he cannot be sued unless there was a discrete encounter between him and the named Plaintiffs—ignores these basic tort-law principles. This Court has held that "where several independent actors concurrently or consecutively produce a single, indivisible injury," each is liable. *Wesby*, 841 F. Supp. 2d at 41 (D.D.C. 2012); *accord Louis*, 59 F. Supp. 3d at 147; *see also* Restatement (Second) of Torts § 876(a) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he does a tortious act in concert with the other or pursuant to a common design with him[.]"). And this Court has pointed approvingly to a Ninth Circuit decision reversing the dismissal of a Fourth Amendment claim by a plaintiff who could not identify which of several officers had arrested her; that court refused to permit the officers to "'hide behind a shield of anonymity and force plaintiffs to produce evidence that they cannot possibly acquire.'" *Wesby*, 841 F. Supp. 2d at 42 (quoting *Dubner v. City & County of S.F.*, 266 F.3d 959, 965 (9th Cir. 2001)).

Here, what Plaintiffs allege is not a series of isolated attacks by random officers, but rather a coordinated, concerted effort, in which LoCascio participated, to drive all the demonstrators—including Plaintiffs—from Lafayette Square and its environs by force. Plaintiffs allege the coordinated nature of the attack throughout the complaint. *See* TAC ¶¶ 82-83 (Defendants attacked Plaintiffs together pursuant to common orders); TAC ¶¶ 88-100 (describing simultaneous attack by many law enforcement officers from different agencies); TAC ¶ 107 (alleging coordination and a "concerted plan" based on the detailed facts presented). LoCascio personally participated in this coordinated attack when, together with other officers, he "rushed forward and attacked the assembled protesters without warning or provocation." TAC ¶ 83. To the extent the Plaintiffs' allegation of coordination requires drawing inferences, they must merely be reasonable to survive a motion to dismiss. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). Here, it is

a perfectly reasonable inference that the officers who charged, beat up, and tear-gassed Plaintiffs were carrying out a joint action—rather than each, individually and spontaneously, deciding to use wildly excessive force at the same moment against people who posed no threat. On a motion to dismiss, where two competing explanations are plausible, the plaintiff's is credited. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). Indeed, LoCascio's own brief acknowledges Plaintiffs' theory that he acted pursuant to "orders" rather than on his own. LoC. MTD 13. And as a result of Defendants' coordinated actions, Plaintiffs were injured. TAC ¶¶ 120-27, 135-37, 141-45, 150, 159-64, 172-76, 187, 194, 198-201. Because LoCascio and his fellow officers are joint tortfeasors, they are jointly responsible for each other's actions—including the First and Fourth Amendment violations of which Plaintiffs complain.

*Second*, as to the conspiracy claims, LoCascio's argument fails for reasons similar to those applicable to the constitutional-tort claims: conspirators are liable for the acts of the conspiracy, and so plaintiffs need not identify which of several conspirators injured them. *See Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 7 (D.D.C. 2015). Whether Plaintiffs have properly pleaded a conspiracy is a question for the merits, not standing. *See* Part IV.A.1, below (explaining how Plaintiffs have pleaded a conspiracy).

*Third*, LoCascio's standing argument fails as to the First Amendment claims for an additional reason: LoCascio *personally* violated Plaintiffs' rights by charging forward to disperse their constitutionally protected demonstration. See TAC ¶ 83 (alleging that LoCascio and fellow officers "rushed forward and attacked the assembled protesters without warning or provocation"). The result of that charge was to "disrupt the protest and drive Plaintiffs and other class members out of Lafayette Square and its vicinity." TAC ¶ 88; *accord* TAC ¶ 107-08.

Accordingly, Plaintiffs have standing to sue LoCascio for their *Bivens* and conspiracy claims. They have alleged that their injuries were caused by LoCascio—directly (in the case of the First Amendment claim) and (for all claims) via his role as a joint tortfeasor and as a member of a conspiracy. And damages, of course, would provide redress. *E.g., Ord v. District of Columbia*, 587 F.3d 1136, 1144 (D.C. Cir. 2009).

The complaint sufficiently alleges standing.

## II. Qualified Immunity Must Be Denied Because Plaintiffs State Claims For Violations Of Clearly Established Constitutional Rights (Claims 1 & 2).

As in their prior briefing, Plaintiffs address qualified immunity together with the merits.

Qualified immunity must be denied if an officer violated clearly established rights of which a reasonable person in his position would have known because either controlling authority or "a robust consensus of cases of persuasive authority" placed the constitutional question beyond debate. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (cleaned up). Plaintiffs need not identify a precisely on-point precedent, *see id.*; rather, the law need only have provided "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). Independently, qualified immunity must also be denied in where the violation is "obvious" "even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590. The Supreme Court recently applied this principle to summarily reverse a grant of immunity because a lower court failed to recognize that the "particularly egregious facts" alone should have alerted any reasonable officer that the conduct at issue was unconstitutional. *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020).

Although there is on-point authority here, this is also a case of obvious unconstitutionality. Attacking a peaceful protest without warning and with unprovoked and overwhelming force, including the use of chemical weapons, rubber bullets, and baton charges, is such a clear violation

of both the First and Fourth Amendments that no elaboration through case law is needed. Indeed, this violation was so egregious that most of the Defendants *do not actually defend the conduct on the merits*. *See* ECF 98, at 17, 21-23, 31-32 (explaining how Defendants' various arguments either do not contest the merits or rely on facts at odds with the complaint). As for LoCascio himself, he cannot articulate why his use of force was justified beyond his conclusory statement that "presidential security and safety is of paramount government interest, justifying the alleged actions of Sgt. LoCascio," LoC. MTD 11; he devotes the remainder of his argument to the propositions that the named Plaintiffs cannot sue him for his actions, *see* LoC. MTD 10 (which Plaintiffs addressed above in Part I in connection with standing) and that the Fourth Amendment was not implicated at all, *see* LoC. MTD 10-11 (which Plaintiffs discuss in the next section, Part II.A.1). LoCascio's inability to defend the conduct alleged is telling.

Independent of the violation's obviousness, immunity should be denied also because on-point cases exist in droves holding that the type of conduct that occurred here is unlawful. Taking Plaintiffs' detailed factual allegations as true—as required at this stage—the question isn't close.

Plaintiffs explain in turn why each of the constitutional rights at issue was both obviously violated and, independently, clearly established by binding authority or a consensus of persuasive authority such that unlawfulness of Defendants' conduct was beyond debate. Qualified immunity should be denied.

**A. No reasonable government official or law-enforcement officer could have thought that attacking a peaceful protest was constitutional under the Fourth Amendment.**

**1. The Fourth Amendment applies to Defendants' conduct.**

LoCascio is wrong as a matter of law when he argues that tear-gassing people, beating them, charging into them, and shooting them with rubber bullets does not "seize" them within the meaning of the Fourth Amendment. LoC. MTD 10-11. The "application of physical force to

restrain movement, even when it is ultimately unsuccessful" is sufficient to constitute a seizure. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *accord United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). Indeed, the concept of a seizure encompasses "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee." *Hodari D.*, 499 U.S. at 624; *accord id.* at 625 (arrest occurs at "the slightest application of physical force, despite the arrestee's escape"). The means to limit the subject's movement must be "intentionally applied." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596-97 (1989). An arrest need not have resulted. *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 391 (D.D.C. 2016).

The D.C. Circuit and this Court have recognized that even a momentary limitation of a person's freedom of movement (or the person's submission to authority) is a seizure if it results from means intentionally applied. *See Brodie*, 742 F.3d at 1061 (seizure occurred for the moment suspect put his hands on a car as directed by police, even though he subsequently fled); *Kyle*, 177 F. Supp. 3d at 390-92 (partygoer seized when she was shoved into a barbeque by police officer, because "a seizure can be accomplished in an instant, and there is no minimum time that a plaintiff's freedom of movement must be terminated in order to establish that a seizure has occurred" (citation and internal quotation marks omitted)). Other courts agree. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1208-09 (8th Cir. 2013) (where officer's "bull rush" knocked subject ten to fifteen feet backward, "a seizure occurred the moment [the officer] charged into [the subject]"); *Nelson v. City of Davis*, 685 F.3d 867, 875-76 (9th Cir. 2012) (person rendered temporarily "immobile" by a projectile filled with pepper spray was seized); *Slusher v. Carson*, 540 F.3d 449, 452, 454-55 (6th Cir. 2008) (plaintiff seized when an officer momentarily grabbed her hand); *Acevedo v. Canterbury*, 457 F.3d 721, 723-25 (7th Cir. 2006) (subject seized by single punch that caused him to fall, in spite of the fact that he got back to his feet; "[t]he fact that the

restraint on the individual's freedom of movement is brief makes no difference"); *see also Hooks v. United States*, 208 A.3d 741, 746 n.11 (D.C. 2019) ("[T]he protections of the Fourth Amendment extend to situations where a citizen has no desire to go elsewhere and instead simply wishes to decline an encounter with the police.").

