UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., et al.,<br>*Plaintiffs*,<br>v.<br>WILLIAM P. BARR, et al.,<br>*Defendants*. | Case No. 1:20-cv-01469-DLF<br>Consolidated with No. 20-01542 (DLF) |

**PLAINTIFF'S REPLY IN SUPPORT OF OBJECTION TO WESTFALL ACT CERTIFICATION**

As Plaintiff Black Lives Matter D.C. has shown, the text of the Westfall Act, the historical meaning of the concept it invokes, and several standard canons of statutory interpretation all point to one conclusion: When Congress legislated to preserve claims "brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), it preserved such claims regardless of whether the cause of action was *Bivens* or the state and local law claims that have historically served to vindicate constitutional rights against federal officials. Defendants' primary response is to assert that Plaintiff's reading has already been rejected by prior decisions. *See* ECF 229, U.S. Memo. in Resp. to Obj'n to Westfall Cert. ("U.S. Memo.") 2, 1-16; ECF 228, LoCascio Resp. to Pl.'s Memo. of Law ("LoC. Resp.") 7-9. But almost none of the authorities on which Defendants rely spoke to—or, indeed, remotely considered—the argument laid out by Judge Walker and pressed by Plaintiff here. Cases do not speak authoritatively on propositions they merely assume or that "lurk in the record." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004).

This is an issue of first impression in this circuit, and largely in the country. And it is entirely understandable that courts have rarely addressed this argument, as the past few years have

seen the significant contraction of permissible *Bivens* claims; thus, during most of the Westfall Act's history, there was no need to make the argument, and it does not appear that other litigants did so. Defendants cite only four district court opinions (two by the same judge) that actually considered the theory. Each of these judges considered the theory within the past year, and although they rejected it, they did so largely based on the same drive-by dicta cited by Defendants here; in fact, one of the judges acknowledged that the Westfall Act's text *supports* Plaintiff's view. *See Mellein v. United States*, 2024 WL 1601802, at *5 (C.D. Cal. Mar. 14, 2024).

As the Supreme Court has instructed, a court's job is to apply statutes based on their text, appropriately understood in light of history, rather than to fear breaking new ground. The Supreme Court has repeatedly confronted choices between entrenched, non-text-based interpretations of statutes and interpretations that hew closely to the statutory language enacted by Congress. However unexpected or novel the result, the latter approach has prevailed every time, because the judiciary's role is to be a faithful agent of Congress in applying statutory text.

Turning to the text here, there is no contest between Plaintiff's reading and Defendants'. Whereas Plaintiff has provided a detailed, historically grounded account of the meaning of the language in § 2679(b)(2)(A), Defendants never explain *why* the statutory text should be artificially narrowed in the way they urge; indeed, Defendants barely discuss the text at all. Defendants ignore two centuries' worth of history reflecting the use of state and local tort law as a bulwark against constitutional abuses. And Defendants ignore the constitutional avoidance and anti-derogation canons of interpretation favoring Judge Walker's reading. Instead, Defendants appeal to statutory purpose and legislative history, but the authoritative indicator of what Congress meant to accomplish is the statutory text it enacted. On that fundamental point, Defendants simply have no answer.

When the Court cuts through Defendants' inapposite authorities and focuses on the merits of the statutory construction issue presented, it should adopt Plaintiff's and Judge Walker's reading of the Westfall Act, and hold that the D.C. First Amendment Assemblies Act is a vehicle by which a plaintiff can seek redress for constitutional violations, as permitted by the statutory text Congress enacted.

## ARGUMENT

### I. The Court Should Apply the Statutory Text As Written.

The central theme of Defendants' briefs in support of Westfall Act certification is that the novelty of Plaintiff's argument dooms it, and Defendants cite various authorities that glancingly touch on—without ever squarely considering, much less deciding—the question presented here. Defendants' approach is misguided: the cardinal sin of statutory interpretation is not novelty but inattention to statutory text, and cases do not stand for propositions not squarely considered regarding issues not raised.

