## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RADIYA BUCHANAN, et al., | **Case No. 20-cv-1469-DLF** |
| *Plaintiffs*, | **(Lead Action)** |
| v. | **Case No. 20-cv-1542-DLF** |
| DONALD J. TRUMP, et al., | **ORAL ARGUMENT** |
| *Defendants*. | **REQUESTED** |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S NOTICE OF SUBSTITUTION

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.    The President Is Not an "Employee of the Government" ................................... 2

    A.    The FTCA's Definition of "Any Employee of the Government" Does Not
Apply to the President........................................................................................ 2

    B.    The Plain Meaning of the Term "Employee" Does Not Encompass the
President...........................................................................................................11

II.    Even If Trump Were an "Employee of the Government," He Acted Outside the Scope
of His Employment......................................................................................... 14

    A.    Directing Law Enforcement to Violently Disperse Peaceful Protesters Is Not
the Kind of Conduct Trump Was "Employed" to Perform ............................. 14

    B.    Trump's Actions Were Not Actuated by a Purpose to Serve His Employer ... 20

III.    Alternatively, This Court Should Grant Plaintiffs Limited Jurisdictional Discovery
Regarding the Scope of Trump's Actions ................................................... 22

CONCLUSION............................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Tamimi v. Adelson*,
264 F. Supp. 3d 69 (D.D.C. 2017), *rev'd and remanded*, 916 F.3d 1 (D.C. Cir. 2019) .................................................................................................................... 9

*Alexander v. F.B.I.*,
691 F. Supp. 2d 182 (D.D.C. 2010), *aff'd*, 456 F. App'x 1 (D.C. Cir. 2011) ........................... 9

*Ali Jaber v. United States*,
155 F. Supp. 3d 70 (D.D.C. 2016), *aff'd*, 861 F.3d 241 (D.C. Cir. 2017) ............................... 6

*Armstrong v. Thompson*,
759 F. Supp. 2d 89 (D.D.C. 2011) ................................................................................ 16, 20

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ...................................................................................................... 8

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*,
515 U.S. 687 (1995) ...................................................................................................... 9

*\*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) .............................................................................. 17, 18, 19, 21

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .................................................................................................... 11

*Buckner v. CONSOL Energy Inc.*,
2024 WL 2382941 (D.D.C. May 23, 2024) ..................................................................... 18

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022) ................................................................................. 5, 11, 12

*Clackamas Gastroenterology Assocs. v. Wells*,
538 U.S. 440 (2003) .................................................................................................... 11

*Clinton v. Jones*,
520 U.S. 681 (1997) .................................................................................................... 18

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) .................................................................................................... 11

*Corley v. United States*,
556 U.S. 303 (2009) ...................................................................................................... 9

*Council on Am. Islamic Relations v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006) ...................................................................................... 15

*Davis v. United States*,
196 F. Supp. 3d 106 (D.D.C. 2016) ...............................................................22, 23

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ...............................................................................................4

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ...............................................................................................8

\**Hicks v. Off. of the Sergeant at Arms for the U.S. Senate*,
873 F. Supp. 2d 258 (D.D.C. 2012) ...............................................................16, 18, 22

*Kissinger v. Reps. Comm. for Freedom of the Press*,
445 U.S. 136 (1980) ...............................................................................................8

*Klayman v. Obama*,
125 F. Supp. 3d 67 (D.D.C. 2015) ...........................................................................6

*LePatourel v. United States*,
571 F.2d 405 (8th Cir. 1978) ....................................................................................7

*Levin v. United States*,
568 U.S. 503 (2013) ...............................................................................................3

*McNamara v. United States*,
199 F. Supp. 879 (D.D.C. 1961) .............................................................................7, 8

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) ..............................................................................................19

*Myers v. U.S.*,
272 U.S. 52 (1926) ................................................................................................12

*Penn Central Transportation Co. v. Reddick*,
398 A.2d 27 (D.C. 1979) .......................................................................................16

*Phillips v. Mabus*,
894 F. Supp. 2d 71 (D.D.C. 2012) ..........................................................................22

*Saleh v. Bush*,
848 F.3d 880 (9th Cir. 2017) ....................................................................................5

*Stenberg v. Carhart*,
530 U.S. 914 (2000) ...............................................................................................3

*Stokes v. Cross*,
327 F.3d 1210 (D.C. Cir. 2003) ...........................................................................17, 18

*Stone v. I.N.S.*,
514 U.S. 386 (1995) ...............................................................................................9

*Thorpe by Castleman v. CERBCO, Inc.*,
676 A.2d 436 (Del. 1996) ......................................................................................12

*_Trump v. Carroll_,
   292 A.3d 220 (D.C. 2023) ..................................................14, 17, 20, 21, 22, 23

_Trump v. Mazars USA, LLP_,
   591 U.S. 848 (2020)........................................................................................2

_Trump v. United States_,
   603 U.S. 593 (2024)...........................................................................1, 2, 12, 16

_U.S. v. CB & I Constructors, Inc._,
   685 F.3d 827 (9th Cir. 2012) .........................................................................12

*_United States v. Brock_,
   94 F.4th 39 (D.C. Cir. 2024) .......................................................................1, 4

_United States v. Castleman_,
   572 U.S. 157 (2014)......................................................................................10

_United States v. Hatter_,
   532 U.S. 557 (2001)......................................................................................13

_United States v. Smith_,
   499 U.S. 160 (1991).....................................................................................3, 4

_Westfall v. Erwin_,
   484 U.S. 292 (1988)......................................................................................10

_Wilson v. Libby_,
   498 F. Supp. 2d 74 (D.D.C. 2007), _aff'd_, 535 F.3d 697 (D.C. Cir. 2008)....................2, 15, 16

_Wilson v. Libby_,
   535 F.3d 697 (D.C. Cir. 2008).........................................................................9

_Wuterich v. Murtha_,
   562 F.3d 375 (D.C. Cir. 2009)........................................................................22

_Youngstown Sheet & Tube Co. v. Sawyer_,
   103 F. Supp. 978 (D.D.C. 1952)....................................................................7, 8

_Ziglar v. Abbasi_,
   582 U.S. 120 (2017)......................................................................................19

