## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLACK LIVES MATTER D.C., *et al.*, | |
| *Plaintiffs*, | No. 20-cv-1469 (DLF) (LEAD) |
| v. | No. 20-cv-1542 (DLF) (Consolidated) |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

This consolidated action arises out of the law enforcement response to protests in Lafayette Square on June 1, 2020.  Before the Court is the United States' Motion to Substitute under the Westfall Act with respect to claims against President Trump, Dkt. 238; the United States' Motions to Dismiss claims against federal officers, Dkts. 239, 240; and the Black Lives Matter D.C. plaintiffs' Motion for Class Certification, Dkt. 237.  For the reasons that follow, the Court will grant the motion to substitute; grant in part and deny in part the motions to dismiss; and grant in part the motion for class certification.

## I.       BACKGROUND

On June 1, 2020, following the death of George Floyd, protestors gathered in D.C.'s Lafayette Square "to protest racism and police brutality."  *Buchanan v. Barr*, 71 F.4th 1003, 1006 (D.C. Cir. 2023).  Federal and local police officers dispersed the protest using riot shields, batons, rubber bullets, and pepper spray.  *Id.*  In the plaintiffs' telling, the police "had no legitimate basis to destroy the peaceable gathering" and did so "to suppress the demonstrators' message."  BLMDC Fourth Am. Compl. ¶ 4, Dkt. 213.  President Trump "ordered law enforcement officers to take the[se] actions . . . in order to forcibly drive protesters from Lafayette Park."  Buchanan Sec. Am.

Compl. ¶ 56, Dkt. 208.  Numerous protestors were allegedly injured by police actions, including

Keara Scallan, Lia Poteet, Dustin Foley, E.X. Foley, and members of the organization Black Lives

Matter D.C., a D.C. limited liability corporation (collectively the "BLMDC plaintiffs"); as well as

Radiya Buchanan, Ann Dagrin, and Lindsay Field (collectively the "Buchanan plaintiffs").

BLMDC Fourth Am. Compl. ¶¶ 9–12; Buchanan Sec. Am. Compl. ¶¶ 12–14.  The protestors sued.

The plaintiffs brought claims against federal officials—including then-Attorney General

Barr and officers from the U.S. Park Police, D.C. National Guard, U.S. Secret Service, and Federal

Bureau of Prisons—for damages under *Bivens* and the First, Fourth, and Fifth Amendments, and

for injunctive relief.[1]  *See* Buchanan Am. Compl. ¶¶ 136–142, No. 20-cv-1542, Dkt. 29; BLMDC

Third Am. Compl. ¶¶ 220–30, Dkt. 52.  The Court granted in part the defendants' motions to

dismiss.  *See* Dkt. 159; Buchanan Dkt. 68.  It held that Supreme Court precedent foreclosed the

plaintiffs' *Bivens* claims,[2]  *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 29–34 (D.D.C.

2021), and the D.C. Circuit affirmed, *Buchanan*, 71 F.4th at 1006.  On remand, the Court

authorized the BLMDC plaintiffs to amend their complaint to add claims under the D.C. First

Amendment Assemblies Act, D.C. Code § 5-331.04(c).  *See* Dkt. 198.  It also authorized the

---

[1] The plaintiffs also brought claims against individual officers from the D.C. Metropolitan and Arlington County Police Departments under § 1983 and the First Amendment.  *See* Buchanan Am. Compl. ¶ 119, Dkt. 29; BLMDC Third Am. Compl. ¶¶ 220–30, Dkt. 52.  The Court found that the plaintiffs had alleged plausible claims of speech restriction and First Amendment retaliation, and that the defendant officers were not entitled to qualified immunity.  *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 44–48 (D.D.C. 2021).  These claims against D.C. and Arlington officers remain.

[2] The Court also held that the plaintiffs had standing to bring First Amendment injunctive claims against certain federal defendants in their official capacity, based on alleged restrictions on the protestors' access to Lafayette Square.  *Black Lives Matter D.C.*, 544 F. Supp. 3d at 437. Subsequently, the plaintiffs and official-capacity defendants stipulated to the dismissal of all injunctive claims with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  *See* Dkt. 181; Buchanan Dkt. 87.

Buchanan plaintiffs to add certain tort and D.C. First Amendment Assemblies Act claims against the United States and against President Trump in his individual capacity. *See* Buchanan Dkt. 106.

In the BLMDC action, the government filed a Notice of Substitution under the Westfall Act. Dkt. 219. The BLMDC plaintiffs objected to substitution, and the Court overruled the objection. *See Black Lives Matter D.C. v. Barr*, No. 20-cv-1469 (DLF), 2024 WL 3300158 (D.D.C. July 4, 2024). The Court found that the D.C. First Amendment Assemblies Act claims "do not arise directly under the Constitution and do not require BLMDC to plead a constitutional violation as an element," meaning they were not precluded from substitution. *Id.* at *9.

The United States now moves to substitute itself for President Trump with respect to the Buchanan plaintiffs' D.C. law claims. Mot. to Substitute, Dkt. 238. It also moves to dismiss claims against federal defendants. Mot. to Dismiss BLMDC, Dkt. 239; Mot. to Dismiss Buchanan, Dkt. 240. The BLMDC plaintiffs move for class certification under Federal Rule of Civil Procedure 23. Mot. for Class Cert., Dkt. 237.

## II.    LEGAL STANDARDS

A plaintiff may object to a Notice of Substitution under the Westfall Act. *De Martinez v. Lamagno*, 515 U.S. 417, 425–26 (1995). In ruling on a plaintiff's objection, the Court decides all questions of law without deference to the government's determination. *See, e.g.*, *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013); *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664–66 (D.C. Cir. 2006). It also decides questions of fact anew, although the "'Attorney General's certification that a federal employee was acting within the scope of his employment'" "constitute[s] *prima facie* evidence" to that effect. *Council on Am. Islamic Relations*, 444 F.3d at 662 (quoting *De Martinez*, 515 U.S. at 434). "[A] plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the

certification." *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (quotation marks omitted).

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994). The burden of establishing the contrary rests upon the party asserting jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182–183 (1936). When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citations and quotation marks omitted). But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quotation marks omitted). A court that lacks jurisdiction must dismiss the action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require

"more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

Rule 23 of the Federal Rules of Civil Procedure requires a "party seeking class certification [to] affirmatively demonstrate his compliance with the" requirements of the rule. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A district court exercises broad discretion in deciding whether to permit a case to proceed as a class action," given that "trial courts are uniquely well situated to make class certification decisions." *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) (quotation marks omitted); *see also DL v. District of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017). But the district court must perform a "rigorous analysis" to ensure compliance with Rule 23. *Wal-Mart*, 564 U.S. at 351. Actual compliance with the rule is "indispensable," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and the burden of demonstrating compliance lies with the plaintiff, *see e.g.*, *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017) (a plaintiff bears the burden of proof by a preponderance of the evidence).

