BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLACK LIVES MATTER D.C., et al., Plaintiffs,

vs.

DONALD J. TRUMP, et al., Defendants.

Case Number 20-cv-1469
Case Number 20-cv-1542

November 13, 2025
1:49 p.m.

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:
MINDY GORIN, ESQ.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019

AMANDA LESAVAGE, ESQ.
LEE CRAIN, ESQ.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166

For the Defendants:
RICHARD P. SOBIECKI, ESQ.
BRENDAN HEATH, ESQ.
MARCUS IRELAND, ESQ.
Office of the Attorney General
400 Sixth Street Northwest
Washington, D.C. 20001

Official Court Reporter:
SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present telephonically.)

COURTROOM DEPUTY: We are on the record in consolidated Civil Cases 20-1469 and 20-1542, Black Lives Matter D.C., et al., versus the United States of America, et al.

Starting with plaintiffs' counsel, please state your appearance for the record.

MS. GORIN: Good afternoon, Your Honor. This is Mindy Gorin from Arnold & Porter on behalf of the class plaintiffs.

And also on the line today are my colleague John Freedman and co-counsel Hannah Mullen from the Washington Lawyers' Committee, Anisa Sirur from the National Lawyers' Committee, and Scott Michelman from the ACLU D.C.

THE COURT: All right. Good afternoon to all of you.

Who do we have for the defendants?

MR. SOBIECKI: Good afternoon, Your Honor. Richard Sobiecki, Marcus Ireland, and Brendan Heath from the District.

THE COURT: Okay. I'm hearing some feedback. Can somebody mute their line? I don't know if you all are in the same room, but it's hard to hear on my end.

Okay. Ms. Gorin --

MS. LESAVAGE: Your Honor, apologies for interrupting. This is Amanda LeSavage from Gibson, Dunn on behalf of plaintiffs Radiya Buchanan, Ann Dagrin, and Lindsay Field. And I am joined by my colleague from Gibson, Dunn Lee Crain.

THE COURT: All right. Good afternoon.

All right. I'm still hearing feedback. Is there anything anyone can do to mute?

Ms. Gorin, will you be speaking for the plaintiffs? For the plaintiffs side in whole, is there just one of you speaking for both cases?

MS. GORIN: I will be speaking today.

THE COURT: That's Ms. Gorin?

MS. GORIN: Yes.

THE COURT: All right. And for the defendants, is that Mr. Sobiecki?

MR. SOBIECKI: Yes, Your Honor.

THE COURT: Ms. Calloway, do you have any idea why there's so much feedback on this line?

COURTROOM DEPUTY: It could be just because everyone is not muted, and it also could be something to do with the courtroom. But I've muted all the mics in the courtroom. So it shouldn't be the courtroom.

THE COURT: All right. I would ask everyone with the exception of Ms. Gorin and Mr. Sobiecki to mute your phones.

All right. I have before me the e-mail, and thank you for that, outlining ten different issues of dispute between the parties regarding ongoing discovery. I would like to start with some of the more straightforward issues that appear to me easy to resolve, the first being issue number 7, which is the

plaintiffs' request for records relating to the officers' injury.

According to the plaintiffs, the defendants have omitted portions of the report, and this report is -- I guess it's the Form TD-42. Regardless, according to the plaintiffs, photographs, medical records, and other items were omitted from discovery.

It does seem to the Court that this evidence about the injury is relevant to the D.C. parties' defense, as well as assessing whether the injury was caused by a protestor or friendly fire.

As I understand it, the District's position is simply that the plaintiffs' position is absurd and the friendly fire claim is demonstrably false.

That said, I think this is relevant evidence, and I don't see why the District is not producing contemporaneous photographs, medical records, and other documents about the injury.

Mr. Sobiecki, am I missing anything here?

MR. SOBIECKI: Well, I guess first, Your Honor, it's not that we are omitting anything. What exists is attached to the IAD report. So I think the first question is, do we have to expend additional resources and time to track down these records?

Officer Murphy is a former employee. He left the District

employ a long time ago. Presuming he was treated at the Police and Fire Clinic, that would be the next resource that we could potentially check, but contacting Sergeant -- or Officer Murphy and attempting to have him track down records relating to his injury.

I also don't see the extent of the injury. In realtime, the officers there obviously would not have known the extent of his injury. These are records that are going to relate to the days and weeks after the fact. I guess I'm not connecting the dots onto the seriousness of his injuries relating back to whether the actions of other officers there were defensible.