Federal courts applying these rules routinely hold that, when an officer intentionally sprays a person with pepper spray, that person is seized, *regardless* of whether the person halts. *See McCracken v. Freed*, 243 F. App'x 702, 708 (3d Cir. 2007) (plaintiff seized when law enforcement threw pepper spray canisters into her house "with the intent of temporarily debilitating any persons occupying the home" (citation and footnote omitted)); *Bettencourt v. Arruda*, 2012 WL 5398475, at *7-*8 (D. Mass. Nov. 1, 2012) (evidence showed seizure when officer "pulled [plaintiff] by the arm and sprayed him with pepper spray," even though it "did not stop him" and plaintiff was able to drive away afterward); *Yelverton v. Vargo*, 386 F. Supp. 2d 1224, 1228 (M.D. Ala. 2005) ("Officer Vargo's pepper spraying of McConnell constituted a seizure even though it did not stop him."); *accord Pluma v. City of New York*, 2015 WL 1623828, at *4 (S.D.N.Y. Mar. 31, 2015); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241 (W.D. Wash. 2009); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005).

And courts have specifically held that using pepper spray to *redirect* demonstrators constitutes a seizure. *See Jennings v. City of Miami*, 2009 WL 413110, at *9 (S.D. Fla. Jan. 27, 2009); *Marbet v. City of Portland*, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003); *see generally Brendlin v. California*, 551 U.S. 249, 254 (2007) (seizure occurs when officer "terminates or *restrains* [subject's] freedom of movement" (emphasis added)).

These decisions refute the core premise of LoCascio's argument—that a person cannot be seized if she flees, or briefly halts then flees, despite the use physical force to limit that person's

movement. LoC. MTD 10. LoCascio's cramped view of what may constitute a seizure is inconsistent with binding and persuasive authorities.

As alleged in the complaint, Plaintiffs were in fact seized by the concerted actions of the Defendants, whose intentional application of physical force—tear-gas, rubber bullets, baton strikes, and an armed charge—limited the named Plaintiffs' and putative class members' freedom of movement, either forcibly halting them (in many cases knocking them to the ground), *see, e.g.*, TAC ¶¶ 172-73, 193-96 (Plaintiffs Poteet, Foley, and E.X.F.); TAC ¶¶ 90, 91, 151 (other putative class members), or forcibly directing or redirecting their movements by compelling them to flee for their safety, *see, e.g.*, TAC ¶¶ 135-36, 141-43, 150, 159-63 (Plaintiffs Sanders, J.N.C., McDonald, Bond, Scallan); TAC ¶¶ 88, 90, 92-99, 102, 159, 187 (other putative class members).

Finally, LoCascio cannot dodge responsibility for his role in Defendants' concerted attack on Plaintiffs on the grounds that Plaintiffs do not yet have the same factual detail for him as for some of the other defendants. *See* LoC. MTD 11. As explained in connection with standing, Part I above, ordinary tort-law principles applicable to this constitutional-tort action establish that LoCascio can be liable for tortious conduct taken in concert with others. That LoCascio "rushed forward and attacked the assembled protesters" in concert with his co-defendants, TAC ¶ 83, pursuant to common instructions, TAC ¶ 82, is enough to render him liable.

## 2. The Fourth Amendment violation was obvious, as the use of force lacked any semblance of justification.

It is black-letter law that a "use of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than 'the countervailing governmental interests at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Under this standard, "a police officer must have some

justification for the quantum of force he uses. … [T]he state may not perpetrate violence for its own sake. Force without reason is unreasonable." *Id.* at 977 (cleaned up).

Taking the facts of the complaint as true, *Rudder*'s simple and powerful distillation of the essence of excessive force law—that "[f]orce without reason is unreasonable"—requires denial of this motion. Plaintiffs broke no laws and posed no threat. TAC ¶¶ 86-87. The Defendants gave no audible warning that Plaintiffs were obligated to move. TAC ¶¶ 84-85. Every reasonable law enforcement officer knows that, under the Fourth Amendment, officers cannot use force, much less tear gas and batons, against people who are doing nothing wrong.

The degree of force used underscores how far out of bounds Defendants' conduct was. As the complaint details, Defendants "fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and/or other projectiles and other chemical irritants into the crowd," TAC ¶ 88, "hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields, including demonstrators whose backs were turned from the police and who were trying to flee the officers," TAC ¶ 90, pursued demonstrators on horseback, *id.*, knocked many protestors to the ground, *id.*, slammed a man into a building from behind and then beat him when he tried to flee, TAC ¶ 91, struck a television journalist with a baton in the back as she was trying to flee the onslaught, TAC ¶ 97, and generally "injected danger into what had been a calm protest as those in the street fled mounted police to avoid being trampled, struck by projectiles or gassed." TAC ¶ 90. Any reasonable officer would have known that these uses of force were grossly impermissible in the circumstances alleged in the complaint.

In the face of all this, LoCascio offers a single, conclusory statement: "presidential security and safety is of paramount government interest, justifying the alleged actions of Sgt. LoCascio." LoC. MTD 11. Plaintiffs do not disagree that presidential security is an important government

interest, but LoCascio provides no explanation whatsoever as to how that interest in fact "justif[ied] the alleged actions of Sgt. LoCascio" *in the circumstances here*. Indeed, the facts Plaintiffs have plausibly alleged show quite the opposite: Plaintiffs were not asked or ordered to move. They were not disobeying any orders of that kind or any other. They posed no threat to the President or anyone else. In fact, the President was nowhere nearby when Defendants' attack occurred; he was in the Rose Garden, *see* TAC ¶ 61, meaning that the entire White House was between him and the demonstrators. Yet Defendants swept Plaintiffs away from Lafayette Square using tear gas, rubber bullets, and an armed charge, and then pursued them as they fled. None of this was remotely necessary to protect presidential security, and no reasonable officer could have believed that it was.

The D.C. Circuit has specifically rejected "the Government's argument that mere mention of the President's safety" defeats a claim of a constitutional right. *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1117 (D.C. Cir. 1969) ("*Quaker Action I*"). Instead, courts must "assure [them]selves that [the Government's] conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat." *Id.* Accordingly, presidential security is not a talisman that wards off all Fourth Amendment scrutiny; rather, like any other law enforcement interest (including the interests in the lives of officers themselves and of civilian bystanders), it is subject to a Fourth Amendment reasonableness analysis. And like any other interest, it may be so attenuated from a particular decision to use force and so plainly inadequate to justify the quantum of force applied that in some circumstances it provides no justification at all. That is the case here. Immunizing any putative presidential security-related use of force from Fourth Amendment scrutiny would effectively permit the President to declare his intent to visit any location and then send officers out ahead of him to attack anyone in the area—

13

as opposed to simply ordering people to move out of the way of a forthcoming presidential movement, audibly, and with enough time to comply.

Qualified immunity does not suspend the normal rules of civil procedure. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). Should LoCascio be able to substantiate a justification for the uses of force (rather than merely assert it, sans explanation), he may seek qualified immunity again later in the case. That possibility is irrelevant to the unavoidable conclusion that the facts in the complaint state a claim for the violation of Plaintiffs' clearly established Fourth Amendment rights by the use of overwhelming force against peaceful, law-abiding demonstrators.

**3.  Precedent independently places the Fourth Amendment violation beyond debate.**

In addition to their obviousness, each of the uses of force at issue here violated Fourth Amendment rights clearly established by binding authority, a consensus of persuasive authority, or both. The D.C. Circuit has specifically held that baton strikes against non-threatening and non-resisting individuals violate the Fourth Amendment. *See Rudder*, 666 F.3d at 795 (baton strike "unprovoked and without warning" violates the Fourth Amendment). The D.C. Circuit has also specifically recognized the unjustified use of chemical agents to be unconstitutionally excessive. *Norris v. District of Columbia*, 737 F.2d 1148, 1152 (D.C. Cir. 1984) (R.B. Ginsburg, J.). Additionally, there is a consensus view, both in this Court and among the federal courts of appeals, that the gratuitous use of tear gas (or comparable chemical agents) on a person who is not threatening anyone or resisting officers is excessive force. *See, e.g., Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010); *Asociacion de Periodistas v. Mueller*, 529 F.3d 52, 60-62 (1st Cir. 2008); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160-61 (10th Cir. 2008); *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Vinyard v. Wilson*, 311 F.3d 1340, 1348-49 (11th Cir. 2002); *Headwaters*

*Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1128-30 (9th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001); *Adams v. Metiva*, 31 F.3d 375, 385-86 (6th Cir. 1994); *Jones v. Ritter*, 587 F. Supp. 2d 152, 157 (D.D.C. 2008).[1]

Accordingly, courts have for decades denied qualified immunity for such uses of force, *see Henderson*, 439 F.3d at 503-04; *Vinyard*, 311 F.3d at 1355; *Adams*, 31 F.3d at 387, including specifically in the context of protests, *see Fogarty*, 523 F.3d at 1160-62 (denying qualified immunity for 2003 incident in which police forcibly escorted non-threatening, non-resisting antiwar protestor through cloud of tear gas); *Headwaters Forest Def.*, 276 F.3d at 1130 (in 1997, "it would be clear to a reasonable officer that it was excessive to use pepper spray against the nonviolent protestors" who "were sitting peacefully, were easily moved by the police, and did not threaten or harm the officers"); *Lucha Unida de Padres y Estudiantes v. Green*, 470 F. Supp. 3d 1021, 1026, 1046-47 (D. Ariz. 2020) (clearly established in 2017 that use of pepper spray against non-threatening and non-resisting protestors was unconstitutional); *Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241-43 (W.D. Wash. 2009) (clearly established in 2007 that police cannot pepper spray protestor attempting to assist an injured protestor without posing a threat, or use batons and pepper spray on protestor calmly trying to cross the street); *Brenes-Laroche v. Toledo*