#### A. Statutory interpretation is about faithfully applying text, not avoiding novel readings.

A court's most basic duty in interpreting a statute is to apply the text. *See, e.g., Bostock v. Clayton Cnty.*, 590 U.S. 644, 683 (2020); *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012); *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004).

The pages of the U.S. Reports are replete with examples in which a rigorous focus on statutory or constitutional text and history yielded conclusions that courts had earlier rejected. For instance, in *Bostock*, 590 U.S. 644, the Court held that the statutory phrase "because of . . . sex" in Title VII should be interpreted according to its plain meaning—even if the words proscribed forms of sex-based discrimination that the authors did not foresee. As between fearing novelty and adhering to text, the Court chose the latter in no uncertain terms:

> Title VII's effects have unfolded with far-reaching consequences, some likely beyond what many in Congress or elsewhere expected. But . . . [o]urs is a society of written laws. Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations. In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law.

*Id.* at 683.

Likewise, in choosing between an atextual judicial gloss on a statutory phrase and the meaning of the phrase itself, the Court has made clear that the text must prevail. In *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), the Court overruled decades' worth of circuit precedent adding a "heightened threshold of harm" requirement to Title VII, because the statutory text "imposes no such requirement" in prohibiting discrimination as to "terms [or] conditions" of employment. *Id.* at 973-74; *see id.* at 973 n.1 (cataloguing breadth of prior circuit adherence to the heightened requirement). To adhere to the widespread circuit rule, the Court admonished, would be "to add words . . . to the statute Congress enacted." *Id.* at 974. Thus, the fact that courts—even a majority of courts—have failed to pay sufficient attention to statutory language does not justify departing from that language. *See also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602 & n.3, 605-06 (2001) (resolving lopsided circuit split about the meaning of federal statutory fee-shifting language in favor of the position adopted by just one circuit, because the minority position was the one that heeded the meaning of the statutory text); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95, 98 (2003) (interpreting federal statute's evidentiary requirement in line with the views of a single circuit, despite the weight of contrary circuit authority, because of the statute's text).

Additionally, text must be interpreted in light of history, even where the results are significantly different from what courts previously understood. That is a key lesson of *District of Columbia v. Heller*, 554 U.S. 570 (2008), which applied a fresh analysis of the Second Amendment's text, in light of its history, to break with longstanding interpretations that had failed to recognize individual rights. *See id.* at 578-605; *cf. id.* at 637-38 & n.2 (Stevens, J., dissenting) (reflecting prior judicial consensus). Another example in the same vein is *Apprendi v. New Jersey*, 530 U.S. 466 (2000), where careful attention to the Sixth Amendment's jury-trial requirement and its historical meaning, *see id.* at 476-83, prompted a revolution in federal sentencing law based on an understanding of the Sixth Amendment that had escaped courts previously, *see id.* at 490 (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

The lesson of these examples is plain: In statutory interpretation, a court's goal should be to discern the most faithful reading of statutory text, not to count lower-court noses or reflexively reject a reading based on its novelty. Although Defendants mean it as a pejorative, their characterization of Plaintiff's interpretation as "hiding in plain sight," U.S. Memo. 17, puts it in fine company, alongside Supreme Court readings of statutory and constitutional provisions whose text and history had previously received insufficient attention.

**B. Cases do not stand for propositions they did not consider.**

Defendants' bevy of citations provides them scant support, as virtually none of Defendants' cases considered, decided, or even contemplated the argument now before this Court.

For instance, Defendants claim that *United States v. Smith*, 499 U.S. 160 (1991), supports their reading of § 2679(b)(2)(A) over Plaintiff's, *see* U.S. Memo 11-12; LoC. Resp. 8-9, but *Smith*