**Statutes**

3 U.S.C. § 105..................................................................................................5

*5 U.S.C. § 101..............................................................................................7, 8

5 U.S.C. § 2105................................................................................................5

*28 U.S.C. § 2671...........................................................................................3, 5

*28 U.S.C. § 2679...........................................................................................1, 2

Pub. L. No. 89-506, § 8, 80 Stat. 306 (1966)..................................................................9

Pub. L. No. 97-124, § 1, 95 Stat. 1666 (1981)...............................................................9

Pub. L. No. 100-694, § 3, 102 Stat. 4563 (1988).....................................................7, 10

Pub. L. No. 106-518, § 401, 114 Stat. 2421 (2000).......................................................9

**Other Authorities**

Application of 18 U.S.C. § 603 to Contributions to the President's Re-Election
    Committee, 27 O.L.C. Op. 118 (2003) ....................................................................11

Cong. Rsch. Serv., RL0673, The President's Cabinet: Evolution, Alternatives, and
    Proposals for Change, 1-4 (2002) ..........................................................................10

*Employee*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH
    LANGUAGE (2d ed. 1943) ........................................................................................11

*The Federalist No. 51* (James Madison) .....................................................................13

H.R. REP. 100-700 ........................................................................................................7

Henry P. Monaghan, *The Protective Power of the Presidency*, 93 COLUM. L. REV.
    1 (1993) ..................................................................................................................12

*In re Claiborne Pell*, U.S. Senate, B-199413, 1980 WL 16158 (Aug. 11, 1980)............6

**Treatises**

Restatement (Second) of Agency § 220.................................................................11, 12

*Restatement (Second) of Agency § 228.................................................................14, 15

Restatement (Second) of Agency § 299....................................................................14

**Constitutional Provisions**

U.S. CONST. art. II, §§ 2-4 .........................................................................................12

Plaintiffs respectfully submit this Reply in Further Support of their Opposition to Defendant United States of America's Notice of Substitution pursuant to 28 U.S.C. § 2679(d), ECF No. 238.

## INTRODUCTION

On June 1, 2020, Plaintiffs and other peaceful protesters were violently dispersed by military and paramilitary officers from Lafayette Park to clear the way for Donald Trump's political, campaign-style photo op in front of St. John's Episcopal Church. *See* ECF No. 208 ("SAC") ¶¶ 2–5. The government seeks to provide Trump with immunity from individual tort liability arising from this vicious attack by substituting itself as a defendant under the Westfall Act of 1988. 28 U.S.C. § 2679(b)(1). But the Westfall Act—which confers immunity *only* to government employees acting within the scope of their employment—does *not* apply to Trump for two independent reasons.

*First*, the President is not an "employee." Instead, as the Supreme Court has repeatedly held, "the President is a *branch* of government." *Trump v. United States*, 603 U.S. 593, 639 (2024) (emphasis added). There is no dispute the President does not fall within the specific definition of "employee of the Government" under the Federal Tort Claims Act ("FTCA"). Nevertheless, the government urges this Court to atextually expand the FTCA's scope. But the President does not fit the "same mold" as the types of employees included in the FTCA's definition. *United States v. Brock*, 94 F.4th 39, 57 (D.C. Cir. 2024). The plain language of the statute, the FTCA's purpose and legislative history, and the plain meaning of the word "employee" *all* confirm that the President is not an "employee" for purposes of the FTCA or the Westfall Act.

*Second*, even if this Court finds that the President is a government employee under the statute, Plaintiffs have sufficiently alleged Trump was not acting within his scope of employment when peaceful protesters like Plaintiffs were attacked in the lead-up to his photo op. Instead, Trump was acting as a candidate for re-election, hoping to burnish his law-and-order image during

1

a contentious presidential campaign. Although the government attempts to divorce Trump's conduct from the political context in which it occurred, that artificially narrow approach is inconsistent with precedents requiring this Court to look to the broader context of the "underlying dispute or controversy." *Wilson v. Libby*, 498 F. Supp. 2d 74, 98 (D.D.C. 2007), *aff'd*, 535 F.3d 697 (D.C. Cir. 2008). The SAC plausibly alleges bolstering his re-election prospects was why Trump acted to forcibly clear protesters from Lafayette Square. The government's arguments to the contrary ask this Court to resolve a factual dispute that is properly reserved for the factfinder.

The government's substitution should be denied, or, at a minimum, Plaintiffs should be granted limited jurisdictional discovery to determine whether Trump was acting within the scope of his employment.

## ARGUMENT

## I.    The President Is Not an "Employee of the Government"

This Court should deny the government's substitution of itself for Trump under the Westfall Act. The government fails to rebut the Supreme Court's finding that "the President is a branch of government," *Trump*, 603 U.S. at 639, and that "[t]he President is the only person who alone composes a branch of government," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020). Accordingly, the President cannot be treated as an "employee of the Government" within the meaning of the Act. 28 U.S.C. § 2679(b)(1).

### A.    The FTCA's Definition of "Any Employee of the Government" Does Not Apply to the President

The Westfall Act confers immunity for individual tort liability on "any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). There is no dispute that this Court must determine whether the President is covered by this provision by looking to the FTCA's explicit definition of "any employee of the Government,"

which the Westfall Act adopts.  28 U.S.C. §§ 2671, 2679(b)(1).  The government concedes the explicit statutory definition omits any mention of the President.  *See* ECF No. 251 ("Reply") at 6–7 (admitting that the "definition of the term 'employee of the Government' makes no specific mention of the President" and "the definition of the term 'Federal agency' refers to various entities within the executive branch (e.g., 'executive departments'), rather than to the executive branch as a whole").  That should end the matter, as where "a statute includes an explicit definition, [the Court] must follow that definition."  *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000).  Despite the government's concession, however, the government claims the words "any" and "includes" in the statute permit this Court to expand its scope.  Both arguments fail.