## III.    DISCUSSION

### A.    Westfall Act Substitution

The FTCA creates a private right of action for citizens injured by a federal employee to sue the United States in tort. 28 U.S.C. § 2574. The Westfall Act makes the FTCA's remedies "exclusive" for all claims within their scope. *Id.* § 2679(b)(1). In general, any claim for damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

employment" must be asserted under the FTCA against the United States. *Id.* § 1346(b)(1). If a tort claim *is* brought directly against "any employee of the Government," the Westfall Act provides that so long as that employee was "acting within the scope of his office or employment," the United States must be substituted as the sole defendant. *Id.* § 2679(b)(1); *see Vrobel*, 724 F.3d at 220. To trigger substitution, the Attorney General's scope-of-employment certification serves as "*prima facie* evidence that the employee was acting within the scope of his employment." *Council on Am. Islamic Relations*, 444 F.3d at 662. But a certification is "not necessarily conclusive as to the substitution of the federal government," *Taylor v. Clark*, 821 F. Supp. 2d 370, 373 (D.D.C. 2011), and a plaintiff "may, if necessary, attain limited discovery to resolve any factual disputes" on the scope-of-employment inquiry, *Phillips v. Mabus*, 894 F. Supp. 2d 71, 85 (D.D.C. 2012) (quotation marks omitted).

### 1.    "Employee" of the Government

As a threshold matter, the Buchanan plaintiffs urge the Court to reject the government's motion for substitution because the President is not an "employee of the Government." 28 U.S.C. § 2679(b)(1). But the text of the Act and the weight of persuasive authority compel the conclusion that "the President is an employee of the government under the Westfall Act." *Carroll v. Trump*, 49 F.4th 759, 772 (2d Cir. 2022). Indeed, until recently, the President's "employee" status has been unquestioned by litigants and the federal courts. *E.g., Saleh v. Bush*, 848 F.3d 880, 890–91 (9th Cir. 2017) (certifying substitution where defendants including the President acted within the scope of their employment); *Klayman v. Obama*, 125 F. Supp. 3d 67, 82–85 (D.D.C. 2015) (same); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 73 n.1 (D.D.C. 2016) (summarily certifying substitution of the President), *aff'd* 861 F.3d 241 (D.C. Cir. 2017); *West v. Trump*, No. 19-cv-2522 (BH), 2020 WL 4721291, at *3 n.6 (N.D. Tex. July 23, 2020) (same).

The Court begins by reading the statutory text in context.  The Westfall Act adopts the FTCA's definition of "any employee of the Government."  28 U.S.C. § 2679(b)(1).  The definitional provision states: the term "'[e]mployee of the government' *includes* (1) officers or employees of any federal agency."  *Id.* § 2671 (emphasis added).  And it further states: the term "'Federal agency' *includes* the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."  *Id.* (emphasis added).  The plaintiffs press for a narrow, literalist reading of these provisions: because the "employee" definition does not specifically list the President, and because the "federal agency" definition lists only "executive departments" and not the executive branch, the plaintiffs argue that the President is excluded from the Act's coverage.  But that argument is foreclosed by the language of the Act.

The statute's use of the term "includes" makes clear that "the examples enumerated in the text are intended to be illustrative, not exhaustive."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012); *see Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.").  Indeed, three federal circuit courts of appeals interpreting this precise statutory language have found that because the "employee" definition "begins with the word 'includes,' which ordinarily introduces exemplary, not exhaustive language . . . § 2671 does not necessarily contain every instance in which a person is an 'employee of the Government.'"  *Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022); *United States v. LePatourel*, 571 F.2d 405, 408 (8th Cir. 1978) ("Congress chose to define 'employees of the government' and 'federal agency' inclusively rather than exclusively."); *Carroll*, 49 F.4th at 768–

7

69 (same); *see also McNamara v. United States*, 199 F. Supp. 879, 880–81 (D.D.C. 1961) (finding that § 2671 does not set forth an "exclusive definition"). Best read, § 2671 "simply sets forth an illustrative set of examples of those who qualify as covered government officials." *Carroll*, 49 F.4th at 768 (emphasis omitted).

The crux of the inquiry then, is whether the President is a federal "employee" under the term's ordinary public meaning at the time of enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). In the mid-20th century, a leading dictionary defined an "employee" as "one who works for wages or salary in the service of an employer." *See Carroll*, 49 F.4th at 770 (quoting *Employee*, Webster's New International Dictionary of the English Language (2d ed. 1943)). There is no question that the President is a federal employee in the literal sense: he renders services to the United States in return for a salary and other compensation. *See* U.S. Const. art. II, § 1, cl. 7 (providing the President "shall . . . receive for his Services, a Compensation"); *United States v. Hatter*, 532 U.S. 557, 562–63 (2001) (describing the President as within the class of "all current employees" of the federal government for purposes of a social security program). It follows, then, that the President falls within the Westfall Act's express terms, which apply to "all federal employees . . . without regard to agency affiliation or line of work." *Levin v. United States*, 568 U.S. 503, 509 (2013).

The President is no less an employee because no individual person "supervises the President's day-to-day operations." *Contra* Opp'n to Substitution, at 19–20, Dkt. 246 (relying on principles of agency law). Even if no person manages the President in his daily activities, he is nonetheless obligated to and serves in the interests of the United States. *See* Restatement (Second) of Agency, ch. 7, topic 2, tit. B, intro. note ("[H]ighly placed employees . . . such as presidents . . . are not less servants because they are not controlled in their day-to-day work by other human

beings. Their physical activities are controlled by the sense of obligation to devote their time and energies to the interests of the enterprise."). The President is also subject to various external checks on his exercise of authority, including "constant scrutiny by the press," "vigilant oversight by Congress," "a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature." *Carroll*, 49 F.4th at 770 n.8 (citing *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982)) (cleaned up). By analogy, Article III judges and members of federal Congress and are likewise unsupervised by any human manager, but it has long been "a matter of common understanding" that federal judges, *LePatourel*, 571 F.2d at 408, and congress members, *Does 1-10 v. Haaland*, 973 F.3d 591, 597–98 (6th Cir. 2020), fall within the ambit of the Act.

Nor does the Act's reference to the "executive departments," 28 U.S.C. § 2671, preclude the President from its coverage. The plaintiffs' argument that "executive departments" means only 15 cabinet-level executive agencies, *see* Opp'n to Substitution, at 15–17, contradicts precedent and long-standing practice. For example, employees of the Executive Office of the President ("EOP") are not part of any agency under the plaintiffs' definition, but courts routinely permit EOP employees to be substituted. *E.g.*, *Wilson v. Libby*, 535 F.3d 697, 711–12 (D.C. Cir. 2008) (Vice President and Vice President's Chief of Staff); *Alexander v. FBI*, 691 F. Supp. 2d 182, 196–97 (D.D.C. 2010) (Director of White House Office of Personal Security and White House Counsel), *aff'd* 456 F. App'x 1 (D.C. Cir. 2011); *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 82 (D.D.C. 2017), *rev'd on other grounds*, 916 F.3d 1 (D.C. Cir. 2019) (President's Deputy National Security Advisor); *see also* Pub. L. No. 80-269, ch. 359, tit. I, 61 Stat. 585, 586 (1947) (appropriating funds to components of EOP for payment of FTCA claims).

The plaintiffs argue that because Congress amended the Act in 1988 to cover employees

in the "legislative and judicial *branches*," in contrast to the "executive *departments*," Congress

intended to exclude employees of the executive *branch* and the President.  Surreply, at 6–7, Dkt.

255.[3]  But that presumes Congress understood the FTCA to only cover a sliver of the executive

branch when it adopted the 1988 amendment.[4]  The legislative history on which the plaintiffs rely

---

[3] The FTCA's use of the term "executive departments" dates to 1946, whereas the addition of the
legislative and judicial branches occurred four decades later.  *See* Pub. L. No. 79-601, ch. 753, tit.
IV, § 402, 60 Stat. 812, 842 (1946) (original definition); Pub. L. No. 100-694, § 3, 102 Stat. 4563,
4564 (1988) (amending 28 U.S.C. § 2671 to add "the judicial and legislative branches" to the
definition of "Federal agency").