And I don't want to --

THE COURT: This may not in the end be admissible at trial, but I think in discovery the standard is broad. And the Court does have to weigh burden on the defense, and I guess at this stage, what I would do is I would ask you to contact Officer Murphy. It seems that if these records are relevant to the defense and to the issue as to how the injury was caused, in the end, they may not be admissible if there's ever a trial in this case, but I think for discovery, it seems to me these are appropriate to turn over. You say --

MR. SOBIECKI: Your Honor, we can -- go ahead.

THE COURT: Go ahead.

MR. SOBIECKI: Your Honor, I guess I want to better understand how much of a lift I need to engage in to track down

these records. I will contact Officer Murphy. I can ask the Police and Fire Clinic.

But beyond that, I don't -- I'm not -- I guess, do I have to go subpoena the doctors that may have treated him? If Officer Murphy tells me you know what, this is five years ago, I don't have any records relating to this, do I need to go beyond that?

THE COURT: Well, let me hear from the plaintiffs. Obviously, I don't know a lot about the -- I know nothing about the evidence, the discovery you've received already. Photos seem most important, in my view.

What do you have? What more do you seek to obtain here?

MS. GORIN: Thank you, Your Honor.

So we have, as we submitted in e-mail, a partial TD-42 form, which is a record made about the injury. We know that it is partial because the record that we have references photos, other items submitted with the report. And so we know that at some point there was a complete form.

And so I think what the District has proposed doing makes sense, plus checking records from the Internal Affairs Department, which I guess from the references they seem, at least at one point, to have had these records and photos, et cetera, submitted on the TD-42. So I think checking, doing a reasonable search for that full form.

THE COURT: Mr. Sobiecki, is that something you can

do?

MR. SOBIECKI: Sure, Your Honor, sure.

THE COURT: Okay. All right. So I hope that that will take care of issue 7. Beyond that, I'm not sure that I would order the District to do more, but I'm hopeful that once they've check these boxes, the plaintiffs have what they need and are satisfied. If not, I can revisit this again with a joint e-mail to chambers.

Issue number 8, obviously, the District didn't pick up all the bottles, rocks, bricks, fireworks at the scene. But to the extent there are any additional reports or documentation about what was recovered, that does seem relevant as well.

Mr. Sobiecki, are you confident that you've produced responsive records to this inquiry?

MR. SOBIECKI: Well, Your Honor, let me -- it was a -- that night was -- what kind of time frame are we looking? There were objects thrown at officers throughout the night. I presume we're talking about this kind of isolated time/location that's the subject of the lawsuit.

And to that extent, yes, if it's not pictured in the BWC or it's not in the IAD report, that is the universe of material that we could check, Your Honor.

THE COURT: It's been a while since my head has been in this case, but my recollection is that things sort of progressed from the park into the street where this incident

occurred.

So I don't know that when you're talking about evidence relating to just the immediate vicinity, are you including context?

MR. SOBIECKI: I guess I was meaning post 7:00. This event occurred between 6:30 and 7:00. Later in the night, there was a host of other activities that occurred --

THE COURT: After the fact.

MR. SOBIECKI: -- which I presume we're not talking about.

THE COURT: Well, I would hope not.

Is there any reason, Ms. Gorin, why you need information about what happened later in the night after this incident?

MS. GORIN: Your Honor, I think limiting it to the incident makes sense.

THE COURT: Okay. So it sounds like Mr. Sobiecki is saying that they have provided that.

Am I correct, Mr. Sobiecki?

MR. SOBIECKI: That's correct. To the extent there's any documentation of it, it would be in the IAD report.

THE COURT: Which you've provided?

MR. SOBIECKI: That is correct, and the BWC. In other words, I'm saying the BWC may reflect objects being thrown at the officers. So I would consider that documentation as well.

THE COURT: But are there reports that memorialize

this?

MR. SOBIECKI: Those would be in the IAD report, Your Honor.

THE COURT: Ms. Gorin, it sounds like they've complied with this. Do you disagree?

MS. GORIN: I do, because the key here is that in the 901-M report, the one that we have received from the District, it was stated that bottles, rocks, bricks, all these things were recovered from the incident site.

THE COURT: What more do you want? It's not surprising they don't have these items.