---

[1] Some of LoCascio's co-defendants try to duck all of this authority by positing that only a case holding that "a cabinet official violated clearly established constitutional rights by issuing an alleged order to peaceably clear a largely unsecured public area near the White House, which was the recent site of unrest and the imminent future site of a presidential appearance," could suffice to clearly establish the law. ECF 127 (Barr), at 16; *accord* ECF 138 (Adamchik), at 17-18 (similar formulation). Of course, if the inquiry were so granular, then qualified immunity would be granted in every case. Identifying clearly established law "do[es] not require a case directly on point," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015), and the Court specifically rejected the "rigid gloss" imposed by one court of appeals that required plaintiffs to point to cases with "materially similar" facts. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). What Plaintiffs' cases show is that no reasonable officer could have thought that an unprovoked attack on peaceful, law-abiding, non-threatening demonstrators was constitutional. That is sufficient to defeat immunity.

*Davila*, 682 F. Supp. 2d 179, 189, 192 (D.P.R. 2010) (clearly established in 2007 that baton strikes to non-threatening, non-resisting protestors was unconstitutional); *Secot v. City of Sterling Heights*, 985 F. Supp. 715, 721 (E.D. Mich. 1997) (clearly unreasonable in 1995 to "[strike] plaintiff while he was peaceably standing in the picket line and not threatening an officer or other member of the public"); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996) (denying qualified immunity for firing of pepper spray into crowd of peaceful demonstrators).

Based on both binding and persuasive authority, qualified immunity for Plaintiffs' Fourth Amendment claims should be denied.

**B. LoCascio and his co-defendants violated Plaintiffs' clearly established First Amendment rights in a manner that was obvious because of its egregiousness and, independently, contravened binding precedent.**

Defendants' attack on a peaceful and lawful demonstration was a blatant suppression of core political speech in one of the nation's most important public forums.

LoCascio devotes scant analysis to the First Amendment, arguing only that he personally did not engage in First Amendment retaliation. LoC. MTD 9-10. However, Plaintiffs have stated a claim for a violation of their First Amendment rights under three *distinct* theories that LoCascio does not even address.

Plaintiffs will address in turn the three ways that Defendants'—including LoCascio's— conduct clearly violated the First Amendment: (1) by burdening far more speech than necessary to serve the government's asserted interest (i.e., failing intermediate scrutiny); (2) by breaking up a demonstration absent a clear and present danger; and (3) by discriminating based on viewpoint— which, as Plaintiffs explain, is distinct from retaliation.

**1. By assaulting and completely scattering a lawful, peaceful demonstration, Defendants burdened far more speech than necessary.**

Although some Defendants have argued that their actions should be analyzed as a content-neutral restriction on the time, place, and manner of speech, *see* ECF 76 (Barr), at 33, ECF 97 (Adamchik), at 33, that framework is generally applied to *regulatory* restrictions on expression—not to on-the-spot police actions that shut down otherwise-permitted demonstrations. Plaintiffs will discuss the correct standard in the next section, but in any case, the actions of Defendants (including LoCascio) were clearly unconstitutional even under a time/place/manner analysis.

One of the requirements of a valid content-neutral restriction is that it is "narrowly tailored." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). This means that "it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 799).

Any reasonable officer would have known that Defendants' assault on Plaintiffs was not "narrowly tailored" to the government's interest. The overwhelming use of force put Plaintiffs and the entire class to headlong flight out of the path of projectiles, chemical weapons, and rampaging officers, some on horseback, pursuing Plaintiffs as they fled. TAC ¶¶ 81-103. The egregiousness of Defendants' use of force is compounded by its disproportionality to any legitimate government objective. If the goal had been simply to move people out of the President's way for his forthcoming walk to the church, the demonstrators could have been clearly and audibly instructed which direction to move and how far—something the Secret Service knows how to do. *See Wood v. Moss*, 572 U.S. 744, 751-54 (2014) (Secret Service moved demonstrators away from where President Bush was unexpectedly dining). Although under this standard Defendants need not have used the least restrictive means, the existence of substantially less burdensome alternatives is "relevant" under this Circuit's case law, *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir.

2002), and Defendants' blitzkrieg was practically the *most* restrictive means they could have used: short of firing on the Plaintiffs with live ammunition, Defendants could not have more forcefully disrupted the demonstration and scattered its participants. Defendants' crackdown, even analyzed as a content-neutral restriction, blatantly fails intermediate scrutiny.

LoCascio's one-sentence argument to the contrary depends on assertions of his own that both contradict the complaint and are too threadbare to demonstrate much of anything. LoCascio says merely, "presidential security and safety is of paramount government interest, justifying the alleged actions of Sgt. LoCascio." LoC. MTD 11. As explained above in connection with the Fourth Amendment, this blithe assertion, devoid of any explanation how LoCascio's actions were "justif[ied]" here, is incapable of overcoming Plaintiffs' well-pleaded allegations that LoCascio and his co-defendants initiated the entire confrontation *un*justifiably and despite the lack of a threat and the absence of the President from the scene at the time of the onslaught. *See* Part I.A.1 above.

If the government, which "bears the burden of showing that its restriction of speech is justified," *United States v. Doe*, 968 F.2d at 90, asserts that the sudden, violent, and complete dispersal of this peaceful protest was narrowly tailored to a legitimate objective, it can support its position with evidence at a later stage, *see id.* at 90-91 (evaluating tailoring by reference to the record, including the government's evidence offered). But courts do not simply "defer to the [government's] unexplained judgment," *id.* at 90; *accord Henderson v. Lujan*, 964 F.2d 1179, 1185 (D.C. Cir. 1992). Rather "it is the government's case to prove." *Doe*, 968 F.2d at 91. Setting aside as unproven LoCascio's ipse dixit that presidential security "justif[ied] [his] alleged actions," any reasonable person would have known Defendants' conduct violated the Constitution.

Circuit precedent underscores that presidential security does *not* preempt normal First Amendment analysis. The D.C. Circuit struck down a limit on demonstrations in front of the White

House that was inappropriately broad in proportion to the security interest asserted. *See Quaker Action Group v. Morton*, 516 F.2d 717, 721, 723, 731 (D.C. Cir. 1975) ("*Quaker Action IV*") (affirming judgment striking down as unduly restrictive 500-person limit on demonstrations in Lafayette Square). The D.C. Circuit has also strongly suggested that presidential security would not justify a blanket speech ban in front of the White House. *See White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518, 1527 (D.C. Cir. 1984) (explaining in dicta that "a strong argument could have been made that a regulation banning all demonstrations on the White House sidewalk and in Lafayette Park would have been unconstitutional"). Thus, binding precedent refutes the view that presidential security concerns, no matter how attenuated they may be in a particular context, automatically justify content-neutral speech restrictions or otherwise displace the requirements of the First Amendment. Because Defendants' actions badly and obviously fail at least one of those requirements—narrow tailoring—Defendants, including Defendant LoCascio, violated Plaintiffs' clearly established rights under intermediate scrutiny.

### 2. Breaking up the protest was clearly established to be unconstitutional absent a "clear and present danger."

Although the constitutional violation was clearly established even under intermediate scrutiny, the correct test to apply here is provided not by cases dealing with general regulations of time, place, and manner, but with protest dispersals specifically. The leading Supreme Court case in this context holds that the First Amendment forbids the dispersal of lawful demonstrations in a public forum "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963). This standard has been applied across the decades and across the circuits (including this one), providing a broad consensus of authority to underscore the holding of *Edwards* that absent a serious and immediate threat, a peaceful and lawful demonstration may not

19

be dispersed. *See Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (Sotomayor, J.) (applying "clear and present danger" standard to deny qualified immunity for breaking up a demonstration where "the facts as alleged by plaintiffs reveal an orderly, peaceful crowd"); *Quaker Action IV*, 516 F.2d at 729 (D.C. Cir.) (upholding National Park Service standard for denying demonstration permits near the White House because it was limited to circumstances presenting "clear and present danger"); *accord Keating v. City of Miami*, 598 F.3d 753, 758, 766-67 (11th Cir. 2010) (no qualified immunity for officers who ordered dispersal of peaceful demonstration via tear gas and projectiles); *Collins v. Jordan*, 110 F.3d 1363, 1367-68, 1371, 1372 (9th Cir. 1996) (no qualified immunity for police chief who banned demonstrations citywide and dispersed peaceful protest; "[t]he law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence"); *Cong. of Racial Equality v. Douglas*, 318 F.2d 95, 102 (5th Cir. 1963) (reversing injunction against peaceful civil rights protest as inconsistent with *Edwards*).