never considered, much less ruled on, the argument Plaintiff advances here. The scope of § 2679(b)(2)(A) was not at issue in *Smith*, which involved a garden-variety medical malpractice claim, not a claimed constitutional violation. *See* 499 U.S. at 162. Defendants stress that *Smith* described § 2679(b)(2)(A) as applying to "a *Bivens* action," 499 U.S. at 166, but *Smith* did not say "*only* a *Bivens* action" or otherwise opine on the issue presented here. Defendants also cite *Smith* for the point that the Court should not read "additional exceptions" into the Westfall Act beyond those enumerated in § 2679(b)(2)(A), U.S. Memo. 11; LoC. Resp. 9, but that principle—with which Plaintiff has no quarrel—likewise does not resolve the question before this Court now. Unlike the *Smith* plaintiff's proposed "additional exception" for tort claims falling within the *exclusions* from the FTCA under 28 U.S.C. § 2680(k), *see* 499 U.S. at 167 (refusing to infer exception for circumstances "when a suit is barred under the FTCA"), Plaintiff here asks not for an *additional* exception but for the Court to apply the full scope of an exception ("brought for a violation of the Constitution") that Congress enacted in the statutory text.

Like *Smith*, the government's other authorities describing § 2679(b)(2)(A) in terms of *Bivens*, *see* U.S. Memo. 2, 12 (discussing *Hui v. Castaneda*, 559 U.S. 799 (2010); and *Hernandez v. Mesa*, 589 U.S. 93 (2020), along with *Smith*), did not consider, and therefore shed no light on, the question before the Court here. The same is true of cases assuming without analysis that no common law claims can be invoked against federal officers, *see* U.S. Memo. 2, 14 (discussing *Minneci v. Pollard*, 565 U.S. 118 (2012)), or accepting, without analysis of the theory Plaintiff asserts here, the substitution of the United States as defendant for state-law claims asserted in parallel with *Bivens* claims, *see* U.S. Memo. 15-16 (citing *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71 (1st Cir. 2005); *Simpkins v. D.C. Gov't*, 108 F.3d 366 (D.C. Cir. 1997); *Sudnick v. Dep't of Def.*, 474 F. Supp. 2d 91 (D.D.C. 2007); and *Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008)).

"Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents," *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (citation and internal quotation marks omitted), "and no resolution of them may be inferred." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979); *accord, e.g., Bismullah v. Gates*, 551 F.3d 1068, 1071 (D.C. Cir. 2009) (question remained open where it "was not presented, granted, or briefed and the Court had no occasion to decide it"); *United States v. Askew*, 529 F.3d 1119, 1148 (D.C. Cir. 2008) (Griffith, J., concurring) ("[T]he Supreme Court 'does not decide important questions of law by cursory dicta inserted in unrelated cases[.]'" (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968))); *see also Thomas v. Clements*, 797 F.3d 445, 448 (7th Cir. 2015) (Easterbrook, J., concurring in denial of rehearing) (noting that "an unreasoned assertion on which no one had focused" is "the judicial equivalent of a rumor chain").

It is not surprising that the authorities on which Defendants focus did not consider the issue now before this Court. There is no indication that the argument was raised in any of those cases, and all but one predated the initial exposition of Plaintiff's theory in Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the Bivens Question*, 161 U. Pa. L. Rev. 509 (2013). Indeed, before the significant contraction of *Bivens* beginning in *Ziglar v. Abbasi*, 582 U.S. 120 (2017), and accelerating in *Egbert v. Boule*, 596 U.S. 482 (2022), plaintiffs suing federal officers who violated their constitutional rights would have had no reason to argue it.[1]

[1] Although the Supreme Court had rejected a number of specific *Bivens* actions between 1980 and 2017, they either involved the military, *see Chappell v. Wallace*, 462 U.S. 296, 305 (1983); *United States v. Stanley*, 483 U.S. 669, 683 (1987); a statute providing an alternative remedial scheme for the situation at issue or foreclosing a specific type of claim, *see Bush v. Lucas*, 462 U.S. 367, 368 (1983); *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988); *Hui*, 559 U.S. at 802; or edge cases