### 1.    The Government's Focus on the Term "Any" Is Misguided

The government argues that the word "any"—as used in the Westfall Act's clause conferring immunity to "*any* employee of the Government," 28 U.S.C. § 2679(b)(1)—has an "expansive meaning" that refers to "every member of the class or group," Reply at 4–5 (internal citations omitted).  The government's focus on the word "any" is a red herring.  Plaintiffs do not dispute words like "any" or "some" can affect the inclusivity of a group, but those words certainly do *not* change the plain meaning of the group (here, government employees), so that someone who is *not* a member is included.  The relevant question here is *who* is a "government employee," not whether the Westfall Act applies to anyone already determined to be encompassed within that term.

The government claims that in two prior decisions, the Supreme Court relied on the word "any" in the FTCA to "reject[] the argument that the Westfall Act's coverage was confined only to those Government employees who were not already shielded from tort liability by other previously enacted immunity statutes."  Reply at 5.  Those decisions are inapposite.  In both *Levin v. United States*, 568 U.S. 503 (2013), and *United States v. Smith*, 499 U.S. 160 (1991), the government substituted itself as a defendant for *military physicians* so that the plaintiffs' suits would proceed

under the FTCA, but in neither case did the plaintiff dispute that the defendants were government "employees." *See Levin*, 568 U.S. at 511; *Smith*, 499 U.S. at 162. Rather, in *Smith*, the plaintiff argued that substitution was improper because the Westfall Act did not cover government employees already protected from tort liability by a pre-existing FTCA exception precluding recovery for injuries sustained abroad. 499 U.S. at 163, 172–73. The Supreme Court rejected this distinction, simply stating that the FTCA covers "any employee of the Government" acting within the scope of employment. *Id.* at 173. And in *Levin*, the plaintiff did not challenge substitution at all. 568 U.S. at 511–12. Instead, the plaintiff disputed whether the FTCA's intentional tort exception applied to certain claims alleging medical malpractice. *Id.* at 513. The government does not explain what relevance these decisions have to the question of whether the President is a "government employee" in the first place—they have none.

## 2. The Word "Includes" Does Not Amend the Statute's Plain Text

The government argues the use of the word "includes" in the FTCA's definitions of "employee of the Government" and "federal agency" creates another opportunity to expand the FTCA's scope to include the President. *See* Reply at 5–6. It does not. While the word "includes" generally means that an ensuing list is "illustrative, not exhaustive," an "illustrative list *illustrates* what . . . is encompassed by the definition, and so other unlisted [employees] must fit that same mold." *Brock*, 94 F.4th at 57 (internal citations and quotation marks omitted); *see Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). And the President is distinct from the other illustrative examples included in the FTCA's definition of "employee of the government":

> (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty . . . and persons acting on behalf of a federal agency in an official

4

capacity, temporarily or permanently in the service of the United States, whether
with or without compensation, and (2) any officer or employee of a Federal public
defender organization, except when such officer or employee performs professional
services in the course of providing representation under section 3006A of title 18.

28 U.S.C. § 2671.  Unlike public defenders, members of the National Guard, and employees of

federal agencies, the President does not merely render services to the government in exchange for

a salary.  *Cf.* Reply at 8.  Rather, the President *is* the branch of government that appoints and fixes

the pay for its employees.  3 U.S.C. § 105(a); 5 U.S.C. § 2105(a)(1)(A).  "No one exerts control

over the President, and no one supervises the President's day-to-day operations."  *Carroll v. Trump*,

49 F.4th 759, 787 (2d Cir. 2022) (Chin, J., dissenting).

In its opposition, the government claims that the "upshot" of the use of the term "includes"

is that these explicit definitions should be read to include the President because (1) such an

inclusion has not previously been questioned; (2) the FTCA has been interpreted to include the

judicial and legislative branches before they were explicitly included; (3) the statutory definition

of "executive departments" is not dispositive; and (4) one of the statutes Plaintiffs mentioned—

the Hatch Act—explicitly excludes the President from its definition of employee.  None of these

arguments suffice to show that the President is an "employee of the Government" under the

Westfall Act.

**a.**  As an initial matter, the government provides a string cite of purported precedential

authority it claims supports the application of the Westfall Act to the President.  *See* Reply at 8.

But not one of the cited cases actually addressed the FTCA's applicability to the President.  In

*Saleh v. Bush*, 848 F.3d 880 (9th Cir. 2017), the court addressed only whether the federal

defendants were acting within the scope of their employment with respect to military actions taken

during the Iraq war.  *Id.* at 891.  The plaintiffs did not challenge—and the court did not address—

whether any of the defendants were "employee[s] of the Government" under the FTCA.  Similarly,

in *Klayman v. Obama*, 125 F. Supp. 3d 67 (D.D.C. 2015), the court addressed only the question of whether the President was acting within the scope of his employment, dismissing the FTCA claims due to the defendants' authority to "engage in conduct directing the United States' foreign policy and military affairs" without assessing or being asked to assess the predicate question of whether the FTCA applied to the President in the first place. *Id.* at 82, 84–85.  Finally, in *Ali Jaber v. United States*, 155 F. Supp. 3d 70 (D.D.C. 2016), *aff'd*, 861 F.3d 241 (D.C. Cir. 2017), the court held that it lacked jurisdiction to hear plaintiffs' claims under the political question doctrine, so it did not consider the applicability of the FTCA to the President. *Id.* at 77–81.  In any event, the plaintiffs did not challenge the government's Westfall Act substitution.  Far from showing that "the Westfall Act's applicability to the President was unquestioned," Reply at 8, these cases merely show that the question has not yet been addressed.

**b.**  The government also argues that the FTCA has long been understood to apply to employees of all three branches.  Reply at 7.  But that is not in dispute.  In any event, the government fails to elucidate how this bears on the *President*, as opposed to "employees" of the executive branch.  And the government's cited authorities do not support its broad reading of the FTCA—they are outdated, inapposite, or both.