[4] The plaintiffs also argue that several amendments which extended the FTCA's coverage to
specific executive branch individuals demonstrated an intent to provide only "piecemeal" coverage
to the branch.  Surreply, at 9–10.  But there is no evidence Congress had such an intent—the
relevant amendments merely clarified the coverage of employees with unique or quasi-federal
status.

     For example, in 1981, Congress amended the "employee" definition to add "members of
the National Guard while engaged in training or duty."  *See* Pub. L. No. 97-124, § 1, 95 Stat. 1666
(1981).  The accompanying House Report explained that the amendment was necessary because
National Guard members have an idiosyncratic status as sometimes under the direction of state
governments:

> Except when federalized, the Guard is under the direct order of state governments.
> For this reason, its activities have not been covered by the Tort Claims Act even
> though the Army and Air National Guard have similar roles in Defense planning
> and training as do the Army Reserve and the Air Force Reserve. This bill amends
> the tort claims provisions of title 28 to provide the National Guard the same
> coverage under the Tort Claims Act as now exists for the Armed Forces and its
> reserve components.

H.R. Rep. 97-384 at 2.

     Further, in 2000, Congress amended the employee definition to clarify that the FTCA
would cover "any officer or employee of a Federal public defender organization, *except* when such
officer or employee performs professional services in the course of providing representation under
section 3006A of title 18."  Pub. L. No. 106-518, § 401, 114 Stat. 2421 (2000) (emphasis added).
That amendment operated to *rescind* coverage for certain claims against federal public
defenders—it provided that claims arising from public defenders' representational services should
be prosecuted under the "malpractice provisions of 18 U.S.C. § 3006A(g)(3) specifically enacted
in 1986 to deal with such claims," rather than under the FTCA.  *See* H.R. Rep. 106-312 at 26.

suggests otherwise.  The House Report cited by the plaintiffs, *see* Opp'n to Substitution, at 20, explains that Congress understood the "FTCA [to] currently cover[] employees of the Executive *Branch* only," H.R. Rep. 100-700 at 5 (emphasis added).  The 1988 amendment "ma[d]e explicit that employees of the judicial and legislative branches are included . . . so that officers and employees of these branches of government will be covered by the FTCA *in the same way* as employees of the Executive Branch." *Id.* at 8 (emphasis added).  The Report further explains that another provision of the Act, *see* Pub. Law. No. 100-694, § 4, 102 Stat. 4564, "specifically preserves . . . traditional immunities" and that "the United States would also be able to continue to assert other functional immunities, such as *Presidential or prosecutorial immunity*." *Id.* at 5 (emphasis added).  The reference to Presidential immunity suggests the drafters presumed the President to be covered. *Cf. Operation Rescue Nat'l v. United States*, 147 F.3d 68, 70–71 (1st Cir. 1998) ("Why would Congressmen vote to exclude themselves from a universal grant of immunity given to all others; to all employees below them; to all officers, *up to the president*, above them?" (emphasis added)).

In the light of the statutory text and contextual evidence, the Court concludes that the President is an "employee of the Government" for purposes of the Westfall Act.

### 2.    Scope-of-Employment Inquiry

Next, the Court will evaluate whether President Trump acted within the scope of his employment when he ordered law enforcement to clear protestors from Lafayette Square.  *See* 28 U.S.C. §§ 1346(b)(1), 2679.  The government's certification, Dkt. 238-1, is *prima facie* evidence that President Trump acted within his official scope, *Council on Am. Islamic Relations*, 444 F.3d at 662.  The plaintiffs bear the "burden of coming forward with specific facts rebutting the certification." *Klayman*, 125 F. Supp. 3d at 82 (quoting *Stokes*, 327 F.3d 1210 at 1214).

To determine whether a federal employee acted within the scope of his office, the Court looks to the respondeat superior law of the state in which the alleged act or omission occurred. *See Williams v. United States*, 350 U.S. 857 (1955). The parties agree that the District of Columbia law of respondeat superior, which tracks the four-factor test set forth in the Restatement (Second) of Agency, applies to this case. Opp'n to Substitution, at 21; Reply in Support of Substitution, at 15, Dkt. 251. Under that test, employee conduct is within the scope of employment if: (1) it is of the kind the employee is employed to perform; (2) it occurs within authorized time and space limits; (3) it is actuated at least in part by a purpose to serve the employed; and (4) for instances where the employee intentionally used force against another, the use of force is expectable as part of the employee's role. *See Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023) (citing Restatement (Second) of Agency § 228).

At core, President Trump's challenged conduct involved "order[ing] law enforcement officers" to "forcibly drive protestors from Lafayette Park." Buchanan Sec. Am. Compl. ¶¶ 56, 60. Taken at face value, ordering law enforcement to respond to large-scale protests near to the White House is self-evidently the "kind" of conduct the President may perform. *Carroll*, 292 A.3d at 230–32. As head of the executive branch, it is the President's prerogative to maintain national security. *See Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). The D.C. Circuit has explained that "regulating the conduct of law enforcement officers near the White House unquestionably has national security implications." *Buchanan*, 71 F.4th at 1009 (cleaned up) (noting the "nation's overwhelming interest" in protecting the "safety of the President and the area surrounding the White House" (cleaned up)); *see also Maintaining Essential Services in the District of Columbia in the Event Appropriations Cease*, 12 O.L.C. Op. 290, 294 (1988) ("[T]he President has the inherent authority to take steps to preserve such order in the District of Columbia as may be

necessary to protect the functioning of the federal government."). And there is no question the President may give direction to federal law enforcement agencies. *See Trump v. United States*, 603 U.S. 593, 620 (2024).

According to the plaintiffs, the President's orders were unwarranted given the protests were largely "peaceful." Buchanan Sec. Am. Compl. ¶ 55. But the Court is reticent to make post-hoc judgment in matters "with possible national security implications." *Buchanan*, 71 F.4th at 1009 (citing *Hernandez v. Mesa*, 589 U.S. 93, 107 (2020)). In-the-moment decisions "regarding presidential and White House security" are properly left to the executive's discretion, *id.*, and the Supreme Court has cautioned "deference to what the Executive Branch 'has determined is essential to national security,'" *Ziglar*, 582 U.S. at 142–43 (cleaned up) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 26 (2008)). In weighing the plaintiffs' factual proffers, the Court cannot ignore the commonsense conclusion that a large crowd of protestors gathered at nightfall near the White House posed some measure of national security risk. *See A Quaker Action Grp. v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975) ("[I]t cannot be denied that a public gathering presents some measure of hazard to the security of the President and the White House."). Although the Court makes no determination at this stage on the legality of the President's conduct, that "there was no security rationale whatsoever" for clearing the protestors is untenable. *Contra* Opp'n to Substitution, at 24. The Court cannot say the President's direction to law enforcement was the kind of conduct he was unauthorized to perform under prong one of respondeat superior.

The plaintiffs further contend that the President's actions were improperly motivated: he allegedly cleared the park to take videos and photographs of himself holding a Bible in front of St. John's Episcopal Church, to bolster his own image for his re-election campaign. Buchanan Sec. Am. Compl. ¶¶ 105–106. As further evidence of the President's "purely personal and political"

motives, the plaintiffs highlight a "29-second campaign-style video" of the President's walk across Lafayette Park after its clearance, and his contemporaneous tweets "denigrating" George Floyd to "secure political points."  Opp'n to Substitution, at 24–25; Buchanan Sec. Am. Compl. ¶¶ 45, 106. These allegations are properly analyzed under prong three—whether the President's conduct was "actuated, at least in part, by a purpose to serve" the United States.  *Carroll*, 292 A.3d at 228.