MS. GORIN: We would like them to make sure of that. I think there could be a reasonable search of evidence and property rooms, and because there is this documentation and this reference to these objects having been collected, we would like an explanation of if they were collected and they no longer exist and were not maintained, where they may have gone and things along those lines.

THE COURT: Mr. Sobiecki, any response to that?

MR. SOBIECKI: Sure. In terms of property, if there was not a CCN or not a case associated with it, there would be no way to look in the property room. Yes, I understand that they were recovered, but I don't think, you know, these items held special evidentiary value at the time such that they were collected. If this is an issue, I'm sure they could ask

questions in deposition, you know, what did you do with the bricks and rocks, and I think the answer would be --

THE COURT: That seems fair.

The firework, the District's position with regard to the specific incident involving the individual officer seems to be that this was a firework thrown. That too wasn't seized?

The other items seem less likely to have been seized if there was not a criminal case, but can you confirm whether there is a firework anywhere?

MR. SOBIECKI: Well, so there were many questions. To Your Honor's question, the firework in question that exploded, no, I don't think there was anything to collect with regard to that.

So I think this is referring to -- I know in other instances, they did find a backpack with fireworks in it and stuff like that.

THE COURT: All right. Well, on this issue, Ms. Gorin, I'm going to suggest that you ask the question in a deposition, and if that doesn't satisfactorily answer the question, you can come back on this one.

MS. GORIN: Thank you, Your Honor.

THE COURT: All right. Moving on down to issue number 9, the missing use of force reports, the District is contesting that there's any missing reports, but the plaintiffs are pointing out that -- they're not sure they have all of the

reports from the 24 officers.

So, Mr. Sobiecki, do you have any more fulsome response other than whatever exists would have been attached to the IAD report?

MR. SOBIECKI: Just some context, Your Honor. I know it's been five years, but these were extreme riotous conditions. There were many uses of force. And I think in that context, maybe there might not have been a 901-M, but I have asked repeatedly to the individuals in the know, knowledgeable of my client, are there any 901-Ms, and I have been repeatedly told if we have any, they're attached to the report.

So I don't know what else I would attempt to do beyond an e-mail search or something along those lines. But this is where I've been repeatedly told they would be found, and there are 901-Ms attached, and the entire incident is on video.

THE COURT: Ms. Gorin?

MS. GORIN: Yes. So this goes back to a similar issue of the IAD report stating that certain things are attached. In this case, it says that nine officers who used force completed 901-M forms. We know just from the general orders of the MPD that officers are required to complete those forms.

So that, plus the fact that only one 901-M form was produced to us as attached to the IAD form raises a question as to where the other ones went if the IAD report says that they were completed. Again, we would like an explanation of, if they

existed and were attached to the IAD report or elsewhere and they no longer exist, an explanation of why that is and where they may have gone.

MR. SOBIECKI: Your Honor, I think I have explained in that this is -- the internal order they're referring to is in the context of a single officer on the street uses force to arrest an individual. Here, we have an instance where it was an official directed use of force, which is why the commanding officer completed the 901-M. So it's not the case that every single officer there would complete a 901-M.

So again, it could be that those officers were referring to a 901-M being completed, meaning it was done for their use of force by the commanding officer. But it's not unusual or surprising that there's only a single 901-M completed by the commanding official.

THE COURT: And are these officers who will be deposed?

MR. SOBIECKI: I don't think they're defendants, Your Honor, the individuals we're talking about. I guess that doesn't answer your question.

THE COURT: Yeah, your hypotheses seem -- hypothesis seems correct. It would be nice to confirm with these officers that that's the reason for the discrepancy.

MR. SOBIECKI: Your Honor, if it would help resolve it, if they can send a list of the officers they're referring

to, I can reach out to these officers on an individual basis and ask if they recall specifically filling out a 901-M.

THE COURT: All right. Can you do that, Ms. Gorin?

MS. GORIN: Yes. We would just essentially like confirmation of if, again if they existed attached to the IAD report, which says that they were completed, if they were completed and they're not attached, why that is.

Again, if they could check with the Internal Affairs Department and their files again because they reference having these in their files.

THE COURT: Mr. Sobiecki, am I correct that you say you've exhausted the internal affairs source?

MR. SOBIECKI: Your Honor, I've asked several times. I will ask again.

THE COURT: Okay. All right. I appreciate that.

Issue number 10, this ties in to some of the earlier requests all surrounding the report.