The D.C. Circuit has repeatedly recognized that Lafayette Square is not just a "quintessential public forum," *Doe*, 968 F.2d at 87, but one with special status, *id.* at 88—"a primary assembly point for First Amendment activity aimed at influencing national policies," *id.* at 89, "where the government not only tolerates but explicitly permits demonstrations and protests because of its unique location across the street from the White House," *id.* at 88. It is a "unique situs for the exercise of First Amendment rights." *Quaker Action IV*, 516 F.2d at 725.

Applying these principles, this Court has held that a peaceful, lawful demonstration on the White House sidewalk may not be dispersed in the absence of a serious threat to public safety, and it has rejected the view that a perceived threat of disorder based on previous events provides such cause. *See Tatum v. Morton*, 402 F. Supp. 719, 722-24 (D.D.C. 1974). More recently, this Court

has recognized that the right of an "ordinary person[] [to] express[] her views while standing on the public sidewalk in front of the White House" is "clearly established." *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 57 (D.D.C. 2013). Other courts have likewise held that the First Amendment does not permit the dispersal of a peaceful protest in circumstances like those here. *See Keating*, 598 F.3d at 758, 766-67 (no qualified immunity for officers who ordered dispersal of peaceful demonstration via tear gas and projectiles); *Lucha Unida*, 470 F. Supp. 3d at 1039-40, 1045-46 (clearly established in 2017 that police could not block a peaceful march where defendants failed to identify a "clear and present danger of substantial evil"); *Adams v. New York*, 2016 WL 1169520, at *1, *3 (S.D.N.Y. Mar. 22, 2016) (dispersing protestors on public sidewalk was unconstitutional where there was no "immediate threat to public safety or order"); *Pena-Pena v. Figueroa-Sancha*, 866 F. Supp. 2d 81, 88, 93 (D.P.R. 2012) (peaceful protestors at territorial Capitol building, whom police attacked with tear gas and batons, stated claim for violation of clearly established First Amendment rights); *Rauen v. City of Miami*, 2007 WL 686609, at *2, *20 (S.D. Fla. Mar. 2, 2007) (no qualified immunity for officers who broke up peaceful protest with chemical irritants; plaintiffs' "right to peacefully protest in the absence of a compelling government interest in quashing their protest" was clearly established).

Like the civil rights protestors whose demonstration was unconstitutionally suppressed in *Edwards*, the civil rights protestors here were exercising their "rights of free speech, free assembly, and freedom to petition for redress of their grievances ... in their most pristine and classic form." *Id.* at 235. Thus, breaking up the demonstration was clearly established as unlawful *both* as an obvious matter based on general principles *and* based on binding authorities and a consensus of persuasive authorities.

### 3.   Viewpoint discrimination violated Plaintiffs' clearly established rights.

Defendants' actions in attacking Plaintiffs' demonstration based on its viewpoint was an independent—and no less clearly established—constitutional violation. *See generally Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (prohibition on viewpoint-discrimination is "a core postulate of free speech law"). D.C. Circuit authority specifically establishes that impermissible viewpoint discrimination occurs where the government treats speech expressing one viewpoint differently than it would have treated a different viewpoint. In *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997), the National Park Service revoked a permit for anti-abortion demonstrators at President Clinton's inauguration, and threatened them with arrest, *id.* at 1454, even though the government admitted that "if instead of carrying graphic posters of late term abortions or signs containing criticisms of the President, Mahoney were to carry signs offering congratulations or best wishes to the President, he would not be subject to arrest." *Id.* at 1456. The court struck down this restriction as "blatant discrimination between viewpoints." *Id.*

Plaintiffs have plausibly alleged the same type of discrimination here—that Defendants' attack breaking up their civil rights protest would not have been mounted against a demonstration with a pro-Administration message. *Compare* TAC ¶ 64 (Defendant Trump tweet boasting that "'protesters' at the White House" were "handled ... easily" by the Secret Service and calling for "MAGA NIGHT AT THE WHITE HOUSE"), *and* TAC ¶ 63 (promoting civil disobedience at various statehouses in opposition to coronavirus-related safety regulations), *with* TAC ¶¶ 53-61 (Defendant Trump calling civil rights protestors "THUGS," advocating calling in the National Guard on them, and urging "overwhelming force" to "dominate" the civil rights protestors). That differential treatment is the hallmark of viewpoint discrimination under the D.C. Circuit's binding decision in *Mahoney*, 105 F.3d at 1456. Thus, in addition to the obvious violation of breaking up

a peaceful demonstration without sufficient (or really any legitimate) basis, qualified immunity must be denied for the independent reason that Defendants' actions amounted to viewpoint discrimination, as demonstrated by the President's own words.

LoCascio argues (briefly) that Plaintiffs have not made out the elements for retaliation. LoC. MTD 9. That point does not address viewpoint discrimination, which is a distinct theory. Whereas First Amendment retaliation requires "retaliatory animus," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019), one way for viewpoint discrimination to occur is "when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction" of speech. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (emphasis added). The rationale in question is the *government's* purpose in taking the challenged action, not the subjective motive of an official who carried it out—as demonstrated by *Mahoney*, where the D.C. Circuit did not inquire if any defendant held animosity toward the plaintiff's viewpoint but found it sufficient that the government would have treated a speaker with a different viewpoint differently. Likewise, *Rosenberger* did not suggest that school officials (who were sued for damages) had anti-Christian animus when they denied funding to a religious student publication, and there was no reason to suspect that they had such animus, as they were merely enforcing a preexisting school rule. *See id.* at 827.

President Trump's statements show that the demonstrators' expressed viewpoint was the reason for attacking and disbanding the protest. Defendant LoCascio, along with his co-defendants, carried out that attack. Thus, Plaintiffs have plausibly pleaded viewpoint discrimination in violation of clearly established law.

III.     **The Traditional Damages Remedy Against Federal Officers For Violating Demonstrators' First And Fourth Amendment Rights Has Long Been Recognized In This Circuit And No Special Factors Counsel Hesitation Here (Claims 1 & 2).**

LoCascio argues, LoC. MTD 5-9, that no cause of action is available under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which recognized a cause of action arising out of the Constitution for damages against federal agents who violate a person's constitutional rights. *Bivens* reflected both an ideal and a body of law with deep historical roots. The ideal, articulated by Chief Justice Marshall, was that "'[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'" *Id.* at 397 (quoting *Marbury v. Madison*, 5 U.S. 137, 163 (1803)). And the body of law, exemplified by an early Marshall Court case as well as pre-Revolutionary English cases, showed that executive officials acting beyond their authority could be held liable in damages. *See Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020); ECF 120 (Br. of Fed. Courts Scholars As Amici Curiae), at 6-16. Indeed, "this exact remedy has coexisted with our constitutional system since the dawn of the Republic." *Tanzin*, 141 S. Ct. at 493. Thus, the federal damages remedy recognized in *Bivens* was "hardly ... a surprising proposition" because "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 U.S. at 395; *see also Tanzin*, 141 S. Ct. at 491 ("In the context of suits against Government officials, damages have long been awarded as appropriate relief."); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 66 (1992) ("Blackstone described it as 'a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded.'" (citing 3 W. Blackstone, Commentaries 23 (1783)).[2]

---

[2] Although today under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), courts cannot invoke a "federal general common law," to recognize "new claims" or recognize statutory causes of action *(footnote continues)*

More recently, Congress indicated its acceptance of the *Bivens* remedy through two laws it passed following *Bivens*: amendments to the Federal Tort Claims Act (FTCA) and the Westfall Act. *See Tanzin*, 141 S. Ct. at 491 (noting that Westfall Act "left open claims for constitutional violations"); *Carlson v. Green*, 446 U.S. 14, 19-20 & n.5 (1980) ("[T]he congressional comments accompanying [the FTCA] amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action."); ECF 120 (Br. of Fed. Courts Scholars), at 17-20.[3]

*Bivens* was a Fourth Amendment case. The D.C. Circuit has found the logic of *Bivens* to apply to First Amendment claims, as well. *See Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977) (holding that *Bivens* damages were available for demonstrators' First and Fourth

---

in the absence of statutory authority, *see Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020), the inherent power to enforce the Constitution itself is neither statutory nor new. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing "long history of judicial review of illegal executive action"); *Franklin*, 503 U.S. at 65-70 (discussing presumption that when a cause of action exists, federal courts may order any appropriate relief).