Other than Judge Walker, only three judges have actually addressed Plaintiff's theory, and their opinions contain no reasoning that should give this Court pause regarding the theory; in fact, they provide some support for it. Judge Klausner, in *Mellein v. United States*, 2024 WL 1601802 (C.D. Cal. Mar. 14, 2024), and *Pearsons v. United States*, 2024 WL 1826472 (C.D. Cal. Mar. 14, 2024), recognized that the text of the Westfall Act *supports* Plaintiff's position—"the language of § 2679(b)(2)(A) broadly suggests that any action brought for Constitutional violations may escape the FTCA's exclusivity," *Mellein*, 2024 WL 1601802, at *5; *Pearsons*, 2024 WL 1826472, at *5—but discounted the text based on the same dicta from *Smith* cited by Defendants here (which Plaintiff addresses above), and shied away from Judge Walker's concurrence as not definitive and not binding. *See Mellein*, 2024 WL 1601802, at *5; *Pearsons*, 2024 WL 1826472, at *5. Judge Orrick likewise rejected the theory based on *Smith*. *See Quinonez v. United States*, 2023 WL 5663156, at *3 (N.D. Cal. Aug. 30, 2023). Judge Lawson expressed concern that Judge Walker's "reasoning has not caught on elsewhere," *Pompy v. Moore*, 2024 WL 845859, at *12 (E.D. Mich. Feb. 28, 2024), before ultimately dispensing with the common law claim before him on the basic ground that it did not satisfy the elements of the relevant tort, *see id.* at *13.

In sum, the question of statutory interpretation Plaintiff raises here is wide open. The Court should use ordinary principles of statutory construction to answer it as a matter of first impression.

---

seeking expansions of *Bivens* beyond its core of constitutional violations by federal officers. *See FDIC v. Meyer*, 510 U.S. 471, 484 (1994) (rejecting *Bivens* liability for federal agencies); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001) (rejecting *Bivens* liability for private corporations); *Wilkie v. Robbins*, 551 U.S. 537, 562 (2007) (rejecting *Bivens* claim for novel theory of governmental retaliation vis-à-vis property rights); *Minneci*, 565 U.S. at 120 (rejecting *Bivens* liability for private contractors).

## II. Defendants Provide No Textual Basis To Limit the Westfall Act's Carveout to *Bivens* Claims Only.

Plaintiff has provided a detailed analysis of how the statutory text, viewed in light of history, context, and traditional canons of interpretation, leads to the conclusion that the Westfall Act's preservation of claims "brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), applies to all claims of this type, not merely claims invoking the *Bivens* cause of action. For their part, Defendants say virtually nothing about the statutory text, do not dispute the historical understanding of that text Plaintiff has laid out, mostly ignore statutory canons, and fail to grapple seriously with the implausibility of their reading of the statute.

Regarding text, Defendants proceed as if the statutory language "brought for a violation of the Constitution" were actually "brought *under* the Constitution," without ever explaining why that should be so in light of the specific words Congress chose. Other than citing cases that did not consider this question, *see* Part I.B above, Defendants provide no reason to depart from the undisputed historical meaning of those words—which, for most of our Nation's history, referred *only* to state law claims brought to vindicate constitutional rights. *See* ECF 226, Pl.'s Memo. in Support of Obj'n to Westfall Act Cert. ("Pl.'s Memo.") 8-10. Defendants also do not answer the point that Congress easily could have chosen statutory language to limit § 2679(b)(2)(A) to *Bivens* claims but did not do so. *See id.* at 11-12, 15. The Supreme Court has admonished time and again that reading absent words into a statute is impermissible: "[I]t is never [courts'] job to rewrite a constitutionally valid statutory text." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017); *accord, e.g.*, *Bostock*, 590 U.S. at 669; *Lamie*, 540 U.S. at 538.

Defendants also largely fail to contend with the interpretive canons supporting Plaintiff's reading of the statute. Defendants provide no answer regarding either the "presumption favoring the retention of long-established and familiar principles" of the common law, *United States v.*

*Texas*, 507 U.S. 529, 534 (1993) (citation and internal quotation marks omitted), or the canon of constitutional avoidance. *See* Pl.'s Memo. 15-18. Although government briefly addresses the elephants-in-mouseholes canon, it identifies the wrong "elephant." Rather than answer Plaintiff's (and Judge Walker's) question as to why Congress should be understood to have eliminated a centuries-old check on federal constitutional violations sub silentio, *see* Pl.'s Memo. 14-15, Defendants claim that Plaintiff's reading—i.e., the *preservation* of traditional authority—is the unexpected result that Congress would not "hide." U.S. Memo. 16-17. The government never explains why preserving the status quo is an "elephant" for purposes of this canon, and there is no reason it should be: Congress does not have to legislate *at all* to preserve the law as it already exists, so courts should not hesitate to read statutes as consistent with the preexisting state of the law. That point dovetails with the requirement of a clear statement to displace the common law, *see* Pl.'s Memo. 15-16—which, again, Defendants do not address.