The government cites a 1947 Comptroller General opinion that broadly interprets the FTCA not to exclude any "agencies or employees."  Reply at 7.  But a more recent opinion narrowed the issue of FTCA applicability to a case-by-case analysis of the "specific factual contexts," excluded certain federal judges, and expressed doubt whether Members of Congress would be covered by the FTCA.  *See In re Claiborne Pell*, U.S. Senate, B-199413, 1980 WL 16158, at *1 (Comp. Gen. Aug. 11, 1980).  The government also relies on the House Report on the 1988 Westfall Act, Reply at 13, which stated that the Act would not impact "ordinary tort defenses" or

"other functional immunities, such as Presidential and prosecutorial immunity, recognized in the constitution and judicial decisions." H.R. REP. 100-700, at 5. From this statement, the government infers that the "Westfall Act's drafters were aware that the President already was covered by the FTCA," Reply at 13. But the better reading is that the drafters knew the President was *already* "covered" by immunities derived from the Constitution and judicial decisions, *not* the FTCA. This conclusion is bolstered by the fact that, as explained in Plaintiffs' Opposition, the same House Report describes the Act's purpose to enshrine protections for "rank and file workers" and "lower-level employees," *not* the President. H.R. REP. 100-700, at 3; *see* Opp. at 20.

The government's turn to caselaw fares no better. It cites *LePatourel v. United States*, 571 F.2d 405, 408 (8th Cir. 1978), in which a federal judge was considered an employee of the government under the FTCA, and *McNamara v. United States*, 199 F. Supp. 879, 880–81 (D.D.C. 1961), which applied the FTCA to a slip and fall in the Capitol building. Reply at 7. But these cases pre-date the Westfall Act's amendment, clarifying that the definition of federal agency provides immunity for those in the legislative and judicial *branches*, and leaving intact the term "executive *departments*." *See* Pub. L. No. 100-694, § 3, 102 Stat. 4563, 4564 (1988). There is no dispute in this case whether employees of the judicial or legislative branches are "employees of the Government" under the Westfall Act, and these cases have no bearing on whether the definition of "federal agency," which has *always* explicitly included "executive departments" and *never* explicitly included the "executive branch," nevertheless should apply to the President.[1]

---

[1] The government overstates the relevance of *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 978 (D.D.C. 1952), which involved an action seeking a declaratory judgment against the Secretary of Commerce. *See* Reply at 7–8. The court was "of the opinion" that "plaintiffs have an adequate remedy in suits for damages" under the FTCA, *id.* at 981, but did not specify against whom. Presumably, the court contemplated a suit being filed against an employee of the Commerce Department, which is an executive department under 5 U.S.C. § 101. *Sawyer* thus has no bearing

**c.**  Next, in response to the clear statutory language defining "executive departments" in a manner that does not describe the executive branch as a whole, the government argues that the term has been interpreted to include more than just the cabinet agencies for certain purposes, and the statutory definition would exclude employees of the Executive Office of the President ("EOP"). Reply at 9–10.  But again, none of the government's arguments support reading the statute to include the *President*, as opposed to employees of certain departments or agencies within the executive branch.

The government's reliance on *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010), is misplaced.  *See* Reply at 9.  The Supreme Court there expressly cabined its conclusion, holding only that the Securities and Exchange Commission was a "'Departmen[t]' for the purposes of the Appointments Clause, and specifically distinguishing it from the "Executive departments' . . . listed in 5 U.S.C. § 101." *Id.* at 511 & n.11.  This case therefore has no relevance to interpreting the Westfall Act.

The government's focus on the EOP is also off-base.  Whether the EOP "fits the mold" of the illustrative list defining "federal agency" does not address whether the entire executive branch or the President—who is not an employee or officer of the EOP—should be included within that definition.  *See Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (clarifying in the context of FOIA that the "'Executive Office' does not include the Office of the President").[2]  This Court need not determine the FTCA's application to EOP employees to decide

---

on whether the President is covered by the FTCA.  The government also touts that the judge who decided *Sawyer* and *McNamara* was involved in the development of the FTCA, Reply at 8, but the "opinion" of a single staffer can never outweigh the plain text of the statute.  *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) ("[A]mbiguous legislative history [will not be allowed] to muddy clear statutory language.").

[2] The government's claim that Congress "specifically appropriated funds to establishments within the EOP for the payment of FTCA claims," Reply at 10, is thus yet another distraction.

whether *the President of the United States* is under the purview of the FTCA.  Moreover, none of the cases the cited by the government, Reply at 10, directly considered whether an EOP employee is an "employee" for FTCA purposes because the plaintiffs in those cases challenged the United States' substitution for executive branch officials only on the grounds that those officials did not act in the scope of their employment.  *See Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008); *Alexander v. F.B.I.*, 691 F. Supp. 2d 182, 197 (D.D.C. 2010), *aff'd*, 456 F. App'x 1 (D.C. Cir. 2011); *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 81 (D.D.C. 2017), *rev'd on other grounds and remanded*, 916 F.3d 1 (D.C. Cir. 2019).

Nor does the government's misinterpretation of the statutory history, Reply at 10–11, support its argument that the President is covered by the Westfall Act.  Congress has amended the definitions relevant to the FTCA four times to *extend* immunity to previously *uncovered* individuals.[3]  And each time Congress did so, it left intact the term executive *departments*.[4]  The fact that the FTCA required amendment to cover "military departments"—which are housed in the executive branch but are distinct from "executive departments"—further evidences the conclusion that the entire executive branch was not intended to be included.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." (quotation marks omitted)).  Most relevant,

---

[3] For these amendments to have "real and substantial effect," the presumption is that the definitions did not previously encompass more than their stated terms.  *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 698 (1995) (describing courts' "reluctance to treat statutory terms as surplusage").

[4] *See* Pub. L. No. 89-506, § 8, 80 Stat. 306, 307 (1966) (amending "federal agency" to include "the military departments"); *see also* Pub. L. No. 97-124, § 1, 95 Stat. 1666 (1981) (amending "employee of the Government" to include "members of the National Guard while engaged in training or duty"); Federal Courts Improvement Act 2000, Pub. L. No. 106-518, § 401, 114 Stat. 2421 (2000) (amending "employee of the Government" to include "any officer or employee of a Federal public defender organization").

following *Westfall v. Erwin*, 484 U.S. 292 (1988), the Westfall Act amended the definition of federal agency to provide immunity for those in the legislative and judicial *branches*, once again leaving intact the term "executive *departments*." *See* Pub. L. No. 100-694, § 3, 102 Stat. 4563, 4564 (1988).  And crucially, the executive departments have long been understood to be a distinct subset of the executive branch.  *See* Cong. Rsch. Serv., RL30673, The President's Cabinet: Evolution, Alternatives, and Proposals for Change, 1-4 (2002) (dating the history of the executive "departments in the executive branch" to George Washington's reliance on his Cabinet and "great Departments" as of 1789).  Congress knew how to include an entire branch of the government in the definition but did not do so.  Instead, it added piecemeal divisions of the branch that it understood not to be covered by the extant language.  This statutory history compels the conclusion that the entire executive branch is not covered by the FTCA.