To evaluate an employee's purpose, the Court looks to (1) "the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer"; (2) whether there was "at least some discernable purpose to serve the employer"; and (3) "any probative, relevant evidence tending to establish the employee's purpose behind their conduct, regardless of how temporally remote that may be from the moment of the tort."  *Id.* at 234–37. "[E]ven a *partial* desire to serve the master is sufficient," *Council on Am. Islamic Relations*, 444 F.3d at 665, and "the fact that an agent may be motivated by self-interest, or interests other than those of its principal is not dispositive," *Klayman*, 125 F. Supp. 3d at 84.  An employee's "partial purpose to serve their employer" need only be "more than an insignificant interest."  *Carroll*, 292 A.3d at 237.

Even assuming President Trump cleared Lafayette Square with an eye toward bolstering his public image, that motivation would not vitiate a simultaneous purpose to serve the United States.  *Klayman*, 125 F. Supp. 3d at 84–85.  Elected officials routinely undertake official duties with the intent to enhance their public standing or improve their re-election prospects—self-interest alone does not necessarily transform their conduct into purely private activity.  *See Blassingame v. Trump*, 87 F.4th 1, 20–21 (D.C. Cir. 2023) (whether the President was acting in an unofficial capacity "does not turn on whether the activity was subjectively undertaken in some measure to enhance the President's re-election prospects or profile").

By the plaintiffs' own account, President Trump's contemporaneous tweets characterized the protestors as a national security threat: he asserted he would "send in the National Guard & get the job done right" if there was "[a]ny difficulty" or "when the looting starts"; that "the Federal Government will step in and do what has to be done, and that includes using the unlimited power of our Military"; and that the protestors "[are]n't going to stop until the good guys are willing to use overwhelming force against the bad guys."  Buchanan Sec. Am. Compl. ¶¶ 43–46.  While the Court takes no position on the ultimate accuracy of those characterizations, they are at least evidence of the President's subjective belief of an imminent threat.  *Carroll*, 292 A.3d at 234; *cf. Nixon*, 457 U.S. at 756 (emphasizing the need to avoid "highly intrusive" inquiries "into the President's motives").  That the President later sought credit for enforcing national security—by posing for a photo-op and releasing the footage—does not undermine his "discernable purpose" of protecting the area around the White House.  *Carroll*, 292 A.3d at 235; *cf. Harbury v. Hayden*, 522 F.3d 413, 421 n.3 (D.C. Cir. 2008) (Kavanaugh, J.) ("In tort cases arising in the national security or foreign policy context," courts are "counsel[ed] strongly against judicial second-guessing of the Attorney General's certification . . . [because] [d]oing so would require courts to intrude deeply into the foreign policy and national security decisionmaking process of the Executive Branch.").  On the whole, the Court finds that the plaintiffs have failed to rebut that President Trump's conduct was actuated in part by his purpose to serve the security interests of the United States.

Because the Buchanan plaintiffs have failed to allege facts that could rebut the government's scope-of-employment certification, the Court will deny the plaintiffs' motion for limited jurisdictional discovery.  *See Wuterich v. Murtha*, 562 F.3d 375, 382–83 (D.C. Cir. 2009) ("[T]here is no right to even limited discovery in a Westfall Act case unless and until a [movant

has alleged facts sufficient] to rebut the Government's certification.").  The Court will grant the motion to substitute President Trump under the Westfall Act as to Counts III, V, VII, VIII, and IX of the Buchanan complaint.

### B.    Motions to Dismiss[5]

The United States moves to dismiss the claims against federal defendants for failure to exhaust, lack of jurisdiction, and failure to state a claim.  The Court will address each issue in turn.

#### 1.    Exhaustion

The government contends that the plaintiffs failed to exhaust the claims originally asserted against federal officers (Counts XIII and XIV of the BLMDC complaint) and against President Trump (Counts III, V, VII, VIII, and IX of the Buchanan complaint).  Upon substitution under the Westfall Act, those claims "automatically convert[ed]" to actions under the FTCA against the United States, and accordingly, all of the FTCA's "requirements, exceptions, and defenses apply." *Harbury*, 522 F.3d at 416.

The FTCA bars plaintiffs from suing in federal court until they have exhausted their administrative remedies.  *McNeil v. United States*, 508 U.S. 106, 113 (1993).  A plaintiff must "first present[] the claim to the appropriate Federal agency and . . . be[] finally denied by the agency in writing" or see the claim go unresolved for six months, before he files a lawsuit.  28 U.S.C. § 2675(a).  The statute imposes a "burden of notice, not substantiation," on the plaintiff. *GAF Corp. v. United States*, 818 F.2d 901, 919 (D.C. Cir. 1987) (explaining that notice requires a "written statement sufficiently describing the injury to enable the agency to begin its own investigation").  Claimants must file an administrative complaint with the agency accused of the

---

[5] For purposes of the motions to dismiss, the Court accepts as true all material factual allegations in the complaint.  *See Am. Nat. Ins. Co.*, 642 F.3d at 1139.

alleged wrongdoing to exhaust claims with the "appropriate" federal agency.  *Norton v. United States*, 530 F. Supp. 3d 1, 6–7 (D.D.C. 2021) (citing 28 U.S.C. § 2675(a)).  And "*each* claimant must file his or her own written notice."  *Miango v. Democratic Republic of the Congo*, 243 F. Supp. 3d 113, 132 (D.D.C. 2017) (emphasis added).  "[E]xhaustion is a jurisdictional requirement," *Mensaw-Yawson v. Raden*, 170 F. Supp. 3d 222, 233 (D.D.C. 2016) (citing *GAF Corp.*, 818 F.2d at 917–20), and "a plaintiff's failure to heed that clear statutory command warrants dismissal," *id.* (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993) (quotations marks omitted).

i.    BLMDC Plaintiffs' Claims

The BLMDC organization is the sole plaintiff with respect to Counts XIII and XIV of the operative complaint.  *See* BLMDC Fourth Am. Compl. ¶¶ 192–202.  The organization does not allege that it filed any administrative complaint—only the individual plaintiffs filed Standard Form 95 administrative complaints with federal agencies—nor does it now dispute that it failed to exhaust its administrative remedies.  *See* BLMDC Opp'n to Mot. to Dismiss, at 17–18, Dkt. 245; *Miango*, 243 F. Supp. 3d at 132 (*each* claimant must administratively exhaust its claims).  Accordingly, the Court will dismiss Counts XIII and XIV of the BLMDC complaint without prejudice under Rule 12(b)(1).

ii.    Buchanan Plaintiffs' Claims

The Buchanan plaintiffs assert similar tort claims against President Trump, for whom the United States has been substituted.  *See* Buchanan Sec. Am. Compl. ¶¶ 144–49, 157–61, 170–84.  The Buchanan plaintiffs allege that the President "direct[ed]" and "agre[ed] to" federal officers' allegedly illegal use of force to commit assault, battery and IIED; and that the President's actions were "based on the content of the beliefs expressed" by the protestors, in violation of the D.C. First