Just let me say generally, as I see these discovery disputes with respect to the IAD reports, it seems that the plaintiffs are entitled to the underlying evidence, photographs, et cetera. I'm not sure the plaintiffs have made a showing at this point of such bad faith that they're entitled to essentially do an audit of internal affairs.

Mr. Sobiecki, can you tell me whether -- the depth of what the internal affairs relied upon in terms of evidence preparing

this report?

MR. SOBIECKI: Sure. First, I want to say, Your Honor, the IAG report focused on officers who used force. Nine of our ten individual defendants didn't use any force. So in terms of the IAD report bearing on the actions of those individual defendants, it's going to be nil, because it's not assessing their conduct at all.

Now, in terms of the IAD report, this report itself is not focused just on this incident. It covers several incidents over June 1. So there's a lot more information in here that has nothing to do with plaintiffs' claim.

But I would analogize it to discovery in a lawsuit. Officers go out looking for CCTV. Civil complaints, a lot of people, civilians have complaints about what happened. They go out and interview these people. They interview the officers. They review the BWC. So I think a lot -- and then they cull that down into a report.

So what they're relying on primarily is the BWC and the officer statements, which plaintiffs have. So if you go beyond that, they're essentially asking for kind of the entire case file, which may include a lot of confidential information. I have to go through and look at redacting. I'm just not sure what this universe of material, what light that will shed on what happened that is not already again contained in the video of this event.

THE COURT: Well, let me ask you in particular -- and as I see it, this relates to issue 4 and issue 5 and 6, as well as issue 10. But issue 4, the missing interviews, the District responds it's produced recorded interviews with individual defendants to the extent they exist.

What more do the plaintiffs want?

MS. GORIN: In terms of issue 4, if we are staying with that one, as we've described, there are missing recorded interviews. We have received three out of, I believe, 18 that were reported to have occurred. We don't see why there would be any sort of burden in producing these other recorded interviews from the same place that they have pulled and produced the other three.

THE COURT: But isn't this to Mr. Sobiecki's point, that the report is much broader than anything related to this incident?

MS. GORIN: I don't see why that is an issue here. I think the recorded interviews, even if they have other more wide-ranging statements about other things or other times of the protest, they would still have contemporaneous accounts or statements by officers that would definitely bear on what happened on June 1st during the time period and might bear on plaintiffs' claims. So whether we have to go -- if there's an issue of confidentiality in some way, in my mind, all of them would relate to this incident. And if there is anything more

wide ranging, it could be -- obviously would not be used.

THE COURT: Well, Mr. Sobiecki, can you explain how the three out of the 18 individuals, how did you make that determination?

MR. SOBIECKI: They're defendants. That was the principal.

I'm not pulling a burden argument here. There's a voluminous number of discovery requests, Your Honor. I do feel like I have to -- I have some rights under Rule 26 and proportionality and need to start drawing some lines.

The request is for all the recorded interviews without any sort of, you know, basis. And so that is my -- I said okay, I will give you the recorded interviews of the individual defendants.

But once we go beyond that, my question is kind of why, why are these other individuals' interviews relevant beyond -- again, everything is on the video. We have the IAD report, all this other voluminous information. Why do I now need to go and get even more?

THE COURT: Ms. Gorin, at least at this stage, I am inclined to agree with the District on this. Maybe you can convince me otherwise in the future, but based on what I've heard so far, I'm not inclined to order them to produce all of the underlying interviews in light of how Mr. Sobiecki describes the report.

MS. GORIN: Just to clarify, I know we're talking about issue 4 --

THE COURT: I want to make sure I'm addressing all the issues. So that goes to issue 4. At least at this point, I'm not requiring the District to do more with regard to the internal affairs recorded interviews.

With respect to issue 5, how do you respond to his point about the multiple events that occurred across the District on June 1 that have nothing to do with this particular incident?

MS. GORIN: Again, what we're seeking are the contemporaneous statements of officers whose statements would be included in these files that would bear on what happened during the incident at issue. I understand that they would include, you know, something beyond those parameters, and that is the nature of these reports. I understand they aren't chopped into event 1, event 2, event 3.

But even so, because these are again contemporaneous statements that plaintiffs wouldn't otherwise have access to, things that bear on very probably contested and very critical factual issues relating to the actual environment of the protest, whether there was actually a riot, because it bears on those issues, I think we have met the relevance threshold for these items.

THE COURT: Other than your point about this covering multiple events across June 1, is there anything more you want

to say?