[3] Defendants Barr and Adamchik attempt to brush aside the significance of *Tanzin* both because it was authored by Justice Thomas, who has elsewhere expressed a desire to overrule *Bivens* entirely, and because the Supreme Court has also characterized the Westfall Act as having "simply left *Bivens* where it found it." *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020). *See* ECF 127, at 3; ECF 138, at 3-4. The first point is not an appropriate way to read Supreme Court decisions: lower courts are bound by what *the Court* has said, and *Tanzin* is an opinion of *the Court*, not a statement by a single Justice to be read contextually with that Justice's other writings and discounted based on that one Justice's views. The second point actually helps Plaintiffs, not Defendants: by 1988, when the Westfall Act was passed, this Circuit had already twice recognized *Bivens* claims for violations of demonstrators' rights, *see infra* Part III.A (discussing the 1977 *Dellums* case and citing the 1984 *Hobson* case), and the Supreme Court's statement that expanding *Bivens* is "disfavored," *Abbasi*, 137 S. Ct. at 1857, would not appear until decades later. Thus, leaving *Bivens* "where [Congress] found it" in 1988 is quite consistent with *Tanzin* and with the application Plaintiffs seek here. Defendants Barr and Adamchik also attempt to discount the Supreme Court's repeated recognition of congressional endorsement of *Bivens* by citing dicta out of context from *Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015), *see* ECF 127, at 3; ECF 138, at 3—even though that case expressly stated that it was not "foreclosing" any interpretation of the congressional enactments but merely found them insufficient to overcome a "thumb [that] is heavy on the scale against recognizing a *Bivens* remedy," *id.* at 428, because of the national-security and extraterritoriality concerns in that case, as discussed in the next section. Indeed, as discussed below, *Meshal* is part of a long line of D.C. Circuit cases stating that excessive force by federal law enforcement officers is within the heartland of *Bivens*. 804 F.3d at 424.

Amendment claims against law enforcement officers). Since *Dellums*, a long line of cases in this Circuit has applied *Bivens* to violations of demonstrators' constitutional rights (as detailed below).

The Supreme Court's approach to *Bivens* claims has evolved since its initial recognition of the remedy. In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Court created a two-step inquiry for deciding whether a *Bivens* claim is available. First, courts must assess whether the claim arises in a "new context," and second, if the context is new, the courts must then ask whether any "special factors" counsel "hesitation" in recognizing a *Bivens* remedy. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (summarizing *Abbasi*, 137 S. Ct. at 1857, 1859). Examples of "special factors" are foreign affairs, national security, *see Hernandez*, 140 S. Ct. at 746-47, and the existence of an "alternative remedial structure." *Abbasi*, 137 S. Ct. at 1858.

Nonetheless, although "expanding" *Bivens* is now "disfavored," *id.* at 1857, the Court did not close the door to all *Bivens* remedies, particularly ones that have long existed. Specifically, the Court in *Abbasi* affirmed that the "opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Id.* at 1856. The Court has not overturned or limited any of its *Bivens* precedents to their facts, despite suggestions that it do so, *see, e.g., Hernandez*, 140 S. Ct. at 750 (Thomas, J., concurring).

Assuming for the sake of argument that the context here is "new" under *Abbasi*, Plaintiffs nonetheless prevail. The Supreme Court's recent decisions do not cast doubt on Circuit precedent holding that *Bivens* is available for demonstrators' First and Fourth Amendment claims and declining to find "special factors" counseling "hesitation" in this context. [4] Importantly, the

---

[4] Defendants Barr and Adamchik conflate the two steps of the *Abbasi* analysis in seeking to minimize the significance of prior D.C. Circuit precedent. In the very passage Defendants cite, the Circuit explained that its prior cases are not relevant *for the new-context inquiry* (step one). *See Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020) (describing prior cases as "overtaken *(footnote continues)*

existence of a "new context" alone does not defeat a claim—otherwise the *Bivens* analysis would end at step one. LoCascio recognizes as much; after addressing the "new context" question, he explains, "[t]he court must then consider whether special factors counsel hesitation." LoC. MTD 7 (cleaned up).

On the special factors question, more than four decades of precedent in this Court and the D.C. Circuit show that nothing about a damages remedy for a violation of demonstrators' First and Fourth Amendment rights—particularly violations as egregious as those here—should cause a court to hesitate. And the special factors invoked by LoCascio are inapplicable to this case. The Court should faithfully apply this Circuit's cases recognizing a *Bivens* action for violating demonstrators' First and Fourth Amendment rights.

**A. Circuit precedent refutes the notion that "special factors" preclude recognizing constitutional damages claims for demonstrators' rights here and distinguishes this case sharply from those in which special factors exist.**

Although the Court's two-step framework for assessing the availability of *Bivens* damages is new, the consideration of special factors in determining whether to apply *Bivens* is not. The "special factors" inquiry has existed since *Bivens* itself, 403 U.S. at 396 ("[t]he present case involves no special factors counselling hesitation"), and it existed when *Dellums* and its successor cases were decided. Yet the D.C. Circuit has never suggested that "special factors" preclude the application of *Bivens* to enforce the First or Fourth Amendment rights of protestors. On the

---

by *Abbasi*'s holding" regarding the "new-context analysis"), *quoted in* ECF 127, at 4-5 n.3; ECF 138, at 5 n.4. But neither the D.C. Circuit nor the Supreme Court suggested that prior precedent was irrelevant *to the special factors inquiry* (step 2).

contrary, the D.C. federal courts have a long history of allowing *Bivens* First and Fourth Amendment claims on behalf of protestors.

LoCascio does not dispute the availability of *Bivens* for excessive force claims generally—a point the D.C. Circuit has repeatedly reaffirmed. *See, e.g., Lash v. Lemke*, 786 F.3d 1, 5 n.2 ("There is no question that [a tased demonstrator] may pursue an excessive force claim under *Bivens*[.]"); *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015) (when "a federal law enforcement officer uses excessive force, contrary to the Constitution," that is "the classic *Bivens*-style tort" (quoting *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987); internal quotation marks omitted)). More specifically, in *Dellums*, no special factors prevented the court from applying *Bivens* to a context just like this one: where police violated the First and Fourth Amendments by disrupting a large demonstration in front of the seat of one of our three branches of government (in *Dellums*, the Capitol; here, the White House). If no special factors existed there and then, none exist here and now.

In *Dellums*, the D.C. Circuit considered First and Fourth Amendment claims asserted by demonstrators protesting the Vietnam War on the steps of the Capitol Building. 566 F.2d at 173. The court affirmed the verdict on the Fourth Amendment *Bivens* claims, *see id.* at 175-91, and concluded that federal courts were capable of addressing First Amendment *Bivens* claims as well, *see id.* at 194-95. Following *Dellums*, D.C. federal courts have repeatedly recognized *Bivens* damages claims for First and Fourth Amendment claims by demonstrators. *See, e.g.*, *Lash*, 786 F.3d at 5 n.2 (D.C. Cir. 2014) (although Park Police officers were entitled to qualified immunity for tasing demonstrator resisting arrest, "[t]here is no question that Lash may pursue an excessive force claim under *Bivens*"); *Hobson v. Wilson*, 737 F.2d 1, 56, 62-63 (D.C. Cir. 1984) (*Bivens* First Amendment damages claim against FBI agents who impeded protests), *partially abrogated on*

*other grounds, Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993);

*Patterson v. United States*, 999 F. Supp. 2d 300, 303, 308-311, 317 (D.D.C. 2013) (demonstrator's

*Bivens* First and Fourth Amendments claims for retaliatory arrest); *Hartley v. Wilfert*, 918 F. Supp.

2d 45, 50-54 (D.D.C. 2013) (*Bivens* First Amendment claim for trying to intimidate plaintiff out

of protesting near the White House); *Bloem v. Unknown Dep't of the Interior Employees*, 920 F.

Supp. 2d 154, 156-57, 159-61 (D.D.C. 2013) (First and Fourth Amendment claims where agents

destroyed plaintiff's protest materials); *Lederman v. United States*, 131 F. Supp. 2d 46, 47, 57, 63

(D.D.C. 2001) (*Bivens* First and Fourth Amendment claim for Capitol Police officer's arrest of

demonstrator), *rev'd on other grounds*, 291 F.3d 36 (D.C. Cir. 2002); *Torossian v. Hayo,* 45 F.

Supp. 2d 63, 66 (D.D.C 1999) (granting qualified immunity but recognizing that "a *Bivens* action

... has been held to be available to plaintiffs claiming violations of the First and Fourth

Amendments" against demonstrators); *Masel v. Barrett*, 707 F. Supp. 4, 11-12 (D.D.C. 1989)

(demonstrator's *Bivens* excessive force claim).

Regardless of whether these cases can show that the context is not "new" for purposes of

*Abbasi*, the D.C. Circuit's longstanding precedent recognizing *Bivens* remedies for First

Amendment claims, Fourth Amendment excessive force claims, and specifically claims under both

Amendments *by demonstrators*, show why no special factors counsel hesitation in recognizing

such claims. These decisions continue to bind this Court today, in the absence of contrary Supreme

Court authority. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871,

876 (D.C. Cir. 1992). And in terms of harm to national security, foreign affairs, or any of the other

reasons causing either the D.C. Circuit or the Supreme Court to hesitate in recognizing *Bivens*

claims, the sky has not fallen despite the decades-long and ongoing recognition of *Bivens* damages

claims in the protest context, including for activity near the White House, *see, e.g.*, *Hartley*, 918

F. Supp. 2d at 50-52, and at the Capitol, *see, e.g.*, *Dellums*, 566 F.2d at 173; *Lederman*, 131 F. Supp. 2d at 57, 63. Given that the D.C. Circuit has already recognized *Bivens* claims without finding that "special factors" counsel "hesitation" in the context of demonstrators' First and Fourth Amendment claims, refusing to recognize such a claim here would contravene Circuit precedent.