Defendants likewise have little to say in response Plaintiff's point that reading § 2679(b)(2)(A) to preclude traditional, common-law constitutional enforcement would create the implausible result that the provision preserves claims for only the three specific factual scenarios that happened to come before the Supreme Court in its first three *Bivens* cases. *See* Pl.'s Memo. 12-14. In fact, the government effectively concedes that, under its view, the clause's facially broad language preserving claims "brought for a violation of the Constitution" really just means "brought for a violation of the Constitution's Fourth Amendment via a warrantless home search by federal narcotics officers, the equal protection component of the Fifth Amendment via employment discrimination on the basis of sex, or the Eighth Amendment via a denial of a medical care at a federal prison." *See* U.S. Memo. 17 (identifying only these three contexts as having been preserved by the § 2679(b)(2)(A)). Plaintiff noted in its opening brief that it is "aware of no instance in which

Congress enacted statutory language prescribing a rule for a broad category of claims, and yet was deemed to have limited that rule to a tiny fraction of claims in that category without saying so." Pl.'s Memo. 14. Apparently, Defendants are not aware of such a statute either, because they muster no examples—nor any support for reading the words of § 2679(b)(2)(A) in such an atextually limited manner.

Instead, Defendants attempt to reassure the Court that their reading is not as strange as it appears because the FTCA's other provisions provide redress for a swath of constitutional violations. *See* U.S. Memo. 17-18. But the question before the Court here is the meaning of § 2679(b)(2)(A) specifically, so the point is not what the rest of the FTCA accomplishes but what that provision does. It remains a mark against Defendants' reading that, in their view, § 2679(b)(2)(A) would preserve virtually no claims, with the result that remedies for any number of serious constitutional violations would be foreclosed, *see* Pl.'s Memo. 17-18 (citing examples involving race discrimination, seizure of First Amendment-protected media, restrictions on religious exercise, and quarantine detentions)—as Defendants do not dispute. In deriding this argument as "results-based reasoning," U.S. Memo. 17, Defendants mistake Plaintiff's point. Plaintiff does not claim that these concerns could overcome clear text supporting Defendants' position. Rather, because text, history, and the canons of construction all point in the *opposite* direction from Defendants' interpretation, the implausibility of their reading provides an additional reason to doubt that Congress meant to do something so bizarrely limited, without a word of statutory text suggesting it. *See Bostock*, 590 U.S. at 669 (rejecting the view that "Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception"); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) (courts "do not

lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply").

In sum, the Court should hold that the text means what it says, as understood in light of history: In § 2679(b)(2)(A), Congress preserved all actions "brought for a violation of the Constitution"—including not just *Bivens* actions but also the state and local law actions that traditionally served this function.

## III. Legislative History and Purpose Do Not Undermine the Meaning of the Text.

The government repeatedly relies on Congress's purported goals in passing the Westfall Act. *See* U.S. Memo. 10, 12-13 & n.2 (discussing the legislative history), *id.* at 16 (deriding Plaintiff's interpretation of the statute as "wholly contrary to the Westfall Act's purpose"). But "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation and internal quotation marks omitted); *accord Bostock*, 590 U.S. at 675-76 (rejecting appeal to legislators' expectations as a basis to override textual command). And appeals to purpose cannot displace the command of the text: "[W]hatever degree of confidence about congressional purpose one derives from the legislative history, that purpose must find expression 'within the permissible limits of the language' before it can be given effect." *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 495 (D.C. Cir. 2004) (Roberts, J.) (quoting Henry J. Friendly, Benchmarks 216 (1967)).