    **d.**  Finally, the government responds to Plaintiffs' argument that interpreting the definition of "government employee" to exclude the President is in line with Congress's articulation of that term in other statutes, Opp. at 17–18, only with respect to the Hatch Act.  Reply at 11.  The government claims that statute, which explicitly excludes the President from its definition of employee, supports the inclusion of the President in the FTCA's definition because it shows that "when Congress wants to exclude the President from a statutory definition of the term 'employee,' it does so expressly." *Id.*  The government's failure to cite a single case in support of this supposed interpretive cannon is telling.  Where Congress has elsewhere defined the term "employee" to exclude the President, the more reasonable interpretation is that Congress generally understands the term to exclude the President, not that the office is automatically included every time not explicitly identified as omitted.  *See United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring) (giving a term the same meaning as in another statute based on "the presumption

of consistent usage—the rule of thumb that a term generally means the same thing each time it is used").[5]

***

In sum, none of the government's arguments or authorities changes the fact that the FTCA's definition of "employee of the Government" does not include the President—either explicitly or implicitly.

### B.    The Plain Meaning of the Term "Employee" Does Not Encompass the President

The plain meaning of the word "employee," along with hornbook agency law, confirms again that the President is not an "employee of the Government" for the purposes of the FTCA. "[I]n accord with the ordinary public meaning of" the FTCA's terms "at the time of its enactment," *see Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020), an employee is "one who works for wages or salary in the service of an employer," *Carroll*, 49 F.4th at 770 (quoting *Employee*, Webster's New International Dictionary of the English Language (2d ed. 1943)). Whether an employee works "in the service of an employer" primarily rests on whether the employee is "subject to the [employer]'s *control or right to control*." Restatement (Second) of Agency § 220(1) (hereinafter, "Restatement") (emphasis added); *see also Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739–40 (1989) (turning to the Restatement because, absent a clear definition, "Congress intend[s] to describe the conventional master-servant relationship as understood by common-law agency doctrine"); *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 448 (2003) (using the "common-law element of control [as] the principal guidepost" to determine the existence of a

---

[5] Nor does the OLC opinion cited by the government, which opines that the White House Office is an "Executive Agency" for the purposes of the Hatch Act because of "features that appear to be unique" to that statute, Application of 18 U.S.C. § 603 to Contributions to the President's Re-Election Committee, 27 O.L.C. Op. 118, 119 (2003), rebut Plaintiffs' arguments.

11

master-servant relationship). The President is not "subject to the [United States]'s control or right to control," Restatement § 220(1), and therefore does not work "in the service of [the United States]," *Carroll*, 49 F.4th at 770, because the President *is* the executive branch of the government. *Trump*, 603 U.S. at 639; *see also Carroll*, 49 F.4th at 787 (Chin, J., dissenting).

The government argues that the President works in service of the United States under "ordinary principles of agency law," relying on language in an historical note from the Restatement that "highly placed employees of a corporation, such as presidents and general managers" can still be considered "servants" because their "physical activities are controlled by the sense of obligation to devote their time and energies to the interests of the enterprise." Reply at 11–12. But "[t]he United States is not a corporation," *U.S. v. CB & I Constructors, Inc.*, 685 F.3d 827, 836 (9th Cir. 2012), and the President is not akin to an executive officer of a corporation, *see* Henry P. Monaghan, *The Protective Power of the Presidency*, 93 Colum. L. Rev. 1, 61 (1993). There is no question that the President's duties go beyond those of a corporate executive: for example, the President must uphold the Constitution, serve as Commander-in-Chief, and "take Care that the Laws be faithfully executed." *See* U.S. CONST. art. II, §§ 2–3. The only discipline or punishment to which he may be subjected is impeachment for "high crimes and misdemeanors." U.S. CONST. art. II, § 4. The President can largely act without liability and that power is kept in check by the legislative and judicial branches. *See Myers v. U.S.*, 272 U.S. 52, 291–92 (1926). In contrast, high-ranking business employees must fulfill duties of loyalty and care, the breach of which may result in myriad liabilities. *See, e.g.*, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996). The President and a corporate executive officer play fundamentally different roles, so it is not surprising that the government cites nothing in support of its suggestion that the President of the United States should be treated like a corporate "president." *See* Reply at 12.

Further, the government's claim that the President is an "employee" because of "his sense of obligations to the United States," Reply at 12, is unpersuasive and borders on absurdity. It is simply not the case that a "sense of obligation" is the defining characteristic of an employee. For example, an independent contractor may feel a sense of obligation to perform good work for the person or enterprise that hired him, but he does not thereby become an "employee" of the person who hired him. The President might reasonably feel a sense of obligation to campaign representatives, family members, and trusted advisors, but this in no way makes the President their *employee*. Moreover, the President is not *controlled* by any obligation—he is controlled by "dependence on the people" as an elected official. *See The Federalist No. 51* (James Madison). The government's reliance on this ancillary language from the Restatement does not support its argument that the President performs work subject to the control of the United States. *See* Opp. at 19.

Nor does *United States v. Hatter*, 532 U.S. 557 (2001), a case about tax withholdings from Article III judges, support the government's position. *See* Reply at 9. That case's reference in dicta to the President's compensation, *Hatter*, 532 U.S. at 563, is hardly a statement of law on whether the President is an "employee of the Government." It is undisputed that the President receives compensation. At issue here is whether the President in turn performs work "in the service of" the United States such that there is an employer-employee relationship. He does not. *See* Opp. at 19–20.