Amendment Assemblies Act.  *Id.*  ¶¶ 146, 159, 171, 182, 188.   On May 24, 2022, the plaintiffs submitted Standard Form 95 administrative complaints to the U.S. Park Police, Federal Bureau of Prisons, D.C. National Guard, and U.S. Secret Service.  *Id.* ¶ 36.  Each plaintiff alleged injuries arising from police officers' use of tear gas and flash-bang grenades; asserted that "members of the U.S. Park Police, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons forcibly dispersed the peaceful protest"; and set forth a sum of damages.  *See* Dkt. 253-1, at 8, 10– 11, 14–15.  None of the administrative complaints mentioned President Trump or made any reference to his conduct.  *See id.*

The Court must determine whether those administrative complaints put the "appropriate" federal agency on notice of the present claims regarding President's conduct.  28 U.S.C. § 2675(a).  The United States argues those claims should have been exhausted before EOP.  *See* Mot. to Dismiss Buchanan, at 7–8.  Although the Court is unaware of any definitive authority prescribing EOP as the agency to be notified of a claim against the President, at a minimum, it finds that notice to the U.S. Park Police, Federal Bureau of Prisons, D.C. National Guard, and U.S. Secret Service was insufficient to exhaust claims against the president.  *See Norton*, 530 F. Supp. 3d at 6–7 (finding no exhaustion where a plaintiff filed notice with the White House rather than the National Park Service); *Ramirez v. United States Park Police*, No. 22-cv-187 (CRC), 2023 WL 1438395, at *3 (D.D.C. Feb. 1, 2023) (finding no exhaustion where a Lafayette Square protestor filed notice with White House Counsel rather than the U.S. Park Police).  "It is [the plaintiff's] responsibility to submit his tort claim to the appropriate federal agency," *Young-Bey v. Unity Med. Healthcare*, 217 F. Supp. 3d 304, 309 (D.D.C. 2016), and the plaintiffs here fail to explain why they had any reason to believe that the Park Police, Bureau of Prisons, National Guard, or Secret Service would be the appropriate agencies to notify of a claim against the President, *see Norton*, 530 F. Supp. 3d

at 6.  Nor did the plaintiffs' administrative complaints make any mention of President Trump, his role in the protests, or his alleged intent to suppress the protestors' beliefs.  Nothing in the complaints would have led a federal agency to "investigate and ascertain the strength of [the plaintiffs'] claim[s]" against the President.  *GAF Corp.*, 818 F.2d at 920.

Accordingly, the Court will dismiss Counts III, V, VII, VIII, and IX of the Buchanan complaint without prejudice under Rule 12(b)(1).

### B.    Waiver of Sovereign Immunity Under the "Law Enforcement Proviso"

Next, the Court will evaluate whether the plaintiffs' FTCA assault and battery claims are barred by sovereign immunity.  The FTCA waives sovereign immunity for tort claims against the United States, *see* 28 U.S.C. § 2674, but the Act contains an exception preserving immunity for "[a]ny claim arising out of assault [or] battery," among other intentional torts, *id.* § 2680(h).  The Act further provides an exception-to-the-exception known as the "law enforcement proviso."  That proviso "extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the 'acts or omissions of investigative or law enforcement officers.'"  *Millbrook v. United States*, 569 U.S. 50, 52–53 (2013) (quoting 28 U.S.C. § 2680(h)).  An "investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violation of Federal law."  28 U.S.C. § 2680(h).  In other words, the FTCA waives immunity only for assault or battery claims arising out of *federal* officers' conduct.  *See Millbrook*, 569 U.S. at 55–56.

### i.    Standard of Review

It is well-settled that "[s]overeign immunity is jurisdictional in nature," *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), but D.C. Circuit precedent suggests that sovereign immunity and *subject-matter* jurisdiction may be distinct concepts, *see Galvan v. Federal Prison Industries, Inc.*,

199 F.3d 461, 463 (D.C. Cir. 1999) (explaining that sovereign immunity can be resolved "even where subject matter jurisdiction is uncertain").  Nonetheless, courts in this district continue to describe a claim barred by sovereign immunity as "lack[ing] . . . subject matter jurisdiction." *E.g., Jones v. United States*, 318 F. Supp. 3d 15, 19 (D.D.C. 2018); *Edwards v. United States*, 211 F. Supp. 3d 234, 236 (D.D.C. 2016); *Scruggs v. Bureau of Engraving & Printing*, 200 F. Supp. 3d 78, 82 (D.D.C. 2016).  A "claim barred by sovereign immunity . . . may be dismissed under a 12(b)(1) motion." *E.g.*, *Edwards*, 211 F. Supp. 3d at 236; *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006); *Stone v. Holder*, 859 F. Supp. 2d 48, 51 (D.D.C. 2012).  Accordingly, the Court will evaluate the plaintiffs' assault and battery claims under Rule 12(b)(1).

Here, the government brings a "facial" jurisdictional challenge to the plaintiffs' claims. *See Cherokee Nation v. United States Dep't of the Interior*, 643 F. Supp. 3d 90, 103–104 (D.D.C. 2022) (explaining that a "facial" challenge disputes the sufficiency of the allegations, while a "factual" challenge disputes the specific facts alleged).  When a jurisdictional challenge is facial, the Court "treat[s] the undisputed facts within or outside the pleadings as true and draw[s] all reasonable inferences in the plaintiff's favor," *id.* at 104, while recognizing that factual allegations "bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim," *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (quotation marks omitted).

### ii.    BLMDC Plaintiffs' Claims

Because the law enforcement proviso waives sovereign immunity for assault or battery claims only if they arise out of *federal* officers' conduct, the plaintiffs must plausibly allege that they were injured by federal officers.  The complaint makes clear that federal officers were part of the coordinated efforts to disperse protestors.  High-level federal officials, including the Attorney

General and the director of the Park Police, were allegedly responsible for giving orders to front-line officers. *See* BLMDC Fourth Am. Compl. ¶¶ 73, 76 ("Barr personally ordered that Lafayette Square be cleared"; and the Acting Chief of the Park Police "gave the order to mo[v]e forward, . . . authorized the use of weapons, and . . . had 'full command and control of th[e] operation.'"). Officers from the U.S. Park Police, Secret Service, D.C. National Guard, and Federal Bureau of Prisons were allegedly involved in the coordinated response. *Id.* ¶ 61 (alleging that "[l]aw enforcement officers from local and federal law enforcement agencies and the military surrounded" the protestors.") The 53-page complaint is also replete with factual allegations of officers' assault and battery, including that they "hit, punched, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields." *Id.* ¶ 86.

The government takes issue with the complaint's failure to name the officers involved in specific allegations as federal. *See* Mot. to Dismiss BLMDC at 9–12. But read in context, *see Menoken v. Dhillon*, 975 F.3d 1, 11 (D.C. Cir. 2020), the allegations clearly reference the actions of federal officers, *see e.g.*, BLMDC Fourth Am. Compl. ¶¶ 61, 70 (identifying the officers as from the "U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons," and then alleging that those officers "donned gas masks in preparation for their deployment of tear gas, smoke canisters, and/or pepper spray and pepper balls"); *id.* ¶ 77 ("[Named federal officers] rushed forward and attacked the assembled protesters without audible warning or provocation. In doing so, law enforcement officials assaulted [the individual plaintiffs] and the other demonstrators present."). Because the complaint plausibly alleges the involvement of federal officers, the Court will deny the government's motion to dismiss Counts XI and XII of the BLMDC complaint under Rule 12(b)(1).