MR. SOBIECKI: I guess it's clear to me now in light of that what they're actually asking for. When they ask for the investigative file, I interpret that to mean all of the materials that the IAD officers considered in compiling their report.

If they're just looking for the other recorded statements and I can remove 4, 5, and 6 by giving them the statements, I would do that. But what they're seeking is much broader. They want the operations manual. They want to know how the report was done.

THE COURT: That, I'm not going to order. That's too far. I don't think they've established a basis for the Court to order the District to produce all of that.

But to the extent you could produce the reports, that perhaps would be a good compromise here.

MR. SOBIECKI: You mean the recorded -- I think all they're missing was the recorded interviews of those other 15 individuals. I guess under their theory, it seems to turn on the use of the word "riot" and kind of what they were meaning. I'm not sure why use of that term is at all relevant here, but if that will help resolve this dispute over the IAD investigation, I would be willing to do that.

THE COURT: All right. Ms. Gorin, that's all I'm going to require the District to produce now.

MS. GORIN: Thank you, Your Honor.

THE COURT: If you discover something more in the future and you want to come back, you may do so.

Where are we?

MR. SOBIECKI: Issue 3, I think I can resolve that pretty quickly.

THE COURT: Okay.

MR. SOBIECKI: For one, there are none. We didn't actually meet and confer about this. I got a letter. I asked why they think there are additional radio runs. I didn't get an answer. So that's point 1. That's all I have.

Point 2, each CDU is a small group of officers. That small group of officers aren't communicating over their own channel. That would be chaos. Everyone is on the same channel so the command official can give orders that everyone hears, and that is verbally distributed among individuals.

I don't have any more radio runs, and I'm explaining why it's just the SOB channels that were used.

THE COURT: Okay. Ms. Gorin, does that satisfy you?

Well, wait. Mr. Sobiecki, what about the 18 minutes? Can you discuss that?

MR. SOBIECKI: I did. I explained it. What I think -- and I have not been provided the specific things, but the radio run is condensed, Your Honor, to eliminate the dead air. It is not a chronological summary of what happened. So

it's not surprising to me that there would be a discrepancy between realtime and kind of if you were to kind of listen to the radio and try to match that up to realtime.

And I think that's what they're referring to, but I will just say, the SOB channel, I've produced it in a bunch of cases. I haven't had any issues raised with it before. I've given them what I have for the radio channel that night. And I've done it several times. I don't have anything else to give them.

THE COURT: All right. Ms. Gorin? In light of that, I'm not inclined to order more here.

MS. GORIN: May I respond?

THE COURT: Yes, you may respond.

MS. GORIN: Thank you. I would note first that from our understanding, the radio run that we have includes time signature, and when we are able to match that up, it does still show that the recording is 18 minutes shorter than the time signature that we have in the summary of the radio runs. The IAD reported that it reviewed a recording that is 18 minutes longer than what we have received.

I would also say that if that recording is dead air, I don't see an issue with the defendants handing that over, if it really is nothing. However, from our perspective, we haven't seen it. We don't have it. We do not feel obligated to simply take their word for it that there would be nothing relevant in those 18 minutes.

And so I think to the extent that that exists, they should be -- they should turn that over.

THE COURT: Mr. Sobiecki?

MR. SOBIECKI: It does not exist, Your Honor. It's not like there are two recordings, one that is compressed and one that is not. My understanding is that's how it's created. When it comes off the assembly line, this is the radio run that we have. No one is going in there and kind of cutting it up.

THE COURT: So there's no alternative version of this to produce?

MR. SOBIECKI: Again, I can't explain why the IAD report -- I mean, I take plaintiffs at their word that there's a discrepancy. If they want to point it out to me, I will take a look at it. But again, this is the channel that was used. We have one recording. It's been produced.

THE COURT: Okay. Well, Ms. Gorin, you can point out and provide a little more detail to Mr. Sobiecki. It sounds like there's nothing more there. Perhaps it could be a typo?

MS. GORIN: That's what we are --

MR. SOBIECKI: It could be --

THE COURT: Well, Mr. Sobiecki, they are going to give you some more details. And just hear them out and make sure that your response here doesn't need to be modified.

All right. With respect to issue 1, and this is the list of BFO officers present, the District's position is that it's

consulted all resources it has to figure out who is present. The plaintiffs are suggesting that these individuals may be able to identify the officers by reviewing body-worn camera footage.