The contrast between the factual context of this case and those of the recent Supreme Court cases finding special factors counselling hesitation underscores how far apart this one is from those. Whereas *Abbasi* stressed caution in allowing judicially-created damages remedies as a means to change ongoing national security policy decisions made by high-ranking federal officials, 137 S. Ct. at 1860-63, it did not speak to any "special factors" pertaining to domestic political demonstrators seeking compensation for egregious violations of their First and Fourth Amendment rights when federal forces violently attacked and disbanded their peaceful demonstration. And whereas *Hernandez* refused to extend *Bivens* to a shooting across the international border because foreign affairs, national security, and congressional acts limiting remedies for foreigners on foreign soil counselled hesitation, 140 S. Ct. at 744-47, it did not invite courts to cut off remedies where U.S. citizens exercising core political freedoms on U.S. soil are met with gratuitous brutality by federal officers. And neither of these decisions instructs the lower courts to abdicate judicial responsibility for *every* claim where federal officials assert a national security interest, however attenuated. Quite the contrary: *Abbasi* specifically admonished against the knee-jerk invocation of security concerns to preclude a *Bivens* remedy, warning that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). Even more to the point here, the Court observed that danger of the "abuse" of this label is "heightened" in purely "domestic cases." *Id.*

Special factors that have recently caused the D.C. Circuit pause in applying *Bivens* are likewise far afield from this case. Although *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020), did involve a First Amendment *Bivens* claim, the plaintiff there sought damages for retaliatory administrative enforcement actions under the Financial Institutions Reform, Recovery, and Enforcement Act—a statute with its own detailed administrative enforcement scheme and circumscribed availability for judicial review. *See id.* at 384-85. The principle that a comprehensive alternative remedy forecloses *Bivens* is not new and has coexisted harmoniously for decades with this Circuit's *Bivens* jurisprudence regarding demonstrators' constitutional rights; indeed, the *Bivens* precedents most critical to the *Loumiet* holding were from the 1980s. *See id.* at 383-85; *accord Liff v. Office of Inspector Gen.*, 881 F.3d 912, 914-15 (D.C. Cir. 2018) (holding that comprehensive remedial scheme barred government contractor's suit against various government officials for reputational harm). And *Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015), which found that national security and foreign affairs counseled hesitation in allowing a claim concerning federal agents' actions with respect to a suspected terrorist in East Africa, is (literally) a world away from purely domestic law enforcement.

In sum, the special factors in those cases are all far removed from the contexts of *Dellums* and this case. They do not call into question Circuit precedent repeatedly recognizing *Bivens* First and Fourth Amendment claims by demonstrators and declining to find any special factors counseling hesitation in this field.

**B.  Presidential security and the other "special factors" invoked by LoCascio are misplaced here and do not overcome Circuit precedent.**

LoCascio argues that federal law enforcement officers' assault on demonstrators expressing their opposition to systemic racism and police brutality is impervious to a *Bivens* remedy because of national and presidential security concerns; what he thinks are Congress's own

views on the subject; hypothetical alternative remedies; and the bizarre argument that *Bivens* actions should not be allowed when too many officers have violated the Constitution at once. While some of these concerns may preclude *Bivens* claims in some circumstances, they have no bearing here. Stripping Plaintiffs of a remedy would abdicate the judicial responsibility to provide a check against the Executive branch and would authorize brutality with impunity.

LoCascio begins by invoking presidential security, but baldly asserting that the unprovoked attack on peaceful demonstrators was required by "presidential security" does not make it true. And on a motion to dismiss, a defendant's assertion that his actions were necessary because of facts beyond the complaint is entitled to no weight. That dispute is for summary judgment or trial, not a motion to dismiss. Heeding *Abbasi*'s warning not to permit "national-security concerns" to "become a talisman used to ward off inconvenient claims," 137 S. Ct. at 1862, and emulating *Abbasi*'s focus on the facts at issue rather than broad generalities, *see id.* at 1860 (considering "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack" rather than prison context generally), courts have not accepted security arguments blindly but rather assessed their relevance to the case at hand. *See Graber v. Dales*, 2019 WL 4805241, at *4 (E.D. Pa. Sept. 30, 2019) (allowing *Bivens* claim against Secret Service agent in connection with arrest outside 2016 Democratic National Convention because under the circumstances "the connection to national security is tenuous"); *Linlor v. Polson*, 263 F. Supp. 3d 613, 623 (E.D. Va. 2017) (allowing *Bivens* remedy where TSA officer used excessive force during security screening: "The question is not whether airports present

special security concerns—they do—but whether those concerns have any particular bearing on the context at issue in this case.").[5]

Here, the purported security justification for the actions Defendants took is, simply, a canard. There was no threat to the President posed by the protestors at Lafayette Square on June 1. The protestors were law abiding and peaceful. TAC ¶¶ 65-66. They were at Lafayette Square, not on the White House Lawn. The President was not even nearby when Defendants' attack occurred; he was in the Rose Garden making a speech. *See* TAC ¶ 61. There were no split-second decisions to be made. On the contrary, the *Defendants* were the aggressors who initiated the entire confrontation.  TAC ¶¶ 77-88. It cannot be the case that the mere invocation of "presidential security" as a justification for force can defeat a *Bivens* claim—if that were so, then every demonstrator on a public street or park in proximity to the White House would be subject to being viciously beaten and tear-gassed at the whim of federal officers. That is clearly wrong. Rather, sufficient deference to decisions made based on national security is embodied in the substantive First and Fourth Amendment standards themselves. *See, e.g.*, *Wood v. Moss*, 572 U.S. 744, 758-59 (2014); *Saucier v. Katz*, 533 U.S. 194, 208-09 (2001), *abrogated on other grounds, Pearson v. Callahan*, 555 U.S. 223 (2009). These standards apply, the D.C. Circuit has explained, even in the specific location of Lafayette Square, where officials must balance "First Amendment freedoms against safety requirements." *Quaker Action IV*, 516 F. 2d at 722. Thus, the Constitution itself

---

[5] Defendants Barr and Adamchik try to coopt *Graber* by citing the dictum from that case that "[t]he potential for chilling decisive action in the course of protecting Presidents would indeed give the Court pause." *See* ECF 127, at 9; ECF 138, at 10 (both quoting 2019 WL 4805241, at *5). But as the preceding sentence of *Graber* makes clear, the "decisive action" referred to there was "the life-or-death snap judgments that Secret Service agents must sometimes make while protecting high-level government officials." *Id*. No such snap judgments were involved here. At the time of LoCascio's actions, the President was still on the White House grounds. *See* TAC ¶ 61 (noting that the President was in the Rose Garden during the attack on the demonstrators).

provides ample latitude for federal officials to make security decisions and protect the President without the need for an extreme rule that federal officers can immunize their misconduct from judicial review merely by *invoking* a presidential security interest no matter the facts.

LoCascio suggests briefly that Congress must not have wanted a *Bivens* remedy in this circumstance, because it did not create one. LoC. MTD 8. Although the Supreme Court has credited that reasoning in other narrow contexts where "[c]ongressional interest has been frequent and intense," like September 11-related litigation, *Abbasi*, 137 S. Ct. at 1862 (cleaned up), LoCascio is wrong that similar reasoning holds here. First, LoCascio cites 42 U.S.C. § 1983, enacted in 1871, when Congress's primary concern was the protection of formerly enslaved individuals from violence that *state officials* either abetted or permitted. *See Monroe v. Pape*, 365 U.S. 167, 174-83 (1961), *overruled on other grounds, Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). That Congress did not consider then whether a cause of action was needed against *federal* officials proves nothing. Second, LoCascio cites the Federal Tort Claims Act, which actually undermines his point, as Congress implicitly endorsed the *Bivens* cause of action via its amendments to the FTCA in the 1970s and the Westfall Act in the 1980s. *See Tanzin*, 141 S. Ct. at 491; *Carlson*, 446 U.S. at 19-20 & n.5. One cannot infer congressional disapproval from its failure to enact a remedy it thought already existed—and that it twice implicitly endorsed.

LoCascio is also wrong that the possibility of injunctive relief counsels against applying *Bivens* here. If the mere ability to sue for injunctive relief foreclosed *Bivens*, then the alternative-remedies exception to *Bivens* would swallow the rule. One can always *seek* an injunction against threatened future conduct. *Abbasi*'s recognition that injunctive relief could provide an alternative remedy sufficient to foreclose *Bivens* was limited to a particular context: where "large-scale policy decisions" are being challenged. 137 S. Ct. at 1862. Here, Plaintiffs do not challenge a large-scale

34

policy—or any policy at all. Rather, Plaintiffs challenge the acts taken on this specific day against this specific group of protestors (the damages claims) and the implied threat to take similar actions in the future at the President's whim (the injunctive relief claims). Further, *Abbasi*'s brief discussion of alternative remedies for challenges to policies does not purport to supplant the thorough treatment of the alternative remedies question in *Minneci v. Pollard*, 565 U.S. 118, 129-30 (2012), which is cited in *Abbasi* and remains good law (and which LoCascio does not even discuss). *Minneci* instructs that in general, "alternative remedies" must "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations." 565 U.S. at 130. That standard is not remotely met here. Given the difficulty of obtaining injunctive relief in many cases because of the absence of demonstrable future harm (a point that federal official-capacity Defendants argue here, ECF 79-1, at 11-14), injunctive relief alone will often be insufficient to deter officials from unconstitutional acts. Additionally, injunctive relief would not provide "roughly similar compensation to victims," because it would provide no compensation at all. *See Aref v. Lynch*, 833 F.3d 242, 265 n.17 (D.C. Cir. 2016) ("Injunctive relief ... cannot provide relief for past harms."). While an alternative remedy need not be "perfectly congruent" with *Bivens*, *Minneci*, 565 U.S. at 129, injunctive relief here falls so short as not to counsel hesitation.