Even if purpose or legislative history were considered here, it would not aid Defendants. The government correctly notes that the purpose of the Westfall Act was to overrule the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988), *see* U.S. Memo. 10, but the government ignores what that decision was about—an ordinary, garden-variety negligence claim without

constitutional implications. *See* Pl.'s Memo. 6-7. Thus, Congress' decision to preserve all claims "brought for a violation of the Constitution," not just *Bivens* claims, is not at odds with that purpose.

Moreover, the snippets of legislative history the government cites actually support Plaintiff's reading of the carveout provision by showing that the bill's sponsors were familiar with the *Bivens* decision and thus could have crafted language to specify that the carveout preserved only *Bivens* claims and no others. *See* Pl.'s Memo. 15. The fact that they did not underscores Plaintiff's central point: The Court should not read limitations into § 2679(b)(2)(A) that the text does not identify.

## IV. Plaintiff's First Amendment Assemblies Act Claims Are "Brought for a Violation of the Constitution."

Defendants' final set of arguments—that, even if Plaintiff's reading is correct, the FAAA claims here are not "brought for a violation of the Constitution"—assails a straw man. Liberally employing italicized quotations from Plaintiff's papers, Defendants stress that FAAA claims are not brought under the Constitution itself. *See* U.S. Memo. 19-21; LoC. Resp. 4-6. This supposed "gotcha" point misconstrues Plaintiff's argument. *Of course* Plaintiff's FAAA causes of action themselves are not constitutional; if they were, they would be *Bivens* claims, which have been rejected in this case already. Plaintiff now brings D.C. law claims "for a violation of the Constitution" in the traditional manner dating back to the Founding. *See* Pl.'s Memo. 8-12, 19-21. Thus, the relevant question is not whether Claims 13 and 14 are "constitutional" claims—no one argues that they are—but whether they are "brought for a violation of the Constitution" within the meaning of the Westfall Act, 28 U.S.C. § 2679(b)(2)(A).

Plaintiff has explained why, as a matter of text and history, claims invoking implied causes of action in statutes that enforce constitutional rights, and negligence per se claims to enforce that

same type of statute, are claims "brought for a violation of the Constitution." Pl.'s Memo. 11. Once again, Defendants have no answer to this history. They simply declare, in conclusory fashion, the point they must prove. *See* U.S. Memo. 21 (asserting, without explanation or elaboration: "That a statutory cause of action includes or incorporates as an element conduct that also happens to violate the Constitution does not transform the action into one that is 'brought for violation of the Constitution' as that phrase is used in the Westfall Act.").

The Court can quickly dispense with the government's argument that the FAAA cannot apply to federal actors because of the Home Rule Act provision barring the D.C. Council from "enact[ing] any act . . . which concerns the functions or property of the United States." D.C. Code § 1-206.02(a)(3); *see* U.S. Memo. 21. As the D.C. Court of Appeals and this Court have held, "[t]he term 'federal function' is narrowly construed and only pertains to those activities that explicitly impact the federal government's ability to operate." *Myerson v. United States*, 98 A.3d 192, 197 (D.C. 2014); *accord Thomas v. Securiguard Inc.*, 412 F. Supp. 3d 62, 75 (D.D.C. 2019) (provision "proscribe[s] laws with potential national implication"); *District of Columbia v. Greater Wash. Cent. Labor Council*, 442 A.2d 110, 116 (D.C. 1982) (provision "withhold[s] from local officials the authority to affect or to control decisions made by federal officials in administering federal laws that are national in scope"). The provision does not bar the D.C. Council from enacting local laws pertaining to the District of Columbia that may produce a local effect on federal officers or property. *See Myerson*, 98 A.3d at 195, 198 (D.C. traffic laws could be enforced by Park Police

on the National Mall); *Thomas*, 412 F. Supp. 3d at 68, 75 (D.C. antidiscrimination law applicable at the Thurgood Marshall Federal Judiciary Building).[2]

Finally, Defendant LoCascio's argument that the FAAA does not apply to federal actors suffers from the same flaws as Defendants' other points: it ignores statutory text. Defendant LoCascio argues that because the general purpose of the FAAA was to regulate the conduct of the D.C. Metropolitan Police Department ("MPD"), none of the FAAA's provisions applies to federal officers. LoC. Resp. 5-6. That is a non sequitur, and the text of the FAAA shows why. Whereas some of the FAAA's provisions do specifically regulate the conduct of the D.C. police,[3] the specific provision on which Plaintiff relies here is more general in nature and does not mention MPD. It provides in full: "No time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly, or on factors such as the attire or appearance of persons participating or expected to participate in an assembly, nor may such restrictions favor non-First Amendment activities over First Amendment activities." *Id.* § 5-331.04(c). The D.C. Council knew how to limit the entities it regulated, and in the viewpoint-discrimination provision at issue, it did not do so.