\*\*\*

Under this Court's precedent, sound statutory interpretation, legislative history, and the indicia of congressional intent, the President is not an "employee of the Government" as the statutory text defines that term. This Court should deny the government's substitution.

## II.    Even If Trump Were an "Employee of the Government," He Acted Outside the Scope of His Employment

Even if Trump qualified as an "employee of the Government," he was not acting within the scope of his office when he directed, agreed to, or ratified the use of force to disperse Plaintiffs and other peaceful protesters from Lafayette Square on June 1, 2020 in aid of his political campaign.  In arguing to the contrary, the government attempts to parse an artificial distinction between "contextual conduct" and "actual conduct," urging this Court not to consider the political context of Trump's actions, but rather to resolve factual disputes that are improper for resolution on a motion to dismiss.  Reply at 15.  As the D.C. Court of Appeals made clear in *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023), however, "whether an employee was acting within the scope of employment is ordinarily a fact-intensive question for the factfinder, and as such is not subject to determination as a matter of law in resolving a motion to dismiss or a motion for summary judgment."  *Id.* at 230.  Plaintiffs have sufficiently alleged that the forcible dispersion of peaceful protesters in service of Trump's personal and political ends was outside the scope of his employment.  Accordingly, this Court should deny the government's Westfall certification or, in the alternative, grant Plaintiffs limited jurisdictional discovery into the scope of employment question.

### A.    The Alleged Conduct Is Not the Kind of Conduct Trump Was "Employed" to Perform

The violent dispersal of peaceful racial justice protesters at Lafayette Square in service of a campaign photo-op is not "of the same general nature as" or "incidental to" the conduct that Trump was "employed to perform."  *Carroll*, 292 A.3d at 230 (quoting Restatement §§ 228(1), 299(1)).  The government argues that Trump's tweets and photo op are merely "contextual conduct" that this Court should disregard in determining whether he was acting within the scope of his employment, and the relevant conduct for the scope-of-employment analysis is "'order[ing] law

enforcement' to clear protesters from Lafayette Square," not directing, agreeing to, or ratifying the clearance of protesters from Lafayette Square *to facilitate his campaign-style photo op*. Reply at 15 (alteration added). But the government cites no authority for that artificially narrow framing—because none exists.

In framing the relevant conduct for purposes of the first prong of the scope-of-employment analysis, courts look to the broader context of the "underlying dispute or controversy," *Wilson*, 498 F. Supp. 2d at 98, to determine whether it was "of the kind [the person] is employed to perform," *id.* at 97 (quoting Restatement § 228(1)(a)). For example, in *Wilson*, a former CIA agent and her husband sued several high-ranking executive branch officials for disclosing her employment as a covert operative. *Id.* at 77. With respect to the first prong of the scope-of-employment analysis, the court found that it could not "take too narrow a view of the relevant conduct," and instead was required to "look beyond alleged intentional torts when assessing whether the actions were of the kind authorized," to the "underlying dispute or controversy." *Id.* at 97–98. Similarly, in *Council on Am. Islamic Relations v. Ballenger ("CAIR")*, 444 F.3d 659 (D.C. Cir. 2006), the plaintiff sued a congressman for defamation and slander for stating that it was the fundraising arm of a foreign terrorist organization while the congressman was making a statement to a reporter about his marital issues. *Id.* at 662. The plaintiff maintained that the congressman's "allegedly defamatory statement *itself* was not conduct of the kind he [was] employed to perform," but the court rejected that framing, finding that the "appropriate question" was whether the conversation in which the statement was made—not just the statement itself—was "the kind of conduct [the congressman] was employed to perform." *Id.* at 664. The same broad analysis that the courts in *Wilson* and *CAIR* used to find that the defendants *were* acting within the scope of their employment must be applied to Plaintiffs' allegations here—with the opposite result.

*Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979), is instructive. In that case, the D.C. Court of Appeals held that a railroad employee who assaulted a taxi driver while traveling off-duty from one worksite to another was acting outside the scope of his employment. *Id.* at 32. In so holding, the court observed that "[t]here is nothing in the business of running a railroad that makes it likely that an assault will occur between a railroad brakeman and a taxicab driver *over the celerity with which the latter will provide a taxicab ride to the former.*" *Id.* (emphasis added). In framing the relevant conduct, the Court of Appeals did not focus narrowly on the alleged act of tortious conduct, finding that the simple act of assault brought the employee's actions outside the scope of his employment. Instead, it considered the broader circumstances surrounding the assault, including the dispute from which the assault arose. *See id.*

These cases confirm that the proper focus of the inquiry is the entire "underlying dispute or controversy," not some artificially narrowed concept of relevant conduct. *Wilson*, 498 F. Supp. 2d at 98. Trump's specific conduct cannot be divorced from the broader context in which it occurred—as a means to take advantage of a photo op in front of St. John's Episcopal Church and use it in a video for "political propaganda." SAC ¶¶ 56, 60, 106. That conduct is not similar to the Presidential duties of "unrivaled gravity" such as, "for instance, commanding the Armed Forces of the United States" or "making treaties, appointing ambassadors, [and] recognizing foreign governments." *Trump*, 603 U.S. at 593, 607. Trump "had no duty, much less authority," to agree to the violent clearing of peaceful protesters in service of his personal and electoral prospects. *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 94 (D.D.C. 2011); *see also Hicks v. Off. of the Sergeant at Arms for the U.S. Senate*, 873 F. Supp. 2d 258, 267 (D.D.C. 2012) (federal employees, who allegedly falsified report against former supervisee, were not engaging in conduct they were employed to perform where "[i]t is not apparent that [their] job duties . . . would contemplate"

16

investigating non-supervisees, "much less by use of false reports"). The well-pled allegations in the SAC allow instead for the reasonable inference that Trump took the alleged actions "as office-*seeker*, not office-*holder*." Opp. at 23 (quoting *Blassingame v. Trump*, 87 F.4th 1, 17 (D.C. Cir. 2023)).