### iii.    Buchanan Plaintiffs' Claims

The Buchanan plaintiffs bring similar assault, battery, and IIED claims "aris[ing] out of" the same conduct as their alleged assault and battery claims. *See Majano v. United States*, 545 F. Supp. 2d 136, 147 (D.D.C. 2008) (explaining that IIED claims arising out of assault or battery conduct are covered by the law enforcement proviso). The plaintiffs allege that mounted officers of the D.C. National Guard and U.S. Park Police charged the crowd; that "Secret Service, Bureau of Prisons 'riot teams,' and . . . U.S. military" were present on the scene; and that federal officers, including from the U.S. Park Police, "deployed tear gas and flash-bang grenades into the crowd." Buchanan Sec. Am. Compl. ¶¶ 53–54. They further allege that then-Attorney General Barr and the chief of the U.S. Park Police ordered the law enforcement response. *Id.* ¶ 51.

The Court finds that the Buchanan plaintiffs have raised a plausible inference that federal law enforcement officers committed the alleged assault and battery. Thus, it will deny the motion to dismiss Counts II and IV of the Buchanan complaint under Rule 12(b)(1). And because those predicate torts giving rise to the plaintiffs' IIED claim survive, the Court will also deny the motion to dismiss Count VI under Rule 12(b)(1).

### 3.    *Failure to State a Claim*

Finally, the Court turns to the government's motion to dismiss all plaintiffs' assault, battery, and IIED claims under Rule 12(b)(6) for failure to state a claim. D.C. common law applies to these claims. *See Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279, 293 (D.D.C. 2003).

In the District of Columbia, assault is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff," *District of Columbia v. Jackson*, 810 A.2d 388, 392 (D.C. 2002), and battery is "an intentional act that causes a harmful or offensive bodily contact," *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (quotation marks

omitted).  The Court finds that the allegations in the complaint, described *supra*, sufficiently state claims for assault and battery under D.C. common law.  Accordingly, the Court will deny the government's motions to dismiss the assault and battery claims under the FTCA with respect to all plaintiffs.

To state an IIED claim in the District of Columbia, "a plaintiff must [allege] (1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress."  *Robertson v. District of Columbia*, 269 A.3d 1022, 1033 (D.C. 2022). "This common law claim has been described as 'a very narrow tort with requirements that are rigorous, and difficult to satisfy.'"  *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2015) (quoting *Snyder v. Phelps*, 562 U.S. 443, 464–65 (2011)).  A defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991) (quotation marks omitted).  "In determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred."  *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (cleaned up).  A court considers the "applicable community standards, the nature of the activity at issue, the relationship between the parties, and the particular environment in which the conduct took place."  *Duncan v. Children's Nat. Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997).

Here, the Buchanan plaintiffs allege that law enforcement officers struck individuals with riot shields and batons, fired rubber bullets, and used tear gas, flash-bang grenades, and smoke bombs, to disperse the large crowd gathered near the White House.  Buchanan Sec. Am. Compl. ¶¶ 53–54, 69, 163–164.  Even taking these allegations in the light most favorable to the plaintiffs, they fail satisfy the elements of an IIED claim.  The Court cannot ignore the setting of the officers'

alleged conduct. *See King*, 640 A.2d at 668. By the plaintiffs' own telling, "[l]arge protests in Washington, D.C. began by May 29, 2020, and continued to grow over the ensuing days. Although most of the protests were peaceful, instances of looting and vandalism did occur, including a fire that broke out in the basement of the historic St. John's Episcopal Church, adjacent to Lafayette Park, on the night of May 31, 2020." Buchanan Sec. Am. Compl. ¶ 46. Law enforcement officers were faced with a mass of protestors, and over the course of the day, "tensions r[o]se between [specific individuals] and the police." *Id.* ¶ 90. In that context, while the officers' alleged conduct is sufficient to support claims for assault and battery, the Court cannot say that they rose to the extreme and outrageous level necessary to plead a claim for IIED. *See e.g.*, *Hargraves*, 134 F. Supp. 3d at 94 (an officer's use of a baton to force a plaintiff to the ground was not extreme and outrageous); *Smith v. District of Columbia*, 882 A.2d 778, 781, 793–94 (D.C. 2005) (rejecting IIED claim where an officer, intervening in a fight, "applied a chokehold to [plaintiff's] throat" and the plaintiff had his jaw broken and spit blood); *Harris v. District of Columbia*, 696 F.Supp.2d 123, 137–38 (D.D.C. 2010) (dismissing IIED claim where a plaintiff alleged that twelve officers used excessive force and unlawfully arrested him with guns drawn). Accordingly, the Court will dismiss the Buchanan plaintiffs' IIED claim without prejudice under Rule 12(b)(6).

*    *    *

In summary, the claims originally asserted against federal officers (Counts XIII and XIV of the BLMDC complaint) and against President Trump (Counts III, V, VII, VIII, and IX of the Buchanan complaint) will be dismissed without prejudice for failure to exhaust administrative remedies. The Buchanan plaintiffs' IIED claim will be dismissed without prejudice under Rule 12(b)(6). The plaintiffs may proceed on their FTCA assault and battery claims under Counts XI and XII of the BLMDC complaint and under Counts II and IV of the Buchanan complaint.

### C.    BLMDC Plaintiffs' Motion for Class Certification

Next, the Court turns to the BLMDC plaintiffs' motion for class certification.[6]  Named

plaintiffs Dustin Foley and E.X. Foley seek to represent a class asserting First Amendment § 1983

claims for damages against D.C. Metropolitan Police Department ("MPD") officers, on behalf of:

> All individuals located one block west of Lafayette Square, at or around the
> intersection of 17th Street NW and H Street NW, on June 1, 2020, around or shortly
> after 6:30 p.m., when MPD officers launched a concerted, uniform offensive that
> included chemical irritants, tear gas, and physical force against those individuals
> (the "Section 1983 Class").

Mot. for Class Cert., at 2.[7]  The plaintiffs propose two theories of constitutional violation: (1) that

MPD officers restricted putative class members' right to speech under *Edwards v. South Carolina*,

372 U.S. 229 (1963); and (2) that officers retaliated against class members' protected activity

through the use of disproportionate force, tear gas, and chemical irritants.  *See Black Lives Matter*

*D.C.*, 544 F. Supp. 3d at 44–48.

In evaluating the Section 1983 class with respect to each theory, the Court must first

determine whether each of the four prerequisites of Federal Rule of Civil Procedure 23(a) are

satisfied.  *See Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529–32 (D.C. Cir. 2006).  Those

prerequisites are that "(1) the class is so numerous that joinder of all members is impracticable; (2)

there are questions of law or fact common to the class; (3) the claims or defenses of the

---

[6] In evaluation a motion for class certification, the Court may look outside the pleadings and make factual findings "to the extent necessary to rule on [the] motion."  *Parker v. Bank of Am., N.A.*, 99 F.Supp.3d 69, 80 (D.D.C. 2015).

[7] The BLMDC plaintiffs also sought to certify a class asserting assault and battery claims under the FTCA (the "FTCA Class").  *See* Mot. for Class Cert., at 21.  But the plaintiffs do not dispute that only 22 individuals timely submitted the administrative claims prerequisite to bringing FTCA claims in federal court, or that 7 of those individuals subsequently settled their claims.  *See* Reply to Class Cert., at 6, Dkt. 254 (withdrawing motion to certify the FTCA Class).  The proposed FTCA Class does not satisfy Rule 23(a)'s numerosity requirement, *see* Fed. R. Civ. P. 23(a)(1), and accordingly, the Court will deny the motion to certify that class.

representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Second, the Court must determine that the proposed class is maintainable under at least one of Rule 23(b)'s subdivisions. *Richards*, 453 F.3d at 529. Where plaintiffs seek money damages, Rule 23(b)(3) requires proof "that the questions of law or fact common to class members predominate over questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614–15 (1997).