Mr. Sobiecki, what can you say about that request?

MR. SOBIECKI: Well, I mean, Your Honor, based on the video, you can see approximately the number of officers that are there at this intersection, 50, maybe 60. We produced at least half of the BWC, which means we know that those officers were there.

So I guess I have two points. One, I'm not sure why identifying additional officers, what new information or how that is going to advance the case, again given that everything is on video. It's not as if these witnesses are going to be interpreting things. They already know all of the command officials who were there, including several sergeants. I think we're now into the universe of officers.

But more to the point where Your Honor started, I don't -- this was a full mobilization time. There just isn't a way -- if they want to depose Chief Carroll and give him a list of officers and then say "five years ago do you remember who else was there," I mean, they can do that, but I don't have -- I don't think I should have to go and interview all of the officers there and say "who else do you remember five years ago was standing next to you on the line" when they already have video of all these officers.

THE COURT: Ms. Gorin?

MS. GORIN: I would say first, the point about video, part of the reason why we want the complete list is to ensure that we have all of the video that would be useful, noting that we think all of the BWC that exists from this incident would be useful and relevant.

What we are asking is for the command officer and sergeant defendants to tell us from the best of their recollection through, you know, reasonable means, from recollection, from taking a look at the video, to -- again, to give us a list. I don't think that would be overly burdensome.

From our review of the BWC that we have received so far, it's difficult to identify people, especially from our perspective as we don't know them, because that is -- as Mr. Sobiecki mentioned, people are moving around. It's not clear --

THE COURT: So why isn't deposing Chief Carroll a way to go here?

MS. GORIN: It could be. However, I think we have this discovery request, and the relevance threshold for discovery requests are quite low. I think we have met that relevance threshold. And so defendants do have an obligation to make reasonable inquiries.

We also have put interrogatories to Chief Carroll, but again, I think the District has obligations.

MR. SOBIECKI: Your Honor, I will push back with proportionality and burden. These officers were all wearing masks. They are several ranks below Chief Carroll. The idea that he is going to say "I remember Officer Jones who was on the left side of the intersection," and to what end? What information then -- I can discuss how we identified the BWC, and I think that's fulsome, but I think it is unduly burdensome, given the marginal value, for me to go and kind of take up Chief Carroll's time and interview him over who -- he's not going to remember.

THE COURT: I thought you suggested them asking?

MR. SOBIECKI: No, they can ask. I thought they were saying that I should be the one.

THE COURT: Well, through interrogatories, why can't you do that for the interrogatories?

MR. SOBIECKI: Oh, okay. If there's -- I don't recall their interrogatories offhand, but if there is one that asks -- and if they want to take up one of the 25 and have me go ask Chief Carroll if he remembers anyone, I can do that.

THE COURT: Ms. Gorin, is that what you're asking for? It sounds like there's no paper or no document that exists that they could provide to you.

MR. SOBIECKI: That's correct.

THE COURT: Is that what you're asking?

MS. GORIN: I think again, as long as they are able to

make a reasonable inquiry in response to our request, whether that is through these requests or interrogatories, we would be seeking full answers from defendant Carroll and all the others.

THE COURT: Okay. Very well, then. If there are no documents, then you can proceed that way, by interrogatory.

All right. Issue -- what's left? 2, the alleged missing body-worn camera footage.

Mr. Sobiecki, this is obviously relevant, but what's your response here? That you provided everything that you need to?

MR. SOBIECKI: Your Honor, I guess we are coming at it two ways. They say only 57, and I say 57. I mean, this is a -- it's just one intersection that we're recovering here. They have a dozen officers at each side of the intersection.

The theoretical idea of this other BWC -- and I've looked at this other 29, and half of those officers don't have BWC. Another six or so, the BWC starts after 7:00. So I already whittled it down.

But again, I do feel like I need to start drawing lines, because 57 BWCs seems to me more than enough to reflect what happened at a single intersection over a 30-minute period. And I never said no absolutely to them. I said hey, if there's an angle or there's something you're missing, I'll work with you to try to identify it. But I disagree that any and all BWC -- that I have an obligation to produce any and all simply because they ask for it.

Let me just say, how I identified it -- excuse me, Your Honor, for getting in the weeds, but when an officer activates his BWC, it pings their geolocation. Now, if they're in a different location, they are at Dupont Circle, activate it, and they walk to the White House, my search isn't going to pick them up. But I took that intersection of 17th and H. I took a two-block radius around it and looked for anyone who activated their BWC between 6:00 and 7:00.