LoCascio's remaining "special factor" is downright bizarre. He posits that permitting a *Bivens* claim here would "put an onerous new burden on police officers" because Plaintiffs seek to name many officers. LoC. MTD 8-9. Put another way, LoCascio's view is that *Bivens* should not be available when *many* officers have acted unconstitutionally—that is, when deterrence of officer wrongdoing (the primary purpose of *Bivens*, *see, e.g.*, *Abbasi*, 137 S. Ct. at 1860; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69-70 (2001)), is most needed. LoCascio's argument

practically refutes itself; it would strike at the heart of *Bivens* by turning its core purpose into an argument to reject it. Alternatively, to the extent LoCascio is simply complaining that Plaintiffs are casting their net too widely, that is not an argument about *Bivens* but a repackaging of his threshold argument, refuted in Part I above, about which officers are proper defendants.

In sum, as Chief Justice Marshall recognized two centuries ago, it is the essence of the rule of law that rights be paired with remedies. *Marbury*, 5 U.S. at 163. Abdicating judicial responsibility for enforcing the Constitution would fail to deter a type of grave constitutional affront that is both at the core of *Bivens* and at the core of our democracy—unchecked governmental violence unleashed on those exercising their First Amendment right "peaceably to assemble, and to petition the Government for a redress of grievances."

## IV.   LoCascio Is Not Entitled To Qualified Immunity As To Plaintiffs' Claims Under 42 U.S.C. §§ 1985 & 1986 (Claims 5 & 6).

### A.   Plaintiffs adequately pleaded claims under 42 U.S.C. § 1985(3).

A § 1985(3) claim requires "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, … and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured ... or deprived of any right or privilege of a citizen of the United States." *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987) (citation omitted). LoCascio claims qualified immunity by disputing the presence of a conspiracy (the first element) and discriminatory intent (a component of the second element). He does not, however, dispute that Plaintiffs are protected by § 1985, that the rights violated are protected by § 1985, that Plaintiffs have alleged acts in furtherance of the conspiracy, or injury.

#### 1.   Plaintiffs adequately pleaded an agreement.

A conspiracy requires "agreement between two or more persons." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004)

(same conspiracy standard under § 1985(3) as civil conspiracy). LoCascio argues that the § 1985 claim must fail because Plaintiffs' allegations do not to show an agreement, but Plaintiffs "need not allege … an express or formal agreement." *United States v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014); *accord Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016). Instead, "courts have to infer an agreement from indirect evidence in most civil conspiracy cases." *Halberstam*, 705 F.2d at 486; *accord Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980). Plaintiffs need only allege facts that allow an "infer[ence] from the circumstances that the [conspirators] had a 'meeting of the minds.'" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-58 (1970), based on "[f]actors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity." *Halberstam*, 705 F.2d at 486. Indeed, LoCascio's main authority regarding the necessary showing for an agreement found that plaintiffs *had* stated a claim based on facts sufficient to "raise an inference" that the alleged conspiracy existed. *See Nanko Shipping, Guinea v. Alcoa, Inc.*, 330 F. Supp. 3d 439, 450 (D.D.C. 2018).

Agreement can be shown through circumstantial evidence, such as "the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; ... and other evidence suggesting unity of purpose or common design and understanding among conspirators to accomplish the objects of the conspiracy." *United States v. Wardell*, 591 F.3d 1279, 1287-88 (10th Cir. 2009) (cleaned up); *see also United States v. Wood*, 879 F.2d 927, 938 (D.C. Cir. 1989) (in criminal context, "[c]ircumstantial evidence, including inferences from a 'development and a collocation of circumstances,' suffices to prove participation in a conspiracy"). For instance, in *Lagayan*, this Court considered a § 1985 claim for human trafficking. 199 F. Supp. 3d at 24, 30-32. Like LoCascio, the defendants there asserted that plaintiff had "failed to allege any particulars ... showing that there was an agreement." *Id.* at 30 (internal

quotation marks omitted). The court rejected this argument, as a plaintiff is not required to allege "the existence of an event, conversation, or document" in which an agreement was reached, and even if such a requirement existed, the plaintiff there had satisfied it because the court could infer the existence of a conspiracy from the mere fact that the defendants had "coordinated Plaintiff's international travel to Defendants' home in the United States." *Id.* at 31. Here, likewise, there is ample circumstantial evidence that Defendants agreed to enter the conspiracy.

Even the barest description of the June 1 attack supports a reasonable inference "suggesting unity of purpose or common design and understanding among conspirators." *Wardell*, 591 F.3d at 1287-88 (cleaned up). LoCascio suggests that the allegations fail to identify a particular "meeting, discussion, or document," reflecting an agreement. LoC. MTD 12. But Plaintiffs have alleged that Defendant Adamchik "gave the immediate order for the law enforcement officers at the Square to attack the peaceably assembled protesters." TAC ¶ 20; *see also* TAC ¶¶ 82, 86, 87. In doing so, Adamchik necessarily communicated and coordinated with the other Defendants. The result, of course, was the coordinated charge by the federal and Arlington Defendants, TAC ¶¶ 83, 88, 99, including LoCascio, TAC ¶ 83—a charge that, given the allegations in the complaint, can be explained only by coordination among all the Defendants who acted together. Likewise, Plaintiffs have alleged that the various Defendants communicated and "coordinated" with each other, TAC ¶¶ 45, 76, 99, 107; that the federal and Arlington Defendants had a "command center" from which the attack was directed, TAC ¶¶ 45, 76, 99, 107; that the District and United States "regularly act[] in coordination" with each other, TAC ¶ 105; and that an MPD officer met with U.S. military officers in close proximity to and shortly prior to the attack, TAC ¶ 106. It is immaterial whether LoCascio met with any *particular* co-conspirators, because members of a conspiracy do not all need to meet each other to be co-conspirators. *See United States v. Jenkins*, 928 F.2d 1175, 1178

(D.C. Cir. 1991); *United States v. Speed*, 78 F. Supp. 366, 368 (D.D.C. 1948). The coordinated nature of the attack is further supported by the fact that tear gas was deployed ahead of officers advancing on foot and the fact that federal, D.C., and Arlington officers used the same type of force against protesters throughout the incident. TAC ¶¶ 141-43, 151, 160-63, 170-74, 186-90, 193. LoCascio errs in demanding from the complaint a level of specificity that courts have made clear is not required in conspiracy cases; the complaint provides ample basis to infer the necessary agreement, and that is enough.

Independently, LoCascio's acting in concert with other officers is sufficient to establish the existence of a conspiracy even without an explicit agreement because the necessary agreement for a conspiracy can be made in an instant—and implicitly. *United States v. Scott*, 979 F.3d 986 (2d Cir. 2020), affirmed convictions under § 1985's criminal analogue, 18 U.S.C. § 241. *See Griffin v. Breckenridge*, 403 U.S. 88, 98 (1971) (describing relationship between § 241 and § 1985(3)). In *Scott*, corrections officers were charged under § 241 for a group beating of an inmate. They claimed that there was no conspiracy because "the assault was spontaneous" and "there was insufficient evidence of an agreement." *Scott*, 979 F.3d at 990. The Second Circuit rejected this position, noting that there is no requirement of "an extended period of meditation or a distinct verbal agreement"; rather, "proof the parties had a tacit understanding to engage in the offense" is enough. *Id.* (citation and internal quotation marks omitted). Although one officer's "initial punch may have been spontaneous," the conspiracy could be established by evidence showing that "the other officers acted in concert and purposefully joined the assault." *Id.* Likewise, here, even if LoCascio and the other officers had acted without any explicit agreement, their decision to act in a coordinated manner to attack the protesters is sufficient to establish a conspiracy.

### 2. Plaintiffs adequately pleaded discriminatory intent.

Plaintiffs have pleaded facts sufficient to establish that all Defendants, including LoCascio, participated in a discriminatory conspiracy. Under § 1985(3), discriminatory intent exists if the conspiracy was targeted at plaintiffs because of their membership in a protected group. For example, in *Griffin*, plaintiffs stated a claim where they alleged defendants conspired to "prevent [the] plaintiffs and other Negro-Americans ... from seeking the equal protection of the laws and from enjoying ... equal rights" because of their race. 403 U.S. at 103.[6]

Plaintiffs are Black Americans and civil rights activists. TAC ¶¶ 65, 67, 94, 128, 138, 167, 246, 248. Those who, like Plaintiffs, advocate equal rights for Black Americans, regardless of their own racial identity, are a protected class under 42 U.S.C. § 1985(3). *Hobson v. Wilson*, 737 F.2d 1, 21 (D.C. Cir. 1984) (holding that "*[a]t a minimum ... section 1985(3) reaches conspiracies motivated by animus against Blacks and those who support them*"), *partially abrogated on other grounds, Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993).