[2] The single line the government quotes from an Office of Legal Counsel analysis, U.S. Memo. 21, could not overcome the views of the D.C. Court of Appeals and this Court, and in any event does not conflict with the claims Plaintiff makes here, which—taking the well-pleaded allegations of the Fourth Amended Complaint as true—is about a viewpoint-based dispersal of peaceful demonstrators, *see* ECF 213, ¶¶ 44-58, 198, 207, not the "congressionally-mandated function of protecting the President." *Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. U.S. Off. Legal Counsel 109, 117 (1995), *at* https://www.justice.gov/olc/file/626891/dl?inline. Further, any hypothetical Home Rule Act conflict that depends on disputed facts should be resolved by summary judgment or trial, not on a motion to dismiss.

[3] *See, e.g.*, D.C. Code § 5-331.07(d) ("The MPD shall not issue a general order to disperse to participants in a First Amendment assembly except where . . . ."); D.C. Code § 5-331.14(c)(1) ("The MPD shall allow media representatives reasonable access to all areas where a First Amendment assembly is occurring.").

Tellingly, Defendant LoCascio's main case purporting to show inapplicability of the FAAA to federal officers broadly, *Ochs v. District of Columbia*, 258 A.3d 169 (D.C. 2021), was about a provision that—unlike the one at issue here—explicitly regulates MPD. *See id.* at 172. Recognizing this point, the D.C. Court of Appeals made clear it was not reaching the question Defendant LoCascio claims that it decided: "The District of Columbia argues broadly that none of the provisions of the FAAA apply to the Capitol Police and that the Council lacks authority to enact legislation regulating the Capitol Police. We need not reach those arguments, because it suffices for current purposes to hold more narrowly that the two specific provisions at issue do not apply to the Capitol Police." *Id.* Defendant LoCascio engages in similar sleight of hand when he contends that "D.C. Code § 5-331.04, which the plaintiffs rely upon, says that *MPD* can 'enforce reasonable time, place, and manner restrictions on First Amendment assemblies,' but prohibits such restrictions if 'based on the content of the beliefs expressed.'" LoC. Resp. 5. Whereas the first subsection of the provision he cites does refer to MPD, the second—on which Plaintiff relies here—does not. *Compare* D.C. Code Ann. § 5-331.04(b) (enumerating restrictions on First Amendment assemblies that "[t]he MPD may enforce"), *with id.* § 5-331.04(c) (viewpoint-discrimination provision; no mention of MPD). Once again, legislative history cannot trump text, and courts are not in the business of concocting limits to clear statutory text.

## CONCLUSION

Adhering to the meaning of the Westfall Act's statutory text, as supported by history and traditional canons of construction, the Court should reject the government's Westfall Act certification.

Dated: June 10, 2024

Respectfully submitted,

/s/ Scott Michelman
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
Joy Holden (D.C. Bar No. 90021283)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
smichelman@acludc.org

Kaitlin Banner (D.C. Bar No. 1000436)
Dennis Corkery (D.C. Bar No. 1016991)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
(202) 319-1000
kaitlin_banner@washlaw.org

David Brody (D.C. Bar No. 1021476)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600
dbrody@lawyerscommittee.org

John A. Freedman (D.C. Bar No. 453075)
David E. Kouba (D.C. Bar No. 483145)
Sonia Tabriz (D.C. Bar No. 1025020)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20004
(202) 942-5000
John.Freedman@arnoldporter.com

*Counsel for Plaintiffs*[4]

[4] Counsel wish to acknowledge the assistance of paralegal Ameerah Adetoro in the preparation of this brief.