In arguing that the "actual conduct" at issue here is "how law enforcement agencies should respond to large-scale protests that occur in the nation's capital, particularly when they are taking place in close proximity to the White House," Reply at 15–16, the government simply takes a competing view of the facts alleged. And in urging this Court to reject Plaintiffs' characterization of Trump's challenged conduct, it urges this Court to resolve factual disputes that are not ripe for resolution on this record. *See Carroll*, 292 A.3d at 230. This Court should decline the invitation and reject the government's Westfall Act certification. The question before the Court is not how to resolve the dispute but whether Plaintiffs have borne their prima facie burden. *See Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003) (to rebut Westfall Act certification, plaintiffs need only "have alleged sufficient facts that, taken as true, would establish that the defendants' actions exceeded the scope of their employment"). They have.

The government's arguments to the contrary are meritless. The government contends that Plaintiffs' argument that Trump was acting as an "office-seeker" "collapses the first and third factors of the Restatement test into one." Reply at 16; *see also id.* at 17 ("Plaintiffs' allegations that [Trump]'s goal in clearing the square was 'to facilitate' campaign activity speaks only to the alleged motivation behind he conduct—not whether the conduct was of the kind he was employed to perform."). But that is simply a repackaging of its argument that this Court should take a narrow view of Trump's conduct, divorced from the broader context in which those actions occurred. That is not the law. *See supra* at 15–17.

Next, the government claims that the SAC does not allege that Trump was acting as an office-seeker rather than an office-holder.  Reply at 17.  But that is simply a demand that Plaintiffs plead a legal conclusion, which they are not required to do.  *See, e.g.*, *Buckner v. CONSOL Energy Inc.*, 2024 WL 2382941, at *7 (D.D.C. May 23, 2024) ("it is not necessary that [a plaintiff] plead their injury in terms of a legal conclusion" (quotation marks omitted)).  Plaintiffs have pleaded the facts supporting their contention that Trump's actions were taken to bolster his own political standing and electoral prospects.  The SAC alleges that "Trump ordered law enforcement officers . . . to forcibly drive protesters from Lafayette Park" so that he could "pos[e] for photographs" in front of St. Johns's Episcopal Church "while holding a bible," which he then used the photo op as a piece of "[p]olitical [p]ropaganda," with his "White House publish[ing] a 29-second video" depicting his walk and ensuing photo op.  SAC ¶¶ 56, 60, 106.  Plaintiffs' "allegations, if true, would allow a reasonable juror to conclude that [Trump's] actions did not stem from [his] job assignments and were not incidental to conduct authorized by [his] employer." *Hicks*, 873 F. Supp. 2d at 268.[6]  That is sufficient to "rebut the [government's] certification." *Stokes*, 327 F.3d at 1216.

The government's attempt to distinguish *Blassingame* fails.  It tries to confine *Blassingame* to its facts by noting that the case involved allegations that Trump exhorted his followers "to go to the Capitol and to disrupt the certification of the results of the Presidential election" at a "'privately

---

[6] Contrary to the government's suggestion, Reply at 17–18, Plaintiffs do not contend that a President acts in a private capacity merely because his conduct "was subjectively undertaken in some measure to enhance the President's re-election prospects or profile." *Id.* at 18 (quoting *Blassingame*, 87 F.4th at 20).  Rather, that conclusion is compelled here by a "context-specific assessment of the 'nature of the function [Trump] performed,'" *Blassingame*, 87 F.4th at 20 (quoting *Clinton v. Jones*, 520 U.S. 681, 695 (1997)), which involved the use of disproportionate and unnecessary force against peaceful protesters to facilitate Trump's photo op in front of a church. *See* SAC ¶¶ 1, 56, 60, 106.

funded' political rally." Reply at 18. That conduct, the government asserts, is "fundamentally different" from the dispersal of protesters from Lafayette Square. *Id.* But even if that were true, it does not mean that Trump's alleged actions here were not *also* taken in an office-seeking capacity, as alleged, or that speaking at a privately funded political rally is the *only* conduct that can qualify as office-seeking. *Blassingame* calls for "an appropriately objective, context-specific assessment" as to whether a President's actions were taken as a candidate or an office holder. 87 F.4th at 21. The government notably fails to argue that Trump's actions were *not* those of a candidate seeking office. That should end the matter.[7]

The government also asserts that Trump's conduct is "of the same general kind" as that attributed to former Attorney General Barr and other federal officers, whom the SAC alleges were acting within the scope of their employment. Reply at 18. Not so. As alleged in the SAC, Trump's involvement in the forcible dispersal of peaceful protesters from Lafayette Square was meant to facilitate a campaign-style photo op to improve his own re-election chances. *See* SAC ¶¶ 56, 60, 106. In contrast, there are no allegations that Barr or the other federal officers were running for office or working for the campaign.

Finally, the government argues that, even if Trump was motivated in part by a desire to facilitate his photo op in front of St. John's Episcopal Church, the dispersal of protesters from Lafayette Square was within the scope of his employment because "national security interests" were at play. Reply at 18–19, 23. But as the Supreme Court has cautioned, "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (quoting *Mitchell v.*

---

[7] Plaintiffs do not, as the government suggests, argue that Trump's conduct was "different in kind from that authorized" because it was illegal and unconstitutional. Reply at 19–20. The cases it cites are therefore inapposite. *See id.*

*Forsyth*, 472 U.S. 511, 523 (1985)).  As alleged in the SAC, there was "no ongoing threat to public safety" presented by the protesters.  SAC ¶ 110.  And none was cited by the defendants.  *Id.*  As one National Guardsman later testified before Congress, "at no time did I feel threated by the protesters or assess them to be violent."  *Id.* ¶ 9.  To the contrary, it was law enforcement officers on the scene who "began to heckle protesters by saying menacing and threatening things to them."  *Id.* ¶ 87.  The government's invocation of imagined national security interests should be rejected.

### B.  Trump's Actions Were Not Actuated by a Purpose to Serve His "Employer"

Trump's conduct does not satisfy the third prong of the scope-of-employment inquiry, which asks whether his conduct was actuated, at least in part, by a purpose to serve the employer.  *See Carroll*, 292 A.3d at 233.  "The 'at least in part' standard strikes . . . a minimum requirement for the quantum of purpose that necessitates at least some discernable purpose to serve the employer."  *Id.* at 235.  "[I]f the employee's conduct is 'too little actuated' by that purpose, then the employee's conduct would be outside of the scope of employment."  *Id.* at 236.  Where an alleged tortfeasor is shown to have "acted with at least a partial purpose to serve their employer's interest," the "factfinder must determine that an employee's partial purpose to serve their employer was more than an insignificant interest."  *Id.* at 237.  That is not the case here.