### 1.    Speech Restriction

The Court turns first to the plaintiffs' speech restriction claims. The plaintiffs contend that the question of whether MPD officers violated class members' speech rights—by dispersing protestors at the intersection of 17th and H streets around 6:30 p.m.—is susceptible to classwide resolution. The Court will address commonality, typicality, numerosity, and adequacy under Rule 23(a), before turning the requirements of Rule 23(b)(3).

### i.    Commonality

To satisfy Rule 23(a)(2), a plaintiff must establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The "claims [by class members] must depend upon a common contention," and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "Rule 23(a)(2) is satisfied if resolution of each plaintiff's claim turns on a common *question* (or questions) and if common *proof* leads to a common *answer* (or answers) to the question for each plaintiff." *Brown v. District of Columbia*, 928 F.3d 1070, 1080 (D.C. Cir.

2019).  The commonality inquiry must be conducted with specificity, because "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Love v. Johanns*, 439 F.3d 723, 729–30 (D.C. Cir. 2006) (cleaned up).  Courts are cautioned to "avoid certification based on superficial commonalities."  *DL v. District of Columbia*, 302 F.R.D. 1, 12 (D.D.C. 2013), *aff'd* 860 F.3d 713 (D.C. Cir. 2017).  Plaintiffs may prove commonality by showing "widespread wrongdoing by a defendant" through a "uniform policy or practice that affects all class members."  *Id.* (quoting *DL v. D.C.*, 713 F.3d 120, 128 (D.C. Cir. 2013)).

Whether class members were entitled to peacefully demonstrate on June 1, 2020, at or shortly after 6:30 p.m. at the intersection of 17th and H Streets is a question susceptible to common resolution.  BLMDC Fourth Am. Compl. ¶ 170.  The right to peaceful demonstration is unquestionably a foundational constitutional right, *Edwards*, 372 U.S. at 335–36, but the First Amendment does not guarantee that right "at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981).  Restrictions may be permissible if assembled protestors pose a credible threat of violence, *see Feiner v. New York*, 340 U.S. 315, 317 (1951), but such restrictions must be narrowly tailored to achieve a legitimate government interest, *Henderson v. Lujan*, 964 F.2d 1179, 1183–84 (D.C. Cir. 1992) (inquiring whether a "restriction burden[s] substantially more speech than is necessary to further the government's legitimate interests" (citation and quotation marks omitted)).

As framed by the parties, the crux of the dispute is whether the crowd that had left Lafayette Square and was traveling west on H street through the intersection of 17th street was peaceful and whether MPD officers' use of force was reasonable under the circumstances.  If the individual participants in the crowd were not behaving peacefully, the officers contend that no protestor could assert a First Amendment violation.  *See* MPD Opp'n to Class Cert., at 17, Dkt. 249 ("[If] a group

of protestors began violently attacking police officers, individuals who were still in Lafayette Park would likely no longer be entitled to demonstrate there."); *Feiner*, 340 U.S. at 317 (permitting the dispersal of a crowd where "at least one [onlooker] threatened violence").  Likewise, the plaintiffs argue that the officers' response to the entirely peaceful crowd was unjustified.  *See* Mot. for Class Cert., at 24–25 (common questions include what "elements of physical force were authorized and deployed" by the officers; whether officers' "justifications [for the use of force were] reasonable under the circumstances"; and whether officers "adequately inform[ed] protesters that they should disperse" and "allow[ed] them an opportunity to do so before using force").  The plaintiffs further allege that MPD policy authorized the unlawful use of force against all protestors.  *See id.*  Because these inquiries turn on the behavior of the crowd *at large* and on the presence of a "uniform [MPD] policy," the Court finds that they are amenable to classwide resolution.  *DL*, 713 F.3d at 128.

The officers protest that the speech restriction claims could not give rise to liability. According to the officers, MPD was not responsible for coordinating the high-level response to the Lafayette Square protests, and MPD officers only deployed tear gas at 17th and H streets after a protestor threw an explosive device.  *See* MPD Opp'n to Class Cert., at 8–10.  But those arguments go to the merits of the plaintiffs' claims, not to the absence of a common question.  *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (cautioning against "free-ranging merits inquiries at the certification stage").  Indeed, the MPD officers' proof on these questions could ultimately demonstrate the absence of any classwide First Amendment violation.

For these reasons, the Court finds no deficiency in commonality with respect to the plaintiffs' speech restriction claims.

ii.    Typicality

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties

are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality "concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). The requirement is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Little v. WMATA*, 249 F. Supp. 3d 394, 420 (D.D.C. 2017) (cleaned up).  Commonality and typicality "often overlap because both serve as guideposts to determine whether a class action is practical and whether the representative plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class members." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 331 (D.D.C. 2018) (quotation marks omitted).

The representative plaintiffs' speech restriction claims satisfy typicality.  Each class member asserts that their rights to speech and assembly were violated by MPD officers' dispersal of the protestors who traveled through the intersection of 17th and H streets.  As the Court has explained, a determination of the constitutionality of the officers' conduct will turn on the behavior of the crowd as a whole and on whether MPD officers' actions at 17th and H streets were reasonable in context.  The "type of force, the circumstances in which it was employed, and by and at whom" are not discrepancies that are likely to affect class members' claims differently. *Contra* MPD Opp'n to Class Cert., at 20–21.  If one class member "was about to throw an explosive at police officers," *id.* at 20, for example, the officers' response to the perceived threat would affect the reasonableness of the force used to disperse the crowd in aggregate.  Thus, each claim—including the representative plaintiffs'—arises from the same context and the "same course of events," and relies on "similar legal arguments." *Little*, 249 F. Supp. 3d at 420. Accordingly, the Court finds that typicality is satisfied as to the speech restriction claims.

###### iii.    Numerosity

To satisfy Rule 23(a)(1), a plaintiff must show that the "class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although the requirement includes no "hard rules for when joinder will be found to be impracticable," *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015), courts generally find numerosity satisfied when a plaintiff presents credible evidence that "a proposed class has at least forty members," *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013); *see Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988).  The Court "must resolve any factual disputes regarding the existence of a sufficiently numerous class."  *Coleman*, 306 F.R.D. at 77.

Numerous protestors were affected by MPD officers' dispersal efforts at the intersection of 17th and H streets.  Thousands of individuals were present in Lafayette Square around 6:30 p.m., and the intersection at 17th and H streets lies immediately northwest of the Square.  *See* Reply to Class Cert., at 17, Dkt. 254.  The defendants' body camera footage and the plaintiffs' video evidence show that large numbers of protestors—well in excess of 40—were affected by MPD officers' clearance of the intersection.  *See* Body-Worn Camera Video of then-Sergeant Brian Stacks, Dkt. 249-1, at 3; Reply to Class Cert., Ex. A, Roddy Hafiz, Edited White House Raw Footage, https://www.youtube.com/watch?v=nkbII5vicS8 (June 3, 2020), Dkt. 254-2.  The Court finds that numerosity is satisfied.