And I got a long list of officers. I looked through that. Some of them had moved on. Others had not. But I ended up with 50-plus videos, and I have yet to hear beyond the theoretical what information is missing from those 57 videos.

THE COURT: Wait. How many did you produce?

MR. SOBIECKI: I think I produced -- plaintiffs say that I produced at least 57.

THE COURT: So there's a total of how many? 86?

MR. SOBIECKI: I'm not sure where they got the number. I looked at -- I found where they got that list. It was 29. Half of those officers don't have BWC, or at least it's not in the system. So I don't have it.

And then another issue, Your Honor, is -- again, apologies. Two or three of the officers proceed to make an arrest. And so we didn't produce that because that gets into juvenile potentially confidential information. I need to redact that information, or else -- because -- if I could cut off the arrest

of -- it was individuals arrested for curfew, attachments 1, 2, and 3 of the IAD report. It has nothing to do with the events at issue, but it gets into the burden. Given that I've produced 57, how much effort do I have to go through to produce another six to ten?

THE COURT: So you're saying of the 29 the plaintiffs claim they don't have, you're saying half of those don't exist because there was no body camera footage for those officers?

MR. SOBIECKI: That is right. One officer we couldn't find. It's thereabouts, Your Honor.

THE COURT: So we're talking about 15 videos roughly that you could produce that you say are unduly burdensome because these officers were involved in arrests?

MR. SOBIECKI: Well, not proportional. There is a burden. I've got to watch all of these videos. I know we're talking about 15, but I've already looked through 57. So I do think that entire burden should be taken into account.

THE COURT: When you say you've watched 57 of these, are these for the whole day, or are these for the hour?

MR. SOBIECKI: Well, it goes on. It's not for the whole day. Most of the officers click on around 6:15, and then they go to, you know, 7:15, 7:30. So it's still 60, 70 hours of BWC watching.

THE COURT: And why do you think that there are juveniles in all of these body-worn camera videos?

MR. SOBIECKI: I have to check, but again, Your Honor, just taking into account the burden as I'm going through these 60, 70 videos when I have 60 that I'm ready to produce, it does seem unduly burdensome for me to investigate and potentially redact two of the videos when they're not providing any additional information.

THE COURT: Are you confident that the 57 videos you provided give every angle of that two-block area for that evening?

MR. SOBIECKI: Yes, I am very confident.

Look, here's my proposal. So I'm looking at the 29. Nine don't have BWC. So I'm down to 20. One had BWC, but it's been deleted. So we're down to 19. One of the officers did not come up in our search -- well, I have a list here from my colleague that says there are 14 outstanding videos. If I can not produce the two that concern the arrest and I can end this BWC issue, I will produce the other 11.

THE COURT: All right. Ms. Gorin, what do you think about that proposal?

MS. GORIN: I would say to begin with that our understanding of the arrests that took place during the incident are reflected in the IAD report, and that reflects the individuals' full names, which would indicate they were not minors. So we can take that review off the plate.

However, that doesn't get us anywhere, then. We are

seeking all of the BWC. We think it's relevant. Again, we should not have take the District's -- however confident they are that we aren't missing anything, obviously we don't know what we don't know from the BWC. We know that it's naturally going to show something different, because every perspective is different, but noting that we do think all of this is relevant.

I will leave it at that.

THE COURT: All right. Mr. Sobiecki, I think I am going to order you to produce the outstanding body-worn camera.

MR. SOBIECKI: Sure, Your Honor.

THE COURT: All right. Does that take care of everything? Have I covered all the issues?

MR. SOBIECKI: It wasn't my call. So I don't have anything further, Your Honor.

THE COURT: Ms. Gorin?

MS. GORIN: Yes, I believe you've covered everything. Thank you.

THE COURT: All right. Okay, Counsel. I appreciate your willingness to try to work through these issues. If there continue to be ongoing issues, I remain available for discovery disputes, but I again would ask you not to file motions but to go through this process. It's a lot more efficient than getting briefing and all of that if we can avoid it. I would appreciate it.

All right. Anything more?

MS. GORIN: No, Your Honor.

MR. SOBIECKI: No, Your Honor.

THE COURT: Thank you.

(Proceedings adjourned at 2:37 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                November 22, 2025

SIGNATURE OF COURT REPORTER                DATE