LoCascio argues that Plaintiffs' claims fail for lack of an allegation that he shared President Trump's "animus" against Plaintiffs, LoC. MTD 12-13, but it is the *conspiracy*, not each individual *conspirator*, that must be "motivated" by a "discriminatory purpose." *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31 (D.D.C. 2016) (concluding that a § 1985(3) claim requires proof "that the *conspiracy* was 'motivated by some class-based, invidiously discriminatory animus'" (emphasis added) (quoting *Martin*, 830 F.2d at 258)); *see also Hobson*, 737 F.2d at 14 (explaining that "the

---

[6] *See also*, *e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993) (the conspiracy must have "selected or reaffirmed a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group"); *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 746 (10th Cir. 1980) ("In order to support a section 1985(3) claim, the plaintiff must be a member of a statutorily protected class, and the *actions taken by defendant must stem from plaintiff's membership in the class*." (emphasis added)).

alleged *conspiracy* in *Griffin* was motivated by racial basis" (emphasis added)); *Bedford v. City of Hayward*, 2012 WL 4901434, at \*14 (N.D. Cal. Oct. 15, 2012) (finding "no authority that Plaintiff must allege racial animus on behalf of each individual conspirator, rather than merely alleging 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" (quoting *Griffin*, 403 U.S. at 102)). "The conspirators must share the general conspiratorial objective, but they need not know all of the details of the plan … or possess the same motives .... [I]t simply must be shown that there was a single plan, the essential nature and general scope of which [were] known to each person who is to be held responsible for its consequences." *Hobson*, 737 F.2d at 51-52 (cleaned up).

LoCascio does not deny that Plaintiffs have amply alleged facts from which a discriminatory purpose on the part of President Trump can be inferred. In the "days and hours leading up" to the attack in Lafayette Square, President Trump "repeatedly advocated the use of force against Black demonstrators and civil rights activists," TAC ¶ 53; he invoked violent and racist slogans from the civil rights era, TAC ¶ 54; and he called for violence against "the bad guys" (referring to civil rights protesters), TAC ¶ 56. On June 2, he praised the law enforcement attack: "Great job done by all. Overwhelming force. Domination," TAC ¶ 205. Tellingly, President Trump spoke quite differently about demonstrators not advocating for racial justice. He urged his own supporters to gather at the White House. TAC ¶ 64. He expressed support for heavily armed and predominantly white demonstrators who threatened lawmakers and stormed statehouses to protest coronavirus restrictions, encouraging them to "LIBERATE MICHIGAN!"; "LIBERATE MINNESOTA!"; and "LIBERATE VIRGINIA." TAC ¶ 63. As discussed above, *see supra* Part

IV.A.1, Plaintiffs have adequately alleged that LoCascio joined this conspiracy, the object of which was President Trump's unlawful discriminatory purpose.[7]

Finally, LoCascio suggests that his responsibility for a discriminatory conspiracy can be negated where he was "simply following orders," LoC. MTD 13, but this Circuit has taken a dim view of such a defense, as have others. *See Wesby v. District of Columbia*, 765 F.3d 13, 29 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018); *accord, e.g., Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n. 5 (11th Cir. 2004))); *Busche v. Burkee*, 649 F.2d 509, 517 (7th Cir. 1981) (tracing invalidity of "just following orders" defense back to *Little v. Barreme*, 6 U.S. 170, 178–79 (1804) (Marshall, C.J.)). Where, as here, the defendant could not reasonably have believed his actions to be lawful, *see supra* Part II, "just following orders" is no defense. *See Wesby*, 765 F.3d at 28-29.

---

[7] If the Court deems these allegations insufficient, it should grant leave to amend, as Plaintiffs have unearthed additional information since filing the last amended complaint that further buttresses the claim of discriminatory intent. Specifically, undersigned counsel have been in contact with a former White House staffer who has personal knowledge that other senior Administration officials were involved with planning the Lafayette Square attack; that there was a discussion of the need to "mow down" the protesters and "show" them who is in charge; and that White House officials made discriminatory comments in relation to the death of George Floyd and subsequent racial justice protests. Plaintiffs are not attempting to amend the complaint via briefing; because these allegations are not a part of the complaint, Plaintiffs do not contend that they should be a basis to determine whether to dismiss the complaint. However, they do counsel in favor in granting leave to amend *if* any claims *are* dismissed.

**B.  Plaintiffs adequately pleaded claims under 42 U.S.C. § 1986.**

LoCascio argues first that Plaintiffs' § 1986 claim fails if Plaintiffs' § 1985 claim fails. LoC. MTD 13-14. Because Plaintiffs have stated a § 1985 claim, LoCascio's bid to dismiss the § 1986 claim on this ground must be rejected.

LoCascio's other objection to the § 1986 claim is that he did not have the ability to prevent or aid in preventing the attack on protesters. This argument is also meritless.

 For a 42 U.S.C. § 1986 claim, a plaintiff must show that (1) the defendant had actual knowledge of a § 1985 conspiracy; (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation; (3) the defendant neglected or refused to try to prevent a § 1985 violation; and (4) a § 1985 violation was committed. *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d. Cir. 1994). For the third element, "negligence is sufficient to maintain a § 1986 claim." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997); *accord Clark*, 20 F.3d at 1298.

The actions of Defendants here—the willful or negligent failure of law enforcement officers to attempt to stop violence carried out in violation of § 1985—are quintessential § 1986 violations. *See, e.g.*, *Park*, 120 F.3d at 1159-61 (alleging police did not adequately intervene to reduce or halt racially-motivated violence); *Clark*, 20 F.3d at 1296 (same); *Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984) (same); *Bergman v. United States*, 579 F. Supp. 911 (W.D. Mich. 1984) (federal government liable for failing to prevent racially motivated conspiracy against Freedom Riders).

Plaintiffs are not arguing that LoCascio personally could have halted the entire federal law enforcement attack. But defendants are not excused from liability for failing to intervene merely because their intervention may not have *completely* stopped or mitigated the conspiracy. The plain text of the statute imposes liability on those who had the "power to prevent *or aid in preventing*"

43

wrongs pursuant to a section 1985 conspiracy. 42 U.S.C. § 1986 (emphasis added). There are a number of actions that U.S. Park Police officers like LoCascio *could* have taken to mitigate the harm from the conspiracy. For example, he could have (1) refused to participate in the conspiracy; (2) urged other officers not to engage in violence against Plaintiffs; or (3) provided or urged other officers to provide medical assistance and avenues of escape to Plaintiffs fleeing the other Defendants' attacks. Any of these efforts would have reduced the harm of the § 1985 conspiracy. *See Symkowski v. Miller*, 294 F. Supp. 1214, 1217 (E.D. Wis. 1969) (§ 1986 claim could proceed where plaintiff claimed that two police officers failed to intervene to stop a beating by a third officer).[8]

## CONCLUSION

LoCascio's motion to dismiss should be denied. Because of the number and complexity of the arguments raised, Plaintiffs respectfully request oral argument.

---

[8] Although there is little case law under § 1986, courts enforce a similar requirement under § 1983 that police officers intervene to stop constitutional violations by other law enforcement officers. *See Gudger v. District of Columbia*, 74 F. Supp. 3d 47, 53 (D.D.C. 2014); *Fernandors v. District of Columbia*, 382 F. Supp. 63, 72 (D.D.C. 2005); *Masel v. Barrett*, 707 F. Supp. 4, 8 (D.D.C. 1989) ("Other circuits that have addressed the issue have uniformly found a constitutional duty for a police officer, particularly one in a supervisory capacity, to intervene affirmatively to prevent the violation of constitutional rights by another officer." (collecting cases)); *see also Martin v. Malhoyt*, 830 F.2d 237, 259 (D.C. Cir. 1987) (negligence claim available for failing to intervene).

February 24, 2021

Respectfully submitted,

/s/ Scott Michelman

Jon Greenbaum (D.C. Bar No. 489887)
Arthur Ago (D.C. Bar No. 463681)
David Brody (D.C. Bar No. 1021476)
Arusha Gordon (D.C. Bar No. 1035129)
Noah Baron (D.C. Bar No. 1048319)
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Megan Yan*
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800
smichelman@acludc.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Thomas D. McSorley (D.C. Bar No. 1001890)
Sonia Tabriz (D.C. Bar No. 1025020)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

Kaitlin Banner (D.C. Bar No. 1000436)
Tristin Brown (D.C. Bar No. 1671642)
Dennis Corkery (D.C. Bar No. 1016991)
Jonathan Smith (D.C. Bar No. 396578)
Washington Lawyers' Committee for Civil
    Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

*Not a D.C. Bar member; practicing under
supervision pursuant to D.C. App. R. 49(c)(8A)

Counsel for Plaintiffs

45