The clearing of peaceful protesters to secure an unimpeded path to St. John's Episcopal Church for Trump's photo op in a highly charged election year "was motivated by personal motives, rather than a desire to advance the interests" of the United States.  *Armstrong*, 759 F. Supp. 2d at 95.  That there was no security rationale for the violent dispersal of peaceful protesters, and the release of a dramatic, campaign-style video featuring Trump walking across the cleared Lafayette Park and posing in front of St. John's Episcopal Church, only confirms his purely personal and political motivations.  *See* SAC ¶¶ 8–10, 55, 56–60, 105–106.  That conclusion is underscored by Trump's contemporaneous tweets, which sought to score easy political points against his supposed

20

enemies on the "left."  *See, e.g.*, SAC ¶ 45 (tweet from Trump claiming he felt "sicken[ed]" by "[t]he fact that [George Floyd] has been held up as a martyr").

The government responds that the SAC's allegations show that Trump was motivated at least in part by "his views concerning how government officials should respond to individuals he regarded as engaging in 'racial unrest' and 'unruly protests.'"  Reply at 23 (citing SAC ¶¶ 43, 47, 50, 57–58, 61).  That does not suggest a motive or desire to "serve the employer," but merely one particular view of how racial justice protests should be handled.  And even if those allegations did raise such an inference, an equally plausible inference from these public pronouncements is that Trump was engaging in political posturing and grandstanding in an election year to show that he was the "tough on crime" and "law and order" candidate, unlike his opponent.  As *Carroll* instructs, even if the government were correct, resolving that question is the province of the factfinder, not this Court on the current, undeveloped record.  *See Carroll*, 292 A.3d at 237.

Repeating a familiar refrain, the government again argues that Trump's photo op in front of St. John's Episcopal Church and his "campaign-related messaging thereafter" are "not the relevant issue[s]" for determining whether Trump's conduct satisfied the purpose prong of the scope-of-employment analysis.  Reply at 23.  That is wrong.  As the court noted in *Carroll*, the purpose inquiry requires "a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct, as may be appropriate under the facts presented."  *Carroll*, 292 A.3d at 235.  The government's attempt to "limit[]" the inquiry "to the tortious conduct itself without the underlying context" is inconsistent with that standard.  *Id.*; *Blassingame*, 87 F.4th at 21 ("We emphasize context because, only by looking to context can the relevant nature of an action

be understood. The same essential message or act may be either official or unofficial depending on the circumstances in which it is delivered or performed."); *see also supra* at 15–16.

### III.    Alternatively, This Court Should Grant Plaintiffs Limited Jurisdictional Discovery Regarding the Scope of Trump's Actions

Plaintiffs have sufficiently alleged Trump was acting outside the scope of his employment when he directed, agreed to, or ratified the use of force to disperse peaceful protesters from Lafayette Square.  To the extent this Court is uncertain whether the alleged conduct falls within the scope of Trump's employment, it should grant Plaintiffs limited jurisdictional discovery into the issue.  Where a plaintiff satisfies its burden of "alleging facts that, if true, would establish that the defendants were acting outside the scope of their employment," it may "attain limited discovery to resolve any factual disputes over jurisdiction." *Phillips v. Mabus*, 894 F. Supp. 2d 71, 85 (D.D.C. 2012) (quoting *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009)).  Indeed, "[i]n the FTCA context, courts in this Circuit frequently grant jurisdictional discovery." *Davis v. United States*, 196 F. Supp. 3d 106, 120–21 (D.D.C. 2016) (collecting cases).  "[T]his Circuit's standard for permitting jurisdictional discovery is quite liberal." *Id.* at 120.

The SAC's allegations that disproportionate and unjustified force was used against peaceful protesters like Plaintiffs to facilitate Trump's photo op for political propaganda, SAC ¶¶ 105–06, 110–11, are "sufficient to warrant limited discovery" because they describe "actions that could permit the imputation of a purely personal motivation" to Trump, wholly unconnected to any of his responsibilities as President.  *Hicks*, 873 F. Supp. 2d at 270 (quotation marks and alterations omitted).  The government's only response is that "an inquiry into the subjective motivation of a former President" is in "considerable tension" with U.S. Supreme Court cases defining presidential immunity.  Reply at 24–25.  But the government has not argued Trump is immune in this case, and a subjective inquiry into Trump's motivations is *exactly* what governing D.C. agency law requires.

*See Carroll*, 292 A.3d at 234 ("The purpose element is an inquiry into the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer. *Our focus is on the subjective state of mind of the tortfeasor-employee*." (emphasis added)). Should the Court decline to reject the Westfall Act certification outright, it should at least grant Plaintiffs limited jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court deny substitution, reinstating Trump as a party to this case. Alternatively, the Court should grant Plaintiffs' request for jurisdictional discovery.

Dated:    November 26, 2024            Respectfully submitted,

   */s Lee R. Crain*
_____

Orin Snyder (*pro hac vice*)
Anne Champion (*pro hac vice*)
Lee R. Crain (*pro hac vice*)
Nadia Alhadi (*pro hac vice*)
Amanda L. LeSavage (D.C. Bar No. 1708824)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel:  212.351.4000
OSnyder@gibsondunn.com
AChampion@gibsondunn.com
LCrain@gibsondunn.com
NAlhadi@gibsondunn.com
ALeSavage@gibsondunn.com


Greta B. Williams (D.C. Bar No. 1006968)
Amalia Reiss (D.C. Bar No. 241775)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
Tel:  202.955.8500
GBWilliams@gibsondunn.com
AReiss@gibsondunn.com


Katherine Marquart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel:  213.229.7000
KMarquart@gibsondunn.com


*Counsel for Plaintiffs Radiya Buchanan,*
*Ann Dagrin, and Lindsay Field*