###### iv.    Adequacy

Under Rule 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class."  The plaintiffs are represented by three well-respected public interest organizations—the American Civil Liberties Union of the District of Columbia, the Lawyers' Committee for Civil Rights Under Law, and the Washington Lawyers Committee for Civil Rights

and Urban Affairs—and one law firm, Arnold & Porter.  Class counsel have decades of civil litigation experience, including in class actions and civil rights lawsuits.  *See* Decl. of Scott Michelman, Dkt. 237-42; Decl. of Kaitlin Banner, Dkt. 237-43; Decl. of John A. Freedman, Dkt. 237-44.  The defendants do not challenge the adequacy of the representative plaintiffs or proposed class counsel.  Accordingly, the Court finds that the adequacy requirement is satisfied.

v.    Predominance and Superiority under Rule 23(b)(3)

Because the plaintiffs seek certification for a class asserting claims for damages, the Court must find (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

On the question of predominance, the "common, aggregation-enabling, issues in the case" must be "more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up).  Predominance "duplicates the commonality analysis in many respects, delving further into an inquiry of the relative importance of the common issues to the case."  *Barnes v. District of Columbia*, 242 F.R.D. 113, 123 (D.D.C. 2007).  Here, the dominant issue is liability—specifically, whether the defendant officers are liable for violating class members' speech and assembly rights.  That issue dwarfs "whatever unique issues might arise the damages stage."  *Id.*; *contra* MPD Opp'n to Class Cert., at 26–27.  To the extent the plaintiffs' claims may give rise to differing damages calculations, those determinations can be resolved in a subsequent stage of litigation.  *See Barnes*, 242 F.R.D. at 123 (certifying Fourth Amendment class under Rule 23(b)(3) even though "unique issues might arise at the damages stage"); *Coleman*, 306 F.R.D. at 85 (D.D.C. 2015) ("[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself

to preclude class certification." (citing *McCarthy v. Kleindienst,* 741 F.2d 1406, 1415 (D.C. Cir.

1984)).  The Court finds no deficiency in predominance.

On the question of superiority, the Court must determine whether "resolution by class

action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of

decisions as to persons similarly situated, without sacrificing procedural fairness.'"  *Meijer, Inc.*

*v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 313 (D.D.C. 2007) (quoting *Amchem*,

521 U.S. at 615).  Rule 23(b)(3) instructs the Court to consider the following factors:

> (A) the interest of members of the class in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already commenced by or against members of the class; (C) the
> desirability or undesirability of concentrating the litigation of the claims in the
> particular forum; (D) the difficulties likely to be encountered in the management of
> a class action.

Ultimately, the rule "militates in favor of class actions where common legal or factual questions

allow a court to 'consolidate otherwise identical actions into a single efficient unit.'"  *Barnes*, 242

F.R.D. at 123 (quoting *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 12 (D.D.C. 2002)).

In this case, where putative class members present nearly identical speech restriction claims

against the same defendant officers, the class action device offers a more efficient and consistent

mechanism for resolution than *in seriatim* actions by each class member.  Given that the costs of

litigation may exceed the damages recoverable by any individual, pooling claims will permit the

plaintiffs to pursue claims "which [c]ould be uneconomical to litigate individually."  *Phillips*

*Petrol. Co. v. Shutts*, 472 U.S. 797, 809 (1985).  Moreover, the events in dispute occurred in the

District of Columbia and most plaintiffs and defendants reside in or near D.C., so this district is

the best forum for resolving the claims presented.  Finally, the experience of class counsel suggest

that this action will be a superior device for managing and resolving the putative class action.

The defendants contend that service of notice poses an insurmountable obstacle to

superiority.  Because most class members were not "detained, arrested, or prosecuted," the defendants argue that no mechanism could notify all eligible plaintiffs and that no "objective proof" could establish who is entitled to recovery.  *See* MPD Opp'n to Class Cert., at 27–28.  But the Court sees no reason why individualized notice to the over-300 individuals who have already contacted class counsel, *see* Mot. for Class Cert., at 22, in addition to public notice over print and internet platforms, would be insufficient to notify eligible class members, *see Pigford v. Veneman*, 355 F. Supp. 2d 148, 162–63 (D.D.C. 2005) (publication in newspapers or periodicals is sufficient to notify potential class members).  True, the plaintiffs must ultimately prove that alleged class member were actually present when protestors were dispersed at 17th and H streets—and thus entitled to damages—but that proof goes to the question of the merits.  At this stage, the plaintiffs need only provide objective parameters for defining the class, which they have done.  *See e.g.*, *McCormick & Co. Inc. v. Pepper Prods. Mktg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 243 (D.D.C. 2019) ("[P]laintiffs need only establish that the proposed classes are defined by 'objective criteria.'").

The Court finds that the requirements of Rule 23(b)(3) are satisfied, and it will certify a damages class with respect to the speech restriction claims.  It will appoint Dustin Foley and E.X. Foley as class representatives of the Speech Restriction Section 1983 Damages Class, and it will appoint the plaintiffs' requested class counsel.

### 2.    *First Amendment Retaliation*

Next, the Court turns to the certification of a Section 1983 class asserting First Amendment retaliation claims.  To state a claim for First Amendment retaliation, a plaintiff must allege that: "(1) he [or she] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from

speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted). To prove causation, it "is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398–99, 400 (2019) (explaining that retaliatory motive requires the defendant's "subjective animus").

The Court's analysis will begin and end with commonality under Rule 23(a)(3). The subjective nature of the but-for causation analysis proves fatal to commonality. Unlike the speech restriction claims, which can be resolved by assessing the crowd at 17th and H streets as a whole, the First Amendment retaliation claims will require an analysis of the injuring officer's subjective motive with respect to each class members. Such analysis will inevitably present individualized questions of fact and law. The evidence establishes multiple plausible motives for the officers' conduct: MPD officials instructed officers to focus "on enforcing the [7:00 p.m.] curfew," numerous protestors physically resisted as the MPD line moved to clear the intersection and H street before curfew, and Sergeant Thau allegedly first deployed tear gas only after a protestor had thrown an explosive device. *See* MPD Opp'n to Class Cert., at 7–10; Reply to Class Cert., at 10 (citing Edited White House Raw Footage, 2:40–5:34). Whether the named officers were driven by legitimate law enforcement motives, or by animus against expressive activity, will require a case-by-case assessment of factors including each class member's own conduct. Individuals who were injured despite maintaining distance and "walking backwards with their hands raised," for example, will prove more plausible cases of unconstitutional retaliation than individuals who physically confronted officers or resisted the MPD line. *See* Reply to Class Cert., at 10. Because

34

no common proof could establish whether an officer's retaliatory motive was the but-for cause of *each* class member's protected activity, *see Brown*, 928 F.3d at 1081, the retaliation claims cannot meet Rule 23(a)(2)'s commonality requirement. Accordingly, the Court will deny the plaintiffs' motion to certify a class asserting First Amendment retaliation claims.

In the alternative, plaintiffs seek certification of an issues class under Rule 23(c)(4) with respect to the retaliation claims. But a certified class "must meet both the threshold requirements of Rule 23(a) and be maintainable under one of Rule 23(b)'s categories." *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 759 (D.C. Cir. 2023). Because the class asserting First Amendment retaliation claims does not satisfy commonality under Rule 23(a), the Court cannot certify an issues class with respect to those claims.

## CONCLUSION

For the reasons stated, the Court grants the government's Motion to Substitute under the Westfall Act, and it grants in part and denies in part the government's Motions to Dismiss. Further, the Court grants in part the BLMDC plaintiffs' motion for class certification. A separate order accompanies this memorandum opinion.

March 14, 2025

DABNEY L. FRIEDRICH
United States District Judge